SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE
--------------------------------------------------------------------X
DAVID VANN,

                                            Plaintiffs,

                        -against-

THE CITY OF ROCHESTER, a municipal entity,
POLICE OFFICER MATTHEW DRAKE, IBM # 1956,
POLICE OFFICER STEVEN MITCHELL, IBM # 2134,
POLICE OFFICER JEFFREY KESTER, IBM # 2230,
POLICE OFFICER CHRISTOPHER J. BARBER, IBM
# 1949, POLICE OFFICER DAVID E. KEPHART, IBM
# 2074, INVESTIGATOR TOMESHA ANGELO, IBM
# 1665, TECHNICIAN STEPHANIE MINTZ, IBM #
2496, SERGEANT DANIEL J. ZIMMERMAN, IBM #
295, Police Officers "JOHN DOES 1-6" (whose names
are currently unknown, but who are described in the
complaint and in pictures attached to the complaint as
exhibits), Police Officers "JOHN DOES 7-12" (names
and number of whom are unknown at present), and other
unidentified members of the Rochester Police
Department,

                                            Defendants.
--------------------------------------------------------------------X

**SUMMONS**

Index No.:

The basis of venue is:
Location of the incident

Plaintiff designates Monroe
County as the place of trial.

**To the above named Defendants:**

        **You are hereby summoned** to answer the complaint in this action, and to serve a copy
of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance on the Plaintiff's attorneys within twenty days after the service of this summons,
exclusive of the day of service, where service is made by delivery upon you personally within
the state, or, within 30 days after completion of service where service is made in any other
manner.  In case of your failure to appear or answer, judgment will be taken against you by
default for the relief demanded in the complaint.

DATED: New York, New York
        May 16, 2018

                                            Yours, etc.,

                                            ROTH & ROTH, LLP.
                                            ELLIOT SHIELDS, ESQ.
                                            Attorney for Plaintiff

192 Lexington Ave, Suite 802
New York, New York 10016
(212) 245-1020


TO:
CITY OF ROCHESTER
CORPORATION COUNSEL
30 Church Street
Rochester, New York 14614

POLICE OFFICER MATTHEW DRAKE, IBM # 1956,
POLICE OFFICER STEVEN MITCHELL, IBM # 2134,
POLICE OFFICER JEFFREY KESTER, IBM # 2230,
POLICE OFFICER CHRISTOPHER J. BARBER, IBM # 1949,
POLICE OFFICER DAVID E. KEPHART, IBM # 2074,
INVESTIGATOR TOMESHA ANGELO, IBM # 1665,
TECHNICIAN STEPHANIE MINTZ, IBM # 2496,
SERGEANT DANIEL J. ZIMMERMAN, IBM # 295
185 Exchange Blvd
Rochester, New York 14614

- 2 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE
-------------------------------------------------------------------X
DAVID VANN,

                                Plaintiffs,

              -against-

THE CITY OF ROCHESTER, a municipal entity,
POLICE OFFICER MATTHEW DRAKE, IBM # 1956,
POLICE OFFICER STEVEN MITCHELL, IBM # 2134,
POLICE OFFICER JEFFREY KESTER, IBM # 2230,
POLICE OFFICER CHRISTOPHER J. BARBER, IBM
# 1949, POLICE OFFICER DAVID E. KEPHART, IBM
# 2074, INVESTIGATOR TOMESHA ANGELO, IBM
# 1665, TECHNICIAN STEPHANIE MINTZ, IBM #
2496, SERGEANT DANIEL J. ZIMMERMAN, IBM #
295, Police Officers "JOHN DOES 1-6" (whose names
are currently unknown, but who are described in the
complaint and in pictures attached to the complaint as
exhibits), Police Officers "JOHN DOES 7-12" (names
and number of whom are unknown at present), and other
unidentified members of the Rochester Police
Department,

                              Defendants.
-------------------------------------------------------------------X

**INDEX NO.:**

**VERIFIED COMPLAINT**
**[JURY TRIAL DEMANDED]**

       Plaintiff DAVID VANN, by his attorneys, ROTH & ROTH, LLP, complaining of the

defendants, respectfully allege as follows:

## I.     <u>PRELIMINARY STATEMENT</u>

       1.       This is a civil rights action against the City of Rochester ("City") based on and

arising out of the wrongful acts and omissions of the Rochester Police Department ("Police

Department" and "RPD") and certain of the employees and agents of the RPD, and against

named individual employees and agents of the RPD, in which the plaintiff seeks relief for the

violation of his rights secured by the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Sections

1981, 1983 and 1985, of his rights secured by the Fourth, Fifth, Sixth, Ninth, Thirteenth and

Fourteenth Amendments to the United States Constitution, and of his rights secured under the laws and Constitution of the State of New York.

2.      The Plaintiff, Mr. David Vann, seeks damages, both compensatory and punitive, and award of costs and attorneys' fees, and such other and further relief as this court deems just and proper, for injuries resulting from an incident that occurred on September 4, 2015, wherein Mr. Vann was falsely arrested, placed in handcuffs, and then brutally beaten after he was handcuffed by defendant RPD officers JEFFREY KESTER, MATTHEW DRAKE, and STEVEN MITCHELL. Mr. Vann seeks additional recovery against KESTER, DRAKE, MITCHELL and the other defendant RPD officers for fabricating evidence against him, for coercing witnesses to sign false sworn statements, for suppressing and destroying evidence favorable to Mr. Vann, and for initiating and continuing his malicious prosecution based upon allegations in felony complaints and witness statements they *knew* were false. Mr. Vann also seeks recovery based on defendants' false testimony at the grand jury and petit jury.

3.      As a result of the false arrest and defendants' fabrication of evidence, Mr. Vann was held in solitary confinement for approximately one month, detained for over four months, and maliciously prosecuted for over 17 months. Eventually, Mr. Vann was acquitted on all charges on February 16, 2017, after a three-day jury trial. At trial, Mr. Vann did not even put on any proof, but instead his attorney simply cross examined KESTER, DRAKE and MITCHELL with security camera videos that defendants collected on the night of the incident, which showed the officers testimony was untrue and that Mr. Vann had not committed any crime.

4.      This lawsuit seeks to hold the defendant CITY OF ROCHESTER liable for the above misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell* v. *Dept. Of Social Services*, 436 U.S. 658 (1978). The unlawful actions of police officers, investigators and

- 4 -

technicians documented in this lawsuit resulted from affirmative or *de facto* municipal policies, practices and customs to violate the constitutional rights of arrestees, and from deliberate indifference by policy-making officials, acting on behalf of the City of Rochester to such violations. As Plaintiff will demonstrate, the RPD, as a matter of policy, deliberately fails to discipline officers who use excessive force, and instead instructs officers to fabricate evidence against arrestees to falsely charge them with crimes they did not commit, to suppress and destroy evidence favorable to arestees and criminal defendants, and to testify falsely in court to cover up their unlawful behavior. In the rare case where such misconduct has been exposed through video recordings and/or court proceedings, as in this case, the City and RPD have taken no disciplinary action against the offending employees, but instead praised and promoted them, thereby encouraging future constitutional violations to occur, including those directed against Mr. Vann.

5.      The principle individual policymaking official of the City who caused Plaintiff's constitutional deprivations by the individual defendant RPD officers was former RPD Chief James Sheppard, who established an unlawful municipal policy of failing to discipline officers who use excessive force, even when the unlawfulness of the force used was clearly demonstrated by video evidence. Chief Sheppard directed and encouraged officers to fabricate evidence in the form of swearing to false written statements, coercing witnesses to sign false written statements, and to testify falsely in court proceedings in order to conceal the unlawfulness of their conduct. Current RPD Chief Michael Ciminelli has ratified and continued these unlawful municipal policies.

6.      The grounds for this action arise out of these wrongful, unlawful, and improper acts of these defendants, including, without limitation, false arrest, excessive force, creation and perpetuation of false evidence and conspiracy to create and perpetuate false evidence,

suppression and concealment of exculpatory evidence and conspiracy to suppress and conceal exculpatory evidence, malicious prosecution, and denial of fair trial.

## II. PARTIES

7.       Plaintiff DAVID VANN is a citizen of the United States and a resident of the County of Monroe, State of New York.

8.       Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

9.       Defendants Rochester Police Department ("RPD") POLICE OFFICER ("P.O.") MATTHEW DRAKE ("DRAKE") (IBM # 1956), P.O. STEVEN MITCHELL ("MITCHELL") (IBM # 2134), P.O. JEFFREY KESTER ("KESTER") (IBM # 2230), P.O. CHRISTOPHER J. BARBER ("BARBER")(IBM # 1949), P.O. DAVID E. KEPHART ("KEPHART")(IBM # 2074), INVESTIGATOR TOMESHA ANGELO ("ANGELO")(IBM # 1665), TECHNICIAN STEPHANIE MINTZ ("MINTZ")(IBM # 2496), SERGEANT DANIEL J. ZIMMERMAN ("ZIMMERMAN")(IBM # 295), JOHN DOES NOS. 1-6 (whose names are currently unknown, but who are described in the complaint below and in pictures attached as exhibits to the complaint) and JOHN DOES 7–12 ("John Does", the names and number of whom are currently unknown) (collectively, "Defendant RPD Officers," individually, "Defendant RPD Officer"), are and were at all times relevant herein, officers, employees and agents of the Defendant City and the RPD. The Defendant RPD Officers are being sued in their individual and official capacities.

10.     JOHN DOE NO. 1, whose actual name is unknown at this time, arrived at the scene according to the date and time stamp on the security camera videos defendants collected from the A&Z Market on the night of the incident at approximately "09-04-2015 11:42:48 PM."[1] JOHN DOE NO. 1 is depicted in Exhibit "A."

11.     Upon information and belief, John Doe No. 1 is in fact P.O. DAVID E. KEPHART.

12.     Upon information and belief, John Doe No. 1 is in fact P.O. CHRISTOPHER J. BARBER.

13.     Upon information and belief, John Doe No. 1 is in fact SERGEANT DANIEL J. ZIMMERMAN.

14.     JOHN DOE No. 2, whose actual name is unknown at this time, arrived at the scene in the same RPD vehicle as JOHN DOE No. 3, in which JOHN DOE No. 2 was in the front passenger's seat and JOHN DOE No. 3 was the driver. According to the date and time stamp on the security camera videos defendants collected from the A&Z Market on the night of the incident, JOHN DOES NO. 2 and 3 arrived on the scene at approximately "09-04-2015 11:43:00 PM." JOHN DOE NO. 2 is depicted in Exhibit "B," and JOHN DOE NO. 3 is depicted in Exhibit "C".

15.     Upon information and belief, John Doe No. 2 is in fact P.O. CHRISTOPHER J. BARBER.

16.     Upon information and belief, John Doe No. 2 is in fact P.O. DAVID E. KEPHART.

---

[1] In Mr. Vann's criminal prosecution, defendants claimed the time stamp on the video is 13 minutes fast.

17.     Upon information and belief, John Doe No. 2 is in fact SERGEANT DANIEL J. ZIMMERMAN.

18.     Upon information and belief, John Doe No. 3 is in fact P.O. DAVID E. KEPHART.

19.     Upon information and belief, John Doe No. 3 is in fact P.O. CHRISTOPHER J. BARBER.

20.     Upon information and belief, John Doe No. 3 is in fact SERGEANT DANIEL J. ZIMMERMAN.

21.     JOHN DOE # 4, whose actual name is unknown at this time, arrived at the scene according to the date and time stamp on the security camera videos defendants collected from the A&Z Market on the night of the incident at approximately "09-04-2015 11:42:59 PM." JOHN DOE NO. 4 arrived alone in an RPD vehicle, and immediately attended to defendant KESTER, who was sitting on the ground. JOHN DOE NO. 4 is depicted in Exhibit "D."

22.     Upon information and belief, John Doe No. 4 is in fact P.O. DAVID E. KEPHART.

23.     Upon information and belief, John Doe No. 4 is in fact P.O. CHRISTOPHER J. BARBER.

24.     Upon information and belief, John Doe No. 4 is in fact SERGEANT DANIEL J. ZIMMERMAN.

25.     JOHN DOE # 5, whose actual name is unknown at this time, arrived at the scene according to the date and time stamp on the security camera videos defendants collected from the A&Z Market on the night of the incident at approximately "09-04-2015 11:43:07 PM." JOHN

DOE NO. 5 arrived alone in an RPD vehicle, and appeared to a supervisor because he began ordering other officers around. JOHN DOE NO. 5 is depicted in Exhibit "E."

26.     Upon information and belief, John Doe No. 5 is in fact SERGEANT DANIEL J. ZIMMERMAN.

27.     Upon information and belief, John Doe No. 5 is in fact P.O. DAVID E. KEPHART.

28.     Upon information and belief, John Doe No. 5 is in fact P.O. CHRISTOPHER J. BARBER.

29.     JOHN DOE # 6, whose actual name is unknown at this time, arrived at the scene according to the date and time stamp on the security camera videos defendants collected from the A&Z Market on the night of the incident at approximately "09-04-2015 11:44:22 PM." JOHN DOE NO. 6 is believed to have arrived alone in an RPD vehicle, and he immediately walked to the back of MITCHELL's vehicle, where MITCHELL was holding plaintiff's hands above his head behind his back, and JOHN DOE NOS. 2, 3 and 5 are standing around looking on. JOHN DOE NO. 6 is depicted in Exhibit "F."

30.     Upon information and belief, John Doe No. 6 is in fact P.O. CHRISTOPHER J. BARBER.

31.     Upon information and belief, John Doe No. 6 is in fact SERGEANT DANIEL J. ZIMMERMAN.

32.     Upon information and belief, John Doe No. 6 is in fact P.O. DAVID E. KEPHART.

33.     At all times relevant herein, MITCHELL was the Defensive Tactic Instructor for the RPD, which involves training recruits in everything from handcuffing up through the

escalation of force chart. At all times relevant herein, MITCHELL was also a Field Training

Officer for the RPD, which involves hands-on training of new officers in the field after they

graduate from the police academy. As both the Defensive Tactics Instructor and a Field Training

Officer for the RPD, MITCHELL is a municipal policymaker with respect to the RPD's use of

force policies and training.

34.     At all times relevant herein, the individual Defendant RPD Officers were acting

under color of state law in the course and scope of their duties and functions as agents, servants,

employees and officers of the Defendant CITY OF ROCHESTER, and otherwise performed and

engaged in conduct incidental to the performance of their lawful functions in the course of their

duties. They were acting for and on behalf of the RPD at all times relevant herein, with the

power and authority vested in them as officers, agents and employees of the RPD and incidental

to the lawful pursuit of their duties as officers, employees and agents of the RPD.

35.     The individual Defendant RPD OFFICERS' acts hereafter complained of were

carried out intentionally, recklessly, with malice, and in gross disregard of plaintiff's rights.

36.     At all relevant times, the individual defendants were engaged in joint ventures,

assisting each other in performing the various actions described herein and lending their physical

presence in support and the authority of their offices to one another.

37.     This action falls within one or more of the exceptions as set forth in CPLR

Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having

acted in reckless disregard for the safety of others, as well as having performed intentional acts.

38.     Plaintiff sustained damages in an amount in excess of the jurisdictional limits of

all the lower Courts of the State of New York.

- 10 -

39.     Plaintiff in furtherance of his causes of action brought pursuant to New York State law filed a timely Notice of Claim against the City, in compliance with the Municipal Law § 50.

40.     More than thirty (30) days have elapsed since service of said Notice of Claim was filed and the City has failed to pay or adjust the claim.

41.     This action is being brought within a year and 90 days of the event that gives rise to Plaintiff's causes of action under New York State law.

## III.  STATEMENT OF FACTS

### A.  Allegations Common to All Causes of Action

42.     On September 4, 2015, at approximately 11:00 p.m., the Plaintiff, Mr. David Vann, was lawfully present inside a convenience store known as A & Z Market, located at 439 South Avenue, Rochester, Rochester, New York. (the "store").

43.     On September 4, 2015, the store had four properly functioning video surveillance cameras.

44.     On September 4, 2015, at approximately 11:00 p.m., Mr. Vann handed the store's owner, "Rafiq", cash to purchase a an individual cigarette, a/k/a a "loosie", which the store sold for $0.75.

45.     Rafiq shortchanged Mr. Vann by approximately $7.00.

46.     Mr. Vann requested the remainder of his change, but Rafiq refused.

47.     When Mr. Vann again requested his change, a store employee, "D.A.", assaulted Mr. Vann and pushed him out of the store.

48.     Mr. Vann left the store and began walking home.

- 11 -

49.     While Mr. Vann was walking home, D.A. exited the store and invited him to come back into the store to get his change.

50.     Mr. Vann accepted D.A.'s invitation to go back into the store because he hoped to get his change.

51.     Shortly thereafter, defendant RPD officer MATTHEW DRAKE arrived at the store.

52.     Mr. Vann complained to DRAKE that he was short changed by Rafiq, the owner.

53.     Mr. Vann complained to DRAKE that Rafiq refused to return his proper change.

54.     Mr. Vann complained to DRAKE that when he again requested his change, D.A., physically assaulted him and pushed him out of the store.

55.     Mr. Vann explained to DRAKE that he began to walk home, but D.A. exited the store and invited him back into the store to get his change.

56.     Mr. Vann explained to DRAKE that he just wanted his change.

57.     DRAKE took no action to ascertain whether Mr. Vann was in fact owed any change.

58.     As Mr. Vann and D.A. were speaking with DRAKE inside of the store, defendant police officer STEVEN MITCHELL arrived at the store.

59.     When MITCHELL arrived, Mr. Vann was calmly speaking to DRAKE, D.A. was standing directly next to him, and they were not blocking the entrance to the store.

60.     Defendant JEFFREY KESTER arrived while DRAKE was speaking with Mr. Vann inside of the store and MITCHELL was speaking with D.A. on the sidewalk in front of the store.

- 12 -

61.     DRAKE told Mr. Vann to follow him out of the store, and Mr. Vann immediately complied and followed DRAKE as he walked out of the store.

62.     As Mr. Vann was walking out the front door, MITCHELL detained him in the doorway and prevented him from walking out of the store onto the sidewalk.

63.     MITCHELL detained Mr. Vann in the doorway and prevented him from exiting the store onto the sidewalk for approximately one and a half minutes.

64.     Mr. Vann complained to MITCHELL, KESTER and DRAKE that he had been short changed by Rafiq, the owner.

65.     Mr. Vann complained to MITCHELL, KESTER and DRAKE that when he requested his change, D.A. physically assaulted him and pushed him out of the store.

66.     Mr. Vann explained that after D.A. assaulted him and pushed him out of the store, he began walking home, until D.A. invited him back into the store to get his change.

67.     Mr. Vann explained to MITCHELL, KESTER and DRAKE that he frequents the store on a daily basis, that he usually makes purchases with his EBT card or debit card, and that the store had been regularly overcharging him for at least several weeks.

68.     Notably, on the date of the incident, local, state and federal law enforcement authorities were wrapping up a yearlong joint investigation of the store for food stamp fraud, which culminated in its owner, Rafiq, being arrested on October 16, 2015—just over a month after this incident—and charged with Misuse of Food Stamps, a Class E Felony.

69.     In light of the ongoing fraud investigation, MITCHELL, KESTER and DRAKE knew or should have known that the store had a long history of fraudulently charging and overcharging customers.

70.     In light of the ongoing fraud investigation, MITCHELL, KESTER and DRAKE knew or should have known Mr. Vann's complaints against Rafiq and D.A. were wholly credible.

71.     Instead, when Mr. Vann told MITCHELL that he just wanted the money he was owed, MITCHELL stated to Mr. Vann, "no one gives a fuck about your money."

72.     MITCHELL ordered Mr. Vann to exit the store onto the sidewalk or he would be arrested for trespassing.

73.     Mr. Vann immediately complied with MITCHELL's order and walked out of the store onto the sidewalk.

74.     After Mr. Vann exited the store onto the sidewalk, he was immediately detained on the sidewalk by KESTER, MITCHELL, and DRAKE.

75.     After Mr. Vann exited the store onto the sidewalk, KESTER made clear through his words and actions that Mr. Vann was not free to leave.

76.     Mr. Vann was lawfully present on the sidewalk.

77.     The sidewalk in front of A & Z Market is a public place.

78.     At no time did Mr. Vann trespass inside of the store.

79.     At no time did Mr. Vann trespass on the sidewalk in front of the store.

80.     DRAKE, KESTER, and MITCHELL lacked reasonable or probable cause to believe Mr. Vann had committed or was committing any criminal act or violation.

81.     DRAKE, KESTER, and MITCHELL did not observe Mr. Vann committing any criminal act or violation.

82.     DRAKE, KESTER, and MITCHELL did not possess a warrant to search or arrest Mr. Vann.

- 14 -

83.    DRAKE, KESTER, and MITCHELL had not been provided with any information that would suggest that Mr. Vann engaged in any criminal activity.

84.    DRAKE, KESTER, and MITCHELL had not been provided with any information that would suggest to a reasonable police officer that Mr. Vann had engaged in any criminal activity.

85.    D.A. admitted to DRAKE, KESTER and MITCHELL that he had assaulted Mr. Vann.

86.    The objective facts known to DRAKE, KESTER and MITCHELL did not provide them with reasonable or probable cause to believe Mr. Vann had committed any criminal act or violation.

87.    Nevertheless, DRAKE, KESTER, and MITCHELL arrested Mr. Vann.

88.    KESTER and MITCHELL placed handcuffs upon Mr. Vann's wrists, without cause or legal justification, causing him pain to his wrists.

89.    Mr. Vann permitted MITCHELL and KESTER to place handcuffs on his wrists and did not resist arrest or resist the officers from securing the handcuffs in any way.

90.    After the handcuffs were secured upon his wrists behind his back, MITCHELL pulled Mr. Vann's hands and wrists upwards towards his head, causing Mr. Vann substantial pain, without justification or lawful purpose.

91.    KESTER then grabbed the back of Mr. Vann's neck, and dragged him head-first towards a metal bench on the sidewalk.

92.    While KESTER dragged Mr. Vann head first towards the metal bench, MITCHELL and DRAKE pushed him from behind.

93.     As a result of KESTER, MITCHELL and DRAKE's actions, Mr. Vann's head slammed into the metal bench, without justification or lawful purpose.

94.     As a result of KESTER, MITCHELL and DRAKE slamming him head first into the metal bench, Mr. Vann suffered serious physical injuries.

95.     As a result of his own actions, and the actions of MITCHELL and DRAKE, KESTER then fell onto the ground.

96.     KESTER pulled Mr. Vann down on top of him when he fell.

97.     MITCHELL also contributed to the fall by pushing Mr. Vann from behind as KESTER pulled him from the front.

98.     DRAKE also contributed to the fall by pushing Mr. Vann and MITCHELL from behind as KESTER pulled Mr. Vann from the front.

99.     Because MITCHELL was holding Mr. Vann by the handcuffs, KESTER also pulled MITCHELL down on top of him.

100.    As a result of KESTER, MITCHELL and DRAKE's actions, MITCHELL fell on top of Mr. Vann and Mr. Vann fell on top of KESTER, causing Mr. Vann to sustain serious physical injuries.

101.    As a result of KESTER, MITCHELL and DRAKE's actions, KESTER allegedly broke his leg.

102.    Mr. Vann did not contribute in any way to the fall or to causing KESTER's alleged injury.

103.    In retaliation for KESTER being injured, MITCHELL proceeded to brutally beat Mr. Vann for approximately two minutes.

- 16 -

104.    MITCHELL struck Mr. Vann in the head and/or body with a closed fist, without justification or lawful purpose.

105.    MITCHELL then searched Mr. Vann's person, including inside of his pockets and along his waist band.

106.    As a result of his search, MITCHELL knew that Mr. Vann did not possess any guns, weapons, drugs or contraband.

107.    MITCHELL grabbed Mr. Vann by the wrists / handcuffs, dragged him to his feet, and walked him to his RPD vehicle.

108.    MITCHELL slammed Mr. Vann into the RPD vehicle, without justification or lawful purpose.

109.    MITCHELL then punched Mr. Vann in the face without justification or lawful purpose.

110.    Mr. Vann was handcuffed at the time MITCHELL punched him in the face.

111.    DRAKE failed to intervene to stop and / or prevent MITCHELL's unjustified use of force against Mr. Vann, despite having been present and having had the time and a realistic opportunity to do so.

112.    Instead, DRAKE joined MITCHELL in using force against Mr. Vann without justification.

113.    DRAKE joined MITCHELL in using force against Mr. Vann in retaliation for KESTER'S injury.

114.    MITCHELL and DRAKE slammed Mr. Vann into the side of the RPD vehicle.

115.    MITCHELL and DRAKE then violently body-slammed Mr. Vann onto the sidewalk, without justification or lawful purpose.

- 17 -

116.    Mr. Vann was handcuffed and was not fighting with the officers or attempting to escape when MITCHELL and DRAKE body-slammed him onto the ground.

117.    As a result of MITCHELL and DRAKE's actions in body-slamming him onto the ground, Mr. Vann suffered serious physical injuries.

118.    As a result of MITCHELL and DRAKE's actions in body-slamming Mr. Vann onto the ground, DRAKE allegedly injured his shoulder.

119.    In retaliation for DRAKE being injured, MITCHELL continued to brutally beat Mr. Vann.

120.    MITCHELL punched Mr. Vann in the head and/or body, without justification or lawful purpose.

121.    MITCHELL then grabbed Mr. Vann by the testicles and shirt, picked him up and slammed his body face-down on the sidewalk.

122.    MITCHELL then punched Mr. Vann in the head and/or body.

123.    Mr. Vann did not resist in any way.

124.    Mr. Vann did not reach for his waistband or his pocket.

125.    Then, while Mr. Vann was the face-down on the sidewalk, handcuffed and helpless, and not physically struggling in any way, MITCHELL sprayed Mr. Vann in the face with O.C. spray for approximately five seconds from a close distance of approximately 2-3 inches, without justification or lawful purpose.

126.    MITCHELL's use of the O.C. spray violated RPD internal rules, which prohibit the use of O.C. spray for a distance of less than seven feet.

127.    MITCHELL then sat on Mr. Vann's back and held him face-down on the ground for approximately 30 seconds

- 18 -

128.    Thereafter, John Doe RPD Officer No. 1 approached the scene in his RPD vehicle.

129.    As John Doe No. 1 approached, MITCHELL rolled Mr. Vann from a face-down to a face-up position and punched him in the head and/or torso.

130.    John Does No. 2 and 3 then arrived at the scene in a marked RPD vehicle.

131.    MITCHELL and John Does 1 and 2 picked up Mr. Vann and violently body-slammed him onto the sidewalk.

132.    When MITCHELL and John Does No. 1 and 2 body-slammed Mr. Vann face-down on the sidewalk, John Doe No. 1 landed on Mr. Vann's back with the full weight and force of his body, without justification or lawful purpose.

133.    As a result of MITCHELL and John Does No. 1 and 2 body-slamming Mr. Vann face-down on the sidewalk, Mr. Vann sustained serious injuries.

134.    John Doe No. 4 and John Doe No. 5 then arrived at the scene.

135.    John Does 2 and 3 and MITCHELL held Mr. Vann on the ground while John Doe number 1 searched Mr. Vann's person, including his pockets and waistband area.

136.    As a result of the search, defendants did not find any guns, weapons, drugs or contraband.

137.    At no time did Mr. Vann possess any guns, weapons, drugs or contraband.

138.    MITCHELL and John Doe No. 3 then pulled Mr. Vann to his feet and dragged his limp body to an RPD vehicle and placed him against its side.

139.    MITCHELL then grabbed Mr. Vann by the handcuffs and wrists, and violently pulled his arms above his head, hyperextending his shoulders, without justification or lawful purpose.

- 19 -

140.     MITCHELL and John Doe No. 3 held Mr. Vann in this painful position, with his handcuffed wrists and arms extended over his head, hyperextending his shoulders, for at least 60 seconds, without justification or lawful purpose.

141.     While MITCHELL and John Doe No. 3 held Mr. Vann in this painful position, JOHN DOE NO. 6 arrived at the scene and approached the back of the RPD vehicle where MITCHELL and JOHN DOE NO. 3 were holding Mr. Vann's hands above his head.

142.     JOHN DOE NO. 2, JOHN DOE NO. 5, and JOHN DOE NO. 6. failed to intervene to stop and / or prevent MITCHELL and JOHN DOE NO. 3's unjustified use of force against Mr. Vann in holding his hands above his head, painfully hyperextending his shoulders for over a minute, despite having been present and having had the time and a realistic opportunity to do so.

143.     Mr. Vann was eventually placed in the back of MITCHELL'S RPD vehicle, where he remained for a period of time before being transported by MITCHELL and KEPHART to the Monroe County Jail against his will.

144.     After Mr. Vann was placed in the RPD vehicle, he was obviously injured and required medical attention.

145.     After Mr. Vann was placed in the RPD vehicle, he was unable to communicate and was unconscious and/or incoherent as a result of the injuries he sustained by defendants' gross use of excessive force against him while he was handcuffed.

146.     Alternatively, Mr. Vann requested medical treatment.

147.     EMS arrived at the scene and evaluated Mr. Vann while he was in the back of the police vehicle.

- 20 -

148.    EMS informed the defendant police officers that Mr. Vann needed to be transported to the hospital for medical treatment.

149.    Despite the obvious need for medical treatment, defendants refused to transport Mr. Vann to the hospital or to permit EMS to transport him to the hospital, and otherwise refused to provide him with adequate and necessary medical attention.

150.    Defendants' denial of medical treatment to Mr. Vann exacerbated his injuries.

151.    Mr. Vann arrived at the Monroe County Jail, MITCHELL, KEPHART and other defendant officers removed him from the RPD vehicle, threw him on the ground, and punched and kicked him about his head and body numerous times.

152.    Mr. Vann was then brought inside of the Monroe County Jail and placed in a holding cell.

153.    MITCHELL, KEPHART and other police officers falsely informed Monroe County Jail staff that Mr. Vann had assaulted KESTER causing him to break his leg, and assaulted DRAKE causing him to separate his shoulder.

154.    MITCHELL, KEPHART and other police officers instructed the Monroe County Jail staff to deny Mr. Vann needed medical treatment in retaliation for KESTER and DRAKE's injuries.

155.    Mr. Vann was denied needed medical treatment when he was detained at the Monroe County Jail.

156.    MITCHELL, KEPHART and other police officers instructed the Monroe County Jail staff to place Mr. Vann in solitary confinement in retaliation for KESTER and DRAKE's injuries.

- 21 -

157.   As explained more fully in sections B-D, supra, after Mr. Vann's arrest, KESTER, DRAKE and ANGELO fabricated allegations in felony complaints, which they forwarded to the Monroe County District Attorney's Office to initiate the malicious prosecution of Mr. Vann.

158.   On or about September 7, 2015, Mr. Vann was arraigned and charged with two counts of assault in the second degree, PL § 120.05(3), assault in the third degree, PL § 120.00(2), resisting arrest, PL § 205.30, and trespass, PL § 140.10.

159.   Mr. Vann was remanded to the custody of the Monroe County Jail.

160.   Mr. Vann was placed in solitary confinement at the Monroe County Jail for approximately one month.

161.   Mr. Vann informed Monroe County Jail staff that he had been diagnosed with serious medical conditions and that he needed to take the medications prescribed by his doctors.

162.   Mr. Vann's mother informed Monroe County Jail staff that he had been diagnosed with serious medical conditions and that he needed to take the medications prescribed by his doctors.

163.   Monroe County Jail staff refused to provide Mr. Vann with the proper medications prescribed by his doctors.

164.   Monroe County Jail staff refused to provide Mr. Vann the medications he was prescribed by his doctors because MITCHELL, KEPHART and other police officer defendants instructed them to retaliate against Mr. Vann because of KESTER and DRAKE's injuries.

165.   As a result of being denied his prescription medications, Mr. Vann's serious medical conditions were exacerbated.

166.    As a result of the exacerbation of Mr. Vann's serious medical conditions, after approximately one month, Mr. Vann was transferred to another facility, where he was detained against his will for approximately four months.

167.    Thereafter, on or about February 3, 2016, Mr. Vann was transferred back to the custody of the Monroe County Jail.

168.    On February 3, 2016, Mr. Vann posted bail and was released from custody.

169.    When MITCHELL, KESTER and DRAKE arrested Mr. Vann, they did not possess objective facts that supported reasonable cause to believe he committed, was committing or was about to commit a crime or offense.

170.    At no time did Mr. Vann trespass at the store.

171.    At no time did Mr. Vann trespass on the sidewalk in front of the store.

172.    At no time did Mr. Vann disobey any lawful orders issued by KESTER, DRAKE or MITCHELL.

173.    At no time did Mr. Vann resist arrest.

174.    At no time did Mr. Vann assault KESTER, DRAKE, D.A. or any other person.

175.    At no time did defendants have reasonable or probable cause to believe Mr. Vann possessed a gun, weapon, drugs, or contraband.

176.    At no time did defendants recover any guns, weapons, drugs, or contraband from Mr. Vann.

177.    At no time did Mr. Vann commit any criminal act, nor did defendants have reasonable or probable cause to believe he committed any criminal act or to charge him with any crime or violation.

178.    Defendants' arrest of Mr. Vann violated clearly established law.

- 23 -

179.     Any reasonable police officer would have known that defendants lacked reasonable or probable cause to arrest Mr. Vann.

180.     Nevertheless, ZIMMERMAN, as the supervising officer, reviewed the evidence and approved Mr. Vann's arrest.

181.     Defendants also lacked a lawful reason or any justification to use any force against Mr. Vann.

182.     All the force used against Mr. Vann occurred after he was handcuffed.

183.     At no time did Mr. Vann pose a threat of physical harm to defendants or any other person.

184.     At no time did Mr. Vann threaten defendants or any other person through his words or actions.

185.     At no time did Mr. Vann resist arrest or attempt to escape defendants' custody.

186.     Defendants' use of force against Mr. Vann violated clearly established law.

187.     Defendants' use of force against Mr. Vann violated the RPD's internal written policies.

188.     Any reasonable officer would have known that defendants lacked any justification to use any force against Mr. Vann.

189.     Nevertheless, as explained more fully in sections B-D, *supra*, ZIMMERMAN, as the supervising officer, reviewed the evidence and failed to discipline KESTER, MITCHELL or DRAKE for their unlawful use of force against Mr. Vann.

190.     After Mr. Vann's arrest, defendants immediately took measures to cover up the unlawful actions of KESTER, MITCHELL and DRAKE.

- 24 -

191.    ANGELO was the "case coordinator" and she spearheaded the cover up, including the decision not to collect, copy and preserve video evidence favorable to Mr. Vann; coercing witnesses to sign false statements; suppressing and concealing witnesses and evidence favorable to Mr. Vann; and coordinating MITCHELL, KESTER and DRAKE's fabricated account of the reasons they arrested and used force against Mr. Vann.

192.    ZIMMERMAN, as ANGELO's supervising officer, reviewed and approved of all her decisions.

### B. Defendants' Spoliation of Exculpatory Evidence

193.    Defendant INVESTIGATOR ANGELO immediately responded to the scene and watched the video recordings from the store's four security cameras.

194.    ANGELO watched the security camera videos from when Mr. Vann first arrived at the store until after he was placed into an RPD vehicle and driven from the scene.

195.    Thereafter, defendant TECHNICIAN MINTZ watched the video recordings from the store's four security cameras from when Mr. Vann first arrived at the store until after he was placed into an RPD vehicle and driven from the scene.

196.    Other defendants, including BARBER, ZIMMERMAN, and JOHN DOE NO. 5 also watched the video recordings from the store's four security cameras from when Mr. Vann first arrived at the store until after he was placed into an RPD vehicle and driven from the scene.

197.    After watching the video, ANGELO, MINTZ, BARBER, ZIMMERMAN, JOHN DOE NO. 5 and the other defendants decided only to copy, collect and preserve the portion of the security camera video that is date and time stamped as "09-04-2015 11:35:00 PM" to "09-04-2015 11:44:59 PM".

- 25 -

198.   ANGELO, MINTZ, BARBER, ZIMMERMAN, JOHN DOE NO. 5 and the other defendants decided not to copy, collect and preserve the portion of the video that depicted Mr. Vann first arriving at the store and his interactions with Rafiq, the store owner, and D.A., the shelving clerk.

199.   The portion of the video that depicted Mr. Vann first arriving at the store and his interactions with Rafiq and D.A. was prior to date and time stamp "09-04-2015 11:35:00 PM."

200.   The portion of the video prior to date and time stamp "09-04-2015 11:35:00 PM" contradicted any complaints D.A. and Rafiq made to DRAKE, MITCHELL, KESTER, ANGELO and other defendants.

201.   Once they watched the portion of the video prior to date and time stamp "09-04-2015 11:35:00 PM", ANGELO, MINTZ, BARBER, ZIMMERMAN, JOHN DOE NO. 5 and the other defendants were not permitted to ignore the fact that it contradicted the D.A. and Rafiq's complaints.

202.   The portion of the video prior to date and time stamp "09-04-2015 11:35:00 PM" showed that Mr. Vann did not attempt to purchase beer.

203.   The portion of the video prior to date and time stamp "09-04-2015 11:35:00 PM" showed that Mr. Vann had not committed any criminal act.

204.   Alternatively, after viewing the video, ANGELO decided to copy, collect and preserve only the portion of the video that is date and time stamped as "09-04-2015 11:35:00 PM" to 09-04-2015 11:44:59 PM," and ordered MINTZ to copy, collect and preserve only that portion of the security camera video.

205.   MINTZ acquiesced to ANGELO's order despite knowing said order was unlawful.

- 26 -

206.    MINTZ failed to intervene and copy, collect and preserve the portion of the video prior to date and time stamp "09-04-2015 11:35:00 PM", despite having had the time and opportunity to do so.

207.    MINTZ failed to intervene and copy, collect and preserve the portion of the video prior to date and time stamp "09-04-2015 11:35:00 PM", despite knowing that portion of the video was evidence favorable to Mr. Vann and was legally required to be preserved.

208.    Any reasonable officer would have known that the portion of the video prior to date and time stamp "09-04-2015 11:35:00" was material and relevant to the charges for which Mr. Vann was arrested and, more importantly, to Mr. Vann's defense against those charges.

209.    Any reasonable officer would know that the portion of the video prior to date and time stamp "09-04-2015 11:35:00 PM" was favorable to Mr. Vann, constituted *Brady/Vilardi* material, and was required to be collected, copied and preserved, and handed over to the District Attorney's Office.

210.    Any reasonable police officer would have known they were required to copy, collect and preserve the portion of the video recording prior to the date and time stamp "09-04-2015 11:35:00 PM" pursuant to *Arizona* v. *Youngblood*, 488 U.S. 51, 56–58, (1988), the Due Process and Fair Trial Clauses of the United States and New York Station Constitutions, and other court precedent, statutes, and rules of the RPD.

211.    ANGELO, MINTZ and other defendant RPD officers knew that the security camera video recordings of the incident prior to the date and time stamp "09-04-2015 11:35:00 PM" constituted evidence favorable to Mr. Vann.

212.    ZIMMERMAN was ANGELO's supervisor and he oversaw her investigation of the incident and approved of all her decisions, including the decision not to copy, collect and

- 27 -

preserve the portion of the video recording prior to the date and time stamp "09-04-2015 11:35:00 PM".

213.    ANGELO, MINTZ and other defendant RPD officers failed to collect, copy and preserve the security camera video prior to time and date stamp "09-04-2015 11:35:00 PM" pursuant to the City and RPD's policy, practice and custom of manufacturing false evidence and "testilying" at hearings, grand juries and petit juries.

### C. Defendants' coerced witnesses to sign false written statements

214.    Immediately after the incident, defendants detained numerous witnesses at the scene—including D.A., D.M., A.M. and others.

215.    Defendant John Doe No. 5 ordered John Doe No. 1, KEPHART, and other defendant police officers to detain the witnesses, including D.A., D.M., A.M. and others.

216.    Defendants forced each witness to produce his or her identification.

217.    Defendants used the identifications to conduct criminal background checks on each witness.

218.    D.M.'s criminal background check showed he was on parole because of a 2013 felony conviction for attempted burglary in the third degree, and that he had an 8:00 p.m. curfew as a condition of his parole.

219.    The incident complained of herein occurred between approximately 11:00 p.m. and 12:00 a.m., so D.M. was violating his parole when he witnessed the incident.

220.    The criminal background check also revealed that D.M. was a predicate felon: he had one additional prior felony conviction in 2009 for burglary in the third degree, and one prior misdemeanor conviction in 2013 for petit larceny.

- 28 -

221.    MITCHELL, KEPHART, and JOHN DOE NO. 1 threatened that D.M. would be arrested for violating his parole unless he sign the false Supporting Deposition.

222.    After conducting D.M.'s criminal background check, defendants, including MITCHELL, KEPHART, and JOHN DOE NO. 1, coerced D.M. to sign a false Supporting Deposition.

223.    KEPHART drafted the statement that D.M. signed, which contained the following false statements:

    a.  The officers told Mr. Vann he was not welcome at the store and gave him a chance to leave the location;

    b.  Mr. Vann "[got] in one of the officer's faces, approximately 3-5 inches from the officer."

    c.  Mr. Vann stood in front of the store and refused officers' orders to leave;

    d.  "[Mr. Vann] began to sway when the officers tried to place [him] in handcuffs. The officers then took [Mr. Vann] to the ground. One of the officers appeared to be injured once [Mr. Vann] was brought to the ground he just laid there on his back while two other officers proceeded to handcuff [Mr. Vann]."

    e.  "The two officers then leaned [Mr. Vann] up against a police car. The male pushed backwards causing the skinny officer to take the male to the ground."

    f.  "The male repeatedly ignored commands by the police to stop resisting. The police commanded him to do so multiple times."

224.    The security camera video of the incident contradicts the allegations in D.M.'s supporting deposition.

225.    D.M. knew all the above statements were false when he signed the Supporting Deposition.

226.    MITCHELL, KEPHART, JOHN DOE NO. 1 and other defendants knew the statements were false when D.M. signed the Supporting Deposition.

- 29 -

227.   D.M. did not voluntarily sign the Supporting Deposition.

228.   MITCHELL, KEPHART, and JOHN DOE NO. 1 threatened to arrest D.M. for violating the conditions of his parole if he refused to sign the false Supporting Deposition.

229.   Defendants also coerced D.A., a store employee, to sign a false supporting deposition.

230.   On the date of the incident, D.A. had an open criminal case.

231.   D.A.'s criminal history also included a prior felony conviction for attempted criminal possession of a weapon in the 2nd degree in 2008, and a DWI in 2012.

232.   The officers used D.A.'s open criminal case and prior criminal history to coerce him to sign the false supporting deposition.

233.   ANGELO drafted the statement that D.A. signed, which falsely stated,

   a.  Mr. Vann entered the store and attempted to purchase beer without an ID;

   b.  Mr. Vann refused to leave the store;

   c.  When the cops arrived, "[Mr. Vann] was standing just inside our front door refusing to leave. The cops were real nice and tried to get him to leave. [Mr. Vann] got in one officers [*sic*] face. The officer warned him but he went after the officers again. The officers went to handcuff him and he began to fight the officers. He was thrashing and refused to keep his hands behind his back. The officers yelled over and over, 'stop resisting! Put your hands behind your back!' The guy continued to fight. He was fighting so bad he caused everyone to fall to the sidewalk. The guy fell on one officer, hurting the officer's ankle. Another officer got him handcuffed and walked him to a cop car. He tried to search the guy but just wouldn't stop fighting, even in handcuffs. Another cop arrived and that made the guy fight and resist more. They fought so much they ended back up on the sidewalk near the store. That's when the second officer got hurt."

   d.  "Like 5 more officers showed up. They were all yelling commands to him but he was still fighting. He was even fighting once he was in the back of the car, that's when they threatened to spray him."

  e. "I'm so thankful the officers came. I do not feel they were inappropriate whatsoever."

234. The security camera video of the incident contradicts the allegations in D.A's supporting deposition.

235. D.A. knew the statements were false when he signed the Supporting Deposition.

236. ANGELO and other defendants knew the statements were false when D.A. signed the Supporting Deposition.

237. D.A. did not voluntarily sign the Supporting Deposition.

238. Defendants did not obtain Supporting Depositions from numerous other eyewitnesses, including A.M.

239. Defendants ordered A.M. to produce identification and ran his criminal background check.

240. Unlike D.M. and A.D., A.M.'s criminal background check revealed he did not have a criminal background that defendants could leverage to coerce him to sign a false statement.

241. Thus, defendants did not collect a Supporting Deposition or witness statement from A.M.

242. Defendants failed to make any record that A.M. witnessed the incident, that they spoke with A.M. and ran his criminal background check, or the reasons they chose not take his witness statement or have him sign a supporting deposition.

243. It was a violation of clearly established law and the RPD's internal rules and regulations for the Defendants to fail to make any record that A.M. witnessed the incident, that they spoke with A.M. about the incident, that they ran his criminal background check, and that they chose not take his witness statement or have him sign a supporting deposition.

- 31 -

244.   The fact that A.M. witnessed the incident and the officers spoke with him and ran his criminal background check, but did not take his witness statement, constituted *Brady*/*Vilardi* material.

245.   Any reasonable officer would know that the fact that A.M. witnessed the incident and that defendants spoke with him and ran his criminal background check, but did not take his witness statement, constituted *Brady*/*Vilardi* material, and that they were required to make a record of their interaction with A.M. and produce said record to the District Attorney's Office.

246.   Any reasonable police officer would have known that pursuant to *Arizona* v. *Youngblood*, 488 U.S. 51, 56–58, (1988), the Due Process and Fair Trial Clauses of the United States and New York Station Constitutions, and other court precedent, statutes, and rules of the RPD, they were required to make a record of the fact that A.M. witnessed the incident and that defendants spoke with him and ran his criminal background check, but did not take his witness statement.

247.   ZIMMERMAN was ANGELO's supervisor and he oversaw her investigation of the incident and approved of all her decisions, including the fabrication of D.M. and D.A.'s Supporting Depositions, and their failure to make any record of the fact that A.M. witnessed the incident and that defendants spoke with him and ran his criminal background check, but did not take his witness statement.

248.   MITCHELL, KEPHART, JOHN DOE NO. 1, ANGELO, and other defendant RPD officers coerced D.A. and D.M. to sign false Supporting Depositions pursuant to the City and RPD's policy, practice and custom of manufacturing false evidence and "testilying" to nullify constitutional deficiencies in their reasons for making arrests and using force against arrestees.

- 32 -

**D. Defendants' Fabrication of Charging Documents and Incident Reports**

249.    KESTER, MITCHELL and DRAKE conspired together and with other defendants, including ANGELO, to concoct a fabricated account of their interaction with Mr. Vann.

250.    KESTER, DRAKE and ANGELO formally initiated criminal proceedings against Mr. Vann by executing Felony Complaints under oath and causing them to be filed.

251.    ANGELO was the "case coordinator" and she drafted the Felony Complaints that were signed by KESTER and DRAKE.

252.    ANGELO did not have personal knowledge of the facts and circumstances surrounding Mr. Vann's arrest, or of the allegations contained in the felony complaints she drafted on behalf of KESTER, DRAKE or herself.

253.    KESTER signed a felony complaint falsely accusing Mr. Vann of assaulting him and causing him to break his leg, and charging him with felony assault of a police officer under PL § 120.05(3).

254.    DRAKE signed a felony complaint that contained false allegations, accused Mr. Vann of assaulting him and causing him to separate his shoulder, and charging him with felony assault of a police officer under PL § 120.05(3).

255.    The felony complaints that DRAKE and KESTER signed and ANGELO drafted each contained the following false statements:

> a. Mr. Vann "intentionally refuse[d] to put his hands behind his back" when the officers arrested him;
>
> b. Mr. Vann "twisted, turned, pulled away and thrashed around in a violent manner causing the defendant and three police officers to fall to the sidewalk";

- 33 -

      c. Mr. Vann's actions caused him to fall "on top of Officer Jeffrey Kester, breaking his right fibula bone";

      d. Mr. Vann "continued to resist officers' lawful arrest by continuing to twist and pull away"; and

      e. Mr. Vann "forced the officers to bring him to the sidewalk to get him under control," causing DRAKE to dislocate his right shoulder.

256.    Each allegation in the above paragraph is false.

257.    The security camera video of the incident contradicts the statements in KESTER and DRAKE's felony complaints.

258.    ANGELO knew the allegations in DRAKE and KESTER's felony complaints were false when she drafted them.

259.    DRAKE and KESTER knew the allegations in the felony complaints were false when they signed them.

260.    The felony complaints signed by DRAKE and KESTER contain the following notice: "**NOTICE: FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.**"

261.    Neither DRAKE nor KESTER was ever disciplined in any way for signing the false felony complaints.

262.    ANGELO swore out a "felony complaint" that falsely alleged that Mr. Vann had assaulted D.A., the store clerk, and that he had committed trespass at the store, and charging Mr. Vann with misdemeanor assault in the third degree under PL § 120.00, and a trespass violation under PL § 140.10.

263. In the complaint, ANGELO falsely stated that Mr. Vann: "refuse[d] to leave the A&Z South Market after being asked by the store employee … multiple times. The defendant then became combative forcing [D.A.] to physically remove the defendant by pushing him out the door."

264. Prior to executing the complaint, ANGELO watched the entire surveillance camera recordings of the incident, including the portion of the video that depicted Mr. Vann's interactions with D.A. and Rafiq.

265. The portion of the video that depicted Mr. Vann's interactions with D.A. and Rafiq contradicted the allegations in ANGELO's sworn complaint.

266. ANGELO failed to collect, copy and preserve the portion of the security camera video that depicted Mr. Vann's interactions with D.A. and Rafiq, which contradicted the allegations in ANGELO's sworn complaint.

267. Instead, ANGELO stated she had "personal knowledge" of the allegations contained in her complaint, which was untrue, because she was not present when the acts alleged in her complaint occurred.

268. Additionally, ANGELO stated the basis of her knowledge was her "investigation of this incident as well as the written depositions from [D.A.], and witness [D.M.]."

269. As explained in section "C", *infra*, defendants coerced D.A. and D.M. to sign false supporting depositions.

270. ANGELO knew that the allegations in her sworn complaint were false.

271. The felony complaint ANGELO signed contains the following notice: "**NOTICE: FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS A**

- 35 -

MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE
STATE OF NEW YORK."

272.   ANGELO was never disciplined in any way for swearing to the veracity of the
false allegations in her complaint.

273.   ZIMMERMAN was ANGELO's supervisor and he oversaw her investigation of
the incident and approved of all her decisions, including the fabrication of the charging
paperwork.

274.   MITCHELL drafted an incident report that contained a fabricated narrative of the
defendants' interaction with Mr. Vann, and falsely accused Mr. Vann of committing various
criminal acts.

275.   The false statements in MITCHELL's incident report include, but are not limited
to:

    a. D.A., "an employee of the store … stated that [Mr. Vann] entered the store
and wanted to buy beer" but that Mr. Vann "did not have identification" so
D.A. refused to sell him beer;

    b. D.A. "told [Mr. Vann] to leave the location several times, but [he]
remained in the store for approximately 45 minutes;

    c. Mr. Vann "told me that he did not have to leave the store and argued with
me."

    d. That Mr. Vann "almost bumped into Officer Kester" when he exited the
store to the sidewalk;

    e. That Mr. Vann "did stop at the side walk," and then "turn[ed] towards
officers and [D.A.] and began to argue with [D.A.] again";

    f. That, "as I began to handcuff [Mr. Vann, he] refused to keep his right arm
behind his back and pulled it away from officers. This action forced
officers to bring [Mr. Vann] to the ground for stabilization, where [Mr.
Vann] was handcuffed."

g. "As [Mr. Vann] was brought to my patrol vehicle, he immediately pulled away from me. [DRAKE] ran over to assist me in controlling [Mr. Vann]. [Mr. Vann] was told multiple times to get on the ground and would not comply. [Mr. Vann] was thrashing and pulling his body away from officers. The actions of [Mr. Vann] once again forced [DRAKE] and I to bring [Mr. Vann] to the ground."

h. Once on the ground, "[Mr. Vann] continued to roll around on the ground and reached with his hands in the area of his waistband … and I did fear that [Mr. Vann] had a weapon on his person."

276.    Each allegation in the above paragraph is false.

277.    The security camera video of the incident contradicts the statements in MITCHELL's incident report.

278.    DRAKE, KESTER and ANGELO's Felony Complaints were filed and initiated the malicious prosecution of Mr. Vann for two counts of felony assault on a police officer, PL § 120.05(3), one count of resisting arrest, PL § 205.30, one count of third degree assault, PL § 120.00(2), and one count of trespassing, PL § 140.10.

279.    DRAKE, KESTER and ANGELO were never disciplined in any way for making the above false sworn written statements.

280.    MITCHELL was never disciplined for making the false statements in his incident report.

281.    MITCHELL, DRAKE, KESTER and ANGELO made the false allegations in their arrest and charging paperwork pursuant to the City and RPD's policy, practice and custom of manufacturing false evidence and "testilying" to nullify constitutional deficiencies in their reasons for making arrests and using force against arrestees.

### E. Defendants' provided false grand jury testimony

282.    Mr. Vann was indicted by a Monroe County grand jury following a false, fraudulent, misleading and incomplete grand jury presentation.

- 37 -

283.    MITCHELL, KESTER and DRAKE offered affirmative evidence against Mr. Vann in the grand jury.

284.    ANGELO completed the grand jury referral and coordinated the testimony of MITCHELL, KESTER and DRAKE, and all other affirmative evidence offered against Mr. Vann in the grand jury.

285.    ZIMMERMAN reviewed ANGELO's grand jury referral and approved it, including the coordination the testimony of MITCHELL, KESTER and DRAKE.

286.    MITCHELL, KESTER and DRAKE testified falsely at the Grand Jury to secure the indictment of Mr. Vann on two counts of assaulting a police officer, PL § 120.05(3).[2]

287.    MITCHELL falsely testified to the grand jury that,

a.  Mr. Vann entered the store and attempted to purchase beer without an ID;

b.  Mr. Vann became upset and refused to leave the store when they refused to sell him beer because he did not have an ID on him;

c.  When MITCHELL informed Mr. Vann he had to leave the store he refused and stated "it's a free county";

d.  After several minutes, "he finally started to walk out the door" but then he "turned back around" and "be[gan] to walk back towards the store, and balled – he actually balled his fists up as he turned towards the officers. And he yelled out something, I can't remember exactly what it was."

e.  While attempting to handcuff Mr. Vann, he pulled his right hand forward to the front of his body, preventing them from securing the handcuff on his right wrist;

f.  The officers had to bring Mr. Vann to the ground to complete handcuffing Mr. Vann;

g.  The officers did not finish handcuffing Mr. Vann until he was on the ground;

---

[2] The trespass, misdemeanor assault, and resisting arrest charges appear to have been dismissed prior to the grand jury presentation.

h.  MITCHELL was not able to search Mr. Vann where he was first brought to the ground;

i.  After he was first brought to the ground, Mr. Vann "had been reaching for part of his waistband";

j.  MITCHELL brought Mr. Vann to the patrol vehicle to try and complete searching him, but "he bumped his chest off the patrol vehicle" causing MITCHELL to lose control of him;

k.  Mr. Vann then stood in front of him "and kind of came at me";

l.  "[Mr. Vann] was told to get on the ground," but he refused, so DRAKE and MITCHELL brought him to the ground again;

m.  After Mr. Vann was brought to the ground the second time, Mr. Vann reached for the same spot on his rear waistband area one or two times, which was the same spot he'd reached for previously. At this time, MITCHELL still had not searched Mr. Vann;

n.  MITCHELL pepper sprayed Mr. Vann because he refused to stop reaching for his waistband.

288.  MITCHELL's testimony to the grand jury, as described in the above paragraph, was false.

289.  The security camera video of the incident contradicts MITCHELL's testimony to the grand jury.

290.  DRAKE falsely testified to the grand jury that,

a.  Defendants did not handcuff Mr. Vann until he was taken to the ground the first time;

b.  Then, "as Officer Mitchell is taking the suspect to the vehicle, somehow there's another altercation and the subject is not wearing two handcuffs, so I go back there to effect that arrest. Again, we have to re-handcuff the defendant."

291.  DRAKE's testimony to the grand jury, as described in the above paragraph, was false.

292.     The security camera video of the incident contradicts DRAKE's testimony to the grand jury.

293.     KESTER also testified falsely to the grand jury that Mr. Vann caused him to break his leg.

294.     KESTER's testimony to the grand jury, as described in the above paragraph, was false.

295.     The grand jury was *not* informed that:

    a.   The RPD had collected security camera video from the store that contradicted the officers' testimony;

    b.   That the RPD failed to collect, copy and preserve exculpatory evidence, *to wit*, the beginning of the store's security camera videos that depicted the interaction between D.A. and Mr. Vann prior to defendants arriving at the store;

    c.   That a witness, D.M., had been coerced into signing a false supporting deposition by defendants, who threatened to arrest him for violating the terms of his parole if he refused to sign the false statement;

    d.   That defendants spoke to numerous other witnesses, including A.M., but failed to make any records of the fact that they spoke with the other witnesses or that they chose not to get witness statements from them;

    e.   That D.A.'s criminal charges and criminal history had also been used by defendants to coerce him to sign a false supporting deposition;

    f.   That the store was under investigation for food stamp fraud on the date of the incident;

    g.   That the store's owner was arrested and charged with Misuse of Food Stamps, a Class E Felony, approximately one month after this incident.

296.     Based on the false sworn grand jury testimony of MITCHELL, DRAKE and KESTER, the grand jury returned a true bill and Mr. Vann was subjected to a prolonged pre-trial detention, was maliciously prosecuted for over 17 months, and was forced to endure a three-day trial on serious felony charges for crimes he did not commit.

- 40 -

297.    MITCHELL, DRAKE and KESTER testified falsely before the grand jury pursuant to the City and RPD's policy, practice and custom of manufacturing false evidence and "testilying" to nullify constitutional deficiencies in their reasons for making arrests and using force against arrestees.

**F. Defendants' false petit jury testimony**

298.    KESTER, DRAKE and MITCHELL testified falsely at Mr. Vann's criminal trial.

299.    At trial, defendants knew they would be cross examined with the security camera video.

300.    KESTER, DRAKE and MITCHELL's trial testimony was inconsistent with their grand jury testimony and with their initial written statements regarding the incident.

301.    KESTER falsely testified that:

    a.  When he arrived on the scene, Mr. Vann was actively arguing with Rafiq and/or D.A.;

    b.  Mr. Vann was pacing back and forth and ignoring the officers;

    c.  Mr. Vann actively resisted arrest, by, for example, attempting to bring his hands to the front of his body to avoid being rear handcuffed;

    d.  As KESTER and MITCHELL were handcuffing Mr. Vann, KESTER told Mr. Vann to relax, but instead he tensed up even more and "ball[ed] his first up and [brought] his arm closer into his body";

    e.  KESTER and MITCHELL were unable to secure handcuffs upon Mr. Vann's wrists while they were standing;

    f.  KESTER stated to MITCHELL and DRAKE that they had to bring Mr. Vann to the ground in order to secure the handcuffs on his wrists;

    g.  The handcuffs were not secured upon Mr. Vann's wrists until the officers brought him to the ground.

302.    All of KESTER's testimony to the petit jury, as described in the above paragraph, was false.

- 41 -

303.   KESTER's testimony to the petit jury was contradicted by the security camera video of the incident.

304.   MITCHELL falsely testified that:

    a.   He told Mr. Vann to leave the store multiple times, but Mr. Vann refused;

    b.   In response to him telling Mr. Vann that he needed to leave the store, Mr. Vann replied, "it's a free country" and that he did not have to leave the store;

    c.   He and KESTER were unable to handcuff Mr. Vann's right hand because Mr. Vann was "trying to move his arm forward."

    d.   That he did not secure the handcuff on Mr. Vann's right hand until after they brought him to the ground;

    e.   After they brought Mr. Vann to the ground, he was unable to search him because Mr. Vann "reached for the back right side of his pants pocket or pants waistband."

    f.   He feared that Mr. Vann had a weapon in his back right pocket or waistband;

    g.   After he brought Mr. Vann to the car, Mr. Vann "kind of bumped off the car [and] he pulled away from me. I told him to get on the ground several times, and he did not."

    h.   When Mr. Vann refused to go to the ground, MITCHELL used a "distractionary [sic] technique" that "was a jab with my right hand";

    i.   MITCHELL pepper sprayed Mr. Vann from a distance of one to two feet;

    j.   After MITCHELL pepper sprayed Mr. Vann, he again reached for his right waistband area, which MITCHELL had not yet searched.

305.   MITCHELL's testimony to the petit jury, as described in the above paragraph, was false.

306.   MITCHELL's testimony to the petit jury was contradicted by the security camera video of the incident.

307.   DRAKE falsely testified that:

- 42 -

    a. After Mr. Vann walked out of the store onto the sidewalk, he chose not to disperse from the area;

    b. Mr. Vann actively resisted arrest;

    c. Mr. Vann resisted being handcuffed by moving / turning his body;

    d. Before DRAKE and MITCHELL took Mr. Vann to the ground the second time, MITCHELL told him Mr. Vann slipped out of one of his cuffs and was reaching for his waistband;

    e. DRAKE and MITCHELL took Mr. Vann to the ground the second time in an attempt to re-handcuff him.

308. DRAKE's testimony to the petit jury, as described in the above paragraph, was false.

309. DRAKE's testimony to the petit jury was contradicted by the security camera video of the incident.

310. At trial, Mr. Vann did not put on any proof, but instead his attorney simply cross-examined KESTER, DRAKE and MITCHELL with the security camera video of the incident, which the RPD collected on the night of the incident, and rested after the People put on their case in chief.

311. KESTER, MITCHELL and DRAKE testified that the security camera video was a fair and accurate depiction of the incident.

312. The jury deliberated for less than three hours, during which time they asked to see multiple playbacks of the video.

313. The jury's last request was to see the video paused on the second for six seconds as Mr. Vann was being handcuffed, (11:40:27-32), immediately before KESTER grabbed his neck and pulled him face-first into the bench then to the ground. (screenshots of the video at

- 43 -

11:40:27-32 annexed hereto as Exhibit "G"). Eight minutes later, the jury informed the Court they had reached a verdict: Mr. Vann was found not guilty on all charges.

314.    On February 16, 2017, after a three-day trial, and after being maliciously prosecuted for one year, five months and twelve days, Mr. Vann was acquitted by the jury on all charges.

315.    Nevertheless, Mr. Vann continues to suffer severe physical, emotional and psychological damages to this day, and will continue to suffer said damages for the rest of his life.

316.    MITCHELL, DRAKE and KESTER were never disciplined for testifying falsely in front of the petit jury.

317.    MITCHELL, DRAKE and KESTER testified falsely before the petit jury pursuant to the City and RPD's policy, practice and custom of manufacturing false evidence and "testilying" to nullify constitutional deficiencies in their reasons for making arrests and using force against arrestees.

**G. Facts pertinent to municipal liability claims**

318.    MITCHELL is the Defensive Tactic Instructor for the RPD, which involves training recruits in everything from handcuffing up through the escalation of force chart.

319.    MITCHELL is also a Field Training Officer for the RPD, which involves hands-on training of new officers in the field after they graduate from the police academy.

320.    As both the Defensive Tactics Instructor and a Field Training Officer for the RPD, MITCHELL is a municipal policymaker with respect to the RPD's use of force policies and training.

- 44 -

321.    MITCHELL's use of force against Mr. Vann while he was handcuffed, helpless, and not fighting, resisting or struggling with the officers in any way, was both grossly excessive under clearly established law and criminal.

322.    Following this incident, MITCHELL was not disciplined in any way.

323.    The City and RPD should have disciplined MITCHELL because the video evidence clearly demonstrated his use of force against Mr. Vann was grossly excessive and criminal.

324.    Further, the City and RPD should have disciplined MITCHELL because his statements and testimony that he and KESTER could not secure handcuffs upon Mr. Vann's wrists was incredible and unbelievable.

325.    As Defensive Tactics Instructor and Field Training Officer, MITCHELL is an expert in effectuating arrests.

326.    As Defensive Tactics Instructor and Field Training Officer, MITCHELL is an expert in handcuffing suspects.

327.    As Defensive Tactics Instructor and Field Training Officer, MITCHELL is an expert in only using force against arrestees when necessary.

328.    As Defensive Tactics Instructor and Field Training Officer, MITCHELL is an expert in the legal limits on the amount of force that a police officer may use against an arrestee.

329.    At the time of the incident, Mr. Vann weighed approximately 160 pounds.

330.    At the time of the incident MITCHELL weighed at least 175 pounds, or approximately fifteen pounds more than Mr. Vann.

331.    At the time of the incident, KESTER weighed at least 220 pounds, or at least 60 pounds more than Mr. Vann.

- 45 -

332.    Following this incident, MITCHELL continued to be employed as Defensive Tactic Instructor and Field Training Officer for the RPD.

333.    As a Defensive Tactic Instructor and Field Training Officer for the RPD, MITCHELL leads by example and teaches recruits and new officers how to make arrests, secure handcuffs onto an arrestee's wrists, and when it is appropriate to use force against arrestees and how much force may be used in different situations.

334.    MITCHELL also teaches recruits and new officers how to complete their paperwork to document the reasons for making an arrest and using force against an arrestee.

335.    By failing to discipline MITCHELL and instead continuing to employ him as Defensive Tactic Instructor, the City and the RPD ratified his conduct as a municipal policy, practice or custom.

336.    Specifically, by failing to discipline MITCHELL and instead continuing to employ him as Defensive Tactic Instructor and Field Training Officer, the City and the RPD ratified the following conduct as permissible by RPD officers:

  a.  Body-slamming a handcuffed, compliant, non-resisting arrestee onto the ground;

  b.  Repeatedly punching a handcuffed, compliant, non-resisting arrestee when said arrestee is subdued on the ground, and does not pose a threat of physical harm to the officer or others;

  c.  Pepper spraying a handcuffed, compliant, non-resisting arrestee when said arrestee is subdued on the ground;

  d.  Pepper spraying a handcuffed, compliant, non-resisting arrestee directly in the face from less than six inches;

  e.  Fabricating the officers' accounts of their interaction with said arrestee in official RPD paperwork such as investigatory reports;

  f.  Falsely swearing to the veracity of charging documents that falsely accuse arrestees of committing criminal acts, and forwarding said documents to prosecutors to initiate the malicious prosecution of said arrestees;

- 46 -

g.  Testifying falsely at grand jury proceedings;

h.  Testifying falsely at petit jury proceedings; and

i.  Signing false statements and testifying falsely despite knowing that objective video evidence contradicts said false statements and testimony.

337.    The City and the RPD also failed to discipline KESTER or DRAKE for their false arrest or use of excessive force against Mr. Vann; for signing false felony complaints; or for testifying falsely in front of the grand jury and petit jury.

338.    By failing to discipline DRAKE and KESTER, the City and the RPD ratified their conduct as a municipal policy, practice or custom.

339.    The Defendant CITY and the RPD failed to conduct any investigation into the MITCHELL, DRAKE and KESTER's use of force and/or failure to intervene to stop and or prevent the unlawful use of force against Mr. Vann, to determine if their conduct was unlawful, excessive or in violation of RPD policies.

340.    The defendant CITY and the RPD knew or should have known that they needed to investigate the MITCHELL, DRAKE and KESTER's use of force and/or failure to intervene to stop and or prevent the unlawful use of force against Mr. Vann on September 4, 2015, because KESTER, MITCHELL and DRAKE all admit to using force against Mr. Vann; because Mr. Vann was acquitted by the jury; and because the security camera video recovered from the store on the night of the incident clearly demonstrates that the officers fabricated their account of their interaction with Mr. Vann in their arrest and charging paperwork, and testified falsely at the grand jury and petit jury.

- 47 -

Case 6:18-cv-06464-MAT   Document 1-3   Filed 06/20/18   Page 48 of 131

341.    For these same reasons, the defendant CITY and RPD knew or should have known that they also needed to investigate ANGELO and MINTZ for failing to copy, collect and preserve the portion of the video that depicted Mr. Vann's interactions with D.A. and Rafiq.

342.    For these same reasons, the defendant CITY and RPD knew or should have known that they also needed to investigate ANGELO, KEPHART, John Doe No. 5 and John Doe No. 1 and other defendant officers for their role in detaining witnesses, forcing them to produce identification so they could run criminal background checks, and coercing D.A. and D.M. to sign false supporting depositions.

343.    For these same reasons, the CITY and the RPD knew or should have known that they also needed to investigate ANGELO for her role in signing a false "felony" complaint, and for drafting the felony complaints that were signed by KESTER and DRAKE, which also contained false allegations against Mr. Vann.

344.    The failure of the City and RPD to investigate or discipline the defendant officers in this incident is part of a longstanding, entrenched policy, pattern and custom of deliberate indifference to RPD officers' use of excessive force.

345.    The failure of the City and RPD to investigate or discipline the defendant officers in this incident is part of a longstanding, entrenched policy, pattern and custom of deliberate indifference to RPD officers' lying about the circumstances that led to the arrest and use of force against an arrestee in official police paperwork, charging documents, and court testimony.

346.    The City's policy and custom of failing to discipline officers who make false arrests, use excessive force and lie about the reasons for making arrests and using force caused Mr. Vann's constitutional rights to be violated as alleged herein.

- 48 -

347. For example, on May 24, 2015, KESTER falsely arrested and used excessive force against Septimus Scott, and then lied about the circumstances that led to his arrest and use of force against Mr. Scott in official police paperwork.

348. In the incident with Mr. Scott, KESTER arrived at the scene of a vehicle stop where Police Officer Destiny Deterville was attempting to conduct a sobriety test on Mr. Scott.

349. After Mr. Scott had passed the walk and turn, stand on one leg, and horizontal nystagmus tests, she attempted to administer a breathalyzer test, even though she did not know how to use the machine.

350. Deterville stated, "the machine is not working."

351. While Deterville was struggling with the breathalyzer machine, KESTER approached and screamed at Mr. Scott to "blow in the fucking machine."

352. Mr. Scott told KESTER that he had complied with all of Deterville's instructions, that he was crying because he was having a panic attack, and that he was an Army Veteran and had been diagnosed with PTSD.

353. KESTER told Mr. Scott to "shut up," then grabbed his head and slammed his face into the side of an RPD vehicle, slammed his body onto the ground, and punched him in the back of the head and torso multiple times, without any reasonable justification or lawful purpose for the amount of force used.

354. KESTER then pepper sprayed Mr. Scott in the eyes and mouth from within one to two inches, without justification or lawful purpose.

355. KESTER fabricated his reasons for arresting and using force against Mr. Scott in official RPD paperwork to initiate a criminal prosecution against Mr. Scott for crimes KESTER knew he did not commit.

- 49 -

356. All the false charges brought against Mr. Scott by KESTER and other RPD officers were eventually dismissed.

357. Nevertheless, the City and the RPD never investigated the incident or disciplined KESTER for his false arrest and use of excessive force against Mr. Scott, or for his fabrication of evidence to initiate the prosecution of Mr. Scott for crimes KESTER knew he did not commit.

358. The incident with Mr. Scott occurred less than four months prior to the incident complained of herein with Mr. Vann.

359. Just like the incident with Mr. Scott, in this incident KESTER similarly arrived late to the scene of an incident and immediately escalated the situation as he was the first officer to use force against Mr. Vann. Additionally, like the incident with Mr. Scott, KESTER lied about the reasons for arresting and using force against Mr. Vann in official police paperwork and charging documents to cover up his unlawful actions.

360. The City and the RPD lack any system for conducting an independent review of officers' conduct, even in cases like this one, where there is overwhelming evidence from court proceedings and video of the incident that indicates RPD officers falsely arrested and used excessive force against an arrestee, and then lied in their paperwork and in court testimony. Moreover, in cases like this one where an arrestee is charged with resisting arrest and assaulting multiple police officers, but all charges are eventually dismissed, the City and the RPD should have a system to automatically investigate the circumstances of the arrest and use of force because the fact that the charges were dismissed strongly suggests that officers falsely charged the arrestee with crimes they did not commit in order to cover up their unlawful use of force against the arrestee.

361.    Because of the foregoing, Mr. Vann sustained, *inter alia*, physical pain, permanent physical injuries, mental injuries, emotional distress, embarrassment, humiliation, lost income, loss of liberty, and deprivation of his common law and constitutional rights.

362.    Because of the foregoing, Mr. Vann demands judgment against Defendants in an amount of money to be determined at trial, and injunctive relief as further detailed below.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF FOURTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983
## <u>ARISING FROM WARRANTLESS ARREST WITHOUT PROBABLE CAUSE</u>
### (Against KESTER, DRAKE and MITCHELL)

363.    Plaintiff Mr. Vann re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

364.    KESTER, DRAKE and MITCHELL detained, handcuffed and arrested Mr. Vann.

365.    This arrest was made in the absence of a warrant for the arrest.

366.    This arrest was made in the absence of probable cause for this arrest.

367.    The Defendant Police Officers arrested Plaintiff Mr. Vann without having exigent circumstances for doing so.

368.    There was no other authority for the arrest of Plaintiff Mr. Vann.

369.    The Plaintiff Mr. Vann was conscious of this arrest.

370.    The Plaintiff Mr. Vann did not consent to this arrest.

371.    As a result, Plaintiff Mr. Vann was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

372.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

- 51 -

## SECOND CLAIM FOR RELIEF
## <u>MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983</u>
## (Against KESTER, DRAKE, MITCHELL, KEPHART, MINTZ, ANGELO,
## ZIMMERMAN JOHN DOE NO. 1 and JOHN DOE NO. 5)

373.    Plaintiff Mr. Vann re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

374.    The Defendant Police Officers, despite knowing that probable cause did not exist to arrest and prosecute Mr. Vann for trespass, for assaulting D.A., resisting arrest, or for assaulting KESTER or DRAKE, acting individually and in concert, fabricated and falsified evidence, which they then forwarded to prosecutors, to cause Mr. Vann to be wrongfully charged with and prosecuted for those crimes.

375.    The Defendant Police Officers lacked probable cause to initiate the prosecution of Mr. Vann and the prosecution of Mr. Vann was procured by fraud, perjury, and the fabrication and suppression of evidence.

376.    False and fabricated evidence was given by Defendant Police Officers to the District Attorney's Office and the Grand Jury.

377.    The Defendant City and the RPD knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest and prosecute Mr. Vann for trespass, resisting arrest, assaulting D.A. or assaulting KESTER or DRAKE, including but not limited to knowledge of the fact that the charging paperwork of the Defendant Police Officers contained fabricated and falsified accounts of their reasons for arresting Mr. Vann, that the charging paperwork incorporated the false witness statements procured by ANGELO, KEPHART, JOHN DOE NO. 1 and JOHN DOE NO. 5; and that ANGELO and MINTZ failed to copy, collect and preserve the portion of the security camera video that contradicted D.A. and Rafiq's complaints about Mr. Vann.

- 52 -

378.     Despite knowing that probable cause did not exist to arrest and prosecute Mr. Vann, and despite the fact that the grand jury's probable cause determination was vitiated by the Defendant Police Officers' fabrication and falsification of evidence, the Defendants acted individually and in concert to initiate and continue the prosecution of Mr. Vann for those crimes.

379.     Notwithstanding the fact that the Defendant Police Officers knew that they lacked objective facts to support reasonable or propable cause that Mr. Vann had committed any crime at the time of his arrest, and that they could not lawfully arrest him for any crime or offense, the Defendant Police Officers initiated and continued the prosecution of Mr. Vann for multiple crimes.

380.     The Defendant Police Officers prosecuted Mr. Vann despite knowing the entire basis for his prosecution was the fabricated and falsified accounts of their interaction with Mr. Vann as recorded in their arrest and charging paperwork, and the coerced and falsified witness statements.

381.     The Defendant Police Officers knew that the video surveilance recordings of the incident contradicted their false allegations that Mr. Vann had committed various crimes.

382.     This conscience-shocking falsificaiton evidence and false testimony at the grand jury and petit jury deprived Mr. Vann of his liberty, in violation of the Fourth and Fourteenth Amendments.

383.     The Defendant Police Officers' conduct was critical to the continued prosecution of Mr. Vann and they knew, or in the absence of their deliberate and reckless indifference, should have known, that their conduct would cause Mr. Vann's prosecution to continue.

384.     On February 16, 2017, the prosecution terminated in Mr. Vann's favor when he was acquitted by a jury.

385.    Defendant Police Officers' actions to deprive Mr. Vann of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 2015 would have believed that the defendants' actions were lawful.

386.    As a direct and proximate result of the Defendant Police Officers' actions, Mr. Vann was wrongly prosecuted and imprisoned for approximately five months and suffered the other grievous and continuing injuries and damages as set forth herein.

387.    Accordingly, Plaintiff demands judgment against the Defendants in a sum of money to be determined at trial.

388.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### THIRD CLAIM FOR RELIEF
### MALICIOUS PROSECUTION UNDER NEW YORK STATE LAW
### (Against KESTER, DRAKE, MITCHELL, KEPHART, MINTZ, ANGELO, ZIMMERMAN, JOHN DOE NO. 1 and JOHN DOE NO. 5)

389.    Plaintiff Mr. Vann re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

390.    By the actions described above, each and all of the Defendant Police Officers, jointly and severally, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

391.    The criminal proceedings terminated in Plaintiff's favor.

392.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

- 54 -

393.   The Defendant Police Officers acted with actual malice.

394.   The Defendant Police Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant City and the RPD, which are therefore responsible for their conduct.

395.   Defendant City is also liable to Plaintiff on the basis of *respondeat superior* as a result of the unlawful actions of the defendant police officers as described herein.

396.   As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

## FOURTH CLAIM FOR RELIEF
## DENIAL OF THE RIGHT TO A FAIR TRIAL
### (Against KESTER, DRAKE, MITCHELL, KEPHART, MINTZ, ANGELO, BARBER, ZIMMERMAN, JOHN DOE NO. 1 and JOHN DOE NO. 5)

397.   Plaintiff Mr. Vann re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

398.   By deliberately manufacturing false evidence against Mr. Vann, including police reports containing the Defendant Police Officers' own fabricated and falsified accounts that Mr. Vann had committed crimes and/or offenses, including trespass, resisting arrest, assaulting DRAKE and KESTER, and assaulting D.A., and forwarding that fabricated evidence to prosecutors, the Defendant Police Officers caused Plaintiff Mr. Vann to be arrested, detained, charged, and prosecuted, in violation of Plaintiff's rights, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, to due process of law and to a fair trial, and are liable to Plaintiff under 42 U.S.C. § 1983, for compensatory and punitive damages.

320.   Accordingly, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

399.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF PLAINTIFF'S FOURTH AMENDMEMNT RIGHTS UNDER 42 U.S.C. § 1983 ARISING FROM DEFENDANTS' USE OF EXCESSIVE FORCE
### (Against KESTER, MITCHELL, DRAKE, KEPHART, JOHN DOE NO. 1, JOHN DOE NO. 2, JOHN DOE NO. 3)

400.    Plaintiff Mr. Vann re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

401.    Defendant KESTER grabbed Mr. Vann by the head, pulled him backwards causing his head to slam into a metal bench, and then slammed him onto the ground.

402.    Defendant DRAKE pushed Mr. Vann from behind, causing his head to slam into the metal bench, and then his body to be slammed onto the ground; and then DRAKE slammed Mr. Vann's body into the side of the RPD vehicle and body slammed Mr. Vann onto the sidewalk.

403.    Defendant MITCHELL pushed Mr. Vann from behind, causing his head to slam into the metal bench, and then body slammed onto the ground on top of KESTER; punched and struck Mr. Vann in the head and body numerous times; slammed Mr. Vann into the side of the RPD vehicle and body slammed Mr. Vann onto the sidewalk; and pepper sprayed Mr. Vann directly in the face from just several inches.

404.    Defendant KEPHART punched and or kicked Mr. Vann while he was handcuffed at the Monroe County Jail after he was removed from the RPD vehicle, before he was brought into the jail for booking.

- 56 -

405.    MITCHELL and John Does No. 1 and John Doe No. 2 violently body-slammed Mr. Vann face-down on the sidewalk, and John Doe No. 1 landed on Mr. Vann's back with the full weight and force of his body.

406.    MITCHELL and JOHN DOE NO. 3 pulled Mr. Vann's hands above his head, behind his back, hyper-extending his shoulders, and held him in that position for at least one minute.

407.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the Defendant RPD OFFICERS against Plaintiff.

408.    As a result, Plaintiff was damaged, harmed and injured, and seeks compensation in an amount to be determined at trial.

409.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. §1983
### ARISING FROM DEFENDANTS' FAILURE TO INTERVENE
### (Against DRAKE, MINTZ, JOHN DOE NO. 2, JOHN DOE NO. 5, JOHN DOE NO. 6)

410.    Plaintiff Mr. Vann re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

411.    DRAKE had an affirmative duty to intercede on Plaintiff's behalf to prevent and stop the violation of his constitutional rights by MITCHELL.

412.    DRAKE failed to intervene on Plaintiff's behalf despite having had a realistic opportunity to do so, and despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by his affirmative conduct.

- 57 -

413.    MINTZ had an affirmative duty to intercede on Plaintiff's behalf to prevent and stop the violation of his constitutional rights by ANGELO and other defendants.

414.    MINTZ failed to intervene on Plaintiff's behalf despite having had a realistic opportunity to do so, and despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

415.    JOHN DOE NO. 2, JOHN DOE NO. 5, and JOHN DOE NO. 6. had an affirmative duty to intercede on Plaintiff's behalf to prevent and stop the violation of his constitutional rights by MITCHELL and JOHN DOE NO. 3.

416.    JOHN DOE NO. 2, JOHN DOE NO. 5, and JOHN DOE NO. 6. failed to intervene to stop and / or prevent MITCHELL and JOHN DOE NO. 3's unjustified use of force against Mr. Vann in holding his hands above his head, painfully hyperextending his shoulders for over a minute, despite having been present and having had the time and a realistic opportunity to do so.

417.    As a result of the aforementioned conduct of the Defendant RPD OFFICERS, Plaintiff's constitutional rights were violated.

418.    As a result, Plaintiff was damaged, injured and harmed, and seeks compensation in an amount to be determined at trial.

419.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### SEVENTH CLAIM FOR RELIEF
### PRIVACY PROTECTION ACT – 42 U.S.C. § 2000aa, *et seq*.
### (Against ANGELO, MINTZ, MITCHELL, BARBER, ZIMMERMAN)

420.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

421.    One or more of the individual-defendants, while acting within the course and scope of their employment and under color of law, destroyed documentary materials and/or work product materials which the defendant RPD officers reasonably believed or should have reasonably believed plaintiffs intended to use to disseminate the above-described incident to members of the public.

422.    As a result, Plaintiff was damaged, injured and harmed, and seeks compensation in an amount to be determined at trial.

423.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### EIGHTH CLAIM FOR RELIEF
### SUPERVISORY LIABILITY under 42 U.S.C. § 1983
### (Against ZIMMERMAN, ANGELO and JOHN DOE NO. 5)

424.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

425.    ZIMMERMAN, ANGELO and JOHN DOE NO. 5 personally caused plaintiff's constitutional injuries by being deliberately or consciously indifferent to the rights of others in failing to properly supervise, train, and discipline their subordinate employees.

426.    As a result, Plaintiff was damaged, injured and harmed, and seek compensation in an amount to be determined at trial.

- 59 -

427.     As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### NINTH CLAIM FOR RELIEF
### MALICIOUS ABUSE OF PROCESS under 42 U.S.C. § 1983
### (Against KESTER, DRAKE, MITCHELL, KEPHART, MINTZ, ANGELO, BARBER, ZIMMERMAN, JOHN DOE NO. 1 and JOHN DOE NO. 5)

428.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

429.     Defendants issued criminal process against plaintiff by causing his arrest and prosecution in Monroe County Criminal Court.

430.     Defendants caused plaintiff to be arrested and prosecuted in order to obtain a collateral objective outside the legitimate ends of the legal process, to wit: to avoid discipline for their abuse of authority and acts of brutality, and to retaliate against him for the injuries they caused to themselves, and thereby violated plaintiff Aaron Jimenez's right to be free from malicious abuse of process.

431.     Accordingly, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

432.     As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### TENTH CLAIM FOR RELIEF
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
### (Against all defendants)

433.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

434.     The Defendant CITY and the Defendant Police Officers have acted under color of law to deprive Plaintiff of his civil, constitutional and statutory rights to due process of law pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and are liable to Plaintiff under 42 USC §1983.

435.     In response to Plaintiff informing numerous defendant police officers that he was in severe pain and that he required medical treatment, one or more defendant police officers denied his requests for medical treatment.

436.     Despite Plaintiff's obvious serious physical injuries, and the fact that he was incoherent and unconscious at the scene of the incident after defendants brutally attacked him, defendants refused to provide him needed medical treatment, refused to transport him to the hospital, and refused to allow EMS to transport him to the hospital, which constituted deliberate disregard towards Plaintiff's serious medical needs and the substantial risk of serious harm he faced.

437.     Plaintiff was not otherwise provided with an opportunity to receive medical attention.

438.     Because Plaintiff was refused immediate medical treatment while he was in custody, he suffered from extreme pain and his physical injuries were exacerbated.

439.     Plaintiff's serious physical injuries were exacerbated by the defendant POLICE OFFICERS refusal to take plaintiff for immediate medical treatment.

440.     Plaintiff's serious physical injuries were exacerbated by the defendant POLICE OFFICERS instructing the staff at the Monroe County Jail not to provide Plaintiff with medical treatment in retaliation for KESTER breaking his leg and DRAKE separating his shoulder, which they falsely informed jail employees were caused by Mr. Vann.

441.    Plaintiff was damaged by the deliberate indifference of the Defendant CITY and the Defendant POLICE OFFICERS.

442.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against defendants in a sum of money to be determined at trial.

443.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

### ELEVENTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM UNCONSTITUTIONAL MUNICIPAL POLICES RELATING TO THE DEFENDANT CITY'S FAILURE TO DISCIPLINE RPD OFFICERS WHO USE FORCE WITHOUT JUSTIFICATION— EVEN WHEN THE UNLAWFUL USE OF FORCE IS CAPTURED ON VIDEO
#### (Against the City)

444.    Plaintiff Mr. Vann re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

445.    The Defendant City and the RPD have deliberately and systemically failed to discipline RPD Officers who use force without justification, even when said unlawful use of force is captured on video.

446.    The need for said discipline is presently and patently obvious, as numerous RPD Officers, including the Defendant RPD OFFICERS, have repeatedly used force without justification.

447.    The City and RPD caused Mr. Vann's injuries by failing to discipline the defendant RPD officers when they used excessive force against arrestees on numerous occasions prior to September 4, 2015, causing them to repeat their unlawful use of force against Mr. Vann, because they knew to a moral certainty that there would be no consequences for their use of excessive force.

- 62 -

448.    The City and RPD also caused Mr. Vann's injuries by failing to discipline the defendant RPD officers and other RPD officers when they used excessive force against arrestees on numerous occasions prior to September 4, 2015, and said use of force was captured on video, but the City and the RPD failed to impose any discipline on the officers, despite the unlawfulness of their conduct being clearly demonstrated by the video evidence; thus, defendants herein knew to a moral certainty that there would be no consequences for their use of excessive force against Mr. Vann.

449.    The failure of the Defendant CITY and the RPD to maintain standards governing the imposition of discipline when the Defendant RPD OFFICERS and their fellow officers use force without justification, even when the force constitutes an unconstitutional municipal policy, practice and custom.

450.    By failing to discipline officers who use force without justification and/or who fail to document use-of-force incidents, despite the repeated unjustified use of force by numerous RPD Officers making the need for said discipline obvious, the Defendant City and the RPD have demonstrated their deliberate indifference to the constitutional deprivations caused by RPD Officers' repeated use of force without justification and their failure to document use-of-force incidents.

451.    The Defendant City and the RPD have had actual and/or constructive knowledge of the pervasive and widespread practice of RPD officers' use force without justification for many years, but has failed to take any affirmative steps to end the practice—like disciplining officers who use excessive force.

452.    Instead, the Defendant City and the RPD have demonstrated their deliberate indifference to the pervasive and widespread practice of RPD officers' use of excessive force by

- 63 -

encouraging RPD Officers to use force without justification through granting awards and promotions to the Defendant RPD OFFICERS and their fellow officers who have repeatedly used force without justification. [3]

453.    While the RPD has never undertaken any internal study of the use of excessive force by its officers, and statistics on these practices are not available, there is extensive evidence of a permanent, longstanding, and widespread practice of the Defendant CITY and RPD failing to discipline RPD Officers who have used force without justification or take other remedial actions to prevent officers from using force without justification, which encourages the Defendant RPD OFFICERS and their fellow officers to use force without justification because they know to a virtual certainty that they will not be disciplined for doing so.

454.    While the RPD has never undertaken any internal study of the use of excessive force by its officers and so no accurate statistics on RPD Officers use of force, statistics from other jurisdictions that do collect data shows that where an officer who uses excessive force is not disciplined following their unlawful use of force, they are more likely to use excessive force again in the future.

455.    Although the Defendant CITY and RPD have the technological capabilities to identify and track officers who have been involved in multiple use of force incidents, this information has not been utilized by the Defendant CITY or the RPD to discipline officers who have repeatedly used force without justification.

---

[3] *See*, Carlet Cleare, *Suspended RPD officer named "Officer of the Year"*, 13 WHAM (May 5, 2017), http://13wham.com/news/top-stories/rpd-officer-honored-in-midst-of-controversy; Todd Clausen, *City man hit by patrol car sues RPD, others for $7M*, DEMOCRAT & CHRONICLE (July 21, 2016), http://www.democratandchronicle.com/story/news/2016/07/21/rochester-ny-man-brian-a-norford-files-7-million-civil-suit-against-rochester-police/87382790/. Articles incorporated by reference herein.

- 64 -

456.    The fact that the Defendant CITY and RPD deliberately fail to discipline RPD Officers who use excessive force in the course of effectuating arrests constitutes an unlawful municipal policy, which permits and encourages RPD Officers to use force without justification in violation of the Fourth Amendment to the United States Constitution.

<u>THE CITY AND RPD HAVE AN OFFICIAL POLICY, PRACTICE AND CUSTOM OF FAILING TO DISCIPLINE OFFICERS WHO USE EXCESSIVE FORCE—EVEN WHEN SAID INCIDENTS ARE CAPTURED ON VIDEO</u>

457.    On May 1, 2013, RPD Officers Joseph M Ferrigno II and Anthony R. Liberatore were recorded by RPD Blue Light Cameras[4] and witnesses cell phone cameras[5] brutally beating Benny Warr, a 52-year-old African American man and wheelchair-bound amputee, while he was waiting for a RTS bus at the intersection of Jefferson and Bartlett Streets.[6] As reported by the Democrat & Chronicle, Mr. Warr testified to the RPD's Professional Standards Section "that he was maced, thrown to the ground and struck after he responded to an order to move by telling officers that he was just waiting for a bus."[7] Mr. Warr's PSS testimony was corroborated by witness' cell phone[8] videos and RPD Blue Light Camera video.[9]

---

[4] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1st of Benny Warr attack*, https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by reference herein.

[5] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016). Video incorporated by reference herein.

[6] *See* Complaint, *Warr, et al. v. City of Rochester, et al.*, 13-cv-6508-DLG-MWP (W.D.N.Y. Sept. 19, 2013). Complaint incorporated by reference herein.

[7] Erica Bryant, *Whatever happened to Benny Warr*, DEMOCRAT & CHRONICLE (Dec. 7, 2013), http://www.democratandchronicle.com/story/news/local/2013/12/06/erica-bryant-what-ever-happened-to-benny-warr-/3895715/ (last visited Apr. 10, 2016). Article incorporated by reference herein.

[8] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016). Video incorporated by reference herein.

[9] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1st of Benny Warr attack*, https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by reference herein.

- 65 -

458.    The PSS investigation found that Officer Libertore utilized an elbow strike to Benny Warr's head while Mr. Warr was lying face down on the ground, and determined that the elbow strike was an untrained technique under RPD standards.

459.    The PSS investigation also found that before Officer Libertore utilized the untrained elbow strike to Mr. Warr's head, he stated to Mr. Warr, "are you ready to get your ass kicked."

460.    Officer Libertore testified to PSS that:

> He knew that he was under arrest. The only way he was going to leave was in an ambulance, meaning that we were definitely going to have to get physical and that either he was going to have to be hurt, or one of us were going to be hurt.

461.    Any reasonable person reviewing the PSS findings, Officer Ferrigno's PSS testimony, and the videos of Officers Ferrigno and Libertore pepper-spraying Benny Warr, pushing his wheel chair over, and repeatedly striking Mr. Warr in the head and body while Mr. Warr was lying face down on the ground could only describe the force used by Officers Ferrigno and Libertore as objectively unreasonable and excessive.

462.    Nevertheless, the PSS and CRB each recommended to the RPD Chief of Police James Sheppard that Officers Ferrigno and Libertore be exonerated on Benny Warr's allegation that the officers used excessive force while effectuating his arrest.

463.    According to the CRB, its main focus "is to determine the fairness, thoroughness and timeliness of the police complaint investigation as well as any possible deficiencies."[10]

---

[10] *Police Community Relations Program: Civilian Review Board 2015 Annual Report* at 15, available at http://www.cityofrochester.gov/WorkArea/DownloadAsset.aspx?id=8589964676 (last visited Apr. 17, 2016) (Hereinafter "2015 CRB Report"). 2015 CRB Report incorporated by reference herein.

- 66 -

Moreover, the CRB prides itself in "providing independent, neutral fair representation for all involved parties."[11]

464.    However, in the CRB review of Benny Warr's excessive force complaint, the CRB panelists accused the RPD of attempting to inappropriately influence their investigation. Specifically, the CRB panelists objected to the fact that Sergeant Andrew McPherson, one of the RPD's Defensive Tactics Coordinators, made a presentation to the CRB explaining the purported reasons the PSS exonerated Officers Ferrigno and Libertore, despite the overwhelming video and testimonial evidence showing they used excessive force in effectuating the arrest of Benny Warr.

465.    Former RPD Chief of Police James Sheppard reviewed the PSS and CRB investigative findings, and the witness cell phone and RPD Blue Light Camera videos of the incident, and decided to exonerate both officers on Mr. Warr's excessive force allegations, because he believed their use of force was reasonable under the circumstances.

466.    Former Chief Sheppard is a municipal policymaker for the defendant City, and his decision not to discipline Ferrigno and Libertore constituted a ratification of their unlawful use of force.

467.    Sheppard's decision not to discipline Ferrigno and Libertore constituted an official policy of the City and the RPD that RPD officers will not be disciplined for using excessive force, even if their grossly excessive use of force is captured on video.

468.    The Defendant City has admitted that the CRB and its use-of-force review procedures are constitutionally deficient, as the City has begun the process to overhaul its civilian review process.[12]

---

[11] *Id*. at 3.

[12] Sharpe, Brian, *City Council seeks outside study of police civilian review process*, DEMOCRAT & CHRONICLE (June 3, 2017).
http://www.democratandchronicle.com/story/news/2017/06/03/council-begins-review-bryant-

469.    The proliferation of video evidence capturing police misconduct has led to an increase in the number and percentage of substantiated complaints of police misconduct in municipalities across the county. For example, in New York City, the number of complaints substantiated by the NYPD's Civilian Complaint Review Board ("CCRB") increased approximately seventy-percent (70%) from 2014 to 2015.[13] In fact, forty-three percent (43%) of cases where video evidence was available were substantiated by the CCRB in 2015, as opposed to thirty-percent (30%) of cases substantiated overall.[14]

470.    Nevertheless, Defendant CITY and the RPD persist in their failure to discipline RPD Officers who use force without justification, even when presented with irrefutable video evidence that said use of force was unjustified and excessive.[15]

471.    In fact, by permitting RPD Officers to attend a training by Bill Lewinski, the self-proclaimed "police psychologist," who is a notorious advocate for police officers who have shot a person under suspicious circumstances, and is infamous for advocating the use of various debunked junk science methods—like that he believes a man's level of aggressiveness can be determined by anthropometry—the Defendant CITY and RPD have demonstrated that their

---

case-seeks-outside-study-civilian-review-board/365336001/. Article incorporated by reference herein.

[13] John Annese and Graham Rayman, *Review Board substantiates 30% of civilian complaints against NYPD officers in December with video evidence*, N.Y. Daily News (Jan. 15, 2016), http://www.nydailynews.com/new-york/30-civilian-complaints-nypd-substantiated-article-1.2497121 (last visited Apr. 10, 2016). Article incorporated herein by reference.
[14] *Id.*
[15] *See generally*, Barbara Lacker-Ware and Theodore Forsyth, *The Case for an Independent Police Accountability System: Transforming the Civilian Review Process in Rochester, New York* (2017). Available online at: http://enoughisenough.rocus.org/wp-content/uploads/2017/02/The-Case-for-an-Independent-Police-Accountability-System-2.1.17-FINAL.pdf. Report incorporated by reference herein.

primary concern is their officers better justifying their unlawful use of force *ex post*, and not reducing the number of force incidents *ex ante*.[16]

### THE DEFENDANT CITY AND RPD'S DELIBERATE INDIFFERENCE IS EVIDENCED BY THE FAILURE TO INVESTIGATE USE OF FORCE INCIDENTS OR TO DISCIPLINE OFFICERS WHO HAVE REPEATEDLY USED FORCE WITHOUT JUSTIFICATION— EVEN WHEN SAID FORCE IS CAPTURED ON VIDEO

472.    The Defendant CITY and the RPD have been on notice of the widespread practice of officers' use excessive force since at least 1992, when former RPD Chief Gordon F. Urlacher pleaded guilty to a felony conspiracy charge that he knew about civil rights abuses of five RPD officers, including the repeated use of excessive force, but deliberately failed to discipline the officers for their unlawful actions.[17]

473.    In recent years, with the proliferation of cell phone cameras, numerous excessive force incidents have been captured on video; nevertheless, even when clear video evidence demonstrates that an officer's use of force was unlawful and excessive, the City and the RPD refuse to discipline said officers.

474.    By failing to discipline officers in the first instance, said officers are encouraged to repeat their use of excessive force against subsequent individuals. The below examples constitute just a small fraction of the officers who have repeatedly used excessive force but have not been disciplined, even when the force incident was captured on video.

---

[16] David Andreatta, *Rochester Police Department backpedals on controversial training*, DEMOCRAT & CHRONICLE (Sept. 6, 2017), http://www.democratandchronicle.com/story/news/local/columnists/andreatta/2017/09/06/rochester-backpedals-controversial-police-training/639216001/. Article incorporated by reference herein.

[17] *Civil Rights Trial Is Likely to Leave a Long-Term Mark on Rochester Police*, N.Y. Times (Apr. 6, 1993), http://www.nytimes.com/1993/04/06/nyregion/civil-rights-trial-is-likely-to-leave-a-long-term-mark-on-rochester-police.html (last visited June 7, 2016). Article incorporated by reference herein.

Case 6:18-cv-06464-MAT   Document 1-3   Filed 06/20/18   Page 70 of 131

## RPD OFFICER PATRICK GIANCORSO AND HIS PARTNER WILLIAM WAGNER

475.    Patrick Giancursio has used excessive force against numerous individuals in the City of Rochester both before and after the incident complained of herein, but has never been disciplined by the Defendant CITY or the RPD.

476.    Instead, Giancursio has been rewarded by the Defendant CITY and the RPD for his repeated unlawful use of force against various arrestees.

477.    For example, the RPD awarded Giancursio its "Officer of the Year Award" in May 2017, even though he was suspended at the time of the award while the department allegedly investigated his use of force against Alexander Grassies in an April 2017 incident that was caught on surveillance video.[18]

478.    Giancursio was also caught on surveillance video using excessive force against Brian Norford in the area of 475 Lyell Avenue, Rochester, New York, on February 3, 2016, when Giancursio drove his RPD vehicle onto a sidewalk to purposefully strike Mr. Norford, who was knocked to the ground. After knocking Mr. Norford to the ground with his police cruiser, Giancursio exited the vehicle and struck him several times along with his partner, William Wagner.[19]

479.    Despite Giancursio being captured on video using grossly excessive amount of force at least two times between February 2016 and April 2017, and the fact that he was

---

[18] Carlet Cleare, *Suspended RPD officer named "Officer of the Year"*, 13 WHAM (May 5, 2017), http://13wham.com/news/top-stories/rpd-officer-honored-in-midst-of-controversy. Article incorporated by reference herein.

[19] Todd Clausen, *City man hit by patrol car sues RPD, others for $7M*, DEMOCRAT & CHRONICLE (July 21, 2016), http://www.democratandchronicle.com/story/news/2016/07/21/rochester-ny-man-brian-a-norford-files-7-million-civil-suit-against-rochester-police/87382790/. Article incorporated by reference herein.

- 70 -

suspended pending the department's investigation into his use of force against Mr. Garries in the April 2017 incident, the RPD still chose to honor Giancursio by awarding him its "Officer of the Year Award."

480.    Despite Giancursio's unlawful actions against Mr. Norford being captured on video, costing the City tens of thousands of dollars to settle Ms. Norford's civil claims, and garnering widespread media attention, the Defendant CITY and the RPD never conducted an independent investigation into Giancursio's use of force against Mr. Norford to determine if it was unlawful, excessive or in violation of RPD policies.

481.    In fact, Giancursio's use of force against Mr. Norford was unlawful, excessive and violated the RPD's policies.

482.    Nevertheless, the Defendant CITY and RPD never disciplined Giancursio following the February 3, 2016 where he, *inter alia*, falsely arrested and used excessive force against Mr. Norford.

483.    Moreover, despite Giancursio's unlawful actions against Mr. Garries being captured on video and garnering widespread media attention, the Defendant CITY and the RPD failed to conduct an independent, full, and fair investigation into Defendant Giancursio's use of force against Mr. Garries to determine if it was unlawful, excessive or in violation of RPD policies.

484.    In fact, Giancursio's use of force against Mr. Norford and Mr. Garries was unlawful, excessive and violated the RPD's policies.

485.    Nevertheless, the Defendant CITY and RPD eventually exonerated Giancursio and failed to impose any meaningful discipline against him following the April 2017 incident where he was captured on video using excessive force against Mr. Garries.

- 71 -

486.    Notably, Giancorso's partner, Wagner, was present with Giancorso throughout the February 3, 2016 incident with Mr. Norford and the April 2017 incident with Mr. Garries, and he both used excessive force against Mr. Norford and Mr Garries, and he failed to intervene to prevent Giancorso's use of excessive force against Mr. Norford and Mr. Garries, despite having had the opportunity to do so.

487.    Moreover, Despite Giancursio's unlawful actions against Mr. Garries being captured on video and garnering widespread media attention, the Defendant CITY and the RPD failed to conduct an independent, full, and fair investigation into Defendant Giancursio's use of force against Mr. Garries to determine if it was unlawful, excessive or in violation of RPD policies.

488.    Instead, Defendant CITY and the RPD accepted Giancursio and Wagner's justification for the use of force at face value.[20]

489.    In fact, in speaking about the suspensions of GIANCURSIO and WAGNER as a result of the incident involving Mr. Garries, RPD Chief Michael Ciminelli stated, "[w]e need to understand the justification for the use of force. Whenever an officer uses force, that officer has an obligation to articulate the justification for the force … why it was done, how it was done, did it follow our training, our policies."[21]

490.    Chief Ciminelli admits that an officers' subjective justification for the use-of-force is more important than objective evidence demonstrating whether said use of force was actually excessive and unlawful.

---

[20] 2 Rochester police officers suspended over incident on video, Democrat & Chronicle (Apr. 20, 2017) https://www.usatoday.com/story/news/2017/04/20/2-rochester-police-officers-suspended/100703474/. Article incorporated by reference herein.
[21] Id.

491. The Defendant CITY and RPD eventually exonerated Giancursio and failed to impose any meaningful discipline against Giancursio following the April 2017 incident where he was captured on video using excessive force against Mr. Garries.

492. Chief Ciminelli is a municipal policymaker for the defendant City, and his decision not to discipline Giancursio constituted a ratification of his unlawful use of force.

493. Chief Ciminelli's decision not to discipline Giancursio, and instead allowing him to be awarded the "Officer of the Year Award" in May 2017, constituted a continuation of the official policy of the City and the RPD that RPD officers will not be disciplined for using excessive force, even if their grossly excessive use of force is captured on video, which was previously established by former Chief Sheppard by his decision not to discipline Officers Ferrigno and Libertore.

## RPD OFFICER THOMAS RODRIGUEZ

494. RPD Officer Thomas Rodriguez has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the City or the RPD.

495. On August 31, 2002, RPD officer Thomas Rodriguez and other RPD Officers attacked Lawrence Rogers at 375 Driving Park Avenue, Rochester, New York, by tacking him to the ground, TASER-ing him, punching, kicking, and beating him with night sticks. Upon information and belief, the excessive force used against Mr. Rogers by RPD officer Thomas Rodriguez and other RPD Officers, caused his death.

496. RPD Officer Thomas Rodriguez was never disciplined by the Defendant City or the RPD following the incident on August 31, 2002 that caused Mr. Rogers' death.

- 73 -

497.    Thereafter, on May 10, 2007, RPD officer Thomas Rodriguez used excessive force against Ann Marie Sanders, a 100-pound woman, during an incident, where he grabbed her by the arms, body slammed her into the ground, put his knee in her back, handcuffed her, threw her into the back of a police vehicle, and threatened to mace her.

498.    RPD Officer Thomas Rodriguez was never disciplined by the Defendant City or the RPD following the May 10, 2007 incident with Ann Marie Sanders.

499.    On August 7, 2016, RPD Officer Thomas Rodriguez, was involved in the brutal beating of 17-year-old Ricky Bryant, wherein Mr. Bryant was shot with "pepper balls," punched in the face, thrown to the ground, sprayed him in the face with mace, and shot with a TASER.

500.    As a result of the brutal beating at the hands of P.O. Rodriguez and other RPD Officers, Mr. Bryant suffered serious physical injuries, including a fractured orbital socket.

501.    Mr. Bryant filed a complaint of excessive force against P.O. Rodriguez and other RPD Officers who brutally beat him with the Civilian Review Board.

502.    The Civilian Review Board and the RPD exonerated P.O. Rodriguez and the other officers involved in the brutal beating of Mr. Bryant.

503.    After the Civilian Review Board and the RPD exonerated P.O. Rodriguez and the other RPD Officers involved in the brutal beating of Mr. Bryant, the Rochester City Counsel, for the first time ever, issued subpoenas for records related to the incident.

504.    The direct and proximate cause of P.O. Rodriguez's utilization of the illegal and excessive amount of force used against Mr. Bryant, resulting in a fractured orbital socket, was the Defendant CITY and the RPD's failure to discipline P.O. Rodriguez after he previously used force without justification against Ms. Sanders, Mr. Rogers, and other individuals in the City of Rochester.

- 74 -

505.     Despite P.O. Rodriguez's unlawful actions garnering national media attention, the Defendant CITY and the RPD have not conducted a full, thorough, fair and independent investigation into P.O. Rodriguez's use of force against Mr. Bryant, to determine if it was unlawful, excessive or in violation of RPD policies.

506.     Defendant CITY and RPD never disciplined P.O. Rodriguez following the August 7, 2016 incident where he, *inter alia*, brutally beat 17-year-old Ricky Bryant and fractured his orbital socket.

507.     In April 2017, RPD Officer Thomas Rodriguez placed DKuan Webb in an illegal chokehold in an incident that was recorded on P.O. Rodriguez's body camera.

508.     P.O. Rodriguez's illegal chokehold of Mr. Webb was investigated by the Federal Bureau of Investigation, according to the Democrat & Chronicle.[22]

509.     In mid-July 2017, the Defendant CITY agreed to pay Mr. Webb $125,000 to settle any potential civil claims arising from the violation of Mr. Webb's rights under the United States Constitution and the common laws of the State of New York.

510.     The direct and proximate cause of P.O. Rodriguez's utilization of the illegal chokehold against Mr. Webb was the Defendant CITY and the RPD's failure to discipline P.O. Rodriguez after he previously used force without justification against Ms. Sanders, Mr. Rogers, Mr. Bryant and other individuals in the City of Rochester.

511.     Despite P.O. Rodriguez's unlawful actions being captured on video, costing the City $125,000 to settle Mr. Webb's civil claims, drawing an FBI investigation into P.O. Rodriguez for possible federal criminal and or civil rights violations, and garnering national

---

[22] Gary Craig, *City pays $125,000 to man allegedly choked by RPD police officer*, DEMOCRAT & CHRONICLE (Sept. 5, 2017), http://www.democratandchronicle.com/story/news/2017/09/05/city-rochester-police-choking-fbi-settlement-dkuan-webb-thomas-rodriguez-john-parrinello/632147001/. Article incorporated by reference herein.

media attention, the Defendant CITY and the RPD have not conducted an independent investigation into P.O. Rodriguez's use of force against Mr. Webb to determine if it was unlawful, excessive or in violation of RPD policies.

512.    Defendant CITY and RPD never disciplined P.O. Rodriguez following the April 2017 incident where he, *inter alia*, utilized an illegal chokehold against DKuan Webb.

### RPD OFFICER ALEXANDER BALDAUF (and his partner Ricky Harris Jr.)

513.    RPD Officer Alexander Baldauf has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant City or the RPD.

514.    On August 17, 2013, RPD Officer Alexander Baldauf and attacked Dwayne Ivery in Rochester, New York, punching Mr. Ivery in the head numerous times, slamming his body onto the ground, again punching Mr. Ivery in the head and body, and stomping on Mr. Ivery's head with his foot. This incident was captured on video.

515.    Throughout the incident, upon information and belief, Officer Baldauf's partner, Ricky Harris Jr., stood idly nearby and failed to intervene to prevent or stop Officer Baldauf's violation of Mr. Ivery's rights, despite having the time and realistic opportunity to do so.

516.    Despite this interaction being caught on video, the Defendant CITY and the RPD never conducted an independent investigation of the use of force by RPD Officers Alexander Baldauf and Ricky Harris Jr. against Mr. Ivery to determine if it was unlawful, excessive or in violation of RPD policies.

517.    RPD Officers Alexander Baldauf and Ricky Harris Jr. were never disciplined by the City or the RPD following the incident on with Mr. Ivery on or about August 17, 2013.

- 76 -

518.    Thereafter, on April 20, 2015, RPD Officer Alexander Baldauf used excessive force against Delmar Lipford during an incident at or near the intersection of Culver Road and East Main Street, Rochester, New York. Officer Baldauf shoved Mr. Lipford in the back several times, punched him in the face, and pointed his TASER at Mr. Lipford.

519.    Throughout the incident on April 20, 2015, Officer Baldauf's partner, Ricky Harris Jr., stood idly nearby and failed to intervene to prevent or stop Officer Baldauf's violation of Mr. Lipford's rights, despite having the time and realistic opportunity to do so.

520.    RPD Officers Alexander Baldauf and Ricky Harris Jr. were never disciplined by the Defendant City or the RPD following the incident with Mr. Lipford on April 20, 2015.

## RPD OFFICER JOSEPH FERRIGNO II

521.    RPD Officer Joseph Ferrigno II has used excessive force against numerous individuals in the City of Rochester but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD.

522.    Officer Ferrigno has been the subject of at least 23 civilian complaints of misconduct reviewed by the RPD's Professional Standards Section ("PSS"), many of which involved allegations of excessive force; however, Officer Ferrigno has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant City or the RPD.

523.    On or about September 12, 2010, RPD Officer Joseph Ferrigno II used excessive force against the Robin Turner during an incident where she called 911 to report that she'd been assaulted by a teenager in her neighborhood; Officer Ferrigno responded and refused to file a police report, and when Ms. Turner complained about Officer Ferrigno's actions, he retaliated

against Ms. Turner by body slamming her onto the ground, dragging her across the ground approximately 10 feet, and arresting her; as a result of the excessive force used by Officer Ferrigno, Ms. Turner suffered a broken rib.

524.    Despite Ms. Turner filing a complaint about the excessive amount of force used against her during her arrest, upon information and belief, the Defendant CITY and the RPD never conducted an independent investigation of the use of force by RPD Officer Ferrigno to determine if it was unlawful, excessive or in violation of RPD policies.

525.    Officer Ferrigno was never reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD following the September 12, 2010 incident where he used excessive force against Ms. Turner.

526.    On or about May 11, 2012, RPD Officer Joseph Ferrigno II used excessive force against Darren Williams during an incident where Officer Ferrigno hit Mr. Williams in the face while he was sitting down, threw him on the ground, punched and kicked him in his body and head, and stating to the plaintiff, "nigger, I'm going to teach you to respect authority."

527.    Despite Mr. Williams filing a complaint about the excessive amount of force used against him during his arrest, the Defendant CITY and the RPD never conducted an independent investigation of the use of force by RPD Officer Ferrigno to determine if it was unlawful, excessive or in violation of RPD policies.

528.    Officer Ferrigno was never reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD following the May 11, 2012 incident where he used excessive force and racial slurs against Mr. Williams.

529.    On May 1, 2013, RPD Officer Joseph M Ferrigno II and his partner, Anthony R. Liberatore, brutally beat and falsely arrested Benny Warr, a 52-year-old African American

wheelchair-bound amputee, while he was waiting for a RTS bus at the intersection of Jefferson and Bartlett Streets. As reported by the Democrat & Chronicle, Mr. Warr testified to the RPD's Professional Standards Section "that he was maced, thrown to the ground and struck after he responded to an order to move by telling officers that he was just waiting for a bus."[23] The incident between Mr. Warr and RPD Officers Ferrigno and Liberatore was caught on video by several bystanders[24] and the RPD's Blue Light Cameras.[25]

530.    RPD Officers Ferrigno and Libertore were never reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD following the May 1, 2013 incident where they brutally beat Benny Warr.

### RPD OFFICER MARIO MASIC

531.    RPD Officer Mario Masic has used excessive force against numerous individuals in the City of Rochester both before and after the incident complained of herein, but has never been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD.

532.    Citizens of Rochester who were repeatedly harassed, assaulted and subjected to excessive force by Masic sarcastically nicknamed him the "Cowboy" because of his wild and lawless tactics. However, upon information and belief, Masic has embraced the nickname, and is

---

[23] Erica Bryant, *Whatever happened to Benny Warr*, DEMOCRAT & CHRONICLE (Dec. 7, 2013), http://www.democratandchronicle.com/story/news/local/2013/12/06/erica-bryant-what-ever-happened-to-benny-warr-/3895715/ (last visited Apr. 10, 2016). Article incorporated by reference herein.
[24] *See* Cell phone video taken by Ms. Tashay Young, a/k/a Shakur Mohammed, originally posted to YouTube on May 4, 2013, and later edited and reposted on June 24, 2013, *Corrected Higher Resolution Video of Benny Warr Being Attacked*, https://www.youtube.com/watch?v=7xifmR0C3Mk&nohtml5=False (last visited Apr. 10, 2016). Video incorporated by reference herein.
[25] *See* RPD Blue Light Camera video posted to YouTube, *edited footage from cop cam on May 1ˢᵗ of Benny Warr attack*, https://www.youtube.com/watch?v=47vo2WVcWY0 (last visited Apr. 10, 2016). Video incorporated by reference herein.

- 79 -

notorious for referring to himself as "The Cowboy" during interactions with citizens in Rochester.

533.    MASIC has used excessive force against other arrestees after the date of the incident complained of herein, including the use of force without justification against arrestees while they were handcuffed.

534.    MASIC has never reprimanded, suspended, retrained on the use of force, retrained on the duty to intervene to prevent and/or stop unlawful actions of his fellow police officers, or been otherwise disciplined by the Defendant City or the RPD following the incident(s) that occurred either before or after the incident complained of herein.

535.    On August 7, 2009, MASIC unlawfully stopped, searched, arrested and used excessive force against a young man named Deshawn Keon Fields. MASIC thereafter falsified his police paperwork in an attempt to justify the reasons that he stopped and arrested Mr. Fields, and then forwarded that falsified paperwork to the Monroe County District Attorney's Office. Thereafter, MASIC perjured himself in front of the grand jury by tailoring his testimony in an attempt to nullify constitutional deficiencies in his arrest paperwork.

536.    Thereafter, in *People* v. *Fields*, Indictment No. 2009-0864 (Feb. 17, 2010), the Honorable Joseph D. Valentino granted the criminal defendant's motion to suppress because forensic evidence showed that MASIC had testified untruthfully before the grand jury to nullify constitutional deficiencies in his arrest paperwork and justify the initial unlawful stop and search of Mr. Fields. Judge Valentino also found Masic's testimony at the suppression hearing to be incredible and unbelievable.

537.    Masic violated NY CPL § 140.05 and RPD internal rules and regulations when he fabricated his arrest and charging paperwork in *Fields*.

538.    Masic violated RPD internal rules and regulations when he lied under oath to the Grand Jury and at the suppression hearing in *Fields*.

539.    After Judge Valentino granted the criminal defendant's motion to suppress in *Fields* based on his finding that Masic had lied in his arrest and charging paperwork and perjured himself on the stand, the Defendant CITY and the RPD failed to discipline Masic.

540.    By failing to discipline MASIC after his unlawful actions in Fields, the Defendant CITY and the RPD condoned his unlawful conduct, causing him to violate the rights of subsequent individuals, including Mr. Vann.

541.    On May 12, 2011, Masic unlawfully entered the property of a woman named Emily Good, and assaulted, battered and falsely arrested Ms. Good in retaliation for her lawfully filming Masic while he conducted vehicle search of an African American motorist who Masic had stopped directly in front of Ms. Good's home. Ms. Good filmed the encounter from her front yard, and when Ms. Good refused Officer Masic's request to stop filming, Officer Masic entered her front yard, grabbed her phone from her hand, threw her to the ground, arrested her and charged her with Disorderly Conduct, Obstruction of Governmental Administration and Resisting Arrest.

542.    Masic falsified his official arrest paperwork in an attempt to justify his unlawful arrest and use of force against Ms. Good, which he then forwarded to prosecutors to initiate her prosecution.

543.    All of the false criminal charges Masic initiated against Ms. Good were dismissed less than a week after Masic falsely arrested her.

544.     Ms. Good filed a Notice of Claim against the Defendant CITY following the May 12, 2011 incident where Masic, *inter alia*, falsely arrested and used excessive force against Ms. Good.

545.     Defendant CITY offered Ms. Good a sum of money to settle her claim in exchange for her agreeing to forgo filing a civil rights lawsuit against the Defendant CITY and Masic related to the incident on May 12, 2011.

546.     Despite this interaction being caught on video, costing the City tens of thousands of dollars to settle Ms. Good's civil claim, and garnering national media attention, the Defendant CITY and the RPD never conducted an independent investigation of the use of force Masic against Mr. Good to determine if it was unlawful, excessive or in violation of RPD policies.

547.     The Defendant CITY and RPD never reprimanded, suspended, retrained, or otherwise disciplined Masic following the May 12, 2011 incident where he, *inter alia*, falsely arrested and used excessive force against Emily Good.

548.     Thereafter, on September 18, 2015, Officer Masic arrested Quintin Keene in a laundromat on Genesee Street, Rochester, New York, and fabricated his arrest paperwork to falsely charge him with disorderly conduct, obstruction of governmental administration and resisting arrest. All the criminal charges were eventually dismissed. In the course of arresting Mr. Keene, Officer Masic pepper sprayed Mr. Keene, body-slammed him onto the ground, and told Mr. Keene if he did not stop moving he was going to be shot.

549.     More details about Masic's misconduct in Mr. Keene's case are detailed in the Seventh Claim for Relief, supra.

- 82 -

550. Despite Masic admitting that he used force against Mr. Keene and all of the false criminal charges brought against Mr. Keene eventually being dismissed, Masic was never disciplined or reprimanded for his unlawful use of force against Mr. Keene.

### OTHER RECENT EXCESSIVE FORCE INCIDENTS CAPTURED ON VIDEO

551. On September 15, 2016, RPD officers were captured on video falsely arresting Lentorya Parker and violently throwing her to the ground.[26] The officers involved were never disciplined.

552. On August 27, 2013, RPD officers were captured on video assaulting a pregnant woman, Brenda Hardaway, punching her in the head and violently throwing her to the ground.[27] The officers involved were never disciplined.

### THESE UNCONSTITUTIONAL POLICIES AND PRACTICES RESULTED IN PLAINTIFF'S INJURIES

553. The City's policy and custom of failing to discipline officers who make false arrests, use excessive force and lie about the reasons for making arrests and using force caused Mr. Vann's constitutional rights to be violated as alleged herein.

554. For example, on May 24, 2015, KESTER falsely arrested and used excessive force against Septimus Scott, and then lied about the circumstances that led to his arrest and use of force against Mr. Scott in official police paperwork.

---

[26] Amy Hudak, *Body camera video released in Hollenbeck St. incident*, WHAM13 (Sept. 27, 2016), http://13wham.com/news/top-stories/body-camera-video-released-in-hollenbeck-st-incident; Amy Hudak, *Woman sues RPD, claiming excessive force in viral video*, WHAM13 (Sept. 6, 2017), http://13wham.com/news/local/woman-sues-rpd-claiming-excessive-force-in-viral-video. Articles and videos linked to therein are incorporated by reference hereto.

[27] Christine Carrie Fien, *Arrest video provokes outrage; chief responds*, CITY NEWSPAPER (Aug. 28, 2013), https://www.rochestercitynewspaper.com/rochester/arrest-video-provokes-outrage-chief-responds/Content?oid=2265099. Articles and videos linked to therein are incorporated by reference herein.

- 83 -

555.    In the incident with Mr. Scott, KESTER arrived at the scene of a vehicle stop where RPD Officer Destiny Deterville was attempting to conduct a sobriety test on Mr. Scott.

556.    After Mr. Scott had passed the walk and turn, stand on one leg, and horizontal nystagmus tests, she attempted to administer a breathalyzer test, even though she did not know how to use the machine.

557.    Deterville stated, "the machine is not working."

558.    While Deterville was struggling with the breathalyzer machine, KESTER approached and screamed at Mr. Scott to "blow in the fucking machine."

559.    Mr. Scott told KESTER that he had complied with all of Deterville's instructions, that he was crying because he was having a panic attack, and that he was an Army Veteran and had been diagnosed with PTSD.

560.    KESTER told Mr. Scott to "shut up," then grabbed his head and slammed his face into the side of an RPD vehicle, slammed his body onto the ground, and punched him in the back of the head and torso multiple times, without any reasonable justification or lawful purpose for the amount of force used.

561.    KESTER then pepper sprayed Mr. Scott in the eyes and mouth from within one to two inches, without justification or lawful purpose.

562.    KESTER fabricated his reasons for arresting and using force against Mr. Scott in official RPD paperwork to initiate a criminal prosecution against Mr. Scott for crimes KESTER knew he did not commit.

563.    All the false charges brought against Mr. Scott by KESTER and other RPD officers were eventually dismissed.

564.     Nevertheless, the City and the RPD never investigated the incident or disciplined KESTER for his false arrest and use of excessive force against Mr. Scott, or for his fabrication of evidence to initiate the prosecution of Mr. Scott for crimes KESTER knew he did not commit.

565.     The incident with Mr. Scott occurred less than four months prior to the incident complained of herein with Mr. Vann.

566.     Just like the incident with Mr. Scott, in this incident KESTER similarly arrived late to the scene of an incident and immediately escalated the situation as he was the first officer to use force against Mr. Vann. Additionally, like the incident with Mr. Scott, KESTER lied about the reasons for arresting and using force against Mr. Vann in official police paperwork and charging documents to cover up his unlawful actions.

567.     None of the Defendant RPD OFFICERS have ever been reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD for any instance where they used force without justification, despite the Defendant CITY and the RPD knowing that each of the Defendant RPD OFFICERS have used force without justification on numerous occasions.

568.     The Defendant City and the RPD's practice of tolerating and condoning police misconduct by its officers, including but not limited to the Defendant RPD OFFICERS, directly and proximately resulted in Plaintiff Mr. Vann being assaulted, battered, subjected to excessive force, falsely arrested, maliciously prosecuted, denied his right to a fair trial, and subjected to the other deprivations of his rights secured by the common law and the United States Constitution as described herein.

569.    The Defendant CITY and the RPD's policy, practice and custom of condoning the use of force without justification has caused countless individuals to be victimized by RPD Officers' repeated use of excessive force, including the Plaintiff Mr. Vann.

570.    As a result of the above constitutionally impermissible conduct, Mr. Vann suffered violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and physical injury.

571.    Accordingly, Mr. Vann demands judgment against Defendants in a sum of money to be determined at trial.

572.    Plaintiff also demands injunctive relief in the form of an Order directing the Defendant City and the RPD to implement a new system for investigating use-of-force incidents and disciplining officers that use force without justification.

573.    Because the Defendant City and RPD have persistently resisted calls for such reforms, Plaintiff demands that any injunctive relief ordered by the Court include independent oversight—such as a Federal Monitor.

574.    Because accountability begins with access to reliable data, any remedy must include mechanisms to ensure the accurate tracking of use-of-force incidents, lawsuits, misconduct complaints and internal probes. Compilation of this data is the only way to find patters and effectively (1) root out bad officers, (2) amend or change RPD policy, and (3) identify issues that need to be addressed via additional training.[28]

575.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

---

[28] *See, e.g.*, Long, Colleen, *NYPD tracking officer data on lawsuits, complaints*, AP (Jul. 15, 2011), http://www.policeone.com/officer-misconduct-internal-affairs/articles/8656321-NYPDtracking-officer-data-on-lawsuits-complaints. Article incorporated by reference herein.

### TWELFTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL*
### ARISING FROM UNCONSTITUTIONAL MUNICIPAL POLICES RELATING TO THE RPD'S CUSTOM, PRACTICE, AND POLICY OF FAILING TO DISCIPLINE RPD OFFICERS' WHO FABRICATE THEIR ACCOUNTS OF INTERACTIONS WITH ARRESTEES IN OFFICIAL POLICE PAPERWORK AND WHO PERJURE <u>THEMSELVES IN SWORN TESTIMONY</u>
### (Against the City)

576.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

577.    The Defendant Police Officers intentionally destroyed evidence favorable to Mr. Vann; coerced witnesses to sign false statements; fabricated their accounts of their interaction with Mr. Vann and the reasons for his arrest and their use of force against him in his arrest and charging paperwork; and testified falsely against Mr. Vann at the grand jury and petit jury, despite having collected security camera recordings of the incident on the night of the incident that contradicted their testimony and demonstrated it was false.

578.    The defendants' actions were taken pursuant to the RPD's policy, practice and custom of fabricating their accounts of their interactions with arrestees in official RPD paperwork and charging documents, and testifying falsely in court, in an attempt to justify false arrests and excessive use of force incidents. This is also known as making "**contempt of cop**" arrests and fabricating their account of the reason that such persons were arrested charging the victim of the unlawful arrest with **"cover charges."**

579.    High-ranking officials within the Defendant City and the RPD are and have been aware of the RPD's practice of arresting the victims of RPD beatings, fabricating their account of the reason for arresting said victims in official police paperwork, and initiating their prosecution for cover charges like resisting arrest and related offenses by forwarding said paperwork to

- 87 -

prosecutors, without reasonable cause or lawful purpose. Despite this knowledge, they have tolerated and encouraged RPD Officers to continue to arrest said victims, fabricate and falsify their paperwork, and request prosecution of said individuals on false cover charges. These supervisors' continued acquiescence to this practice--of arresting victims of excessive force, fabricating and falsifying police paperwork to charge said victims with false cover charges, and forwarding said paperwork to prosecutors—manifests deliberate indifference toward the rights of arrestees and the public in the City of Rochester.

580.   Moreover, the Defendant City, through former RPD Chief James Sheppard, has admitted that the Defendant City and the RPD maintain an unlawful policy of making "**contempt of cop**" arrests and fabricating their account of the reason that such persons were arrested charging the victim of the unlawful arrest with **"cover charges."** Specifically, Chief Sheppard admitted in sworn testimony that the RPD has historically and continues to maintain a policy whereby RPD Officers are instructed to issue dispersal orders to individuals lawfully present on public sidewalks, and when the individuals fail to display the degree of deference or subservience demanded by the arresting officer(s), RPD Officers are instructed to arrest the individuals despite the absence of the commission of any crime and to falsely charge them with "cover charges" such as disorderly conduct, trespass, obstruction of governmental administration and harassment.

581.   A case recently settled by the Defendant City, *Redd* v. *City, et al.*, 15-CV-6049-DGL-JWF (W.D.N.Y. 2014), in the amount of $30,000 exemplifies a quintessential contempt-of-cop/cover charge false arrest, where the arresting officers fabricated their reasons for arresting the plaintiff in official police paperwork. In *Redd*, on November 27, 2013, RPD Officer Eliud Rodriguez arrested the 16-year-old plaintiff and two of his Edison Tech Varsity Basketball

teammates[29] as they waited at the bus stop in downtown Rochester, NY, which was designated by City of Rochester officials and employees as the bus stop for all Rochester City School District sports teams. Officer Rodriguez arrested Mr. Redd and his two teammates in retaliation for their perceived failure to adequately comply with his unlawful order to "move along" when the three student-athletes attempted to explain they were waiting for their school bus. Officer Rodriguez and other RPD officers lied in official police paperwork and charged Mr. Redd and his two teammates with Disorderly Conduct, despite knowing they lacked probable cause to do so. Approximately ten (10) days after the false arrest, the Monroe County District Attorney dropped all of the false criminal charges levied against Mr. Redd and his two teammates.

582.    As detailed in the complaint in *Redd v. City, et al.*, in the Summer of 2014, the United States Department of Justice, including the Federal Bureau of Investigation (FBI) and the United States Attorneys' Office for the Western District of New York, conducted an investigation to determine whether federal criminal charges should be brought against RPD Officer Eliud Rodriguez for his unlawful conduct.

583.    A third high profile contempt of cop/cover charge arrest occurred on May 1, 2013, when RPD Officers Ferrigno and Libertore arrested Benny Warr, a 52-year-old wheelchair bound man, while he was waiting for a RTS bus at the intersection of Jefferson and Bartlett Streets.[30] As reported by the Democrat & Chronicle, Mr. Warr testified to the RPD's Professional Standards Section "that he was maced, thrown to the ground and struck after he responded to an order to move by telling officers that he was just waiting for a bus." The incident

---

[29] The two co-arrestees of the plaintiff in *Redd v. City, et al.*, 15-CV-6049-DGL-JWF (W.D.N.Y. 2014) reached settlements in the amount of $10,000 (Weathers and Carelock) with Defendant City prior to filing civil rights lawsuits in court.

[30] *See* Complaint, *Warr, et al. v. City of Rochester, et al.*, 13-cv-6508-DLG-MWP (W.D.N.Y. Sept. 19, 2013). Complaint incorporated by reference herein.

- 89 -

between Mr. Warr and the Rochester Police Officers was caught on video by several bystanders,

and by the RPD's "blue light" cameras. The Rochester Police Officers charged Mr. Warr with

Disorderly Conduct and Resisting Arrest. Further, "[s]ince reporting his version of the events,

[Mr. Warr] has heard nothing from the police or the Civilian Review Board, the body that is

supposed to review citizens' complaints of alleged police misconduct."[31]

584.    Another "contempt of cop" arrest that received national media attention occurred

in May 2011, when Masic arrested and used excessive force against Emily Good. As reported by

CNN, after RPD Officers pulled over an African American motorist and began searching his

vehicle in front of Ms. Good's home, Ms. Good began filming the search because she was

concerned it was motivated by racial profiling. Ms. Good filmed the encounter from her front

yard. When Ms. Good refused Masic's unlawful order to stop filming, Masic falsely arrested Ms.

Good and charged her with Obstruction of Governmental Administration. The Monroe County

District Attorney eventually dismissed all charges against Ms. Good, stating that, "Based upon

the evidence, we could not make out the elements of the crime charged."[32] Upon information and

belief, Ms. Good reached a settlement with the Defendant City prior to filing a civil rights

lawsuit in court.

585.    Moreover, the City and RPD are aware that several RPD officers, including Mario

Masic, have a long history of violating individuals' constitutional rights, and then lying about

---

[31] Bryant, Erica, *Whatever Happened to Benny Warr?*, DEMOCRAT & CHRONICLE (Dec. 7, 2013). Article incorporated by reference herein and available online at: http://www.democratandchronicle.com/story/news/local/2013/12/06/erica-bryant-what-ever-happened-to-benny-warr-/3895715/ (last visited Dec. 8, 2014). Article incorporated by reference herein.

[32] *See* Solomon, Jessee, *Charges dismissed against woman who videotaped police encounter*, CNN (June 27, 2011). Article incorporated by reference herein and available online at: http://www.cnn.com/2011/CRIME/06/27/new.york.police.video/ (last visited Dec. 7, 2014). Article incorporated by reference herein.

their reasons for arresting and/or using force against individuals, but have failed to take any disciplinary actions against those repeat offenders, despite video evidence and/or court opinions finding or strongly suggesting that they fabricated their paperwork and/or lied under oath in an attempt to nullify constitutional deficiencies in their arrest paperwork.

586.    There are numerous other cases in addition to that of Emily Good where Officer Masic has falsely arrested and/or used excessive force against individuals, and then fabricated his account in his paperwork and/or testified falsely in court regarding his reasons for arresting and using force against the individual.

587.    For example, in *People* v. *Fields*, Indictment No. 2009-0864 (Feb. 17, 2010), the Honorable Joseph D. Valentino granted the criminal defendant's motion to suppress because he found MASIC's testimony that he observed Mr. Fields commit alleged crimes incredible and unbelievable, and tailored to nullify constitutional deficiencies in the arrest and charging paperwork completed by MASIC.

588.    After Judge Valentino granted the criminal defendant's motion to suppress in Fields based on his finding that MASIC had lied in his arrest and charging paperwork and perjured himself on the stand, the Defendant CITY and the RPD failed to discipline MASIC.

589.    Thereafter, on September 18, 2015, Officer Masic arrested Quintin Keene in a laundromat on Genesee Street, Rochester, New York, and fabricated his arrest paperwork to falsely charge him with disorderly conduct, obstruction of governmental administration and resisting arrest. All the criminal charges were eventually dismissed. In the course of arresting Mr. Keene, Officer Masic pepper sprayed Mr. Keene, body-slammed him onto the ground, and told Mr. Keene if he did not stop moving he was going to be shot.

- 91 -

590.    On March 16, 2014, the Honorable Thomas R. Morse dismissed the false Resisting Arrest charge levied against Mr. Keene after hearing oral argument on the motion to dismiss filed by Mr. Keene's criminal defense attorney.

591.    On or about May 27, 2015, MASIC testified at a Mapp/Huntley hearing before the Honorable Thomas R. Morse, and his testimony established that he did not have reasonable suspicion to stop or seize Mr. Keene, or reasonable or probable cause to arrest him for any crime or violation, and that he had fabricated his arrest and charging paperwork.

592.    On or about May 27, 2015, Masic committed perjury when he testified untruthfully at the Mapp/Huntley hearing.

593.    As a result of Masic's testimony, the People determined the lacked probable cause to continue the prosecution of Mr. Keene for Obstruction of Governmental Administration, and so on or about May 30, 2015, the People offered Mr. Keene an Adjournment in Contemplation of Dismissal ("ACD") with respect to the Obstruction of Governmental Administration charge.

594.    RPD Officer Mario Masic was never reprimanded, suspended, retrained on the use of force, or otherwise disciplined by the Defendant CITY or the RPD following the incident on September 18, 2018 where he used excessive force in the course of effectuating the false arrest of Mr. Keene.

595.    Further, more detailed information regarding the repeated acts of misconduct of RPD Officers Eliud Rodriguez, Masic, Joseph Ferrigno and Anthony Libertore are outlined in the Sixth Claim for Relief, *supra*.

THESE UNCONSTITUTIONAL POLICIES AND PRACTICES
RESULTED IN PLAINTIFF'S INJURIES

596.    The City's policy and custom of failing to discipline officers who make false arrests, use excessive force and lie about the reasons for making arrests and using force caused Mr. Vann's constitutional rights to be violated as alleged herein.

597.    For example, on May 24, 2015, KESTER falsely arrested and used excessive force against Septimus Scott, and then lied about the circumstances that led to his arrest and use of force against Mr. Scott in official police paperwork.

598.    Further details regarding KESTER's false arrest, use of excessive force and fabrication of evidence against Mr. Scott are detailed in the Ninth Claim for Relief, *infra*, and are incorporated in full herein.

599.    None of the Defendant RPD OFFICERS were disciplined by the Defendant CITY or the RPD for any instance where they falsified police paperwork, coerced false witness statements, failed to preserve exculpatory evidence, or testified falsely in court, despite the Defendant CITY and the RPD knowing that each of the Defendant RPD OFFICERS have committed such misconduct on numerous occasions.

600.    None of the Defendant RPD OFFICERS have ever been reprimanded, suspended, retrained on their legal duties to testify truthfully in court a/k/a to not commit perjury, or otherwise disciplined by the Defendant CITY or the RPD for any instance where they committed perjury, despite the Defendant CITY and the RPD knowing that each of the Defendant RPD OFFICERS have committed perjury on numerous occasions.

601.    The Defendant City and the RPD's practice of tolerating and condoning police misconduct by its officers, including but not limited to the Defendant RPD OFFICERS, directly and proximately resulted in Plaintiff Mr. Vann being assaulted, battered, subjected to excessive force, falsely arrested, maliciously prosecuted, denied his right to a fair trial, and subjected to the

- 93 -

other deprivations of his rights secured by the common law and the United States Constitution as described herein.

602.     The Defendant CITY and the RPD's policy, practice and custom of condoning the RPD officers' falsification of their arrest and charging paperwork has denied countless individuals of their right to a fair trial, including the Plaintiff Mr. Vann.

603.     The Defendant CITY and the RPD's policy, practice and custom of condoning the RPD officers' perjuring themselves in front of the Grand Jury, at suppression hearings and at trial has denied numerous individuals of their right to a fair trial, including the Plaintiff Mr. Vann.

604.     As a result of the above constitutionally impermissible conduct, Mr. Vann suffered violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and physical injury.

605.     Accordingly, Mr. Vann demands judgment against Defendants in a sum of money to be determined at trial.

606.     As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

**THIRTEENTH CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY UNDER *MONELL***
**ARISING FROM UNCONSTITUTIONAL MUNICIPAL POLICES RELATING TO THE DELIBERATE INDIFFERENCE OF THE CITY AND THE RPD TO THE RIGHTS OF INDIVIDUALS SUFFERING FROM MENTAL ILLNESSES AND/OR EXPERIENCING ACUTE MENTAL HEALTH EPISODES**
(Against the City)

607.     Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

- 94 -

608. The Defendant City and the RPD maintain an unconstitutional policy, practice and custom of RPD officers arresting individuals without probable cause and using force without justification during arrests and non-arrest interactions with individuals in the City of Rochester suffering from mental illnesses, both chronic and acute.

609. MITCHELL, KESTER, and DRAKE knew or should have known that Mr. Vann was suffering from a mental health condition when they were interacting with him on the night of the incident.

610. MITCHELL, KESTER, and DRAKE's false arrest and excessive use of force against Mr. Vann was caused by their lack of training on identifying individuals suffering from mental health conditions, and how to properly interact with such individuals.

611. Defendant City and the RPD lack any rules, regulations or standards governing officers' interactions with individuals suffering from either chronic or acute mental illnesses.

612. Defendant City and the RPD does not provide any training, either at the police academy or in-service, regarding how to safely and lawfully interact with individuals suffering from either chronic or acute mental illnesses.

613. The Defendant City knew or should have known that the requirements, guidelines, and terms of its training for the Defendant Police Officers were inadequate regarding interacting with individuals suffering from either chronic or acute mental illnesses., and to prevent the Defendant Police Officers from engaging in the wrongful conduct alleged herein.

614. The Defendant City and the RPD has persistently failed to discipline officers who fail to comply with the laws, rules, regulations and standards governing officers' conduct during interactions with individuals suffering from either chronic or acute mental illnesses. Specifically,

the City and the RPD have persistently failed to discipline officers who falsely arrest and/or use force without justification on individuals suffering from either chronic or acute mental illnesses.

615.    On July 15, 2001, RPD Officer Eliud Rodriguez falsely arrested and used excessive force against Edward S. Richards, who suffered from a chronic and/or acute mental illness. Just like this case, RPD Officer Eliud Rodriguez pepper sprayed Mr. Richards while he was handcuffed, and stood idly by and failed to prevent or stop his partner from striking Mr. Richards multiple times while he was handcuffed.

616.    RPD Officer Rodriguez was never reprimanded, suspended, retrained on the use of force, retrained on how to properly interact with individuals suffering from either chronic or acute mental illnesses, or otherwise disciplined by the Defendant City or the RPD following the incident with Mr. Richards on July 15, 2001.

617.    Thereafter, on or about June 21, 2012, RPD Officer Eliud Rodriguez was one of seven RPD Officers who shot and killed Israel Andino. When Officer Rodriguez and other officers shot and killed Israel Andino, they knew that he was suffering from chronic and/or acute mental illnesses.

618.    RPD Officer Rodriguez was never reprimanded, suspended, retrained on the use of force, retrained on how to properly interact with individuals suffering from either chronic or acute mental illnesses, or otherwise disciplined by the Defendant City or the RPD following the shooting death of Israel Andino on June 21, 2012.

619.    On July 10, 2005, RPD Officer Mark Simmons responded to a 911 call that 13-year-old LaShedica Mason was suicidal and had locked herself in a room in her family's home on St. Jacob Street in Rochester. After Officer Simmons entered the home, the 13-year-old girl opened the door to the room and was holding a knife. Upon seeing the 13-year-old LaShedica

- 96 -

holding a knife, Officer Simmons shot her three times, resulting in serious permanent injuries to LaShedica.

620.    RPD Officer Simmons was never reprimanded, suspended, retrained on the use of force, retrained on how to properly interact with individuals suffering from either chronic or acute mental illnesses, retrained on suicide intervention, or otherwise disciplined by the Defendant City or the RPD following the July 10, 2015 incident where he shot LaShedica Mason—a suicidal 13-year-old girl—three times from close range.

621.    Instead, following the July 10, 2005 incident where he shot LaShedica Mason, Officer Simmons has received several promotions: first to Sergeant and Special Assistant to former Chief of Police James Sheppard; then to Lieutenant and commanding officer of the Professional Standards Section; and then recently to Deputy Chief of Administration.

622.    The Defendant City apparently admits that fails to train its officers on how to properly interact with individuals who are suffering from chronic and/or acute mental illnesses. Specifically, City of Rochester's official website states that the Rochester Police Department's Emotionally Disturbed Persons Response Team (EDPRT) is:

> [a] group of employees specially trained, on a *voluntary basis*, to deal with emotionally disturbed individuals in a variety of situations in the Rochester community. These situations may include suicidal persons, persons exhibiting irrational behavior, handling psychiatric patients, the homeless, various mental health concerns and/or referrals, and any other situations that deal specifically with the needs of the mental health community and emotionally disturbed persons.[33]

## THESE UNCONSTITUTIONAL POLICIES AND PRACTICES RESULTED IN PLAINTIFF'S INJURIES

---

[33] *ROCHESTER POLICE DEPARTMENT SPECIAL OPERATIONS DIVISION*, CITY OF ROCHESTER, http://www.cityofrochester.gov/article.aspx?id=8589936531 (last visited June 7, 2017)(emphasis added).

- 97 -

623.     The City's policy and custom of failing to discipline officers who make false arrests, use excessive force and lie about the reasons for making arrests and using force caused Mr. Vann's constitutional rights to be violated as alleged herein.

624.     For example, on May 24, 2015, KESTER falsely arrested and used excessive force against Septimus Scott, who had been diagnosed with PTSD and was suffering a panic attack at the time of his arrest and KESTER's brutal use of force against him.

625.     Further details regarding KESTER's false arrest, use of excessive force and fabrication of evidence against Mr. Scott, who was also suffering from both a chronic and acute mental health condition, are detailed in the Ninth Claim for Relief, *infra*, and are incorporated in full herein.

626.     During the May 24, 2015 incident, Mr. Scott explained to the RPD officers, including KESTER, that he was an army veteran, he had a serious injury to his right leg from an IED explosion, that he had been diagnosed with PTSD, and that he was crying because he was having a panic attack.

627.     Nevertheless, KESTER ignored Mr. Scott, became frustrated with him as he tried to explain his mental health issues, told Mr. Scott to "shut up," then grabbed his head and slammed his face into the side of an RPD vehicle, slammed his body onto the ground, and punched him in the back of the head and torso multiple times, and then pepper sprayed him in the face from a distance of just several inches.

628.     KESTER was never disciplined following the incident with Mr. Scott, nor was he retrained on how to properly identify whether an individual is suffering from a mental health condition or how to properly interact with such individuals.

FILED: MONROE COUNTY CLERK 05/16/2018 10:45 PM
NYSCEF DOC. NO. Case 6:18-cv-06464-MAT Document 1-3 Filed 06/20/18 Page 99 of 131

INDEX NO. E2018003491
RECEIVED NYSCEF: 05/16/2018

629. KESTER's false arrest and use of excessive force against Mr. Scott occurred less than four months prior to his false arrest and use of excessive force against Mr. Vann, and the failure of the City and the RPD to take any remedial action to train KESTER on how to identify individuals dealing with mental health conditions, to properly interact with such individuals, or to discipline him for his unlawful actions was a direct and proximate cause of the violation of Mr. Vann's rights as alleged herein.

630. The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City and the RPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff Mr. Vann as alleged herein.

631. Any reasonable and/or properly trained police officer would have understood that at the time of the incident on September 4, 2015, Mr. Scott suffered from a chronic mental illness.

632. The Defendant Police Officers had never received any training during their employment by the Defendant City and the RPD on how to properly and lawfully interact with individuals suffering from chronic and/or acute mental illnesses, including individuals suffering from PTSD and individuals having panic attacks.

633. The Defendant City is deliberately indifferent to the fact that its police officers do not receive any training on how to properly and lawfully interact with individuals suffering from mental illnesses, and individuals experiencing acute mental health episodes. Despite being on notice that officers regularly and routinely interact with individuals suffering from chronic mental illnesses and individuals experiencing acute mental health episodes, and despite knowing that said lack of training had previously caused repeated violations of individuals' rights, the Defendant City and the RPD failed to take any remedial action.

- 99 -

Case 6:18-cv-06464-MAT   Document 1-3   Filed 06/20/18   Page 100 of 131

634.     The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City and the RPD constituted deliberate indifference to the safety, well-being and constitutional rights of the Plaintiff Mr. Vann.

635.     The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City and the RPD were the moving force behind the constitutional violations suffered by Plaintiff Mr. Vann as alleged herein.

636.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the Defendant City and the RPD, Plaintiff was subjected to an unlawful stop, seizure, search, assault, battery, use of excessive force, false arrest, malicious prosecution, denial of his right to a fair trial, and to the other deprivations of his rights secured by the common law and the constitutions of the State of New York and the United States as described herein.

637.     As a result of the foregoing, Plaintiff was caused to suffer personal injuries, violation of his civil rights, physical harm, pain, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, damage to his reputation and standing within his community.

As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

638.     As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed. Accordingly, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

- 100 -

**WHEREFORE and in light of the foregoing**, Plaintiff respectfully requests that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief, including appointing a federal monitor to oversee necessary reforms of the Defendant CITY's process for investigating incidents where RPD Officers use force, and implementing measures to ensure that officers who use force without justification are disciplined.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.


Dated: New York, New York
       May 16, 2018

Respectfully Submitted,


ROTH & ROTH, LLP

By: _____
    Elliot D. Shields
    Roth & Roth, LLP
    Counsel for Plaintiff
    192 Lexington Avenue, Suite 802
    New York, New York 10016
    Phone:    (212) 425 1020
    Fax:      (212) 532 3801
    Email eshields@rothandrothlaw.com


- 101 -

## ATTORNEY'S VERIFICATION

**ELLIOT D. SHIELDS,** an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalties of perjury:

I am associated with the law firm **ROTH & ROTH, LLP**, I have read the annexed **VERIFIED COMPLAINT** and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files. The reason this verification is made by me and not Plaintiff is that Plaintiff does not reside in the county wherein I maintain my office.

DATED: New York, New York
       May 16, 2018

_____
ELLIOT D. SHIELDS

# EXHIBIT "A"







# EXHIBIT "B"



FILED: MONROE COUNTY CLERK 05/16/2018 10:45 PM





# EXHIBIT "C"





FILED: MONROE COUNTY CLERK 05/16/2018 10:45 PM
NYSCEF DOC. NO. Case 6:18-cv-06464-MAT   Document 1-3   Filed 06/20/18   Page 113 of 131

INDEX NO. E2018003491

RECEIVED NYSCEF: 05/16/2018

# EXHIBIT "D"





# EXHIBIT "E"

INDEX NO. E2018003491
RECEIVED NYSCEF: 05/16/2018







# EXHIBIT "F"





FILED: MONROE COUNTY CLERK 05/16/2018 10:45 PM

NYSCEF DOC. NO. 8

INDEX NO. E2018003491

RECEIVED NYSCEF: 05/16/2018













FILED: MONROE COUNTY CLERK 05/16/2018 10:45 PM
NYSCEF DOC. NO. 8
INDEX NO. E2018003491

RECEIVED NYSCEF: 05/16/2018



