UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAVID VANN,

                    Plaintiff,

        -vs-

THE CITY OF ROCHESTER, a
municipal entity, POLICE OFFICER
MATTHEW DRAKE, IBM # 1956,
POLICE OFFICER STEVEN MITCHELL,
IBM # 2134, INVESTIGATOR JEFFREY
KESTER, IBM # 2230, SERGEANT
JEFFREY LAFAVE, II, IBM # 1634
POLICE OFFICER DAVID E. KEPHART,
IBM # 2074, POLICE OFFICER ADAM
BRODSKY, IBM # 2478, POLICE
OFFICER TIMOTHY DEMPSEY, IBM #
2122, INVESTIGATOR CHRISTOPHER
MUSCATO, IBM # 1331, CAPTAIN
GARY MOXLEY, POLICE OFFICER
ANGEL PAGAN, IBM # 2421, POLICE
OFFICER CHRISTOPHER J. BARBER,
IBM # 1949, SERGEANT DANIEL J.
ZIMMERMAN, IBM # 295, POLICE
OFFICER ERIC MCGRAW, IBM # 2131,
SERGEANT JOSEPH LAIOSA, IBM #
1180, INVESTIGATOR TOMESHA
ANGELO, IBM # 1665, TECHNICIAN
STEPHANIE MINTZ, IBM # 2496, ,
Police Officers "JOHN DOES 1-10"
(whose names are currently
unknown), and other unidentified
members of the Rochester Police
Department, THE COUNTY OF
MONROE, SANDRA DOORLEY,
individually and as
District Attorney of the County
of Monroe, and MICHAEL HARRIGAN,
as an employee of the Monroe
County District Attorney's
Office and individually,

                    Defendants.

**DECISION AND ORDER**
**No. 6:18-cv-06464(MAT)**

## I. Introduction

David Vann ("Vann" or "Plaintiff"), represented by counsel, instituted this action pursuant to 42 U.S.C. § 1983 ("§ 1983") alleging violations of his constitutional rights by the City of Rochester ("the City"), the County of Monroe ("the County"), and the various individual defendants, who are either employees of the Monroe County District Attorney's Office ("MCDA") or the City of Rochester Police Department ("RPD"). On March 25, 2019, the Court issued a Decision and Order (Docket No. 27) denying the City's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"). In this Decision and Order, the Court addresses the County's Motion to Dismiss (Docket No. 14) the Amended Complaint pursuant to Rule 12(b)(6). For the reasons discussed below, the County's motion is granted in its entirety.

## II. Factual Background and Procedural History

The Court assumes the parties' familiarity with its previous Decision and Order summarizing the Amended Complaint's allegations regarding the incident on September 4, 2015, involving the alleged excessive use of force against Vann by various RPD officers, including Matthew Drake ("Drake"), Jeffrey Kester ("Kester"), and Steven Mitchell ("Mitchell"), in effecting Vann's arrest.

After he was arrested, Vann was arraigned on two counts of Assault in the Second Degree (New York Penal Law ("P.L.") § 120.05(3)), Assault in the Third Degree (P.L. § 120.00(2)),

Resisting Arrest (P.L. § 205.30), and Trespass (P.L. § 140.10). RPD Investigator Tomesha Angelo ("Angelo") referred the felony complaints to defendant Assistant District Attorney Michael Harrigan ("Harrigan") for presentation to a Monroe County grand jury. The packet of materials sent to Harrigan included a DVD of the portion of the security camera video collected by the RPD.

While preparing Vann's case for presentation to the grand jury, Harrigan reviewed the DVD with three of the RPD officers involved in the September 4, 2015 incident, Mitchell, Kester, and Drake. Harrigan discussed with them how they were going to testify before the grand jury. Am. Compl. ¶¶ 319-26.

Mitchell, Kester, and Drake subsequently testified falsely before the grand jury that, among other things, Vann resisted arrest, fought with the officers, and was not handcuffed until he was taken to the ground the first time. Id. ¶¶ 327-36. Harrigan's presentation to the grand jury was misleading and incomplete because, among other things, the security camera footage that allegedly exculpated Vann was not introduced. Id. ¶¶ 340-41. The grand jury returned an indictment on April 29, 2016, charging Vann with two counts of assaulting a police officer. Id. ¶ 329, 337.

After the grand jury proceeding, Harrigan continued to investigate the case against Vann by interviewing witnesses, including D.M., who was at the A&Z Market on the night in question. Upon reviewing the security camera video, D.M. informed Harrigan

−3−

that it showed the police officers overreacting and using excessive force. Harrigan disagreed and responded that the video could be interpreted differently. Am. Compl. ¶¶ 346-48. Harrigan reviewed the video with D.M. and discussed how to testify about certain material facts.

Harrigan also requested that Kester, Mitchell, Drake, and Angelo produce all records regarding Vann's arrest. Although Angelo provided Harrigan with copies of the Subject Resistance Reports completed by Kester, Mitchell, and Kephart regarding their use of force against Vann, Harrigan never provided them to Vann's attorney. Am. Compl. ¶¶ 349-55.

At trial, Harrigan elicited testimony from D.M., Kester, Mitchell, Drake that he knew was false and contradicted by the security camera video. Am. Compl. ¶¶ 370-78. The jury asked to see multiple playbacks of the security camera video, including a request to have the video paused at the moment Vann was being handcuffed. Id. ¶ 383. After deliberating less than three hours, the jury returned a verdict acquitting Vann of all charges. Id. ¶ 384.

In their Motion to Dismiss (Docket Nos. 14 to 14-2), the County Defendants seek dismissal of the fourteenth claim (denial of the right to a fair trial against Harrigan) and fifteenth claim (municipal liability against the County for Doorley's failure to supervise or discipline prosecutors for violating defendants'

constitutional rights), as well as dismissal of Doorley as a defendant due to Vann's failure to allege her personal involvement in any constitutional violations. Vann filed a Memorandum of Law in Opposition ("Pl.'s Opp. Mem.") (Docket No. 20). The County Defendants filed a Reply Memorandum of Law ("Reply") (Docket No. 22). The matter was submitted without oral argument on December 15, 2018 (Docket No. 26).

## III. Rule 12(b)(6) Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint pleads a claim with facial plausibility when it sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint that consists merely of "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" or "'naked assertion[s]' devoid of 'further factual enhancement'" does not meet the plausibility standard. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555, 557). In deciding a motion to dismiss under Rule 12(b)(6), a court must accept the complaint's well pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. ECA, Local 134 IBEW

Joint Pension Tr. of Chi. v. J.P. Morgan Chase Co., 533 F.3d 187, 196 (2d Cir. 2009).

## IV. Discussion

### A. Overview of the Law on Prosecutorial Immunity

"Absolute immunity bars a civil suit against a prosecutor for advocatory conduct that is 'intimately associated with the judicial phase of the criminal process.'" Giraldo v. Kessler, 694 F.3d 161, 165 (2d Cir. 2012) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). "This immunity attaches to conduct in court, as well as conduct 'preliminary to the initiation of a prosecution and actions apart from the courtroom.'" Id. (quoting Imbler, 424 U.S. at 431 n. 33).

Since Imbler, the Supreme Court has followed a functional approach to determining whether immunity applies. Burns v. Reed, 500 U.S. 478, 486 (1991) (citing Imbler, 424 U.S. at 430-31; collecting cases). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" Hill v. City of N.Y., 45 F.3d 653, 661 (2d Cir. 1995) (quoting Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994); alteration in original). Whether or not an activity is protected by absolute immunity depends upon the function the prosecutor was performing. See Kalina v. Fletcher, 522 U.S. 118, 127 (1997) ("[W]e examine the

nature of the function performed, not the identity of the actor who performed it. . . .").

On a motion to dismiss a claim against a prosecutor based on absolute immunity, the plaintiff's allegations are taken as true. Kalina, 522 U.S. at 122 (citing Buckley v. Fitzsimmons, 509 U.S. 259, 261 (1993)). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." Burns, 500 U.S. at 486–87 (citations omitted). The key inquiry is whether the prosecutors' alleged wrongdoing took place in the course of "administration or investigation not undertaken in preparation for judicial proceedings[,]" Hill, 45 F.3d at 661 (citing Buckley, 509 U.S. at 269; Barbera v. Smith, 836 F.2d 96, 100 (2d Cir. 1987)), in which case the prosecutor will not be subject to absolute immunity, id. Stated another way, "[t]he ultimate 'question . . . is whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they' engaged in the challenged conduct." Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting Buckley, 509 U.S. at 273; ellipsis in original).

**B.  Harrigan Is Entitled to Absolute Immunity for his Actions**

Vann contends that Harrigan's actions were investigative rather than advocatory in nature and therefore outside the scope of

the traditional prosecutorial functions covered by absolute immunity. The County responds that Harrigan was acting as an advocate preparing for judicial proceedings at all relevant times and therefore is protected by absolute immunity.

As an initial matter, Vann's repeated invocation of the adjective "investigative" to describe Harrigan's conduct is immaterial to the Court's inquiry. See Watson v. Grady, No. 09-CV-3055 KMK, 2010 WL 3835047, at *16 (S.D.N.Y. Sept. 30, 2010) ("[The] [p]laintiff's labeling of the prosecutor's actions as investigatory does not make it so.") (citing Crews v. Cty. of Nassau, No. 06-CV-2610, 2007 WL 4591325, at *15 n. 15 (E.D.N.Y. Dec. 27, 2007) (stating that the plaintiffs' "labeling various actions 'investigative' or 'administrative' in the complaint is of no moment")). In other words, although Vann affixes the "investigatory" label to Harrigan's actions, the Court must look at the actual substance of those actions—whether they were the "work of an advocate and . . . integral to the initiation of the prosecution." Kalina v. Fletcher, 522 U.S. 118, 130 (1997). Furthermore, while the timing of the prosecutor's conduct is relevant in drawing a distinction between investigative and advocatory functions, DiBlasio v. Novello, 344 F.3d 292, 300-01 (2d Cir. 2003) (citations omitted), it is "not necessarily determinative," Genzler v. Longanbach, 410 F.3d 630, 640 (9th Cir. 2005) (citations omitted).

The actions by Harrigan about which Vann complains fall generally into two categories—actions taken in preparation for, and during the grand jury; and actions taken in preparation for, and during, the trial. The Court addresses them in turn below.

### 1. Harrigan's Actions Prior to and During the Grand Jury

#### a. Decision to Prosecute Plaintiff

Vann alleges that Harrigan, despite viewing the DVD of the security camera footage which allegedly exculpated him, did not recommend dropping the charges but instead convened a grand jury to present Vann's case.

It is well-settled that "[t]he decision to initiate prosecution, what charges to bring, and how to perfect and consolidate those charges is a quintessential prosecutorial function." Ogunkoya v. Monaghan, 913 F.3d 64, 71 (2d Cir. 2019) (citing Imbler, 424 U.S. at 431; Ying Jing Gan v. City of New York, 996 F.2d 522, 530 (2d Cir. 1993) ("A prosecutor . . . has absolute immunity in connection with the decision whether or not to commence a prosecution.")). Harrigan is thus entitled to absolute immunity with regard to his decision to pursue the charges against Vann by grand jury indictment. See Ogunkoya, 913 F.3d at 71; see also, e.g., Williams v. City of N.Y., No. 06-CV-6601, 2009 WL 3254465, at *10 (E.D.N.Y. Oct. 9, 2009) ("[E]valuating evidence and deciding whether to initiate a prosecution are exactly the sort of actions for which absolute immunity shields prosecutors from liability.");

<u>Bhatia v. Gaetano</u>, No. 06-CV-1771, 2008 WL 901491, at *3 (D. Conn. Mar. 31, 2008) (finding that the prosecutor's decision to institute a criminal prosecution "after considering the weight of evidence in the case" was protected by absolute immunity, despite the prosecutor's knowledge of evidence that witnesses were lying).

> **b.    Meeting With Witnesses Prior to Grand Jury and Elicitation of False Testimony**

Vann alleges that Harrigan met with RPD officers Mitchell, Kester, and Drake prior to their appearance before the grand jury. Am. Compl. ¶¶ 319-21. At this meeting, Harrigan reviewed the DVD of the security camera footage with the officers and "instructed [them] on how to testify to nullify their constitutionally objectionable conduct, as depicted in the DVD of the incident." <u>Id.</u> ¶ 321. Then, at the grand jury proceeding, Harrigan knowingly permitted Mitchell, Kester, and Drake to testify as to "facts that were contradicted by the security camera video of the incident pursuant to the City and RPD's policy, practice and custom of fabricating evidence and 'testilying' to nullify constitutional deficiencies in their reasons for making arrests and using force against arrestees." <u>Id.</u> ¶ 339.

The Second Circuit has "consistently stated that prosecutors are immune from § 1983 liability for their conduct before a grand jury." <u>Hill</u>, 45 F.3d at 661 (citing <u>Burns</u>, 500 U.S. at 490 n.6 (listing other circuit court cases which have so held); <u>Maglione v. Briggs</u>, 748 F.2d 116, 118 (2d Cir. 1984) (<u>per curiam</u>); other

citation omitted). In <u>Hill</u>, the Second Circuit emphasized that even the plaintiff's allegations of a conspiracy among the prosecutor and others to present falsified evidence to the grand jury did not "alter this rule[,]" <u>Hill</u>, 45 F.3d at 662 (citing <u>Dory</u>, 25 F.3d at 83). <u>Dory</u>, which established that absolute prosecutorial immunity extends even to conspiracies to present false evidence at trial, "compels the same result in the grand jury setting." <u>Hill</u>, 45 F.3d at 662. "'The fact that such a conspiracy is not something that is properly within the role of a prosecutor is immaterial,'" <u>id.</u> (quoting <u>Dory</u>, 25 F.3d at 83), "because immunity attaches to the function the prosecutor is performing, not the way in which it is performed." <u>Id.</u>

Nonetheless, the Second Circuit in <u>Hill</u> declined to find that, as a matter of law, absolute immunity protected a prosecutor's actions in fabricating evidence against the plaintiff. The prosecutor in <u>Hill</u> allegedly instructed a minor witness to accuse his mother of criminal child abuse during a videotaped interview, and then used this falsified videotape in the grand jury presentation against the mother while deliberately suppressing an earlier videotape that exonerated her. <u>Hill</u>, 45 F.3d at 662. The Second Circuit noted that since the prosecutor did not order Hill's arrest until *after* filming the second, fabricated interview, "it was possible to conclude that [the videotape] was made, at least in part, to provide probable cause for Hill's arrest." <u>Id.</u> Applying

the Supreme Court's "objective" functional test for absolute immunity, the Second Circuit found that it was impossible to determine whether the making of the videotape was "performed by the prosecutor in an advocacy or an investigatory role[.]" Id. at 663.

Subsequently, in Bernard v. Cty. of Suffolk, 356 F.3d 495 (2d Cir. 2004), the Second Circuit observed that

> the line between advocacy and investigative functions is frequently difficult to draw, but, as a rule, the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement, rests on the advocacy side of this line[.]

Id. at 506 (internal citation omitted; citing Pinaud v. Cty. of Suffolk, 52 F.3d 1139, 1149 (2d Cir. 1995) ("Case law from this circuit clearly establishes that the district attorneys' activities with respect to the malicious prosecution claim, as well as all the claims relating to Pinaud's plea agreement and the presentations to the grand jury, are covered by absolute immunity."); Hill, 45 F.3d at 661).

Here, despite Vann's repeated assertion that Harrigan "fabricated" evidence during an "investigatory" phase of the proceeding, the Amended Complaint does not plausibly suggest such conduct. At the time Harrigan interviewed the RPD officers and civilian witnesses, Vann already had been arrested, unlike the plaintiff in Hill. Furthermore, in contrast to the prosecutor in Hill, Harrigan did not assemble or create evidence himself. Rather, he conducted a "professional evaluation of the evidence assembled"

by the RPD officers, such as viewing the security camera DVD and reading any available witness statements. Even the human witnesses themselves—the RPD officers and the civilian witnesses at the store—are best described as "evidence assembled by the police" since it was not Harrigan who went out and found these individuals and brought them in to interview. After evaluating the evidence assembled by the police, Harrigan's subsequent activities involving that evidence, including conducting interviews of the RPD officers and the civilian witnesses, constituted "preparation for . . . presentation [of the evidence] . . . before a grand jury[.]" Buckley, 509 U.S. at 273 (reaffirming adherence to "the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity").

### c. Failure to Present Exculpatory Evidence to the Grand Jury

Vann complains that Harrigan withheld exculpatory evidence from the grand jury by not informing the jurors that, among other things, the "RPD failed to collect, copy and preserve exculpatory evidence, to wit, the beginning of the store's security camera videos that depicted the interaction between [eyewitness] D.A. and Mr. Vann prior to defendants arriving at the store[.]" Am. Compl. ¶ 336(c); see also id. ¶ 336(a)-(b), (d)-(i). However, even the act of "knowingly presenting false evidence to, while at the same time

withholding exculpatory evidence from [the grand jury] . . . lie[s] at the very core of a prosecutor's role as an advocate engaged in the judicial phase of the criminal process." Bernard, 356 F.3d at 503 (citing Imbler, 424 U.S. at 431 & n. 34 (holding prosecutor is absolutely immune from liability for initiating a prosecution and from claims that he willfully used perjured testimony); other citations omitted).

In Bernard, the plaintiff "accuse[d] defendants of knowingly presenting false evidence to, while at the same time withholding exculpatory evidence from, the various grand juries that returned these flawed indictments." 356 F.3d at 503. The district court concluded that if, as the plaintiffs alleged, "defendants pursued prosecutions without probable cause and engaged in misconduct before the grand jury as part of a political 'witch hunt,' then that motive would remove their conduct from the scope of official duties shielded by absolute immunity." Id. The Second Circuit reversed the district court, noting that where a prosecutor's charging decisions are not linked to any unauthorized actions by him, such as a demand for a bribe or sexual favors, "the fact that improper motives may influence his authorized discretion cannot deprive him of absolute immunity." Id. (citation omitted). Based on Bernard, the Court finds that Harrigan is shielded by absolute immunity with regard to any alleged misconduct in his presentation of evidence to the grand jury. Id. at 505.

## 2. Harrigan's Actions Prior to and During the Trial

### a. Failure to Disclose Exculpatory Evidence

Vann asserts that Harrigan violated his State and Federal constitutional obligations to disclose all material favorable to the defense, as well as his duty under New York State law to disclose all recorded statements of prosecution witnesses, including the "use of force" or Subject Resistance Reports completed by the RPD officers in this case. <u>See</u> Am. Compl. ¶¶ 358-69. In addition, Vann accuses Harrigan of failing to inform his defense attorney that RPD officers had spoken to witness A.M. at the A&Z Market but did not take a written statement from A.M., even though A.M. witnessed the incident. According to Vann, this also constituted exculpatory material. <u>See</u> <u>id.</u> ¶ 256-57.

Harrigan's alleged failure to turn over any material having exculpatory or impeachment value to the defense falls into the category of an advocacy function. Therefore, he is entitled to absolute immunity in this regard. <u>See</u>, <u>e.g.</u>, <u>Warney v. Monroe Cty.</u>, 587 F.3d 113, 125 (2d Cir. 2009) ("If the conduct challenged by Warney had occurred during Warney's trial, that is, if the prosecutors had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); but they would be absolutely immune from personal liability. . . . The reason that is so is that the disclosure of

evidence to opposing counsel is an advocacy function.") (internal citation omitted).

### b. Meeting With Witnesses Prior to Trial and Elicitation of False Testimony at Trial

Vann alleges that Harrigan spoke with Mitchell, Kester, Drake, and D.M. prior to their testimony at Vann's trial. Then, when Harrigan called them as witnesses, they all presented false testimony that Harrigan knew was untruthful. Harrigan's actions in preparing witnesses for trial and eliciting testimony from witnesses at trial likewise represent the performance of an advocacy function. Therefore, he is entitled to absolute immunity for this conduct. See Daloia v. Rose, 849 F.2d 74, 75 (2d Cir. 1988) (per curiam) (federal prosecutor's activities in trying case, presenting allegedly false testimony, allegedly using guilty plea allocution for investigative purposes, and allegedly transmitting false information to parole authorities were intimately associated with judicial phase of criminal process and entitled prosecutor to absolute immunity in § 1983 action).

### C. Doorley Is Entitled to Absolute Immunity for her Actions

Doorley is not named in any the enumerated causes of action. Indeed, her name appears only sparsely throughout the Amended Complaint. Vann only alleges that Doorley attended a meeting at which the store surveillance DVD was reviewed and nevertheless allowed his criminal case to proceed. See Am. Compl. ¶¶ 462-66. "[P]rosecutorial decisions as to whether or not to institute a

prosecution, and if so on what charges . . . plainly decisions as to which [a prosecutor] is entitled to absolute immunity." Ying Jing Gan, 996 F.2d at 531. Vann cannot hold Doorley liable for failing to terminate his prosecution as she is entitled to absolute immunity for this decision, assuming for the sake of argument she was even involved in making it. See id.

Vann also asserts that Doorley is liable as Harrigan's supervisor. It is beyond debate that the doctrine of respondeat superior is not a basis for imposing liability under § 1983. Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 691 (1978). Because vicarious liability is inapplicable in § 1983 actions, Vann must plead that Doorley, through her "own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. To that end, Vann alleges that Doorley "[h]as failed to properly supervise, train, instruct, and discipline prosecutors" who, among other things, "fabricate evidence . . . and then knowingly make use of said fabricated evidence in the grand jury, at trial and in other court proceedings[.]" Am. Compl. ¶ 467. However, all of the topics as to which Vann claims Doorley provided substandard supervision and training are subject to absolute prosecutorial immunity. See Van De Kamp v. Goldstein, 555 U.S. 355, 344-46 (2009).

In Van De Kamp, the respondent claimed that the district attorney and his chief assistant violated their constitutional

obligation to provide his attorney with impeachment-related information because they failed to adequately train and supervise deputy district attorneys on that subject and failed to create any system for the deputies handling criminal cases to access information pertaining to the benefits provided to jailhouse informants and other impeachment information. 555 U.S. at 343–44 (quotation to record omitted). The Supreme Court agreed that such claims attacked the district attorney's office's administrative procedures and assumed, for argument's sake, that the Fifth Amendment imposes certain obligations on district attorney's as to training, supervision, or information-system management. Id. at 344.

Even so, the Supreme Court concluded, "absolute immunity must follow" because the claims "focus[ed] upon a certain kind of administrative obligation—a kind that itself is directly connected with the conduct of a trial." 555 U.S. at 344. The fact that general methods of supervision and training were challenged in Van de Kamp versus the actions of a particular prosecutor was not "critical" because "[t]hat difference does not preclude an intimate connection between prosecutorial activity and the trial process." Id. at 362. As the management tasks at issue in Van de Kamp "concern[ed] how and when to make impeachment information available at a trial[,]" they were "thereby directly connected with the prosecutor's basic trial advocacy duties." Id. at 363. Given

-18-

_Imbler_'s function-based approach, "every consideration . . . militate[d] in favor of immunity." Id.

As in _Van De Kamp_, the administrative obligation which Doorley is accused of neglecting is "a kind that itself is directly connected with the conduct of a trial." 555 U.S. at 344. That is, the subjects on which Doorley allegedly failed to provide sufficient training, supervision, and discipline to her trial assistants, including Harrigan, "are directly connected with the prosecutor's basic trial advocacy duties." Id. Indeed, this conclusion follows from the Court's analysis of Harrigan's conduct, supra. Because Doorley has established entitlement to absolute immunity with regard to the claims alleging the failure to train, supervise, and discipline, she is dismissed as a defendant. See id. at 349.

**D.    The _Monell_ Claim Against the County Fails as a Matter of Law**

In _Monell_, the Supreme Court held that municipalities and other bodies of local government are "persons" within the meaning of § 1983 and, as such, they may be sued directly if they are alleged to have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. In addition, § 1983 authorizes a plaintiff to sue "for constitutional

deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the [municipality]'s official decisionmaking channels." Id. at 690-91.

The County Defendants assert that prosecutors are state actors when performing prosecutorial functions, and therefore Doorley and Harrigan's actions or omissions do not represent any official policy of the County. It is true that "State law determines whether a particular official has the requisite policymaking authority that can render a governmental unit liable for unconstitutional actions taken in pursuance of that policy[.]" Baez v. Hennessy, 853 F.2d 73, 76 (2d Cir. 1988) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 124-25 (1988)). And, in New York State, it is well settled that a district attorney prosecuting a criminal matter acts in a quasi-judicial capacity and "represents the State not the county." Baez, 853 F.2d at 77 (citing McGinley v. Hynes, 51 N.Y.2d 116, 123 (1980) (stating that "the public prosecutor has the obligation of representing the State in its efforts to bring individuals accused of crimes to justice"); other citations omitted).

In a decision issued after the County's motion was fully briefed, Bellamy v. City of New York, 914 F.3d 727 (2d Cir. 2019), the Second Circuit altered the legal landscape again and further restricted the holding in Baez, characterizing that case as representing a "narrow exception." Id. at 759. The Court need not

delve into this thorny area of law because the motion may be resolved on an alternative basis. Even assuming that <u>Monell</u> liability potentially could attach to the County based on Doorley's failure to train prosecutors in the MCDA, Plaintiff has not plausibly alleged a municipal policy or custom.

The Supreme Court has emphasized that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011) (citing <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 822–23 (1985) (plurality opn.) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in <u>Monell</u>[.]")). To satisfy § 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" <u>Id.</u> (quotation omitted; brackets in original). To fulfill the "stringent standard[,]" <u>id.</u> at 61 (quotation omitted), of demonstrate deliberate indifference in the context of a failure-to-train claim, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' . . . ." <u>Id.</u> at 62 (quotation omitted).

In an attempt to show a "policy" or "custom" of deliberate indifference to citizens' constitutional rights, Vann cites cases involving reversals of convictions by the Appellate Division,

Fourth Department based on prosecutorial misconduct during trial, e.g., improper remarks on summation. See Am. Compl. ¶ 458 (collecting cases). None of the cases dealt with the constitutional violations alleged in this case, i.e., fabrication of evidence and the presentation of false testimony. Only one of the cases dealt with a Brady violation. In other words, these cases do not suffice to show "a pattern of similar constitutional violations[.]" Connick, 563 U.S. at 62-63 (respondent alleged that during the 10 years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of Brady violations by prosecutors in the district attorney's; Supreme Court found that those "four reversals could not have put Connick on notice that the office's Brady training was inadequate with respect to the sort of Brady violation at issue here" because "[n]one of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind"). Because the violations that occurred in the intermediate appellate cases cited by Vann are "not similar to the violation at issue here, they could not have put [Doorley] on notice that specific training was necessary to avoid this constitutional violation." Id. at 63. Therefore, Vann has failed to allege a plausible Monell claim based on a policy or custom.

While Canton v. Harris, 489 U.S. 378 (1989), "left open the possibility that, 'in a narrow range of circumstances,' a pattern

of similar violations might not be necessary to show deliberate indifference[,]" 563 U.S. at 64 (quotation omitted), the Supreme Court in Connick stated that "[f]ailure to train prosecutors in their Brady obligations does not fall within the narrow range of Canton's hypothesized single-incident liability." Id. "In light of th[e] regime of legal training and professional responsibility" to which lawyers are subject, the Supreme Court explained, "the unconstitutional consequences of failing to train" district attorneys on Brady was not "so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." Id. at 66-67. Accordingly, Vann may not avail himself of the "single-incident" theory of Monell liability.

**E.  Summary of the Remaining Claims in the Amended Complaint**

The Amended Complaint originally asserted fifteen causes of action. Following the Court's Decision on the City's Motion to Dismiss, these claims against the City Defendants remain pending: first claim (warrantless arrest without probable cause against Kester, Drake, and Mitchell); second claim (malicious prosecution under § 1983 against Kester, Drake, Mitchell, Kephart, Mintz, Angelo, Zimmerman, and LaFave); third claim (malicious prosecution under New York State law against Kester, Drake, Mitchell, Kephart, Mintz, Angelo, Zimmerman, and LaFave); fourth claim (denial of the right to a fair trial against Kester, Drake, Mitchell, Kephart,

Mintz, Angelo, Barber, Zimmerman, and LaFave); fifth claim (excessive force against Kester, Mitchell, Drake, Kephart, Dempsey, and Brodsky); sixth claim (failure to intervene against Drake, Mintz, Barber, Dempsey, LaFave, and Angelo); eighth claim (supervisory liability against Zimmerman, Angelo, LaFave, Moxley, and Laiosa); tenth claim (deliberate indifference to serious medical needs against the City and RPD defendants); eleventh claim (municipal liability against the City for failure to discipline officers who use excessive force); and twelfth claim (municipal liability against the City for failure to discipline officers who fabricate evidence and commit perjury). The City Defendants have filed an Answer to the Amended Complaint.

Following the instant Decision on the County's Motion to Dismiss, no claims against the County Defendants remain pending. The fourteenth claim (denial of the right to a fair trial against Harrigan); and fifteenth claim (municipal liability against the County based on  Doorley's failure to train, supervise, or discipline prosecutors for violating defendants' constitutional rights) are dismissed for failure to state claim. Harrigan and Doorley are dismissed as defendants.

## V.  Conclusion

For the foregoing reasons, the County Defendants' Motion to Dismiss is granted in its entirety; Michael Harrigan and Sandra

Doorley are dismissed as defendants; and the Clerk of Court is directed to enter judgment in their favor.

       **SO ORDERED**.

S/Michael A. Telesca

_____

  HON. MICHAEL A. TELESCA
United States District Judge

Dated:     June 27, 2019
            Rochester, New York