UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DAVID VANN, | | DECLARATION OF ELLIOT D. SHIELDS |
| | Plaintiff, | |
| -against- | | |
| CITY OF ROCHESTER, et al., | | INDEX NO.: 18-cv-6464 (EAW)(JMP) |
| | Defendants. | |

ELLIOT D. SHIELDS, hereby declares under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am associated with Roth & Roth, LLP, where I represent plaintiffs in personal injury and civil rights lawsuits.

2. We are counsel for the Plaintiff and as such I am fully familiar with the facts and circumstances of this action.

3. I give this declaration in support of Plaintiff's motion for an order:

   a) Pursuant to Rule 26(c) for a protective order to prevent defendants counsel from making improper speaking objections during depositions in this matter; and

   b) Pursuant to Rule 26(c) to enter plaintiff's proposed protective order, which is annexed hereto as Exhibit "E".

   c) Granting such other and further relief as the Court deems just and proper.

4. By way of background, this action arises in part under 42 U.S.C. Section 1983 and involves a September 4, 2015 incident where RPD Officers Jeffrey Kester, Matthew Drake and Steven Mitchell falsely arrested and handcuffed Mr. Vann, and then

brutally beat him for approximately two minutes after he was handcuffed. See Amended Complaint, ECF No. 7.

5. Defendants have consented to plaintiff taking up to 20 depositions in this case without seeking permission from the Court.

6. Plaintiff has taken only three depositions thus far in this litigation, largely because of defendants' delays in producing documents.

7. In each of the three depositions, defendants' counsel has made numerous speaking objections, improper objections to questions based on alleged "irrelevancy", improper objections based on his perception that the question was a "hypothetical" question, and improper comments, which constitute improper witness coaching. This misconduct has frustrated plaintiff's attempts to question the witnesses.

8. In two of the three depositions, the depositions of defendants Police Officer Adam Brodsky and defendant Investigator Christopher Barber, plaintiff was unable to complete the depositions of the witnesses, in part, because of the improper objections made by defense counsel.

9. Specifically, on March 23, 2022, plaintiff deposed defendant Police Officer Adam Brodsky. Brodsky's Deposition Transcript annexed hereto as **Exhibit "A"**.

10. Mr. Campolieto began by making improper interjections such as "you can answer if you can: See Ex. A at 25:13-15

"Q: And you're taught like good and accepted police practices and procedures?

Mr. Campolieto: Objection. You can answer, if you can."

11.    Thereafter, Mr. Campolieto improperly sought clarification for Defendant Brodsky. *See id.* at 30:10-31:12

> "Q:    Okay. Did you speak with any of the other defendants in this case?
>
> Mr. Campolieto: I just asked what time frame are you talking about? In preparation for the deposition?
>
> MR. SHIELDS: All right, John, you know, I'm just going to ask if he's confused that he ask the question and you can just say objection, if you have an objection.
>
> MR. CAMPOLIETO: Okay. I object to the question. And maybe you can clarify it for the officer.
>
> MR. SHIELDS: All right, John, you can say "I object, " you know, but don't give him instructions about why you're objecting.
>
> MR. CAMPOLIETO: No. I was giving you the instruction.
>
> MR. SHIELDS: All right, well, look, if he's confused by my question, we went over this in the beginning, and he promised me that he would ask for clarification, so I will withdraw my question and re-ask it."

12.    Thereafter, Mr. Campolieto made numerous "objections" to questions that were clearly not objectionable, which affected Officer Brodsky's testimony, as he would look at Mr. Campolito for direction every time he objected. For example: Exhibit A at 37:11-20.

> "Q:    Um, would there ever be a situation where you would use Level 2 force but not effectuate an arrest?
>
> A:    Yeah, yes.
>
> Q:    Can you give me an example?
>
>     Mr. Campolieto: Objection.
>
> Q:    When he objects, unless he directs you not to answer, you can just go ahead and answer it.
>
> A:    I'm sorry. Can you repeat what you were asking me?"

13. Thereafter, after several more improper "objections", Mr. Campolito objected to a clearly relevant question, claiming that it was an improper "hypothetical" question, leading to a long colloquy at Exhibit "A", 40:21-42:25:

"Q: In general, striking someone above the clavicle with your hand could be considered a Level 4 use of force, correct?

Mr. Campolieto: Objection.

Mr. Shields: John, you got to stop objecting when it's not an objectionable question.

*MR. CAMPOLIETO: Sure, that's objectionable when you're giving him a hypothetical and-*

*MR. SHIELDS: John, I can ask him any hypothetical I want and you' re --*

*MR. CAMPOLIETO: (Inaudible.)*

*MR. SHIELDS: -- objecting and give him instructions. Every time you object. he sits here and gives me some kind of wishy-washy answer because you're directing him in some way. You can't make objections –*

*MR. CAMPOLIETO: You're asking him hypothetical questions that make no sense to a police officer.*

*MR. SHIELDS: John/ it's up to him to say that he's confused and doesn't understand my question.*

*MR. CAMPOLIETO: I'm here to defend the deposition and I'll object if*

*MR. SHIELDS: John, you're making improper objections and I' 11 call the judge if you keep it up.*

*MR. CAMPOLIETO: We can do that.*

*MR. SHIELDS: What I'm asking you to do is Officer Brodsky has two college degrees, he's a smart guy. I don't need you to help him answer questions, okay? This is his deposition.*

*MR. CAMPOLIETO: I have made no speaking objections. I have made objections to hypothetical questions that do not make any sense.*

> MR. SHIELDS: You cannot make any speaking objections because you're instructing him when --•
>
> (Multiple voices.)
>
> MR. CAMPOLIETO: -- (inaudible.)
>
> MR. SHIELDS: -- for clarification, and he's perfectly capable of doing that on his own.
>
> MR. CAMPOLIETO: Move on with the deposition.
>
> MR. SHIELDS: Okay, John, stop making improper objections."

14. After this exchange, Mr. Campolieto refrained from making improper objections for some time, until I asked officer Brodsky questions about the video of the incident. *See* Exhibit "A" at 89:2-9:

> "Q: I want you to look at my client, until the time that you approach, and tell me, um, if it looks like he's actively resisting at all, okay?
>
> (video played)
> Q: Does it look like he was actively resisting at all?
>
> Mr. Campolito: Objection.
>
> A: I don't know."

15. A few pages later at 91:10-93:5:

> "Q: And now, right there, since we last paused, it looks like Officer Mitchell rolled my client over from his stomach to his back; is that right?
>
> MR. CAMPOLIETO: Objection.
>
> A Um, I don't know if that's what he did, or he was moving that way and he went with him/ or if he tried to turn that way. I don't know.
>
> MR. SHIELDS: Okay. And, John, I'm going to tell you, you've got to stop these crazy objections. I'm asking, what did you see in the video, and then --

> MR. CAMPOLIETO: You phrased the question a certain way that the officer did something. I objected as improper. I'm not going to stop objecting.
>
> Mr. SHIELDS: Okay. Did the officer roll him over? It's a yes or no question, John? You don't need to –
>
> MR. CAMPOLIETO: You didn't say, Did the officer roll him over? You ~-
>
> MR. SHIELDS: Yes or no.
>
> (Multiple voices.)
>
> MR. SHIELDS: Like we just said, Officer Brodsky is a smart guy. He's got two college degrees. He doesn't need ~-
>
> MR. CAMPOLIETO: He is a smart guy but that doesn't mean that I'm not here to do my job and to object, and I will continue to object.
>
> MR. SHIELDS: Okay, John. And you know, that could cause a problem with the transcript. We're wasting time right now. And, you know, I'm just going to ask you to let him answer my questions which are not objectionable, okay?
>
> MR. CAMPOLIETO: He's going to answer your questions, but if I have an objection, I'm going to object/ and I object to that question.
>
> MR. SHIELDS: John, okay. You've got to stop making unobjectionable – objections to unobjectionable questions, okay? All right."

16. Then a few minutes later, Mr. Campolieto again started making objections to questions about what the video depicted. First at page 97:5-23,

> Q   All right. And so I'm just going to pause.
>
>     (Video paused.)
>
> Q   For the record, it looks like Kephart stands up at 10:26 into the video on the bottom left and 11:43:42 on the top right. And then it looks like -- now/

> *at that point I'm going to pause at 10:32 on the bottom left and 11:43:48 on the top right. It looks like Mitchell is kind of – now, I say drag because he's pulling my client's body while his feet are dragging along the ground a little bit; is that fair to say?*
>
> > *MR. CAMPOLIETO: Objection to the use of a freeze-frame here. I mean, you can freeze it at any point. I'm going to object to the use of the freeze-frame to ask these questions. The officer can answer/ but the freeze-frame is objectionable.*

(note, while I ended up withdrawing my question, I should not have done that, as my question was not about the "freeze frame" image but about what the video depicted before the video was paused).

17. Then a few pages later, at page 102:5-17

> Q:   *Now I'm going to hit play.*
>
> > *(Video played.)*
>
> Q:   *All right. Now I'm going to hit pause at 10:56 on the bottom left, 11:44:08 on the top right. Does it look like Mitchell grabbed his hands which were handcuffed behind his back and pulled him up above his head?*
>
> > *MR. CAMPOLIETO: Object to the use of the freeze-frame video, but he can answer.*
>
> > *MR. SHIELDS: Well, John, just, you know, to respond to your objection, I played the video and I asked what he saw in the video, not the freeze-frame.*

18. Then a few pages later, Mr. Campolito again makes a meritless objection, at page 105:11-13,

> Q:   *Okay. It didn't look like he was trying to run away or anything, right?*
>
> > *Mr. Campolieto: Objection.*

19. Then a few pages later, at page 107:3-5

> Q:   *And it would also be unlawful under state and federal law, correct?*
>
> > *Mr. Campolieto: Objection.*

20. Then a few pages later, at page 118:15-23

Q: *Okay. All right. Let's say there's an incident where there was a complaint made against you, would you ever watch any video of that incident, um, as part of the review process for that complaint?*

A *Um, a complaint? What do you mean by a – like a complaint how?*

Q: *Let's say, you know, a citizen complaint saying that you used excessive force against them?*

  *Mr. Campolieto: Objection.*

21. Then a few pages later, when asking more questions about the video, Mr. Capolieto again began improperly objecting to questions and coaching the witness about how to answer the questions, at page 135:2-136:2

Q: *Okay. So at this point/ does it look like Officer Mitchell is grabbing my client by the neck?*

A: *I don't know.*

Q: *Okay. Where are Officer Mitchell's hands right now?*

A: *Could be on his shoulders, could be on his arms, could be on his neck, could be on his back of his head.*

Q: *And we're at 8:01 in the bottom left and 11:41:42 in the top right.*

  *(Video played.)*

Q *And what's it look to you like Officer Mitchell is trying to do right now?*

  *MR. CAMPOLIETO: Objection. He answer for Officer Mitchell.*

A: *I don't know what his intentions are.*

  *MR. SHIELDS: What does it look like he's trying to do, John. He can answer what the video looks like.*

  *MR. CAMPOLIETO: How does he know Officer Mitchell is trying to do?*

> MR. SHIELDS: Okay. Well, what it looks like, John? That is the question.

22. Because of the improper objections throughout the deposition, and the fact that defendants unilaterally moved the start time of the deposition back one hour, we had to agree to keep the deposition open and defendants agreed to reproduce Officer Brodsky. See Id. 140:6 – 144:10.

23. The following day, on March 24, 2022, plaintiff deposed defendant Investigator Tomesha Angelo. Transcript annexed hereto as **Exhibit "B".**

24. From the beginning, Mr. Campolieto again made improper speaking objections, seeking clarification for the deponent. See Exhibit "B" at 16:7-10:

> Q What is the first thing that happened after that?
>
> MR. CAMPOLIETO: Objection. In terms of what, her job?

25. Then at 19:6-9:

> Q You are taught that you have to be diligent when conducting an investigation, right?
>
> MR. CAMPOLIETO: Objection. Go ahead and answer.

26. Sometimes Mr. Campolieto wouldn't even object, he'd just start talking and giving the witness instructions, like at page 20:3-8

> Q Do you remember the date that you graduated from the police academy?
>
> A No.
>
> Q But sometime in 2005 or six?
>
> MR. CAMPOLIETO: If you remember generally.

27. Then again a few pages later, at page 32:20-25,

> Q Would you also do –

*A You don't always get them and it also depends on staffing levels.*

*MR. CAMPOLIETO: Just answer his question.*

28. Sometimes Mr. Campolieto would jump in and answer the question for the deponent, like he did at page 42:10-16,

*Q That would be something that would be part of your personnel file?*

*A I hope so. I don't know. I don't know. I don't look. I don't know.*

*MR. CAMPOLIETO: The answer is "I don't know."*

*THE WITNESS: I'm sorry.*

29. Moreover, throughout the deposition, it was obvious that Mr. Campolieto was having improper conversations with his client that were not captured on the record, such as this exchange at page 48:14-49:10,

*Q Can you give any kind of estimate on when it might have been.*

*A No. I mean I feel like, I don't want to -- I don't know. Sorry.*

*MR. SHIELDS: John, it is a little hard when you are obviously sitting right next to [her]. Just, can you verbalize any objections that you have. I don't want her looking at you.*

*MR. CAMPOLIETO: Yes, I am trying to let this flow. She answered twice, "I don't know." The objection is that she answered the question twice; she answered a third time, she doesn't know.*

*MR. SHIELDS: That is fine. I just want you to be able to get it on the record, okay?*

*MR. CAMPOLIETO: Got you.*

30. Then we again had a long exchange where Mr. Campolieto improperly sought clarification on behalf of the deponent at page 53:21-54:25

*Q If you violated the policies, that would be a violation of good and accepted police practices?*

>    MR. CAMPOLIETO: Objection.

A It would be a violation of whatever policy, not just in general violation.

Q In the policies, they set forth good and accepted police practices, right?

A Yes.

Q So the answer would be, Yes, if you violated the policies that would be a violation of good and accepted police practices, right?

>    MR. CAMPOLIETO: Objection. Vague.

>    MR. SHIELDS: She just answered the question, John, you can't object.

>    MR. CAMPOLIETO: What is good and proper police work? Define it. I don't know what that is.

>    MR. SHIELDS: I just defined it for her and she said, "The policy set forth good and accepted police practices."

>    MR. CAMPOLIETO: Objection. Vague.

31.  The improper objections and continued improper instructions to his witness continued on the next page at 55:15-56:3,

>    Q: It is a priority, right, to ensure that you do your due diligence?

>    MR. CAMPOLIETO: Objection.

>    MR. SHIELDS: John?

>    MR. CAMPOLIETO: Priority to whom and what is the priority?

>    MR. SHIELDS: Stop instructing the witness. You can say your objection and she can go ahead an answer.

>    MR. CAMPOLIETO: You continued, Elliot. It is an objection. It is vague.

32.  On the next page, Mr. Campolieto interrupted his deponent, preventing her from providing a full answer to the question, allegedly to seek clarification on her behalf, at page 57:8-21,

*Q Is it priority to collect all of the evidence as part of your due diligence in investigating?*

*A It depends on the investigation.*

*Q What sort of things would that depend on?*

*A Well, I am not going to treat a violation -- if I am investigating a violation, I am not going to treat it like it is a homicide and depose the entire neighborhood or collect every single --*

> MR. CAMPOLIETO: Is that what you are asking, Elliot? What are you asking?

33. Mr. Campolieto's improper objections continued on the next page, which clearly had an effect on the deponent, who apologized to Mr. Campolieto after his objection at page 58:2-12,

*Q So as part of a professional police investigation, to make sure you are doing your due diligence, if you are investigating a felony, you are going to make sure you track down all of the relevant evidence, right?*

*A I am going to try to.*

MR. CAMPOLIETO: Objection.

THE WITNESS: Sorry.

MR. CAMPOLIETO: You can answer.

*A I am going to try to.*

34. As Mr. Campolieto continuously objected, the deponent would not answer the question until Mr. Campolieto gave her another cue, like "go ahead". See page 58:22-59:5,

*Q If you are aware of evidence you are not allowed to ignore it, right?*

*A I wouldn't.*

*Q You wouldn't because you are not allowed to, right?*

> MR. CAMPOLIETO: Objection. Go ahead.
>
> A I don't know what the policy on that -- I don't know how to answer that. I can tell you what I would do.

35. Again, at page 60:11-20,

> Q You do that because that is what is required in order to ensure all of the relevant evidence to the case is preserved, right?
>
> > MR. CAMPOLIETO: Objection. Go ahead.
>
> A I try my best to support whatever the allegation is or isn't. Sometimes you have to prove something didn't happen.

36. The speaking objections were continuous. For example, on the next page, at 61:6-13,

> Q You adhere to a code of ethics?
>
> > MR. CAMPOLIETO: The Rochester Department Code of Ethics and Rochester Police Standards?
>
> Q I am just saying, you adhere to a code of ethics; that is my question?
>
> A Yes.

37. Almost every time Mr. Campolieto objected, the witness would look at him before she would answer the question. For example at page 73:9-13

> Q It is important to make sure that you don't arrest somebody that hasn't committed a crime, right?
>
> > MR. CAMPOLIETO: Objection.
>
> Q You can answer.

38. Mr. Campolieto's speaking objections clearly tipped the witness to what he thought the question was asking and what he thought her answers should be. See page 75:20-76:8

*Q As an investigator, part of your job is speaking to witnesses, right?*

*A Again, what kind of case are we talking about? Are we talking about this specific case or are we taking about in general?*

*Q In general I am talking right now.*

    *MR. CAMPOLIETO: For this case.*

*A Are we talking about this case?*

*Q I am saying in general, part of your job is speaking to witnesses, right?*

39. See also page 138:19-141:8,

*Q So you didn't feel like she needed to collect the video from earlier in the incident, that was part and parcel of the incident?*

    *MR. CAMPOLIETO: Objection. She answered the question.*

    *MR. SHIELDS: Okay, John, no she hasn't answered the question. You can go ahead and answer.*

    *MR. CAMPOLIETO: She didn't order her to do anything.*

    *MR. SHIELDS: Okay.*

*Q Do you have any reason to believe that Stephanie testified falsely at the criminal trial?*

*A Falsely?*

*Q Do you have any reason to believe that Stephanie testified falsely at the criminal trial?*

    *MR. CAMPOLIETO: Objection.*

*Q Is the answer "No"?*

>MR. CAMPOLIETO: The answer is objection.
>
>MR. SHIELDS: The answer is not objection, John. She answered the question and she said "No."
>
>MR. CAMPOLIETO: She has no idea what Stephanie said. It is her report.
>
>MR. SHIELDS: John, I asked her if she has any reason to believe.
>
>MR. CAMPOLIETO: Objection.
>
>MR. SHIELDS: John, you need to stop.
>
>MR. CAMPOLIETO: No, you need to stop with your hypothetical questions.
>
>MR. SHIELDS: It wasn't a hypothetical. I asked her if she testified falsely. Why don't you prepare the witness and show her the testimony, John?
>
>MR. CAMPOLIETO: She wasn't there.
>
>MR. SHIELDS: Let's go back. The answer to my last question was, "No." Correct?
>
>THE COURT REPORTER: I don't think she answered it. Let me read back.
>
>(The requested portion of the record was read back by the reporter.)

>Q Do you have any reason to believe that the technician, Stephanie Mentz, would have testified falsely at the criminal trial?
>
>A No.

40. A few pages later, at page 150:20-151:6, Mr. Campolieto answers a question for the deponent and then instructs her to ask to review her report,

>Q When you say, "The two depositions," what is the second one?
>
>A I don't remember the dude's name. Rafeq?
>
>>MR. CAMPOLIETO: No.
>
>A No. Let me see.

> MR. CAMPOLIETO: *Ask if him if you can review your report.*
>
> *A I am trying to adjust because my back is killing me. Can I review my information [report].*

41. Thereafter, at the December 5, 2022, plaintiff deposed defendant investigator Christopher Barber. Again, from the beginning of the deposition, Mr. Campolieto made objections to completely non-objectionable questions, which confused his witness and slowed the deposition. See, e.g., **Exhibit "C"** at 25:16-21; 26:15-20.

42. Mr. Campolieto would only state "objection", but would not state the basis of the objection. Apparently, Mr. Campolito objected any time he didn't like a question or thought it wasn't relevant. For example, when I asked Investigator Barber to "compare the culture within the RPD at the time that you started in 2007 until what you think it's like today", Mr. Campolieto objected, but stated no basis for the objection. Id. 26:15-20.

43. As I continued to ask about the culture within the RPD, Mr. Campolieto continued to make baseless objections, without stating any reason for the objection. *See id*. at 27:11-14; 27:23-28:2; 31:17-20, 31:21-32:3.

44. Then when I asked Investigator Barber about the various police chiefs that he's worked under since 2007, Mr. Campolito's inappropriate speaking objections really started.

45. First, Mr. Campolieto simply began instructing his witness on how to answer my questions, without even objecting. *Id*. at 34:11-13 ("Just answer the question he's asking. He just asked do you know the names.").

46. Then as I began asking about the different chiefs, Mr. Campolieto simply started taking and obstructing my fair examination of the witness, often without even

making an "objection." *See id*. at 34:25-35:4 ("We have a list we can provide you of the police chiefs' names, Elliot, if you'd like it, and their dates of service."); 35:21-25 ("What's the question? Do you want him to name them or do you want to know if they stand out to him? I can get you a list of the chiefs.")

47. When Mr. Campolieto began talking and obstructing my questioning, I asked him to stop talking during my deposition. *Id*. 35:18-36:8. I explained that he can say "objection" but he can't talk. Id. 36:9-11. And Mr. Campolieto then instructed his witness to stop answering questions. *Id*. 36:12-13.

48. I asked Mr. Campolieto to state the basis of his instruction to the witness not to answer my question, but he refused. I then informed Mr. Campolieto that his instruction to the witness not to answer the question was improper under Rule 30(c)(2) and that I was going to call the Court. Mr. Campolieto said that he was going to take a break and that he did not need to be on the call to the Court. *Id*. at 36:14-39:4.

49. I then called the Court, and had a conversation with Ms. Gleason about Mr. Campolieto's inappropriate objections and instructions to the witness not to answer the questions. Id. at 39:9-43:14. Ms. Gleason took down my message and said she'd attempt to get in touch with Judge Pedersen.

50. Mr. Campolieto then came back into the deposition, and we had another long colloquy wherein he refused to state the basis of his objection and stated that he would not permit his officer to answer the line of questions regarding former police chiefs. I informed Mr. Campolieto that it was inappropriate for him to instruct his witness not to answer the questions and that he could be subject to sanctions for doing so. *Id*. at 43:17-49:6.

51. Later at that same deposition, when I asked Officer Barber a line of questions about other force incidents where RPD officers punched handcuffed subjects in the face, and under what circumstances it would be appropriate to punch a handcuffed subject in the face, Mr. Campolieto began objecting and attacking every question posed—a prohibited practice known as "Rambo tactics"—which interfered with the fair examination of the witness about clearly relevant information. *Id*. at 88:5-95:13. Again, when Mr. Campolieto objected, he failed to state the reason for the objection, but these were clearly not "form" objections.

52. On December 7, 2022, I called Mr. Campolieto and spoke with him about the conduct of depositions in this case, and suggested that we enter into a stipulation regarding the protocol for making objections at depositions. Mr. Campolieto agreed that a deposition protocol made sense.

53. Later that day, I sent Mr. Campolieto a letter, dated December 7, 2022, which outlined my concerns about his improper objections, and laid out suggested terms for the making of objections at future depositions. **Exhibit "D"**.

54. Mr. Campolieto never responded to my December 7, 2022 letter.

55. It is within this backdrop that we ask the Court to issue an order setting forth a deposition protocol, as set forth in the proposed order annexed hereto as **Exhibit "E"**.

**WHEREFORE**, Plaintiff respectfully requests that the Court issue an Order granting the following relief:

a) Pursuant to Rule 26(c) to enter the proposed protective order annexed hereto as Exhibit "E";

b) Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York  
       December 19, 2022

Respectfully Submitted,  
ROTH & ROTH LLP

By: _____~/s/~_____  
Elliot Dolby Shields, Esq.  
*Counsel for Plaintiff*  
192 Lexington Ave, Suite 802  
New York, New York 10016  
Ph: (212) 425-1020

To:    All parties (via ECF)