

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -X
DAVID VANN,

                          Plaintiff,
          - against -    Case No.:
                          18-cv-6464 (EAW)(MJP)


THE CITY OF ROCHESTER, et al.,


                          Defendants.


- - - - - - - - - - - - - - - - - - - - - -X


                    March 23, 2022
                    3:11 p.m.



          DEPOSITION VIA ZOOM VIDEOCONFERENCING of
ADAM BRODSKY, s/h/a POLICE OFFICER ADAM BRODSKY, one
of the Defendants herein, taken by the Plaintiff,
pursuant to Federal Rules of Civil Procedure, and
Notice, held at the above-noted date and time, before
Jeanine Koerner, a Stenotype Reporter and Notary
Public of the State of New York.



2

```
 1    A P P E A R A N C E S:
 2

 3            ROTH & ROTH, LLP
                    Attorneys for Plaintiff
                    192 Lexington Avenue, Suite 802
 4                  New York, New York 10016
                    (212) 425-1020
 5

        BY:  ELLIOT SHIELDS, ESQ.
 6      File #: 6162
        E-mail: eshields@rothandrothlaw.com
 7      (Via Zoom Videoconferencing)
 8

 9            CITY OF ROCHESTER, NEW YORK -
10                  LAW DEPARTMENT
                    Attorney for Defendants
11                  City Hall Room 412A
                    30 Church Street
12                  Rochester, New York 15614
                    (585) 428-7410
13

        BY:  JOHN CAMPOLIETO, ESQ.
14      E-mail: john.campolieto@cityofrochester.gov
        (Via Zoom Videoconferencing)
15
16
17
18
19
20
21
22
23
24
25
```

3

FEDERAL STIPULATIONS

1

2

3      IT IS HEREBY STIPULATED AND AGREED by and

4  between the attorneys for the respective parties

5  herein, that the sealing, filing and certification of

6  the within deposition be waived;

7      IT IS FURTHER STIPULATED AND AGREED that all

8  objections, except as to form, are reserved to the

9  time of trial;

10      IT IS FURTHER STIPULATED AND AGREED that the

11  transcript of this deposition may be signed before any

12  Notary Public, with the same force and effect as if

13  signed before a clerk or Judge of the Court;

14      IT IS FURTHER STIPULATED AND AGREED that all

15  rights provided to all parties by the F.R.C.P. cannot

16  be deemed waived, and the appropriate sections of the

17  F.R.C.P. shall be controlling with respect thereto.

18

19

20                     ooOoo

21

22

23

24

25

4

1               P R O C E E D I N G S

2               THE REPORTER:  The attorneys

3      participating in this deposition

4      acknowledge that I am not physically

5      present in the deposition room and that I

6      will be reporting this deposition

7      remotely.

8               They further acknowledge that, in

9      lieu of an oath administered in person, I

10     will administer the oath remotely.

11              The parties and their counsel

12     consent to this arrangement and waive any

13     objections to this manner of reporting.

14              Please indicate your agreement by

15     stating your name and your agreement on

16     the record.

17              MR. SHIELDS:  Agreed.

18              MR. CAMPOLIETO:  Agreed.

19                   o0o

20

21

22

23

24

25

5

1  A D A M   B R O D S K Y,

2          having first been duly sworn by the Notary

3          Public, was examined and testified as follows:

4                  THE REPORTER:  Please state your

5          full name for the record.

6                  THE WITNESS:  Adam Brodsky.

7                  THE REPORTER:  Please state your

8          present business address for the record.

9                  THE WITNESS:  185 Exchange Boulevard,

10         Rochester, New York 14614.

11 EXAMINATION BY

12 MR. SHIELDS:

13     Q     All right.  Good afternoon,

14 Officer Brodsky.

15     A     Good afternoon.

16     Q     My name is Elliot Shields.  I represent

17 the man that was injured, and I'm going to ask you

18 some questions today.

19             If there is anything I ask you that you

20 don't understand, please say so, and I'll gladly

21 rephrase any questions, okay?

22     A     Very good.

23     Q     And otherwise, if you answer the

24 question, I'm going to assume that you understood it.

25             Do you understand everything I said so

6

1                        P.O. Adam Brodsky

2    far?

3          A      I do.

4          Q      And you agree to those terms?

5          A      Yes.

6          Q      Okay.  And we're doing it on a virtual

7    deposition today on Zoom.

8                 Where are you doing this virtual

9    deposition from?

10         A      City of Rochecter City Hall.

11         Q      And is there anyone in the room with you

12   other than your attorney?

13         A      No.

14         Q      And do you have any papers in the room

15   with you that you plan to review to help you to answer

16   any questions?

17         A      I don't have any papers with me, no.

18         Q      And you understand that everything we're

19   talking about is going to be recorded and transcribed

20   into a little book for use at trial in this matter?

21         A      I do.

22         Q      And have you ever been questioned under

23   oath before?

24         A      Yes.

25         Q      How many times?

7

1                         P.O. Adam Brodsky

2        A      Well over 50.

3        Q      And were those all in the context of

4   criminal proceedings or something else?

5        A      Most of them were, yes.

6        Q      Okay.  And other than criminal

7   proceedings, what testimony under oath have you given

8   previously?

9        A      One prior deposition.

10        Q      And was that a civil rights case like

11   this one or something else?

12        A      Um, I don't know if you would -- it was

13   for a false arrest or something like that.  I don't

14   know if it's classified as that.

15        Q      Okay.  And was that when you were an

16   officer with the Rochester Police Department?

17        A      No.

18        Q      Where were you working at the time you

19   gave that deposition?

20        A      In the City of Buffalo for the Niagara

21   Frontier of Transportation Authority.

22        Q      Okay.  And what was the name of that

23   case, if you remember?

24        A      Um, I believe his name was Buckley.

25        Q      Okay.  And can we just back up?  Can you

8

```
 1                       P.O. Adam Brodsky
 2    give me the name of the Buffalo Niagara Authority,
 3    whatever that was again?
 4         A       Niagara Frontier Transportation
 5    Authority, referred to as a lot of times NFTA.
 6         Q       Okay, thank you.
 7                 And so would that be like a police
 8    department for the transit system in Buffalo?
 9         A       Yes.
10         Q       I'll ask you more questions about that
11    in a minute.  Let's see.
12                 And so you gave your business address,
13    but do you live in the city of Rochester or somewhere
14    else?
15         A       Somewheres else.
16         Q       Can you give me the town or whatever
17    suburb you live in?  I don't need the actual address.
18                     MR. CAMPOLIETO:  We're not giving
19                 out any information about addresses,
20                 towns, or whatever.  We can take this up
21                 later with the judge, if you want,
22                 Elliot, but --
23                     MR. SHIELDS:  It's not a huge,
24                 big deal.  You know, it's just on the
25                 website, it says he doesn't live in the
```

9

P.O. Adam Brodsky

1

2                city of Rochester.  That's good enough

3                for me.

4                        MR. CAMPOLIETO:  Okay.

5        Q        Are you aware that Mayor Warren proposed

6    changing the law to require RPD officers to live in

7    the city?

8                        MR. CAMPOLIETO:  Objection.

9        A        I'm sorry.  Your question was, was I

10   aware if what?

11       Q        So before she left office, Mayor Warren

12   proposed making a change to the law to require RPD

13   officers to live inside of the city of Rochester.

14       A        Okay.

15       Q        Are you aware of that?

16       A        No.

17       Q        If the law changed and you were required

18   to live in the city of Rochester, would you continue

19   working as an RPD officer?

20                        MR. CAMPOLIETO:  Objection.

21       A        I mean, I think we're thinking

22   hypothetically if -- I mean, I don't know how far we

23   want to go down what ifs.

24       Q        Yeah, sure.  Can you just answer my

25   question?

1                    P.O. Adam Brodsky

2        A       So if the -- if the mayor were to ask

3   for me to live outside -- to live in the city to

4   continue to be employed by the City of Rochester

5   Police Department, would I move and live in the city?

6        Q       Correct.

7        A       I don't know.

8        Q       Maybe you would, maybe you wouldn't?

9        A       Right.  I don't -- unless I was

10  presented with that actual situation, I don't know.

11  That's a big adjustment, so I'm not sure what I would

12  do.

13       Q       Yeah.  I mean, I think that's why

14  there's a lot of controversy about it, right?  So

15  that's why I'm asking you, if you were required to

16  live inside of the city of Rochester to work as a

17  Rochester Police Department officer, you're not sure

18  if you would do that; is that your answer?

19       A       Yes.

20       Q       Okay.  And, um, so I'll try to tell you

21  as we go through the deposition where I'm going.

22  First, I'm going ask some more background questions,

23  and then I'll -- so I'll start with your educational

24  background, okay?

25                    Where did you go to high school?

1                          P.O. Adam Brodsky

2          A       Kenmore West.

3          Q       Where is that?

4          A       Kenmore, New York.

5          Q       Kenmore West in Kenmore, New York, okay.

6                  And what's your highest level of

7     education?

8          A       Bachelor's degree.

9          Q       And where did you get that from?

10         A       Hilbert College.

11         Q       Where is Philbert College?

12         A       Hilbert with an H, as in Henry.

13         Q       Okay.  And where is that?

14         A       Hamburg, New York.

15         Q       Did you get your BA in any particular

16    field?

17         A       I did.

18         Q       What would that be?

19         A       It's called economic crime

20    investigation.

21         Q       And can you tell me about that a little

22    bit?

23         A       Sure.  Um, it's a technology-based

24    approach to white-collar crime and fraud

25    investigation.

12

1              P.O. Adam Brodsky

2        Q      And what year did you get your BA from

3   Hilbert College?

4        A      I believe it was 2006.

5        Q      All right.  And so in addition to

6   white-collar criminal matters, did that involve any

7   other type of police work, coursework?

8        A      I have an associate's degree in criminal

9   justice as well.

10       Q      And is that also from Hilbert College?

11       A      Correct.

12       Q      And did you get that at the same time in

13  2006 or a different time?

14       A      No.  That would have been, I think,

15  either 2003 or 2004.

16       Q      Okay.  So after you got your associate's

17  degree in criminal justice, did you continue directly

18  on to get your BA in economic crime investigation?

19       A      I did.

20       Q      During that time, were you working as

21  well?

22       A      Um, off and on, I believe I had

23  part-time jobs.

24       Q      Any police-related work during that

25  time?

13

1                              P.O. Adam Brodsky

2          A       No.

3          Q       What kind of jobs generally?

4          A       Um, a restaurant, um, changing oil in

5    cars and tires, um, coaching tumbling for kids.

6    That's about all I can think of.

7          Q       Okay.  No, like, um, security guard work

8    or anything like that?

9          A       No.

10         Q       And can you give me an overview of your

11   experience as it relates to police work?

12         A       Sure.  In January 2009, um, I was hired

13   by the NFTA Police Department.  I attended the

14   Eerie County Law Enforcement Training Academy at that

15   time.  After successfully completed that, I was placed

16   on field training.  Once I successfully completed

17   that, I was then, um, a solo police officer for the

18   NFTA.

19                 Um, I remained employed as a police

20   officer with them until January 2015, when I came to

21   the City of Rochester department.  Um, I attended the

22   Monroe County Law Enforcement Training Academy at that

23   time, completed that successfully.  Then was in field

24   training here as well.  And once I completed that, I

25   became a solo City of Rochester police officer.

14

                           P.O. Adam Brodsky

1

2      Q      All right.  So let me ask you some

3  questions about what you just said.

4             So 2009, you're hired by NFTA, the

5  police department.

6             Generally, what is the, like, geographic

7  boundaries that you would police there?

8      A      There is two different divisions.  There

9  was the downtown division and there was an aviation

10  division.  Um, our jurisdictional boundaries were

11  Eerie County, Niagara County, and Genesee County.

12     Q      And that's separate and apart from the

13  Buffalo Police Department, right?

14     A      Correct.

15     Q      How many officers were within NFTA?

16     A      I don't know currently.  At that time, I

17  think we were right around a hundred.

18     Q      And what was your assignment after you

19  completed -- let me back up.

20             So you went to the Eerie County Training

21  Academy.  How long did that last?

22     A      I believe it's a six-month academy.

23     Q      All right.  Was that just for NFTA or

24  did you go with, for example, Buffalo police officers

25  also?

                        P.O. Adam Brodsky

1

2      A        Correct.  It was for the towns, the

3  villages and cities in Eerie County.

4      Q        Okay.  So that was six months, you said?

5      A        Yeah.  They usually -- all of the

6  New York State academies like that are usually, I

7  believe, six months.

8      Q        Okay.  And then you said you did field

9  training with the NFTA.

10               How long did that last?

11      A        It's hard for me to remember exactly,

12  but I believe around three, four months it was.

13      Q        Okay.  All right.  And you mentioned

14  earlier that there was one lawsuit that you were

15  involved with from your time at the NFTA, correct?

16      A        Correct.

17      Q        Were you named as a defendant in that

18  case?

19      A        I was brought in for a deposition.  I

20  don't really understand much how that works as far as

21  being named or --

22      Q        Sure.

23      A        -- how that works.

24      Q        Did someone allege that you did

25  something wrong?

1                         P.O. Adam Brodsky

2          A       Yeah.   I suppose, yes.

3          Q       Okay.   Do you remember what happened

4    with that case?   Did it go to trial?

5          A       It was dismissed.

6          Q       Okay.   So dismissed before trial?

7          A       I believe it went to a magistrate who

8    dismissed it, and then upon appealing, it was

9    dismissed by the judge.

10         Q       Got it.   So you only testified once in a

11   deposition but never before a jury, a trial, right?

12         A       Correct.   I mean, for criminal matters,

13   yes.   For that, no.

14         Q       That's what I meant.   Just for that

15   case.   Okay.

16                 So you were with the NFTA from 2009 to

17   2015, correct?

18         A       Correct.

19         Q       So about six years?

20         A       Correct.

21         Q       And then after that, you came to the

22   RPD?

23         A       Yes.

24         Q       And why did you decide to go from the

25   NFTA to the RPD?

1                          P.O. Adam Brodsky

2        A        Um, I was trying to seek out the -- what

3    I felt was the best city department in New York State.

4        Q        And so you did that in 2015?

5        A        Well, prior to.  I was hired in 2015.

6        Q        Sorry.  So can you tell me the process

7    about getting hired with the RPD?  Did you submit an

8    application?

9        A        Um, I believe the first step is signing

10   up for the test.

11       Q        Okay.  So you had to take an officer

12   test?

13       A        It's a written civil service test.

14       Q        Okay.  So you take the civil service

15   test.  Um, I'm assuming -- did you pass on the first

16   try?

17       A        Yes.

18       Q        Okay.  So you passed the test.  Then

19   what was the next step?

20       A        You -- you're brought in for a physical

21   agility test I believe is next.

22       Q        Okay.  So you do that.  And then what

23   happened next?

24       A        At that time you turn in a background

25   packet as well.  So after you complete -- if you

18

1                        P.O. Adam Brodsky

2    successfully complete the physical agility part, you

3    go on to turn in your background packet.

4           Q       Okay.  And then what happened next?

5           A       Um --

6           Q       I'll withdraw that.

7                   Eventually you got a letter or something

8    saying, Officer Brodsky, we'd like to offer you

9    employment with RPD?

10          A       I believe there's a -- you meet with a

11   panel of administrators, and then that happens.  That

12   might have been the very last step.  There's like a

13   face-to-face meeting with administration.

14          Q       And when you say "with administration,"

15   that'd be RPD administration?

16          A       Right.

17          Q       All right.  So you do that, um, and then

18   you get hired, and you said that you went to the

19   police academy in Monroe County in January of 2015; is

20   that right?

21          A       Correct.

22          Q       All right.  And how long did that last,

23   six months?

24          A       Correct.

25          Q       Okay.  And then were you, um -- so you

P.O. Adam Brodsky

1

2  went full time to the police academy?

3        A        I did.

4        Q        And you had to go to the police academy

5   all over again in Rochester even though you'd already

6   completed that in Eerie County?

7        A        Correct.

8        Q        That doesn't like transfer or something?

9        A        It should.

10       Q        Um, you didn't ask for a waiver or

11  anything like that?

12       A        The answer I got was -- is usually what

13  happens is, is if you're a certified police officer in

14  New York State, they'll do what they call the lateral

15  academy where if they have several officers that were

16  already sworn off, and so they do an abbreviated

17  academy.  Um, but in this case, I believe I was the

18  only one at the time, so they weren't going to do that

19  specifically for me, so if I wanted the job I had to

20  attend the academy.

21       Q        Got it.  Um, and you went full time like

22  everyone else or did you get out of some stuff since

23  you'd already been working as a police officer for six

24  years?

25       A        No.  I went full time like everybody

1                    P.O. Adam Brodsky

2    else.

3        Q       Um, all right.  So you complete the

4    police academy, and let's see, how many hours a week

5    was that?

6        A       I think right around 40.  It was a

7    full-time position.

8        Q       Okay.  And then after the police academy

9    you did field training?

10       A       Correct.

11       Q       With the RPD?

12       A       Right.

13       Q       And how long did that last?

14       A       Four months.

15       Q       Do you remember the date that you

16   completed your police academy with the RPD?

17       A       Including field training are you asking?

18       Q       No.  So do you remember when you

19   transitioned from the police academy to field

20   training?

21       A       I do not.

22       Q       But if it's six months, sometime around

23   June or July?

24       A       Yes.  They have a post academy as well

25   where the City of Rochester does additional training

1                        P.O. Adam Brodsky

2    beyond, um, what is required than just the academy.

3    So we attend that for a few more weeks than the

4    regular, um -- the other towns, villages that attended

5    that academy as well.  So I'm not sure exactly how

6    that lines up and what date that would be, so it was

7    around those months.

8                        (Reporter clarification.)

9          Q      Is what you just said?  So post academy

10   training, is that between the police academy and field

11   training?

12         A      Correct.

13         Q      Do you remember how long that lasted?

14         A      If I remember correctly, about two

15   weeks.

16         Q      Okay.  And so that's basically extra

17   classroom training before you go out into the field?

18         A      Yes.

19         Q      And during your field training, did you

20   have a field training officer?

21         A      I had several.

22         Q      Okay.  Were those specific assigned

23   people?

24         A      Yes.

25         Q      And before we get into who they were,

1                         P.O. Adam Brodsky

2       were they -- was it one person at a time?

3            A       Can you clarify what you mean by that?

4            Q       So like would you have one person --

5       let's say you had four and it lasted four months.

6       Would it be one person for one month, one person for

7       month two, one person for month three, one person for

8       month four, or kind of four people throughout the

9       entire field training?

10           A       No.   Like you stated, so it's broken

11      down into the four phases, and you have one field

12      training officer per month, unless they're out sick or

13      there's something they have to do, and then they'll

14      have people fill in.

15           Q       Got it.   Do you remember who your field

16      training officers were?

17           A       Yes.

18           Q       Okay.   Who were they for the different

19      phases?

20           A       My primary field training officer was

21      now Lieutenant Justin Stewart.   My secondary field

22      training officer was Officer Timothy Dempsey.   My

23      third tertiary training officer was

24      Officer Margaret Dreyhan (phonetic).   And then for

25      your final phase, you would turn back to your primary

23

1                      P.O. Adam Brodsky

2    officer.  So it would have been Lieutenant

3    Justin Stewart again.  So actually it's only three,

4    not four officers.  Sorry.

5          Q       Okay.  In those terms that you used,

6    primary, secondary, tertiary, those are RPD terms?  Is

7    that what they call them in general?

8          A       Yes.

9          Q       In general, are you supposed to be

10   learning different things during the different phases

11   of your field training?

12                      MR. CAMPOLIETO:  Objection.

13                      You can answer.

14         A       I'm sorry.  You have to be a little more

15   specific.

16         Q       Yeah.  Like what's the difference

17   between Phase I and Phase II?

18         A       Sure.  The amount of responsibility on

19   the officer and their duties change per phase,

20   correct.

21         Q       When you're doing your field training,

22   do you have your own car or are you assigned with your

23   FTO?

24         A       You're riding in a car with your FTO.

25         Q       And, um, are you -- you said riding in

24

1                          P.O. Adam Brodsky

2       the car, so does that mean that you're the passenger

3       in the car or is there ever a time where you'd be the

4       driver?

5               A       I -- both.

6               Q       So it just depends?

7               A       No.  It's broken down further.

8               Q       Okay.

9               A       Um, in the primary phase, the first two

10      weeks are observational, so you do not drive during

11      that.  The secondary phase, I want to say for the

12      first two days, um, they use that as a limbo or

13      observational period.  Um, the same for the third.

14      And then you should be -- there isn't a limbo phase

15      for your final.

16              Q       Okay.

17              A       So other than those that I mentioned,

18      you should be driving unless the recruit has an issue

19      with driving.

20              Q       Got it.  When you say an issue with

21      driving, you mean -- can you explain what you mean by

22      that?

23              A       Um, I imagine if a recruit isn't

24      operating the vehicle as the training officer would

25      like them -- to see them do that, that may require

25

1                          P.O. Adam Brodsky

2      some type of remedial training or if they're involved

3      in an accident, maybe that would require remedial

4      training.

5           Q      Got it.  Let's see, and just going

6      through some of the stuff you learned at the academy.

7      You covered basic topics like, I don't know, police

8      sciences?

9           A      Police science?

10          Q      I guess, you know, like practices and

11     procedures?

12          A      Sure.

13          Q      And you're taught like good and accepted

14     police practices and procedures?

15                     MR. CAMPOLIETO:  Objection.

16                     You can answer, if you can.

17          A      I'm sorry.  You would have to be a

18     little more specific.  I'm not sure what you mean by

19     that.

20          Q      Sure.  So, um, is the -- were the

21     courses taught by like the Division of Criminal

22     Justice Services?

23          A      It depends on the topic.

24          Q      Okay.  So some of the topics were DCJS

25     trainings?

1                         P.O. Adam Brodsky

2          A       Some of the topics would be taught by

3    officers who like received additional training for

4    Instructor Development School.

5          Q       But in general, the purpose of -- the

6    purpose of going to the police academy is to learn how

7    to do your job as a police officer, correct?

8          A       Yes, functions -- certain functions,

9    correct.

10         Q       And you were taught the professional

11   police standards of care?

12                         MR. CAMPOLIETO:  Objection.

13         A       I guess I just have trouble following

14   the terminology.  I mean, I'm not -- 'cause I'm not

15   sure what you mean when you say that.

16         Q       Sure.  So you're taught the minimum

17   standards of care for a police officer, right?

18                         MR. CAMPOLIETO:  Objection.

19         Q       Do you understand what the term

20   "standard of care" means?

21         A       I guess I would like for you to explain

22   that further.

23         Q       So you're taught how to -- for example,

24   the laws of arrest, correct?

25         A       Correct.

27

1                          P.O. Adam Brodsky

2          Q        What constitutes probable cause?

3          A        Correct.

4          Q        How to make that determination when

5     you're in the field?

6          A        Correct.

7          Q        And you're taught things like, you know,

8     Graham v O'Connor [sic] and objective reasonableness

9     in terms of use of force?

10         A        Correct.

11         Q        And so you're taught the standards of

12    care for when you have probable cause to make an

13    arrest, correct?

14                       MR. CAMPOLIETO:   Objection.

15         A        If what you just described is what

16    you're summing it up to be, then yes.  I guess when

17    you say "standards of care," I just don't follow that

18    other than the examples you just gave.

19         Q        Yeah.  So, for example, you're taught,

20    you know, that you can't use force unless under the

21    circumstances it's objectively reasonable to do so,

22    correct?

23         A        Yes.

24         Q        And you're taught -- are you taught

25    things like that, um, based on case law?  Do they go

1                           P.O. Adam Brodsky

2      over case law with you?

3           A       Yes.

4           Q       For example, you understood when I said

5      Graham v O'Connor, right?

6           A       Correct.

7                           MR. CAMPOLIETO:   Objection.

8           Q       And you're taught about how to properly

9      fill out paperwork and stuff like that?

10          A       Some of it's general because you have

11     more than one department in there and not everybody --

12     not every department has the same paperwork, so it's

13     hard to duplicate it exactly in the academy setting.

14          Q       So after you left the academy, are you

15     given specific training by the RPD about the

16     requirements to fill out paperwork after an incident?

17          A       In field training, is that what you're

18     asking me?

19          Q       Sure.   Let's go with field training.

20     During field training do you learn that?

21          A       You'd go over the paperwork that would

22     be required for the incident that you're involved in.

23          Q       And I guess the idea would be in the

24     course of four months you should be exposed to various

25     different incidents and learn on the job?

1                          P.O. Adam Brodsky

2        A        Correct.

3        Q        And in the academy you're taught about

4    the Use of Force Matrix?

5        A        Correct.

6        Q        And I forgot to ask.

7                 Can you tell me everything that you did

8    to prepare for today's deposition?

9        A        I had a meeting with my attorney

10   approximately a week ago, and we watched an angle of

11   the video footage from this case.

12       Q        Um, did you talk with anybody else in

13   preparation for this deposition?

14       A        No.

15       Q        Did you review any paperwork in

16   preparation of the deposition?

17       A        No.

18       Q        Did you watch any other videos?

19       A        No.

20       Q        And the video that you watched in

21   preparation for the deposition, um, it was of the

22   incident that we're here to talk about as part of this

23   lawsuit?

24       A        Correct.

25       Q        And, um, how long was that meeting?

1                          P.O. Adam Brodsky

2          A        I'm sorry?

3          Q        How long did the meeting last?  Don't

4   tell me anything that you and John talked about.

5   Just, um, you know, was it 30 minutes, an hour?

6          A        Maybe 15 minutes, 20.

7          Q        And did you speak with anybody in the

8   police department about your deposition today?

9          A        No.

10         Q        Okay.  Did you speak with any of the

11  other defendants in this case?

12                          (Inaudible sounds.)

13                          (Reporter clarification.)

14                  MR. CAMPOLIETO:  I just asked

15                  what time frame are you talking about?

16                  In preparation for the deposition?

17                  MR. SHIELDS:  All right, John,

18                  you know, I'm just going to ask if he's

19                  confused that he ask the question and you

20                  can just say objection, if you have an

21                  objection.

22                  MR. CAMPOLIETO:  Okay.  I object

23                  to the question.  And maybe you can

24                  clarify it for the officer.

25                  MR. SHIELDS:  All right, John,

P.O. Adam Brodsky

```
 1                        P.O. Adam Brodsky
 2                   you can say "I object," you know, but
 3                   don't give him instructions about why
 4                   you're objecting.
 5                        MR. CAMPOLIETO:  No.  I was
 6                   giving you the instruction.
 7                        MR. SHIELDS:  All right, well,
 8                   look, if he's confused by my question, we
 9                   went over this in the beginning, and he
10                   promised me that he would ask for
11                   clarification, so I will withdraw my
12                   question and re-ask it.
13        Q         At any time since you were told that you
14   were going to have to testify at this deposition, have
15   you spoken with any of the other officers involved in
16   this lawsuit?
17        A         Regarding this deposition?
18        Q         Regarding the deposition or the case in
19   general.
20        A         No.
21        Q         At any time since this lawsuit was
22   filed, have you spoken with any of the other officers
23   involved in the incident?
24        A         Regarding the incident?
25        Q         Regarding the incident.
```

32

1                        P.O. Adam Brodsky

2          A       No, I have not.

3          Q       Not about, you know, coaching Little

4    League.

5          A       Right.

6          Q       Um, so you already said you didn't

7    review any paperwork in preparation, right?

8          A       Right.

9          Q       Have you -- other than preparing for

10   this deposition in connection with the lawsuit, have

11   you viewed any videos or reviewed any paperwork?

12         A       I'm sorry, can you repeat that?

13         Q       Sure.  Like since the case was filed,

14   right, we filed the Summons & Complaint and then we

15   served it on you at the police department.  Did you

16   review the Summons & Complaint when it was served?

17         A       No.

18         Q       Okay.  Do you understand, you know, what

19   my client alleges you did wrong in this case?

20         A       I do not.

21         Q       Okay.  Um, and let's get back to the Use

22   of Force Matrix for a second.

23                 Now, would you agree that Force Matrix

24   is an approach to the escalation and deescalation of

25   levels of force or control in a response to levels of

33

                        P.O. Adam Brodsky

1

2   resistance?

3       A       Yes.

4       Q       Okay.  And you were taught various

5   defensive tactics that would fall on the spectrum on

6   the Force Matrix, correct?

7       A       Correct.

8       Q       And the sole purpose for any defensive

9   tactic is control, correct?

10                      MR. CAMPOLIETO:  Objection.

11      A       I wouldn't say that's the sole purpose.

12      Q       Okay.  What are the other purposes?

13      A       Um, well, control or effect the arrest,

14  also defend yourself.  I think that's a big part of it

15  as well.

16      Q       Um, and you were taught that as you're

17  progressing through the use of force, um, you're

18  supposed to verbalize throughout the entire encounter

19  and deescalate your force when the subject complies

20  with those commands?

21                      MR. CAMPOLIETO:  Objection.

22                      You can answer.

23      A       I agree that you escalate and deescalate

24  as necessary.  Um, as far as verbalizing the entire

25  time, that may not be applicable.

34

1              P.O. Adam Brodsky

2        Q        Okay.  If that was something in your

3   training, you'd remember it?

4                      MR. CAMPOLIETO:  Objection.

5        A        That if what was in my training?

6        Q        If that was something that like was in

7   the RPD's policies and training, um, would you agree

8   that that's something that you're supposed to do?

9        A        To verbalize?

10       Q        Yeah, you know, Hey, stop resisting,

11   stop resisting.

12       A        Sure.

13       Q        And is that something that you're taught

14   to say specifically to a subject when you're making an

15   arrest?

16       A        That specific phrase?

17       Q        Correct.

18       A        I don't remember that.

19       Q        Are there any specific phrases that

20   you're taught to say to somebody when you're effecting

21   an arrest?

22       A        "Put your hands behind your back, you're

23   under arrest."

24       Q        Um, okay.  And on the Use of Force

25   Matrix, there's four levels of force, correct?

35

1                              P.O. Adam Brodsky

2          A       Correct.

3          Q       And Level 1, um, is presence, dialogue,

4    verbal, non-verbal psych; is that right?

5          A       Yes.

6          Q       So that just basically means no physical

7    contact?

8          A       Correct.

9          Q       So the basic idea is that just by being

10   a police officer with a gun and other weapons on your

11   belt, that's intimidating to a subject, right?

12                            MR. CAMPOLIETO:   Objection.

13         A       I don't think that that's what the, um,

14   the spirit behind that is.

15         Q       Okay.  Can you just kind of explain what

16   Level 1 is then?

17         A       Sure.  I think you're right when you say

18   it's the presence, um, and the presence of you being

19   there as a law enforcement officer.  Um, I don't

20   believe that intimidation would be necessarily

21   somebody cause compliance.

22         Q       Yeah.  Intimidation was a bad word.  I

23   agree.

24                 I guess what I mean more is you're there

25   in a situation as a police officer perhaps to -- you

36

P.O. Adam Brodsky

1   know, two people are arguing, and you just kind of

2   show up and make your presence known and maybe the

3   argument ends instead of escalating to a fight, right?

4   

5            A       That could be part of Level 1, correct.

6            Q       Okay.  Um, and then maybe everything is

7   done, no one is arrested, everyone goes on their own

8   way, right?

9            A       Sure.

10           Q       Okay.  Um, and then Level 2 is

11   persuasion compliance or soft techniques; is that

12   right?

13           A       Sure.  I mean, I think of it more as --

14   well, I mean, yes, that's what we would categorize it,

15   I suppose, in the Level 2, yes.

16           Q       Okay.  And that would involve the use of

17   like OC spray and pressure points?

18           A       Correct.

19           Q       And can you elaborate more to what

20   Level 2 would be?

21           A       Non-verbal compliance.

22           Q       And can you --

23           A       That's -- if somebody were to tell you

24   if you -- if you were -- if you told somebody that

25   they were under arrest and to place their hands behind

P.O. Adam Brodsky

2    their back and they say no and cross their arms, that

3    is non-verbal compliance.

4         Q      That's when Level 2 would be

5    appropriate?

6         A      Correct.

7         Q      Um, and then what's the difference

8    between Level 2 and Level 3 if Level 2 involves, um,

9    some use of physical force, correct?

10        A      Correct.

11        Q      Um, would there ever be a situation

12    where you would use Level 2 force but not effectuate

13    an arrest?

14        A      Yeah, yes.

15        Q      Can you give me an example?

16             MR. CAMPOLIETO:  Objection.

17        Q      When he objects, unless he directs you

18    not to answer, you can just go ahead and answer it.

19        A      I'm sorry.  Can you repeat what you were

20    asking me?

21        Q      Yeah.  Can you give me an example of a

22    situation where you might use Level 2 force but not

23    effectuate an arrest?

24        A      Could be a riotous condition.

25        Q      Okay.  What if you're just trying to

38

P.O. Adam Brodsky

1   like say, Hey, you know, you need to leave, and the

2   person is not complying with your orders to leave the

3   area, um, outside of the context of a protest or riot,

4   as you called it?

5

6                   MR. CAMPOLIETO:   Objection.

7         A       I guess you'd have to be more specific.

8         Q       Sure.  You want somebody to leave the

9   area, right?  Do you push them and say, Get out of

10  here, but not arrest him?

11                  MR. CAMPOLIETO:   Objection.

12        A       I wouldn't probably do that.

13        Q       Okay.  Other than the context of a riot

14  or protest, um, can you give me an example of using

15  Level 2 force but not effectuating an arrest?

16        A       Could be a situation of defense where

17  you're defending yourself and maybe you're not sure

18  who the suspect is.  Um, I mean, I -- there's times

19  where you use force and you're not necessarily

20  arresting the person.

21        Q       So there's times when you might use

22  force when you don't have probable cause to arrest the

23  person?

24        A       Correct -- well, no.  I mean, you do,

25  but you're making a decision not to arrest that

1                     P.O. Adam Brodsky

2    person.

3        Q      Okay.  And, um, so Level 3 involves a

4    greater use of force than Level 2, correct?

5        A      Correct.

6        Q      And that'd be hard reactionary

7    techniques, like kicks and punches?

8        A      Correct.

9        Q      And, um, other than kicks and punches,

10   what other type of -- how about like throwing someone

11   on the ground?

12                     MR. CAMPOLIETO:  Objection.

13       Q      So Level 3 would basically be everything

14   between, you know, Level 2 and Level 4, obviously,

15   right?

16       A      Well, if it doesn't constitute a Level 2

17   technique or a Level 4 technique, then yes, it would

18   fall into Level 3.

19       Q      Um, and Level 4 is lethal force,

20   correct?

21       A      Deadly physical force.

22       Q      And there's different types of deadly

23   physical force, correct?

24       A      Correct.

25       Q      Like using a firearm, obviously?

40

1                    P.O. Adam Brodsky

2      A      That is one.

3      Q      Um, and in general, is the force capable

4  of causing serious physical injury or death?

5      A      Correct.

6      Q      And, um, Level 4 force could include

7  like nontraditional uses of physical force, correct?

8                    MR. CAMPOLIETO:  Objection.

9      A      I ask what do you mean by traditional or

10 nontraditional?

11     Q      Sure.  Are you trained as part of your

12 RPD training that there's "nontraditional" uses of

13 physical force?

14     A      I just don't know what you mean by that.

15     Q      Sure.  I mean, could striking someone in

16 the head be considered Level 4 use of force?

17     A      It depends.

18     Q      So by "it depends," the answer is yes,

19 it could be considered in some circumstances, correct?

20     A      Yes.

21     Q      In general, striking someone above the

22 clavicle with your hand could be considered a Level 4

23 use of force, correct?

24                   MR. CAMPOLIETO:  Objection.

25                   MR. SHIELDS:  John, you got to

Enright Court Reporting    (631) 589-7788

1          P.O. Adam Brodsky

2     stop objecting when it's not an

3     objectionable question.

4          MR. CAMPOLIETO:  Sure, that's

5     objectionable when you're giving him a

6     hypothetical and --

7          MR. SHIELDS:  John, I can ask him

8     any hypothetical I want and you're --

9          MR. CAMPOLIETO:  (Inaudible.)

10          MR. SHIELDS:  -- objecting and

11     give him instructions.  Every time you

12     object, he sits here and gives me some

13     kind of wishy-washy answer because you're

14     directing him in some way.  You can't

15     make objections --

16          MR. CAMPOLIETO:  You're asking

17     him hypothetical questions that make no

18     sense to a police officer.

19          MR. SHIELDS:  John, it's up to

20     him to say that he's confused and doesn't

21     understand my question.

22          MR. CAMPOLIETO:  I'm here to

23     defend the deposition and I'll object if

24     I --

25          MR. SHIELDS:  John, you're making

1            P.O. Adam Brodsky

2       improper objections and I'll call the

3       judge if you keep it up.

4            MR. CAMPOLIETO:  We can do that.

5            MR. SHIELDS:  What I'm asking you

6       to do is Officer Brodsky has two college

7       degrees, he's a smart guy.  I don't need

8       you to help him answer questions, okay?

9       This is his deposition.

10           MR. CAMPOLIETO:  I have made no

11      speaking objections.  I have made

12      objections to hypothetical questions that

13      do not make any sense.

14           MR. SHIELDS:  You cannot make any

15      speaking objections because you're

16      instructing him when --

17           (Multiple voices.)

18           MR. CAMPOLIETO:  -- (inaudible.)

19           MR. SHIELDS:  -- for

20      clarification, and he's perfectly capable

21      of doing that on his own.

22           MR. CAMPOLIETO:  Move on with the

23      deposition.

24           MR. SHIELDS:  Okay, John, stop

25      making improper objections.

43

1               P.O. Adam Brodsky

2                   I'm sorry, Jeanine, can you read

3          back my last question?

4                   (Record read as requested.)

5                   MR. CAMPOLIETO:   I renew my

6          objection.

7                   You can go ahead and answer.

8     A       I oppose to the part where you say "in

9  general," but yes, striking somebody above the

10 clavicle can be considered a Level 4 technique.

11    Q       Thank you.

12               And as we discussed earlier the use of

13 force must be reasonable under the circumstances,

14 correct?

15    A       Correct.

16    Q       And that's a law that you were taught at

17 the academy?

18    A       Correct.

19    Q       And in your additional training with the

20 RPD after you graduated from the academy?

21    A       Yes.

22    Q       And, um, can you just tell me, is there

23 a requirement with the RPD for a certain amount of

24 additional training, um, in a number of hours per

25 year?   In-service training is what I mean.

1                       P.O. Adam Brodsky

2       A       I wouldn't -- we have in-service

3   training annually.  I don't know what -- if there's a

4   required amount of hours.

5       Q       Okay.  Are you required to do in-service

6   training every year?

7       A       Yes.

8       Q       And do you have any idea how much

9   in-house training you're required to do?

10      A       No.

11      Q       Um, since you've been with the RPD, has

12  it changed over time?

13      A       It's usually two or three times a year,

14  I believe.

15      Q       And when you say two to three times a

16  year, how long are those trainings each time?

17      A       It depends.

18      Q       On average, would it be one day or one

19  week or something else?

20      A       If it's an in-service day where that's

21  your scheduled workday, it would be one day.

22      Q       Did you ever have like week-long

23  in-service trainings?

24      A       No.

25      Q       So, um, would it be fair to say that

45

1                         P.O. Adam Brodsky

2    it's about maybe three to four days every year?

3         A      Yes.

4         Q      Okay.  Are there required topics for

5    in-service training every year?

6         A      I don't know.

7         Q      For example, do you get firearms

8    training every year?

9         A      Yes.

10        Q      Do you get other types of training every

11   year or just firearms training?

12        A      The firearms is the most consistent.

13        Q      Are there any other specific types of

14   training that you remember receiving every year since

15   you began working with the RPD?

16        A      Um, no.  I -- firearms is the consistent

17   one per year.

18        Q      Um, do you know the other types of

19   training, would it be, for example, maybe if the law

20   changed on the topic, you'd get the training on that?

21        A      That would mostly be done -- we have

22   roll call trainings --

23        Q      All right.

24        A      -- where, um, the department might put

25   together a PowerPoint to be done prior to our shift

46

1                    P.O. Adam Brodsky

2   and gone over in our -- our platoon, if there's a

3   change to a law like that.  They probably wouldn't

4   spend an entire day on it.

5        Q      When you do a roll call training, is

6   that something the entire department receives?

7        A      I don't know.

8        Q      Okay.  How long would a roll call

9   training last, like, for example, one hour, half a day

10  or --

11       A      No.  They're meant to be 10 to 15

12  minutes.  Roll calls last 15 minutes.

13       Q      Okay.  When you go to those in-service

14  trainings, do they give you handouts?

15       A      Sometimes.

16       Q      Do you save those handouts or course

17  materials?

18       A      I don't know if I have them or not.

19       Q      There's no requirement that you save

20  them?

21       A      Correct.

22       Q      What about roll calls, do they give you

23  handouts or materials?

24       A      I don't know.

25       Q      Um, you said that they would do like a

47

1                    P.O. Adam Brodsky

2    PowerPoint at the roll calls.

3              Um, are those PowerPoints accessible to

4    you later if you had a question about them?

5         A    Yes.

6         Q    You say, Hey, Boss, like I wanted to

7    review that PowerPoint we watched on Tuesday, can I

8    see it again?

9         A    No.  They're usually put, um, on -- we

10   have -- it's called the RPD Web.

11        Q    It's like an internal server that you

12   can access?

13        A    A program, I guess, where it had -- it

14   would have -- they would put that on there.

15        Q    And is that accessible like only inside

16   of police headquarters or can you access it when

17   you're at home also?

18        A    Um, I imagine you have to have -- I

19   don't know.  I access it at work.

20        Q    Okay.  Do you have your own work

21   computer or is there like a library or something?

22        A    Um, it -- they have review -- they have

23   several computers throughout the office that everybody

24   uses and shares.

25        Q    Okay.  So you don't have like an office

1                    P.O. Adam Brodsky

2   like your own assigned computer?

3        A      No.

4        Q      Okay.  Back to the matrix.

5               Once a suspect or an arrestee is, um,

6   handcuffed and not resisting, are you allowed to use

7   force against that person?

8        A      So if a suspect is handcuffed and

9   nonresistive, would you use force on them at that

10  time?  For what reason?

11       Q      Legally based on your training and

12  experience are you allowed to?

13       A      So if somebody's standing there under

14  arrest in handcuffs not resisting, I would not use

15  force on them.

16       Q      What about if they're on the ground and

17  handcuffed and not resisting, um, under an officer's

18  control, is it appropriate under any circumstances to

19  use force against that person?

20       A      So if somebody's in handcuffs laying on

21  the ground not resisting?

22       Q      Correct.

23       A      Would you use force on them?

24       Q      Correct.

25       A      No.

49

1                       P.O. Adam Brodsky

2          Q        Would it ever be appropriate if somebody

3    is handcuffed on the ground and not resisting to

4    pepper spray them?

5          A        If a person's handcuffed on the ground

6    and not resisting would I pepper spray them, no.

7          Q        And what if they were resisting, um, but

8    they were, you know, under an officer's control in a

9    mount position handcuffed behind their back, um, would

10   it ever be appropriate to pepper spray them?

11         A        I think that the question is, is why are

12   they in a mount position, are they saying certain -- I

13   think there's variables.

14         Q        So under certain circumstances your

15   testimony is that it might be appropriate to pepper

16   spray them?

17         A        Yes.

18         Q        What circumstances might be appropriate

19   to pepper spray somebody who's handcuffed behind their

20   back in a mount position?

21         A        If you're saying -- when you say "mount

22   position," you mean the officer's on top of them

23   mounted on them?

24         Q        Correct, with their knees splayed on

25   either side of their body.

50

1                          P.O. Adam Brodsky

2          A       And the person's face up or facedown?

3          Q       Um, let's say facedown.

4          A       Um, what would be -- when would you use

5    pep -- I would say after kicking you, um, spitting on

6    you, just to name two, I guess.

7          Q       But if they're spitting on you, you

8    could put a spit sock on their head, right?

9          A       If I have one accessible right then and

10   there.

11         Q       Um, would it be, um, appropriate to use

12   pepper spray in that circumstance simply to cause

13   pain?

14         A       I would not.

15         Q       And you wouldn't do that because that

16   would be a violation of your department's policies,

17   right?

18         A       I wouldn't do that because -- yes, it

19   would be a violation of department policy and New York

20   State.

21         Q       When you say "New York State," you mean

22   the law of the state of New York, correct?

23         A       Well, Article 35 which governs our

24   policy for use of force.

25         Q       It would be a violation of, you know,

51

1                      P.O. Adam Brodsky

2    case law that lays out the appropriate level of force

3    that you can use against somebody also, correct?

4         A        To pepper spray somebody to solely

5    inflict pain, yes.

6         Q        And did you ever learn specifically in

7    your training that you're not allowed to use force

8    against somebody who's handcuffed and not resisting?

9         A        I think that would be -- I don't recall

10   a specific time that somebody said that directly.

11        Q        It would fall more under the category of

12   you're only allowed to use reasonable force under the

13   circumstances, correct?

14        A        Yes.

15        Q        With Level 4 force, you're only allowed

16   to use deadly physical force if you're confronted

17   yourself with deadly physical force by the subject; is

18   that right?

19                      MR. CAMPOLIETO:   Objection.

20        A        You, a third person, um, or something

21   that can cause serious physical injury.

22        Q        Okay.  So, um, the general thing that

23   you said, just to make sure I understood your answer

24   is, the subject with themselves have to be causing or

25   doing something that could cause either an officer or

1                        P.O. Adam Brodsky

2    some other person serious physical injury, correct?

3            A       Yes.

4            Q       And if the subject is not doing

5    something that could cause an officer or someone else

6    serious physical injury, then it would be unlawful for

7    the officer to use Level 4 force, correct?

8            A       At the most simplistic level, yes.

9            Q       All right.  Let's move on to the date of

10   the incident here.

11                   Do you remember the date of the

12   incident?

13                           MR. CAMPOLIETO:  Is this a good

14                   time to take a break, if I need a break?

15                           MR. SHIELDS:  Sure.

16                           MR. CAMPOLIETO:  Right, we'll be

17                   back.

18                           MR. SHIELDS:  4:15?

19                           MR. CAMPOLIETO:  Yes, five

20                   minutes.  Thank you.

21                           (A short recess was taken at

22                   4:10 p.m. to 4:17 p.m.)

23                                *    *    *

24

25

53

1                    P.O. Adam Brodsky

2  CONTINUED EXAMINATION

3  BY MR. SHIELDS:

4        Q      Officer Brodsky, we just took a little

5  break.

6               Did you have an opportunity to talk to

7  your attorney during the break?

8        A      Yes.

9        Q      Are there any answers to any previous

10 questions that you want to change your answer to?

11       A      No.

12       Q      Okay.  All right.  So getting back on

13 the date of the incident now.

14              Um, do you remember the date of the

15 incident in this lawsuit?

16       A      Um, it would have been 2015.

17       Q      If I said September 4, 2015, does that

18 sound right to you?

19       A      Yes.

20       Q      And, um, at that time you were a field

21 training officer, right?

22       A      Correct.

23       Q      And I guess so what I mean is, um, is

24 that the correct term?  You were -- you had a field

25 training officer, right?  You were a recruit?

1                          P.O. Adam Brodsky

2          A      Yes.

3          Q      Okay.  Is that the proper terminology?

4    You were a recruit and you had a field training

5    officer?

6          A      Yes.

7          Q      Okay.  Um, and who was your field

8    training officer at that time?

9          A      Officer Tim Dempsey.

10         Q      So at that time you would have shared a

11   car with Officer Dempsey?

12         A      Correct.

13         Q      Um, and on the night of the incident,

14   um, before you responded to the scene, did you get a

15   call over the radio or something else?

16         A      I'm sorry.  You're asking what I was

17   responding to before the incident?

18         Q      No, I'm sorry.

19                You went to the scene of this incident,

20   correct?

21         A      Correct.

22         Q      How were you alerted to the facts, um,

23   that this incident was occurring?

24         A      Um, I remember officers loudly on the

25   microphone stating there was injuries.  Um, I think

55

```
 1                    P.O. Adam Brodsky
 2    that's what alerted me to it.
 3         Q      Okay.  So when you say "officers loudly
 4    on the microphone," do you mean over the radio?
 5         A      Yes.
 6         Q      And so you heard the officers themselves
 7    on the radio and you didn't hear it just thirdhand
 8    through dispatch; is that correct?
 9         A      From what I remember.
10         Q      Okay.  Do you remember what officers you
11    heard over the radio?
12         A      No.
13         Q      Do you remember anything specifically
14    that they were saying?
15         A      No.
16         Q      Um, what did you do when you heard the
17    officers over the radio?
18         A      I responded to that location.
19         Q      And were you driving the car or was
20    Dempsey driving the car?
21         A      I believe I was driving.
22         Q      Um, did you -- did you and Dempsey
23    together make the decision to go to the scene or how
24    did that happen?
25         A      I don't remember.  My guess is yes,
```

P.O. Adam Brodsky

1

2    because we went.

3        Q        In general, you're the driver, but

4    you're also the recruit?

5        A        Right.

6        Q        Under those circumstances, you know, can

7    you make the decision to go to the scene or would that

8    be something that you would kind of have to discuss

9    with your field training officer?

10        A        At that phase, it would probably be a

11    brief discussion.  I -- you're not running the car by

12    yourself and making all the decisions.

13        Q        And, um, let me just back up.

14                When you hear something over the radio

15    like that, is it up to you to respond or like can you

16    make the decision on your own?  Let's say, you're not

17    a field training office -- or you're not a recruit

18    anymore.  You're in your own car, you hear an officer

19    over the radio, um, asking for help.

20                Do you personally make the decision to

21    go to the scene or does someone else have to tell you,

22    Hey, we need officers to go to the scene and ask you

23    to go?

24        A        It can happen both ways.

25        Q        But here you think you and Dempsey

57

1                          P.O. Adam Brodsky

2    decided to go to the scene?

3          A      Yes.

4          Q      Because you were in the area?

5          A      It was our section, so you're always

6    kind of in the area of the other cars that are in your

7    section.

8          Q      Okay.  And, um, you were in Phase II of

9    your field training at that point?

10         A      Yes.

11         Q      And what section were you assigned to?

12         A      Central.

13         Q      Okay.  And did you have a computer in

14   your car?

15         A      Yes.

16         Q      Would you have received any information

17   about the incident on the computer?

18         A      If I looked it up.

19         Q      In general, when you respond to an

20   incident, do you get information on the computer?

21         A      It depends.

22         Q      Okay.  Um, when would you get

23   information on the computer?

24         A      If dispatch acknowledges -- puts me on

25   the actual call for service.

1                          P.O. Adam Brodsky

2          Q       Okay.  And would that be the, um, ECD or

3    would that be something else?

4          A       Yeah.  The dispatcher and ECD.

5          Q       So you hear the call, you respond to the

6    scene, was this a priority one call?

7          A       I don't know.

8          Q       Did you show up with your lights and

9    sirens?

10         A       Yes.

11         Q       And, um, do you remember if dispatch

12   told you anything before you responded?

13         A       I don't recall.

14         Q       What do you remember knowing before you

15   arrived at the scene?

16         A       That there was an altercation where

17   officers were injured.

18         Q       So that's all that you knew before you

19   showed up?

20         A       Yeah -- yes.

21         Q       Did you speak with any other officers,

22   um, other than Dempsey before you arrived at the

23   scene?

24         A       No.

25         Q       And what's the first thing you did when

59

                    P.O. Adam Brodsky

1

2   you pulled up to the scene?

3        A        Exited my patrol car.

4        Q        I'm sorry?

5        A        Exited my patrol vehicle.

6        Q        Okay.  And then what did you do next?

7        A        Um, I went over to where the suspect was

8   on the ground on the sidewalk.

9        Q        Tell me what you remember seeing when

10  you exited your car and approached the sidewalk.

11       A        Um, there were a couple of officers, um,

12  where he was laying on the sidewalk.  I remember

13  seeing the one officer kind of rolling in pain --

14  actually both of them.

15       Q        And who were those officers?

16       A        Officer Kester and Officer Drake.

17       Q        Did you know Kester and Drake before

18  this incident?

19       A        Yes.

20       Q        Did they work in your same section?

21       A        Yes.

22       Q        Did they ever do any training with you?

23       A        No.

24       Q        Like, um, by "training with you," I

25  meant, um, like were they ever one of your instructors

60

1                         P.O. Adam Brodsky

2      as you were a recruit?

3             A      Not that I recall.

4             Q      Because they weren't recruits at that

5      time, right?  They were -- they moved on from that

6      phase?

7             A      Correct.

8             Q      Okay.  What else do you remember seeing

9      when you walked up to the sidewalk?

10            A      That's pretty much it.

11            Q      What other officers were on the scene

12     when you arrived?

13            A      I don't know.

14            Q      And in addition to Kester and Drake, um,

15     there was another officer with the subject, right?

16            A      Yes.

17            Q      Who was that?

18            A      I don't know.

19            Q      If I told you it was Officer Mitchell,

20     would that refresh your recollection?

21            A      He worked in the section.  I believe he

22     was working at that time, so that's possible.

23            Q      Okay.  And, um, do you remember who

24     approached the sidewalk first, you or Dempsey?

25            A      I don't know.

61

1                    P.O. Adam Brodsky

2          Q        And what did you do next after you

3    walked up on the sidewalk?

4          A        I kneeled down and placed my hand on the

5    suspect's left shoulder, I believe.

6          Q        Okay.  And what did you do next?

7          A        I assisted -- helped assist him to his

8    feet.

9          Q        Did you do anything between placing your

10   hand on his left shoulder and assisting him to his

11   feet?

12         A        Not that I remember.

13         Q        Okay.  And how did you assist him to his

14   feet?

15         A        I put my, um -- I hooked my arm under

16   his arm and lifted to put him back on his feet.

17         Q        All right.  Was he able to walk?

18         A        Yeah.

19         Q        So he was able to walk on his own

20   without you holding him, you and other officers

21   holding him?

22         A        I -- I believe so.

23         Q        You don't have an independent

24   recollection as we --

25         A        I remember help -- assisting him to his

P.O. Adam Brodsky

1

2   feet, and I didn't carry him to the nearby patrol car,

3   so that leads me to believe under his own he moved to

4   the patrol car.

5       Q     Do you remember if you or any other

6   officers asked him to stand up before you assisted him

7   to his feet?

8       A     Um, that would have been common

9   practice.

10       Q     And if he was able to stand on his own,

11   would you have needed to assist him to his feet?

12       A     Depends.

13       Q     It would depend on, for example, if he

14   was resisting?

15       A     Sure.  If he was complying or not.

16       Q     Do you remember here if he was complying

17   or not?

18       A     Like I said, it would have been common

19   to ask him to assist, to not have to lift him up, so

20   my guess is he was not following the command to stand

21   up.

22       Q     And there's various reasons why he might

23   not follow the command to stand up, correct?

24       A     Sure.

25       Q     One of those reasons could be that he

63

1                         P.O. Adam Brodsky

2    was disobeying the command, correct?

3         A       Correct.

4         Q       One could be that he was physically

5    unable to comply with the command, correct?

6         A       Correct.

7         Q       And here, do you know if he was

8    physically able to comply with the command?

9         A       I don't know.

10        Q       So he might not have been able to

11   physically comply with the command, correct?

12        A       He might not have been able to

13   physically comply with the command or he might not

14   have just wanted to comply with the command, sure.

15        Q       Um, but you don't remember, sitting here

16   today, which one of those things it was, right?

17        A       I wasn't there prior to, so I wouldn't

18   have that knowledge.

19        Q       Well, I mean, you helped him -- you

20   assisted him to stand up, right?

21        A       Correct.

22        Q       And then you assisted him over to the

23   police vehicle, correct?

24        A       Correct.

25        Q       And do you remember if you had to kind

1                          P.O. Adam Brodsky

2      of support his weight as you assisted him over to the

3      police vehicle?

4              A       I don't remember.

5              Q       And what happened next -- let me

6      withdraw that.

7                      Whose vehicle did you bring him over to,

8      if you remember?

9              A       I don't remember.

10             Q       What's the next thing that happened when

11     you got him over to the police vehicle?

12             A       Um, I searched him.

13             Q       Um, let me back up.

14                     Prior to assisting him to his feet, um,

15     was Mr. Vann searched?

16             A       I don't know.

17             Q       Do you remember searching him prior to

18     him being brought to his feet?

19             A       No.

20             Q       Do you remember any other officer

21     searching him before he was brought to his feet?

22             A       I don't know if they did.

23             Q       Okay.  In your presence, you don't

24     remember if they searched him or not?

25             A       Correct.

65

1                         P.O. Adam Brodsky

2          Q      And so you brought him to the car and

3    did you yourself perform the search?

4          A      Um, there was another officer there, but

5    I conducted the search, yes.

6          Q      Okay.  Who was the other officer?

7          A      I don't know.

8          Q      What was the other officer doing when

9    you searched him?

10         A      Holding him.

11         Q      Okay.  So there was one officer

12   physically restraining Mr. Vann while you searched

13   Mr. Vann, correct?

14                      MR. CAMPOLIETO:  Objection.

15         A      I remember standing there, um, yeah,

16   holding onto him.

17         Q      Do you remember how the other officer

18   was holding onto him?

19         A      Um, I started searching him.  I remember

20   seeing the video, the other officer lifted his arms up

21   leaning his body forward onto the patrol car.

22         Q      And what part of his body was being

23   leaned onto what part of the patrol car?

24         A      It would have been his chest onto the

25   area of the trunk.

1              P.O. Adam Brodsky

2        Q       Do you remember that independently or do

3    you remember that just because you recently watched

4    the video?

5        A       I remember that because I watched the

6    video.

7        Q       And, um, do you remember performing the

8    search of Mr. Vann?

9        A       Yeah.

10       Q       Did you speak with him at all while you

11   were performing the search?

12       A       I don't remember.

13       Q       Did you ask him if he had anything in

14   his pockets?

15       A       I don't remember.

16       Q       Um, are you trained that when you search

17   someone you're supposed to ask them if they have any,

18   for example, needles or anything that could hurt you

19   or poke you if you reached your hand into their

20   pocket?

21       A       Oh, you're trained to be cautious of

22   items like that, but not necessarily to ask them.

23       Q       In your practice when you search people,

24   do you ask them if they have anything on them that

25   they shouldn't have?

1                         P.O. Adam Brodsky

2         A         Not usually.

3         Q         Um, so here you -- just to be clear, you

4    don't remember whether or not you spoke with Mr. Vann

5    as you were searching him, correct?

6         A         I don't.

7         Q         Do you remember when you arrived at the

8    scene before you assisted him to his feet if any of

9    the officers were speaking with Mr. Vann at all?

10        A         I don't know.

11        Q         Do you remember if Mr. Vann had the

12   ability to speak at any point when you interacted with

13   him on the night of the incident?

14        A         Um, I do remember him speaking, yes.

15        Q         What do you remember him saying?

16        A         I don't know.

17        Q         Was he being threatening at all?

18        A         With his words?

19        Q         Do you remember anything that he said?

20        A         No.

21        Q         And do you remember if he requested

22   medical assistance?

23        A         I don't know.

24        Q         Do you remember if he said, for example,

25   I did nothing wrong?

68

1                         P.O. Adam Brodsky

2         A         I don't recall.

3         Q         When you performed your search, what did

4    you find?

5         A         I don't remember.

6         Q         If you found anything, you would have

7    written it down in the report, right?

8         A         No.

9         Q         If you found something, it would have

10   been written by someone in a report, right?

11        A         Not necessarily.

12        Q         Um, is there a requirement to do like a

13   property voucher when somebody is arrested?

14        A         No.

15        Q         So if someone has $500 in their pocket

16   and they're brought down to the precinct, that would

17   be taken from them, correct?

18        A         No.  It would go with them.

19        Q         So they would be brought to PSB and put

20   in a cell, and they would have their money in their

21   pocket?

22        A         No.

23        Q         Okay.  So when they're brought to PSB,

24   if they have money in their pocket, what happens?

25        A         Um, usually any property that's removed

P.O. Adam Brodsky

1

2    from them will be with the officer who is taking them

3    wherever they're headed.

4         Q     And that property would be documented

5    somewhere, what the officer had taken from them?

6         A     Not necessarily.

7         Q     Okay.  All right.  So let's back up to

8    your search of Mr. Vann on the night of the incident.

9            Um, you don't remember finding anything

10   illegal on him, correct?

11        A     I don't remember.

12        Q     If something illegal had been found on

13   him, that would have been documented somewhere,

14   correct?

15        A     Um, it -- I don't know.  I mean, I would

16   have turned anything I found over to the arresting

17   officer, and if they chose to charge him with it,

18   that's at their discretion.

19        Q     If he had a gun, you know, that would

20   probably be documented somewhere, right?

21        A     I would say so.

22        Q     And if he had drugs, that would probably

23   be documented somewhere?

24        A     That depends.

25        Q     Okay.  Are there instances where you

70

1                        P.O. Adam Brodsky

2     find someone with illegal drugs on them and you don't

3     document it, and you just take the drugs?

4           A     No.

5           Q     So it should be probably be documented

6     somewhere, right?

7           A     I -- yes.

8           Q     So the fact that -- if I represent to

9     you that that wasn't documented anywhere in this case,

10    that'd mean you probably didn't find anything on him

11    of an illegal nature, drugs, guns when you searched

12    him, right?

13          A     I have no control over what -- after I

14    turn over property to an officer, and I'm no longer

15    involved in the case --

16          Q     Yeah.

17          A     -- I have no idea what they do, what

18    they don't do with property, what they document, what

19    they don't document.  I can only tell you what I do.

20          Q     Sure.  And here, if you had found

21    something like a gun, that'd probably jump out at you,

22    right?

23          A     Yeah, if he had a gun, I would remember.

24          Q     So it's pretty safe to say that he

25    didn't have a gun here, right?

71

1                        P.O. Adam Brodsky

2          A        I don't believe he had a gun, correct.

3          Q        Okay.  Um, so you searched Mr. Vann, you

4    don't find a gun, and then what happens next?

5          A        I believe another officer places him in

6    a patrol car.

7          Q        What did you do after he was placed in

8    the patrol car?

9          A        Nothing of importance.

10         Q        Well, that's why we're here, to figure

11   out if there is anything important.

12                  Um, so what's the next thing that you

13   did?  Did you remain at the scene for some period of

14   time?

15         A        I mean, I -- I remember being there for

16   maybe a couple of minutes and then we left.

17         Q        So when you say you were there for a

18   couple minutes "and then we left," so you and Dempsey?

19   Is that what you mean?  You left with your field

20   training officer?

21         A        Yes.

22         Q        And when you say a "couple of minutes,"

23   do you mean two or do you mean 20?

24         A        I don't know.

25         Q        Do you have an independent recollection

72

1                          P.O. Adam Brodsky

2    of how long you remained at the scene after Mr. Vann

3    was placed in the car?

4          A       From what I remember, it didn't seem

5    like a significant amount of time.

6          Q       Did you speak with any officers while

7    you were at the scene after Mr. Vann was placed in the

8    car?

9          A       If I did, I don't recall.

10         Q       Did you speak with any witnesses after

11   Mr. Vann was placed in the car?

12         A       No.

13         Q       Okay.  Um, where did you go after you

14   left the scene with Dempsey?

15         A       I don't recall.

16         Q       Did you go to the hospital and speak

17   with any of the injured officers?

18         A       No.

19         Q       Okay.

20         A       I don't recall, I guess.

21         Q       Okay.  I just want to -- I'm going to

22   put up an exhibit and I'm just going to ask you, um,

23   to tell me what it means because I'm not sure.

24                        MR. SHIELDS:  I think that his

25                        is -- so, Jeanine, this will be, I guess,

73

1                     P.O. Adam Brodsky

2                     Exhibit 1, and I believe that this is

3                     what you call the ECD printout from this

4                     case.  Um, let's see.  I'm dealing with

5                     new technology that I think I know how to

6                     use.  Um, all right.

7                          (ECD printout, was received

8                     and marked as Plaintiff's Exhibit 1

9                     for Identification, as of this date.)

10        Q      Officer Brodsky, are you seeing what

11   looks to be an ECD printout (screen sharing)?

12        A      (Viewing.)  Yes.

13        Q      And it says -- can you see my mouse

14   moving around on the screen (indicating)?

15        A      Yep.

16        Q      Okay, great.  And does this say here,

17   "Search parameters, incident number, CTY152473876"

18   (indicating)?

19        A      Yes.

20        Q      Okay.  So I'm just going to go through

21   this, um, and just ask you some questions about it,

22   okay?

23                     So this says, "2320, entry,

24   complaint [sic] having problem with male who has been

25   hanging around the store all day - refusing to leave,

P.O. Adam Brodsky

1
2  black male LSW black jacket and gray hoodie."

3          Is that what that says?

4      A      Yes.

5      Q      "LSW," is -- what is that, long-sleeved

6  shirt or something?

7      A      Last seen wearing.

8      Q      Last seen wearing, okay.  Thank you.

9          And then if we go down here, I'm just

10  going to ask about some of these codes because I don't

11  know what they mean, okay (indicating)?

12     A      I'll do my best.  I don't know that I

13  know it -- all of these either.

14     Q      "DISPER," does that mean -- do you know

15  what that means?

16     A      I believe that is the person who is

17  dispatched to it.

18     Q      Okay.  And then "209A," is that the car

19  number or something else?

20     A      That would have been his call sign for

21  the day.

22     Q      His call sign?

23     A      It might not match up with the car

24  number he's driving.

25     Q      Okay.  So the cars have like on their

1                      P.O. Adam Brodsky

2   license plate a number.  That number here, would that

3   not necessarily match up with the license number,

4   correct (indicating)?

5          A       Correct.

6          Q       Okay.  And then this number right here,

7   "182230" [sic], is that like his assigned officer

8   number (indicating)?

9          A       Correct.

10         Q       Okay.  And this says "Jeffrey Kester,"

11  right?

12         A       Yes.

13         Q       Okay.  So this means that Officer Kester

14  was assigned to this incident by the dispatcher?

15         A       Right.

16         Q       Okay.  And then we go down.  Do you know

17  what "ASNCAS" means?

18         A       No.

19         Q       Okay.  And then it says "209A," so

20  that's Kester that it's referring to apparently?

21         A       That's what?

22         Q       So that would be -- if this is the same

23  assigned number for Kester, this entry here -- I'm

24  sorry, this entry here, "209A," would also refer to

25  Officer Kester (indicating)?

76

1                          P.O. Adam Brodsky

2          A          Yes.

3          Q          Okay.  And then the one below that says

4    "ASSTER" and then "D29D."

5                      Um, does this mean assister?

6          A          He's like an assisting officer, yes.

7          Q          So that's Steven Mitchell, right?

8          A          Yeah.

9          Q          And then after that, it's "A-S-S-T-O-S."

10                     Would that also mean an assisting

11   officer?

12         A          Correct.

13         Q          Okay.  And then it says "D," it looks

14   like "09D," and then it says "Matthew Drake"?

15         A          Correct.

16         Q          So basically Mitchell and Drake were the

17   assisting officers that showed up on the scene, is

18   what this means, right?

19         A          Um, anybody who shows up after the first

20   initial dispatch is going to be labeled an assisting

21   officer.

22         Q          Okay.  All right.  So that was between

23   2320 and 2321, right?

24                     So then we go down, it says, "On scene

25   D29D, on scene 209A."  That's just when those officers

77

1                     P.O. Adam Brodsky

2    arrived, right?

3          A       Correct.

4          Q       And how does that get input into the

5    system?  Do they like call in on the radio and say,

6    I'm here?

7          A       It could be done that way.

8          Q       How else could it be done?

9          A       They manually input it.

10         Q       Okay.  On a computer or something?

11         A       Correct.

12         Q       In their car?

13         A       Right.

14         Q       Okay.  All right.  And so next,

15   "Misc, D09D."  Okay.  So now this says, "Boss for

16   SSR -- SRR -- ambulance for broken ankle for officer."

17   That's at 2328.

18                 So about seven minutes after he arrives

19   at the scene that call is made?  Does that look right

20   to you?

21         A       "On scene 2223 [sic]," 22 -- about five

22   minutes.

23         Q       Five minutes, okay.

24                 Um, and then this says "Assister,

25   Jeffrey LaFave."

1                          P.O. Adam Brodsky

2                   Um, this right here, does that mean, um,

3        that LaFave arrived, Sergeant LaFave, on the scene at

4        that time or does that mean that he said, I'm going to

5        go there at that time (indicating)?

6           A       It's hard to say.  I mean, I believe

7        that's him saying that he's going to head there.

8           Q       Because they're asking for a boss,

9        right --

10          A       Right.

11          Q       -- and he responds immediately?

12                  Okay.  And that would be something done

13       over the radio?

14          A       Yes.

15          Q       Okay.  Do you remember hearing that at

16       all?

17          A       I don't recall the exact wording of what

18       I heard on the radio that night.

19          Q       Okay.  Um, so LaFave and then

20       David Kephart, um, also responds also at 2328, um, and

21       then it says, "Miscellaneous, more cars, second rig."

22                  So that's asking for additional

23       officers, correct?

24          A       Yeah.  He's asking that more cars are

25       needed to control the subject is why you would ask for

79

                        P.O. Adam Brodsky

1
2    that, and then another ambulance in addition to the

3    one I already requested.

4         Q      Okay.  So to control the subject that'd

5    be the reason to ask for more officers?

6         A      I mean, the situation is still not in

7    control and they need more officers to help handle the

8    situation.

9         Q      Okay.  And then the next one is

10   "Assister, 229A."  And that's you, right, Adam Brodsky

11   and Timothy Dempsey?

12        A      Correct.

13        Q      And is there only one number because you

14   were in the same car?

15        A      Right.

16        Q      Okay.  All right.  And then after that,

17   additional officers are responding, right?  And then

18   it says at "2329, need a second rig now per DO9D."

19               So this is one of the officers asking

20   for a second rig?

21        A      I thought they already did.  I don't

22   know why that's in there again.  I don't know what the

23   reasoning for that is.

24        Q      And when they say "rig," does that mean

25   ambulance?

80

1                        P.O. Adam Brodsky

2           A       Yes.

3           Q       All right.  So these are additional

4    officers, and eventually at 2330 it says, "Cars can

5    slow it down."

6                   Does that mean that the situation would

7    have been under control at that point?

8           A       It would have meant that there's enough

9    officers on scene that anybody else responding doesn't

10   need to be responding lights and sirens.

11          Q       Got it.  So this is page 2.  All right.

12   We don't need to go though everything.

13                  But in general it says, Two injured

14   officers, one possibly with a broken ankle, one with a

15   dislocated shoulder.

16                  Um, and then if you go down, it says

17   "Daniel Zimmerman, Sergeant," Daniel Zimmerman was

18   responding and assisting, right?  Um, and then it

19   says -- at 2345, it says, "SUPP, text, third ambulance

20   will be for suspect for eyewash and lacerations" --

21                       (Reporter clarification.)

22          Q       It says "SUPP."  What would SUPP mean,

23   if you know, support?

24          A       My guess it would be supplemental.

25          Q       Okay.  And it says, "Text, third

81

1                        P.O. Adam Brodsky

2     ambulance will be for a suspect - eyewash and

3     lacerations to the head," right?

4          A        Right.

5          Q        So after there were two ambulances

6     called for the officers?   There was one called for

7     Mr. Vann, right?

8          A        Based on that previous page, I don't

9     know if that other transmission asking for that second

10    one was the third one, or if this was just to clarify

11    or if that was duplication and then this is when the

12    third one is being requested.

13         Q        Okay, thank you.

14                  Um, and then at 0000, so that would be

15    midnight, right?

16         A        Right.

17         Q        It says, "Assist, 1219A, [sic]" in

18    brackets, "Highland Hospital, McGraw, Eric with an

19    injured officer," right?

20                  So what's that mean?

21         A        Um, my guess would be that

22    Officer McGraw was at Highland Hospital with an

23    injured officer.

24         Q        So whichever officer was transported to

25    Highland, McGraw went there with them?

1                        P.O. Adam Brodsky

2       A       I don't know how he did it.  I don't

3   know if he took him, he met him there -- well, he was

4   taken by ambulance, so I -- I don't know how that

5   played out.

6       Q       Okay.  And then these ones say "RGH" and

7   it says "Joseph Laiosa."

8               Did I say that right?

9       A       Correct.

10      Q       And then "Isaac Armstrong, RGH"?

11      A       Right.

12      Q       And do you know -- does that mean that

13  they went to Rochester General Hospital with injured

14  officers?

15      A       I don't know.

16      Q       Okay.  And then if we go down here, it

17  says "RGH" again at 0033, and then at 0039 it says you

18  and Officer Dempsey, um, are listed.

19              Do you have any idea what that entry

20  means (indicating)?

21      A       No.

22      Q       Okay.  It doesn't mean that you went to

23  Rochester General Hospital?

24      A       No.

25      Q       Okay.  Do you remember going to the

83

1                        P.O. Adam Brodsky

2   hospital at all that night?

3        A      No.

4        Q      Okay.  Is it possible that you went to

5   the hospital that night?

6        A      I don't remember going to the hospital

7   that night.

8        Q      Okay.  Because you weren't injured,

9   right?

10       A      I wasn't injured, no.

11       Q      Okay.  And you don't remember going

12  there and speaking with either Kester or Drake, right?

13       A      Correct.

14       Q      I think that's all my questions for

15  that.  And I spent way too long earlier today figuring

16  out trying to stop share so that it didn't -- ten

17  minutes doing it right there.  All right.  Um, so just

18  going back to when you, um, arrived at the scene.

19             Now that we went through the order of

20  the officers, do you remember if when you arrived at

21  the scene Officer Mitchell had Mr. Vann controlled on

22  the ground when you arrived?

23       A      I don't know.

24       Q      Do you remember when you arrived, um,

25  that my client was on the ground?

1                              P.O. Adam Brodsky

2          A        Yes.

3          Q        And was there an officer with him?

4          A        Yes.

5          Q        Where was that officer positioned?

6          A        Um, maybe like the midsection of your

7   client.

8          Q        Okay.  Do you remember anything that my

9   client was doing?

10         A        No.

11         Q        All right.  Let me see if I can do this

12  again.  I'm going to share my screen again.  Let me

13  see here and see if I can figure this out.

14                  Okay.  Officer Brodsky, are you seeing

15  the video on pause right now with "cam4" down here in

16  the bottom left corner (indicating)?

17         A        Yes.

18         Q        Is that all that you see or do you see

19  my documents and stuff, too?

20                          MR. CAMPOLIETO:  No, it's just

21                      the screen and the video.

22                          MR. SHIELDS:  Okay, great.  I

23                      have three screens here, and it looks

24                      like I did it right.

25         Q        Okay.  And would it be accurate to say

85

1                          P.O. Adam Brodsky

2     that the timestamp in the top right says "9/4/2015,

3     11:42:46 p.m."?

4          A      Correct.

5          Q      And we don't need to get into it, but

6     there is testimony about the times being a little off

7     on this video, so I'm not going to make any

8     representations about actual objective time, but I'm

9     just going to ask you questions about the video, okay?

10         A      Okay.

11         Q      So right now we see -- well, let's see.

12    I'm just going to play the video from here.  Um, on

13    the very bottom left, I'm starting it at 9:18 into the

14    video on cam4.

15                          MR. SHIELDS:  So I guess for the

16                          record, um, we'll call this Exhibit 2,

17                          um, and then we'll figure out how to, you

18                          know, include it afterwards, okay?

19                               (Video, was deemed marked as

20                          Plaintiff's Exhibit 2, for

21                          identification, as of today's date.)

22         Q      So I'm just going to hit play and then

23    I'll ask you some questions, okay?

24                          Oh, before I hit play, do you know who

25    this officer is (indicating)?

1                          P.O. Adam Brodsky

2          A       No.

3          Q       Do you recognize him based on this

4    video?

5          A       No.

6          Q       Okay.

7                          (Video played.)

8          Q       Okay, great.  It's going a little

9    choppy.  Um, if I pause it right there, do you know

10   who this officer is (indicating)?

11                         (Video paused.)

12         A       It looks kind of like Officer Kephart.

13         Q       So that might be Kephart?

14         A       Right.

15         Q       Okay.  Which would make sense based on

16   the order of the ECD that we looked at, right?

17         A       I don't -- was his name listed there as

18   well?

19         Q       I believe so, but we can -- it's not

20   important.  I'm just going to keep doing that, okay,

21   asking you questions as I play the video and pause it.

22                         (Video played.)

23         Q       All right.  So a couple more cars show

24   up now, right?  Here's a car right here (indicating).

25   I'm going to pause it.

87

1                        P.O. Adam Brodsky

2                 As I paused it, do you know if this is

3     your car?

4          A     I don't know.

5          Q     Okay.

6                        (Video played.)

7          Q     We see one officer get out of the car

8     and come over to where the one that we think Kephart

9     is who came back, the original officer on the scene

10    with my client, right?  So they're all there.  We're

11    paused at 9:41 into the video, and I'll hit play.

12                        (Video played.)

13         Q     Do you know if the officer that exited

14    the driver's side of that vehicle is you?

15         A     Yeah.  That looks like me.

16         Q     Okay.  So that's you.

17               So the other officer that exited the

18    vehicle would have been Dempsey, correct?

19         A     Correct.

20         Q     Okay.  So on the scene right here, you

21    think we've got you, Officer Dempsey, Officer Kephart,

22    and then whatever officer was there before you

23    arrived, correct (indicating)?

24         A     Right.

25         Q     Okay.  And I'm just going to represent

88

1                          P.O. Adam Brodsky

2     to you that that's Mitchell, okay?

3          A     Okay.

4          Q     So you got the four of you right here,

5     and you got my client on the ground, right

6     (indicating)?

7          A     Right.

8          Q     Okay.  So I'm going to hit play again.

9                          (Video played.)

10         Q     Now, did you see that when I hit play at

11    9:45 -- or I'm sorry, I think it was 9:48 -- 7 into

12    the video, and I paused at 9:48, they just flipped him

13    over.  Does that look like what just happened?

14         A     I saw movement.  I don't know.

15         Q     Okay.  So let me just -- I'm just going

16    to rewind that for a second and then I'm going to let

17    it go for a little bit, okay?

18                          (Video rewound and played.)

19         Q     So I rewound that to 9:40, okay?  Um,

20    let me just rewind it a little bit more, just to get

21    to, um, when you guys pull up and exit the car, okay?

22                          (Video rewound and played.)

23         Q     Now, I want you to look at -- I'm sorry.

24    I'm going to rewind that again.

25                          (Rewinding video.)

1                      P.O. Adam Brodsky

2       Q      I want you to look at my client, um,

3 until the time that you approach, and tell me, um, if

4 it looks like he's actively resisting at all, okay?

5                      (Video played.)

6       Q      Does it looks like he was actively

7 resisting at all?

8                  MR. CAMPOLIETO:  Objection.

9       A      I don't know.

10      Q      All right.  So you don't know or no?

11      A      I don't know if he's actively resisting

12 based on this.

13      Q      Okay.  Did it look like he was kicking?

14      A      His feet didn't look like they were

15 moving around that much.

16      Q      Did it look like he was trying to stand

17 up?

18      A      I don't know.

19      Q      Did it look like his hands were

20 handcuffed behind his back?

21      A      I don't know.

22      Q      All right.  Let's rewind it one more

23 time and see what you think.  Okay.  Yeah, let's

24 rewind it a little further.  Um, okay.

25                  (Video rewound and played.)

90

P.O. Adam Brodsky

1

2      Q     So I'll just represent to you that

3  that's Officer Drake, and this is Officer Mitchell,

4  okay?  I'm going to start -- it's paused at 9:06 into

5  the video.  I'm going to hit play.

6                (Video played.)

7      Q     All right.  Now, I'm going to pause it

8  at 9:12 into the video.

9           Did it look like Mr. Vann was, um,

10  fighting the officers or resisting at all in those six

11  seconds?

12     A     I don't know.

13     Q     You don't know or no?

14     A     I don't know.  I don't know what's

15  happening at that time.

16     Q     Okay.  Is my client moving at all?

17     A     His left leg is coming up a little bit

18  and I don't know if he's trying to move his upper body

19  or not.

20     Q     Okay.  So let's just back up again and

21  let's watch that again, all right?

22             (Video rewound and played.)

23     Q     Now, at that point is Officer Mitchell --

24  I'm just going to represent to you that that's

25  Officer Mitchell -- on top of him holding him down

P.O. Adam Brodsky

1
2  with his hands and maybe his knee and his back right
3  here (indicating)?

4          MR. CAMPOLIETO:  Objection.

5      A     I think that's what they're attempting
6  to do right there.

7      Q     All right.  So I'm just going to go for
8  it again, okay?

9          (Video played.)

10      Q     And now, right there, since we last
11  paused, it looks like Officer Mitchell rolled my
12  client over from his stomach to his back; is that
13  right?

14          MR. CAMPOLIETO:  Objection.

15      A     Um, I don't know if that's what he did,
16  or he was moving that way and he went with him, or if
17  he tried to turn that way.  I don't know.

18          MR. SHIELDS:  Okay.  And, John,
19          I'm going to tell you, you've got to stop
20          these crazy objections.  I'm asking, What
21          did you see in the video, and then --
22          MR. CAMPOLIETO:  You phrased the
23          question a certain way that the officer
24          did something.  I objected as improper.
25          I'm not going to stop objecting.

1          P.O. Adam Brodsky

2                MR. SHIELDS:  Okay.  Did the

3          officer roll him over?  It's a yes or no

4          question, John?  You don't need to --

5                MR. CAMPOLIETO:  You didn't say,

6          Did the officer roll him over?  You --

7                MR. SHIELDS:  Yes or no.

8                (Multiple voices.)

9                MR. SHIELDS:  Like we just said,

10         Officer Brodsky is a smart guy.  He's got

11         two college degrees.  He doesn't need --

12               MR. CAMPOLIETO:  He is a smart

13         guy, but that doesn't mean that I'm not

14         here to do my job and to object, and I

15         will continue to object.

16               MR. SHIELDS:  Okay, John.  And

17         you know, that could cause a problem with

18         the transcript.  We're wasting time right

19         now.  And, you know, I'm just going to

20         ask you to let him answer my questions

21         which are not objectionable, okay?

22               MR. CAMPOLIETO:  He's going to

23         answer your questions, but if I have an

24         objection, I'm going to object, and I

25         object to that question.

1              P.O. Adam Brodsky

2                    MR. SHIELDS:  John, okay.  You've

3              got to stop making unobjectionable --

4              objections to unobjectionable questions,

5              okay?  All right.

6                    (Video played.)

7        Q       All right.  During that entire time that

8   we just played the video, we're now paused at 9:42 on

9   the bottom right -- I mean, the bottom left of the

10  video at 9:42 into the video, and 11:43:06 at the top

11  right, did it look like Mr. Vann was fighting with

12  Officer Mitchell at all?

13       A       What do you mean by fighting?

14       Q       You know, was he trying to strike

15  Officer Mitchell in any way?

16       A       He was -- I don't believe he was trying

17  to hit him with his hands.  Um, his feet were moving.

18  I don't know if they were intended to kick him or not.

19       Q       His legs were going back and forth

20  slowly, correct?

21       A       Yes.

22       Q       And did it look like he was trying to

23  stand up?

24       A       I don't know.

25       Q       Okay.  Um, and did it look like he was

94

P.O. Adam Brodsky

1    trying to resist Officer Mitchell in any way?

2

3         A       I don't know.

4         Q       Okay.  And now I'm going to hit play

5    again at 9:42 into the video or 11:43:06 in the top

6    right.

7                        (Video played.)

8         Q       All right.  So I'm going to pause, it's

9    9:51.  And it looks like you testified earlier it was

10   you, Officer Dempsey, Officer Kephart, and I told you

11   this is Mitchell.

12                It looks like you've all got Mr. Vann

13   face down on the ground, right?

14        A       Yes.

15        Q       Okay.  And I'm going to hit play again

16   at 9:51 on the bottom left and 11:43:14 on the top

17   right.

18                        (Video played.)

19        Q       And I know it's a bad camera angle, but

20   do you know who this officer is who just walked onto

21   the video (indicating)?

22        A       I believe it's Sergeant Lafave.

23        Q       Okay.  Okay, Lafave, all right.  I will

24   hit play again.

25                        (Video played.)

1                    P.O. Adam Brodsky
2        Q      All right.  Did you see -- I think you
3    said this is Kephart just throwing something, and it
4    looks like it landed on Officer Lafave's shoe?
5        A      No.
6        Q      Okay.  I'm going to just rewind it real
7    quick and ask that you watch what Officer Kephart is
8    doing, okay?
9        A      Okay.
10                     (Video played.)
11       Q      Do you see him throw something right
12   there (indicating)?
13       A      Yeah.
14       Q      Okay.  Does that look like he's
15   searching him?
16       A      Um, I don't know.
17       Q      It looks like -- I'm just going to pause
18   at 10:18 on the bottom right, 11:43:36 on the top --
19   I'm sorry.  10:18 on the bottom left and 11:43:36 on
20   the top right.
21              In general, does it looks like you and
22   Dempsey and maybe Mitchell are holding him down while
23   Kephart is searching him?
24       A      I don't remember what he was doing at
25   that time.

96

1                          P.O. Adam Brodsky

2          Q        But in general, Kephart's doing

3     something different than the rest of you guys?

4          A        It appears so.

5          Q        Okay.  Did he just throw something else

6     there?

7          A        Correct.

8          Q        Okay.  All right.  And now it looks like

9     Kephart stood up and moved away a little bit, and it

10    looks like there's Mitchell, then you kind of

11    dragging -- you had to drag my client to his feet; is

12    that fair to say?

13         A        No.

14         Q        All right.  Let's back that up just a

15    little bit.

16         A        I oppose to the language.  You know, we

17    lifted him to his feet.  I wouldn't say we dragged him

18    to his feet.

19         Q        Okay, lifted him.  All right.  Let's

20    just kind of look at that again.

21                  In looking at this picture again -- I'm

22    sorry, you said that you think that's Lafave?

23         A        Yes.

24         Q        Now that you see his face, do you think

25    that's Lafave?

1                         P.O. Adam Brodsky

2        A     Yes.

3        Q     Okay, thank you.

4                    (Video played.)

5        Q     All right.  And so I'm just going to

6    pause.

7                    (Video paused.)

8        Q     For the record, it looks like Kephart

9    stands up at 10:26 into the video on the bottom left,

10   and 11:43:42 on the top right.

11               And then it looks like -- now, at that

12   point I'm going to pause at 10:32 on the bottom left

13   and 11:43:48 on the top right.  It looks like Mitchell

14   is kind of -- now, I say drag because he's pulling my

15   client's body while his feet are dragging along the

16   ground a little bit; is that fair to say?

17                    MR. CAMPOLIETO:  Objection to the

18                    use of a freeze-frame here.  I mean, you

19                    can freeze it at any point.  I'm going to

20                    object to the use of the freeze-frame to

21                    ask these questions.  The officer can

22                    answer, but the freeze-frame is

23                    objectionable.

24                    MR. SHIELDS:  Sure.  That's fair,

25                    John.  Let me withdraw that question.

98

1                              P.O. Adam Brodsky

2          Q       And in this picture my client's legs are

3   extended and Officer Mitchell looks like he's holding

4   him by his shoulder and arm or his upper torso?

5          A       Okay.

6          Q       Okay.  So yes, you agree that that's

7   what that depicts?

8          A       I don't know what he's holding him by or

9   anything like that.

10         Q       So we're going to go 10:32 and we're at

11  11:43:48.  I'm going to hit play again.

12                      (Video played.)

13         Q       All right.  And so between when we were

14  paused and now when we're paused again at 10:38 on

15  bottom left and 11:43:52 on the top right, that's when

16  you assisted my client to his feet, correct?

17         A       Correct.

18         Q       And can you describe how you assisted

19  him to his feet?

20         A       I hooked my arm under his arm and lifted

21  upwards.

22         Q       Did it look like he used any of his own

23  muscle force to stand with his own legs?

24         A       No.

25         Q       I'm sorry.  And I'm hitting play again

1                         P.O. Adam Brodsky

2     at 10:38, and the video is choppy, so now I paused it

3     again at 10:41 at the bottom and 11:43:55 in the top

4     right, and it looks like you guys are now bringing him

5     over to the car, right?

6              A      Right.

7              Q      Okay.  I'm going to hit play again.

8                     (Video played.)

9              Q      All right.  And I'm going to hit pause

10    right there at 10:49 on the bottom left and 11:44:02

11    on the top right.

12                    And did you see, um, it looks like

13    Officer Mitchell opened the door to the car?

14             A      Yep.

15             Q      But then Mr. Vann wasn't put directly in

16    the car, correct?

17             A      Right.

18             Q      Do you know why he wasn't put directly

19    in the car?

20             A      Um, based on what happens next, probably

21    to conduct a thorough search of his person before

22    putting him in the car.

23             Q      So you don't think that you did a

24    thorough search on the ground over here before you

25    picked him up (indicating)?

100

                              P.O. Adam Brodsky

1

2        A        In my opinion, I don't think it's

3   possible to do a thorough search of something when

4   they're on the ground like that.

5        Q        Okay.  So we're paused at 10:49 on the

6   bottom left and 11:44:02 on the top right, and I'm

7   going to hit play again, okay?

8                         (Video played.)

9        Q        All right.  So I'm just going to pause

10  it right here.  It's 11:01 on the bottom left and

11  11:44:11 on the top right.

12                        (Video paused.)

13       Q        Um, do you see it looks like

14  Officer Mitchell is holding Mr. Vann's arms above his

15  head?

16       A        I don't see that.

17       Q        Okay.  What do you see?

18       A        Um, all of our tiles are in the way.

19       Q        All of your tiles are in the way?

20       A        Yeah, all of our pictures are blocking

21  that.

22       Q        Do you see -- what's this look like to

23  you right here (indicating)?  And I'm circling my

24  mouse around.

25       A        Our pictures have to be moved so I can

                          P.O. Adam Brodsky

1

2    see it, our video screens.

3         Q      I don't know what you mean.

4                Are you looking at the video still?

5         A      Yes.

6         Q      Oh, you want me to hit play; is that

7    what you're saying?

8         A      No, no.  We're minimized on the side or

9    my video --

10        Q      You don't see the portion of the video

11   that depicts --

12        A      You're moving it, so I can know.

13        Q      Oh, okay.  All right.  So now can you

14   see you and Officer Mitchell and my client against the

15   side of the car?

16        A      Yes.

17        Q      Okay.  And let me just -- if you didn't

18   see that part of the video, let me just back up a few

19   seconds, okay?

20        A      Okay.

21        Q      So now we backed up to 10:51, so ten

22   seconds on the bottom left, 11:44:04 on the top right.

23               At this point, it looks like Mr. Vann is

24   kind of standing up straight.  You can see his head

25   here; is that right (indicating)?

1                    P.O. Adam Brodsky

2        A      Right.

3        Q      Now I'm going to hit play.

4                    (Video played.)

5        Q      All right.  Now I'm going to hit pause

6    at 10:56 on the bottom left, 11:44:08 on the top

7    right.

8                    Does it look like Mitchell grabbed his

9    hands which were handcuffed behind his back and pulled

10   him up above his head?

11                    MR. CAMPOLIETO:  Object to the

12                    use of the freeze-frame video, but he can

13                    answer.

14                    MR. SHIELDS:  Well, John, just,

15                    you know, to respond to your objection, I

16                    played the video and I asked what he saw

17                    in the video, not the freeze-frame.

18       A      Yes.

19       Q      Okay.  And can you put your hands above

20   your head like that behind your back?

21       A      I don't know.

22       Q      Have you ever tried to, you know, close

23   your arms like this and go like that (indicating)?

24       A      I -- I don't think I've ever been

25   handcuffed and put in that position.  I don't know if

1                     P.O. Adam Brodsky

2    I can do it like that.

3         Q      Um, is that something that you were

4    trained to do at the academy?

5         A      I don't know.  I don't remember -- we

6    didn't -- we didn't put people against the car like

7    that.  There's certain things that I've trained in the

8    academy that you can't replicate when you're on --

9    in -- on the street because we didn't search -- go

10   over searching somebody against a car like that.

11        Q      And, um, do you know why

12   Officer Mitchell put his arms like that above his

13   head?

14        A      You'd have to ask him.

15        Q      Do you think it helped you conduct your

16   search?

17        A      Yes.

18        Q      Was my client actively resisting when

19   you brought him over to the car?

20        A      When we walked to the car?

21        Q      Correct.

22        A      No.

23        Q      Was my client actively resisting when

24   you first tried to put him inside the car and decided

25   not to?

104

1                        P.O. Adam Brodsky

2        A        Um, I don't recall.

3        Q        Was my client actively resisting

4   immediately before Officer Mitchell placed his arms

5   above his head?

6        A        You'd have to ask him.

7        Q        Okay.  Let's just, um, rewind a second,

8   look at the video and you can tell me what you see,

9   okay?

10                        (Video rewound and played.)

11       Q        So I rewound it to 10:39 on the bottom

12  left and 11:43:53 on the top right, okay?  And I'm

13  going to hit play.

14                        (Video rewound and played.)

15       Q        Now I'm just going to pause because I

16  have a question before that.  As you're walking him --

17  I want to go back to 10:49.  All right, I -- it's hard

18  to do that, so at 10:36.

19                        (Video played.)

20       Q        Can you tell me what you see, as you

21  walk him over to the car, can you tell me what you see

22  my client's head doing, okay?  And I'm going to hit

23  play.

24                        (Video played.)

25       Q        10:36 on the bottom left, 11:43:51 on

1                        P.O. Adam Brodsky

2      the top right.

3                          (Video played.)

4           Q      And now I'm going to pause at 10:44 on

5      the bottom left and 11:43:57 in the top right.

6                   Does it looks like his head was down and

7      bowed kind of as you walked him over?

8           A      It looked like initially he was leaning

9      forward and then he stood up straight when we got

10     closer to the car.

11          Q      Okay.  It didn't look like he was trying

12     to run away or anything, right?

13                        MR. CAMPOLIETO:  Objection.

14          A      I don't believe so.

15          Q      You don't remember him ever trying to

16     run away or fight you, right?

17          A      Right.

18          Q      So now I'm going to hit play at 10:44 on

19     the bottom left to 11:43:57 in the top right, and I'm

20     going ask you to watch my client and try to see if it

21     looks like he's resisting or fighting in any way,

22     okay?

23                          (Video played.)

24          Q      All right.  I'm pausing it at 10:56 in

25     the bottom left, 11:44:08 in the top right.

P.O. Adam Brodsky

1
2          In that period that we just played, did
3   it look like he was resisting or fighting in any way?
4          A      I don't know.
5          Q      Okay.  You don't know or no?
6          A      It's something that -- you're asking me
7   what another officer's perspective is of something.
8          Q      Oh, no.  I'm asking you, you know, what
9   you remember at the time of the incident and with your
10  recollection refreshed, as we watch the video of you
11  and Officer Mitchell handling Mr. Vann on the night of
12  the incident.
13         A      So when he goes to get placed in the
14  car, I don't know if he doesn't want to get in or we
15  back him away from the door, and then as I go to
16  search him, I wouldn't know if he's resisting because
17  I'm not in a position to be able to tell.
18         Q      Okay.  You don't know if, um, this
19  arms-above-the-head technique is something that was
20  trained at all, um, by the RPD, correct?
21         A      Right.
22         Q      Um, and if Mitchell pulled his arms up
23  above his head like this solely for the purpose of
24  inflicting pain, that would be a violation of
25  department policy, right?

107

1                          P.O. Adam Brodsky

2        A        Correct.

3        Q        And it would also be unlawful under

4    state and federal law, correct?

5                          MR. CAMPOLIETO:  Objection.

6        A        Right.  I mean, there are times where

7    pain compliance -- force compliance is used, so I --

8    it depends on what the goal is.

9        Q        Okay.  So I just want you to listen to

10   my question.

11                If the goal -- if he was solely pulling

12   his arms above his head to inflict pain, that would be

13   a violation of department policy, and it would also be

14   unlawful, correct?

15       A        That would be problematic, yes.

16       Q        All right.  I'm going to hit play.

17                          (Video played.)

18       Q        Now I'm just going to pause.

19                Do you see -- no, I'm sorry, you said

20   that this was Lafave, correct?

21       A        I believe so, yes.

22       Q        And he's kind of -- you see him kind of

23   pointing, these EMTs have just walked up, over around

24   and stuff.  Would it be fair to say that LaFave was

25   like the officer in charge at the scene?

1                          P.O. Adam Brodsky

2       A        Yes.

3       Q        Okay.  You remember that or that's what

4  it looks like as you watch the video?

5       A        Um, if he is the only supervisor on

6  scene at that time, then he would be the commanding

7  officer.

8       Q        Okay.  All right.  So we're paused at

9  11:07 on the bottom left and 11:44:17 in the top

10  right, and I'm just going to hit play again.

11                          (Video played.)

12       Q        And I'm just pausing now at 11:17 on the

13  bottom left, and 11:44:25 on the top right.

14                 Um, is it fair to say that it looks

15  like, um, Sergeant Lafave walked up next to you and

16  Officer Mitchell at this point?

17       A        If that's who that is, yes.

18       Q        Okay.  This person standing here is next

19  to you, right (indicating)?

20       A        Correct.

21       Q        Okay.  And Mr. Vann's arms are still

22  above his head?

23       A        It appears so.

24       Q        And you probably can't tell from the

25  still, um, image, but -- so I'll keep playing it,

1                          P.O. Adam Brodsky

2    but -- and then I'll ask you if it looks like you're

3    still searching him at that point, okay?

4                          (Video played.)

5         Q      Let me pause it right here.

6                Do you know who this is (indicating)?

7         A      That looks like Officer Dempsey.

8         Q      Okay.  Thank you.

9                He's wearing the gloves and he just

10   walked out of the store.

11        A      I didn't see where he came from.  I

12   believe you if that's what you say.

13                          (Video paused.)

14                MR. SHIELDS:  Okay.  And just for

15                the record, we're paused at 11:23 in the

16                bottom left and 11:44:30 in the top

17                right, and I'm going to hit play again.

18                          (Video played.)

19        Q      All right.  So I'm pausing right now.

20   And 11:37 in the bottom left and 11:44:42 in the top

21   right.

22                And did you watch what was happening

23   with you and Officer Mitchell, um, with my client

24   between the times that we were paused?

25        A      I was watching this.

110

P.O. Adam Brodsky

1    Q    So it looks like you kind of went over
2
3    to the other side of him, right?

4    A    Correct.

5    Q    And like Officer Mitchell let his arms
6    come down a little bit?

7    A    Right.

8    Q    Okay.  And now, does it look like he's
9    lifting his arms back up, and that's where we're
10   paused?

11   A    I don't know.

12   Q    All right.  So I'm going to hit play and
13   then I'll ask you questions.  We're 11:37 in the
14   bottom left and 11:44:42 on the top right.

15              (Video played.)

16   Q    And I'm going to pause, and now we're at
17   11:41 in the bottom left and 11:44:45 in the top
18   right.

19              Does it look like Officer Mitchell
20   placed him back up against the car and put his hands
21   back up above his head?

22   A    Yes.

23   Q    Do you know why he did that?

24   A    No.

25   Q    Did it look like my client was resisting

1                        P.O. Adam Brodsky

2       or fighting in any way in between there?

3              A       I don't know.

4              Q       Okay.  So no or you don't know?

5              A       I don't know.

6              Q       Okay.  So let's just watch that real

7       quick again.

8              A       I'm not going to be able to answer that

9       question because I'm not going to be able to tell if

10      he's resisting or not at that time.

11             Q       Okay.  Well, I'm just going to play it

12      again just, you know, just to see if you're seeing

13      anything, okay?  So we'll go on to --

14                           MR. CAMPOLIETO:  Elliot, can I

15                      just ask how much longer you have to go?

16                           MR. SHIELDS:  I play to the end

17                      when my four-year-old runs in here at

18                      about six o'clock.

19                           MR. CAMPOLIETO:  I was going to

20                      say six o'clock is the time that we

21                      probably got to go.

22                           MR. SHIELDS:  Yeah, then I think

23                      I should be done, John, and if not, we'll

24                      set up another time to finish, but I

25                      don't plan on going any longer, okay?

1                          P.O. Adam Brodsky

2                          MR. CAMPOLIETO:  Okay.

3         Q      All right.  So you got -- you're coming

4    around to the side, right?  And I'm just going to

5    pause.

6                  Does that look like Dempsey to you again

7    right behind Lafave?

8         A      Yes.

9                          MR. SHIELDS:  For the record,

10                   we're paused at 11:35 in the bottom left

11                   and 11:44:40 in the top right.  All

12                   right, and hitting play.

13                          (Video played.)

14        Q      All right.  And now I'm pausing.

15                  Did it look like Mitchell just kind of

16   rolled him back and forth on the car?

17        A      Say that -- I'm sorry, ask one more

18   time.

19        Q      Did it look like Mitchell moved my

20   client on the back of the car for some reason?

21        A      Yes.

22        Q      Okay.  Do you know why he did that?

23        A      Yeah.  The defendant started moving and

24   not standing still.

25        Q      Is that what that looked like to you?

1                          P.O. Adam Brodsky

2          A        Yeah.

3          Q        Okay.  Let's watch that again.  All

4    right.  So we're at 11:39 in the bottom left and

5    11:44:43 in the top right.

6                          (Video played.)

7          Q        All right.  So that was the end of the

8    video, okay.

9                   Now, I think those are all my questions

10   on that video, okay, for now.  Oh, we're back to

11   normal.

12                  Let's see.  Officer Brodsky, after the

13   incident, did you fill out any paperwork?

14         A        No.

15         Q        Um, did you fill out a subject

16   resistance report?

17         A        No.

18         Q        And the subject resistance report is

19   required for any force other than handcuffing,

20   blanketing, escorting or application of a hobble or

21   spit sock, correct?

22         A        Um, it can depend.

23         Q        It can depend?

24         A        Sure.

25         Q        Okay.  What would that depend on?

114

1                          P.O. Adam Brodsky

2          A       Um, a supervisor's discretion.

3          Q       So a supervisor could say, You don't

4    have to comply with RPD General Article 335 in their

5    discretion?

6          A       I didn't say that.

7          Q       Okay.  Can you explain what you meant

8    then?

9          A       If the supervisor is present or based on

10   what happened doesn't feel that you used an amount of

11   force that needs to be documented, then they will

12   inform me that it does not need to be completed.

13         Q       Okay.  Is that what happened here?  Is

14   that why you didn't do a subject resistance report for

15   this incident?

16         A       I didn't do one, yes.

17         Q       Because a supervisor told you you didn't

18   need to?

19         A       Um, my field training officer told me

20   that one wasn't necessary.

21         Q       Did you ask if you needed to do one and

22   Dempsey said you didn't need to?

23         A       He just -- I don't remember, but I

24   remember him telling me that one wasn't necessary.

25         Q       Okay.  So just to be clear, Dempsey

1                      P.O. Adam Brodsky

2   informed you you didn't have to fill out any paperwork

3   for this incident, right?

4          A       Correct.

5          Q       Okay.  After the incident, did you ever

6   watch the video prior to watching it with John in

7   preparation for your deposition here today?

8          A       No.

9          Q       So you never watched the video to learn

10  from it in any way, correct?

11         A       I've never seen the video.

12         Q       And you were in your training period at

13  the time that this incident happened, right?

14         A       Right.

15         Q       So necessarily the incident and what

16  happened would be considered part of your training as

17  an RPD officer, right?

18         A       My interaction with it or my

19  involvement?

20         Q       Policies and procedures that needed to

21  be followed, correct?

22         A       We just -- yes, we would debrief my

23  involvement in the incident for any incident.

24         Q       Did you debrief your involvement in this

25  incident?

1                        P.O. Adam Brodsky

2        A        Um, I'm sure we did.

3        Q        And do you remember doing that?

4        A        I don't remember specifics.

5        Q        And do you remember, um -- do you

6   remember who it would have been at that time, would it

7   have been with your field training officer?

8        A        What do you mean by that?

9        Q        After an incident, when you're a recruit

10  and you have an assigned field training officer, um,

11  would be common practice to debrief with your field

12  training officer?

13       A        Yes.

14       Q        Okay.  Would it be common practice to

15  also debrief with other people or just your field

16  training officer?

17       A        Usually just your field training

18  officer.

19       Q        Okay.  And, um, in general when you're

20  involved in a use of force incident, do you review

21  your body camera video or any other video of the

22  incident?

23       A        Sometimes.

24       Q        When would you not review it?

25       A        If it's not necessary or it's minor.

P.O. Adam Brodsky

1

2      Q      Okay.  So in general, does the

3   department use videos from force incidents to teach

4   officers about the appropriate level of force that can

5   be used in different circumstances?

6      A      Not usually in-house videos.

7      Q      So not usually videos of actual

8   incidents like this?

9      A      Of -- with our officers.  I mean,

10  they'll use training videos maybe, um, from other

11  departments, um, or things that are available online.

12  Um, we don't usually use incidents like that of our

13  own officers in like a training environment for

14  everybody to critique.

15     Q      Um, now, you say you don't usually.

16            Under any circumstances has the

17  department done that?

18     A      Not that I can recall.

19     Q      Okay.  So you don't recall ever watching

20  a video of, I don't know, let's say, Benny Water.

21  That case is over and done with, right?

22            So, Benny Water, the department never

23  played that video and said, you know, Here, this was

24  appropriate, this was inappropriate, or anything like

25  that?

118

1                        P.O. Adam Brodsky

2      A        Actually, I remember in the academy

3  watching the video of when, um, Officer Del Pearson

4  was chasing a suspect and was shot and killed by him.

5      Q        So you watched that in the academy?

6      A        Yes.

7      Q        And what did they teach you about that

8  incident from watching that video in the academy?

9      A        I believe the takeaway was when chasing

10 somebody to be offset, so that if they reach back and

11 fire a round like that, it's less likely to strike you

12 in general.

13     Q        So it was about officer safety?

14     A        I believe that was the takeaway.

15     Q        Okay.  All right.  Let's say there's an

16 incident where there was a complaint made against you,

17 would you ever watch any video of that incident, um,

18 as part of the review process for that complaint?

19     A        Um, a complaint?  What do you mean by

20 a -- like a complaint how?

21     Q        Let's say, you know, a citizen complaint

22 saying that you used excessive force against them?

23                        MR. CAMPOLIETO:  Objection

24                        (inaudible.)

25                        (Reporter clarification.)

119

                    P.O. Adam Brodsky

1                    MR. CAMPOLIETO:  I said

2         "Objection."

3    Q      Yeah.  It's a hypothetical question.

4    A      So if a citizen made a call to 911 and

5    they complained to my direct supervisor that I used

6    excessive force against them, would I review the body

7    cam footage?

8    Q      Yeah, or I mean they don't have to call

9    911, right?  There's a whole process for making a

10   complaint against an officer with CRB, you know, it

11   gets elevated to PSS, it goes through the process.

12          Um, do you know under those

13   circumstances, would you review the video?

14   A      Um, if you're talking a complaint that

15   rose to that level, then I probably would.

16   Q      Yeah.  Now, in your time at the RPD,

17   have you ever been disciplined for any incident

18   whatsoever?

19   A      No.

20   Q      Do you remember any incidents where

21   you've ever had any internal complaints filed by a

22   citizen against alleging that you violated their

23   rights in some way?

24   A      No.

120

1                      P.O. Adam Brodsky

2        Q        Have you ever had any internal

3    complaints lodged against you by the department?

4        A        No.

5        Q        Now, do you know in your concise officer

6    history, there was one incident that was listed in --

7    let me see if I can find that -- from 2016.

8                 Um, do you know what I'm talking about?

9        A        Um, no.  If you told me more about it,

10   maybe.

11       Q        Okay.  You were involved in an incident

12   like in the Seneca Park Zoo; is that right?

13       A        Yes.

14       Q        There was some sort of investigation

15   that happened after that?

16       A        Yes.

17       Q        And can you tell me basically what

18   happened in that incident?

19       A        Um, I was hit, run over and drug by a

20   car.

21       Q        And, um, was the review that was done

22   something that was -- do you know why there was a

23   review done by the police department that would have

24   --

25       A        Yes.

1                         P.O. Adam Brodsky

2         Q       Can you just explain that?

3         A       I discharged my firearm.

4         Q       Okay.  And is there automatic basically

5    anytime you discharge a firearm that there will be a

6    review process?

7         A       I believe so.

8         Q       Okay.  And did you discharge your

9    firearm at the person that struck you with the car?

10        A       Yes.

11        Q       And you were given an award, um, I think

12   Officer of the Month or something, right?

13        A       Yes.

14        Q       And did you strike the person that you

15   shot at?

16        A       Yes.

17        Q       Were they killed?

18        A       No.

19        Q       Okay.  Did you get any kind of

20   counseling after you shot the person?

21                        MR. CAMPOLIETO:  Objection to the

22                question.

23                        I mean, are you asking him if he

24                received psychological counseling or what

25                are you asking?

122

```
 1                    P.O. Adam Brodsky
 2               MR. SHIELDS:  Correct.
 3               MR. CAMPOLIETO:  It's a sensitive
 4          area in terms of what we're going to.
 5          I'll allow him to answer this --
 6               MR. SHIELDS:  I'm not trying to
 7          dig for too much, John.  What I want to
 8          know is, did you get counseling and is
 9          that pursuant to policy for the RPD if
10          you discharge your firearm and hit
11          somebody, do you get counseling?
12               MR. CAMPOLIETO:  Okay.
13     A     Yes.
14     Q     Okay.  Did you have to take time off of
15 work, is that mandatory?
16     A     They required me to take a certain
17 amount of time off the road; however, I was severely
18 injured, so I wasn't returning.
19     Q     Got it.  All right.  I don't think I
20 need to put up your officer history on that since all
21 of that makes sense.
22               So how long were you out because of your
23 injury?
24     A     About two months, maybe three.  I think
25 it was two.
```

123

1                          P.O. Adam Brodsky

2          Q      Okay.  And you recovered, thank God?

3          A      Yes, for the most part.

4          Q      Are you back to full service now?

5          A      Yes.

6          Q      Okay.  All right.  All right.  What I

7    want to do is just go back to the video and play from

8    earlier, okay, and ask you some questions.

9                 Can you see the video again?

10         A      No.

11         Q      Oh, I'm sorry.  Because I did not hit

12   share.  There we go.  I'm sorry.  Do you see it now

13   (screen sharing)?

14         A      (Viewing.)  Yes.

15         Q      All right.  I'm going to play it

16   through, the video, and ask you a couple of questions

17   and hopefully we can get out of here, okay?

18         A      Okay.

19                        (Video played.)

20         Q      So I'm just going to pause.

21                        (Video paused.)

22                 Do you recognize who this is?

23         A      I believe that's Officer Kester.

24         Q      How about this officer (indicating)?

25         A      Um, this might be Drake.

1                    P.O. Adam Brodsky

2          Q       I'll represent to you that is Kester and

3    that is Drake (indicating).

4          A       Okay.

5          Q       Okay.  And we're paused at 4:44 on the

6    bottom left and 11:38:57 on the top right.

7                  And also, we see here a man standing

8    near this trash can in all white, right?  And one

9    other person over by the bench with a bicycle; is that

10   right?

11         A       Yeah.  It appears to be.

12         Q       Okay.  I'm going to hit play, okay?

13                 (Video played.)

14         Q       Let me just pause this here.

15                 (Video paused.)

16         Q       Have you ever seen this part of the

17   video before?

18         A       No.

19         Q       Okay.  You didn't watch this part of the

20   video when you were with John?

21         A       No.

22         Q       You only watched the later part that we

23   watched earlier?

24         A       Right.

25         Q       Okay.  I'm going to fast forward a

1                    P.O. Adam Brodsky

2    little bit and see if we cannot waste time.

3                        (Fast forwarding video.)

4         Q       Okay.  So now I fast forwarded to 6:12

5    on the bottom left and 11:40:11 on the top right,

6    okay?

7               And it looks like my client is walking

8    on the sidewalk at this point kind of towards the

9    camera; is that fair to say?

10        A       Yeah -- yes.

11        Q       And you see Kester with his hand up

12   making a gesture apparently?

13        A       Apparently.

14        Q       And the other officer is just standing

15   there?

16        A       Right.

17        Q       Okay.  I'm going to hit play.

18                        (Video played.)

19        Q       Okay.  I'm just going to pause right at

20   6:23 on the bottom left, 11:40:20 on the top right.

21               And it looks like they've approached him

22   and put his hands behind his back; is that accurate?

23        A       Right.

24        Q       Okay.  And when I say "they," it looks

25   like Mitchell and Drake -- I'm sorry, Mitchell and

1                    P.O. Adam Brodsky

2    Kester; is that right?

3          A      Right.

4          Q      Okay.  And Drake is standing in front of

5    them?

6          A      Correct.

7          Q      Okay.  And it looks like his hands, you

8    can see them both behind his back, but he's not quite

9    handcuffed yet?

10         A      Yeah.  He's not handcuffed.  His hands

11   are behind his back.

12         Q      Okay.  And I'm going to hit play.

13                      (Video played.)

14         Q      All right.  And I paused at 6:28 on the

15   bottom left and 11:40:24 on the top right.

16                Does it look like Mitchell just put a

17   handcuff on his -- it looks like his left hand?

18         A      I don't know.

19         Q      All right.  And let's watch that little

20   part again, okay?

21                      (Video played.)

22         Q      All right.  So we're paused right at

23   6:27, and on this paused screen, does it looks like

24   Mitchell is starting to apply a handcuff on his left

25   hand?

1                      P.O. Adam Brodsky

2        A       Yes.

3                      MR. SHIELDS:   Okay.   For the

4               record, it was 6:27 on the bottom left

5               and 11:40:23 on the top right.   I'm going

6               to hit play again.

7                      (Video played.)

8        Q       I'm just going to pause real quick at

9   6:29 on the bottom left, 11:40:25 on the top right.

10               Does it looks like he got the handcuff

11   on his left hand?

12       A       I don't know.

13       Q       Okay.   I'm just going to hit play now,

14   okay?

15                      (Video played.)

16       Q       And now we're paused right at 6:37 on

17   the bottom left and 11:40:32 on the top right.

18               And my question is, does it look like

19   Officer Kester is grabbing my client's neck or head

20   area?

21       A       He's reaching across him, yes.

22                      (Video played.)

23       Q       Okay.   I'm sorry, now I'm hitting play

24   and now I'm going to hit play and I paused at 6:39 on

25   the bottom left and 11:40:33 on the top right.

P.O. Adam Brodsky

2    Um, now, does it look like Officer Drake

3  has his hand on Officer Mitchell's back here?

4    A    Yes.

5    Q    And it looks like Officer Mitchell has

6  his hands on Mr. Vann's hands here?

7    A    In the area of.

8    Q    Okay.  And, um, an area of his hands

9  which are behind his back, right?

10    A    It appears so.

11    Q    Okay.  And it looks like Officer Kester

12  is still kind of around the area of my client's head

13  or upper shoulder area, right?

14    A    Right.

15              (Video played.)

16    Q    Okay.  And now I'm going to hit play

17  again.  We're at 6:39 on the bottom left and 11:40:33

18  on the top right.

19              (Video played.)

20    Q    All right.  Now I paused at 6:41 on the

21  bottom left, 11:40:35 on the top right.

22              Did it look like they all kind of pushed

23  into the bench where the bike was propped up against

24  it?

25              MR. CAMPOLIETO:  Objection.

129

1                    P.O. Adam Brodsky

2                         You can answer.

3         A       They are in the area of the bench and

4    bike.

5         Q       Okay.  So it looks like my client kind

6    of bounced off the bench and the bike?

7         A       I don't know.

8         Q       All right.  Let's just play that one

9    more time and I'll ask you again.

10                       (Video played.)

11        Q       All right.  Right there, did it look

12   like he hit him -- did it look like the bike moved

13   because someone touched the bike?

14        A       You have to play it again.

15        Q       Okay.  No problem.  I aligned it to --

16   let's see.  All right.  So starting the video again

17   from 6:38 at the bottom left and 11:40:33 at the top

18   right.

19                       (Video played.)

20        A       Yes, the bike moves.

21        Q       Okay, thank you.

22                All right.  And now I'm going to pause

23   this video and I'm going to fast forward a little bit,

24   okay?

25                       (Video played.)

1                          P.O. Adam Brodsky

2          Q        I fast forwarded to 7:56 on the bottom

3  left and 11:41:37 on the top right, okay?

4                   And I'll just represent to you that this

5  is Officer Mitchell walking my client David Vann over

6  to the car, okay?  And I'm just going to play it from

7  here.

8                        (Video played.)

9          Q        Okay.  So I'm pausing it at 8:15 in the

10  bottom left and 11:41:54 in the top right.

11                   Does it look during that time period

12  like Mr. Vann ever escaped from his handcuffs?

13         A         Um, I didn't see when the handcuffs were

14  applied.  Was that off camera?

15         Q         I'll just represent -- sure.  We'll just

16  represent to you that he was handcuffed, um, before he

17  was walked over to the car.

18                   Did it look like he'd ever performed

19  some kind of Houdini move and escaped from his

20  handcuffs to you?

21         A         The handcuffs are still applied, if

22  they're on.

23         Q         So the answer is no, he did not escape

24  from his handcuffs, right?

25         A         I don't think he escaped from his

                         P.O. Adam Brodsky

1

2    handcuffs.  I don't know.  I can't see that.

3         Q     Okay.

4         A     It doesn't appear -- it appears his

5    hands are still behind his back hands in their cuff.

6         Q     Okay.  So that's going to be the same

7    question I'm going to ask you.  I'm just going to play

8    it again, okay?

9                    (Video played.)

10        Q     From right here at 7:54 on the bottom

11   left and 11:41:36 on the top right, okay?

12                   (Video played.)

13        Q     All right.  So I'm going to pause again

14   at 8:14 on the bottom left and 11:41:52 on the top

15   right.

16                   (Video paused.)

17        Q     Throughout that period, did it appear to

18   you, Officer Brodsky, that Mr. Vann ever escaped from

19   his handcuffs?

20        A     No.  I guess.  I don't really know what

21   you mean by that.  Like did he take them off or did

22   he --

23        Q     Yeah, exactly.  At any point in that

24   little clip that we just played did it look like

25   Mr. Vann was only wearing one handcuff?

1                    P.O. Adam Brodsky

2        A       I don't know.  I don't know.  I can't

3    tell from this.

4        Q       Okay.  I just want you to try and pay

5    attention to his hands and tell me, does it look like

6    when -- let's say -- let's just say from the point

7    when right here until -- just tell me, does it look to

8    you from between where we're paused at 7:55 to

9    11:41:37 on the top right -- um, at this point, let me

10   just ask you based on this still screen, an officer

11   generally wouldn't walk an officer over to the car

12   with only one handcuff applied, right?

13                    MR. CAMPOLIETO:  Objection to the

14                    still screen.  He's answered the question

15                    of whether he thought he was handcuffed,

16                    so it's asked and answered.  I'll let him

17                    go this last time again if you want to

18                    ask him the questions again.

19                    MR. SHIELDS:  Sure.  John, asked

20                    and answered actually is not an

21                    appropriate objection.

22                    MR. CAMPOLIETO:  I mean, first of

23                    all, it's a vague question.  It's also a

24                    repetitive question and he's answered it

25                    three times already.

133

1                    P.O. Adam Brodsky

2                    MR. SHIELDS:  He's given

3           different answers, John.  We're looking

4           at a video that, you know, people can

5           disagree about, so --

6                    MR. CAMPOLIETO:  (Inaudible.)

7                    (Multiple voices.)

8                    MR. SHIELDS:  So let me just play

9           the video and we'll be out of here, okay?

10                    (Video played.)

11      Q      Okay.  So right there, before I paused

12   at 8:01 and 11:41:44, did it appear to you that he had

13   two handcuffs applied to his hands?

14      A      I don't know how well they're applied,

15   but his hands are behind his back.

16      Q      His hands are behind his back, right?

17      A      Right.

18      Q      And both hands are behind his back,

19   right?

20      A      It appears so.

21      Q      And that would indicate to you that both

22   handcuffs were most likely applied, not just one

23   handcuff on one side, right?

24      A      I don't know how he had them on.

25      Q      All right.  And let's just play from

134

1                       P.O. Adam Brodsky

2    here.

3                       (Video played.)

4        Q       I'm going to pause here at 8:11 on the

5    bottom left and 11:41:50 in the top right.

6                       And, um, why do you think they took him

7    to the ground like that?

8        A       Because he was resisting.

9        Q       Oh, it looked like he was resisting to

10   you?

11       A       It looked like he was, um, holding his

12   weight, not complying and not going with where they're

13   walking.

14       Q       Okay.

15       A       I don't know what other type of

16   resistance he was offering physically because my hands

17   weren't on him and I wasn't there --

18       Q       Okay.

19       A       -- but it doesn't look like he was doing

20   what he was being told to do.

21       Q       At 7:56 on the bottom left and 11:41:37

22   on the top right --

23                      (Reporter clarification.)

24                      MR. CAMPOLIETO:  Object to the

25                      use of the freeze-frame video.

P.O. Adam Brodsky

1           Q      Okay.  So at this point, does it look

2  like Officer Mitchell is grabbing my client by the

3  neck?

4           A      I don't know.

5           Q      Okay.  Where are Officer Mitchell's

6  hands right now?

7           A      Could be on his shoulders, could be on

8  his arms, could be on his neck, could be on his back

9  of his head.

10          Q      And we're at 8:01 in the bottom left and

11  11:41:42 in the top right.

12                   (Video played.)

13          Q      And what's it look to you like

14  Officer Mitchell is trying to do right now?

15               MR. CAMPOLIETO:  Objection.  He

16               can't answer for Officer Mitchell.

17       A      I don't know what his intentions are.

18               MR. SHIELDS:  What does it look

19               like he's trying to do, John.  He can

20               answer what the video looks like.

21               MR. CAMPOLIETO:  How does he know

22               what Officer Mitchell is trying to do?

23               MR. SHIELDS:  Okay.  Well, what

24               does it looks like, John?  That is the

1                        P.O. Adam Brodsky

2                question.

3        A        It looks like he's standing there with

4    his arms out forward.  His one leg's back straight and

5    the first one is bent a little bit, then the leg

6    closest to Mr. Vann.

7        Q        Like he's trying to pull him, right?

8        A        Let's continue and see if that's what

9    happens.

10        Q        Okay.

11                        (Video played.)

12        A        Yes, he was pulling him.

13        Q        All right.  And now paused at 8:03 in

14    the bottom left and 11:41:44 on the top right.  And

15    I'm just going to play it again.

16                        (Video played.)

17        Q        And now, did it look to you like

18    Officer Mitchell just struck him in the face?

19        A        I don't know.

20        Q        If he did strike him in the face, let's

21    just say that he did strike him in the face, would

22    that have been appropriate under the circumstances?

23        A        Well, I don't know that he did to say

24    let's just say that he did.  I mean --

25        Q        Hypothetically.  That doesn't mean that

P.O. Adam Brodsky

1
2   he did.

3              Hypothetically, if he had punched him in
4   the face right there while he's handcuffed, it didn't
5   look like he could pose any physical threat, would
6   that have been appropriate?

7          A     I don't know what he did.  I don't know
8   how to answer that any better.

9          Q     Okay.  So if Officer Mitchell punched
10  him in the face as he was handcuffed behind his back,
11  we established earlier that strikes to the head can be
12  Level 4 force, correct?

13         A     It depends.

14         Q     It depends.  It can be, correct?

15         A     Sure.

16         Q     A strike to the face can be Level 4
17  force, right?

18         A     Right.

19         Q     And to use Level 4 force, you have to be
20  getting a threat from the subject that is equal to,
21  you know, almost Level 4 force from the subject to the
22  officer, or someone else, correct?

23         A     Are you implying that this is a use of
24  Level 4 techniques?

25                         (Multiple voices.)

1                         P.O. Adam Brodsky

2          Q       What I'm asking you is if an officer is

3    using force it has to be justified, right?

4          A       Correct.

5          Q       And to use Level 4 force which could

6    include in some circumstances strikes to the head, you

7    have to be faced with Level 4 force, either yourself,

8    as the officer, or that person has to be using Level 4

9    force potentially against someone else, right?

10         A       Yes, but I don't think that's applicable

11   here, if that's what you're trying to imply.

12         Q       So the answer is yes.

13                        MS. SHIELDS:  And I'm going to

14                 move to strike the --

15                        MR. CAMPOLIETO:  Objection.

16                        MS. SHIELDS:  -- nonresponsive

17                 portion of the question.

18                        MR. CAMPOLIETO:  Objection.

19         Q       All right.  I'm just going to -- and so

20   the question is, um -- all right.  I'm just going to

21   play this, and then --

22                        MR. CAMPOLIETO:  Well, what is

23                 the question?

24                        MR. SHIELDS:  I'm sorry.  I

25                 withdraw the question.  He answered the

139

1          P.O. Adam Brodsky

2          portion of the question that I was asking

3          an answer for.  Thank you.

4                    MR. CAMPOLIETO:  But you withdrew

5          the question.

6                    MR. SHIELDS:  John, he answered

7          yes, and then he gave some other answer.

8          I moved to strike the nonresponsive

9          portion, and you objected.  I think

10         that's what the record will show.  And

11         then I said --

12                   MR. CAMPOLIETO:  And he --

13                   MR. SHIELDS:  -- and then I said

14         what my question is and then I withdrew

15         my part that said what my question is.

16         That's what I recall.

17                   MR. CAMPOLIETO:  He said Level 4

18         force is not applicable here.

19                   MR. SHIELDS:  I didn't say that.

20                   MR. CAMPOLIETO:  He said it.

21                   MR. SHIELDS:  He said it, and I

22         moved to strike the nonresponsive portion

23         of the question which is what he said.

24                   MR. CAMPOLIETO:  And I've

25         objected to that.

1              P.O. Adam Brodsky

2              Okay, go ahead.

3      Q      Okay.  And you think that it was

4   necessary for them to throw him to the ground like

5   that?

6      A      I don't know.

7              MR. SHIELDS:  Okay.  All right.

8              So at this point, you know, I think that

9              I'm done with my questions for now.

10             What I want to do, John, is -- I think

11             I'm done, but I just want to review this.

12             Um, I don't think I'm going to need to

13             call Officer Brodsky back, but, you know,

14             for the record, you guys -- let me just

15             ask you a couple of other questions.

16     Q      We had to move the other deposition from

17   2 p.m. to 3 p.m. today because you had training,

18   correct?

19     A      Correct.

20     Q      And what was your training on today?

21     A      I'm a member of the hostage negotiation

22   team.

23     Q      And so your training was part of the

24   hostage negotiation team?

25     A      Correct.

1                      P.O. Adam Brodsky

2        Q       Okay.  And so that's the reason that we

3    had to start the deposition an hour later, um, at

4    three o'clock instead of two o'clock, right?

5        A       Well, I had to miss the least amount of

6    training as possible.  I still had to miss an hour of

7    it and now I am two hours behind my shift.

8        Q       Okay.  But for the purposes of our

9    deposition, we started late today because you had

10   training, right?

11       A       Yes.

12                        MR. SHIELDS:  Okay.  All right.

13                   And so just for the record, John, to

14                   clear up what we talked about earlier,

15                   you said that you're not going to object

16                   to more than ten depositions in the case,

17                   um, right?

18                        MR. CAMPOLIETO:  Yeah.  I don't

19                   have the number for you, but, you know,

20                   I'll allow 20 dep -- I mean, without

21                   permission of the court, I'm going to

22                   allow you, Elliot, 20 depositions here.

23                   If we go beyond 20, I would ask to seek

24                   permission.

25                        MR. SHIELDS:  Thank you, John.

1    P.O. Adam Brodsky

2         And then just for the record

3    today, I'm done with my questions for

4    today, but I want to hold the deposition

5    open since we didn't go for the full time

6    that we had planned for to start at

7    2 p.m.  Um, we only went from a little

8    after three until a little after six.

9    Um, and I will get back to you, John, as

10   to whether I think I need to, you know,

11   use my whole -- maybe not the whole seven

12   hours, but that additional hour that we

13   missed out on, okay?

14        MR. CAMPOLIETO:  I will agree to

15   that as long as we're not going back over

16   old testimony, so if you have new

17   questions, but in terms of his, you

18   know --

19        MR. SHIELDS:  I'm not going to

20   ask him all the questions about the video

21   that I already asked him.

22        MR. CAMPOLIETO:  Well, I was

23   talking about his training and the

24   background information, that's done.

25   Maybe if you have more questions about

P.O. Adam Brodsky

1               the incident, I'll allow it.  Do we have

2               a limit?  Do you want to reserve the full

3               four hours that we have left?

4                     MR. SHIELDS:  Sure.  Look, I

5               mean, I scheduled it for two because I

6               didn't think I needed, you know, the

7               whole seven, right?  You know, but we

8               only got three and I just don't want to

9               say I'm done, I'm done and then get the

10             transcript and say, Oh, man, there is

11             that thing that I was rushed and I forgot

12             to ask, okay?

13                   MR. CAMPOLIETO:  All right.  But

14             again, it would be questions regarding

15             the incident, we would agree to that.

16                   MR. SHIELDS:  And look, if

17             there's some like important training

18             thing that I don't think off the top of

19             my head right now I missed, but let's say

20             I look at some document, and I'm like,

21             Oh, I have a couple of questions about

22             this, like, yeah, if I didn't ask it

23             before, I think that's appropriate.  I

24             don't plan on redoing -- of calling him

144

1          P.O. Adam Brodsky

2          back to testify more, but --

3                    MR. CAMPOLIETO:  Okay.

4                    MR. SHIELDS:  -- I can't close

5          the deposition and say I'm done, I agree

6          not to take him back, okay?

7                    MR. CAMPOLIETO:  Right, but if

8          it's in regards to RPD training and this

9          incident, that's fine.

10                   MR. SHIELDS:  Okay.

11                   MR. CAMPOLIETO:  I have a couple

12         of questions for him, so I'm just going

13         to ask him.

14   EXAMINATION BY

15   MR. CAMPOLIETO:

16         Q     Officer, when you reviewed the video

17   today shown to you by Mr. Shields, is that the view

18   of -- is that the view you have when you're working on

19   the street and interacting with individuals?

20         A     The video view that was shown?

21         Q     When you viewed the video today shown to

22   you by Mr. Shields, is that the view you have when

23   you're working on the street interacting with

24   individuals?

25         A     No.

P.O. Adam Brodsky

1
2      Q      How is it different?

3      A      It is on street level.  Um, there is

4   audio.  The colors are more vivid.

5      Q      Are you able to see the whole of the

6   incident when you're on the street as compared to when

7   you watched the video today?

8      A      No.

9      Q      And how is that different from what you

10  saw today and from when you were on the street?

11     A      Based on where you're standing, you may

12  be blocked by objects or people from seeing the

13  totality, um, or just simply based on what you're

14  looking at at the time or paying attention to, you may

15  miss other things that are happening.

16     Q      When you were on the street interacting

17  with individuals, is it the same speed as when you

18  were watching the video today?

19     A      No.

20     Q      How is it different?

21     A      Um, at times it seemed slow and at times

22  it seemed faster.  It's differently more fluid.  Um,

23  the things that you are paying attention to aren't as

24  choppy.

25     Q      Are there things that you could see in

146

1                          P.O. Adam Brodsky

2      the video you were shown today that you weren't able

3      to see at the time you were interacting with the

4      plaintiff in this case?

5              A       Part of it.

6              Q       And what part of it are you referring

7      to?

8              A       Everything prior to me responding.

9              Q       Okay.  Well, that's obvious.

10                     But when you were watching the parts

11     that you were in, um, were there things that you were

12     able to see watching the video today that you weren't

13     able to see at the time?

14             A       Yes.

15             Q       What?

16             A       When I was kneeling next to the

17     defendant's, um, shoulder/head area, anything beyond

18     that officer next to me, I couldn't see.  I couldn't

19     see his legs.  I couldn't see his hands.  Um, I

20     couldn't -- when I was searching him, I was paying

21     attention to what I was looking at.  I couldn't see

22     what he was doing at that time.

23             Q       And do you have the ability to stop and

24     start your viewing when you were on the street like

25     you did today, with the start and stop?

                         P.O. Adam Brodsky

1

2       A       Of course not.

3               MR. CAMPOLIETO:  Elliot, I don't

4       have any further questions.

5               MR. SHIELDS:  Thanks.  I have no

6       more as well.

7               THE REPORTER:  You both want a

8       copy?

9               MR. SHIELDS:  Yes.  I'll take

10      just a digital copy is good for me.

11              MR. CAMPOLIETO:  Yes.  I'll take

12      a copy of the transcript.  An electronic

13      e-mail copy of the transcript.

14                      (TIME NOTED:  6:13 p.m.)

15                         o0o

16

17

18

19

20

21

22

23

24

25

148

1                    A C K N O W L E D G M E N T

2

3      STATE OF NEW YORK    )

                           )   ss

4      COUNTY OF SUFFOLK    )

5

6            I, P.O. ADAM BRODSKY, hereby certify that I

7      have read the transcript of my testimony taken under

8      oath in my deposition of March 23rd of 2022; that the

9      transcript is a true, complete and correct record of

10     my testimony, and that the answers on the record as

11     given by me are true and correct.

12

13                              _____

                                P.O. ADAM BRODSKY

14

15

16     Subscribed and sworn to

17     before me this _____ day

18     of _____, 2022.

19     _____

            Notary Public

20

21

22

23

24

25

149

1                    INDEX TO TESTIMONY

2

   WITNESS                    BY                    PAGE

3

   Adam Brodsky               Mr. Shields              5

4

                              Mr. Campolieto         144

5

6

7                              EXHIBITS

8

   PLAINTIFF'S                DESCRIPTION           PAGE

9  EXHIBITS

10      1                     ECD printout           73

11      2                     Video                  85
                              (Deemed marked)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

150

1                        CERTIFICATION

2

3    STATE OF NEW YORK   )

                         )   ss

4    COUNTY OF SUFFOLK   )

5

6            I, JEANINE KOERNER, a Notary Public in and

7    for the State of New York, do hereby certify:

8            THAT the witness(es) whose testimony is

9    hereinbefore set forth, was duly sworn by me; and

10           THAT the within transcript is a true record

11   of the testimony given by said witness(es).

12           I further certify that I am not related,

13   either by blood or marriage, to any of the parties to

14   this action; and

15           THAT I am in no way interested in the outcome

16   of this matter.

17           IN WITNESS WHEREOF, I have hereunto set my

18   hand this 2nd day of April, 2022.

19

20

21           _Jeanine Koerner_____

                      JEANINE KOERNER

22

23

24

25

**A**

-S-S-T-O-S 76:9
abbreviated 19:16
ability 67:12
   146:23
able 61:17,19 62:10
   63:8,10,12 106:17
   111:8,9 145:5
   146:2,12,13
above-noted 1:17
academies 15:6
academy 13:14,22
   14:21,22 18:19
   19:2,4,15,17,20
   20:4,8,16,19,24
   21:2,5,9,10 25:6
   26:6 28:13,14
   29:3 43:17,20
   103:4,8 118:2,5,8
accepted 25:13
access 47:12,16,19
accessible 47:3,15
   50:9
accident 25:3
accurate 84:25
   125:22
acknowledge 4:4,8
acknowledges
   57:24
action 150:14
actively 89:4,6,11
   103:18,23 104:3
actual 8:17 10:10
   57:25 85:8 117:7
Adam 1:14 5:6
   6:1 7:1 8:1 9:1
   10:1 11:1 12:1
   13:1 14:1 15:1
   16:1 17:1 18:1
   19:1 20:1 21:1
   22:1 23:1 24:1
   25:1 26:1 27:1
   28:1 29:1 30:1
   31:1 32:1 33:1
   34:1 35:1 36:1
   37:1 38:1 39:1
   40:1 41:1 42:1
   43:1 44:1 45:1

46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1,10 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:6,13 149:3
addition 12:5 60:14
   79:2
additional 20:25
   26:3 43:19,24
   78:22 79:17 80:3
   142:12
address 5:8 8:12,17
addresses 8:19
adjustment 10:11
administer 4:10
administered 4:9
administration
   18:13,14,15

administrators
   18:11
afternoon 5:13,15
agility 17:21 18:2
ago 29:10
agree 6:4 32:23
   33:23 34:7 35:23
   98:6 142:14
   143:16 144:5
Agreed 3:3,7,10,14
   4:17,18
agreement 4:14,15
ahead 37:18 43:7
   140:2
al 1:6
alerted 54:22 55:2
aligned 129:15
allege 15:24
alleges 32:19
alleging 119:23
allow 122:5 141:20
   141:22 143:2
allowed 48:6,12
   51:7,12,15
altercation 58:16
ambulance 77:16
   79:2,25 80:19
   81:2 82:4
ambulances 81:5
amount 23:18
   43:23 44:4 72:5
   114:10 122:17
   141:5
angle 29:10 94:19
ankle 77:16 80:14
annually 44:3
answer 5:23 6:15
   9:24 10:18 19:12
   23:13 25:16 33:22
   37:18,18 40:18
   41:13 42:8 43:7
   51:23 53:10 92:20
   92:23 97:22
   102:13 111:8
   122:5 129:2
   130:23 135:17,21
   137:8 138:12
   139:3,7

answered 132:14
   132:16,20,24
   138:25 139:6
answers 53:9 133:3
   148:10
anybody 29:12
   30:7 76:19 80:9
anymore 56:18
anytime 121:5
apart 14:12
apparently 75:20
   125:12,13
appealing 16:8
appear 131:4,17
   133:12
appears 96:4
   108:23 124:11
   128:10 131:4
   133:20
applicable 33:25
   138:10 139:18
application 17:8
   113:20
applied 130:14,21
   132:12 133:13,14
   133:22
apply 126:24
approach 11:24
   32:24 89:3
approached 59:10
   60:24 125:21
appropriate 3:16
   37:5 48:18 49:2
   49:10,15,18 50:11
   51:2 117:4,24
   132:21 136:22
   137:6 143:24
approximately
   29:10
April 150:18
area 38:4,9 57:4,6
   65:25 122:4
   127:20 128:7,8,12
   128:13 129:3
   146:17
arguing 36:2
argument 36:4
arm 61:15,16 98:4

98:20,20
arms 37:2 65:20
   100:14 102:23
   103:12 104:4
   106:22 107:12
   108:21 110:5,9
   135:9 136:4
arms-above-the-...
   106:19
Armstrong 82:10
arrangement 4:12
arrest 7:13 26:24
   27:13 33:13 34:15
   34:21,23 36:25
   37:13,23 38:10,15
   38:22,25 48:14
arrested 36:7 68:13
arrestee 48:5
arresting 38:20
   69:16
arrived 58:15,22
   60:12 67:7 77:2
   78:3 83:18,20,22
   83:24 87:23
arrives 77:18
Article 50:23 114:4
asked 30:14 62:6
   102:16 132:16,19
   142:21
asking 10:15 20:17
   28:18 37:20 41:16
   42:5 54:16 56:19
   78:8,22,24 79:19
   81:9 86:21 91:20
   106:6,8 121:23,25
   138:2 139:2
ASNCAS 75:17
assigned 21:22
   23:22 48:2 57:11
   75:7,14,23 116:10
assignment 14:18
assist 61:7,13 62:11
   62:19 81:17
assistance 67:22
assisted 61:7 62:6
   63:20,22 64:2
   67:8 98:16,18
assister 76:5 77:24

79:10
ssisting 61:10,25
  64:14 76:6,10,17
  76:20 80:18
associate's 12:8,16
ASSTER 76:4
assume 5:24
assuming 17:15
attempting 91:5
attend 19:20 21:3
attended 13:13,21
  21:4
attention 132:5
  145:14,23 146:21
attorney 2:10 6:12
  29:9 53:7
attorneys 2:3 3:4
  4:2
audio 145:4
Authority 7:21 8:2
  8:5
automatic 121:4
available 117:11
Avenue 2:3
Average 44:18
aviation 14:9
award 121:11
aware 9:5,10,15

**B**

B 5:1
BA 11:15 12:2,18
Bachelor's 11:8
back 7:25 14:19
  22:25 32:21 34:22
  37:2 43:3 48:4
  49:9,20 52:17
  53:12 56:13 61:16
  64:13 69:7 83:18
  87:9 89:20 90:20
  91:2,12 93:19
  96:14 101:18
  102:9,20 104:17
  106:15 110:9,20
  110:21 112:16,20
  113:10 118:10
  123:4,7 125:22
  126:8,11 128:3,9

131:5 133:15,16
  133:18 135:9
  136:4 137:10
  140:13 142:9,15
  144:2,6
backed 101:21
background 10:22
  10:24 17:24 18:3
  142:24
bad 35:22 94:19
based 27:25 48:11
  81:8 86:3,15
  89:12 99:20 114:9
  132:10 145:11,13
basic 25:7 35:9
basically 21:16
  35:6 39:13 76:16
  120:17 121:4
began 45:15
beginning 31:9
believe 7:24 12:4
  12:22 14:22 15:7
  15:12 16:7 17:9
  17:21 18:10 19:17
  35:20 44:14 55:21
  60:21 61:5,22
  62:3 71:2,5 73:2
  74:16 78:6 86:19
  93:16 94:22
  105:14 107:21
  109:12 118:9,14
  121:7 123:23
belt 35:11
bench 124:9 128:23
  129:3,6
Benny 117:20,22
bent 136:5
best 17:3 74:12
better 137:8
beyond 21:2 141:23
  146:17
bicycle 124:9
big 8:24 10:11
  33:14
bike 128:23 129:4,6
  129:12,13,20
bit 11:22 88:17,20
  90:17 96:9,15

97:16 110:6 125:2
  129:23 136:5
black 74:2,2
blanketing 113:20
blocked 145:12
blocking 100:20
blood 150:13
body 49:25 65:21
  65:22 90:18 97:15
  116:21 119:7
book 6:20
boss 47:6 77:15
  78:8
bottom 84:16 85:13
  93:9,9 94:16
  95:18,19 97:9,12
  98:15 99:3,12
  100:6,10 101:22
  102:6 104:11,25
  105:5,19,25 108:9
  108:13 109:16,20
  110:14,17 112:10
  113:4 124:6 125:5
  125:20 126:15
  127:4,9,17,25
  128:17,21 129:17
  130:2,10 131:10
  131:14 134:5,21
  135:11 136:14
Boulevard 5:9
bounced 129:6
boundaries 14:7,10
bowed 105:7
brackets 81:18
break 52:14,14
  53:5,7
brief 56:11
bring 64:7
bringing 99:4
Brodsky 1:14,14
  5:6,14 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1,8
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1

31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1,6
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1,4 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1,10 74:1 75:1
  76:1 77:1 78:1
  79:1,10 80:1 81:1
  82:1 83:1 84:1,14
  85:1 86:1 87:1
  88:1 89:1 90:1
  91:1 92:1,10 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:1 111:1
  112:1 113:1,12
  114:1 115:1 116:1
  117:1 118:1 119:1
  120:1 121:1 122:1
  123:1 124:1 125:1
  126:1 127:1 128:1
  129:1 130:1 131:1
  131:18 132:1
  133:1 134:1 135:1
  136:1 137:1 138:1
  139:1 140:1,13
  141:1 142:1 143:1
  144:1 145:1 146:1
  147:1 148:6,13
  149:3
broken 22:10 24:7
  77:16 80:14
brought 15:19
  17:20 64:18,21
  65:2 68:16,19,23
  103:19

Buckley 7:24
Buffalo 7:20 8:2,8
  14:13,24
business 5:8 8:12

**C**

C 2:1 4:1 148:1
call 19:14 23:7 42:2
  45:22 46:5,8
  54:15 57:25 58:5
  58:6 73:3 74:20
  74:22 77:5,19
  85:16 119:5,9
  140:13
called 11:19 38:5
  47:10 81:6,6
calling 143:25
calls 46:12,22 47:2
cam 119:8
cam4 84:15 85:14
camera 94:19
  116:21 125:9
  130:14
Campolieto 2:13
  4:18 8:18 9:4,8,20
  23:12 25:15 26:12
  26:18 27:14 28:7
  30:14,22 31:5
  33:10,21 34:4
  35:12 37:16 38:6
  38:11 39:12 40:8
  40:24 41:4,9,16
  41:22 42:4,10,18
  42:22 43:5 51:19
  52:13,16,19 65:14
  84:20 89:8 91:4
  91:14,22 92:5,12
  92:22 97:17
  102:11 105:13
  107:5 111:14,19
  112:2 118:23
  119:2 121:21
  122:3,12 128:25
  132:13,22 133:6
  134:24 135:16,22
  138:15,18,22
  139:4,12,17,20,24
  141:18 142:14,22

143:14 144:3,7,11
144:15 147:3,11
149:4
**capable** 40:3 42:20
**car** 23:22,24 24:2,3
54:11 55:19,20
56:11,18 57:14
59:3,10 62:2,4
65:2,21,23 71:6,8
72:3,8,11 74:18
74:23 77:12 79:14
86:24 87:3,7
88:21 99:5,13,16
99:19,22 101:15
103:6,10,19,20,24
104:21 105:10
106:14 110:20
112:16,20 120:20
121:9 130:6,17
132:11
**care** 26:11,17,20
27:12,17
**carry** 62:2
**cars** 13:5 57:6
74:25 78:21,24
80:4 86:23
**case** 1:5 7:10,23
15:18 16:4,15
19:17 27:25 28:2
29:11 30:11 31:18
32:13,19 51:2
70:9,15 73:4
117:21 141:16
146:4
**categorize** 36:14
**category** 51:11
**cause** 26:14 27:2,12
35:21 38:22 50:12
51:21,25 52:5
92:17
**causing** 40:4 51:24
**cautious** 66:21
**cell** 68:20
**Central** 57:12
**certain** 26:8 43:23
49:12,14 91:23
103:7 122:16
**certification** 3:5

150:1
**certified** 19:13
**certify** 148:6 150:7
150:12
**change** 9:12 23:19
46:3 53:10
**changed** 9:17 44:12
45:20
**changing** 9:6 13:4
**charge** 69:17
107:25
**chasing** 118:4,9
**chest** 65:24
**choppy** 86:9 99:2
145:24
**chose** 69:17
**Church** 2:11
**circling** 100:23
**circumstance** 50:12
**circumstances**
27:21 40:19 43:13
48:18 49:14,18
51:13 56:6 117:5
117:16 119:14
136:22 138:6
**cities** 15:3
**citizen** 118:21
119:5,23
**city** 1:6 2:9,11 6:10
6:10 7:20 8:13 9:2
9:7,13,18 10:3,4,5
10:16 13:21,25
17:3 20:25
**civil** 1:16 7:10
17:13,14
**clarification** 21:8
30:13 31:11 42:20
80:21 118:25
134:23
**clarify** 22:3 30:24
81:10
**classified** 7:14
**classroom** 21:17
**clavicle** 40:22 43:10
**clear** 67:3 114:25
141:14
**clerk** 3:13
**client** 32:19 83:25

84:7,9 87:10 88:5
89:2 90:16 91:12
96:11 98:16
101:14 103:18,23
104:3 105:20
109:23 110:25
112:20 125:7
129:5 130:5 135:3
**client's** 97:15 98:2
104:22 127:19
128:12
**clip** 131:24
**close** 102:22 144:4
**closer** 105:10
**closest** 136:6
**coaching** 13:5 32:3
**codes** 74:10
**college** 11:10,11
12:3,10 42:6
92:11
**colors** 145:4
**come** 87:8 110:6
**coming** 90:17 112:3
**command** 62:20,23
63:2,5,8,11,13,14
**commanding** 108:6
**commands** 33:20
**common** 62:8,18
116:11,14
**compared** 145:6
**complained** 119:6
**complaint** 32:14,16
73:24 118:16,18
118:19,20,21
119:11,15
**complaints** 119:22
120:3
**complete** 17:25
18:2 20:3 148:9
**completed** 13:15,16
13:23,24 14:19
19:6 20:16 114:12
**compliance** 35:21
36:11,21 37:3
107:7,7
**complies** 33:19
**comply** 63:5,8,11
63:13,14 114:4

**complying** 38:3
62:15,16 134:12
**computer** 47:21
48:2 57:13,17,20
57:23 77:10
**computers** 47:23
**concise** 120:5
**condition** 37:24
**conduct** 99:21
103:15
**conducted** 65:5
**confronted** 51:16
**confused** 30:19
31:8 41:20
**connection** 32:10
**consent** 4:12
**considered** 40:16
40:19,22 43:10
115:16
**consistent** 45:12,16
**constitute** 39:16
**constitutes** 27:2
**contact** 35:7
**context** 7:3 38:4,13
**continue** 9:18 10:4
12:17 92:15 136:8
**CONTINUED** 53:2
**control** 32:25 33:9
33:13 48:18 49:8
70:13 78:25 79:4
79:7 80:7
**controlled** 83:21
**controlling** 3:17
**controversy** 10:14
**copy** 147:8,10,12
147:13
**corner** 84:16
**correct** 10:6 12:11
14:14 15:2,15,16
16:12,17,18,20
18:21,24 19:7
20:10 21:12 23:20
26:7,9,24,25 27:3
27:6,10,13,22
28:6 29:2,5,24
33:6,7,9 34:17,25
35:2,8 36:5,18
37:6,9,10 38:24

39:4,5,8,20,23,24
40:5,7,19,23
43:14,15,18 46:21
48:22,24 49:24
50:22 51:3,13
52:2,7 53:22,24
54:12,20,21 55:8
60:7 62:23 63:2,3
63:5,6,11,21,23
63:24 64:25 65:13
67:5 68:17 69:10
69:14 71:2 75:4,5
75:9 76:12,15
77:3,11 78:23
79:12 82:9 83:13
85:4 87:18,19,23
93:20 96:7 98:16
98:17 99:16
103:21 106:20
107:2,4,14,20
108:20 110:4
113:21 115:4,10
115:21 122:2
126:6 137:12,14
137:22 138:4
140:18,19,25
148:9,11
**correctly** 21:14
**counsel** 4:11
**counseling** 121:20
121:24 122:8,11
**County** 13:14,22
14:11,11,11,20
15:3 18:19 19:6
148:4 150:4
**couple** 59:11 71:16
71:18,22 86:23
123:16 140:15
143:22 144:11
**course** 28:24 46:16
147:2
**courses** 25:21
**coursework** 12:7
**court** 1:1 3:13
141:21
**covered** 25:7
**crazy** 91:20
**CRB** 119:11

**crime** 11:19,24
  12:18
**criminal** 7:4,6 12:6
  12:8,17 16:12
  25:21
**critique** 117:14
**cross** 37:2
**CTY152473876**
  73:17
**cuff** 131:5
**currently** 14:16

**D**

**D** 4:1 5:1,1 76:13
  148:1
**D09D** 77:15
**D29D** 76:4,25
**Daniel** 80:17,17
**date** 1:17 20:15
  21:6 52:9,11
  53:13,14 73:9
  85:21
**David** 1:3 78:20
  130:5
**day** 44:18,20,21
  46:4,9 73:25
  74:21 148:17
  150:18
**days** 24:12 45:2
**DCJS** 25:24
**deadly** 39:21,22
  51:16,17
**deal** 8:24
**dealing** 73:4
**death** 40:4
**debrief** 115:22,24
  116:11,15
**decide** 16:24
**decided** 57:2
  103:24
**decision** 38:25
  55:23 56:7,16,20
**decisions** 56:12
**deemed** 3:16 85:19
  149:11
**deescalate** 33:19,23
**deescalation** 32:24
**defend** 33:14 41:23

**defendant** 15:17
  112:23
**defendant's** 146:17
**defendants** 1:7,15
  2:10 30:11
**defending** 38:17
**defense** 38:16
**defensive** 33:5,8
**degree** 11:8 12:8,17
**degrees** 42:7 92:11
**Del** 118:3
**Dempsey** 22:22
  54:9,11 55:20,22
  56:25 58:22 60:24
  71:18 72:14 79:11
  82:18 87:18,21
  94:10 95:22 109:7
  112:6 114:22,25
**dep** 141:20
**department** 2:10
  7:16 8:8 10:5,17
  13:13,21 14:5,13
  17:3 28:11,12
  30:8 32:15 45:24
  46:6 50:19 106:25
  107:13 117:3,17
  117:22 120:3,23
**department's** 50:16
**departments**
  117:11
**depend** 62:13
  113:22,23,25
**depends** 24:6 25:23
  40:17,18 44:17
  57:21 62:12 69:24
  107:8 137:13,14
**depicts** 98:7 101:11
**deposition** 1:13 3:6
  3:11 4:3,5,6 6:7,9
  7:9,19 10:21
  15:19 16:11 29:8
  29:13,16,21 30:8
  30:16 31:14,17,18
  32:10 41:23 42:9
  42:23 115:7
  140:16 141:3,9
  142:4 144:5 148:8
**depositions** 141:16

  141:22
**describe** 98:18
**described** 27:15
**DESCRIPTION**
  149:8
**determination** 27:4
**Development** 26:4
**dialogue** 35:3
**difference** 23:16
  37:7
**different** 12:13
  14:8 22:18 23:10
  23:10 28:25 39:22
  96:3 117:5 133:3
  145:2,9,20
**differently** 145:22
**dig** 122:7
**digital** 147:10
**direct** 119:6
**directing** 41:14
**directly** 12:17
  51:10 99:15,18
**directs** 37:17
**disagree** 133:5
**discharge** 121:5,8
  122:10
**discharged** 121:3
**disciplined** 119:18
**discretion** 69:18
  114:2,5
**discuss** 56:8
**discussed** 43:12
**discussion** 56:11
**dislocated** 80:15
**dismissed** 16:5,6,8
  16:9
**disobeying** 63:2
**dispatch** 55:8 57:24
  58:11 76:20
**dispatched** 74:17
**dispatcher** 58:4
  75:14
**DISPER** 74:14
**DISTRICT** 1:1,1
**division** 14:9,10
  25:21
**divisions** 14:8
**DO9D** 79:18

**document** 70:3,18
  70:19 143:21
**documented** 69:4
  69:13,20,23 70:5
  70:9 114:11
**documents** 84:19
**doing** 6:6,8 23:21
  42:21 51:25 52:4
  65:8 83:17 84:9
  86:20 95:8,24
  96:2 104:22 116:3
  134:19 146:22
**door** 99:13 106:15
**downtown** 14:9
**drag** 96:11 97:14
**dragged** 96:17
**dragging** 96:11
  97:15
**Drake** 59:16,17
  60:14 76:14,16
  83:12 90:3 123:25
  124:3 125:25
  126:4 128:2
**Dreyhan** 22:24
**drive** 24:10
**driver** 24:4 56:3
**driver's** 87:14
**driving** 24:18,19,21
  55:19,20,21 74:24
**drug** 120:19
**drugs** 69:22 70:2,3
  70:11
**duly** 5:2 150:9
**duplicate** 28:13
**duplication** 81:11
**duties** 23:19

**E**

**E** 2:1,1 4:1,1 148:1
  148:1
**e-mail** 2:6,14
  147:13
**earlier** 15:14 43:12
  83:15 94:9 123:8
  124:23 137:11
  141:14
**EAW** 1:5
**ECD** 58:2,4 73:3,7

  73:11 86:16
  149:10
**economic** 11:19
  12:18
**education** 11:7
**educational** 10:23
**Eerie** 13:14 14:11
  14:20 15:3 19:6
**effect** 3:12 33:13
**effecting** 34:20
**effectuate** 37:12,23
**effectuating** 38:15
**either** 12:15 49:25
  51:25 74:13 83:12
  138:7 150:13
**elaborate** 36:19
**electronic** 147:12
**elevated** 119:12
**Elliot** 2:5 5:16 8:22
  111:14 141:22
  147:3
**employed** 10:4
  13:19
**employment** 18:9
**EMTs** 107:23
**encounter** 33:18
**ends** 36:4
**enforcement** 13:14
  13:22 35:19
**entire** 22:9 33:18
  33:24 46:4,6 93:7
**entry** 73:23 75:23
  75:24 82:19
**environment**
  117:13
**equal** 137:20
**Eric** 81:18
**escalate** 33:23
**escalating** 36:4
**escalation** 32:24
**escape** 130:23
**escaped** 130:12,19
  130:25 131:18
**escorting** 113:20
**eshields@rothan...**
  2:6
**ESQ** 2:5,13
**established** 137:11

et 1:6
eventually 18:7
  80:4
everybody 19:25
  28:11 47:23
  117:14
exact 78:17
exactly 15:11 21:5
  28:13 131:23
EXAMINATION
  5:11 53:2 144:14
examined 5:3
example 14:24
  26:23 27:19 28:4
  37:15,21 38:14
  45:7,19 46:9
  62:13 66:18 67:24
examples 27:18
excessive 118:22
  119:7
Exchange 5:9
exhibit 72:22 73:2
  73:8 85:16,20
EXHIBITS 149:7,9
exit 88:21
exited 59:3,5,10
  87:13,17
experience 13:11
  48:12
explain 24:21 26:21
  35:15 114:7 121:2
exposed 28:24
extended 98:3
extra 21:16
eyewash 80:20 81:2

F
F.R.C.P 3:15,17
face 50:2 94:13
  96:24 136:18,20
  136:21 137:4,10
  137:16
face-to-face 18:13
faced 138:7
facedown 50:2,3
fact 70:8
facts 54:22
fair 44:25 96:12

97:16,24 107:24
  108:14 125:9
fall 33:5 39:18
  51:11
false 7:13
far 6:2 9:22 15:20
  33:24
fast 124:25 125:3,4
  129:23 130:2
faster 145:22
federal 1:16 3:1
  107:4
feel 114:10
feet 61:8,11,14,16
  62:2,7,11 64:14
  64:18,21 67:8
  89:14 93:17 96:11
  96:17,18 97:15
  98:16,19
felt 17:3
field 11:16 13:16,23
  15:8 20:9,17,19
  21:10,17,19,20
  22:9,11,15,20,21
  23:11,21 27:5
  28:17,19,20 53:20
  53:24 54:4,7 56:9
  56:17 57:9 71:19
  114:19 116:7,10
  116:11,15,17
fight 36:4 105:16
fighting 90:10
  93:11,13 105:21
  106:3 111:2
figure 71:10 84:13
  85:17
figuring 83:15
File 2:6
filed 31:22 32:13,14
  119:22
filing 3:5
fill 22:14 28:9,16
  113:13,15 115:2
final 22:25 24:15
find 68:4 70:2,10
  71:4 120:7
finding 69:9
fine 144:9

finish 111:24
fire 118:11
firearm 39:25
  121:3,5,9 122:10
firearms 45:7,11,12
  45:16
first 5:2 10:22 17:9
  17:15 24:9,12
  58:25 60:24 76:19
  103:24 132:22
  136:5
five 52:19 77:21,23
flipped 88:12
fluid 145:22
follow 27:17 62:23
followed 115:21
following 26:13
  62:20
follows 5:3
footage 29:11 119:8
force 3:12 27:9,20
  29:4 32:22,23,25
  33:6,17,19 34:24
  34:25 37:9,12,22
  38:15,19,22 39:4
  39:19,21,23 40:3
  40:6,7,13,16,23
  43:13 48:7,9,15
  48:19,23 50:24
  51:2,7,12,15,16
  51:17 52:7 98:23
  107:7 113:19
  114:11 116:20
  117:3,4 118:20
  119:7 137:12,17
  137:19,21 138:3,5
  138:7,9 139:18
forgot 29:6 143:12
form 3:8
forth 93:19 112:16
  150:9
forward 65:21
  105:9 124:25
  129:23 136:4
forwarded 125:4
  130:2
forwarding 125:3
found 68:6,9 69:12

69:16 70:20
four 15:12 20:14
  22:5,5,8,8,11 23:4
  28:24 34:25 45:2
  88:4 143:4
four-year-old
  111:17
frame 30:15
fraud 11:24
freeze 97:19
freeze-frame 97:18
  97:20,22 102:12
  102:17 134:25
front 126:4
Frontier 7:21 8:4
FTO 23:23,24
full 5:5 19:2,21,25
  123:4 142:5 143:3
full-time 20:7
functions 26:8,8
further 3:7,10,14
  4:8 24:7 26:22
  89:24 147:4
  150:12

G
G 4:1 148:1
general 23:7,9 26:5
  28:10 31:19 40:3
  40:21 43:9 51:22
  56:3 57:19 80:13
  82:13,23 95:21
  96:2 114:4 116:19
  117:2 118:12
generally 13:3 14:6
  132:11
Genesee 14:11
geographic 14:6
gesture 125:12
getting 17:7 53:12
  137:20
give 8:2,16 13:10
  31:3 37:15,21
  38:14 41:11 46:14
  46:22
given 7:7 28:15
  121:11 133:2
  148:11 150:11

gives 41:12
giving 8:18 31:6
  41:5
gladly 5:20
gloves 109:9
go 9:23 10:21,25
  14:24 16:4,24
  18:3 19:4 21:17
  27:25 28:19,21
  37:18 43:7 46:13
  55:23 56:7,21,22
  56:23 57:2 68:18
  72:13,16 73:20
  74:9 75:16 76:24
  78:5 80:12,16
  82:16 88:17 91:7
  98:10 102:23
  103:9 104:17
  106:15 111:13,15
  111:21 123:7,12
  132:17 140:2
  141:23 142:5
goal 107:8,11
God 123:2
goes 36:7 106:13
  119:12
going 5:17,24 6:19
  10:21,22 19:18
  25:5 26:6 30:18
  31:14 72:21,22
  73:20 74:10 76:20
  78:4,7 82:25 83:6
  83:11,18 84:12
  85:7,9,12,22 86:8
  86:20,25 87:25
  88:8,15,16,24
  90:4,5,7,24 91:7
  91:19,25 92:19,22
  92:24 93:19 94:4
  94:8,15 95:6,17
  97:5,12,19 98:10
  98:11 99:7,9
  100:7,9 102:3,5
  104:13,15,22
  105:4,18,20
  107:16,18 108:10
  109:17 110:12,16
  111:8,9,11,19,25

112:4 122:4
123:15,20 124:12
124:25 125:17,19
126:12 127:5,8,13
127:24 128:16
129:22,23 130:6
131:6,7,7,13
134:4,12 136:15
138:13,19,20
140:12 141:15,21
142:15,19 144:12
**good** 5:13,15,22 9:2
25:13 52:13
147:10
**governs** 50:23
**grabbed** 102:8
**grabbing** 127:19
135:3
**graduated** 43:20
**Graham** 27:8 28:5
**gray** 74:2
**great** 73:16 84:22
86:8
**greater** 39:4
**ground** 39:11 48:16
48:21 49:3,5 59:8
83:22,25 88:5
94:13 97:16 99:24
100:4 134:7 140:4
**guard** 13:7
**guess** 25:10 26:13
26:21 27:16 28:23
35:24 38:7 47:13
50:6 53:23 55:25
62:20 72:20,25
80:24 81:21 85:15
131:20
**gun** 35:10 69:19
70:21,23,25 71:2
71:4
**guns** 70:11
**guy** 42:7 92:10,13
**guys** 88:21 96:3
99:4 140:14

**H**
**11:12
**half** 46:9

**Hall** 2:11 6:10
**Hamburg** 11:14
**hand** 40:22 61:4,10
66:19 125:11
126:17,25 127:11
128:3 150:18
**handcuff** 126:17,24
127:10 131:25
132:12 133:23
**handcuffed** 48:6,8
48:17 49:3,5,9,19
51:8 89:20 102:9
102:25 126:9,10
130:16 132:15
137:4,10
**handcuffing** 113:19
**handcuffs** 48:14,20
130:12,13,20,21
130:24 131:2,19
133:13,22
**handle** 79:7
**handling** 106:11
**handouts** 46:14,16
46:23
**hands** 34:22 36:25
89:19 91:2 93:17
102:9,19 110:20
125:22 126:7,10
128:6,6,8 131:5,5
132:5 133:13,15
133:16,18 134:16
135:7 146:19
**hanging** 73:25
**happen** 55:24
56:24
**happened** 16:3
17:23 18:4 64:5
64:10 88:13
114:10,13 115:13
115:16 120:15,18
**happening** 90:15
109:22 145:15
**happens** 18:11
19:13 68:24 71:4
99:20 136:9
**hard** 15:11 28:13
39:6 78:6 104:17
**head** 40:16 50:8

78:7 81:3 100:15
101:24 102:10,20
103:13 104:5,22
105:6 106:23
107:12 108:22
110:21 127:19
128:12 135:10
137:11 138:6
143:20
**headed** 69:3
**headquarters**
47:16
**hear** 55:7 56:14,18
58:5
**heard** 55:6,11,16
78:18
**hearing** 78:15
**held** 1:17
**help** 6:15 42:8
56:19 61:25 79:7
**helped** 61:7 63:19
103:15
**Henry** 11:12
**hereinbefore** 150:9
**hereunto** 150:17
**Hey** 34:10 38:2
47:6 56:22
**high** 10:25
**highest** 11:6
**Highland** 81:18,22
81:25
**Hilbert** 11:10,12
12:3,10
**hired** 13:12 14:4
17:5,7 18:18
**history** 120:6
122:20
**hit** 85:22,24 87:11
88:8,10 90:5
93:17 94:4,15,24
98:11 99:7,9
100:7 101:6 102:3
102:5 104:13,22
105:18 107:16
108:10 109:17
110:12 120:19
122:10 123:11
124:12 125:17

126:12 127:6,13
127:24 128:16
129:12
**hitting** 98:25
112:12 127:23
**hobble** 113:20
**hold** 142:4
**holding** 61:20,21
65:10,16,18 90:25
95:22 98:3,8
100:14 134:11
**home** 47:17
**hoodie** 74:2
**hooked** 61:15 98:20
**hopefully** 123:17
**hospital** 72:16
81:18,22 82:13,23
83:2,5,6
**hostage** 140:21,24
**Houdini** 130:19
**hour** 30:5 46:9
141:3,6 142:12
**hours** 20:4 43:24
44:4 141:7 142:12
143:4
**huge** 8:23
**hundred** 14:17
**hurt** 66:18
**hypothetical** 41:6,8
41:17 42:12 119:4
**hypothetically** 9:22
136:25 137:3

**I**
**idea** 28:23 35:9
44:8 70:17 82:19
**identification** 73:9
85:21
**ifs** 9:23
**II** 23:17 57:8
**illegal** 69:10,12
70:2,11
**image** 108:25
**imagine** 24:23
47:18
**immediately** 78:11
104:4
**imply** 138:11

**implying** 137:23
**importance** 71:9
**important** 71:11
86:20 143:18
**improper** 42:2,25
91:24
**in-house** 44:9 117:6
**in-service** 43:25
44:2,5,20,23 45:5
46:13
**inappropriate**
117:24
**inaudible** 30:12
41:9 42:18 118:24
133:6
**incident** 28:16,22
29:22 31:23,24,25
52:10,12 53:13,15
54:13,17,19,23
57:17,20 59:18
67:13 69:8 73:17
75:14 106:9,12
113:13 114:15
115:3,5,13,15,23
115:23,25 116:9
116:20,22 118:8
118:16,17 119:18
120:6,11,18 143:2
143:16 144:9
145:6
**incidents** 28:25
117:3,8,12 119:21
**include** 40:6 85:18
138:6
**Including** 20:17
**independent** 61:23
71:25
**independently** 66:2
**INDEX** 149:1
**indicate** 4:14
133:21
**indicating** 73:14,18
74:11 75:4,8,25
78:5 82:20 84:16
85:25 86:10,24
87:23 88:6 91:3
94:21 95:12 99:25
100:23 101:25

102:23 108:19
109:6 123:24
124:3
**individuals** 144:19
144:24 145:17
**inflict** 51:5 107:12
**inflicting** 106:24
**inform** 114:12
**information** 8:19
57:16,20,23
142:24
**informed** 115:2
**initial** 76:20
**initially** 105:8
**injured** 5:17 58:17
72:17 80:13 81:19
81:23 82:13 83:8
83:10 122:18
**injuries** 54:25
**injury** 40:4 51:21
52:2,6 122:23
**input** 77:4,9
**inside** 9:13 10:16
47:15 103:24
**instances** 69:25
**instructing** 42:16
**instruction** 31:6
**instructions** 31:3
41:11
**Instructor** 26:4
**instructors** 59:25
**intended** 93:18
**intentions** 135:18
**interacted** 67:12
**interacting** 144:19
144:23 145:16
146:3
**interaction** 115:18
**interested** 150:15
**internal** 47:11
119:22 120:2
**intimidating** 35:11
**intimidation** 35:20
35:22
**investigation** 11:20
11:25 12:18
120:14
**involve** 12:6 36:16

**involved** 15:15 25:2
28:22 31:15,23
70:15 116:20
120:11
**involvement**
115:19,23,24
**involves** 37:8 39:3
**Isaac** 82:10
**issue** 24:18,23
**items** 66:22

**J**

**jacket** 74:2
**January** 13:12,20
18:19
**Jeanine** 1:18 43:2
72:25 150:6,21
**Jeffrey** 75:10 77:25
**job** 19:19 26:7
28:25 92:14
**jobs** 12:23 13:3
**John** 2:13 30:4,17
30:25 40:25 41:7
41:19,25 42:24
91:18 92:4,16
93:2 97:25 102:14
111:23 115:6
122:7 124:20
132:19 133:3
135:20,25 139:6
140:10 141:13,25
142:9
**john.campolieto...**
2:14
**Joseph** 82:7
**judge** 3:13 8:21
16:9 42:3
**July** 20:23
**jump** 70:21
**June** 20:23
**jurisdictional**
14:10
**jury** 16:11
**justice** 12:9,17
25:22
**justified** 138:3
**Justin** 22:21 23:3

**K**

**K** 5:1 148:1
**keep** 42:3 86:20
108:25
**Kenmore** 11:2,4,5
11:5
**Kephart** 78:20
86:12,13 87:8,21
94:10 95:3,7,23
96:9 97:8
**Kephart's** 96:2
**Kester** 59:16,17
60:14 75:10,13,20
75:23,25 83:12
123:23 124:2
125:11 126:2
127:19 128:11
**kick** 93:18
**kicking** 50:5 89:13
**kicks** 39:7,9
**kids** 13:5
**killed** 118:4 121:17
**kind** 13:3 22:8
35:15 36:2 41:13
56:8 57:6 59:13
63:25 86:12 96:10
96:20 97:14
101:24 105:7
107:22,22 110:2
112:15 121:19
125:8 128:12,22
129:5 130:19
**knee** 91:2
**kneeled** 61:4
**kneeling** 146:16
**knees** 49:24
**knew** 58:18
**know** 7:12,14 8:24
9:22 10:7,10
14:16 25:7,10
27:7,20 30:5,18
31:2 32:3,18
34:10 36:2 38:2
39:14 40:14 44:3
45:6,18 46:7,18
46:24 47:19 49:8
50:25 56:6 58:7
59:17 60:13,18,25

63:7,9 64:16,22
65:7 67:10,16,23
69:15,19 71:24
73:5 74:11,12,13
74:14 75:16 79:22
79:22 80:23 81:9
82:2,3,4,12,15
83:23 85:18,24
86:9 87:2,4,13
88:14 89:9,10,11
89:18,21 90:12,13
90:14,14,18 91:15
91:17 92:17,19
93:14,18,24 94:3
94:19,20 95:16
96:16 98:8 99:18
101:3,12 102:15
102:21,22,25
103:5,11 106:4,5
106:8,14,16,18
109:6 110:11,23
111:3,4,5,12
112:22 117:20,23
118:21 119:11,13
120:5,8,22 122:8
126:18 127:12
129:7 131:2,20
132:2,2 133:4,14
133:24 134:15
135:5,18,22
136:19,23 137:7,7
137:21 140:6,8,13
141:19 142:10,18
143:7,8
**knowing** 58:14
**knowledge** 63:18
**known** 36:3
**Koerner** 1:18 150:6
150:21

**L**

**L** 148:1
**labeled** 76:20
**lacerations** 80:20
81:3
**LaFave** 77:25 78:3
78:3,19 94:22,23
96:22,25 107:20

107:24 108:15
112:7
**Lafave's** 95:4
**Laiosa** 82:7
**landed** 95:4
**language** 96:16
**lasted** 21:13 22:5
**late** 141:9
**lateral** 19:14
**law** 2:10 9:6,12,17
13:14,22 27:25
28:2 35:19 43:16
45:19 46:3 50:22
51:2 107:4
**laws** 26:24
**lawsuit** 15:14 29:23
31:16,21 32:10
53:15
**laying** 48:20 59:12
**lays** 51:2
**leads** 62:3
**League** 32:4
**leaned** 65:23
**leaning** 65:21 105:8
**learn** 26:6 28:20,25
51:6 115:9
**learned** 25:6
**learning** 23:10
**leave** 38:2,3,8 73:25
**left** 9:11 28:14 61:5
61:10 71:16,18,19
72:14 84:16 85:13
90:17 93:9 94:16
95:19 97:9,12
98:15 99:10 100:6
100:10 101:22
102:6 104:12,25
105:5,19,25 108:9
108:13 109:16,20
110:14,17 112:10
113:4 124:6 125:5
125:20 126:15,17
126:24 127:4,9,11
127:17,25 128:17
128:21 129:17
130:3,10 131:11
131:14 134:5,21
135:11 136:14

143:4
g 90:17 136:5
leg's 136:4
Legally 48:11
legs 93:19 98:2,23
146:19
let's 8:11 20:4 22:5
25:5 28:19 32:21
50:3 52:9 56:16
69:7 73:4 85:11
89:22,23 90:20,21
96:14,19 104:7
111:6 113:3,12
117:20 118:15,21
126:19 129:8,16
132:6,6 133:25
136:8,20,24
143:20
lethal 39:19
letter 18:7
level 11:6 35:3,16
36:5,10,15,20
37:4,8,8,8,12,22
38:15 39:3,4,13
39:14,14,16,17,18
39:19 40:6,16,22
43:10 51:2,15
52:7,8 117:4
119:16 137:12,16
137:19,21,24
138:5,7,8 139:17
145:3
levels 32:25,25
34:25
Lexington 2:3
library 47:21
license 75:2,3
lieu 4:9
Lieutenant 22:21
23:2
lift 62:19
lifted 61:16 65:20
96:17,19 98:20
lifting 110:9
lights 58:8 80:10
limbo 24:12,14
mit 143:3
lines 21:6

listed 82:18 86:17
120:6
listen 107:9
little 6:20 11:21
23:14 25:18 32:3
53:4 85:6 86:8
88:17,20 89:24
90:17 96:9,15
97:16 110:6 125:2
126:19 129:23
131:24 136:5
142:7,8
live 8:13,17,25 9:6
9:13,18 10:3,3,5
10:16
LLP 2:2
location 55:18
lodged 120:3
long 14:21 15:10
18:22 20:13 21:13
29:25 30:3 44:16
46:8 72:2 83:15
122:22 142:15
long-sleeved 74:5
longer 70:14
111:15,25
look 31:8 77:19
88:13,23 89:2,13
89:14,16,19 90:9
93:11,22,25 95:14
96:20 98:22
100:22 102:8
104:8 105:11
106:3 110:8,19,25
112:6,15,19
126:16 127:18
128:2,22 129:11
129:12 130:11,18
131:24 132:5,7
134:19 135:2,14
135:19 136:17
137:5 143:5,17,21
looked 57:18 86:16
105:8 112:25
134:9,11
looking 96:21
101:4 133:3
145:14 146:21

looks 73:11 76:13
84:23 86:12 87:15
89:4,6 91:11 94:9
94:12 95:4,17,21
96:8,10 97:8,11
97:13 98:3 99:4
99:12 100:13
101:23 105:6,21
108:4,14 109:2,7
110:2 125:7,21,24
126:7,17,23
127:10 128:5,11
129:5 135:21,25
136:3
lot 8:5 10:14
loudly 54:24 55:3
LSW 74:2,5

M
M 5:1 148:1
magistrate 16:7
making 9:12 34:14
38:25 41:25 42:25
56:12 93:3 119:10
125:12
male 73:24 74:2
man 5:17 124:7
143:11
mandatory 122:15
manner 4:13
manually 77:9
March 1:10 148:8
Margaret 22:24
marked 73:8 85:19
149:11
marriage 150:13
match 74:23 75:3
materials 46:17,23
matrix 29:4 32:22
32:23 33:6 34:25
48:4
matter 6:20 150:16
matters 12:6 16:12
Matthew 76:14
mayor 9:5,11 10:2
McGraw 81:18,22
81:25
mean 9:21,22 10:13

16:12 22:3 24:2
24:21,21 25:18
26:14,15 35:24
36:13,14 38:18,24
40:9,14,15 43:25
49:22 50:21 53:23
55:4 63:19 69:15
70:10 71:15,19,23
71:23 74:11,14
76:5,10 78:2,4,6
79:6,24 80:6,22
81:20 82:12,22
92:13 93:9,13
97:18 101:3 107:6
116:8 117:9
118:19 119:9
121:23 131:21
132:22 136:24,25
141:20 143:6
means 26:20 35:6
72:23 74:15 75:13
75:17 76:18 82:20
meant 16:14 46:11
59:25 80:8 114:7
medical 67:22
meet 18:10
meeting 18:13 29:9
29:25 30:3
member 140:21
mentioned 15:13
24:17
met 82:3
microphone 54:25
55:4
midnight 81:15
midsection 84:6
minimized 101:8
minimum 26:16
minor 116:25
minute 8:11
minutes 30:5,6
46:12,12 52:20
71:16,18,22 77:18
77:22,23 83:17
Misc 77:15
Miscellaneous
78:21
missed 142:13

143:20
Mitchell 60:19 76:7
76:16 83:21 88:2
90:3,23,25 91:11
93:12,15 94:2,11
95:22 96:10 97:13
98:3 99:13 100:14
101:14 102:8
103:12 104:4
106:11,22 108:16
109:23 110:5,19
112:15,19 125:25
125:25 126:16,24
128:5 130:5 135:3
135:15,17,23
136:18 137:9
Mitchell's 128:3
135:6
MJP 1:5
money 68:20,24
Monroe 13:22
18:19
month 22:6,7,7,8
22:12 121:12
months 15:4,7,12
18:23 20:14,22
21:7 22:5 28:24
122:24
mount 49:9,12,20
49:21
mounted 49:23
mouse 73:13
100:24
move 10:5 42:22
52:9 90:18 130:19
138:14 140:16
moved 60:5 62:3
96:9 100:25
112:19 129:12
139:8,22
movement 88:14
moves 129:20
moving 73:14 89:15
90:16 91:16 93:17
101:12 112:23
Multiple 42:17 92:8
133:7 137:25
muscle 98:23

**N**

2:1 4:1 148:1,1
**name** 4:15 5:5,16
7:22,24 8:2 50:6
86:17
**named** 15:17,21
**nature** 70:11
**near** 124:8
**nearby** 62:2
**necessarily** 35:20
38:19 66:22 68:11
69:6 75:3 115:15
**necessary** 33:24
114:20,24 116:25
140:4
**neck** 127:19 135:4
135:9
**need** 8:17 38:2 42:7
52:14 56:22 79:7
79:18 80:10,12
85:5 92:4,11
114:12,18,22
122:20 140:12
142:10
**needed** 62:11 78:25
114:21 115:20
143:7
**needles** 66:18
**needs** 114:11
**negotiation** 140:21
140:24
**never** 16:11 115:9
115:11 117:22
**new** 1:1,19 2:4,4,9
2:12 5:10 11:4,5
11:14 15:6 17:3
19:14 50:19,21,22
73:5 142:16 148:3
150:3,7
**NFTA** 8:5 13:13,18
14:4,15,23 15:9
15:15 16:16,25
**Niagara** 7:20 8:2,4
14:11
**night** 54:13 67:13
69:8 78:18 83:2,5
83:7 106:11
**non-verbal** 35:4

36:21 37:3
**nonresistive** 48:9
**nonresponsive**
138:16 139:8,22
**nontraditional** 40:7
40:10,12
**normal** 113:11
**Notary** 1:18 3:12
5:2 148:19 150:6
**NOTED** 147:14
**Notice** 1:17
**number** 43:24
73:17 74:19,24
75:2,2,3,6,8,23
79:13 141:19

**O**

**O** 4:1 5:1 148:1
**o'clock** 111:18,20
141:4,4
**O'Connor** 27:8
28:5
**o0o** 4:19 147:15
**oath** 4:9,10 6:23 7:7
148:8
**object** 30:22 31:2
41:12,23 92:14,15
92:24,25 97:20
102:11 134:24
141:15
**objected** 91:24
139:9,25
**objecting** 31:4 41:2
41:10 91:25
**objection** 9:8,20
23:12 25:15 26:12
26:18 27:14 28:7
30:20,21 33:10,21
34:4 35:12 37:16
38:6,11 39:12
40:8,24 43:6
51:19 65:14 89:8
91:4,14 92:24
97:17 102:15
105:13 107:5
118:23 119:3
121:21 128:25
132:13,21 135:16

138:15,18
**objectionable** 41:3
41:5 92:21 97:23
**objections** 3:8 4:13
41:15 42:2,11,12
42:15,25 91:20
93:4
**objective** 27:8 85:8
**objectively** 27:21
**objects** 37:17
145:12
**observational**
24:10,13
**obvious** 146:9
**obviously** 39:14,25
**OC** 36:17
**occurring** 54:23
**offer** 18:8
**offering** 134:16
**office** 9:11 47:23,25
56:17
**officer** 1:14 5:14
7:16 9:19 10:17
13:17,20,25 17:11
18:8 19:13,23
21:20 22:12,20,22
22:22,23,24 23:2
23:19 24:24 26:7
26:17 30:24 35:10
35:19,25 41:18
42:6 51:25 52:5,7
53:4,21,25 54:5,8
54:9,11 56:9,18
59:13,16,16 60:15
60:19 64:20 65:4
65:6,8,11,17,20
69:2,5,17 70:14
71:5,20 73:10
75:7,13,25 76:6
76:11,21 77:16
81:19,22,23,24
82:18 83:21 84:3
84:5,14 85:25
86:10,12 87:7,9
87:13,17,21,21,22
90:3,3,23,25
91:11,23 92:3,6
92:10 93:12,15

94:2,10,10,20
95:4,7 97:21 98:3
99:13 100:14
101:14 103:12
104:4 106:11
107:25 108:7,16
109:7,23 110:5,19
113:12 114:19
115:17 116:7,10
116:12,16,18
118:3,13 119:11
120:5 121:12
122:20 123:23,24
125:14 127:19
128:2,3,5,11
130:5 131:18
132:10,11 135:3,6
135:15,17,23
136:18 137:9,22
138:2,8 140:13
144:16 146:18
**officer's** 48:17 49:8
49:22 106:7
**officers** 9:6,13
14:15,24 19:15
22:16 23:4 26:3
31:15,22 54:24
55:3,6,10,17
56:22 58:17,21
59:11,15 60:11
61:20 62:6 67:9
72:6,17 76:17,25
78:23 79:5,7,17
79:19 80:4,9,14
81:6 82:14 83:20
90:10 117:4,9,13
**offset** 118:10
**Oh** 66:21 85:24
101:6,13 106:8
113:10 123:11
134:9 143:11,22
**oil** 13:4
**okay** 5:21 6:6 7:6
7:15,22,25 8:6 9:4
9:14 10:20,24
11:5,13 12:16
13:7 15:4,8,13
16:3,6,15 17:11

17:14,18,22 18:4
18:25 20:8 21:16
21:22 22:18 23:5
24:8,16 25:24
30:10,22 32:18,21
33:4,12 34:2,24
35:15 36:6,10,16
37:25 38:13 39:3
42:8,24 44:5 45:4
46:8,13 47:20,25
48:4 51:22 53:12
54:3,7 55:3,10
57:8,13,22 58:2
59:6 60:8,23 61:6
61:13 64:23 65:6
65:11 68:23 69:7
69:25 71:3 72:13
72:19,21 73:16,20
73:22 74:8,11,18
74:25 75:6,10,13
75:16,19 76:3,13
76:22 77:10,14,15
77:23 78:12,15,19
79:4,9,16 80:25
81:13 82:6,16,22
82:25 83:4,8,11
84:8,14,22,25
85:9,10,18,23
86:6,8,15,20 87:5
87:16,20,25 88:2
88:3,8,15,17,19
88:21 89:4,13,23
89:24 90:4,16,20
91:8,18 92:2,16
92:21 93:2,5,25
94:4,15,23,23
95:6,8,9,14 96:5,8
96:19 97:3 98:5,6
99:7 100:5,7,17
101:13,17,19,20
102:19 104:7,9,12
104:22 105:11,22
106:5,18 107:9
108:3,8,18,21
109:3,8,14 110:8
111:4,6,11,13,25
112:2,22 113:3,8
113:10,25 114:7

114:13,25 115:5
116:14,19 117:2
117:19 118:15
120:11 121:4,8,19
122:12,14 123:2,6
123:8,17,18 124:4
124:5,12,12,19,25
125:4,6,17,19,24
126:4,7,12,20
127:3,13,14,23
128:8,11,16 129:5
129:15,21,24
130:3,6,9 131:3,6
131:8,11 132:4
133:9,11 134:14
134:18 135:2,6,24
136:10 137:9
140:2,3,7 141:2,8
141:12 142:13
143:13 144:3,6,10
146:9
old 142:16
once 13:16,24
16:10 48:5
ones 82:6
online 117:11
oo0oo 3:20
open 142:5
opened 99:13
operating 24:24
opinion 100:2
opportunity 53:6
oppose 43:8 96:16
order 83:19 86:16
orders 38:3
original 87:9
outcome 150:15
outside 10:3 38:4
overview 13:10

**P**
P 2:1,1 4:1
p.m 1:10 52:22,22
85:3 140:17,17
142:7 147:14
P.O 6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1

16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:6,13
packet 17:25 18:3
page 80:11 81:8
149:2,8

pain 50:13 51:5
59:13 106:24
107:7,12
panel 18:11
papers 6:14,17
paperwork 28:9,12
28:16,21 29:15
32:7,11 113:13
115:2
parameters 73:17
Park 120:12
part 18:2 29:22
33:14 36:5 40:11
43:8 65:22,23
101:18 115:16
118:18 123:3
124:16,19,22
126:20 139:15
140:23 146:5,6
part-time 12:23
participating 4:3
particular 11:15
parties 3:4,15 4:11
150:13
parts 146:10
pass 17:15
passed 17:18
passenger 24:2
patrol 59:3,5 62:2,4
65:21,23 71:6,8
86:21,25 90:7
94:8 95:17 97:6
97:12 99:9 100:9
102:5 104:15
105:4 107:18
109:5 110:16
112:5 123:20
124:14 125:19
127:8 129:22
131:13 134:4
paused 86:11 87:2
87:11 88:12 90:4
91:11 93:8 97:7
98:14,14 99:2
100:5,12 108:8
109:13,15,24
110:10 112:10

123:21 124:5,15
126:14,22,23
127:16,24 128:20
131:16 132:8
133:11 136:13
pausing 105:24
108:12 109:19
112:14 130:9
pay 132:4
paying 145:14,23
146:20
Pearson 118:3
people 21:23 22:8
22:14 36:2 66:23
103:6 116:15
133:4 145:12
pep 50:5
pepper 49:4,6,10
49:15,19 50:12
51:4
perfectly 42:20
perform 65:3
performed 68:3
130:18
performing 66:7,11
period 24:13 71:13
106:2 115:12
130:11 131:17
permission 141:21
141:24
person 4:9 22:2,4,6
22:6,7,7 38:3,20
38:23 39:2 48:7
48:19 51:20 52:2
74:16 99:21
108:18 121:9,14
121:20 124:9
138:8
person's 49:5 50:2
personally 56:20
perspective 106:7
persuasion 36:11
phase 22:25 23:17
23:17,19 24:9,11
24:14 56:10 57:8
60:6
phases 22:11,19
23:10

Philbert 11:11
phonetic 22:24
phrase 34:16
phrased 91:22
phrases 34:19
physical 17:20 18:2
35:6 37:9 39:21
39:23 40:4,7,13
51:16,17,21 52:2
52:6 137:5
physically 4:4 63:4
63:8,11,13 65:12
134:16
picked 99:25
picture 96:21 98:2
pictures 100:20,25
place 36:25
placed 13:15 61:4
71:7 72:3,7,11
104:4 106:13
110:20
places 71:5
placing 61:9
plaintiff 1:4,15 2:3
146:4
Plaintiff's 73:8
85:20 149:8
plan 6:15 111:25
143:25
planned 142:6
plate 75:2
platoon 46:2
play 85:12,22,24
86:21 87:11 88:8
88:10 90:5 94:4
94:15,24 98:11,25
99:7 100:7 101:6
102:3 104:13,23
105:18 107:16
108:10 109:17
110:12 111:11,16
112:12 123:7,15
124:12 125:17
126:12 127:6,13
127:23,24 128:16
129:8,14 130:6
131:7 133:8,25
136:15 138:21

played 82:5 86:7,22
  87:6,12 88:9,18
  88:22 89:5,25
  90:6,22 91:9 93:6
  93:8 94:7,18,25
  95:10 97:4 98:12
  99:8 100:8 102:4
  102:16 104:10,14
  104:19,24 105:3
  105:23 106:2
  107:17 108:11
  109:4,18 110:15
  112:13 113:6
  117:23 123:19
  124:13 125:18
  126:13,21 127:7
  127:15,22 128:15
  128:19 129:10,19
  129:25 130:8
  131:9,12,24
  133:10 134:3
  135:13 136:11,16
playing 108:25
please 4:14 5:4,7,20
pocket 66:20 68:15
  68:21,24
pockets 66:14
point 57:9 67:12
  80:7 90:23 97:12
  97:19 101:23
  108:16 109:3
  125:8 131:23
  132:6,9 135:2
  140:8
pointing 107:23
points 36:17
poke 66:19
police 1:14 7:16 8:7
  10:5,17 12:7
  13:11,13,17,19,25
  14:5,7,13,24
  18:19 19:2,4,13
  19:23 20:4,8,16
  20:19 21:10 25:7
  25:9,14 26:6,7,11
  26:17 30:8 32:15
  35:10,25 41:18
  47:16 63:23 64:3

64:11 120:23
police-related
  12:24
policies 34:7 50:16
  115:20
policy 50:19,24
  106:25 107:13
  122:9
portion 101:10
  138:17 139:2,9,22
pose 137:5
position 20:7 49:9
  49:12,20,22
  102:25 106:17
positioned 84:5
possible 60:22 83:4
  100:3 141:6
possibly 80:14
post 20:24 21:9
potentially 138:9
PowerPoint 45:25
  47:2,7
PowerPoints 47:3
practice 62:9 66:23
  116:11,14
practices 25:10,14
precinct 68:16
preparation 29:13
  29:16,21 30:16
  32:7 115:7
prepare 29:8
preparing 32:9
presence 35:3,18
  35:18 36:3 64:23
present 4:5 5:8
  114:9
presented 10:10
pressure 36:17
pretty 60:10 70:24
previous 53:9 81:8
previously 7:8
primary 22:20,25
  23:6 24:9
printout 73:3,7,11
  149:10
prior 7:9 17:5
  45:25 63:17 64:14
  64:17 115:6 146:8

priority 58:6
probable 27:2,12
  38:22
probably 38:12
  46:3 56:10 69:20
  69:22 70:5,10,21
  99:20 108:24
  111:21 119:16
problem 73:24
  92:17 129:15
problematic 107:15
Procedure 1:16
procedures 25:11
  25:14 115:20
proceedings 7:4,7
process 17:6 118:18
  119:10,12 121:6
professional 26:10
program 47:13
progressing 33:17
promised 31:10
proper 54:3
properly 28:8
property 68:13,25
  69:4 70:14,18
proposed 9:5,12
propped 128:23
protest 38:4,14
provided 3:15
PSB 68:19,23
PSS 119:12
psych 35:4
psychological
  121:24
Public 1:19 3:12
  5:3 148:19 150:6
pull 88:21 136:7
pulled 59:2 102:9
  106:22
pulling 97:14
  107:11 136:12
punched 137:3,9
punches 39:7,9
purpose 26:5,6
  33:8,11 106:23
purposes 33:12
  141:8
pursuant 1:16

122:9
push 38:9
pushed 128:22
put 34:22 45:24
  47:9,14 50:8
  61:15,16 68:19
  72:22 99:15,18
  102:19,25 103:6
  103:12,24 110:20
  122:20 125:22
  126:16
puts 57:24
putting 99:22

                 Q
question 5:24 9:9
  9:25 30:19,23
  31:8,12 41:3,21
  43:3 47:4 49:11
  91:23 92:4,25
  97:25 104:16
  107:10 111:9
  119:4 121:22
  127:18 131:7
  132:14,23,24
  136:2 138:17,20
  138:23,25 139:2,5
  139:14,15,23
questioned 6:22
questions 5:18,21
  6:16 8:10 10:22
  14:3 41:17 42:8
  42:12 53:10 73:21
  83:14 85:9,23
  86:21 92:20,23
  93:4 97:21 110:13
  113:9 123:8,16
  132:18 140:9,15
  142:3,17,20,25
  143:15,22 144:12
  147:4
quick 95:7 111:7
  127:8
quite 126:8

                 R
R 2:1 4:1 5:1
radio 54:15 55:4,7

55:11,17 56:14,19
  77:5 78:13,18
re-ask 31:12
reach 118:10
reached 66:19
reaching 127:21
reactionary 39:6
read 43:2,4 148:7
real 95:6 111:6
  127:8
really 15:20 131:20
reason 48:10 79:5
  112:20 141:2
reasonable 27:21
  43:13 51:12
reasonableness
  27:8
reasoning 79:23
reasons 62:22,25
recall 51:9 58:13
  60:3 68:2 72:9,15
  72:20 78:17 104:2
  117:18,19 139:16
received 26:3 57:16
  73:7 121:24
receives 46:6
receiving 45:14
recess 52:21
recognize 86:3
  123:22
recollection 60:20
  61:24 71:25
  106:10
record 4:16 5:5,8
  43:4 85:16 97:8
  109:15 112:9
  127:4 139:10
  140:14 141:13
  142:2 148:9,10
  150:10
recorded 6:19
recovered 123:2
recruit 24:18,23
  53:25 54:4 56:4
  56:17 60:2 116:9
recruits 60:4
redoing 143:25
refer 75:24

referred 8:5
eferring 75:20
  146:6
refresh 60:20
refreshed 106:10
refusing 73:25
regarding 31:17,18
  31:24,25 143:15
regards 144:8
regular 21:4
related 150:12
relates 13:11
remain 71:13
remained 13:19
  72:2
remedial 25:2,3
remember 7:23
  15:11 16:3 20:15
  20:18 21:13,14
  22:15 34:3,18
  45:14 52:11 53:14
  54:24 55:9,10,13
  55:25 58:11,14
  59:9,12 60:8,23
  61:12,25 62:5,16
  63:15,25 64:4,8,9
  64:17,20,24 65:15
  65:17,19 66:2,3,5
  66:7,12,15 67:4,7
  67:11,14,15,19,21
  67:24 68:5 69:9
  69:11 70:23 71:15
  72:4 78:15 82:25
  83:6,11,20,24
  84:8 95:24 103:5
  105:15 106:9
  108:3 114:23,24
  116:3,4,5,6 118:2
  119:21
remotely 4:7,10
removed 68:25
renew 43:5
repeat 32:12 37:19
repetitive 132:24
rephrase 5:21
replicate 103:8
eport 68:7,10
  113:16,18 114:14

Reporter 1:18 4:2
  5:4,7 21:8 30:13
  80:21 118:25
  134:23 147:7
reporting 4:6,13
represent 5:16 70:8
  87:25 90:2,24
  124:2 130:4,15,16
representations
  85:8
requested 43:4
  67:21 79:3 81:12
require 9:6,12
  24:25 25:3
required 9:17
  10:15 21:2 28:22
  44:4,5,9 45:4
  113:19 122:16
requirement 43:23
  46:19 68:12
requirements 28:16
reserve 143:3
reserved 3:8
resist 94:2
resistance 33:2
  113:16,18 114:14
  134:16
resisting 34:10,11
  48:6,14,17,21
  49:3,6,7 51:8
  62:14 89:4,7,11
  90:10 103:18,23
  104:3 105:21
  106:3,16 110:25
  111:10 134:8,9
respect 3:17
respective 3:4
respond 56:15
  57:19 58:5 102:15
responded 54:14
  55:18 58:12
responding 54:17
  79:17 80:9,10,18
  146:8
responds 78:11,20
response 32:25
responsibility
  23:18

rest 96:3
restaurant 13:4
restraining 65:12
returning 122:18
review 6:15 29:15
  32:7,16 47:7,22
  116:20,24 118:18
  119:7,14 120:21
  120:23 121:6
  140:11
reviewed 32:11
  144:16
rewind 88:16,20,24
  89:22,24 95:6
  104:7
Rewinding 88:25
rewound 88:18,19
  88:22 89:25 90:22
  104:10,11,14
RGH 82:6,10,17
riding 23:24,25
rig 78:21 79:18,20
  79:24
right 5:13 10:9,14
  12:5 14:2,13,17
  14:23 15:13 16:11
  18:16,17,20,22
  20:3,6,12 26:17
  28:5 30:17,25
  31:7 32:5,7,8,14
  35:4,11,17 36:4,8
  36:12 38:9 39:15
  45:23 50:8,9,17
  51:18 52:9,16
  53:12,18,21,25
  56:5 60:5,15
  61:17 63:16,20
  68:7,10 69:7,20
  70:6,12,22,25
  73:6 75:6,11,15
  76:7,18,22,23
  77:2,13,14,19
  78:2,9,10 79:10
  79:15,16,17 80:3
  80:11,18 81:3,4,7
  81:15,16,19 82:8
  82:11 83:9,12,17
  83:17 84:11,15,24

85:2,11 86:9,14
86:16,23,24,24
87:10,20,24 88:4
88:5,7 89:10,22
90:7,21 91:2,6,7
91:10,13 92:18
93:5,7,9,11 94:6,8
94:13,17,23 95:2
95:11,18,20 96:8
96:14,19 97:5,10
97:13 98:13,15
99:4,5,6,9,10,11
99:17 100:6,9,10
100:11,23 101:13
101:22,25 102:2,5
102:7 104:12,17
105:2,5,12,16,17
105:19,24,25
106:21,25 107:6
107:16 108:8,10
108:13,19 109:5
109:17,19,19,21
110:3,7,12,14,18
112:3,4,7,11,12
112:14 113:4,5,7
115:3,13,14,17
117:21 118:15
119:10 120:12
121:12 122:19
123:6,6,15 124:6
124:8,10,24 125:5
125:16,19,20,23
126:2,3,14,15,19
126:22,22 127:5,9
127:16,17,25
128:9,13,14,18,20
128:21 129:8,11
129:11,16,18,22
130:3,10,24
131:10,11,13,15
132:7,9,12 133:11
133:16,17,19,23
133:25 134:5,22
135:7,12,15 136:7
136:13,14 137:4
137:17,18 138:3,9
138:19,20 140:7
141:4,10,12,17

143:8,14,20 144:7
rights 3:15 7:10
  119:24
riot 38:4,13
riotous 37:24
road 122:17
Rocheter 6:10
Rochester 1:6 2:9
  2:12 5:10 7:16
  8:13 9:2,13,18
  10:4,16,17 13:21
  13:25 19:5 20:25
  82:13,23
roll 45:22 46:5,8,12
  46:22 47:2 92:3,6
rolled 91:11 112:16
rolling 59:13
room 2:11 4:5 6:11
  6:14
rose 119:16
ROTH 2:2,2
round 118:11
RPD 9:6,12,19
  16:22,25 17:7
  18:9,15 20:11,16
  23:6 28:15 40:12
  43:20,23 44:11
  45:15 47:10
  106:20 114:4
  115:17 119:17
  122:9 144:8
RPD's 34:7
Rules 1:16
run 105:12,16
  120:19
running 56:11
runs 111:17
rushed 143:12

S
S 2:1 4:1 5:1
s/h/a 1:14
safe 70:24
safety 118:13
save 46:16,19
saw 88:14 102:16
  145:10
saying 18:8 49:12

49:21 55:14 67:15
78:7 101:7 118:22
says 8:25 73:13,23
74:3 75:10,19
76:3,13,14,24
77:15,24 78:21
79:18 80:4,13,16
80:19,19,22,25
81:17 82:7,17,17
85:2
scene 54:14,19
55:23 56:7,21,22
57:2 58:6,15,23
59:2 60:11 67:8
71:13 72:2,7,14
76:17,24,25 77:19
77:21 78:3 80:9
83:18,21 87:9,20
107:25 108:6
scheduled 44:21
143:6
school 10:25 26:4
science 25:9
sciences 25:8
screen 73:11,14
84:12,21 123:13
126:23 132:10,14
screens 84:23 101:2
sealing 3:5
search 65:3,5 66:8
66:11,16,23 68:3
69:8 73:17 99:21
99:24 100:3 103:9
103:16 106:16
searched 64:12,15
64:24 65:9,12
70:11 71:3
searching 64:17,21
65:19 67:5 95:15
95:23 103:10
109:3 146:20
second 32:22 78:21
79:18,20 81:9
88:16 104:7
secondary 22:21
23:6 24:11
seconds 90:11
101:19,22

section 57:5,7,11
59:20 60:21
sections 3:16
security 13:7
see 8:11 20:4 24:25
25:5 47:8 73:4,13
84:11,13,13,18,18
85:11,11 87:7
88:10 89:23 91:21
95:2,11 96:24
99:12 100:13,16
100:17,22 101:2
101:10,14,18,24
104:8,20,21
105:20 107:19,22
109:11 111:12
113:12 120:7
123:9,12 124:7
125:2,11 126:8
129:16 130:13
131:2 136:8 145:5
145:25 146:3,12
146:13,18,19,19
146:21
seeing 59:9,13 60:8
65:20 73:10 84:14
111:12 145:12
seek 17:2 141:23
seen 74:7,8 115:11
124:16
Seneca 120:12
sense 41:18 42:13
86:15 122:21
sensitive 122:3
separate 14:12
September 53:17
Sergeant 78:3
80:17 94:22
108:15
serious 40:4 51:21
52:2,6
served 32:15,16
server 47:11
service 17:13,14
57:25 123:4
Services 25:22
set 111:24 150:9,17
setting 28:13

seven 77:18 142:11
143:8
severely 122:17
share 83:16 84:12
123:12
shared 54:10
shares 47:24
sharing 73:11
123:13
Shields 2:5 4:17
5:12,16 8:23
30:17,25 31:7
40:25 41:7,10,19
41:25 42:5,14,19
42:24 52:15,18
53:3 72:24 84:22
85:15 91:18 92:2
92:7,9,16 93:2
97:24 102:14
109:14 111:16,22
112:9 122:2,6
127:3 132:19
133:2,8 135:19,24
138:13,16,24
139:6,13,19,21
140:7 141:12,25
142:19 143:5,17
144:4,10,17,22
147:5,9 149:3
shift 45:25 141:7
shirt 74:6
shoe 95:4
short 52:21
shot 118:4 121:15
121:20
shoulder 61:5,10
80:15 98:4 128:13
shoulder/head
146:17
shoulders 135:8
show 36:3 58:8
86:23 139:10
showed 58:19
76:17
shown 144:17,20
144:21 146:2
shows 76:19
sic 27:8 73:24 75:7

77:21 81:17
sick 22:12
side 49:25 87:14
101:8,15 110:3
112:4 133:23
sidewalk 59:8,10
59:12 60:9,24
61:3 125:8
sign 74:20,22
signed 3:11,13
significant 72:5
signing 17:9
simplistic 52:8
simply 50:12
145:13
sirens 58:9 80:10
sits 41:12
sitting 63:15
situation 10:10
35:25 37:11,22
38:16 79:6,8 80:6
six 15:4,7 16:19
18:23 19:23 20:22
90:10 111:18,20
142:8
six-month 14:22
slow 80:5 145:21
slowly 93:20
smart 42:7 92:10
92:12
sock 50:8 113:21
soft 36:11
sole 33:8,11
solely 51:4 106:23
107:11
solo 13:17,25
somebody 34:20
35:21 36:23,24
38:8 43:9 49:2,19
51:3,4,8,10 68:13
103:10 118:10
122:11
somebody's 48:13
48:20
Somewheres 8:15
sorry 9:9 17:6 23:4
23:14 25:17 30:2
32:12 37:19 43:2

54:16,18 59:4
75:24 88:11,23
95:19 96:22 98:25
107:19 112:17
123:11,12 125:25
127:23 138:24
sort 120:14
sound 53:18
sounds 30:12
speak 30:7,10
58:21 66:10 67:12
72:6,10,16
speaking 42:11,15
67:9,14 83:12
specific 21:22 23:15
25:18 28:15 34:16
34:19 38:7 45:13
51:10
specifically 19:19
34:14 51:6 55:13
specifics 116:4
spectrum 33:5
speed 145:17
spend 46:4
spent 83:15
spirit 35:14
spit 50:8 113:21
spitting 50:5,7
splayed 49:24
spoke 67:4
spoken 31:15,22
spray 36:17 49:4,6
49:10,16,19 50:12
51:4
SRR 77:16
ss 148:3 150:3
SSR 77:16
stand 62:6,10,20,23
63:20 89:16 93:23
98:23
standard 26:20
standards 26:11,17
27:11,17
standing 48:13
65:15 101:24
108:18 112:24
124:7 125:14
126:4 136:3

145:11
ands 97:9
start 10:23 90:4
  141:3 142:6
  146:24,25
started 65:19
  112:23 141:9
starting 85:13
  126:24 129:16
state 1:19 5:4,7
  15:6 17:3 19:14
  50:20,21,22 107:4
  148:3 150:3,7
stated 22:10
STATES 1:1
stating 4:15 54:25
Stenotype 1:18
step 17:9,19 18:12
Steven 76:7
Stewart 22:21 23:3
STIPULATED 3:3
  3:7,10,14
STIPULATIONS
  3:1
stomach 91:12
stood 96:9 105:9
stop 34:10,11 41:2
  42:24 83:16 91:19
  91:25 93:3 146:23
  146:25
store 73:25 109:10
straight 101:24
  105:9 136:4
street 2:11 103:9
  144:19,23 145:3,6
  145:10,16 146:24
strike 93:14 118:11
  121:14 136:20,21
  137:16 138:14
  139:8,22
strikes 137:11
  138:6
striking 40:15,21
  43:9
struck 121:9
  136:18
tuff 19:22 25:6
  28:9 84:19 107:24

subject 33:19 34:14
  35:11 51:17,24
  52:4 60:15 78:25
  79:4 113:15,18
  114:14 137:20,21
submit 17:7
Subscribed 148:16
suburb 8:17
successfully 13:15
  13:16,23 18:2
SUFFOLK 148:4
  150:4
Suite 2:3
summing 27:16
Summons 32:14,16
supervisor 108:5
  114:3,9,17 119:6
supervisor's 114:2
SUPP 80:19,22,22
supplemental
  80:24
support 64:2 80:23
suppose 16:2 36:15
supposed 23:9
  33:18 34:8 66:17
sure 9:24 10:11,17
  11:23 13:12 15:22
  21:5 23:18 25:12
  25:18,20 26:15,16
  28:19 32:13 34:12
  35:17 36:9,13
  38:8,17 40:11,15
  41:4 51:23 52:15
  62:15,24 63:14
  70:20 72:23 97:24
  113:24 116:2
  130:15 132:19
  137:15 143:5
suspect 38:18 48:5
  48:8 59:7 80:20
  81:2 118:4
suspect's 61:5
sworn 5:2 19:16
  148:16 150:9
system 8:8 77:5

_____
        T
_____
T 148:1

tactic 33:9
tactics 33:5
take 8:20 17:11,14
  52:14 70:3 122:14
  122:16 131:21
  144:6 147:9,11
takeaway 118:9,14
taken 1:15 52:21
  68:17 69:5 82:4
  148:7
talk 29:12,22 53:6
talked 30:4 141:14
talking 6:19 30:15
  119:15 120:8
  142:23
taught 25:13,21
  26:2,10,16,23
  27:7,11,19,24,24
  28:8 29:3 33:4,16
  34:13,20 43:16
teach 117:3 118:7
team 140:22,24
technique 39:17,17
  43:10 106:19
techniques 36:11
  39:7 137:24
technology 73:5
technology-based
  11:23
tell 10:20 11:21
  17:6 29:7 30:4
  36:23 43:22 56:21
  59:9 70:19 72:23
  89:3 91:19 104:8
  104:20,21 106:17
  108:24 111:9
  120:17 132:3,5,7
telling 114:24
ten 83:16 101:21
  141:16
term 26:19 53:24
terminology 26:14
  54:3
terms 6:4 23:5,6
  27:9 122:4 142:17
tertiary 22:23 23:6
test 17:10,12,13,15
  17:18,21

testified 5:3 16:10
  94:9
testify 31:14 144:2
testimony 7:7 49:15
  85:6 142:16 148:7
  148:10 149:1
  150:8,11
text 80:19,25
thank 8:6 43:11
  52:20 74:8 81:13
  97:3 109:8 123:2
  129:21 139:3
  141:25
Thanks 147:5
that'd 18:15 39:6
  70:10,21 79:4
thereto 3:17
thing 51:22 58:25
  64:10 71:12
  143:12,19
things 23:10 27:7
  27:25 63:16 103:7
  117:11 145:15,23
  145:25 146:11
think 9:21 10:13
  12:14 13:6 14:17
  20:6 33:14 35:13
  35:17 36:13 49:11
  49:13 51:9 54:25
  56:25 72:24 73:5
  83:14 87:8,21
  88:11 89:23 91:5
  95:2 96:22,24
  99:23 100:2
  102:24 103:15
  111:22 113:9
  121:11 122:19,24
  130:25 134:6
  138:10 139:9
  140:3,8,10,12
  142:10 143:7,19
  143:24
thinking 9:21
third 22:23 24:13
  51:20 80:19,25
  81:10,12
thirdhand 55:7
thorough 99:21,24

100:3
thought 79:21
  132:15
threat 137:5,20
threatening 67:17
three 15:12 22:7
  23:3 44:13,15
  45:2 84:23 122:24
  132:25 141:4
  142:8 143:9
throw 95:11 96:5
  140:4
throwing 39:10
  95:3
tiles 100:18,19
Tim 54:9
time 1:17 3:9 7:18
  12:12,13,20,25
  13:15,23 14:16
  15:15 17:24 19:2
  19:18,21,25 22:2
  24:3 30:15 31:13
  31:21 33:25 41:11
  44:12,16 48:10
  51:10 52:14 53:20
  54:8,10 60:5,22
  71:14 72:5 78:4,5
  85:8 89:3,23
  90:15 92:18 93:7
  95:25 106:9 108:6
  111:10,20,24
  112:18 115:13
  116:6 119:17
  122:14,17 125:2
  129:9 130:11
  132:17 142:5
  145:14 146:3,13
  146:22 147:14
times 6:25 8:5
  38:18,21 44:13,15
  85:6 107:6 109:24
  132:25 145:21,21
timestamp 85:2
Timothy 22:22
  79:11
tires 13:5
today 5:18 6:7 30:8
  63:16 83:15 115:7

140:17,20 141:9
142:3,4 144:17,21
145:7,10,18 146:2
146:12,25
today's 29:8 85:21
told 31:13 36:24
58:12 60:19 94:10
114:17,19 120:9
134:20
top 49:22 85:2
90:25 93:10 94:5
94:16 95:18,20
97:10,13 98:15
99:3,11 100:6,11
101:22 102:6
104:12 105:2,5,19
105:25 108:9,13
109:16,20 110:14
110:17 112:11
113:5 124:6 125:5
125:20 126:15
127:5,9,17,25
128:18,21 129:17
130:3,10 131:11
131:14 132:9
134:5,22 135:12
136:14 143:19
topic 25:23 45:20
topics 25:7,24 26:2
45:4
torso 98:4
totality 145:13
touched 129:13
town 8:16
towns 8:20 15:2
21:4
traditional 40:9
trained 40:11 66:16
66:21 103:4,7
106:20
training 13:14,16
13:22,24 14:20
15:9 20:9,17,20
20:25 21:10,11,17
21:19,20 22:9,12
22:16,20,22,23
23:11,21 24:24
25:2,4 26:3 28:15

28:17,19,20 34:3
34:5,7 40:12
43:19,24,25 44:3
44:6,9 45:5,8,10
45:11,14,19,20
46:5,9 48:11 51:7
53:21,25 54:4,8
56:9,17 57:9
59:22,24 71:20
114:19 115:12,16
116:7,10,12,16,17
117:10,13 140:17
140:20,23 141:6
141:10 142:23
143:18 144:8
trainings 25:25
44:16,23 45:22
46:14
transcribed 6:19
transcript 3:11
92:18 143:11
147:12,13 148:7,9
150:10
transfer 19:8
transit 8:8
transitioned 20:19
transmission 81:9
Transportation
7:21 8:4
transported 81:24
trash 124:8
trial 3:9 6:20 16:4,6
16:11
tried 91:17 102:22
103:24
trouble 26:13
true 148:9,11
150:10
trunk 65:25
try 10:20 17:16
105:20 132:4
trying 17:2 37:25
83:16 89:16 90:18
93:14,16,22 94:2
105:11,15 122:6
135:15,20,23
136:7 138:11
Tuesday 47:7

tumbling 13:5
turn 17:24 18:3
22:25 70:14 91:17
turned 69:16
two 14:8 21:14 22:7
24:9,12 36:2 42:6
44:13,15 50:6
71:23 80:13 81:5
92:11 122:24,25
133:13 141:4,7
143:6
type 12:7 25:2
39:10 134:15
types 39:22 45:10
45:13,18

## U

um 7:12,24 10:20
11:23 12:22 13:4
13:4,5,7,12,17,19
13:21 14:10 17:2
17:9,15 18:5,17
18:25 19:10,17,21
20:3 21:2,4 23:25
24:9,12,13,23
25:20 27:25 29:12
29:21,25 30:5
32:6,21 33:13,16
33:17,24 34:7,24
35:3,13,18,19
36:6,10 37:7,8,11
38:4,14,18 39:3,9
39:19 40:3,6
43:22,24 44:11,25
45:16,18,24 46:25
47:3,9,18,22 48:5
48:17 49:7,9 50:3
50:4,5,11,11
51:20,22 53:14,16
53:20,23 54:7,13
54:14,22,24,25
55:16,22 56:13,19
57:8,22 58:2,11
58:22 59:7,11,11
59:24,25 60:14,23
61:15 62:8 63:15
64:12,13,14 65:4
65:15,19 66:7,16

67:3,14 68:12,25
69:9,15 71:3,12
72:13,22 73:4,6
73:21 76:5,19
77:24 78:2,2,19
78:20,20 80:16,18
81:14,21 82:18
83:17,18,24 84:6
85:12,16,17 86:9
88:19,21 89:2,3
89:24 90:9 91:15
93:17,25 95:16
99:12,20 100:13
100:18 103:3,11
104:2,7 106:18,20
106:22 108:5,14
108:15,25 109:23
113:15,22 114:2
114:19 116:2,5,10
116:19 117:10,11
117:12,15 118:3
118:17,19 119:13
119:15 120:8,9,19
120:21 121:11
123:25 128:2,8
130:13,16 132:9
134:6,11 138:20
140:12 141:3,17
142:7,9 145:3,13
145:21,22 146:11
146:17,19
unable 63:5
understand 5:20,25
6:18 15:20 26:19
32:18 41:21
understood 5:24
28:4 51:23
UNITED 1:1
unlawful 52:6
107:3,14
unobjectionable
93:3,4
upper 90:18 98:4
128:13
upwards 98:21
use 6:20 24:12 27:9
27:20 29:4 32:21
33:17 34:24 36:16

37:9,12,22 38:19
38:21 39:4 40:16
40:23 43:12 48:6
48:9,14,19,23
50:4,11,24 51:3,7
51:12,16 52:7
73:6 97:18,20
102:12 116:20
117:3,10,12
134:25 137:19,23
138:5 142:11
uses 40:7,12 47:24
usually 15:5,6
19:12 44:13 47:9
67:2 68:25 116:17
117:6,7,12,15

## V

v 27:8 28:5
vague 132:23
Vann 1:3 64:15
65:12,13 66:8
67:4,9,11 69:8
71:3 72:2,7,11
81:7 83:21 90:9
93:11 94:12 99:15
101:23 106:11
130:5,12 131:18
131:25 136:6
Vann's 100:14
108:21 128:6
variables 49:13
various 28:24 33:4
62:22
vehicle 24:24 59:5
63:23 64:3,7,11
87:14,18
verbal 35:4
verbalize 33:18
34:9
verbalizing 33:24
video 29:11,20
65:20 66:4,6
84:15,21 85:7,9
85:12,14,19 86:4
86:7,11,21,22
87:6,11,12 88:9
88:12,18,22,25

Page 16

89:5,25 90:5,6,8
90:22 91:9,21
93:6,8,10,10 94:5
94:7,18,21,25
95:10 97:4,7,9
98:12 99:2,8
100:8,12 101:2,4
101:9,10,18 102:4
102:12,16,17
104:8,10,11,19,24
105:3,23 106:10
107:17 108:4,11
109:4,13,18
110:15 112:13
113:6,8,10 115:6
115:9,11 116:21
116:21 117:20,23
118:3,8,17 119:14
123:7,9,16,19,21
124:13,15,17,20
125:3,18 126:13
126:21 127:7,15
127:22 128:15,19
129:10,16,19,23
129:25 130:8
131:9,12,16 133:4
133:9,10 134:3,25
135:13,21 136:11
136:16 142:20
144:16,20,21
145:7,18 146:2,12
149:11
**Videoconferencing**
1:13 2:7,14
**videos** 29:18 32:11
117:3,6,7,10
**view** 144:17,18,20
144:22
**viewed** 32:11
144:21
**viewing** 73:12
123:14 146:24
**villages** 15:3 21:4
**violated** 119:23
**violation** 50:16,19
50:25 106:24
107:13
**virtual** 6:6,8

**vivid** 145:4
**voices** 42:17 92:8
133:7 137:25
**voucher** 68:13

**W**

**W** 148:1
**waive** 4:12
**waived** 3:6,16
**waiver** 19:10
**walk** 61:17,19
104:21 132:11
**walked** 60:9 61:3
94:20 103:20
105:7 107:23
108:15 109:10
130:17
**walking** 104:16
125:7 130:5
134:13
**want** 8:21 9:23
24:11 38:8 41:8
53:10 72:21 88:23
89:2 101:6 104:17
106:14 107:9
122:7 123:7 132:4
132:17 140:10,11
142:4 143:3,9
147:7
**wanted** 19:19 47:6
63:14
**Warren** 9:5,11
**wasn't** 63:17 70:9
83:10 99:15,18
114:20,24 122:18
134:17
**waste** 125:2
**wasting** 92:18
**watch** 29:18 90:21
95:7 105:20
106:10 108:4
109:22 111:6
113:3 115:6
118:17 124:19
126:19
**watched** 29:10,20
47:7 66:3,5 115:9
118:5 124:22,23

145:7
**watching** 109:25
115:6 117:19
118:3,8 145:18
146:10,12
**Water** 117:20,22
**way** 36:8 41:14
77:7 83:15 91:16
91:17,23 93:15
94:2 100:18,19
105:21 106:3
111:2 115:10
119:24 150:15
**ways** 56:24
**we'll** 52:16 85:16
85:17 111:13,23
130:15 133:9
**we're** 6:6,18 8:18
9:21 29:22 71:10
87:10 92:18 93:8
98:10,10,14 100:5
101:8 108:8
109:15 110:9,13
110:16 112:10
113:4,10 122:4
124:5 126:22
127:16 128:17
132:8 133:3
135:11 142:15
**we've** 87:21
**weapons** 35:10
**wearing** 74:7,8
109:9 131:25
**Web** 47:10
**website** 8:25
**week** 20:4 29:10
44:19
**week-long** 44:22
**weeks** 21:3,15
24:10
**weight** 64:2 134:12
**went** 14:20 16:7
18:18 19:2,21,25
31:9 54:19 56:2
59:7 81:25 82:13
82:22 83:4,19
91:16 110:2 142:7
**weren't** 19:18 60:4

83:8 134:17 146:2
146:12
**West** 11:2,5
**WESTERN** 1:1
**whatsoever** 119:19
**WHEREOF**
150:17
**whichever** 81:24
**white** 124:8
**white-collar** 11:24
12:6
**wishy-washy** 41:13
**withdraw** 18:6
31:11 64:6 97:25
138:25
**withdrew** 139:4,14
**WITNESS** 5:6,9
149:2 150:17
**witness(es)** 150:8
150:11
**witnesses** 72:10
**word** 35:22
**wording** 78:17
**words** 67:18
**work** 10:16 12:7,24
13:7,11 47:19,20
59:20 122:15
**workday** 44:21
**worked** 60:21
**working** 7:18 9:19
12:20 19:23 45:15
60:22 144:18,23
**works** 15:20,23
**wouldn't** 10:8
33:11 38:12 44:2
46:3 50:15,18
63:17 96:17
106:16 132:11
**written** 17:13 68:7
68:10
**wrong** 15:25 32:19
67:25

**X**

**X** 1:2,8

**Y**

**Y** 5:1

**yeah** 9:24 10:13
15:5 16:2 23:16
27:19 34:10 35:22
37:14,21 58:4,20
61:18 65:15 66:9
70:16,23 76:8
78:24 87:15 89:23
95:13 100:20
111:22 112:23
113:2 119:4,9,17
124:11 125:10
126:10 131:23
141:18 143:23
**year** 12:2 43:25
44:6,13,16 45:2,5
45:8,11,14,17
**years** 16:19 19:24
**Yep** 73:15 99:14
**York** 1:1,19 2:4,4,9
2:12 5:10 11:4,5
11:14 15:6 17:3
19:14 50:19,21,22
148:3 150:3,7

**Z**

**Zimmerman** 80:17
80:17
**Zoo** 120:12
**Zoom** 1:13 2:7,14
6:7

**0**

**0000** 81:14
**0033** 82:17
**0039** 82:17
**09D** 76:14

**1**

**1** 35:3,16 36:5 73:2
73:8 149:10
**10** 46:11
**10:18** 95:18,19
**10:26** 97:9
**10:32** 97:12 98:10
**10:36** 104:18,25
**10:38** 98:14 99:2
**10:39** 104:11
**10:41** 99:3

10:44 105:4,18
0:49 99:10 100:5
   104:17
10:51 101:21
10:56 102:6 105:24
10016 2:4
11:01 100:10
11:07 108:9
11:17 108:12
11:23 109:15
11:35 112:10
11:37 109:20
   110:13
11:38:57 124:6
11:39 113:4
11:40:11 125:5
11:40:20 125:20
11:40:23 127:5
11:40:24 126:15
11:40:25 127:9
11:40:32 127:17
11:40:33 127:25
   128:17 129:17
1:40:35 128:21
11:41 110:17
11:41:36 131:11
11:41:37 130:3
   132:9 134:21
11:41:42 135:12
11:41:44 133:12
   136:14
11:41:50 134:5
11:41:52 131:14
11:41:54 130:10
11:42:46 85:3
11:43:06 93:10 94:5
11:43:14 94:16
11:43:36 95:18,19
11:43:42 97:10
11:43:48 97:13
   98:11
11:43:51 104:25
11:43:52 98:15
11:43:53 104:12
11:43:55 99:3
11:43:57 105:5,19
1:44:02 99:10
   100:6

11:44:04 101:22
11:44:08 102:6
   105:25
11:44:11 100:11
11:44:17 108:9
11:44:25 108:13
11:44:30 109:16
11:44:40 112:11
11:44:42 109:20
   110:14
11:44:43 113:5
11:44:45 110:17
1219A 81:17
144 149:4
14614 5:10
15 30:6 46:11,12
15614 2:12
18-cv-6464 1:5
182230 75:7
185 5:9
192 2:3

___ 2 ___

2 36:10,15,20 37:4
   37:8,8,12,22
   38:15 39:4,14,16
   80:11 85:16,20
   140:17 142:7
   149:11
20 30:6 71:23
   141:20,22,23
2003 12:15
2004 12:15
2006 12:4,13
2009 13:12 14:4
   16:16
2015 13:20 16:17
   17:4,5 18:19
   53:16,17
2016 120:7
2022 1:10 148:8,18
   150:18
209A 74:18 75:19
   75:24 76:25
212 2:4
22 77:21
2223 77:21
229A 79:10

23 1:10
2320 73:23 76:23
2321 76:23
2328 77:17 78:20
2329 79:18
2330 80:4
2345 80:19
23rd 148:8
2nd 150:18

___ 3 ___

3 37:8 39:3,13,18
   140:17
3:11 1:10
30 2:11 30:5
335 114:4
35 50:23

___ 4 ___

4 39:14,17,19 40:6
   40:16,22 43:10
   51:15 52:7 53:17
   137:12,16,19,21
   137:24 138:5,7,8
   139:17
4:10 52:22
4:15 52:18
4:17 52:22
4:44 124:5
40 20:6
412A 2:11
425-1020 2:4
428-7410 2:12

___ 5 ___

5 149:3
50 7:2
500 68:15
585 2:12

___ 6 ___

6:12 125:4
6:13 147:14
6:23 125:20
6:27 126:23 127:4
6:28 126:14
6:29 127:9
6:37 127:16

6:38 129:17
6:39 127:24 128:17
6:41 128:20
6162 2:6

___ 7 ___

7 88:11
7:54 131:10
7:55 132:8
7:56 130:2 134:21
73 149:10

___ 8 ___

8:01 133:12 135:11
8:03 136:13
8:11 134:4
8:14 131:14
8:15 130:9
802 2:3
85 149:11

___ 9 ___

9/4/2015 85:2
9:06 90:4
9:12 90:8
9:18 85:13
9:40 88:19
9:41 87:11
9:42 93:8,10 94:5
9:45 88:11
9:48 88:11,12
9:51 94:9,16
911 119:5,10