1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
DAVID VANN,

                    Plaintiff,


     -against-


THE CITY OF ROCHESTER, et al,


                    Defendant.


- - - - - - - - - - - - - - - - - x


                    Video Conference


                    March 24, 2022
                    10:33 a.m.


     EXAMINATION BEFORE TRIAL of TOMESHA
ANGELO, a Defendant in the above-entitled action,
taken by the Defendant, held at the above
time and place, pursuant to Court Order,
taken before Robyn Lehrmann, a Notary Public
in and for the State of New York.

2

1

2    A P P E A R A N C E S :

3

4    ROTH & ROTH, LLP
          Attorneys for Plaintiff
5          192 Lexington Avenue, Suite 802
          New York, New York 10016

6

    BY:   ELLIOT SHIELDS, ESQ

7

8

    JOHN CAMPOLIETO, ESQ.
9          Attorney for Defendants
          30 Church Street
10         Rochester, New York 14614

11   BY:   JOHN CAMPOLIETO, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2                    STIPULATIONS

3

4        IT IS HEREBY STIPULATED AND AGREED by

5   and among counsel for the respective parties

6   hereto, that the sealing and certification of

7   the within deposition shall be and the same

8   are hereby waived;

9        IT IS FURTHER STIPULATED AND AGREED

10  that all objections, except to the form of

11  the question, shall be reserved to the time

12  of the trial;

13       IT IS FURTHER STIPULATED AND AGREED

14  that the within deposition may be signed

15  before any Notary Public with the same force

16  and effect as if signed and sworn to before

17  the Court.

18

19                    THE REPORTER:  The attorneys

20                    participating in the deposition

21                    acknowledge that I am not

22                    physically present in the

23                    deposition room and that I will

24                    be reporting this deposition

25                    remotely.

4

1

2            They further acknowledge

3       that in lieu of an oath

4       administered in person, I will

5       administer the oath remotely.

6          The parties and their

7       counsel consent to this

8       arrangement and waive any

9       objections to this manner of

10      reporting.  Please indicate your

11      agreement by stating your name

12      and your agreement on the

13      record.

14         MR. CAMPOLIETO:  I consent.

15      I will request a digital format

16      of the transcript.

17         MR. SHIELDS:  I consent. I

18      will also request an e-mailed

19      copy of the transcript.

20            *********

21

22

23

24

25

5

1

2    T O M E S H A   A N G E L O,

3         having been first duly sworn by a

4         Notary Public of the State of New York,

5         was examined and testified as follows:

6    EXAMINATION BY

7    MR. SHIELDS:

8                    THE COURT REPORTER:  Please

9              state your name for the record.

10                   THE WITNESS:  Tomesha

11             Angelo.

12                   THE COURT REPORTER:  Please

13             state your business address for

14             the record.

15                   THE WITNESS:  185 Exchange

16             Boulevard, Rochester, New York

17             14614.

18                   MR. CAMPOLIETO:  The City

19             would request a review and

20             signing of the transcript.

21        Q    Good morning, Investigator.

22        A    Good morning.

23        Q    My name is Elliot Shields and I

24    represent a man that was injured and I am

25    going to ask you some questions today.

6

1                    Tomesha Angelo

2        A        Okay.

3        Q        If there is anything that I ask

4    you that you don't understand, please say so,

5    and I will gladly rephrase the question for

6    you, okay?

7        A        Okay.

8        Q        Otherwise, if you answer the

9    question, we will assume you understood it.

10   Do understand everything I said so far?

11       A        Yes.

12       Q        Do you agree to those terms?

13       A        Yes.

14       Q        If there is anything that I ask

15   you that you don't understand, you will let

16   me know, right?

17       A        Yes.

18       Q        So we are doing this deposition

19   virtually on zoom.  Can you tell me where you

20   are doing the deposition from?

21       A        City Hall.

22       Q        I know you are in the room with

23   your attorney, John Campolieto.  Is there

24   anyone else in the room with you?

25       A        No.

7

1                     Tomesha Angelo

2          Q       Do you have any papers or any

3     other documents in the room with you that you

4     plan to review to help you answer any

5     questions?

6          A       He has a whole file of stuff,

7     but I guess I can ask him for something if I

8     need it.

9          Q       But there is nothing in front of

10    you that you plan to pick up and look at to

11    answer any questions, correct?

12         A       No.

13         Q       You understand everything that

14    you say today is going to get transcribed

15    into a little book that we are going to use

16    at trial in this matter?

17         A       Okay.

18         Q       Have you ever been questioned

19    under oath before?

20         A       Yes.

21         Q       How many times would you

22    estimate?

23         A       I have been on the job seventeen

24    years, so I don't know.  More than I can

25    count.

8

1                    Tomesha Angelo

2        Q       Every prior time that you have

3    testified, has that been in the context of a

4    criminal prosecution?

5        A       Some of it was for family court

6    so I don't know if it is considered criminal

7    or civil.

8        Q       Have you ever been deposed as

9    part of a civil lawsuit like this before?

10       A       No, this is my first time.

11       Q       Have you ever been named as a

12   defendant in any prior civil lawsuits like

13   this before?

14       A       No.

15               MR. SHIELDS:  John, since

16               you had the investigator give

17               her business address, do you

18               agree to produce the

19               investigator at the time of

20               trial?

21               MR. CAMPOLIETO:  She didn't

22               give her home address?

23               MR. SHIELDS:  She didn't.

24               MR. CAMPOLIETO:  Yes, okay.

25               Anything you sent her you send

9

```
                        Tomesha Angelo
 1
 2              it to my address, it will get to
 3              her.  She gave you the business
 4              address but, yes, I intend to
 5              produce her at trial.  She is
 6              requested.
 7                   MR. SHIELDS:  Thank you,
 8              John.
 9         Q    So, Investigator, first I will
10    ask you some background questions, okay?
11         A    Okay.
12         Q    Can you tell me where you went
13    to high school?
14         A    Grease Arcadia.
15         Q    What is your highest level of
16    education?
17         A    I have an associate's degree.
18         Q    Where is that from?
19         A    MCC.
20         Q    What year did you get that
21    degree in?
22         A    2000.
23         Q    What field did you get your
24    degree in?
25         A    Criminal justice.
```

10

1                    Tomesha Angelo

2          Q       Do you just have one degree or

3   any other degrees?

4          A       That degree.

5          Q       How many years was that course

6   work?

7          A       It was a two-year degree.

8          Q       Did you do any police related

9   work while you were in college?

10         A       No.

11         Q       Did you do any security jobs or

12  anything like that?

13         A       Not during college, no.  It was

14  after college.  Wait.  Yes, I did.  I worked

15  asset protection at Sears.

16         Q       So asset protection is basically

17  one of the security guards at Sears?

18         A       Yes.

19         Q       Were you one of the uniformed

20  people on the floor or were you in the back

21  looking at cameras?

22         A       There was no uniform.  It was in

23  the back; sometimes they had us walking

24  around, but it was never in uniform.

25         Q       Did you have to get any type of

1                     Tomesha Angelo

2    certificates or licenses for that job?

3         A      I don't know if that one

4    required a security guard card or not.  I

5    don't remember.  It was so long ago.

6         Q      After that, did you work

7    additional security type jobs?

8         A      After college you mean or after

9    that particular job?

10        Q      Let me back up.  Why don't you

11   give me an overview of your employment

12   history between when you began college and

13   when you started working at RPD?

14        A      All right so in 2000, when I

15   began college, okay, so that was in '98.  I

16   don't remember what year I started at Sears.

17   I started off working on cars, so I was in

18   the automotive department.  That is when

19   security approached me and asked me to become

20   an asset protection for more money so that is

21   when I switched positions at Sears.

22               I think I was bartending at that

23   time and then I started work for security for

24   UR, and at one point I know I had several

25   jobs.  I don't know if I was cooking at that

1                    Tomesha Angelo
2    point still.  And then I didn't -- then I
3    left the U of R in 2005.  I think so I guess
4    it would either be automotive, maybe asset
5    protection.  I wasn't in asset protection
6    long, bartending and the U of R.
7                    MR. CAMPOLIETO:  Just answer
8                 the question he is asking.
9         A     I'm trying to remember.  I don't
10   know, it's been so long.
11        Q     Thank you.
12              When you worked at that time U
13   of R, did you have to get any licensing or
14   certificates to work that security job?
15        A     I think we were suppose to have
16   a guard card.
17        Q     You think you were suppose to;
18   do you know if you did?
19        A     I know I had a guard card at one
20   point.  I don't know when I got it if it was
21   before that or during them.  They had a long
22   training process.
23        Q     How long was there training
24   process?
25        A     I don't remember but I had to do

1                        Tomesha Angelo

2    work.  It was very similar, like, police work

3    where you had to do class work and then went

4    out in the field with somebody.

5         Q       So it was basically like an

6    in-class training program and then you had

7    like a field training officer sort of?

8         A       Yes.

9         Q       The class work, it was a few

10   months at least?

11        A       I don't remember.

12        Q       Did you carry any weapons when

13   you were a U of R security guards?

14        A       No.  They had not gotten police

15   officer status at that time.

16        Q       Did you do any police work for

17   any other agency before you joined the RPD?

18        A       No.

19        Q       When did you join the RPD?

20        A       2005.

21        Q       Was that right after you left U

22   of R security?

23        A       Yes.

24        Q       So tell me how that happened,

25   did you apply for a job at RPD?

14

1                    Tomesha Angelo

2        A       Oh, no.  Back up.  I went per

3   diem for U of R for a while so I was

4   part-time and then I started 9-1-1, but I was

5   only 9-1-1 like five or eight months before I

6   got picked up by RPD, but I had to get the U

7   of R prior to RPD.

8        Q       When you say you went to 9-1-1,

9   do you mean that you worked as a dispatcher?

10       A       It is called a telecommunicator.

11  So I just answered phones; I never

12  dispatched.

13       Q       So you answered calls that came

14  into 911?

15       A       Yes.

16       Q       How long did you do that for?

17       A       It was either five months or

18  eight months.

19       Q       During your time at U of R and

20  at 911, did you plan to apply to become an

21  RPD officer?

22       A       Repeat that question.

23       Q       When did you first apply to the

24  RPD?

25       A       You have to take a test and I

1                    Tomesha Angelo

2    took the test, I believe, three years before

3    getting hired.

4          Q      So somewhere around 2002?

5          A      Something like that.

6          Q      You took the test, that's the

7    first step and then what is the next step?

8          A      Physical agility.

9          Q      So you take the test, they

10   called you up three years later in 2005; is

11   that when you took the physical agility test?

12         A      No.  It would have been

13   throughout this time and if you pass

14   everything, the requirements, any step you

15   can fail, but if you pass all the

16   requirements, RPD can call you up and say,

17   "Hey, you have the job."

18         Q      So you have to basically get all

19   your tests passed, and then they will call

20   you when there is an opening?

21         A      Yes.

22         Q      So do you remember when you took

23   your physical agility test?

24         A      No.

25         Q      Sometime between 2002 and 2005?

1                       Tomesha Angelo

2          A      Yes.

3          Q      You passed both of those tests

4    and they called you in 2005 and offered you a

5    position?

6          A      Yes.

7          Q      What is the first thing that

8    happened after that?

9                     MR. CAMPOLIETO:  Objection.

10               In terms of what, her job?

11                    MR. SHIELDS:  Yes.

12         Q      What is the next step in the job

13   application process, going to the police

14   academy?

15         A      Yes.

16         Q      Where did you go to the police

17   academy?

18         A      On Scottsville Road at the

19   Monroe Training Facility.

20         Q      So that training at the police

21   academy, that would include officers from

22   other police departments in Monroe County,

23   not just RPD officers; is that correct?

24         A      Yes.

25         Q      So who put on the training, do

                    Tomesha Angelo

1   you know?

3        A       I don't understand the question.

4        Q       Let me withdraw that.  Was the

5   training held by the New York State Division

6   of Criminal Justice Services?

7        A       I honestly don't know.

8        Q       It was the RPD, right, it

9   involved multiple agencies?

10       A       Correct.

11       Q       So the training that you

12  received, that is training that would apply

13  to officers statewide not just RPD officers,

14  right?

15       A       Correct.

16       Q       So you learn minimum standards

17  for officers, for all law enforcement

18  officers in New York State, right?

19       A       Yes.

20       Q       They teach you various different

21  types of police practices and procedures that

22  you have to know to become a police officer,

23  right?

24       A       Yes.

25       Q       They teach you the professional

1                    Tomesha Angelo

2    standards of care that you have to employ as

3    a police officers?

4         A      I don't know if that is what it

5    is called but how to read law books,

6    firearms, defensive tactics.

7         Q      So the answer would be, yes, all

8    of those things are things that a

9    professional police officer needs to know to

10   do your job, right?

11        A      Yes.

12        Q      Basically they teach you the

13   minimum standards of care as a police

14   officer, you have to have probable cause, for

15   example, to make an arrest, right?

16        A      Yes.

17        Q      They teach you the law of

18   probable cause in the police academy?

19        A      Yes.

20        Q      They taught you about conducting

21   investigations?

22        A      As an officer, yes.

23        Q      So not at the police academy,

24   that was later?

25        A      What do you mean?

```
 1                  Tomesha Angelo
 2        Q      You meant conducting
 3   investigations as an officer as opposed to as
 4   an investigator?
 5        A      Yes.
 6        Q      You are taught that you have to
 7   be diligent when conducting an investigation,
 8   right?
 9               MR. CAMPOLIETO:  Objection.
10               Go ahead an answer.
11        A      Yes.
12        Q      You were taught other things
13   like how to fill out paperwork?
14        A      Yes.
15        Q      Let's see, how long did you work
16   as a police officer?
17        A      Ten years.
18        Q      The first step, when you
19   graduate from the police academy is doing
20   field training; is that right?
21        A      Yes.
22        Q      How long does that last?
23        A      Five or six months.
24        Q      When you did your field training
25   it would have been 2005 or 2006?
```

1                    Tomesha Angelo

2        A     Yes.

3        Q     Do you remember the date that

4   you graduated from the police academy?

5        A     No.

6        Q     But sometime in 2005 or six?

7              MR. CAMPOLIETO:  If you

8              remember generally.

9        A     Yes.  It would have been the end

10  of 2005 beginning 2006.

11       Q     Then you did field training for

12  five to six months and that would have ended

13  in 2006?

14       A     So you don't graduate the

15  academy unless you pass field training so

16  graduation would have been after field

17  training.

18       Q     Okay.  Got it.  Field training

19  is part of your training process?

20       A     Yes.

21       Q     This is part of the learning

22  process as a police officer?

23       A     Yes.

24       Q     What you are saying is that if

25  you fail field training, then you might not

21

1                    Tomesha Angelo

2    graduate and you might not be able to become

3    a police officer?

4         A      You wouldn't.

5         Q      You wouldn't.  Thank you.

6                Do you know any instances of

7    officers doing something in field training

8    that caused them to fail and not graduate?

9         A      Yeah, it happens all the time.

10        Q      It happens all the time?  Can

11   you explain the field training process

12   generally to me?

13        A      You were paired up with various

14   FTO, field training officers, and they show

15   you, literally -- you go to a call and in the

16   beginning you watch them, how they would do

17   it and then you are kind of given the lead,

18   like you take the lead, but then there is

19   somebody there to correct you if you are

20   doing something wrong or dangerous.  And

21   then, towards the end, you have these

22   practice finals where you have to ask other

23   people for help even though your trainer is

24   right there watching and judging you.

25        Q      Are there different phases of

22

1                    Tomesha Angelo

2     the field training?

3          A      Yes.

4          Q      How many phases?

5          A      Four, yes.  Four there were with

6     me; I don't know if it has changed.

7          Q      So you said at first you

8     basically follow, then you are given the

9     chance to try to take the lead.  Would that

10    be phase two, when you get to take the lead a

11    little bit?

12         A      It is different for everybody

13    depending on how fast you catch on or are

14    comfortable taking the lead.

15         Q      Let me ask you this:  Between

16    the academy in the beginning of field

17    training, do you have to pass a written test?

18         A      We have lots of written tests

19    throughout.  I don't recall if there was a

20    final, but there were tests throughout, yes.

21         Q      Lots of written tests throughout

22    the academy, the class work?

23         A      Yes.

24         Q      There are also written tests as

25    part of the field training?

23

1                    Tomesha Angelo

2          A       No.

3          Q       Your FTO would write up reports

4     to document your progress while you are doing

5     your field training?

6          A       Yes.

7          Q       Would that just be your FTO or

8     would there be other supervisors that would

9     supervise you and write up reports?

10         A       No, just the FTO.

11         Q       So the FTO is the person that

12    teaches you during that field training,

13    right?

14         A       Yes.

15         Q       Like a one-on-one mentorship?

16         A       Yes.

17         Q       At the end of that, you said you

18    take a test and you either graduate or you

19    don't?

20         A       I don't think any of the tests

21    were when you are still in the academy.

22                    MR. CAMPOLIETO:  I didn't

23                    hear her answer.  Can you read

24                    that back to me?

25                    (The requested portion of

24

1                    Tomesha Angelo

2                    the record was read back by the

3                    reporter.)

4        A        There is no written test after

5    field training.  All the tests are done in

6    the academy.

7        Q        Got it.

8        A        So if you are talking about

9    testing, as far as I know what, it is called

10   -- you are actually doing it.  There is no

11   written test during field training.  All the

12   written tests are in the academy, but if you

13   want to say whether or not they are being

14   tested as to whether or not they can do the

15   job, it is not a formal test, I guess you

16   would say, but they are all ultimately graded

17   each and every day on their performance.

18       Q        When you say, "They are graded

19   every day on their performance," would that

20   be documented on some kind of paperwork

21   somewhere?

22       A        Yes.

23       Q        So, like, I don't know.  If they

24   are given the opportunity to drive the

25   vehicle and they get in a crash, that could

25

1                    Tomesha Angelo

2    be a negative thing that maybe would cause

3    them not to graduate, right?

4         A     Correct.

5         Q     During that time, they are still

6    called recruits during that time?

7         A     Yes.

8         Q     During that time, recruits would

9    go with FTO to crime scenes and basically do

10   all the police work alongside a uniform

11   police officer, right?

12        A     Yes.

13        Q     Do recruits wear different

14   uniforms?

15        A     No.

16        Q     Same uniform?

17        A     In the academy they wear greys

18   but on the field they wear blues.

19        Q     So people can't really tell the

20   difference?

21        A     Correct.

22        Q     So you said you were a police

23   officer with the RPD for ten years, right?

24        A     Yes.

25        Q     Then, after that ten years, you

1                    Tomesha Angelo

2     were promoted to investigator?

3          A      Yes.

4          Q      Can you tell me the process of

5     how you became an investigator?

6          A      It is just a Civil Service exam.

7          Q      So you took the exam because you

8     want to be an investigator instead of a

9     police officer, right?

10         A      Yes.

11         Q      By the way, why did you make

12     that decision?

13         A      Something that I was is

14     interested in, and it was a promotion.  It

15     was the next step in my career.

16         Q      So you make more money?

17         A      Yes.

18         Q      What do Investigators do?

19         A      Lots of stuff.  When you become

20     an investigator, you can either handle

21     in-progress calls, you can get assigned a

22     case that was -- a report was taken from

23     another officer, but more follow up needs to

24     be done, so you were assigned that case.  I

25     would say good majority of our job is just

1                    Tomesha Angelo

2    assisting the officers when they have

3    questions, or don't know how to do paperwork

4    or need clarification on a law, and they

5    wanted to either know your experience or if

6    you can get hold of the DA.

7          Q      So you have more responsibility?

8          A      Yes.

9          Q      Is there a minimum amount of

10   time that you have to work as a police

11   officer before you can apply?

12         A      Yes.

13         Q      What is that?

14         A      Three years.

15         Q      So do you remember the date that

16   you became an investigator?

17         A      Yes.

18         Q      What was that date?

19         A      April 10th, 2015.

20         Q      It was like a promotion ceremony

21   when you officially were promoted?

22         A      Yes.

23         Q      When you became an investigator,

24   did you receive additional training?

25         A      Not really.  So back then there

28

1                    Tomesha Angelo

2    was no mandatory training.  They just started

3    like, hey, I think we should do some FTO kind

4    of stuff so that really wasn't established

5    yet, but you can, on your own, take

6    additional classes or sign up to take classes

7    but a lot of the training at the time -- I

8    don't know what the word would be.  You learn

9    as you go kind of thing.

10        Q      You learn as you go, but you are

11   not paired up with a more experienced

12   investigator to show you the ropes?

13        A      They tried doing that for a

14   while.  When I got promoted, it was when they

15   were first starting to talk about that.  When

16   I got promoted, they were changing from east

17   to west to sections.  They didn't have

18   anywhere for us to go so we did

19   kind-of-sort-of pair up, but there was no

20   official training.

21        Q      Did you have a direct supervisor

22   when you were first promoted?

23        A      When I got assigned, it was in

24   central section so my direct supervisor would

25   have been Sergeant Zimmerman.

29

1                    Tomesha Angelo

2         Q         Sergeants are above

3    Investigators?

4         A         Yes.

5         Q         Down here in the NYPD we have

6    detectives.   Investigators in Rochester, are

7    they basically the equivalent, is that your

8    understanding?

9         A         Well, they weren't; they are

10   now.  So prior to a lawsuit, Investigators

11   were an internal promotion that was not

12   recognized by the state.  Whereas, detectives

13   had to take a Civil Service exam and were

14   recognized by the state as a promotion and

15   then there was a big lawsuit and now they are

16   both recognized as a promotion by the state

17   so they are equivalent.

18        Q         That happened before you were

19   promoted, correct?

20        A         I don't think so.  I don't think

21   so.  I think that lawsuit was after.

22        Q         Did that lawsuit affect your job

23   duties at all?

24        A         I don't think so.

25        Q         Did it affect your pay?

30

1                    Tomesha Angelo

2        A       I don't remember.  I don't know.

3        Q       It is just interesting to me.

4        A       With the union contract, I don't

5    know.  I don't know.

6        Q       So you are promoted to

7    investigator in April 2015 and you start to

8    learn on the job, right?

9        A       Yes.

10       Q       Generally, how do your job

11   duties change once you became an

12   investigator?

13       A       Normally as an officer, you

14   know, you start the preliminary investigation

15   and once it is -- the preliminary

16   investigation is done, you can either hang

17   onto it or you can --  it can go to a

18   specialized -- say we use to have an economic

19   crimes unit, it could have got transferred

20   there.  But as an investigator, once it is

21   assigned to you, I mean, that is your case.

22       Q       So the case stays with you

23   basically?

24       A       Usually.  And then if -- so say

25   for example there was a shooting and you are

31

1                    Tomesha Angelo

2   working it and eventually the person passes

3   away, then that would get transferred to

4   homicide, but homicide will say, you worked

5   so long in this, you can stay on this case

6   too.  So it just really depends.

7        Q      Got it.  But for the most part,

8   one of the differences is that, as an

9   officer, you do the initial work and pass it

10  on; as an investigator it is your case?

11       A      Sometimes.  Me, as an officer, I

12  would hold onto cases; very rarely would I

13  pass them on.  Officers can take the case and

14  run with it or they can turn it over to

15  somebody; there is just too many variables to

16  answer that question.

17       Q      When you say, when you were an

18  officer you would hold onto the case, is that

19  a decision that officers get to make or that

20  is made by your boss?

21       A      Both.

22       Q      As an investigator, one of the

23  things that you do is coordinate with the

24  District Attorney's office?

25       A      Try to, yes.

32

Tomesha Angelo

1

2      Q      You said you can do voluntary

3  training when you become an investigator.

4  Did you do any voluntary training when you

5  became an investigator?

6      A      You can sign up for courses.  I

7  have been signing up for courses.  I couldn't

8  tell you when I took what, whether it was

9  before or after.

10     Q      Those courses relate to your

11 work as an investigator, right?

12     A      Yes.

13     Q      If you sign up for a voluntary

14 class, do you have to tell the RPD?

15     A      They are the ones that put it

16 on.

17     Q      So you would sign up for classes

18 that the RPD hosts?

19     A      Yes.

20     Q      Would you also do --

21     A      You don't always get them and it

22 also depends on staffing levels.

23            MR. CAMPOLIETO:  Just answer

24            his question.

25     A      I'm sorry.

33

1                      Tomesha Angelo

2          Q      When you say you don't always

3   get them, you mean the RPD will say, "Hey

4   there is a class that we want to host," and

5   maybe you need to get twenty people to sign

6   up and if twenty people don't sign up, then

7   it will be canceled?

8          A      I am sure that is what happens,

9   but, for example, if you have a class RPD

10  puts on, "Hey we're putting on this class,"

11  you tell your boss, "I am interested" and the

12  bosses figure out how many people can we lose

13  that day and can you go and even though you

14  have seniority, your shift might be short

15  that day and somebody with lessor seniority

16  might be able to go on a different sheet.

17  So, you have to wait for the next time they

18  host that class to get that certification.

19         Q      So those are voluntary?  Those

20  are not things that the RPD says you have to

21  do this as part of a yearly requirement for a

22  number of hours or something else, right?

23         A      Correct.

24         Q      Do you have any kind of minimum

25  required in-service training hours?

34

1                    Tomesha Angelo

2        A       Yes.

3        Q       What is that?

4        A       No idea.

5        Q       You just do it and complete the

6   hours every day?

7        A       Yes.  I have no say in what gets

8   trained to us.  Every year we have in-service

9   and we just go to it.

10       Q       Are there specific topics that

11   you to get in-service training on every year?

12       A       Every year.  I think the sexual

13   harassment stuff we're required every year

14   and, you know, every few years we have to do

15   some type of training for deaf and hard of

16   hearing.  Other than that I don't know what

17   the requirements are.  I'm sorry.

18       Q       You have to get firearms

19   training every year?

20       A       Yes.

21       Q       Other than firearms training and

22   sex -- let me back that up.  What was the

23   sexual harassment training that you said?

24       A       I am pretty sure there is sexual

25   harassment training we have to do every so

1                    Tomesha Angelo

2    often.  I don't know if it is yearly.  I know

3    our deaf and hard of hearing we have to do

4    every so often, but other than that, I don't

5    know what the other requirements are.

6         Q     The deaf and hard of hearing you

7    think that is because Rochester has a large

8    deaf population?

9         A     I don't know why.

10        Q     You just know that periodically

11   you are required to take that training?

12        A     Yes.

13        Q     So it sounds like the only

14   training you are required to get every year

15   is firearms training?

16        A     I don't know.

17        Q     Is there any other training that

18   you remember taking every year?

19        A     No.

20        Q     As it relates to work as an

21   investigator, how often do you take voluntary

22   training courses?

23        A     I don't know.

24        Q     What is the last training that

25   you did?

36

1                       Tomesha Angelo

2          A        Forensic interviewing.

3          Q        When was that?

4          A        Last year, I think.

5          Q        What was that course about?

6          A        Interviewing children in a

7     forensic interviewing way.

8          Q        Generally, what is forensic

9     interviewing?

10         A        Nonleading, nonsuggestive

11    questions.

12         Q        Which seems like it would be

13    especially important with children?

14         A        Yes.

15         Q        When you go to these trainings,

16    did they give you handouts?

17         A        This was over zoom so that if

18    they did send information, a lot of it was

19    too large to print out.

20         Q        When you go to a training like

21    that, does RPD have a library that you are

22    required to store those training materials

23    in?

24         A        I wouldn't know.

25         Q        So if you wanted to access

37

1                    Tomesha Angelo

2    training materials from a course that you

3    took five years ago, would you be able to do

4    that somehow?

5          A      I don't know.  But I would ask

6    PDS, they are in charge of training; I am

7    sure they would know.

8          Q      So if you took a voluntary

9    training PDS would have a record of that,

10   right?

11         A      I would hope so, yes.

12         Q      It is part of your personnel

13   file?

14         A      I believe so.

15         Q      Can you give me an overview of

16   what PDS does?

17         A      I don't know.

18         Q      But they handle all of the

19   training for the RPD?

20         A      Yes.

21         Q      That is the Professional

22   Development Section?

23         A      Yes.

24         Q      If you sign up for training, who

25   do you tell, your direct boss or do you tell

38

                    Tomesha Angelo

1

2    PDS?

3         A      Yes.  Well, you would have to

4    ask your direct boss if you could take the

5    training.

6         Q      Got it.  Then they would

7    register you with PDS?

8         A      Yes, and depending on the

9    courses sometimes you have to go online and

10   fill out some stuff.

11        Q      Have they ever asked for or

12   looked at the list of the training that you

13   have taken?

14        A      Yes.  When I was -- yes.  I

15   think it was last year.

16        Q      Why did you do that?

17        A      I was trying to apply for Major

18   Crimes.

19        Q      Were you able to obtain that

20   list?

21        A      I don't know if she just

22   answered one of the questions I had or sent

23   me the whole list.

24        Q      So you know that the list

25   existed as of last year at least?

39

1                     Tomesha Angelo

2         A      Yes.

3                MR. SHIELDS:  John, I am

4                going to call for production of

5                the list of all of her training.

6                I was looking through my

7                discovery that I got from you

8                and I think we demanded all the

9                training from the officers, but

10               if not, I am calling for

11               production of all of her

12               training records at this point,

13               okay.

14               MR. CAMPOLIETO:  Just for

15               this Investigator?

16               MR. SHIELDS:  Well, now that

17               you mention it, for this

18               investigator and all the other

19               defendants.

20               MR. CAMPOLIETO:  All right.

21               Let me look into it.

22               MR. SHIELDS:  Yes.

23        Q      You said the in-service training

24    would be held by the RPD, right?

25        A      Yes.

40

1                    Tomesha Angelo

2          Q       Sometimes would you take

3     training at the Monroe County Training Center

4     also?

5          A       Yes.

6          Q       Would that be hosted by DCJS?

7          A       I don't know.

8          Q       Do you know if you have taken

9     DCJS training other than at the police

10    academy?

11         A       I don't know.

12         Q       That should be something that

13    would be reflected in your training records,

14    right?

15         A       I don't know how that is all

16    documented.

17         Q       For example, like you said with

18    PDS, they would have records of the training

19    that you took, so they should know if it was

20    at the RPD or at a different location, right?

21         A       I would like to assume so, but I

22    am not going to say because I don't work

23    there.  I don't know.

24         Q       Other than at the Monroe County

25    Training Center and at the RPD, have you ever

41

1                    Tomesha Angelo

2     taken training put on by private companies?

3         A      Yes.  I think the forensic

4     interviewer was a private company.

5         Q      What was that private company,

6     if you remember?

7         A      Child First.

8         Q      Can you say that again, Child

9     First?

10        A      I think that is the name of it.

11        Q      There was a training a few years

12    ago by Bill Lewinski, did you attend that

13    training?

14        A      What was it for?

15               MR. CAMPOLIETO:  Answer the

16               question.

17        A      I don't know.

18        Q      You don't know.  That is your

19    answer?

20        A      No.

21        Q      That is just one private

22    training that was reported widely in the news

23    so that is just one private company that I

24    knew off the top of my head.  But you don't

25    remember attending that training, right?

42

1                    Tomesha Angelo

2         A       I don't know.

3         Q       Do you remember that training

4    being reported about in the news?

5         A       No.

6         Q       Of these trainings, I think you

7    mentioned sometimes you receive a

8    certification; is that right?

9         A       Yes.

10        Q       That would be something that

11   would be part of your personnel file?

12        A       I hope so.  I don't know.  I

13   don't know.  I don't look.  I don't know.

14                   MR. CAMPOLIETO:  The answer

15                is "I don't know."

16                   THE WITNESS:  I'm sorry.

17        Q       Those certificates, what do they

18   do for you when you earn a certificate?  It

19   just certifies that you completed that

20   training?

21        A       Yes.

22        Q       It helps you apply for jobs like

23   for Major Crimes last year?

24        A       It depends on what the position

25   is requesting.  So if that position is

1                    Tomesha Angelo

2   requesting something specific that you took,

3   then you have to prove that you took it.

4        Q      Are there ever requirements that

5   you take certain training for certain

6   positions?

7        A      You have to be more specific.

8        Q      When you applied for the job

9   with Major Crimes, did it require that you

10  had taken certain training?

11       A      I recall one of the trainings

12  was required was the Forensic Interviewing.

13       Q      What is your title right now?

14       A      Investigator.

15       Q      So you are still an

16  investigator?

17       A      Yes.

18       Q      Are you still in the application

19  process for the Major Crimes job?

20       A      No.

21       Q      You just didn't get it?

22       A      No, I did get it.

23       Q      So now you are an investigator

24  with Major Crimes?

25       A      Yes, is it lateral move.  It is

44

1                    Tomesha Angelo
2    just a different unit.  Same title, different
3    unit.
4         Q      What unit were you in September,
5    2015?
6         A      I was with patrol investigation
7    with the central section.
8         Q      Did you ever do any training
9    related to collection of evidence?
10        A      Training?  No, not that I
11   remember.
12        Q      Not at the academy?
13        A      No.  It wasn't big at the
14   academy.
15        Q      Not after you became an
16   investigator either?
17        A      No.
18        Q      Did you ever do any training on
19   video analysis?
20        A      I don't -- I am trying to
21   remember.  I don't remember.
22        Q      For example, there are some
23   security cameras that record night vision,
24   right?
25        A      Yes.

1                    Tomesha Angelo

2        Q       So that would be important, to

3    understand how a night vision camera works,

4    an opposed to a regular camera, right?

5        A       I never have taken training with

6    regard to that.

7        Q       Obviously every camera is

8    different, right?

9        A       Correct.

10       Q       So like frame rates are

11   different?  Do you know what frame rates and

12   drop speed would be?

13       A       I am not commissioned when it

14   comes to cameras.

15       Q       Is reviewing security camera

16   something that you have to do regularly in

17   your job as an investigator?

18       A       Sometimes.

19       Q       So you have a general

20   understanding from on-the-job work how

21   different cameras work, right?

22       A       I know they work different but

23   as far as their operating capacity, I

24   couldn't tell you.

25       Q       Some videos are clearer than

1                    Tomesha Angelo

2    other videos?

3          A     Correct, yes.

4          Q     Some are choppier than other

5    videos?

6          A     Yes.

7          Q     Some have different file types

8    that work with different video players?

9          A     Yes.

10         Q     Did you ever take any training

11   with dealing with individuals with mental

12   health conditions?

13         A     I think that was part of

14   in-service before.

15         Q     So it might have been an

16   in-service training?

17         A     I think so.

18         Q     Are in-service trainings

19   required by the RPD?

20         A     Yes.

21         Q     So you said some of the training

22   that you do is voluntary, but that would be

23   something different than in-service training,

24   right?

25         A     Correct.

Tomesha Angelo

1

2      Q      So in-service training is
3  something that from top down they say
4  everybody in the department has to take this;
5  is that right?

6      A      Yes.

7      Q      Sometimes though would it be
8  like a one-time thing?

9      A      You mean they were annual, is
10  that your question?

11      Q      Correct, it could be, hey, for
12  example, a court decision came down, there is
13  a change in the law, person has to take this
14  training one time?

15      A      Yes.

16      Q      After that, maybe there is not a
17  follow-up on that topic to make sure it
18  really sank in for everybody?

19      A      Correct.

20      Q      Do you know why firearms
21  training is required every year as opposed to
22  other topics?

23      A      No.

24      Q      Is it because you have to
25  maintain a certificate or a license to carry

1                    Tomesha Angelo

2    a firearm in New York?

3         A      I don't know the reasoning.

4         Q      Do you remember when you took

5    the in-service training about dealing with

6    individuals with mental health conditions?

7         A      No.

8         Q      Do you know if it was before or

9    after September 2015?

10        A      I do not remember.

11        Q      Do you think it was more than a

12   couple of years ago?

13        A      I don't remember.

14        Q      Can you give any kind of

15   estimate on when it might have been.

16        A      No.  I mean I feel like, I don't

17   want to -- I don't know.  Sorry.

18                    MR. SHIELDS:  John, it is a

19                    little hard when you are

20                    obviously sitting right next to

21                    here.  Just, can you verbalize

22                    any objections that you have.  I

23                    don't want her looking at you.

24                    MR. CAMPOLIETO:  Yes, I am

25                    trying to let this flow.  She

49

                    Tomesha Angelo

1
2          answered twice, "I don't know."
3          The objection is that she
4          answered the question twice; she
5          answered a third time, she
6          doesn't know.
7               MR. SHIELDS:  That is fine.
8          I just want you to be able to
9          get it on the record, okay?
10              MR. CAMPOLIETO:  Got you.
11     Q     Do you know if, at that
12  training, you learned about specifically
13  dealing with individuals who have been
14  diagnosed as schizophrenic?
15     A     Specifically, no.  I don't
16  recall what the specifics were.
17     Q     You don't remember any specifics
18  about that training at all?
19     A     No.
20     Q     Do you know if in general
21  dealing with people in mental health
22  conditions is something that the RPD requires
23  its officers to be trained on?
24     A     I don't know if it is a
25  requirement.

50

1                    Tomesha Angelo

2        Q       Is that something that you

3    learned anything about at the academy?

4        A       Yes.

5        Q       There is general training about

6    dealing with people with mental health

7    conditions at the academy?

8        A       I believe so, yes.

9        Q       When you do in-service

10   trainings, do you get certificates similar to

11   the voluntary training that you do?

12       A       No, not that I recall.

13       Q       Are you a member of any

14   professional associations?

15       A       Such as what?

16       Q       I don't know.  I know for

17   example, International Police Mountain Biking

18   Club?

19       A       When it comes to, like, police

20   stuff, am I a member of stuff?

21       Q       Correct.

22       A       I am a member of IALEO.

23       Q       What is IALEO?

24       A       Italian American Law Enforcement

25   Officers.

51

1                    Tomesha Angelo

2        Q      Is that a nationwide

3   association?

4        A      I don't know if it is

5   nationwide.

6        Q      There is a Rochester chapter?

7        A      Yes.  I don't know if it is just

8   in Rochester or -- I don't know.

9        Q      Are there members of other law

10  enforcement agencies other than the RPD?

11       A      Yes.

12       Q      Anything else?

13       A      No.

14       Q      With IALEO do you do lobbying?

15       A      I don't.  I don't know if they

16  do.

17       Q      What do you do?  Is it social?

18       A      It is social.

19       Q      Social?

20       A      Yes.

21       Q      Do you remember the Locust Club?

22       A      Yes.  That is our union.

23       Q      Any other unions or law

24  enforcement associations?

25       A      No.

52

1                    Tomesha Angelo

2          Q        Just going back to your training

3     at the police academy and your in-service

4     training and your certificate training, that

5     is what I will call it, training that you

6     received, voluntary training, certificate

7     training; that fair to call it?

8          A        Sometimes you get one; sometimes

9     you don't.

10         Q        Do you agree that the New York

11    State Division of Criminal Justice Services

12    establishes the standards for all law

13    enforcement in New York State?

14         A        Yes.

15         Q        But can the RPD can have

16    policies that create a higher standard?

17         A        More strict?

18         Q        Correct.

19         A        Yes.

20         Q        But they wouldn't go below that

21    minimum standard set by DCJS, right?

22         A        Correct.

23         Q        Those DCJS rules of the road,

24    they set forth the proper and established

25    procedures and practices, right?

53

1                    Tomesha Angelo

2        A       As far as I know, yes.

3        Q       If you violated those DCJS rules

4    of the road that would be a violation of the

5    proper and required practices and procedures,

6    right?

7        A       I don't know if you can get

8    violatations for DCJS, but I think our

9    policies are based on DCJS so you would be a

10   violation on our policies.

11       Q       So it would be a violation, an

12   internal violation of RPD policy?

13       A       Whatever they were set,

14   depending on what you are talking about.

15       Q       The policies they set forth,

16   professional standards, right, so if you

17   violate your policies, that would be a

18   violation of professional standards?

19       A       I don't -- I don't know what it

20   would be called.  I'm sorry.

21       Q       If you violated the policies,

22   that would be a violation of good and

23   accepted police practices?

24                    MR. CAMPOLIETO:  Objection.

25       A       It would be a violation of

1                    Tomesha Angelo

2    whatever policy, not just in general

3    violation.

4         Q     In the policies, they set forth

5    good and accepted police practices, right?

6         A     Yes.

7         Q     So the answer would be, Yes, if

8    you violated the policies that would be a

9    violation of good and accepted police

10   practices, right?

11                   MR. CAMPOLIETO:  Objection.

12              Vague.

13                   MR. SHIELDS:  She just

14              answered the question, John, you

15              can't object.

16                   MR. CAMPOLIETO:  What is

17              good and proper police work?

18              Define it.  I don't know what

19              that is.

20                   MR. SHIELDS:  I just defined

21              it for her and she said, "The

22              policy set forth good and

23              accepted police practices."

24                   MR. CAMPOLIETO:  Objection.

25              Vague.

55

1                    Tomesha Angelo

2        A      But every policy -- you can't

3    just say this person was in violation of good

4    practice and policies.  They were in

5    violation of A, B and C which are based on

6    the DC -- whatever the state policies are.

7    So when you violate someone, it is not a

8    general thing; it is a violation of A, B or C

9    which are all based on state practices, state

10   standards.

11       Q      Is it fair to say your duty as

12   investigator is to conduct thorough

13   investigations?

14       A      Yes.

15       Q      It is a priority, right, to

16   ensure that you do your due diligence?

17                    MR. CAMPOLIETO:  Objection.

18                    MR. SHIELDS:  John?

19                    MR. CAMPOLIETO:  Priority to

20               whom and what is the priority?

21                    MR. SHIELDS:  Stop

22               instructing the witness.  You

23               can say your objection and she

24               can go ahead an answer.

25                    MR. CAMPOLIETO:  You

56

1               Tomesha Angelo

2               continued, Elliot.  It is an

3               objection.  It is vague.

4      A      So if I am assigned an

5   investigation, I am going to do my due

6   diligence and be as thorough as I possibly

7   can, but as an investigator, sometimes I am

8   just there to assist or they just have

9   questions or they just need me to create a

10  photo array so...

11     Q      So when it is your case that is

12  assigned to you, you are investigating,

13  right?

14     A      Yes.

15     Q      Then you are going to do your

16  due diligence, right?

17               MR. CAMPOLIETO:  Objection.

18     Q      It is your priority to do your

19  due diligence when you have a case assigned

20  to you, right?

21     A      As far as my due diligence, as

22  far as running down evidence or my due

23  diligence for the victim or my due diligence

24  for --

25     Q      Correct.

57

```
 1                    Tomesha Angelo
 2        A      Which one?
 3        Q      All of the above.
 4               Let's start with doing your due
 5   diligence in terms of collecting all the
 6   relevant evidence, right?
 7        A      Uh-huh.
 8        Q      Is it priority to collect all of
 9   the evidence as part of your due diligence in
10   investigating?
11        A      It depends on the investigation.
12        Q      What sort of things would that
13   depend on?
14        A      Well, I am not going to treat a
15   violation -- if I am investigating a
16   violation, I am not going to treat it like it
17   is a homicide and depose the entire
18   neighborhood or collect every single --
19               MR. CAMPOLIETO:  Is that
20               what you are asking, Elliot?
21               What are you asking?
22        Q      You are a professional, right?
23        A      I'm a professional.
24        Q      Correct?
25        A      Yes.
```

58

1                    Tomesha Angelo

2        Q      So as part of a professional

3   police investigation, to make sure you are

4   doing your due diligence, if you are

5   investigating a felony, you are going to make

6   sure you track down all of the relevant

7   evidence, right?

8        A      I am going to try to.

9               MR. CAMPOLIETO:  Objection.

10              THE WITNESS:  Sorry.

11              MR. CAMPOLIETO:  You can

12              answer.

13       A      I am going to try to.

14       Q      You can't ignore evidence,

15   right?

16       A      Ignore it?

17       Q      Correct.

18       A      Well, I don't.

19       Q      You wouldn't, right?

20       A      Well, at least I try not to.

21   Sometimes you are not aware of it.

22       Q      If you are aware of evidence you

23   are not allowed to ignore it, right?

24       A      I wouldn't.

25       Q      You wouldn't because you are not

59

1                    Tomesha Angelo

2  allowed to, right?

3                    MR. CAMPOLIETO:  Objection.

4              Go ahead.

5      A      I don't know what the policy on

6  that -- I don't know how to answer that.  I

7  can tell you what I would do.

8      Q      Yes.

9              You need to collect all of the

10  evidence?  For example, if you are going to

11  charge someone with a felony crime, the basis

12  for probable cause is totality of the

13  circumstances, right?

14      A      Sometimes, yes.

15      Q      So you need all of the relevant

16  evidence that would go into your

17  determination of making a probable cause

18  analysis, right?

19      A      Then the issue becomes, what is

20  relevant, so I may look at something and say,

21  "Hey, technician, I want you to collect A, B

22  and C," but based on the technician's

23  experience and training, she is only going to

24  collect B and C, I can't tell -- I have no

25  authority over a technician, what she

60

1                    Tomesha Angelo
2    collects because she has the training when it
3    comes to that.
4                    So it just depends.  So I can
5    put my two cents in; I don't have final say.
6        Q      When you are conducting an
7    investigation, the things that you have
8    control over, you make sure to collect all of
9    that evidence, correct?
10       A      I do, yes.
11       Q      You do that because that is what
12   is required in order to ensure all of the
13   relevant evidence to the case is preserved,
14   right?
15                   MR. CAMPOLIETO:  Objection.
16                   Go ahead.
17       A      I try my best to support
18   whatever the allegation is or isn't.
19   Sometimes you have to prove something didn't
20   happen.
21       Q      Best practices would be, collect
22   all the evidence, right, make sure it is
23   preserve3d?
24       A      Correct.
25       Q      Would it be fair to say as a

1                    Tomesha Angelo

2    professional police investigator you follow

3    professional standards of conduct for your

4    performance, right?

5         A     Yes.

6         Q     You adhere to a code of ethics?

7                    MR. CAMPOLIETO:   The

8                Rochester Department Code of

9                Ethics and Rochester Police

10               Standards?

11        Q     I am just saying, you adhere to

12   a code of ethics; that is my question?

13        A     Yes.

14        Q     So you have to follow all of the

15   leads and explore all evidence, right?

16        A     Well, it depends on the case,

17   again.

18        Q     Okay.  Let me back up for a

19   second, I forgot to ask you.  Can you tell me

20   everything that you did to prepare for

21   today's deposition?

22        A     I read over the package.

23        Q     When you say, "the package,"

24   what are you referring to?

25        A     There was an arrest package that

62

1                    Tomesha Angelo

2    was made.

3         Q      What was in the arrest package?

4         A      Grand jury referral, crime

5    report, an IA, a technician's report, and I

6    think there were two depositions.

7         Q      Did you speak to anybody?

8         A      Other than my lawyer?

9         Q      Just a yes or no question.

10        A      My lawyer, yes.

11        Q      When did you speak with your

12   lawyer?  Don't tell me anything that you

13   talked about.  When was the meeting?

14        A      The meeting?  Just when I got

15   here.

16        Q      Before today, did you speak with

17   John or any other lawyer in the law

18   department about this deposition?

19        A      Well, we talked -- we did talk

20   once before.

21        Q      Other than John, did you speak

22   with anybody else about today's deposition?

23        A      No.

24        Q      Your husband?

25        A      I don't have a husband.

63

1                    Tomesha Angelo
2         Q       I'm sorry for presuming.
3                 Any friends or anybody?
4         A       No.
5         Q       Any other defendants in this
6    case?
7         A       No.
8         Q       Have you ever spoken to any of
9    defendants in this case about this case?
10        A       Yes.
11        Q       When was that?
12        A       When I got served with the
13   lawsuit.
14        Q       Who did you speak with?
15        A       Kester.
16        Q       What did you talk about?
17        A       I just asked what happened and
18   why we were getting sued.
19        Q       And what did he say?
20        A       Just that it went to court and I
21   don't know the term he used but that he
22   didn't get convicted and now he is suing us.
23        Q       Before speaking with Kester did
24   you know that the criminal charges against my
25   client, David Van, had been dismissed?

64

1                    Tomesha Angelo

2         A       I knew nothing about this case

3    until I got served.

4         Q       Did you speak to Kester again

5    before today's deposition?

6         A       No.  Not about this case, but I

7    do speak to him regarding investigations.

8         Q       But you haven't spoken with him

9    about this case?

10        A       No.

11        Q       So the only conversation that

12   you had with him was after you got served

13   with this lawsuit?

14        A       Yes.

15        Q       Did you speak to anybody else

16   other than Kester?

17        A       That is named?

18        Q       Or anyone else in the police

19   department.

20        A       In the police department?  The

21   union.

22        Q       Who did you speak with at the

23   union?

24        A       I don't know.  It was a long

25   time ago.

65

1                    Tomesha Angelo

2        Q        Are you required to tell your

3    union if you are served with a civil lawsuit?

4        A        I don't know if I am required,

5    but I have never been served so I asked.

6        Q        You asked your union

7    representative or something else?

8        A        No.  I think I called the union

9    directly.

10        Q        What did they tell you?

11        A        Just that the city lawyer would

12    be in contact with me.

13        Q        After you got the copy of the

14    Summons and Complaint, what did you do with

15    it?

16        A        Read it.

17        Q        So you understand the basic

18    allegations in the case from reading the

19    lawsuit?

20        A        I don't remember them all

21    because I read it a long time ago.

22        Q        After getting served, you

23    basically called the union and they said the

24    city would be in touch with you?

25        A        Yes.

1                    Tomesha Angelo

2        Q      Do you have to request

3   representation from the city when you are

4   served with a lawsuit?

5        A      I don't know if I am suppose to.

6        Q      There is no rule that you are

7   aware of that says, "Hey, I have to reach out

8   and request representation from The City Law

9   Department?"

10       A      Not that I know of.

11       Q      Did you ever consider hiring a

12  private attorney instead?

13       A      No.

14       Q      Are you aware that is an option?

15       A      I never thought about it.

16       Q      Did you ever speak with anyone

17  in the District Attorney's Office about this

18  lawsuit?

19       A      No.

20       Q      As part of the underlying

21  criminal prosecution, did you speak with

22  anybody in the District Attorney's Office?

23       A      No.  I don't think I spoke to

24  anybody regarding that trial.

25       Q      So if you didn't speak with

1                     Tomesha Angelo
2    anybody, then you didn't testify at the grand
3    jury, right?
4         A      No, I don't think I did.
5         Q      You didn't testify at the trial?
6         A      I definitely didn't testify at a
7    trial.
8                     MR. SHIELDS:  Let's take a
9                recess.
10                     (A recess was taken at this
11               time.)
12         Q      Investigator, we had a little
13   break there for about fifteen minutes.  Did
14   you have a chance to speak with
15   Mr. Campolieto?
16         A      I used the restroom.
17         Q      Did you speak to Mr. Campolieto
18   at all?
19         A      Yes.
20         Q      Is there any answer that you
21   gave that you would like to change in any
22   way?
23         A      I don't know.  It is just hard
24   to do yes or no answers, so sometimes it --
25   there just needs to be more said.

                    Tomesha Angelo

1

2      Q      I will try not to take up the

3  whole day.  If you can do yes or no, that

4  makes things go a lot quicker so I appreciate

5  you trying.  I am almost done with this line

6  of questioning, but I have a few more, okay?

7      A      Okay.

8      Q      When you are investigating a

9  crime in general, there are uniform

10 procedures; is that fair to say?

11     A      I don't know if they would be

12 considered uniform procedures.

13     Q      Earlier you said the first thing

14 that is done is the officers would conduct a

15 preliminary investigation?

16     A      Right, but I don't know if that

17 is like set in stone.  It is just when you go

18 to a scene there is, who, why, what, when

19 kind of thing.

20     Q      Yes, that is what I mean.  For

21 example, you speak with the victim?

22     A      If you can.  Sometimes the

23 victim can't talk; sometimes witnesses aren't

24 available; sometimes suspects aren't

25 available.

69

1                    Tomesha Angelo

2        Q        You secure the scene?

3        A        Yes.  The best you can, yes.

4        Q        You identify any evidence that

5    you can collect?

6        A        Yes.

7        Q        You collect that evidence?

8        A        Depending.

9        Q        Depending on, if it is

10    physically able to be collected?

11        A        That, and it also depends on the

12    crime.  Like I said, you are not going to

13    treat a violation the same as you will a

14    homicide, so.  You are not getting witness'

15    depositions for certain crimes.  You are not

16    collecting video for certain crimes.  You

17    don't collect video for every single crime.

18    It just depends; it all depends.

19        Q        Got it.

20                  When did you first become

21    involved in the investigation of this

22    incident?

23        A        I think after I heard the

24    officers calling out that somebody was

25    injured, I went to see if they needed a hand.

70

1                    Tomesha Angelo

2        Q        Where did you hear that?

3        A        On the radio.

4        Q        At the time, were you in your

5    car?

6        A        I don't remember where I was at

7    the time.

8        Q        Did you hear your radio even if

9    you are not in the car?

10       A        Yes, I have a hand set.

11       Q        So you hear it on the radio and

12   you respond to the scene?

13       A        Yes.

14       Q        Yes.  What is the first thing

15   that you remember when you arrived at the

16   scene?

17       A        The first thing I remember is

18   Sarge telling me to take a deposition from

19   somebody in the store.

20       Q        When you say, "Sarge," who is

21   that?

22       A        Zimmerman.

23       Q        Do you remember everyone that

24   was on scene when you arrived?

25       A        There was quite a few so I might

71

1                       Tomesha Angelo

2    miss some.

3          Q       Can you tell me who you

4    remember?

5          A       Kester, Mitchell, Drake,

6    Kephart, Sarge, Brodsky.  I think LaFave,

7    L-A-F-A-V-E.

8                       (Reporter clarification.)

9          A       Me.  The technician showed up.

10         Q       Do you remember seeing my

11   client?

12         A       Your client was in the back of a

13   car so I never saw his face.  I just saw the

14   car moving and him either banging or kicking,

15   trying to kick the window out because it was

16   near where I was standing.

17         Q       You remember that?

18         A       Yeah.

19         Q       When you say, "Sarge," again,

20   you are referring to Zimmerman?

21         A       Yes.

22         Q       Did you ever speak to my client?

23         A       No.  He was very out of control

24   in the back of the car so he was not calm

25   enough for me to speak to.

72

1                    Tomesha Angelo

2        Q       Was there an ambulance on scene

3    when you arrived?

4        A       I don't remember if they were

5    there yet.

6        Q       When you arrived, were you the

7    only investigator on the scene?

8        A       Yes.

9        Q       Your job as the investigator on

10   the scene is to gather and collect the

11   evidence?

12       A       No.  I was there to assist the

13   officers in their investigation.

14       Q       Were you the case coordinator?

15       A       So case coordinator means I put

16   the paperwork together, but I was not the

17   lead on this investigation.

18       Q       Who was the lead on this

19   investigation?

20       A       Mitchell.

21       Q       When you gather the evidence,

22   you want to be able to solve the crime,

23   right?

24       A       It depends.  Sometimes you

25   gather evidence to prove something didn't

73

1                     Tomesha Angelo
2   happen, but it just depends, and just because
3   I am an investigator, doesn't mean I am the
4   only one that gathers evidence.  Sometimes
5   other people will take that responsibility.
6   If they see something, they will get it
7   collected and tell the lead investigator,
8   "Hey, this is what I found."
9        Q     It is important to make sure
10  that you don't arrest somebody that hasn't
11  committed a crime, right?
12                    MR. CAMPOLIETO:  Objection.
13       Q     You can answer.
14       A     As far as like charging them or
15  taking them in custody, because some people
16  think that just because somebody is in
17  custody they are under arrest, so explain
18  that a little bit more.
19       Q     Sure, we can break it down.
20             It is important to not put
21  someone under arrest without probable cause,
22  right?
23       A     Correct.
24       Q     It is important to make sure
25  that you have probable cause before you

74

1                    Tomesha Angelo
2   charge them with a crime, correct?
3        A      Well, if you have two people
4   that are in a disagreement and one wants the
5   other one arrested, and they sign the
6   paperwork, then they can go, especially in,
7   like, domestics.
8        Q      Are you ever allowed to ignore
9   exculpatory evidence?
10       A      Can you break that down?
11  Meaning what?
12       Q      If there is evidence that would
13  contradict a specific complaint that somebody
14  committed a crime, are you allowed to ignore
15  that evidence?
16       A      Ignore it?  I would say no, but
17  sometimes you don't know about it prior so.
18       Q      So the answer is no, you cannot
19  ignore it?
20       A      I wouldn't.  I don't know what
21  the rules are, whether you can or cannot.  I
22  wouldn't.
23       Q      You wouldn't because it would be
24  part of the overall totality of the
25  circumstances which is required to make a

1                    Tomesha Angelo

2    probable cause determination, correct?

3         A      It is just the right thing to

4    do.

5         Q      Is it the lawfully required

6    thing to do, correct?

7         A      Yes.  You need probable cause

8    for the arrest, yes so if I can prove that

9    something didn't happen, then I would want to

10   know about it.

11        Q      You have to gather all the

12   evidence that you know about, right?

13        A      Yes.

14        Q      All of the evidence that you

15   have access to?

16        A      Yes.  You are asking another

17   question or are you making a statement?

18        Q      That was a question.

19        A      Yes.

20        Q      As an investigator, part of your

21   job is speaking to witnesses, right?

22        A      Again, what kind of case are we

23   talking about?  Are we talking about this

24   specific case or are we taking about in

25   general?

76

Tomesha Angelo

1

2      Q      In general I am talking right

3  now.

4              MR. CAMPOLIETO:  For this

5              case.

6      A      Are we talking about this case?

7      Q      I am saying in general, part of

8  your job is speaking to witnesses, right?

9      A      Yes.  I can speak to witnesses

10  but I don't if I am not the lead

11  investigator.  I may go to a scene and not

12  speak to a witness because it is not my

13  scene.

14     Q      So it is just a simple question:

15  In general, you, as part of your job, you

16  talk to witnesses, right?

17     A      Yes.

18     Q      Best practice would be to

19  corroborate any witness statement with

20  objective evidence, right?

21              MR. CAMPOLIETO:  Objection.

22     A      Again, sometimes it is really

23  difficult because you could have a witness

24  saying, "Oh my God I saw him.  He was wearing

25  a blue hat," and then you look at video and

77

                          Tomesha Angelo

1

2    he wasn't, he was wearing a green a hat so

3    you can talk to a lot of people, you don't

4    necessarily talk to everybody.  You don't

5    take depositions from everybody.  It just

6    depends on the case.

7         Q     So, in your hypothetical where

8    one person says green hat and ten people say

9    blue hat and there is a video showing a green

10   hat, that is all evidence that you can't

11   ignore, right?

12        A     It is not ignoring it.  I mean,

13   you don't necessarily depose everybody.  You

14   can say the majority were saying this and

15   this guy said this and then it is up to a

16   judge or a jury to determine who understood

17   it correctly.  It is not necessarily them

18   lying, it is just how they interpreted it or

19   it or the angle they saw it.

20        Q     Let's say somebody makes a

21   specific complaint and says, "The guy that

22   did this was wearing a green hat."

23        A     Okay.

24        Q     And then there is a video and

25   the video shows the guy wearing a blue hat

78

1                    Tomesha Angelo
2   and you talk to ten people who say, "Hey,
3   look, there is a guy with a blue hat, but we
4   don't know anything about him doing the
5   crime, he is just walking down the street,"
6   right?  Well, that is all going to go into
7   your probable cause determination if the blue
8   hat guy is the same person as the green hat
9   guy, right?
10                    MR. CAMPOLIETO:  Objection.
11        A       That is not enough to go on.  It
12   all depends on the crime, how close he was,
13   does he match other physical descriptions.
14        Q       Yes, right, all of that stuff is
15   stuff that you could consider, right?
16        A       Right.
17        Q       When you talk to witnesses, you
18   have to make credibility determinations,
19   right?
20        A       Yes and no.
21        Q       Sometimes they tell you
22   something and you are like, that is
23   ridiculous, I don't believe so?
24                    MR. CAMPOLIETO:  Objection.
25        A       I am not like that.  You just

79

1                    Tomesha Angelo
2    never know, you just never know.
3          Q      You see crazy things on the job?
4          A      Yeah.
5          Q      When you hear something crazy,
6    it is better to back that up with objective
7    evidence if you can, to prove or disprove
8    what that person is saying?
9          A      It all really depends on the
10   crime and what is going on.
11         Q      So, you know, sometimes you have
12   to determine as part of your job whether
13   somebody is telling you the truth, right?
14         A      Sometimes you can't and
15   sometimes, for example, if you and your wife
16   are fighting and she is demanding you get
17   arrested because you smacked her, there is no
18   video, there is no marks on her, but she is
19   insistent, you know, you just, unfortunately,
20   have to make the arrest and let the court
21   determine who has more credibility.
22   Sometimes it is not in my hands to determine
23   who is right and who is wrong.  That is not
24   my job; that is for the jury.
25         Q      But if there was a video of

1                    Tomesha Angelo

2    their fight that showed that the wife wasn't

3    hit, you are not allowed to ignore that

4    video, correct?

5        A       You have to know about it first.

6        Q       If you knew about it, you

7    wouldn't be allowed to ignore it, correct?

8        A       I wouldn't ignore it.

9        Q       But you are not allowed to

10   ignore it?

11       A       I don't know what the rules are.

12                MR. CAMPOLIETO:  Objection.

13       Q       As part of the determination of

14   probable cause, you are not allowed to ignore

15   exculpatory evidence, right?

16       A       Like I said, I don't know what

17   the rules and regulations on paper are.  I am

18   just letting you know, I wouldn't because I'm

19   not going to send somebody to jail if they

20   didn't do it, but if I don't know about it,

21   it can happen.

22       Q       Just a general principal, you

23   are not allowed to ignore exculpatory

24   question?

25       A       You keep asking the same

1                    Tomesha Angelo

2    questions, Dude.  I don't know what the

3    general orders say as far as that.  I can

4    tell you what I would do.

5          Q      Do you ever have to get

6    statements from police officers as part of

7    your job?

8          A      No.

9          Q      But you did that in this case,

10   right?

11         A      A statement?  I didn't write a

12   statement from an officer.

13         Q      Some officers are more reliable

14   than others, right?

15                      MR. CAMPOLIETO:  Objection.

16         Q      You can answer.

17         A      I mean, it depends on what --

18   reliable showing up on time or -- I mean I

19   guess it depends on what you are talking

20   about?

21         Q      You trust the word of some

22   officers more than others; is that fair to

23   say?

24         A      No.  I mean if an officer tells

25   me this is what is going on, that is what is

                        Tomesha Angelo

 1

 2    going on.

 3          Q       There have been some officers

 4    that have been determined by courts in

 5    Rochester to have testified falsely

 6    repeatedly, are you aware of that?

 7          A       Okay.

 8          Q       Like Hartley and Osipovitch?

 9    The Democratic Chronicle did a long story

10    about how a bunch of convictions were

11    overturned?

12          A       So I know the media and stuff

13    will say things about my coworkers.  I don't

14    know if courts really did overturn them; I am

15    not aware of that.

16          Q       If a court found, for example,

17    that Ryan Hartley had testified falsely

18    leading to convictions in cases that he

19    worked on to be overturned, would that be

20    something that he would be disciplined for

21    within RPD?

22          A       I don't know.

23          Q       You don't know?

24          A       No.

25          Q       If you were aware that Ryan

1                  Tomesha Angelo

2   Hartley had testified falsely about certain

3   crimes that he investigated, and then you

4   later got a report from him, would you look

5   at that a little more sceptically than a

6   report from another officer that you trusted?

7        A     Probably not because if it were

8   instances where something happened and -- if

9   it was bad enough they, I am assuming, they

10  would have fired him so obviously he is still

11  good to be a police officer, so, no, I am

12  still going to trust his reports at that

13  point.

14       Q     So you trust all of the police

15  officers that work with you equally?

16       A     Yes.  Now, just like I said

17  before, you know, obviously officers, they

18  are human too and if something is -- if it

19  was -- he is claiming it was a green hat and

20  it is really a black hat, obviously I am

21  going to understand that, but as far as far

22  as just flat out lying in a report, I

23  wouldn't think that.

24       Q     If other officers that you

25  worked with told you one thing and there was

84

Tomesha Angelo

1    a video that contradicted what they said,

2    would you trust what they said or would you

3    trust the video?

4    Q        Well, you have to give

5    A        Well, you have to give

6    credibility to both because the video only

7    shows a little bit of what is going on and

8    some videos don't have audio and you don't

9    know what is happening outside of the scope

10   of the video, so you have to take -- you have

11   to take everything with a grain of salt and

12   luckily I am not Judge or jury and that is

13   not my decision.

14   Q        Your job as an investigator is

15   to be impartial and fair, right?

16   A        To the best of my ability.

17   Q        To not be the Judge or jury, and

18   that requires you to review all of the

19   evidence and give it proper weight?

20   A        It depends on if I am the lead

21   investigator or what is going on.  Just

22   because I am an investigator and I show up on

23   the scene, it doesn't mean it is my scene.

24   Q        Is it important that you

25   document everything that you do, correct?

85

1                    Tomesha Angelo

2        A       I am very good at documenting,

3    yes.

4        Q       Does the RPD require that you

5    carry around a little notebook to take notes

6    in?

7        A       No, not required.

8        Q       For example, I don't know if you

9    are aware, the New York City Police

10   Department requires all officers to carry

11   what is called a memo book and document their

12   activities throughout the day.  The RPD

13   doesn't have a similar requirements?

14       A       No.

15       Q       Are you required in some other

16   way to document your activities throughout

17   the day?

18       A       No.

19       Q       You are not required to

20   document, for example, if you showed up to a

21   scene, every person that you spoke with?

22       A       No.

23       Q       Is that something that you do?

24   You mention that you are very good at

25   documenting, is that a personal practice of

                    Tomesha Angelo

 1    yours?

 2          A       Yes.

 3          Q       I'm sorry.  I can't hear you.

 4          A       Yes.

 5          Q       Where do you do that?

 6          A       What do you mean?

 7          Q       Do you have a note pad or do you

 8    do it by hand?

 9          A       A note pad, but I don't always

10    write everything in the note pad, but it will

11    be in my report.

12          Q       Where do you keep your note pad?

13          A       Like, on my person?

14          Q       I want to get your reports from

15    this case, from your note pad, where would

16    that be?

17          A       Wait, you want to get the

18    information in the note pad regarding this

19    case?

20          Q       Right, if I wanted all of your

21    handwritten notes, where are your handwritten

22    notes stored?

23          A       I supply them.

24          Q       You what?

1                    Tomesha Angelo

2         A       I supply them in the arrest

3    package, a copy of them.

4         Q       So you would take out your

5    handwritten notes and put them in the arrest

6    package?

7         A       Sometimes we would put them in

8    evidence and then we got into the practice of

9    copying them and putting copies and now that

10   we -- the officers have bodycams, they take

11   pictures of them and put them into the C.3 so

12   a lot has changed over the last few years how

13   we keep our notes.

14        Q       Do you save your original

15   handwritten notes?

16        A       Yes, I do.  If they are not in

17   evidence, then I have them.

18        Q       When you say you have them, at

19   your home?

20        A       Or at the office, depends on the

21   notebook.

22        Q       As an investigator, do you have

23   an office at PSD?

24        A       No.

25        Q       When you say you keep them at

1                    Tomesha Angelo

2     the office, what do you mean?

3          A     I have a locker at the public

4     safety building, but my desk is not at the

5     public safety building.

6          Q     Where is your desk?

7          A     Bivona, B-I-V-O-N-A.

8          Q     Do you keep your notes in your

9     locker or do you keep your notes at your desk

10    in Bivona?

11         A     It depends on the note pad.  The

12    last couple of note pads I will keep at my

13    desk the old ones I will either keep them in

14    my locker or sometimes I have storage in my

15    attic.

16         Q     As part of this case, did John

17    ever ask you for a copy of your note from

18    this case?

19         A     He has a copy of my note from

20    this case.

21                    MR. SHIELDS:  John to the

22                    extent I don't have them, I

23                    would request production of

24                    those notes.

25                    MR. CAMPOLIETO:  We sent

89

                    Tomesha Angelo

1                   them in the Rule 26 Disclosures.

2                   There are two pages of them.

3                       I think they are numbers 103

4                   and 102.

5       Q       Do you know if you gave those

6   notes to the District Attorney?

7       A       It would have been in the

8   package.

9                   MR. CAMPOLIETO:  This is

10                  just one page.  This is one

11                  page, 103.  There is one page

12                  103 with two copied note pages.

13                  MR. SHIELDS:  For the

14                  record, I am going to put this

15                  up, it is going to mess up all

16                  my other numbers that I predate.

17                  I will do this as Exhibit 1.

18                      (Handwritten notes were

19                  marked as Plaintiff's Exhibit 1

20                  for identification, as of this

21                  date.)

22      Q       Investigator, on your screen do

23  you see these two, they look like spiral

24  notebook copies on this one page that is

1                 Tomesha Angelo

2    marked at the bottom COR103?

3         A     Yes.

4         Q     I will try to see if I can zoom

5    in.

6               So it looks like what you wrote

7    down is basically the witness' name, Dawan?

8         A     Yes.

9         Q     The location, his birthday, his

10   phone number.

11              Is this A&Z South Market, is

12   that what it says?

13        A     Yes.

14        Q     It says, left pinky?

15        A     Yes.

16        Q     And then John put his stamp on

17   the middle so it is a little hard to read the

18   rest of it.  I think it says Rafeq Zayed.  He

19   is another witness?

20        A     I don't remember who that guy

21   is.

22        Q     In general, what is the type of

23   stuff that you would write down in these

24   notes?

25        A     Again, that would depend on the

1                  Tomesha Angelo
2    case, but if you want to talk about this
3    case, obviously I was asked to talk to or
4    take a deposition from the witness so that is
5    why the witness is first in my book; that was
6    the first thing that I did.
7                  Obviously, I had to get all of
8    his pedigree information, where it happened.
9    The name of the store is A&Z.  He is injured
10   on his left pinky.  This is over ten -- that
11   was a pain level.  I asked him what was pain
12   scale from one to ten and he said over ten.
13        Q     Okay.
14        A     I don't remember who Rafeq is
15   and then the name of the guy in the back of
16   the car.  I don't even have his date of birth
17   on here and then the other note pad would
18   have been what I was asked to charge him
19   with.
20        Q     What is 16F, right here, mean?
21        A     Where are you looking?  Oh,
22   apartment number.
23        Q     When you say you were tasked
24   with charging him, someone told you the
25   charges to press?

1                    Tomesha Angelo

2        A       Well, I would talk to the

3   officer.  I would talk to somebody that is at

4   the hospital and say, "What are the injuries

5   of the officers?"  And then I would have to

6   look them up in the book and because the

7   officers are at the hospital, they can't

8   draft these reports so I had to draft it for

9   them.

10              The charges would have been

11   based on what I was told their injuries are

12   and what I was told happened in their

13   investigation as well as whatever the

14   deposition I took from the other guy.

15       Q       I will get back to that in a

16   second.

17              When you showed up at the scene,

18   there were numerous witnesses at the scene,

19   right?

20       A       I only talked to one.

21       Q       You only talked to one.

22       A       I don't know how many others

23   there were or who talked to them.

24       Q       If you were the lead

25   investigator on the case, would you have

93

1                    Tomesha Angelo

2    talked to all of the different witnesses on

3    the scene?

4         A     It depends on what their

5    involvement was, what they saw.  It just

6    depends.  Sometimes officers will, for lack

7    of a better term, triage and talk to these

8    people and find out what do they have and

9    come back to an investigator and say, "Hey

10   this one we heard screaming."  This one we

11   heard from a person that was walking by and

12   then that will point us in the right

13   direction as to who to talk to at a scene,

14   not necessarily do we talk to everybody.

15   Sometimes officers help us out.  It just

16   depends on the scene.

17        Q     If the officers did talk to

18   other witnesses, that should be documented

19   somewhere?

20        A     Who knows.  It depends on what

21   the crime is; it depends on what they had to

22   say.  Sometimes they do; sometimes they

23   don't.

24        Q     So here the people that you

25   spoke with were the one deposition that you

94

1                    Tomesha Angelo

2    took and the police officers?

3         A     I believe I talked to them

4    directly regarding what happened.  As far as

5    their injuries, I don't know if they told me

6    or if the officer that was tasked to be up

7    there told me.  I did end up talking to the

8    officers once they came back to the office.

9         Q     Did you talk to them before you

10   wrote their felony complaints?

11        A     Yes, and the video because I got

12   the video and I saw it at the office with the

13   officers.

14        Q     How did you get the video?

15        A     I had asked the technician to

16   collect it.

17        Q     That would have been Stephanie

18   Febrezio, now Stephanie Mentz?

19        A     Yes, and she collected it

20   however she collected it and put it on a CD

21   for me.

22        Q     What did you tell Stephanie to

23   collect?

24        A     Just the video.

25        Q     What were your instructions that

95

1                    Tomesha Angelo

2     you gave her?

3         A      I don't recall giving her

4     instructions because I hadn't seen the video,

5     so I couldn't say, "Collect from this time to

6     this time."  I just said, "Collect the

7     video."  I know there were issues.  They had

8     to call somebody down there from the store.

9         Q      So if Stephanie testified that

10    you told her to collect the video from a

11    specific time to a specific time, she was

12    lying?

13        A      Not necessarily.  I don't recall

14    giving her a time.  I don't have times

15    written down in my notebook so unless it was

16    from the time of the call to whatever time

17    the first officer -- or the call that they

18    were in distress, I don't know.

19        Q      It is possible that you told her

20    to collect from a specific time to a specific

21    time?

22        A      Yes, it is possible, but I don't

23    recall that.

24        Q      You don't recall what those

25    times were?

96

1                    Tomesha Angelo

2         A       No.

3         Q       And you don't recall how you

4    made that determination?

5         A       I wouldn't know.  Other than

6    from when the officer's time of the job until

7    whenever the officers called out.  I wouldn't

8    know how to pick a time other than that.

9         Q       Let's go through some other

10   stuff.  Maybe we'll come back to that.

11                Did you ever speak to my client,

12   David Van?

13        A       No.

14        Q       What was his condition when you

15   arrived on the scene?

16        A       He was in the patrol car being

17   very combative.

18        Q       I am going to put up some

19   exhibits.  If I can figure out this

20   technology that was working yesterday.

21                    MR. SHIELDS:  I will share

22                my screen.  This will be Exhibit

23                2.

24                    (Still shot from a news clip

25                was marked as Plaintiff's

97

1                    Tomesha Angelo

2                    Exhibit 2 for identification, as

3                    of this date.)

4          Q      Does that look like my client to

5    you, investigator?

6          A      I don't know what your client

7    looks like.

8          Q      I am sorry?

9          A      I don't know what your client

10   looks like.

11         Q      So, in general, can you tell me

12   what is depicted in this picture?

13         A      It looks like possibly a male

14   sitting and it looks like either a doctor, a

15   nurse or possibly EMT holding their head.

16         Q      So there are three pictures in

17   this Exhibit 2.  I will go to the second

18   picture.  It's a similar picture, right, with

19   the EMT?

20         A      Okay.

21         Q      Is that fair to say?

22         A      It must be a paramedic or EMT.

23   They are wearing a badge and doctors and

24   nurses don't wear a badge.

25         Q      What does it look like she might

1                    Tomesha Angelo

2    be doing, can you tell?

3         A       Checking an eye.

4         Q       Do you know when paramedics

5    might check somebody's eye?

6         A       It could be a number of reasons.

7         Q       If they had head trauma?

8         A       What?

9         Q       If they have head trauma?

10        A       Head trauma, I am not a doctor.

11   I don't know.

12        Q       Have you ever responded to a

13   scene where someone has a head injury?

14        A       Yes.

15        Q       Is one of things they might do

16   to see if they have a concussion is to check

17   their eyes?

18        A       I don't know.

19        Q       How about this third picture,

20   what do you see depicted here?

21        A       The EMT with the hand on the

22   head and I don't know what she is looking at.

23        Q       Does she look like she is

24   looking at my client?

25        A       Either the chin, the neck, the

99

1                      Tomesha Angelo

2     chest.  I don't know what he is looking at.

3          Q      She is looking at his body?

4          A      Okay.  I don't know.

5          Q      It is fair to say?

6          A      I don't want to say the body.

7          Q      She is looking at him?

8          A      Yes.  Looking at him, yes.

9          Q      Does it look like his eyes are

10    open?

11         A      No.  It does not look like his

12    eyes are open.

13         Q      I will take that one down and

14    put up what will be Exhibit 3.

15                      (Photograph was premarked as

16                      Plaintiff's Exhibit 3 for

17                      identification, as of this

18                      date.)

19         Q      Investigator, do you see a

20    picture of a man with his eyes closed?

21         A      Yes.

22         Q      Do you recognize him at all?

23         A      No.

24         Q      If I represent to you that is my

25    client Dave Van, I will tell you that because

1                    Tomesha Angelo

2    there will be a few more pictures of him, all

3    right?

4         A      All right.

5         Q      This glove, is that the type of

6    glove officers wear?

7         A      Sometimes.

8         Q      Do you think that is probably an

9    officer holding his shoulder?

10        A      A lot of the EMTs and stuff like

11   that all also wear gloves like that.  I just

12   don't know if that is an EMT.  It is

13   possible.

14        Q      Do you see the big cut on the

15   side of his face right here?

16               MR. CAMPOLIETO:  Objection.

17        A      I wouldn't call it big, but yes,

18   there is a cut.

19        Q      Do his eyes look like they are

20   open or closed?

21        A      Closed.

22        Q      Does it look like he has other

23   scrapes on his head also?

24        A      I don't know if they are scrapes

25   or from shaving his head, but he has red

101
```
                     Tomesha Angelo
1
2   marks.  Can I say that?
3        Q     He has other red marks on the
4   side of his face as this cut right here?
5        A     Yes.
6               MR. CAMPOLIETO:  Can we take
7               a three minute pause?
8               MR. SHIELDS:  Three minutes?
9               MR. CAMPOLIETO:  Yes.  Three
10              minutes.  I have a quick thing
11              if you don't mind.
12              MR. SHIELDS:  Off the
13              record.
14              (A discussion was held off
15              the record.)
16              (A brief recess was taken.)
17       Q     I will move on and show you a
18   few more pictures, okay?
19       A     Yes.
20       Q     I will share my screen again.
21              (Photograph was marked as
22              Plaintiff's Exhibit 4 for
23              identification, as of this
24              date.)
25       Q     Investigator, do you see a
```

1              Tomesha Angelo
2  picture of my client seated in the back of a
3  RPD vehicle?
4       A     Yes.
5       Q     Are his arms behind his back?
6       A     One is.
7       Q     Do you see his other fingers
8  here?
9       A     Yes.  The other one is on his
10  side.
11       Q     So that would be one arm right,
12  and the second arm right here?
13       A     Yes.
14       Q     Does he look like he is being
15  combative in this picture?
16       A     I don't know.  It is a picture;
17  it doesn't show motion and his eyes are
18  closed.
19       Q     Is there an officer that is
20  looking like he is calmly standing besides
21  him?
22                 MR. CAMPOLIETO:  Objection.
23       A     I don't know who that is.
24       Q     Do you see a cord right here and
25  some tattoos?  It doesn't look like the

                     Tomesha Angelo

1

2    officer is doing much to have to hold him up,

3    right?  Stop him from fighting or anything?

4         A    You can't tell that from a

5    picture.

6         Q    Are his eyes closed?

7         A    Yes.

8              MR. SHIELDS:  What I want to

9              do is, I am going to share my

10             screen again and I am going to

11             play the video that was marked

12             as Exhibit 2 at yesterday's

13             deposition.  So, we don't need

14             to re-mark it for this one.

15             Just note for the record, that

16             yesterday it was marked as

17             Exhibit 2.

18             MR. CAMPOLIETO:  What was it

19             marked?  I don't recall it being

20             marked.  If you want, we can go

21             back and do it.  That is fine.

22             MR. SHIELDS:  I don't know

23             what the common practice is for

24             -- obviously, it is going to be

25             in the one record.  It will be

104

1                    Tomesha Angelo

2              on this video.

3                    MR. CAMPOLIETO:  We can

4              consider it Exhibit 2 from

5              yesterday, that is fine.

6        Q      Investigator, we have this video

7    paused.  This is camera four, paused at

8    10:30.  On the video, on the bottom left it

9    says 11:43:46 on the top right.

10                   Investigator, just looking at

11   the pause portion of this video, is this a

12   video that you have previously seen before?

13       A      Yes.

14       Q      When did you see this video

15   previously?

16       A      I saw it today and I saw a video

17   the day it happened but I don't remember

18   anything about it.  It was so long ago.

19       Q      I am going to play the video, if

20   you can try to pay attention to my client and

21   then I will ask you some questions about the

22   video, okay?

23       A      Okay.

24                   MR. SHIELDS:  I played to

25              the end.  I know we had a

                    Tomesha Angelo

1

2              problem yesterday with the video

3              being on the screen.  Is that

4              what she is referring to?

5                  MR. CAMPOLIETO:  I will try

6              to fix it.

7        Q     So, investigator, were you not

8    able to see my client throughout the entire

9    video?

10       A     No.  He was behind some windows

11   of ours.

12       Q     So let me try to do that again.

13   Hopefully it will be a little less choppy,

14   let's see.

15       A     You just want me focusing on him

16   right now?

17       Q     Yes.

18                  MR. SHIELDS:  I will pause

19              to see if it will stop being as

20              choppy and then restart it.

21       Q     I will pause it and ask a

22   question.  This right here, is that LaFave?

23       A     Yes.

24       Q     Is that Dempsey?

25       A     Yes.

1                    Tomesha Angelo

2        Q        Is that Mitchell, if you can

3    tell?

4        A        It kind of looks like it because

5    he is bald, but it is too far away.

6        Q        Brodsky testified yesterday that

7    that he is him, so.

8        A        Okay.

9        Q        Is this the individual who you

10   took the deposition from the store?

11       A        I don't remember what he looked

12   like.  I'm sorry.

13       Q        I will stop sharing that.  Were

14   you able to see my client throughout that

15   video at that time?

16       A        Yes.

17       Q        Did he look like he was being

18   combative and fighting with the officers?

19       A        Yes.

20       Q        He did?

21       A        Yes.

22       Q        I guess that is what you saw.

23   Did you see him have to get picked up to his

24   feet?

25       A        Yes.

1                    Tomesha Angelo

2         Q       What are the reasons that

3    officers might have to pick someone up with

4    their feet?

5         A       If people refuse to get up and

6    sometimes they can resist by, like, passive

7    resistance where they just lay there or not

8    get up or tighten their arm.

9         Q       Or if they are physically unable

10   to, correct, that would be another reason?

11        A       To resist?  That is not another

12   reason to resist.

13        Q       A reason that the officers might

14   have to pick someone up to their feet could

15   be that they are physically unable to stand

16   up on their own, correct?

17        A       Yes.

18                       (Photograph was marked as

19                       Plaintiff's Exhibit 5 for

20                       identification, as of this

21                       date.)

22        Q       Investigator, do you see this

23   picture?

24        A       Okay.

25        Q       I will represent to you that

```
1                  Tomesha Angelo
2    that is my client's mug shot?
3         A     Okay.
4         Q     And, is there anything that
5    jumps out to you about this mug shot?
6         A     I have seen a lot of mug shots,
7    you are going to have to be more specific.
8         Q     Are my client's eyes closed?
9         A     They are closed but there are
10   many reasons why they could be closed.  He
11   could be refusing to look at the camera.  He
12   could have been pepper sprayed.  There are a
13   number of reasons why.
14        Q     And his eyes were closed in all
15   the previous pictures that we looked at when
16   he was in the back of the car, right?
17        A     Yes.
18        Q     Do you know if he was pepper
19   sprayed?
20        A     I do not know.
21        Q     You said you never spoke with my
22   client, right?
23        A     Right.
24        Q     You said it was because he was
25   being combative?
```

1                    Tomesha Angelo

2        A       Yes.

3        Q       Could another reason have been

4   because he was physically unable to speak

5   with you?

6        A       From what I remember, he was

7   screaming in the back seat and kicking.

8        Q       Would that be a common reaction

9   from someone who had just been assaulted and

10  beat up and pepper sprayed in the face by

11  point blank range?

12       A       There are a number of reasons

13  why people do that.

14       Q       So the answer would be yes,

15  could be?

16       A       I answered it.  I don't know

17  what this specific one was, but there are a

18  number of reasons people do that.

19       Q       I asked you if one of the

20  reasons could be those things and you said a

21  bunch of stuff and I asked you if your answer

22  is yes?

23       A       Say the things again.

24       Q       One reason that somebody could

25  be upset in the back seat of a police car is

1                     Tomesha Angelo

2    because they were just assaulted by the

3    police, correct?

4         A      Their interpretation of being

5    assaulted.

6         Q      Sure.

7         A      Yes.

8         Q      If someone was in physical pain

9    that could be one reason why they would be

10   upset, correct?

11        A      Upset or screaming and trying to

12   kick out a window.

13        Q      Sure.  Upset in however way they

14   are showing their being upset?

15        A      I have never seen it like that,

16   but sure, anything is possible.

17        Q      Did my client kick out the

18   window?

19        A      No.  I believe Brodsky addressed

20   that.

21        Q      How did Brodsky address that?

22        A      If I remember correctly, he

23   opened the door and yelled at him.

24        Q      So, the same guy that we saw get

25   dragged to the car with his eyes closed in

111

```
1                    Tomesha Angelo
2    all the pictures also tried to kick out the
3    window?
4         A      He was either trying to kick it
5    or use his head.  I don't remember.  I just
6    remember the banging and I remember the car
7    shaking.
8         Q      So he beat himself up?
9         A      I didn't say that.
10                MR. SHIELDS:  Please mark
11                this.
12                (Rochester Police Department
13                Action Report was marked as
14                Plaintiff's Exhibit 6 for
15                identification, as of this
16                date.)
17        Q      Let's put up the next exhibit,
18   Exhibit 6.
19                Do you see the investigative
20   action report on the scene?
21        A      Yes.
22        Q      At the bottom here, is it your
23   name, right?
24        A      Yes.
25        Q      It is dated September 5, 2015?
```

1                    Tomesha Angelo

2         A      Yes.

3         Q      So basically, did you review

4    this before your deposition today?

5         A      Yes.

6         Q      It says you showed up, you

7    talked with (V1) Algazall and (W) Zayed; is

8    that correct?

9         A      Okay.

10        Q      It said why he called 911.  It

11   says, "A comes into the store every day

12   giving them a hard time.  He became

13   aggressive and then (V1) decided to

14   physically remove him from the store."

15   Right?

16        A      That is what he told me, yes.

17        Q      And it says, "See his deposition

18   for further details."  Right?

19        A      Yes.

20        Q      Then he complained about his

21   pinky hurting and pain in his finger, right?

22        A      Yes.

23        Q      (W) stated he was inside when

24   the officers arrived, and told you the store

25   had cameras, right?

113

1                    Tomesha Angelo

2         A       Yes.

3         Q       (W) called someone to make a

4    copy, but he stated that he did not have

5    anything to copy it to.  Fabrizio was on

6    scene to help him make a copy so Stephanie

7    made the copy and turned it into the property

8    clerk, right?

9         A       Yes.

10                 MR. SHIELDS:  John, if you

11                 are going to say stuff, you have

12                 to do it loud and on camera.

13                 MR. CAMPOLIETO:  I don't

14                 know what you are talking about.

15                 MR. SHIELDS:  It looked like

16                 she was looking at you.

17                 MR. CAMPOLIETO:  Her report

18                 is here.  You will hear me talk

19                 if I talk.

20                 MR. SHIELDS:  Okay.

21        Q       Then it says you completed the

22   information for Kester and Drake to sign,

23   right?

24        A       Yes.

25        Q       Then it says you called (V1) the

114

                    Tomesha Angelo

1

2    next day to see how his finger was feeling

3    and he said he thought he broke it, towards

4    the end of his finger.  He was going to

5    follow up with a specialist, right?

6           A     Yes.

7           Q     The he rated his pain ten out of

8    ten?

9           A     Yes.

10          Q     So other than this and your

11   handwritten notes, do you have any other

12   notes about any of the conversations that you

13   had with either the witness, Zayed, the

14   victim, Algazall or Kester or Drake?

15          A     Say that again.

16          Q     Do you have any additional notes

17   about the substance of your conversations

18   with Drake, Kester, Zayed or Algazall?

19          A     No.

20          Q     No?

21          A     No.

22          Q     Do you have any notes anywhere

23   about my client allegedly trying to kick out

24   the window of the police car?

25          A     No.

1                      Tomesha Angelo

2        Q        Did you ever tell anybody that

3   previously?

4        A        Who would I tell?

5        Q        I don't know.  Is that a crime

6   to try to break out the window in the police

7   car?

8        A        I mean that would be an

9   attempted criminal mischief, but it is kind

10  of a -- he didn't actually do it.  He was

11  warned and stopped.

12       Q        He could have been charged with

13  a crime for that?

14       A        Yes.

15       Q        But he wasn't?

16       A        No.

17       Q        You said you spoke to Mitchell

18  on the night of the incident?

19       A        I think so, yes.

20       Q        Where did you speak with him on

21  the night of the incident?

22       A        I can't remember if he was the

23  officer up at the hospital or not.

24       Q        When you say, "If he was the

25  officer up at the hospital or not," what do

1                     Tomesha Angelo

2    you mean?

3          A      There would always be an officer

4    with injured officers.

5          Q      So you are not sure if Mitchell

6    went to the hospital with Drake and/or

7    Kester?

8          A      No.

9          Q      Did you go to the hospital on

10   the night of the incident and speak with

11   Drake or Kester?

12         A      No.

13         Q      So the conversation with

14   Mitchell on the night of the incident would

15   not have happened at the hospital?

16         A      No, not that I am aware of.  I

17   don't recall going to the hospital at all.

18   They may be the phone, but I don't recall

19   going to the hospital.  I needed to know the

20   extent of the injures of the officers so I

21   don't know if it was me or Sarge or whoever

22   called the officers up there.

23         Q      You remember speaking with

24   Kestler at some point, right?

25         A      I am going to say no, I don't

1                    Tomesha Angelo

2    remember because I am not sure that it was

3    me.  I don't know if it was me or Sarge.

4         Q      I missed that.  You don't

5    remember speaking to Mitchell?

6         A      No.

7         Q      But you do remember speaking to

8    Drake?

9         A      I definitely remember Kester

10   back at the office, and we watched the video.

11   I am trying to remember if Drake was there

12   too or if that -- if it was at two different

13   times because I don't know if they got

14   discharged at the same time, but I would have

15   had to speak with them to make sure that the

16   information was accurate because if they

17   weren't, I would have had to fix them before

18   they signed them.  So at some point I would

19   have had to talk to them.

20        Q      At some point you talked to them

21   before they signed the informations.

22        A      Yes.

23        Q      Let's look at their information.

24                    MR. CAMPOLIETO:  So this

25                    will be Exhibit 7.

118

                    Tomesha Angelo

1                   Tomesha Angelo

2                   (Officer Drake's Felony

3              Complaint was marked as

4              Plaintiff's Exhibit 7 for

5              identification, as of this

6              date.)

7      Q     "I, officer Matthew Drake."  You

8  see at the bottom it says September 5, 2015,

9  Officer Matthew Drake?

10     A     It is really blurry, but that is

11 what it looks like.

12     Q     It doesn't look really blurry on

13 my screen.  Is it your computer?  Does

14 everything look blurry today?

15     A     We have it smaller so your

16 pictures are --

17     Q     How about if I make it a little

18 bigger; is that better?

19     A     Yes.

20     Q     Is this the information that you

21 drafted for Officer Drake?

22     A     Yes.

23     Q     When you drafted it the first

24 time, had you spoken to him prior to drafting

25 it?

1                    Tomesha Angelo

2          A        I don't know if I spoke to him

3      prior to drafting it.  Either I talked to

4      somebody at the hospital, meaning an officer,

5      or Sarge did and relayed the injuries so I

6      knew what to write there.

7                    I would have at least started

8      this.  I don't know how far I got before

9      talking to them, but obviously if they needed

10     something, I would have changed it.

11         Q        So, you drafted it.  Maybe you

12     talked to him beforehand, maybe you didn't,

13     and then before he signed it, you said that

14     you talked to him, right?

15         A        Yes.

16         Q        When you talked to him before

17     you signed it, did you do that in person or

18     on the phone or something else?

19         A        That, I don't remember.

20         Q        So you drafted it and he signed

21     it, right?

22         A        Yes.

23         Q        "The defendant fell on top of

24     Officer Jeffrey Kester breaking his right

25     fibula bone.  Officer Kester's pain level was

1                  Tomesha Angelo

2    an eight out of ten.  The defendant continued

3    to resist officer's lawful arrest by

4    continuing to twist and pull away.  The

5    defendant 's actions forced the officers to

6    bring him to the sidewalk to get him under

7    control.

8                  "While going to the ground, your

9    complaintant dislocated his right shoulder

10   causing a pain level of eight out of ten.

11   All officers were on duty and in full

12   uniform."

13                  Do you know where you got those

14   facts from before you drafted that?

15        A      I would have gotten facts from

16   either Sarge, the officers themselves, the

17   video and then confirmed that the information

18   was correct before they signed it.

19        Q      How did you confirm that the

20   information was correct?

21        A      By them reading it and signing

22   it.

23        Q      So you asked the officers if

24   that was correct?

25        A      Yes.

121

1                    Tomesha Angelo

2         Q      Did you do anything else to make

3    an independent determination if all of that

4    was accurate?

5         A      No, if they told me to change

6    something, I would have changed it.  I was

7    not there.

8         Q      So you didn't have personal

9    knowledge so you couldn't contradict them?

10        A      Correct.

11        Q      Even if the video contradicted

12   what they told you?

13        A      The video is very, how do I say,

14   one dimensional.  There is more than video;

15   you can't just go by video.

16        Q      Sure.

17               But if the video contradicted

18   it, what would you do?

19        A      Are we taking this case or in

20   general?

21        Q      Yes, in general.  I will say

22   specifically here if I am referring to

23   specifically here.

24               If someone tells you something

25   and that thing they told you is contradicted

1                    Tomesha Angelo

2    by a video, do you go with the video or do

3    you go with the statement?

4         A       If they tell me this, they are

5    the ones that have to sign it.  I'm not going

6    to put my words into it.  If they want their

7    words into it, that is what they are putting.

8    That is what I am going to draft and that is

9    what I am going to sign.  And if there is

10   contradiction in your eyes, that is for a

11   jury or a Judge.

12        Q       And a jury did make a

13   determination on that, right?

14        A       I don't know.  I was not there.

15   I didn't know anything about this case until

16   I got served.

17        Q       But Kester told you the jury

18   dismissed the charges?

19        A       I don't know what his exact

20   words were, but sum and substance, yes.

21        Q       It went to trial and Kester

22   testified, are you aware of that?

23        A       No, I'm not aware of that.

24        Q       I will represent to you it went

25   to trial, Kester testified, Drake testified,

1                     Tomesha Angelo

2    Fabrizio, Stephanie Mentz testified and after

3    hearing that testimony and watching the

4    videos, the jury dismissed all charges

5    against my client.

6          A      Okay.

7                     MR. SHIELDS:  I'm going to,

8                 for the record, put up Kester's

9                 Felony Complaint.  This will be

10                Exhibit 8.

11                    (Officer Kester's Felony

12                Complaint was marked as

13                Plaintiff's Exhibit 8 for

14                identification, as of this

15                date.)

16         Q      Do you see on your screen a

17   Felony complaint, investigator?

18         A      Yes.

19         Q      I am going to go to the bottom.

20   This says, September 5, 2015, Officer Jeffrey

21   Kester; is that correct?

22         A      Yes.

23         Q      When you went over the complaint

24   with Drake that we put up previously, as

25   Exhibit 7, did Drake have any changes for you

124

1                         Tomesha Angelo

2    to make to it?

3         A       I don't remember that.  If he

4    did, I would have changed them.

5         Q       You don't remember if you had

6    multiple drafts of the complaint or not,

7    correct?

8         A       I don't remember that.

9         Q       If you did have multiple

10   complaints and you make changes to it, is

11   that saved on your computer?

12        A       It would be up on my computer.

13   It is not like I would print them out.

14        Q       So, for example, if you did make

15   changes to the first draft after you spoke

16   with Drake, would you have copies of both the

17   original first draft and the edited second

18   draft?

19        A       No, it was still a work in

20   progress, so it is not like it was complete

21   or finished.

22        Q       So, for example, some people

23   have multiple versions of different documents

24   with different names?

25        A       Okay.

1                      Tomesha Angelo

2        Q       You don't do that?

3        A       I don't do that.

4        Q       You go right in to the same

5    document and make the edits there?

6        A       Yes.

7        Q       Do you remember where you

8    drafted these complaints?

9        A       It would have been at my office

10   which was the Central Section Office.

11       Q       Do you have a different computer

12   today?

13       A       Yes.

14       Q       You don't have the same computer

15   that you drafted these on?

16       A       No.  When you change buildings,

17   you change computers.

18       Q       Do you have the same files?

19   Would you have copies of these on your

20   computer?

21       A       I don't know because if I had a

22   similar in incident, I would have changed the

23   names.

24       Q       There is a form that you use?

25       A       Yes, is it like a template.  So

1                    Tomesha Angelo

2    I would have changed the names and then

3    changed the narrative if I had another

4    incident that had these charges.

5          Q      Do you have a David Van folder

6    where you would have saved different

7    documents for different incidents?  Maybe you

8    are saving an arrest number or something?

9          A      I am sorry?  Say that again.

10         Q      For different cases that you

11   work on, do you set up different case folders

12   where you save documents?

13         A      Yes.

14         Q      On your computer would you have

15   a case folder for this case?

16         A      No, not on my computer.  So we

17   store the reports.  We used to store paper

18   reports so those would have been at the

19   Central Section Office and then they end up

20   going to archives somewhere, but then we

21   started saving things electronically so these

22   packages would be scanned into a program and

23   the originals would go to the District

24   Attorney's Office.

25         Q      What is the name of that

127

                    Tomesha Angelo

1

2    program?

3          A       LERMS, it's an acronym.  Don't

4    ask me what it stands for because I don't

5    know.

6          Q       With LERMS do you put your

7    handwritten notes in there to?

8          A       A copy of the package would be

9    put in, so my notes would be in the scanned

10   package, yes.

11         Q       Going back to this exhibit that

12   we're going to mark as Exhibit 8 which is

13   Kester's Felony Complaint, do you remember

14   drafting this?

15         A       I remember that I did draft it.

16   I don't remember the conversation that I had

17   with him.

18         Q       Like Drake, do you remember

19   anything about whether you talked to him

20   before you drafted it versus if you only

21   spoke to him after you drafted it?

22         A       No, I don't recall that.  As

23   long as they said that whatever I wrote was a

24   true and accurate representation then that is

25   what they said.

1                    Tomesha Angelo

2          Q      Did you watch the video before

3    you drafted it?

4          A      Before I drafted it, I don't

5    know.

6          Q      Did you watch the video on the

7    night of the incident?

8          A      Yes.  It was late at night so I

9    couldn't tell you if it was the next morning

10   or it would have been the same -- I would

11   have still been working on it, had the date

12   changed.

13         Q      It happened close to midnight so

14   you probably watched it on September 5?

15         A      I am assuming September 5, yes.

16         Q      When you drafted this and when

17   he signed it, it was true and accurate to

18   your knowledge?

19         A      Yes.

20         Q      Based on watching the video and

21   speaking to Kester?

22         A      Not only speaking to Kester but

23   officers there and Drake and the totality,

24   and if they wanted me to change anything, I

25   would have changed it.  This is their words.

1                    Tomesha Angelo

2        Q      It is their words that you wrote

3    up for them?

4        A      Yes.  I just drafted them for

5    them.  It is their information; it is their

6    paperwork.  I just helped them write it

7    because they were injured.

8                    MR. SHIELDS:  I will mark

9                this Exhibit 9.

10                   (Deposition of

11               Dawan Algazall was marked as

12               Plaintiff's Exhibit 9 for

13               identification, as of this

14               date.)

15       Q      Now, I will put up what will be

16   Exhibit 9.  This is the deposition of DA (W)

17   Algazall.  This is the one that you took.  Do

18   you remember?

19       A      That?  Yes.

20       Q      Do you know, here at the bottom,

21   is that your signature right there?

22       A      Yes.

23       Q      Did you read this today before

24   the deposition?

25       A      I skimmed over it.

1                    Tomesha Angelo

2          Q      So is this your handwriting or

3     is this his handwriting?

4          A      Mine.

5          Q      So you wrote out this deposition

6     by hand?

7          A      Yes.

8          Q      After you spoke with him?

9          A      He was standing -- we wrote this

10    on the garbage can that was next to the car

11    your client was in, that is how I know he was

12    trashing around in there.  He was standing

13    next to me as I was writing.

14         Q      So he is standing next to you,

15    you are writing on the garbage can and had

16    you watched the video before you wrote this

17    out?

18         A      No.

19         Q      So, he said, "My name is Dawan

20    Algazall.  I'm 28 years old -- is that a

21    nine?

22         A      Nine.

23         Q      "Twenty-nine years old.  On

24    9/5/15, around 11:20 p.m., I had my coworker,

25    Rafeq, call 911 for me.  We had a guy come

1                    Tomesha Angelo

2    into our store, A&Z South Market and harassed

3    Rafeq to try to sell him a beer without his

4    ID.  We refused and asked him multiple times

5    to leave.  He was in our store like 30

6    minutes.  He got very mad at me and started

7    to get nasty.  I finally had enough and

8    physically pushed him out our back door and

9    locked it.  Before I had to run to the front

10   he ran into our store.  That is when I had

11   Rafeq call 911.  The cops came quick.  The

12   guy was standing just inside our front door

13   refusing to leave.  The cops were real nice

14   and tried to get him to leave.  The guys got

15   in one of the officer's face.  The officer

16   warned him but he went after the officer

17   again.  The officers went to handcuff him and

18   he began to fight the officers.  He was

19   thrashing and refused to keep his hand behind

20   his back.  The officers yelled over and over,

21   'Stop resisting, put your hands behind your

22   back.'"

23              And then you crossed out.  It

24   said,  "They even threatened to spray him,"

25   but then you crossed it out.

```
 1                   Tomesha Angelo
 2              "The guy continued to fight.  He
 3    was fighting so bad he caused everyone to
 4    fall onto the sidewalk.  The guy fell on the
 5    officer, hurting the officer's ankle.
 6    Another officer got him handcuffed and walked
 7    him to the car.  He tried to search the guy,
 8    but he just wouldn't stop fighting even in
 9    handcuffs.
10              "Another officer arrived and
11    that made the guy fight and resist more.
12    They fought so much, they ended up back on
13    the sidewalk near the store.  That is where
14    the second officer got hurt.  I couldn't tell
15    a what he hurt, but..."  What does that say
16    there?
17       A      That is his initials also.  We
18    have everyone initial the last sentence.
19       Q      "But he was in a lot of pain and
20    couldn't move and I tried to jump in and
21    help, but the officers told me to stay back.
22              "Like, five more officers showed
23    up.  They were all yelling commands to him,
24    but he was still fighting.  He was even
25    fighting once he was in the back of the car.
```

1                        Tomesha Angelo

2      That is when they threatened to spray him.  I

3      am so thankful the officers came.  I do not

4      feel they were inappropriate whatsoever.

5      They gave him more than enough chances to

6      cooperate.  This guy comes into our store

7      every day causing problems but I don't know

8      his name.  I do know he lives across the

9      street, 500 South Avenue.  He is a black

10     male, 20 to 25 years old, five-foot-seven, a

11     140 pounds wearing a black tank top and pants

12     pulled up to his knees.

13                   "I want to go to the hospital

14     because I think I broke my left little finger

15     trying to get him out of our store.  I want

16     to press charges against him for refusing to

17     leave and causing me to get hurt."

18                   And then that is his initials,

19     again, right?  That is his signature, 9/5/15.

20     And that is your signature, 9/5/15, right?

21          A     Yes.

22          Q     So you wrote that out for him?

23          A     That is what he told me to

24     write.  That is why there are corrections.

25          Q     You wrote verbatim what he told

1                    Tomesha Angelo

2    you?

3         A       I try to.  It in his words; I

4    didn't dictate it.  I'm not a stenographer.

5         Q       Isn't often that people say

6    things like, "You know, I don't feel like the

7    officers were inappropriate whatsoever."

8         A       I would ask them, "Do you feel

9    if the officers were inappropriate?"  And

10   that was his answer.

11        Q       So you asked him that?

12        A       Yes.

13        Q       So it is in there because you

14   asked him that?

15        A       Yes.  It is common practice to

16   get depositions when an officer has what we

17   call an SRR or use of force.

18                Regardless, I mean, I have taken

19   depositions where they did not feel that the

20   officer was appropriate and still have to

21   write whatever they tell you.

22        Q       So you said you wrote that, you

23   think before you watched the video?

24        A       That was one of the first things

25   that I did.

135

                              Tomesha Angelo

1

2      Q      So you showed up and took his

3  deposition, basically, because Zimmerman told

4  you to?

5      A      Yes.

6      Q      Did you speak to anybody else

7  before you took his deposition or just

8  Zimmerman?

9      A      I don't know.

10      Q      You don't remember?

11      A      No.

12      Q      So you might have, but you are

13  not sure?

14      A      Do you mean officers or other

15  witnesses?

16      Q      Did you speak with anyone, any

17  witnesses or officers before taking this

18  deposition?

19      A      I don't know.

20      Q      Do you remember who you spoke

21  with first, whether it was Algazall or his

22  coworker, Rafeq?

23      A      No.

24      Q      Do you know if you spoke to them

25  together?

1                Tomesha Angelo

2        A        I do not believe I did.

3        Q

4                 MR. SHIELDS:  I want to put

5                 that up one more time.

6        Q        Do you see the deposition again

7    or do you see more than the deposition?

8                 MR. SHIELDS:  This is the

9                 one we had previously, Exhibit

10                9.

11       Q        He says at the beginning, "It

12   was around 11:20 that he came in."  Right?

13       A        That is what he told me, so it

14   doesn't match whatever I know, that is what I

15   put.

16       Q        He said that, "He was in our

17   store for like 30 minutes."  Right?

18       A        That is what he said, yes.

19       Q        Then he said that, he pushed him

20   out and he ran around the side and came back

21   in the front door, right?

22       A        Yes.

23       Q        But you didn't have Officer

24   Mentz collect any of that video, right?

25       A        No.

1                    Tomesha Angelo

2        Q        That would have proved his

3    allegations?

4        A        When it comes to the trespass,

5    it is not common practice for us to collect

6    video for a trespass.

7        Q        So you are allowed to just

8    ignore this evidence that would have

9    corroborated his claim; is that what you are

10   saying?

11       A        It is not common practice for us

12   to collect video for a trespass or a

13   violation.  It is our technician that does

14   all the -- they did -- now it is not, but we

15   are not tying up technicians collecting video

16   for violations and stuff.

17                You know, for example, if there

18   was a petty larceny at a grocery store.  If

19   they --

20       Q        This will go a lot quicker if

21   you don't give me these examples that are not

22   responsive to my question.  I am just trying

23   to get out of here before 5 o'clock for us

24   all, okay?

25                Listen to my question here:

138

1                    Tomesha Angelo

2     There was video collected, right?

3          A      Yes.

4          Q      Here, Officer or Technician

5     Stephanie Mentz testified at the criminal

6     trial that you instructed her to only collect

7     video between 11:35 and 11:45.  Does that

8     sound accurate to you?

9          A      I have no idea what time, if I

10    told her a time.  I did ask her to collect

11    video; I do not recall telling her a time.

12    It is common practice for us to collect video

13    for felonies and SRRs, but not trespassing

14    and --

15         Q      So here, Stephanie was already

16    collecting video for the felony portion of

17    the crime, correct?

18         A      Right, right.

19         Q      So you didn't feel like she

20    needed to collect the video from earlier in

21    the incident, that was part and parcel of the

22    incident?

23                    MR. CAMPOLIETO:  Objection.

24             She answered the question.

25                    MR. SHIELDS:  Okay, John, no

Tomesha Angelo

1
2             she hasn't answered the
3             question.  You can go ahead and
4             answer.
5                   MR. CAMPOLIETO:  She didn't
6             order her to do anything.
7                   MR. SHIELDS:  Okay.
8       Q     Do you have any reason to
9   believe that Stephanie testified falsely at
10  the criminal trial?
11      A     Falsely?
12      Q     Do you have any reason to
13  believe that Stephanie testified falsely at
14  the criminal trial?
15                  MR. CAMPOLIETO:  Objection.
16      Q     Is the answer "No"?
17                  MR. CAMPOLIETO:  The answer
18            is objection.
19                  MR. SHIELDS:  The answer is
20            not objection, John.  She
21            answered the question and she
22            said "No."
23                  MR. CAMPOLIETO:  She has no
24            idea what Stephanie said.  It is
25            her report.

                    Tomesha Angelo

1

2          MR. SHIELDS:  John, I asked

3     her if she has any reason to

4     believe.

5          MR. CAMPOLIETO:  Objection.

6          MR. SHIELDS:  John, you need

7     to stop.

8          MR. CAMPOLIETO:  No, you

9     need to stop with your

10    hypothetical questions.

11         MR. SHIELDS:  It wasn't a

12    hypothetical.  I asked her if

13    she testified falsely.  Why

14    don't you prepare the witness

15    and show her the testimony,

16    John?

17         MR. CAMPOLIETO:  She wasn't

18    there.

19         MR. SHIELDS:  Let's go

20    back.  The answer to my last

21    question was, "No." Correct?

22         THE COURT REPORTER:  I don't

23    think she answered it.

24         Let me read back.

25         (The requested portion of

141

Tomesha Angelo

1

2          the record was read back by the

3          reporter.)

4     Q     Do you have any reason to

5  believe that the technician, Stephanie Mentz,

6  would have testified falsely at the criminal

7  trial?

8     A     No.

9     Q     So here, would it have tied her

10 up to have simply collected fifteen minutes

11 more of video when she was already collecting

12 video?

13    A     I don't know what that would

14 have done for her.

15    Q     She could have easily just

16 downloaded fifteen more minutes of video,

17 correct?

18    A     I don't know.

19    Q     You don't know?

20    A     No.  You have to ask her that.

21    Q     Did you speak with Stephanie

22 before or after you spoke with the witness

23 Dawan Algazall?

24    A     After.

25    Q     You spoke with Stephanie after

1                    Tomesha Angelo

2    Algazall?

3         A      Yes.

4         Q      At the time that you ordered

5    Stephanie Mentz to download the video, you

6    knew what Dawan Algazall had told you:  That

7    David Van had been in the store for thirty

8    minutes, ran out the back, came back around

9    to the front?

10        A      Yes.

11                Can I clarify?  You keep saying

12   the word "order."  I don't have that

13   authority over her; I can only ask her to do

14   it.  Only a sergeant can order her.  It is

15   just a play on words, but you keep saying,

16   "order."

17                MR. SHIELDS:  Okay.  Give me

18                a second.  The next exhibit is

19                going to be 10.  It is going to

20                be the felony complaint that you

21                drafted for, Dawan Algazall.

22                (Dawan Algazall's Felony

23                Complaint was premarked as

24                Plaintiff's Exhibit 10 for

25                identification, as of this

1                    Tomesha Angelo

2              date.)

3         Q      It says, "Felony Complaint,

4    September 5, 2015.  Investigator Tomesha

5    Angelo," correct?

6         A      Yes.

7         Q      It is your felony complaint,

8    because you signed it, investigator?

9         A      It is an information.

10        Q      The top, is that is correct,

11   right there?

12        A      Yes.  It is because I used a

13   template and didn't put --  it is an

14   information for -- I can't pronounce that.

15   Dawan Algazall's name.

16        Q      Is there a difference between a

17   felony complaint and an information.  An

18   information is a misdemeanor and a felony

19   complaint is for felonies?

20        A      I believe so.

21        Q      Here the charges were, it says,

22   "Misdemeanor, assault in the third degree and

23   violation of trespass contrary to the

24   provisions of sub-section 120.00 sub (2) and

25   140.10 of the penal law."  Right?

1                    Tomesha Angelo

2        A      That is what it says.

3        Q      So what is assault in the third

4   degree under sub-section 120.00 sub (2)?

5        A      I do not have any penal law in

6   front of me.

7        Q      Luckily, I do.  So we can go

8   over that together.

9               When you charged him with those

10  two crimes, how did you decide that those

11  were the crimes that you were going to charge

12  him with?

13       A      Based on the information that,

14  or the deposition that that gentleman gave

15  me.

16       Q      Had you previously received any

17  training about when it is appropriate to

18  charge people with those various crimes?

19       A      That's a broad question.  Such

20  as what, I mean?

21       Q      I mean those two specific

22  crimes, assault in the third degree, under

23  120.00 sub (2) or trespass?

24       A      You have to be more specific.

25                    (Copy of Mckinney Penal Law

1          Tomesha Angelo

2          120.00 was marked as Plaintiff's

3          Exhibit 11 for identification,

4          as of this date.)

5              (Copy of Mckinney Penal Law

6          15.05 was premarked as

7          Plaintiff's Exhibit 12 for

8          identification, as of this

9          date.)

10

11      Q      This is assault in the third

12  degree, right?  Is that what you see on your

13  screen?

14          Mckinny Penal Law 120, assault

15  in the third degree?

16      A      Yes, that is what it says.

17      Q      You charged him with sub-section

18  (2), so a person is guilty of assault in the

19  thirds degree when:  Recklessly causes

20  physical injury to another person?

21      A      Okay.

22      Q      That is what you charged my

23  client with, right?

24      A      Okay.

25      Q      Do you remember that?

146

1                    Tomesha Angelo

2          A        That is what the information

3     says.

4          Q        So before you charged him with

5     that, you would have looked up the penal law

6     and decided this is the section I am going to

7     charge with him?

8          A        That is what I generally do.

9          Q        So that is what you generally

10    do?  You say,  "Okay, let me see what the

11    allocations of the complaint are," and then

12    you go to the penal law and look it up?

13         A        Yes.

14         Q        You see what matches.

15                  What does "recklessly" mean?

16         A        That he didn't intend to break

17    the guy's finger, that is why I charged

18    recklessly.

19         Q        What is the definition of

20    recklessly under the criminal law?

21         A        I don't know.  I don't have that

22    memorized.

23         Q        How could you charge him with

24    reckless assault if you don't know the

25    definition of reckless?

1                Tomesha Angelo

2       A      I, like I said, I went through

3  the penal law prior.

4       Q      So you went through the penal

5  law and looked up the definition of reckless?

6       A      I made sure that whatever I

7  choose was what I thought was proper and then

8  obviously if it was not, the information

9  would have been kicked back to me after

10 filing it and then I would have gotten a

11 chance to refile it had I done it

12 incorrectly.

13      Q      So you filed it, you choose

14 reckless because it wasn't intentional; that

15 is what you are saying?

16      A      That is not how I perceived it

17 in the deposition --

18                (Audio Complication.)

19                MR. CAMPOLIETO:  Let's keep

20           the place and keep the question.

21                MR. SHIELDS:  Off the

22           record.

23                (A discussion was held off

24           the record.)

25                (A brief recess was taken.)

148

1                    Tomesha Angelo

2                    MR. SHIELDS:  Can you please

3              read back.

4                    (The requested portion of

5              the record was read back by the

6              reporter.)

7         A      So, obviously, it is based off

8    of the two depositions that the two males

9    gave me that I attached to the information

10   and I choose reckless because they did not go

11   to the level of intent.

12        Q      So can you tell me what the

13   definition of reckless is?

14        A      Not off the top of my head, no.

15        Q      Do you think you looked that up

16   when you filed the charges or did you just

17   decide it is not to the level of intent?

18        A      No.  No.  Like I said before, I

19   look things up to make sure I am doing them

20   correctly.

21        Q      So let's look at it together.

22   Penal law 15.05, "The following definitions

23   are applicable to this chapter.

24   "Intentionally:  A person acts intentionally

25   with respect to the result or to conduct

1                     Tomesha Angelo

2    described by a statute finding an offense

3    when his conscious objective is to cause such

4    a result or to engage in such conduct."

5                    So, here, you are saying that

6    based on what Mr. Algazall told you, that you

7    did not think it was intentional, correct?

8         A    Correct.

9         Q    We will go down to "Recklessly:

10   The person acts recklessly with respect to a

11   result or a circumstance described by a

12   statute in finding an offense when he is

13   aware of and consciously disregards

14   substantial and unjustifiable risk that such

15   a result will occur or that such

16   circumstances exist.  The risk must be of

17   such nature and degree, that the disregard

18   thereof constitutes a gross deviation from

19   the standard of conduct that a reasonable

20   person would observe in this situation.  The

21   person who creates such a risk but is unaware

22   thereof solely by reason of voluntary

23   intoxication also acts recklessly with

24   respect thereto."

25                    Does that sound like what you

1                    Tomesha Angelo

2    looked up prior to filing the charge?

3         A       Yes.

4         Q       So you read that definition, you

5    said, "That is it; he acted recklessly"?

6         A       Yes.

7         Q       So let's see, I am going to

8    switch back to Exhibit 11.  Assault in the

9    second degree.  So he recklessly causes

10   physical injury to another person, so you

11   think that based on what he told you that you

12   had probable cause to believe that my client

13   acted, that he was aware of and consciously

14   disregarded a substantial and unjustifiable

15   risk that Mr. Algazall would hurt his little

16   pinky finger?

17        A       Yes.

18        Q       Based on just what he told you?

19        A       The two depositions combined.

20        Q       When you say, "The two

21   depositions," what is the second one?

22        A       I don't remember the dude's

23   name.  Rafeq?

24                    MR. CAMPOLIETO:  No.

25        A       No.  Let me see.

151

```
 1                    Tomesha Angelo
 2                    MR. CAMPOLIETO:  Ask if him
 3              if you can review your report.
 4        A     I am trying to adjust because my
 5   back is killing me.
 6              Can I review my information.
 7        Q     Sure.  Let me?
 8                    MR. CAMPOLIETO:  I have it.
 9                    MR. SHIELDS:  This is the
10              one that you are referring to
11              which would be Exhibit 6?
12              When you say information.
13              Oh, you mean that.  Okay.  That
14              is Exhibit 10.
15        Q     Did you figure out the answer?
16        A     Yes.  If you look at the bottom
17   paragraph, it says I based it on the two.
18   I'm sorry.  I cannot pronounce the names,
19   Dawan and Dwane depositions and I attached it
20   to this information.
21              Obviously, one was more
22   descriptive than the other and obviously I
23   included both.
24        Q     Did you speak with Dwane
25   Maracelea?
```

1              Tomesha Angelo

2      A      Yes.  I think he is the guy that

3  I talked to inside the store.  I didn't take

4  his deposition though.

5      Q      What did Dwane Maraclea tell

6  you?

7      A      It wasn't anything different

8  than what was written in the deposition.

9      Q      So you wrote in the deposition

10 what he told you?

11     A      I did not write his deposition;

12 I just read the deposition.

13     Q      So you -- but you spoke to him?

14     A      And it was consistent with what

15 he told me.

16     Q      You said that you spoke with him

17 inside the store?

18     A      Yes.

19     Q      Did you speak with him before or

20 after you spoke with the store workers?

21     A      You mean the guys I took the

22 deposition from?

23     Q      Dawan Algazall and his coworker

24 Rafeq?

25     A      I don't know about Rafeq but it

1                    Tomesha Angelo
2   was definitely Algazall.
3        Q       Was it before or after he gave
4   the deposition?
5        A       That, I don't know.
6        Q       How long after you spoke with
7   Dawan did you speak with Dwane?
8        A       I don't know.  I wasn't at the
9   scene that long, so I don't know.
10        Q       Why did you speak with Dwane?
11        A       I believe he was one of the
12   workers that was in the store when I walked
13   in so I wanted to know what he saw.
14        Q       You think Dwane Maraclea was one
15   of the workers in the store?
16        A       He was either in the store or
17   working in the store but I believe I talked
18   to him in the store but I am not positive on
19   that.
20        Q       Did you mark down in your notes
21   anywhere that you spoke to Dwane?
22        A       No.
23        Q       You marked down in your notes
24   that you spoke to Rafeq, right?
25        A       Yes.

154

                    Tomesha Angelo

1

2        Q       Is there a reason that you wrote

3    down that you spoke with Rafeq but not Dwane?

4        A       I don't know.

5        Q       Did you speak with anyone else

6    who you didn't mark in your notes?

7        A       Not that I know of.

8        Q       But there is no way that you can

9    know since you didn't mark it down in your

10   notes?

11       A       No.  I guess no because I can

12   only make assumptions.

13       Q       That that is why it is important

14   that you document everything accurately,

15   correct?

16       A       I do document things accurately.

17   If I have additional information that

18   somebody has, usually when I document --

19   because I told you before, sometimes we

20   document or write their names down or

21   document or depose people depending on what

22   they have to say.

23               If this gentleman was deposed

24   and what he is telling me is the same thing,

25   I am not going to mark that; I also talked to

```
 1                   Tomesha Angelo
 2    him when somebody else already did that.  So
 3    if it is new information or I am the only
 4    person that talked to him then I will
 5    document it.
 6                   MR. SHIELDS:  Let's look at
 7              his deposition.
 8                   (Deposition of Dwane
 9              Maraclea was marked as
10              Plaintiff's Exhibit 13 for
11              identification, as of this
12              date.)
13       Q      So, it says, "My name is Dwane
14    Maraclea.  My date of birth is 10/11/89 and I
15    live at 539 South Avenue, number 304 in the
16    City of Rochester."  Let's just see.
17                   So, "September 4th, 2015,
18    approximately 11:30 p.m. I was outside at the
19    corner store located at 439 South Avenue
20    waiting to enter.  I saw the police talking
21    to a black guy outside of the store telling
22    him to leave and that he was not welcome
23    inside.  The officers gave the male a chance
24    to leave the location.  While walking away
25    from the store, I saw the male get in one of
```

1                     Tomesha Angelo

2    the officers faces approximately three to

3    five inches from the officer.  The male then

4    stood in front of the store.

5                     "The police officer told the

6    male to leave, but he refused to do so.

7    Officers then approached the male and told

8    him he was under arrest.  The male began to

9    sway when the officers tried to place him in

10   handcuffs.  The officers then took the male

11   to the ground.  One of the officers appeared

12   to be injured once the man was brought to the

13   ground.  He just laid there."

14                    It doesn't look like there are

15   any initials here like there were on yours,

16   right?

17        A     No.

18        Q     "On his back while two officers

19   proceeded to handcuff the male.  Two officers

20   then leaned the male up against a police car,

21   the male pushed backwards causing the skinny

22   officer to take the male to the ground.  The

23   skinny officer then appeared to have injured

24   his shoulder.

25                    "At this time, other officers

1                    Tomesha Angelo

2    arrived and were able to control the male.

3    Officer Kephart approached me and asked if I

4    would give a deposition.

5                    "The male repeatedly ignored

6    commands from the police to stop resisting.

7    The police commanded him to do so multiple

8    times."

9                    Okay.  Did I read that

10   accurately?

11        A      Looks like it.

12        Q      You didn't write this one,

13   right?

14        A      No and I can't tell whether or

15   not he was a patron or a store person, so I

16   don't know what his title was.

17        Q      But you talked to him at some

18   point that night?

19        A      Yes.

20        Q      You said you don't remember if

21   you talked to anybody else?

22        A      No.  I don't believe I talked to

23   anybody else.

24        Q      Do you know how either you or

25   other officers choose to take depositions

1                    Tomesha Angelo

2    from Dwane Maraclea and Dawan Algazall and

3    nobody else?

4         A      So like I said before, we take

5    depositions when there are SRRs.  So anybody

6    that witnessed the SRR, we're going to need

7    to take depositions from.

8         Q      So you are suppose to take

9    depositions from everybody that witnessed the

10   SRR?

11        A      We try.  Many people that would

12   allow us to; some people say no.

13        Q      Some people say no?  So you

14   would ask every witness to SRR and say,

15   "Please, can you give a deposition?"

16        A      Yes.

17        Q      If people are resistant to

18   giving a deposition, what do you say to them?

19        A      Okay.  I am not going to force

20   somebody to give a deposition.

21        Q      They did it voluntary?

22        A      Yes.

23        Q      Now, there were numerous other

24   witnesses there that night that witnessed the

25   SRR that didn't give depositions, right?

```
 1                  Tomesha Angelo
 2      A      I don't know of any other
 3  witnesses that were there.
 4                  MR. SHIELDS:  So this will
 5             be Exhibit 14.
 6                  (Video, 11:41:10, was marked
 7             as Plaintiff's Exhibit 14 for
 8             identification, as of this
 9             date.).
10      Q      This is from inside the store.
11  This is camera two from inside the store.  On
12  the camera it says 11:41:10 p.m., do you see
13  that?
14      A      Yes.
15      Q      I will play this very quick.  It
16  is not too long, a minute and seven second
17  long video.
18                  Do you see that boy walking
19  around?  Do you remember talking to him?
20      A      I don't remember what anybody
21  looks like.
22      Q      If I represent to you that the
23  guy in the tank top is, Rafeq, do you
24  remember talking to him?
25      A      I don't remember what they look
```

                    Tomesha Angelo
 1
 2   like.
 3        Q       So if you can watch the boy in
 4   the black shirt real quick.
 5        A       Okay.
 6        Q       Do you have any idea what he is
 7   looking at?
 8        A       No idea.
 9        Q       Do you remember what the inside
10   of the store looked like at all?
11        A       No.
12        Q       Do you remember where the camera
13   equipment was located inside the store?
14        A       No, I don't remember.
15        Q       Is it possible that he is
16   looking at a video showing the outside of the
17   store?
18        A       No idea.
19        Q       You never asked him?
20        A       I don't ever remember, no.
21        Q       You don't remember seeing if
22   there was a television screen up here
23   displaying what the security cameras showed?
24        A       No.  I don't remember the inside
25   of the store.  I don't remember this video; I

161

1                    Tomesha Angelo

2   don't remember it.

3        Q     You never watched this video?

4   You don't remember?

5        A     This does not look familiar.

6        Q     But this guy was one of the

7   witnesses?

8        A     I don't know what they looked

9   like.

10       Q     We did see two people inside the

11  store, right?

12       A     Yes.

13             MR. SHIELDS:  So this will

14             be 15.

15             (Still shot from camera

16             three, 11:41:15, was marked as

17             Plaintiff's Exhibit 15 for

18             identification, as of this

19             date.)

20       Q     This is going to be fifteen.

21  This is a still shot from camera three

22  outside of the store paused in the bottom

23  left one minute and eight seconds in this

24  video, and the time stamp in the top right is

25  11:41:15.  I will try to zoom in so we can

```
 1                    Tomesha Angelo
 2   see a little better here.
 3                    Do you remember watching camera
 4   three from outside the store ever?
 5        A       I have never seen this video.
 6        Q       I will represent to you this is
 7   one of the security camera videos from
 8   outside of the store and that these are the
 9   officers who had fallen onto the ground and
10   that is officer Drake standing.
11                    Do you see what appears to be
12   other individuals standing around near the
13   sidewalk and in the street?
14        A       Okay.
15        Q       Can we count them together?
16   There appears to be one guy in the street on
17   the bicycle right here, right?
18        A       Okay.
19        Q       Another guy right here.
20        A       Okay.
21        Q       Two, three, four, and five,
22   right?
23        A       Okay.
24                    MR. SHIELDS:  John, I see
25                    her looking at the side.  I
```

1              Tomesha Angelo
2              don't know if you are doing
3              anything or you can move back so
4              we can see you in the screen
5              too.  John, I just -- that is
6              why I like it when we do it with
7              two screens so we can see both
8              of you.
9        Q     You agree there are five
10   witnesses to the SRR, right?
11       A     I don't know.  I'm not going to
12   presume what they saw.  I was not there.  I
13   have no idea who they are or if they were
14   still there when I got there.  I have no
15   idea.
16       Q     But we can agree that we just
17   counted five people standing here aside from
18   what is depicted right here in the video?
19       A     But I am not going to stipulate
20   that they witnessed what happened or if they
21   walked up after the impact.
22       Q     Okay.  We are just saying right
23   here in this still shot, we can look at
24   videos if you prefer that, but for right now
25   in Exhibit 15, we count, one, two, three,

164

                    Tomesha Angelo

1    four, five people standing there, right?

3        A      Yes.

4              MR. SHIELDS:  This will be

5         Exhibit 16.

6              (Video, 11:44:45, was marked

7         as Plaintiff's Exhibit 16 for

8         identification, as of this

9         date.)

10       Q      Exhibit 16 is the same camera

11   angle, camera three a little later.  Paused

12   it at five minutes twenty-one seconds into

13   the video, 11:44:45 and we will zoom in a

14   little bit here.

15             Can we count together?  Bicycle

16   guy, white shirt guy and apparently two

17   others, so maybe four people standing right

18   here?

19       A      Possibly.  I don't know if they

20   are the same thing, people from the video or

21   different people.

22       Q      Is it fair to say, one, two,

23   three, four people that you see?

24       A      It looks like four; it could be

25   five.  I don't know.

1                Tomesha Angelo

2       Q       Does it look like these are

3    maybe officers walking over?

4       A       I have no idea.

5       Q       But there are two people on the

6    street?

7       A       Yes, two people on the street.

8       Q       You said earlier that you

9    drafted the information based on just the two

10   depositions, right, Algazall and Maraclea?

11      A       Which information are you

12   talking about?

13      Q       The one that you did.

14      A       Yes.

15      Q       That was before you watched the

16   video, right?

17      A       Before I watched the video.   I

18   look the depositions before I watched the

19   video is that what you are asking me?

20      Q       Correct?

21      A       Yes.

22              MR. SHIELDS:   The next

23              Exhibit will 17.   This is the

24              prosecution's witness list from

25              the criminal trial.

```
 1                    Tomesha Angelo
 2                  (Prosecution's witness list
 3               was marked as Plaintiff's
 4               Exhibit 17 for identification,
 5               as of this date.)
 6        Q     So that says, "Dawan Algazall."
   So this last, the required information that
 7
 8   the prosecution is required to disclose about
 9   the witnesses' credibility issue, right?
10               So it says, "Dawan Algazall:
11   Pending DWI, E felony."  Right?  That is the
12   first thing there.  And then that is from --
13   I guess, that doesn't give a date.  It says
14   it was pending at the time of trial.
15               Second thing:  Criminal mischief
16   in the 4th degree March 14th, 2016, right?
17        A     Yes.
18        Q     Below that:  Driving a vehicle
19   not equipment with an ignition Interlock on
20   June 9th, 2015, right?
21        A     Yes.
22        Q     Driving while intoxicated on
23   April 5, 2012?
24        A     Yes.
25        Q     Attempted criminal possession of
```

1              Tomesha Angelo

2    a weapon in the 2nd degree, January 15th

3    2008, right?

4         A    Yes.

5         Q    Below that, Dawan Maraclea,

6    attempted burglary in the 3rd degree, July

7    8th, 2014.

8              MR. CAMPOLIETO:  We can

9              stipulate to the document,

10             Elliot.

11             MR. SHIELDS:  All right.

12             So.

13        Q    The document that John just

14   stipulated in says that Dawan Maraclea was on

15   parole at the time of the incident, okay?

16        A    Okay.

17        Q    In your experience, is a

18   condition of parole often that the individual

19   has a curfew?

20        A    Some do, some don't.

21        Q    I will go ahead and tell you

22   Dwane Maraclea had a curfew of nine o'clock

23   p.m. on the night of the incident, and this

24   incident happened after eleven o'clock p.m.?

25        A    I don't remember if that was the

1                     Tomesha Angelo

2   exact time, but that sounds about right.

3         Q      All the videos say eleven

4   something, right, 11:40?

5         A      Right.

6         Q      So it makes sense?

7         A      Right.

8         Q      Does that mean Dwane Maraclea

9   was violating his curfew?

10                    MR. CAMPOLIETO:  Objection.

11        A      I wouldn't know.

12        Q      Assuming what I told you is

13  true, that he had a curfew and it was nine

14  o'clock, then he would have been in violation

15  of his curfew, right?

16                    MR. CAMPOLIETO:  Objection.

17                    MR. SHIELDS:  You can

18                    answer.

19        A      So I have learned through the

20  years that sometimes, or a lot of times, they

21  don't violate people for curfews, so was that

22  against the rules is a better term, then yes,

23  but would they have violated him, more likely

24  no.

25        Q      So when people take statements

                    Tomesha Angelo

1

2    of people for this incident, would they run

3    their name through the system?

4         A      Not generally.

5         Q      Sometimes they would?

6         A      You would have to have a hunch

7    of whether or not you think they have a

8    warrant or something; it is not general

9    practice.

10        Q      Do you think it is a coindence

11   that the only two peoples whose depositions

12   were taken had pending criminal charges and

13   were on parol?

14        A      No.  We have a lot of people in

15   society that have pending charges, various

16   charges.

17        Q      So we counted five people at

18   least, maybe six or seven who witnessed the

19   SRR and were at the scene after the incident

20   but --

21        A      Wait.  How do you know they were

22   at the scene after the incident?

23                    MR. CAMPOLIETO:  Let me

24                    object.  Objection, you can

25                    answer.

170

1                    Tomesha Angelo

2        A      I don't know that they were at

3   the scene after the fact, and I don't know if

4   officers asked them if they were before going

5   to give a deposition.  They could have said

6   no.  We're not going to force it.

7        Q      That is the whole point of the

8   question, right?

9               You see these folks standing

10  over here, right?

11       A      Okay.

12       Q      Referring to Exhibit 16, do you

13  see an officer also approach the guy standing

14  across the street, right?

15       A      I don't know if those are

16  officers, I really don't.  They look like

17  blobs to me.  They actually look like snow

18  suits to me to be honest with you.  I don't

19  know what they are.

20               If you are going to tell me

21  those are officers, okay, cool.  I can't tell

22  what they are from this picture.

23       Q      We can watch the video, but you

24  agree with me, that the only two people who

25  gave depositions both had pending criminal

Tomesha Angelo

1    charges or were on parol, correct?

2    A      That is what you are telling me.

3    I never looked into that.  If your

4    information is correct, than cool, the two

5    people that were willing to give depositions.

6    I don't know who else was asked.  I don't

7    know who else was willing.  When I got to the

8    scene, I didn't see anybody else.

9    Q      You were told by Zimmerman to

10   take the deposition of Algazall?

11   A      Yes.

12   Q      Is that right?

13   A      Yes.

14   Q      Do you know who told Kephart to

15   take Maraclea's deposition?

16   A      You mean Dwane?

17   Q      Dwane Maraclea?

18   A      No, I do not.

19   Q      Do you think it was probably

20   Zimmerman?

21   A      I have no idea.

22   Q      Zimmerman was the officer in

23   charge on the scene?

24   A      He was the sergeant; yes, he

1                      Tomesha Angelo

2     would be.  LaFave was there, I think, and

3     outranked him at the time.  I can't remember

4     what rank everybody was.  I know Zimmerman

5     was a sergeant.  I don't remember what LaFave

6     was.

7          Q     So whoever the highest ranking

8     officer on the scene was, that was the person

9     in charge, right?

10         A     Yes.

11         Q     That is either Zimmerman or

12    LaFave?

13         A     Yes.

14         Q     What if they were the same rank

15    at the time?

16         A     Then, well, they are in the same

17    section.  I don't know.  One of them would

18    decide who was going to be primary because it

19    involved -- it would involve both 4th Platoon

20    and the 1st Platoon so the two of them would

21    have to decide between the two of them who

22    was going to.

23         Q     One of those two were in charge?

24         A     Yes.

25         Q     And the person in charge is

173

```
 1                    Tomesha Angelo
 2    termed the primary officer?
 3          A      Yes.
 4                 (Grand Jury Referral was
 5                 marked as Plaintiff's Exhibit 18
 6                 for identification, as of this
 7                 date.)
 8          Q      So I put up on the screen, can
 9    you see the Grand Jury Referral?
10          A      Yes.
11          Q      That will be Exhibit 18.  My
12    question about this document is:  I see one
13    date right here, date of the crime, right?
14          A      Okay.
15          Q      The arrest date.  Would this
16    document contain the date that you completed
17    it?
18          A      No.
19          Q      Do you remember when you did
20    this Grand Jury Referral?
21          A      I made the Grand Jury Referral,
22    yes.  So, I don't know when I completed it,
23    but I have to hand it into a boss to it have
24    approved and then it has to get scanned and
25    then sent over and signed in or sent over to
```

174

1                    Tomesha Angelo

2    the District Attorney's Office.

3                This doesn't get handed in right

4    away generally.  The informations do or the

5    felony complaints do, but this usually

6    doesn't get handed in right away.

7         Q      My question is:  How would we

8    determine when this was handed in?

9         A      I don't know.

10        Q      Is there any way to either --

11   you said it gets scanned in, right?

12        A      Yes.

13        Q      When you turn it into the RPD,

14   to your boss, do you do that physically or do

15   you send it in an e-mail?

16        A      No, it was physically.

17        Q      When it gets sent to the

18   District Attorney's Office is that physically

19   or in an e-mail?

20        A      Physically, because the original

21   depositions would have been in it.

22        Q      Would you give it at the time

23   that the grand jury presentation takes place

24   or would you do it closer to when the arrest

25   happened?

1                    Tomesha Angelo

2        A      I don't know.  I mean, I know it

3    gets sent over to that office.  How soon it

4    goes through the chain to get over there, I

5    don't know.  I don't know if they time stamp

6    it when they received it.  I have no idea.

7        Q      I am going to scroll through it.

8    So the one thing, it says, Officer's

9    Handwritten Notes.  So there were no hand

10   written notes included in this, right?

11       A      Mine were.  The box just wasn't

12   checked.

13       Q      So you didn't check the box,

14   that was a mistake?

15       A      Yes.

16       Q      Are there any other mistakes on

17   this report?

18       A      Not that I am aware of.

19       Q      Are there any other mistakes in

20   any of the other reports that you filled out

21   as part of this case?

22       A      Not that I am aware of.

23       Q      But there could be?

24       A      I am human.

25       Q      Do you know when this case was

 1                    Tomesha Angelo

 2    presented to the grand jury?

 3         A      No.

 4         Q      Well, we can tell you.  So the

 5    date of the incident was September 4th, 2015,

 6    right?

 7         A      September 4th, 2015, okay.

 8                    MR. SHIELDS:  The grand jury

 9                    testimony, People of the State

10                    of New York.

11                    (Grand Jury Testimony was

12                    marked as Plaintiff's Exhibit 19

13                    for identification, as of this

14                    date.)

15         Q      People of the State of New York,

16    against David Van.  Charges:  Assault in the

17    2nd degree.  Presented April 4th, 8th and

18    9th, 2016.

19                    Do you know why there was such a

20    long time between the incident on September

21    4th, 2015 and the grand jury presentation in

22    April 2016?

23         A      No idea.  That is something you

24    have to ask the District Attorney's Office.

25         Q      Do you know what happened to my

1                     Tomesha Angelo

2    client after this incident?

3         A      No idea.

4         Q      Did you know he was put into

5    soloditary confinement for one month?

6         A      No.  I don't know anything about

7    what happened to your client or the trial.

8         Q      Are you aware that he spent four

9    months at the Rochester Psychiatric Center

10   incarcerated there after he was deemed

11   incompetent to stand trial?

12        A      No.

13        Q      Do you think that might be the

14   reason it took so long until he was finally

15   deemed to stand trial?

16               MR. CAMPOLIETO:  Objection.

17        A      I have no idea.  The only person

18   that can answer that question is the District

19   Attorney.  I have no idea.

20        Q      So in all of your years of

21   experience, you are unaware of whether or not

22   there can be an arraignment or grand jury

23   proceeding if the person is deemed

24   incompetent to stand trial?

25        A      I do not know of that.  It is

178

```
 1                  Tomesha Angelo
 2    not something I deal with.
 3                  MR. CAMPOLIETO:  Objection.
 4                  Objection.
 5         Q     Between my client's arrest and
 6    the grand jury presentation, are you aware
 7    that the store, and I think it is called an
 8    A&M Market, A&M South Market was shutdown
 9    because the owner was arrested for food stamp
10    fraud?
11         A     No, I did not.
12         Q     You are unaware of?
13         A     That, no.
14                  MR. SHIELDS:  This is
15                  Exhibit 20.  The Office of the
16                  Inspector General dated October
17                  6, 2015.
18                  (Article dated 10/16/15, the
19                  Office of the Inspector General
20                  dated October 6, 2015 was marked
21                  as Plaintiff's Exhibit 20 for
22                  identification, as of this
23                  date.)
24
25                  MR. CAMPOLIETO:  I object to
```

179

1                    Tomesha Angelo
2           the exhibit.  I object to the
3           question.  This is really
4           irrelevant to this witness,
5           Elliot.
6               MR. SHIELDS:  Okay.  John, I
7           am going to ask a couple of
8           questions.
9               MR. CAMPOLIETO:  I am
10          objecting to the exhibit.  You
11          can ask her questions.
12              MR. SHIELDS:  You can object
13          all you want, John.
14              MR. CAMPOLIETO:  I did.
15          Before you ask the question, are
16          we going to be here until five,
17          5:30?
18              MR. SHIELDS:  We are not
19          going to be here until 5:30.
20              MR. CAMPOLIETO:  My witness
21          is tired and hungry and she is
22          not wearing well because this
23          has gone on so long.  She is not
24          use to this.
25              MR. SHIELDS:  I have seven

180

Tomesha Angelo

1        hours to ask questions.  I told

2        you earlier I don't plan on

3        going long, we're almost done,

4        so.  Let me ask my questions and

5        we'll get out of here soon.

6            MR. CAMPOLIETO:  But this

7        document has nothing to do with

8        the witness here.

9            MR. SHIELDS:  You can't say

10       that.

11           MR. CAMPOLIETO:  I can.  She

12       is asking for a lunch break.  It

13       is now three o'clock.

14           MR. SHIELDS:  You took two

15       breaks.

16           MR. CAMPOLIETO:  I took ten

17       minute breaks.

18           MR. SHIELDS:  I am almost

19       done.  I have two more exhibits,

20       okay?

21           THE WITNESS:  Okay.

22           MR. SHIELDS:  I apologize.

23       We are almost done.

24   Q    You said earlier that you

1                    Tomesha Angelo

2  gathered all the documents in the case as

3  part of your role as the investigator, right?

4        A      I was helping out.  Yes, so I

5  put them all together in a package, yes.

6        Q      You were the case coordinator,

7  right?

8        A      Yes.  The case coordinator just

9  means I am the Grand Jury Referral.  There

10  are a list of documents we have to get

11  together.  I get them all together in a nice

12  little package and handed them in.  That is

13  what the case coordinator means; it was not

14  the lead investigator on this.

15        Q      Either you or anyone else, are

16  you aware of what happened with the store

17  owners getting arrested for food stamp fraud?

18        A      No.

19        Q      That might have been something

20  that could have played an impact in the whole

21  set of circumstances that lead to my client

22  being arrested?

23        A      I have no idea.  Did this happen

24  before or after your client was arrested?

25        Q      It says October 16th, 2015, and

182

                    Tomesha Angelo

1

2    it says it is part of an ongoing

3    investigation, so at the time that my client

4    was arrested, what this article says is --

5         A      This is from the New York State

6    Inspector General, we don't talk to them.  We

7    wouldn't know they had this investigation

8    going on.

9         Q      Okay.  So after it was

10   publically announced that at the time my

11   client was arrested for this alleged dispute,

12   right?

13        A      Okay.

14        Q      What this is saying is that they

15   had an ongoing criminal fraud where they were

16   ripping people off from their EBT cards?

17                    MR. CAMPOLIETO:  Objection.

18        Q      So you don't think it would have

19   been a pertinent part of the case to gather

20   this information and turn it over to the

21   District Attorney?

22        A      No.  Why?  This doesn't have

23   anything to do with my case.

24        Q      So if my client's allegations

25   are that he went to pay for something and he

1                    Tomesha Angelo

2    did not get the proper amount of change from

3    the store owner and that the store owner had

4    repeatedly robbed him when he tried to pay

5    with his EBT card?

6                    MR. CAMPOLIETO:  Objection.

7         A      That is not what I was there

8    for.  I was there because the two officers

9    were injured.

10        Q      And you were there because you

11   wrote an information for Dawan Algazall?

12        A      Right.

13        Q      Who claimed that my client was

14   trespassing and refused to leave the store,

15   right?

16        A      Right, but it doesn't say

17   anything about food stamps or not getting the

18   correct change.  That is not --  he didn't

19   have ID for beer.  Why would I know anything

20   that this would be connected to?

21        Q      Did you ever figure out why my

22   client was alledgedly refusing to leave the

23   store?

24        A      I don't recall that and it is

25   not in the depositions.

1                    Tomesha Angelo

2         Q      So would it have been important

3    to maybe speak with him to figure out his

4    side of the story, why he says that he wasn't

5    leaving the store?

6         A      He was in no condition to talk

7    to that night.

8         Q      Because as we looked at him

9    earlier, his eyes were closed?

10        A      No because he was extremely

11   combative in the back of the car.  I saw that

12   with my own eyes.  He was so combative, he

13   was making the car shake.

14        Q      Despite the fact that none of

15   the videos show that?

16        A      I am telling you that is what

17   happened.  I was standing three feet from the

18   car.

19        Q      So, just to wrap this up:  You

20   never became aware at any point of the owner

21   of the store getting arrest for food stamp

22   fraud, right?

23        A      No.

24        Q      Then, one more on that.  This

25   article is dated April 15th, 2016, "Two

```
1                    Tomesha Angelo
2      Rochester grocers pled guilty to food stamp
3      fraud."
4                    Would that be the same month
5      that the Grand Jury Presentation took place,
6      April 2016?
7           A     I don't know.  I wasn't at grand
8      jury.
9           Q     I mean, based on what the
10     document we put up before, April 4th, 8th and
11     9th, 2016, right?
12          A     Okay.
13          Q     And then that is the same months
14     as this article, April 15, 2015, right?
15          A     This is all stuff you are
16     telling me after the fact.  I didn't know
17     when grand jury was.  I didn't watch the news
18     and I didn't see this nor would I put
19     two-and-two together.
20          Q     I am just asking you questions.
21     I'm not accusing you of anything.  You would
22     agree with me that this article which says
23     that the store owner pled guilty to food
24     stamp fraud, that happened in the same month
25     that the case was presented to the grand
```

186

1                    Tomesha Angelo

2    jury, correct?

3         A      Those are not the same names I

4    dealt with.

5

6         Q      Exhibit 20, an article dated

7    October 16, 2015 for the New York State

8    Office of the Inspector General, that is 20

9    and it says here, in this paragraph on page

10   1:  Arrested and arraigned today was Anile

11   Sultan, 41 of Penfield, owner and operator of

12   S&M Minimart at 439 South Avenue.

13                S&M Minimart was the same

14   location where this incident that is part of

15   this lawsuit took place; is that right?

16        A      That wasn't the name of the

17   business.  It has nothing to do with the

18   people.

19        Q      I am asking you about the name

20   of the business, S&M Minimart, right, 439

21   South Avenue?

22        A      No, A&D South Market or

23   something.  It wasn't even the same name.  It

24   could have changed owners by then.

25        Q      This is one month later, right?

187

1                    Tomesha Angelo

2        A       This is in April?

3        Q       The owner was arrested on April

4    16th, 2015, that's the date of this article,

5    okay?

6                Let me ask the question:  So

7    this is the Grand Jury Referral, right?

8        A       Okay.

9        Q       This says A&Z {sic} South Market

10   439 South Avenue, right?

11       A       Yes.

12       Q       So, that is the location of the

13   incident?

14       A       Yes.

15       Q       439 South Avenue, is the same

16   address as this article, right, 439 South

17   Avenue?

18       A       Okay.

19       Q       So you would agree with me they

20   are talking about the same location, correct?

21       A       Same physical location, but not

22   listed at the same store and it is not

23   listing the same dude.

24       Q       Do you remember a different

25   store located at 439 South Avenue?

188

1                    Tomesha Angelo

2       A       You have to understand, in the

3  City, a lot of businesses change hands like

4  crazy so it is not like one owner stays

5  there.  Same with apartment buildings, they

6  change hands constantly.  That is not

7  something new.  That wouldn't be surprising.

8       Q       So you think sometime between

9  the incident in September and October 16th

10 2015, the store changed hands?

11      A       Yes, it is possible.  I have had

12 it done before with apartment buildings.

13      Q       I might have asked you this

14 before, I am tying up loose ends:  When you

15 first arrived at the scene, you said my

16 client was in the back of the car or was he

17 outside of the car?

18      A       Inside the car.

19      Q       Did you ever send any e-mails as

20 part of this case?

21      A       I don't think so.  I wouldn't

22 see why or who I would e-mail.

23      Q       I asked you earlier how you

24 submitted the grand jury referral, you said

25 that was physically?

189

                    Tomesha Angelo

1

2       A       Yes.

3       Q       Did you ever make any phone

4   calls or send any text messages on the site

5   of incident about the incident?

6       A       Like I said before, I don't know

7   if I specifically talked to somebody at the

8   hospital to get injuries or if Sarge did.

9       Q       But you didn't go to the

10  hospital, right?

11      A       I don't ever recall going to the

12  hospital.

13      Q       When you submit the grand jury

14  referral, I think you said earlier that you

15  just do that physically?  You didn't speak to

16  the ADA assigned to this case?

17      A       No.  I have no idea who handled

18  this case, so when I submit it, it gets

19  submitted to Sarge and then Sarge will sign

20  off and scan it or he will have the

21  coordinator scan it and it gets sent off to

22  the District Attorney's office in the mail or

23  the interdepartmental mail, but then I never

24  see it after that.

25      Q       Sometimes will the Assistant

1                    Tomesha Angelo

2    District Attorney call you up because you are

3    the case coordinator?

4         A     Yes.

5         Q     But that didn't happen here, to

6    your recollection?

7         A     No.

8                    MR. SHIELDS:  John, what I

9                want to do, I think that is all

10               my questions for today.  I know

11               everyone is hungry and I want to

12               do the same thing as yesterday.

13                    I called for production of

14               her training records.  I want to

15               discuss that with you and look

16               at those and get back to you

17               about whether I might need to

18               ask her a couple of questions

19               about that stuff.

20                    MR. CAMPOLIETO:  We'll have

21               to figure out a better way, but

22               that is fine.  Trust me, you are

23               not going to come back.  If we

24               can do it by written deposition

25               we'll try that.  Thank you.

191

1

2                    That is fine, Elliot.

3                       MR. SHIELDS:  Thank you,

4                 investigator, for your time.

5                       (TIME NOTED:  2:51 p.m.)

6

7                         _____

                          TOMESHA ANGELO

8

9     Subscribed and sworn to

10    before me this_____ day

11    of_____, 2022.

12

      _____
13         NOTARY PUBLIC

14

15

16

17

18

19

20

21

22

23

24

25

192

```
 1
 2                  INDEX TO TESTIMONY
 3
 4   WITNESS                EXAMINATION BY      PAGE
 5   Tomesha Angelo      Mr. Shields           5
 6
 7
                    INDEX TO EXHIBITS
 8
     PLAINTIFF'S
 9   EXHIBITS              DESCRIPTION          PAGE
     1      Handwritten notes                  89
10   2      still shot from a news clip        96
     3      Photograph                         99
11   4      Photograph                         101
     5      Photograph                         107
12   6      Rochester Police Department Action
            Report                             111
13   7      Officer Drake's Felony Complaint   118
     8      Officer Kester's Felony Complaint  123
14   9      Deposition of Dawan Algazall       129
     10     Dawan Algazall's Felony Complaint  142
15   11     Copy of Mckinney Penal Law         144
     12     Copy of Mckinney Penal Law 15.05   145
16   13     Deposition of Dwane Maraclea       155
     14     Video, 11:41:10                    159
17   15     Still shot, 11:41:15               161
     16     Video, 11:44:45                    164
18   17     Prosecution Witness List           166
     18     Grand Jury Referral                173
19   19     Grand Jury Testimony               176
     20     The Office of the Inspector
20          General dated October 6, 2015      178
            Article dated 10/16/15
21
22
23
24
25
```

193

1

2    TO BE PRODUCED/INSERTED

3    DESCRIPTION                              PAGE

     Any notes taken                          88

4    Training records                         190

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

194

1

2                    C E R T I F I C A T E

3

4        I, ROBYN LEHRMANN, a Shorthand Reporter

5   and Notary Public of the State of New York,

6   do hereby certify:

7

8        That, TOMESHA ANGELO, the witness whose

9   examination is hereinbefore set forth, was

10   duly sworn, and that such examination is a

11   true record of the testimony given by such

12   witness.

13

14        I further certify that I am not related

15   to any of the parties to this action by blood

16   or marriage; and that I am no way interested

17   in the outcome of this matter.

18

19

20

21

                         April 16, 2022

22

    ROBYN LEHRMANN                     DATE

23

24

25