1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------x
DAVID VANN,

              Plaintiff,

                          Index No.
  - against -                 6:18-cv-06464

THE CITY OF ROCHESTER, a municipal entity,
POLICE OFFICER MATTHEW DRAKE, IBM# 1956,
POLICE OFFICER STEVEN MITCHELL, IBM# 2134,
INVESTIGATOR JEFFREY KESTER, IBM# 2230,
SERGEANT JEFFREY LAFAVE, II, IBM# 1634,
POLICE OFFICER DAVID E. KEPHART, IBM# 2074,
POLICE OFFICER ADAM BRODSKY, IBM# 2478,
POLICE OFFICER TIMOTHY DEMPSEY, IBM# 2122,
INVESTIGATOR CHRISTOPHER MUSCATO, IBM #1331,
CAPTAIN GARY MOXLEY, POLICE OFFICER ANGEL
PAGAN, IBM# 2421, POLICE OFFICER CHRISTOPHER
J. BARBER, IBM# 1949, SERGEANT DANIEL J.
ZIMMERMAN, IBM# 295, POLICE OFFICER ERIC
McGRAW, IBM# 2131, SERGEANT JOSEPH LAIOSA,
IBM# 1180, INVESTIGATOR TOMESHA ANGELO,
IBM# 1665, TECHNICIAN STEPHANIE MINTZ,
IBM# 2496, Police Officers "JOHN DOES 1-10"
(whose names are currently unknown), and
other unidentified members of the Rochester
Police Department, THE COUNTY OF MONROE,
SANDRA DOORLEY, Individually and as District
Attorney of the County of Monroe, and MICHAEL
HARRIGAN, as an employee of the Monroe County
District Attorney's Office and Individually,

              Defendants.

-------------------------------------------x

              Held via Zoom Videoconference

              December 5, 2022
              11:03 a.m.

2

1

2           EXAMINATION BEFORE TRIAL of

3   CHRISTOPHER J. BARBER, Defendant, taken by

4   Plaintiff, pursuant to Article 31 of the

5   Civil Practice Law and Rules of Testimony,

6   and Order, held at the above-noted time and

7   place, before Michelle Conero, a Stenotype

8   Reporter and Notary Public within and for the

9   State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2   A P P E A R A N C E S:

3

4   ROTH & ROTH, LLP
         Attorneys for Plaintiff
5        192 Lexington Avenue, Suite 802
         New York, New York  10016
6        Phone:  212-425-1020
         E-mail:  eshields@rothandrothlaw.com
7   BY: ELLIOT SHIELDS, ESQ.

8

9

10    CITY OF ROCHESTER ATTORNEY'S OFFICE
         Attorneys for Defendants
11       City Hall
         30 Church Street, Room 400-A
12       Rochester, New York  14614-1295
         Phone:  585-428-6986
13       E-mail:  john.campolieto@cityofrochester.gov
    BY: JOHN CAMPOLIETO, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

4

1

2                      S T I P U L A T I O N S

3

4              IT IS HEREBY STIPULATED AND AGREED

5    by and between the parties hereto that all

6    rights provided by the F.R.C.P. including the

7    right to object to any question except as to

8    the form, or to move to strike any testimony

9    at this examination, are reserved, and, in

10   addition, the failure to object to any

11   question or move to strike any testimony at

12   this examination shall not be a bar or waiver

13   to make such a motion, and is reserved for

14   the trial of the action;

15              It is further stipulated and

16   agreed that this examination may be sworn to

17   by the witness being examined before a notary

18   public other than the notary public before

19   whom this examination was begun;

20              It is further stipulated and

21   agreed that the filing and certification of

22   the original of this examination are waived.

23

24              *  *  *  *  *  *

25

1

2    THE REPORTER:

3

4      The attorneys participating in this

5    deposition acknowledge that I am not physically

6    present in the deposition room and that I will be

7    reporting this deposition remotely.

8      They further acknowledge that, in lieu of

9    an oath administered in person, I will administer

10   the oath remotely.

11     The parties and their counsel consent to

12   this arrangement and waive any objections to

13   this manner of reporting.

14     Counsel, please state your acknowledgement

15   and agreement to this method of reporting on

16   the record.

17

18

19

20

21

22

23

24

25

1

2   C H R I S T O P H E R   J   B A R B E R,

3        Defendant, having first been duly sworn

4        by the Notary Public, was examined and

5        testified as follows:

6   EXAMINATION BY

7   MR. SHIELDS:

8        Q      Please state your name for the

9   record.

10       A      Christopher Barber.

11       Q      Please state your business address

12  for the record.

13       A      30 Church Street, Rochester, City

14  Hall 14614.

15       Q      Good morning.  My name is Elliot

16  Shields and I represent a man that was hurt.

17  I'm going to ask you some questions today.  If

18  there's anything that I ask you that you don't

19  understand, please say so and I'll rephrase the

20  question for you.  Okay?

21       A      Okay.

22       Q      Otherwise, if you answer the

23  question we're going to assume you understood

24  it.  Do you understand everything I've said so

25  far?

1

2        A.    Yes.

3        Q.    And you agree to ask me to

4   rephrase any questions you don't understand?

5        A.    Yes.

6        Q.    Okay.  And so we're doing this

7   deposition virtually today.  Can you tell

8   me, is there anyone else in the room with

9   you?

10       A.    Just the attorney, Mr. Campolieto.

11       Q.    It took me awhile to get it

12  down when I first met John as well.

13       A.    I worked until 3:30 in the

14  morning.  I got a little bit of sleep and a

15  little bit of coffee.  I apologize for the

16  yawning and whatnot.

17       Q.    No worries.  Investigator --

18  it's Investigator Barber now.  Right?

19       A.    Correct.

20       Q.    Investigator, do you have any

21  papers in the room with you that you plan

22  to look at to help you answer any

23  questions?

24       A.    Nope.  I have nothing with me.

25       Q.    Okay.  And you understand that

8

1

2    everything that you say today, that I say

3    and anyone else says is going to be

4    transcribed into a little book by the court

5    reporter for use at trial in this matter?

6        A.    Yes.

7        Q.    And have you ever been

8    questioned under oath before?

9        A.    Once, yeah.  Do you mean court

10   in general or just a deposition like this?

11       Q.    So let's take it -- in the

12   criminal context you've been questioned

13   under oath before?

14       A.    I've been a police officer for

15   fifteen years, so I've been to court a

16   bunch where there's court reporters.

17       Q.    So yes, you've been questioned

18   under oath in criminal court a bunch of

19   times.  Correct?

20       A.    Yes.

21       Q.    It sounds like you said you've

22   also been questioned under oath once before

23   in the context of a civil case?

24       A.    Correct.

25       Q.    Okay.  And was that the Melinda

9

1

2    Santos case?

3         A.    Yes.

4         Q.    Okay.  Any other times that

5    you've testified under oath in a civil case

6    other than Melinda Santos?

7         A.    No.

8         Q.    And how about at any PSS or

9    other disciplinary hearings.  Have you ever

10   testified at a PSS hearing?

11        A.    I talked to a sergeant before

12   at their office.  I don't know if that was

13   a hearing.  I don't think -- I don't

14   remember it being recorded or anything.

15        Q.    Okay.  So that time that you

16   spoke with a sergeant in the context of a

17   PSS case, there was no court reporter to

18   your --

19        A.    Not that I remember.

20        Q.    -- knowledge?  Okay.  And what

21   was the context of that PSS case that you

22   spoke with the sergeant about?

23        A.    I was a witness or -- like I

24   wasn't the named complainant on it but I

25   was on scene.  They asked me to just like

1

2    say what I saw there.

3        Q.    Okay.  And what case was that,

4    do you remember?

5        A.    It was down on East Ave,

6    probably maybe five years ago.  Somewhere

7    around there.

8        Q.    Okay.

9        A.    It was an incident on East Ave.

10   I don't remember exactly what it was.

11       Q.    Okay.  Did you use force during

12   that incident or you were just a witness?

13       A.    I had a use of force against

14   somebody else that wasn't involved, and I

15   think there was a complaint against another

16   officer who had a use of force with

17   somebody else somewhere else.  It was all

18   one job card so my name was on it even

19   though I wasn't there.

20       Q.    Okay.  So like when the bars

21   were getting out and there was an incident?

22       A.    Yeah.  There was a big bar

23   fight at the end of the night.

24       Q.    Okay.  And do you remember what

25   type of force you used?

1

2      A.    I think I just helped with

3  handcuffing.

4      Q.    Okay.  Is that the only time

5  that you've ever had to speak with a

6  sergeant regarding a PSS case?

7      A.    I think I went twice for the

8  same one for that.  That's kind of all I

9  can remember.

10          MR. SHIELDS:  And Michelle, I'm

11      saying PSS as in Professional

12      Standard Section.

13      Q.    So first Investigator Barber,

14  can you tell me everything that you did to

15  prepare for today's deposition?

16      A.    I had the original, I think,

17  file that was sent to me years and years

18  ago, so I flipped through that, tried to

19  see if I had a report and what paperwork I

20  had.  I reviewed anything that had my name

21  on it or was associated to the case.

22      Q.    Okay.  When you say original

23  file that was sent to you years ago, can

24  you explain a little more what you mean?

25      A.    Probably maybe three years ago

1

2    now when I was first served with the

3    paperwork for the David Vann case, I think

4    there was some stuff in there that had my

5    name on it, that I was listed as being

6    involved in it.

7         Q.    Okay.  So you were served with

8    a summons and complaint in the case.

9    Right?

10        A.    Yes.

11        Q.    Okay.  Did you review the

12   summons and complaint before you came here

13   today?

14        A.    It was years ago.  I haven't

15   really reviewed the whole thing in quite

16   awhile.  It's been an ongoing thing.

17        Q.    So when you first got the

18   complaint, it was a lengthy complaint, did

19   you review that?

20        A.    Yeah.  Like I said, it was a

21   couple years ago now probably.

22        Q.    Yeah.  And then in preparation

23   for today's deposition did you look at any

24   paperwork?  Any other paperwork?

25        A.    The reports and stuff that were

13

1

2    part of the case.  Like the felony package

3    I think it's called.

4         Q.    Okay.  So you looked at the

5    reports that were included with the felony

6    package?

7         A.    Correct.

8         Q.    Did you look at any other

9    records?

10        A.    I had my PSS history, flipped

11   through that.  Just some of the other -- I

12   think that's kind of the major stuff.  Just

13   some of the reports that had been kind of

14   with them.

15        Q.    And did looking at those

16   documents refresh your recollection of the

17   incident?

18        A.    From the original night, is

19   that what you're talking about, on South

20   Ave?

21        Q.    Correct.

22        A.    Yes.

23        Q.    Okay.  And so I just want to,

24   you know, have an idea as I ask you

25   questions today, you know, what you used to

14

1

2    refresh your recollection.  It sounds like

3    the grand jury referral?

4          A.    Correct.

5          Q.    Your concise officer history?

6          A.    Yup.

7          Q.    Incident reports from the night

8    of the incident?

9          A.    Yes.  They were in the package.

10         Q.    Okay.  Subject resistance

11   reports?

12         A.    Those I didn't really look

13   through because they weren't -- they

14   weren't mine.

15         Q.    Okay.

16         A.    I wasn't there for any of it.

17         Q.    Okay.  Text sheets?

18         A.    Yes, I had a text sheet.

19         Q.    Okay.  Any videos?

20         A.    Yes.

21         Q.    Okay.  Pictures?

22         A.    Yes.  We confirmed the photos

23   that I took from that night.

24         Q.    Okay.  So we'll get to that in

25   a little bit.  Anything else that you

15

1

2    looked at?

3         A.    I kind of think that sums it

4    up.

5         Q.    Okay.

6         A.    I mean there was a bunch of

7    stuff, so if I'm forgetting something, I

8    apologize.

9         Q.    Okay.  And did you speak with

10   anybody about the deposition to prepare?

11        A.    Just the attorney.

12        Q.    Okay.  By the attorney, you

13   mean John Campolieto?

14        A.    Yes.

15        Q.    Any other attorneys from the

16   Corporation Counsel's office?

17        A.    No.

18        Q.    Okay.  Any of the other named

19   police officer defendants in the case?

20        A.    No.

21        Q.    Okay.  So you didn't speak with

22   Angelo?

23        A.    No.  I haven't seen her in

24   awhile.

25        Q.    Okay.  How about Brodsky?

1

2        A.    No.  Not about this.  I seen

3  him at training on Thursday but we didn't

4  talk about this.

5        Q.    Okay.  What was the training

6  you attended on Thursday?

7        A.     We had an active deadly

8  behavior training for like an active

9  shooter in like workplaces and stuff like

10  that.

11        Q.    Okay.  Where was that training?

12        A.     It was out in Greece is where

13  the -- it was an empty office building that

14  we were using for it, just to kind of make

15  it look more like a real-life scenario, if

16  it were to happen how we should react.

17        Q.     Got it.  Was that just RPD or

18  was that other local agencies as well?

19        A.     It was just our PD, but fire

20  was there because we're now kind of

21  utilizing them for active scenarios.

22  Rochester Fire was there as well for the

23  last half of the day.

24        Q.    Okay.  And is that a department-

25  wide training or something that only

17

1

2    certain officers had to do?

3         A.    Department wide.  I think the

4    county is getting it in the spring.

5         Q.    Okay. Did you speak with

6    Kester?

7         A.    I haven't seen him in awhile.

8    He's on days now and I work 7 at night

9    until 3 in the morning.  We don't really

10   cross paths that often anymore.

11        Q.    Okay.  So right now you work

12   nights.  Can you just tell me what section

13   you work and what your general schedule is

14   when you say you work nights?

15        A.    Sure.  So my section is now

16   called patrol section investigations.  All

17   the investigators are out of a central

18   location.  I work from 7:15 at night is

19   roll call, and we work until 7:30 a.m.  I

20   have a set schedule five days on now from

21   Sunday night to early Friday morning.

22        Q.    Okay.  And how long have you

23   had that schedule?

24        A.    The hours have been the same

25   for about two years now.  The days off

18

1

2    switched probably -- maybe a year ago now

3    probably.

4         Q.    Okay.  You were promoted to

5    investigator in 2020.  Is that right?

6         A.    Yup.  January of 2020.  So

7    almost two years.

8         Q.    And what did you do before

9    that?

10        A.    I was patrol on midnights for

11   the first twelve, almost thirteen years.

12        Q.    When you say patrol on

13   midnights, that means you worked the

14   nightshift?

15        A.    Yup.  11 at night until 7 in

16   the morning.

17        Q.    So you pretty much worked

18   nights your entire career?

19        A.    The whole time.  Oh, yeah.

20   It's brutal.  Never get used to it, I don't

21   care what anybody says.

22        Q.    What section did you work when

23   you were a patrol officer?

24        A.    So first I started out on the

25   west side, and then they did like a

19

1
2    reformatting of the city of how they were
3    set up.  They went from east/west to then
4    like five divisions.  So after they did
5    that, then I went to what was called
6    central section when they did the
7    reorganization.
8          Q.    Okay.  And when was that re-org?
9          A.    Maybe eight years ago now.
10   Somewhere around there. Eight and-a-half,
11   nine.
12         Q.    So that would be 2013, 2014?
13         A.    Yeah.  Probably. I'm not
14   positive on the year.
15         Q.    Okay.  Before the incident that
16   we're here to talk about today.  Right?
17         A.    Yes.
18         Q.    And in September 2015 what was
19   your assigned section and, I guess, shift?
20         A.    So I would have been central
21   first, which is central section, and
22   midnight hours.
23         Q.    When you say midnight hours, do
24   you start at 11 p.m.?
25         A.    Central section started at 10

20

1

2    p.m. and we got out at 6 a.m.  So they had

3    an hour shift to help with coverage and

4    stuff.

5         Q.    10 p.m. to 6 a.m.?

6         A.    Yes.

7         Q.    You started with the RPD in

8    2007.  Is that right?

9         A.    Correct.

10        Q.    Okay.  Did you speak with

11   Mitchell before your deposition?

12        A.    No.  I haven't seen him in a

13   few years.  It's been quite awhile.

14        Q.    And did you speak with Drake

15   before your deposition?

16        A.    No.  I haven't seen him in

17   awhile either.

18        Q.    Okay.  And you haven't seen

19   them because of your different work

20   schedules or something else?

21        A.    Yeah.  Usually work schedules.

22   Now I work out of a different office

23   altogether, so we don't usually cross

24   paths.

25        Q.    Okay.  And where is your office

1

2   now?

3        A.    I'm in -- we are in the Clinton

4   office.  We share an office with the

5   Clinton and Goodman section at, I think

6   it's 113 North Clinton, I think, is the

7   address.

8        Q.    Okay.  I'm assuming if you're

9   saying that you haven't seen Mitchell and

10  Drake or Kester in awhile because of work

11  schedules, that you also don't like hang

12  out with them socially?

13       A.    No.

14       Q.    Okay.  Are there officers that

15  you know at the RPD that you do hang out

16  with socially?

17       A.    Dempsey occasionally.  Now that

18  we have kids it's harder to do anything

19  anymore.

20       Q.    I understand that one.  I'm

21  just going to ask you some more background

22  questions before we get into some other

23  stuff.  Generally what made you want to

24  become a police officer?

25       A.    At the time my first wife was a

22

1

2      police officer.  Her family always did it

3      and she loved it.  I didn't really have an

4      interest in it.  I was working in a machine

5      shop, and that's what I went to school for.

6      We started losing a bunch of work to like

7      Indonesia and stuff like that, and they

8      were cutting hours.  She was making good

9      pay and had benefits and a retirement.  One

10     of her friends that I knew said I should do

11     a ride along.  I did that and kind of

12     started liking it, so I decided to take the

13     test.

14          Q.    Was she an RPD officer?

15          A.    Yeah.  She was Rochester, yeah.

16          Q.    When was that that you did the

17     ride along?

18          A.    Oh, that was maybe 2005.

19          Q.    And what did you like about

20     what you saw on the ride along that made

21     you want to join the RPD?

22                MR. CAMPOLIETO:  Objection.

23          A.    The guys and people were great.

24     It was kind of the people.

25          Q.    So it seemed like a good work

23

1

2    environment?

3         A.    Yeah.  It was -- you know, I

4    never really had any real interactions with

5    officers who were on the job so I never

6    really had an idea what it was actually

7    like.  She obviously knew more about it.

8    Once I did that, then it was great.

9         Q.    And your first wife, is she

10   still a police officer?

11        A.    Yup.

12        Q.    And who is that?

13        A.    She's remarried now.  Trenton

14   is her last name.

15        Q.    Jennifer Trenton?

16        A.    Yes.

17        Q.    Okay.  And when did you split?

18        A.    Maybe '09.  Somewhere in there.

19        Q.    Okay.  So I don't want to get

20   too much into your personal life.  At the

21   time that you got married, you were not a

22   police officer and she was.  Correct?

23        A.    Correct.

24        Q.    And when was that?

25        A.    A little while after college.

1

2    Maybe -- it might have been around the 2005

3    area. I'm not positive.

4         Q.    Okay.  Where did you go to

5    college?

6         A.    I went to MCC.

7         Q.    Okay.  And where did you go to

8    high school?

9         A.    Letchworth down in -- a school

10   down in Wyoming County.

11        Q.    Near the park?

12        A.    Yup.

13        Q.    And can you just give me an

14   overview of -- I know you went into it a

15   little bit before -- all the ranks and

16   positions that you've held since you began

17   working with the RPD in 2007 until now?

18        A.    So I was just an officer, and

19   then from officer I went to investigator.

20   It was kind of -- you just have to pick

21   which path.  You either go investigator or

22   boss.  Investigator was more appealing to

23   me.

24        Q.    Okay.  Why was investigator

25   more appealing to you?

1

2        A.    I think I liked the appeal of

3   working on the bigger jobs, I guess,

4   instead of -- I guess just going to all the

5   intoxicated bar closings wore on me.

6        Q.    And can you tell me what your

7   role is generally as an investigator?

8        A.    Sure.  So we usually respond to

9   major events, like felony level stuff.

10  Shootings in Rochester are kind of --

11  honestly are the most predominant thing

12  that we respond to.

13       Q.    So you respond to large events

14  like shootings and investigate?

15       A.    Yes.

16       Q.    So your role is to solve the

17  crimes?

18       A.    We usually --

19             MR. CAMPOLIETO:  Objection.

20             THE WITNESS:  Sorry.

21             MR. CAMPOLIETO:  Go ahead.

22       A.    We usually -- once it happens,

23  then we get assigned follow-up stuff, like

24  see if we can find video, re-interview the

25  victims, witnesses, stuff like that to try

1

2  to solve the crime.  Yes.

3        Q.    I think a different

4  investigator explained this to me but I

5  just want to check with you.  In Rochester

6  the role of investigator is basically the

7  same that some other departments, like the

8  NYPD, call a detective.  Right?

9        A.    Correct.  I think there's some

10  little difference about it.  I don't

11  remember what it was.

12        Q.    Like RPD doesn't have a title

13  called detective.  Right?

14        A.    Correct.

15        Q.    Can you compare the culture

16  within the RPD at the time that you started

17  in 2007 until what you think it's like

18  today?

19           MR. CAMPOLIETO:  Objection.  Go

20    on.

21        A.    You mean like a broad picture

22  of how things were when I -- with the

23  office or like just kind of the city in

24  general?

25        Q.    The culture within the

1

2    department when you began.  You said that

3    you liked the camaraderie among the

4    officers.  Let's start with that.  Do you

5    feel like there's the same camaraderie

6    today as when you joined?

7         A.    I think so.  I mean when we

8    were younger, though, we hung out more.

9    I'm older and have kids so it doesn't

10   happen as often.

11        Q.    Okay.  So that's you

12   personally.  What about among other

13   officers in the department?

14             MR. CAMPOLIETO:  Objection.

15        A.    I think there still is.

16        Q.    Okay.  What do you think is

17   different now, generally, within the

18   department than it was in 2007?

19        A.    I think when they did the

20   reorganization it broke everything up to

21   smaller kind of groups so you don't see

22   everybody as often.

23        Q.    Okay.  Did the culture in the

24   department change when body worn cameras

25   were rolled out?

1

2              MR. CAMPOLIETO:  Objection.

3     A.    I don't really think so.

4     Q.    Okay.  What, if anything, did

5  change when body worn cameras were rolled

6  out?

7     A.    I think they helped us a lot,

8  actually.  I know nobody really wanted them

9  when they first came out, but then it just

10  kind of justified all the stuff we were

11  saying.  I kind of -- I was actually quite

12  a bit for them after we had them for

13  awhile.

14     Q.    Okay.  And can you explain what

15  you mean when you said they justified

16  everything that you were saying?

17     A.    Sure.  So like we go to things,

18  like, you know, family troubles or

19  incidents, and they would tell us one thing

20  and we'd write it down, then we go to court

21  and they said I never seen that or I never

22  said that.  We would have our body cam that

23  showed exactly what we said.  So it just

24  kind of helped us out a ton when people

25  would go back on stuff.

1

2      Q.    So it's a good tool for

3   preserving evidence?

4      A.    Yes.

5      Q.    Is the same true about

6   officers' actions?

7      A.    Yeah.  I mean everything is

8   recorded.  It's there.  You can't really

9   dispute it.

10      Q.    And in your role as

11   investigator, I think you compared that

12   previously to the role of a boss.  Can you

13   explain --

14      A.    Okay.

15      Q.    I'll withdraw that. So earlier

16   I think you said there were two career

17   paths you could have chosen, investigator

18   or boss?

19      A.    Yes.

20      Q.    Can you explain what you mean

21   by that?

22      A.    So usually once you go to

23   investigator, investigator is where you

24   stop.  There's no real place to go from

25   there.  We have divisions that go to

1

2   separate things.  Like, you know, there's a

3   drug division and there's some financial

4   crime stuff.  You're always that rank but

5   you can go to different investigations,

6   where a boss can go from sergeant,

7   lieutenant and then onwards that way.

8        Q.    So there's more upward mobility

9   if you had instead taken like the

10  sergeant's exam?

11       A.    Correct.

12       Q.    Okay.  And as an investigator

13  do you oversee any other officers?

14       A.    Not really.  I mean I don't

15  have any supervisory role over them.  I can

16  ask them for help and stuff, but I don't

17  really have any authority over them.

18       Q.    And is that different from a

19  sergeant?

20       A.    Yes.

21       Q.    Okay.

22       A.    That would be their supervisor.

23       Q.    So is that sort of the

24  difference when you were explaining earlier

25  investigator versus boss as a career path?

31

1

2      A.    I just liked more of the aspect

3  of doing an investigation compared to being

4  a boss or an administrative person.

5      Q.    So let's say there was a use of

6  force incident, somebody made a complaint

7  against an officer.  Is there any situation

8  where you would, for example, review the

9  body worn camera of that incident and what

10 happened?

11         MR. CAMPOLIETO:  Objection.

12     A.    No.  That would be a

13 supervisor's role.

14     Q.    Okay.  That's what I was trying

15 to get at.

16     A.    Got you.  Okay.

17     Q.    How has the culture within the

18 RPD changed since the Daniel Prude

19 incident?

20         MR. CAMPOLIETO:  Objection.

21     A.    I think we still just kind of

22 do our job.  There's, I guess, nothing I

23 can really like pinpoint or say that's

24 changed.

25     Q.    A lot of officers have quit,

1

2   though.  Right?

3           MR. CAMPOLIETO:  Objection.

4       A.    I don't think because of that

5   in general.

6       Q.    Have you seen reports in the

7   media where the city and/or the RPD has

8   complained that it's been difficult to

9   retain officers?

10      A.    I've heard it but I haven't

11  read any reports or anything.

12      Q.    Do you know anybody that has

13  quit from the RPD since the Daniel Prude

14  incident?

15      A.    Not quit.  I know some guys

16  that have retired and stuff, but they just

17  had their time in.

18      Q.    Is it uncommon for people to

19  just retire once they've got their time in

20  and can collect their pension?

21      A.    It all depends on the people.

22  One guy was waiting for a kid to get out of

23  college.  Some guys are just twenty and

24  done.  It all depends on kind of their own

25  personal stuff they've got going on.

1

2      Q.    Do you have any plans to quit
3  in 2027?
4      A.    I wish.  Two little kids, it
5  ain't happening.
6      Q.    What's the pension?  Like
7  three-quarters or something?
8      A.    We're tier 2.  I'm not sure
9  what -- I'm tier 2.  I'm not sure what all
10  the math works out to be.  I know the
11  longer you stay, the more you leave with.
12      Q.    So needless to say, it's not
13  your full salary that you retire with.
14  Right?
15      A.    No.  Nope.
16      Q.    But you can pick up a second
17  job and make more?
18          MR. CAMPOLIETO:  Objection.
19      A.    I could I guess, yeah.
20      Q.    I guess it wouldn't be a second
21  job, it would be a new job?
22      A.    Yeah.
23      Q.    On that note, while you're
24  working with the RPD are you allowed to
25  work other jobs?

34

1

2      A.    Yes.   There's like a form you

3   have to fill out to say what you want to do

4   and then get approval.

5      Q.    Okay.  So you've been with RPD

6   since 2007.  Do you know the names of all

7   of the different police chiefs since you

8   began?

9      A.    We've had a handful of them.

10   Maybe three.

11          MR. CAMPOLIETO:  Just answer

12       the question he's asking.  He just

13       asked do you know the names.

14      A.    Okay.  Some of them.

15      Q.    In 2007 was that Duffy?

16      A.    I think Duffy was gone when I

17   got here.  I think it might have been

18   Moore.

19      Q.    Okay.  And then do you know who

20   was after Moore?

21      A.    We had another guy for a little

22   while, but I can't remember who it was.

23      Q.    Was it Sheppard or someone

24   different?

25          MR. CAMPOLIETO:  We have a list

1

2          we can provide you of the police

3          chiefs' names, Elliot, if you'd like

4          it, and their dates of service.

5      A.    I remember Sheppard but I don't

6  remember where he was in there.

7      Q.    And do you know who was after

8  Sheppard?

9      A.    We had some interims and stuff

10 like that, but I can't remember how they

11 all went.

12     Q.    Cimonelli was after Sheppard?

13     A.    Cimonelli I think.  Yup.

14     Q.    And then after Cimonelli, do

15 you remember who was next?

16     A.    Like the interim ones or just

17 the ones that were appointed to chief?

18     Q.    I don't know.  I'm just trying

19 to see if there's any that stand out to

20 you.

21          MR. CAMPOLIETO:  What's the

22          question?  Do you want him to name

23          them or do you want to know if they

24          stand out to him?  I can get you a

25          list of the chiefs.

36

1

2          MR. SHIELDS:  I have a list of

3     the chiefs, too, John.

4          MR. CAMPOLIETO:  What's the

5     point of the question?

6          MR. SHIELDS:  I'm going to ask

7     you to stop talking during my

8     deposition.

9          MR. CAMPOLIETO:  I'm objecting.

10          MR. SHIELDS:  You can say

11     objection.

12          MR. CAMPOLIETO:  I'll ask him

13     to stop answering the questions.

14          MR. SHIELDS:  John, I'm going

15     to call Judge Pedersen if you keep

16     talking.

17          MR. CAMPOLIETO:  Call him right

18     now.

19          MR. SHIELDS:  Stop talking,

20     John.  Let me ask my questions.  You

21     can say objection and that's it.

22          MR. CAMPOLIETO:  He's not

23     answering these questions.

24          MR. SHIELDS:  I don't care.

25     It's not an appropriate objection,

1

2      John.

3           MR. CAMPOLIETO:  He's not

4      answering this question.  Ask another

5      question.

6           MR. SHIELDS:  I'm calling Judge

7      Pedersen right now.  I'm calling him

8      right now.  You can't -- this is an

9      appropriate question and you're going

10     to be sanctioned, John.

11          MR. CAMPOLIETO:  You're not

12     going to give him a quiz.

13          MR. SHIELDS:  You're going to

14     be sanctioned, John.  You need to

15     stop interrupting my deposition.

16          MR. CAMPOLIETO:  He's not

17     answering this question.  Call Judge

18     Pedersen.  I don't even need to be on

19     the call.  You can talk to him

20     yourself.

21          MR. SHIELDS:  You'd think after

22     a few years of doing depositions

23     you'd know what a proper objection

24     is, John.

25          MR. CAMPOLIETO:  I'm objecting

38

1

2          and I'm telling him not to answer

3          that question.

4               MR. SHIELDS:  What's the basis

5          of that, John?  What's the basis?

6          Why don't you look up --

7               MR. CAMPOLIETO:  We will

8          provide you a list.  It's not whether

9          he knows the names of --

10              MR. SHIELDS:  Why don't you

11         look up Rule 30(C)2, John.

12              MR. CAMPOLIETO:  We'll let you

13         call the Judge.  If you need me on

14         the line with the Judge, you can call

15         me.  We're taking a break.

16              MR. SHIELDS:  We're not taking

17         a break.  We're putting all of this

18         on the record.

19              Don't go off the record,

20         Michelle

21              MR. CAMPOLIETO:  We're going

22         off the record for a minute and --

23              MR. SHIELDS:  John, we're not

24         going off the record.  I'm going to

25         do this call --

39

1

2          MR. CAMPOLIETO:  We are.

3          (Mr. Campolieto and Mr. Barber

4     turned off their Zoom cameras.)

5          MR. SHIELDS:  Please stay on

6     the record while I make the call to

7     the Judge.

8          (Phone ringing.)

9          VIKKI:  Judge Pedersen

10    (inaudible).

11         MR. SHIELDS:  Hi.  This is

12    Elliot Shields. How are you doing?

13    Is this Vikki?

14         VIKKI:  Yeah.

15         MR. SHIELDS:  Hi, Vikki.  I'm

16    in the middle of a deposition with

17    John Campolieto on the Vann case, and

18    I'm calling because I am getting

19    some, what I believe to be, frivolous

20    objections from John, and he directed

21    his officer not to answer my question

22    and did not provide any basis.  I

23    think it's inappropriate because Rule

24    30(C)2 is very clear that you can

25    only direct the deponent not to

1

2          answer for a limited number of

3          reasons, and John was unable to

4          articulate any of those reasons.  I

5          told him to stay on the record as I

6          called the Judge and he turned off

7          his Zoom and walked to the other room

8          or something.  I think that's

9          inappropriate and I'd like him to be

10         ordered to only make form objections

11         because he's interrupting my

12         deposition.

13             Basically I was asking -- I was

14         asking the deponent questions about

15         which police chiefs he remembers

16         working under.  I was asking about

17         basically the change in the culture

18         of the department over the years that

19         he's worked there.  John objected and

20         told him not to answer the questions.

21             VIKKI:  Okay.  The Judge isn't

22         here right now.  I can try to give

23         his cellphone a call.  What is the

24         best number to reach you?  The one

25         you called -- wait.  Why do you have

1

2      an 585 number?

3           MR. SHIELDS:  Because I grew up

4      in Rochester and I've had the same

5      phone number since I was maybe twelve

6      years old.

7           VIKKI:  So 585 (inaudible)?

8           MR. SHIELDS:  Yup, that's my

9      cell.

10          VIKKI:  All right.  I'll call

11     and see if I can get a hold of him

12     now.  I'm not -- I'll call him and

13     see what he says.  I don't know how

14     long he's going to be gone

15     (inaudible).  He's not participating

16     any more?

17          MR. SHIELDS:  I don't know what

18     he did.  He said we're taking a break

19     and left the room maybe to, I don't

20     know, ask his boss if that was an

21     appropriate objection or something.

22     He did not articulate any basis other

23     than --

24          VIKKI:  He just objected?

25          MR. SHIELDS:  He just objected,

1
2          and it sounded like it was a
3          relevancy objection which is not an
4          appropriate objection, and it's
5          certainly not an appropriate reason
6          to direct his deponent not to answer
7          a question.  If he wants to object,
8          he can object, but then he can't go
9          on making a speaking objection and,
10         you know, basically giving his
11         deponent a heads up about -- you
12         know, coaching him about how to
13         answer the question or why he thinks
14         it's inappropriate.  The deponent has
15         to answer the question.  I mean I
16         think that the only appropriate
17         objection to make is objection to
18         form or objection relevance.  I mean
19         objection relevance I think is an
20         inappropriate objection.  You can't
21         object on the basis of relevance.  I
22         want to ask the guy about the culture
23         in the department.  I had led up with
24         several questions that he did not
25         object to, and then I asked about the

43

1

2          various chiefs and then John

3          objected, had a long speaking

4          objection and refused to let him

5          answer the question, and then he

6          stormed out after I yelled at him and

7          said John, you can't make that

8          objection, you have to let him answer

9          the question.

10               VIKKI:  Okay.  I will call and

11          see what he says.  And in the

12          meantime --

13               MR. SHIELDS:  Thank you.  I

14          appreciate it, Vikki.  Bye-bye.

15               (Mr. Campolieto turned his Zoom

16          camera back on.)

17               MR. CAMPOLIETO:  Is the Judge

18          on the line?

19               MR. SHIELDS:  I called the

20          Judge, John.  Vikki took down my

21          message that you decided not to

22          participate in.  She's calling the

23          Judge and he'll call me back if she

24          can get him.  He was not in the

25          office right now.

1

2        MR. CAMPOLIETO:  Did you have

3     other questions you want to ask or

4     did you want to wait to get a list of

5     the police chiefs' names?

6        MR. SHIELDS:  I plan on

7     continuing to ask my questions, John.

8     I plan on you not interrupting and

9     disrupting my deposition.

10        MR. CAMPOLIETO:  I'm

11    obstructing this question about the

12    police chiefs' names.  We have a list

13    of them and we can give that to you.

14        MR. SHIELDS:  John, I'm not

15    trying to trick the guy.

16        MR. CAMPOLIETO:  I don't know

17    how this is even relevant in any way.

18        MR. SHIELDS:  John, relevance

19    is not an appropriate --

20        MR. CAMPOLIETO:  That's not why

21    I'm objecting.  We offered to give

22    you a list.

23        MR. SHIELDS:  I will make a

24    motion for sanctions and you will be

25    sanctioned, I promise you.

1

2          MR. CAMPOLIETO:  Elliot, just

3     stop, would you please.  I want to do

4     the deposition.  I'd like to get it

5     done.

6          MR. SHIELDS:  No, you don't.

7          MR. CAMPOLIETO:  The names we

8     can provide you.

9          MR. SHIELDS:  John, apparently

10    you don't want to get the deposition

11    done because you are making frivolous

12    objections.

13         MR. CAMPOLIETO:  Okay.  Do you

14    want to stop the deposition now at

15    this point?

16         MR. SHIELDS:  John, if you stop

17    the deposition, I guarantee you you

18    will be sanctioned.

19         MR. CAMPOLIETO:  I guarantee

20    you -- I just asked you if you wanted

21    to stop, not that I was stopping.  Do

22    you --

23         MR. SHIELDS:  If you stop the

24    deposition you will be sanctioned, so

25    don't do either one.

1

2          MR. CAMPOLIETO:  You can't tell

3     me when I'm going to get sanctioned.

4     You have no idea.  You're sitting

5     here like an authoritative little

6     person, asking my officer to name

7     police chiefs.  I can give you a list

8     of the police chiefs.

9          MR. SHIELDS:  John, you've got

10    to let me ask my questions.  You've

11    got to stop getting so mad.  You're

12    not allowed to make inappropriate

13    objections.  You've got to let me ask

14    my questions.  You're holding up the

15    deposition.

16         MR. CAMPOLIETO:  -- about the

17    names --

18         MR. SHIELDS:  John, I swear --

19    John, you need to stop, John.  What

20    do you think --

21         MR. CAMPOLIETO:  Do you want to

22    ask another question?

23         MR. SHIELDS:  Please articulate

24    a basis of your objection.

25         MR. CAMPOLIETO:  We have

1
2          offered to give you a list of the
3          names of the police chiefs.
4              MR. SHIELDS:  John, I don't
5          care.  I'm asking him what he knows.
6          I'm asking about -- I asked him a few
7          questions about how the culture of
8          the department has changed.
9              MR. CAMPOLIETO:  The what?
10             MR. SHIELDS:  I asked him
11         several questions about how the
12         culture of the department has
13         changed.  He answered those
14         questions.  Now he's had several
15         different police chiefs.  Right?
16         They're the policymakers of the
17         department.  I don't need to explain
18         to you why I'm asking my questions,
19         but I'm doing this as a courtesy
20         right now.  If you continue to object
21         to my questions, I'm going to make a
22         motion.
23             MR. CAMPOLIETO:  Then you're
24         going to have to make a motion.
25         We're objecting to him listing the

48

1

2          names of the police chiefs.  We will

3          provide you with a list.

4              MR. SHIELDS:  Okay, John.  You

5          know what I'm going to do.  I'm going

6          to make a motion and I'm pretty sure

7          you're going to be sanctioned.

8              MR. CAMPOLIETO:  Okay.  Then

9          we're done with this here?

10             MR. SHIELDS:  Are you -- it's

11         up to you.  Are you --

12             MR. CAMPOLIETO:  It's up to

13         you, Elliot.  Are you going to ask

14         another question?

15             MR. SHIELDS:  I am going to ask

16         the questions, and I expect him to

17         answer them.

18             MR. CAMPOLIETO:  He's not going

19         to answer that question. Do you want

20         to ask another one?

21             MR. SHIELDS:  I'm going to keep

22         asking my questions and I'm going to

23         make my record.

24             MR. CAMPOLIETO:  I don't know

25         what you're saying.

49

1

2           MR. SHIELDS:  I'm going to

3      continue with my deposition.  If you

4      keep objecting, it will be on the

5      record.

6           MR. CAMPOLIETO:  Go ahead.

7      Q.   Welcome back, Investigator.

8      A.   Hi.

9      Q.   After Cimonelli it was

10 Singletary.  Right?

11     A.   Yes.

12     Q.   And of all the chiefs that

13 you've worked under, was there one that you

14 thought was better than the others?

15     A.   I don't know.  I was -- I mean

16 they were -- they were the head of it.  I

17 didn't really have any direct contact with

18 any of them.

19     Q.   Have you noticed any

20 differences in the department since

21 Singletary left and Chief Smith has taken

22 over?

23     A.   Nothing that's directly

24 affected me, no.

25     Q.   Has the culture of the

50

1

2    department changed since Chief Smith took

3    over?

4         A.    No.

5         Q.    Since the Daniel Prude incident

6    is there any more emphasis on officers not

7    using excessive force?

8         A.    No.

9         Q.    So nothing has changed in terms

10   of officers' use of force since the Daniel

11   Prude incident?

12        A.    I don't think we've had any

13   additional training or anything, no.

14        Q.    Okay.  So no additional

15   training is what you just said.  Right?

16        A.    I don't believe so, no.

17        Q.    Is there any like discussions

18   at roll calls about how the officers should

19   act differently?

20        A.    No.

21        Q.    What was the reaction among

22   investigators and officers to the

23   $12,000,000 settlement?

24             MR. CAMPOLIETO:  Objection.

25        A.    There wasn't really anything.

51

1

2          Q.     Is that viewed among officers

3    in the department as an admission of

4    liability?

5          A.     Admission of liability?  Is

6    that what you said?

7          Q.     Correct.

8          A.     No.

9          Q.     So officers in the department

10   still think that the officers that used force

11   against Mr. Prude acted appropriately?

12              MR. CAMPOLIETO:  Objection.

13         A.     Repeat it again, the question.

14         Q.     Do officers in the department,

15   after the $12,000,000 settlement, still

16   think that the officers who used force

17   against Mr. Prude acted appropriately?

18              MR. CAMPOLIETO:  Objection.

19         A.     I believe so.  They did all the

20   stuff they were trained to do.  They didn't

21   do anything out of the normal.

22         Q.     Do you personally think that

23   Mark Vaughn acted appropriately?

24         A.     I wasn't there.  I'm not really

25   aware of the circumstances, so I couldn't

1
2  really comment on what he did.
3       Q.    Did you see the video?
4       A.    I usually try not to get too
5  involved with the stuff.  I didn't watch
6  the body cam or any of that stuff.
7       Q.    Is there a general -- among the
8  department did you have conversations with
9  other investigators and officers about the
10  incident?
11       A.    No.
12       Q.    Do you think Chief Smith is
13  committed to making the reforms to prevent
14  another Daniel Prude incident from
15  happening?
16            MR. CAMPOLIETO:  Objection.
17       A.    I don't know.
18       Q.    Because you haven't seen any
19  changes since he took over?
20            MR. CAMPOLIETO:  Objection.
21       A.    I think he wants to but I don't
22  really know what his plans are.
23       Q.    Have there been any general
24  policy changes in terms of use of force
25  since he took over?

53

1

2      A.    Not that I can recall.  Nothing

3  that comes to mind.

4      Q.    Okay.  I think you testified

5  earlier that there's been no new training

6  on use of force.  Correct?

7      A.    Correct.  Once all the COVID

8  stuff kind of hit, it really stopped a lot

9  of the stuff.

10     Q.    Okay.  I want to go through

11  some exhibits.  Hopefully I'm organized

12  here.  I'm going to display them on the

13  screen and ask you some questions. Okay?

14     A.    Okay.

15           (Concise officer history was

16      marked as Plaintiff's Exhibit 1 for

17      identification as of this date.)

18     Q.    Exhibit 1 is going to be your

19  concise officer history which you said that

20  you reviewed in preparation for this

21  incident.  Right?  I mean this deposition.

22     A.    Yes.

23     Q.    Investigator, can you see on

24  your screen the concise officer history?

25     A.    Yes.

54

1

2         Q.    I'm just going to scroll down.

3    It's a one-page document I believe.  Police

4    Officer Christopher J. Barber.  That's you;

5    correct?

6         A.    Correct.

7         Q.    And I guess this was printed on

8    July 22, 2020.  You had been promoted to

9    investigator by that point.  Right?

10         A.    Yes.

11         Q.    Okay.  So I guess they just

12    didn't update that in the system, your

13    rank?

14         A.    Yeah, probably not.

15         Q.    Okay.  So my questions about

16    this, Investigator, are it looks like there

17    are a total of two incidents listed.  Is

18    that correct?

19         A.    Yes.

20         Q.    The first one is IA number

21    2015-0129?

22         A.    Correct.

23         Q.    And then the second one is IA

24    number 2017-0055?

25         A.    Correct.

55

1

2          MR. SHIELDS:  For the record,

3      this one-page document is Bates

4      numbered COR000085.  That's Exhibit

5      1.

6      Q.    My first question is it looks

7 like the 2015 incident just was regarding a

8 vehicle accident.  Is that right?

9      A.    Correct.

10      Q.    Did that involve anything

11 having to do with interactions with a

12 member of the public?

13      A.    No.  Our parking lot was icy.

14 When I tried to turn the car, it didn't

15 turn and I slid into a fence post.

16      Q.    Okay.  And the second incident

17 looks like there were two allegations,

18 discourteous/offensive behavior and

19 unnecessary use of force.  Is that right?

20      A.    Yes.

21      Q.    Okay.  Do you remember the

22 underlying incident that gave rise to these

23 allegations?

24      A.    No.

25      Q.    Okay.  Is this the incident

56

1

2   where you spoke with the PSS officer or

3   sergeant as you spoke about earlier?

4        A.    I am not sure.

5        Q.    Okay.

6             MR. CAMPOLIETO:  Can we stop

7        for a second?  Don't ask any

8        questions until I return.  I'll be

9        right back.

10            (Whereupon, a brief recess was

11       taken.)

12            (Whereupon, Judge Pedersen

13       entered the Zoom Videoconference in

14       person at the Rochester City Hall via

15       Mr. Campolieto's computer.)

16            MR. CAMPOLIETO:  Elliot, can

17       you hear me?

18            MR. SHIELDS:  I can hear you,

19       John.

20            MR. CAMPOLIETO:  We have Judge

21       Pedersen here.

22            MR. SHIELDS:  Let me stop

23       sharing the screen for a second.

24            Hello, Judge.

25            JUDGE PEDERSEN:  Good afternoon.

57

1

2          MR. SHIELDS:  Would you like to

3      sit in on all of our depositions?

4          JUDGE PEDERSEN:  I'm sure it

5      would be fascinating but I'm sure the

6      Social Security people would be upset

7      if I didn't read the transcripts and

8      get ready for tomorrow.

9          What's the issue?  Vikki filled

10     me in a little bit.

11         MR. SHIELDS:  Vikki explained

12     that she was calling you.  I didn't

13     realize that you were going to be

14     over at the City.

15         JUDGE PEDERSEN:  I was at the

16     Pizza Stop restaurant.  You know

17     where that is.  Vikki called and I

18     said well, I haven't seen City Hall

19     in a long time so I'll stop over on

20     my way.

21         MR. SHIELDS:  We were going

22     through some questions that John

23     lodged some objections that I felt

24     were unwarranted and unnecessary, and

25     he had directed his client not to

1

2      answer.  First I had asked the

3      officer -- I'm sorry, the

4      investigator several questions about

5      the culture in the department and how

6      it has changed since he became an

7      officer in 2007, and he answered

8      those questions.  John had not

9      objected.  And then I was asking him

10     several questions about which police

11     chiefs he had worked under to

12     establish the culture and any change

13     in the culture in the RPD under

14     various police chiefs.  After I asked

15     him about several different chiefs,

16     John directed him not to answer.  I

17     told John under Rule 30(C)2 it's an

18     inappropriate objection, relevancy is

19     not an appropriate objection, and

20     that he is not permitted to direct

21     his officer not to answer that

22     question.  He's got to make his

23     objection and let him answer.  The

24     only appropriate reason to direct a

25     deponent not to answer a question is

1

2          to preserve a privilege, or the other

3          reasons under 30(C)2, which are to

4          enforce the limitation ordered by the

5          court or present a motion under Rule

6          30(D)3.

7               JUDGE PEDERSEN:  Okay.  Mr.

8          Campolieto, why don't you have a seat

9          here so you're on the record.  Go

10         ahead and put your side on.

11              MR. CAMPOLIETO:  Your Honor,

12         the question was for my officer -- or

13         the investigator to name the police

14         chiefs in order.  He was struggling

15         to do that.  We offered to provide a

16         list of police chiefs and interim

17         police chiefs to Mr. Shields.  He

18         said no, he was going to ask his

19         questions. I said we'll provide a

20         list and the investigator didn't have

21         to answer, because he was having

22         trouble answering about each chief

23         and interim chief.  I told the

24         investigator not to answer that

25         question.  It was specific to listing

60

1

2          the police chiefs he worked under.  I

3          offered to provide a list of police

4          chiefs he worked under.

5               JUDGE PEDERSEN:  Mr. Shields?

6               MR. SHIELDS:  He instructed him

7          not to answer.  That's an

8          inappropriate objection.  He can't

9          instruct him not to answer.  He can

10         say I don't know and that's his

11         answer.

12              JUDGE PEDERSEN:  Okay.  I have

13         to agree that if a deponent is

14         struggling with the answer, that's

15         fine, you can offer that to Mr.

16         Shields, but it really isn't a proper

17         objection to say you won't answer, or

18         you mustn't answer, or you don't have

19         to answer.  It's up to the officer to

20         give his answer, whatever it might

21         be, and it might be I don't know, or

22         I don't remember, or I need to

23         refresh my recollection, something

24         along those lines.  We can take it

25         from there.

61

1

2              Anything further?

3              MR. SHIELDS:  I think that's

4         all for now, Your Honor.  To John's

5         credit, after we went back on the

6         record I asked the question about who

7         the next chief was and John did not

8         object, so --

9              JUDGE PEDERSEN:  Okay.

10             MR. CAMPOLIETO:  I think we're

11        past that problem.  We'll continue

12        with the deposition.  I'm sorry that

13        had to break your lunch up early.

14             JUDGE PEDERSEN:  Not a problem.

15             MR. CAMPOLIETO:  Thank you for

16        the in-person service.  It's unusual.

17             MR. SHIELDS:  Thank you, Judge

18        Pedersen.

19             MR. CAMPOLIETO:  I'll be back

20        in one second.

21             (Whereupon, a brief recess was

22        taken.)

23        Q.   Investigator, in terms of --

24   let me just throw that back up for one

25   second here.  I'm going to put Exhibit 1

1

2    back up on the screen for you.

3              Investigator, is that your

4    concise officer history that you see on the

5    screen again?

6         A.    If somebody is talking, I don't

7    hear it.

8         Q.    Can you hear me?

9              MR. CAMPOLIETO:  Hang on.

10        Q.    So my question about this

11   document is it says at the bottom received

12   two total.  Are those the only two PSS

13   complaints that you've had against you that

14   you know of?

15        A.    Yes.

16        Q.    Okay.  And I forget what your

17   answer was prior to the Judge joining us.

18   This second 2017 incident, do you remember

19   the underlying facts of what happened in

20   that incident, or the allegations?

21        A.    No. I'm not sure what it is.

22        Q.    Okay. And it says that -- I

23   believe the outcome here was officed?  Is

24   that what officed means, that that was the

25   outcome?

1

2         A.    Yes.

3         Q.    Do you know what officed means?

4         A.    I know how I use it.  If that's

5    what --

6         Q.    Okay.  How do you use it?

7         A.    So when I office a case, it

8    usually means there's no further that I can

9    go with it but it can be -- it's not

10   closed, it's still open, but there's just

11   not any more to do with it is how I use it

12   in my reports, if it's the same thing.

13        Q.    Okay.  But you're not sure if

14   it's the same thing when PSS uses it?

15        A.    I would assume so because it's

16   all kind of standard with our department.

17        Q.    Okay.

18        A.    I've never worked with PSS so

19   I'm not sure if they use the same thing.  I

20   would assume they would.

21        Q.    Okay.  So would that mean

22   basically that it's not closed, and if they

23   receive, for example, additional

24   information it can be pursued further?

25        A.    I don't know.

64

1

2          Q.    Okay.

3          A.    I would assume so because it's

4     the same department.

5          Q.    Is that how you would consider

6     something that you marked as officed?

7          A.    Yes.

8          Q.    Okay.  But in terms of this

9     2017 incident, did PSS ever contact you to

10    gather any information about what happened

11    there?

12         A.    I'm not sure what the incident

13    is because I don't see any of the details.

14              MR. SHIELDS:  Okay.  And John,

15         I don't think you ever provided any

16         of the details for that incident, so

17         we'll follow up in writing.  I think

18         that we did demand that in our set of

19         demands.  If we get it and I need to

20         ask him questions, hopefully we can

21         just do that through interrogatories

22         or something.

23              MR. CAMPOLIETO:  Okay.

24              MR. SHIELDS:  I will follow up

25         in writing.

1

2          Q.    Investigator Barber, have you

3    ever been disciplined for any citizen or

4    internal complaint?

5          A.    No.  Just a letter of reprimand

6    from the driving thing.

7          Q.    Okay.  Have you ever had any

8    other incidents where someone complained

9    that you used excessive force, --

10         A.    Not that I'm aware of.

11         Q.    -- other than the Melinda

12   Santos incident?

13         A.    Correct.

14         Q.    Okay.  I'm going to put down

15   Exhibit 1.  Actually, I have this new

16   program.  I'm going to put up a second

17   exhibit which is going to be your PDS file.

18   I'm going to ask you some questions about

19   that.  That's going to be Exhibit 2.

20               (Investigator Barber's PDS file

21           was marked as Plaintiff's Exhibit 2

22           for identification as of this date.)

23         Q.    Investigator, do you see on the

24   screen, I guess this top page here, the top

25   left corner says Investigator Chris Barber?

66

1

2      A.    Yes.

3      Q.    Let me just see something going

4  forward.  Now you see your concise officer

5  history?

6      A.    Correct.

7      Q.    Okay, great.  My plan worked.

8  I have a few questions about several notes

9  on a couple of pages.  Give me one second.

10          MR. SHIELDS:  So for the

11      record, this document is marked Bates

12      number COR VANN 027793 to COR VANN

13      027902.  I want to go to page 027834.

14      Let's do that.

15      Q.    Investigator, do you see at the

16  bottom where that says COR VANN 027834?

17      A.    Yes.

18      Q.    If we go to the top of this

19  document, it says the date is 1/11/2016.

20  Is that correct?

21      A.    Correct.

22      Q.    It says the evaluation period

23  is 4/2015 to 12/2015?

24      A.    Correct.

25      Q.    Do you know why it wasn't for

67

1
2   the whole year?

3        A.    They usually do them once a

4   year.  I don't know.  Oh, maybe -- was that

5   when the re-org happened?

6        Q.    2015 you think?

7        A.    Maybe.

8        Q.    Okay.  Because this says

9   central first, and that's where you were

10  after the re-org.  Right?

11       A.    Correct.

12       Q.    So if we go down to the second

13  page, can you just read this first

14  paragraph to yourself and then I'm going to

15  ask you some questions about it?

16            (Pause in the proceedings.)

17       A.    Okay.

18       Q.    So would it be fair to say that

19  it's a good review?

20       A.    Yes.

21       Q.    And they call you a team player

22  and somebody that everyone gets along with?

23       A.    Yes.

24       Q.    And you think that's a fair

25  review, you get along with all of your

68

1

2    peers?

3         A.    Yes.  Generally, yes.

4         Q.    That's part of the reason you

5    became a police officer.  Right?

6              MR. CAMPOLIETO:  Objection.

7         A.    Yes.

8         Q.    And we had just looked at your

9    concise officer history and you've had only

10   a few complaints in your career. Right?

11        A.    Correct.

12        Q.    So do you think that you

13   generally get along with the citizens that

14   you interact with also?

15        A.    Yes.

16        Q.    Why do you think you get along

17   with everybody?  Hold on.  Let me withdraw

18   that.  Getting along with both your peers

19   in the department and the citizens that you

20   interact with is an important characteristic

21   to be a successful police officer.  Right?

22              MR. CAMPOLIETO:  Objection.

23        A.    Repeat it one more time.

24        Q.    Being able to get along with

25   both your co-workers and with the citizens

69

1

2      that you interact with is important to your

3      role as a police officer.  Right?

4              MR. CAMPOLIETO:  Objection.

5        A.    Correct.  Just usually being

6      polite helps us understand one another.

7        Q.    And when you say one another,

8      you mean both police officers --

9        A.    Police officers and citizens.

10       Q.    I'm sorry.  Both police

11     officers and citizens.  Right?

12       A.    Correct.

13       Q.    It helps you to solve

14     crimes, --

15       A.    Yes.

16       Q.    -- having a good rapport with

17     the citizens you interact with?

18       A.    Yes.

19       Q.    Otherwise they don't want to

20     give you information to help you solve

21     crimes.  Right?

22       A.    You just have to have a good

23     attitude.

24       Q.    Okay.  And where do you think

25     your good attitude came from?

1

2              MR. CAMPOLIETO:  Objection.

3       A.    I don't know.  I'm just a nice

4  guy.

5       Q.    I mean is that something that

6  the RPD trains its officers to do, to be a

7  nice guy when you interact with citizens?

8              MR. CAMPOLIETO:  Objection.

9       A.    We're generally told it helps

10  to listen and stuff, but just kind of in

11  general it makes sense to be nice.

12      Q.    Do you think that's one of the

13  reasons that you've had very few citizen

14  complaints in your career?

15      A.    Could be, yeah.

16      Q.    In general do you think that

17  you've had fewer citizen complaints than

18  other officers?

19             MR. CAMPOLIETO:  Objection.

20      A.    I don't know.  I'm not sure of

21  everybody's history.

22      Q.    Would you agree with me that

23  two citizen complaints in a fifteen-year

24  career is a pretty low number.  Right?

25             MR. CAMPOLIETO:  Objection.

71

1

2          Just to clarify the record, they are

3          both not citizens complaints.

4                MR. SHIELDS:  That's true.

5      Q.    Would you agree with me that

6  one citizen complaint in a fifteen-year

7  career is a very low number?

8      A.    I've always been nice to

9  everybody, so I'm even surprised I have

10  one.

11      Q.    The goal should be to have

12  zero.  Right?

13      A.    It should be, but sometimes

14  people just say things and you can't help

15  it.

16      Q.    You can't control what other

17  people do.  Right?

18      A.    Correct.

19      Q.    You can only control your own

20  actions. Right?

21      A.    Yup.

22      Q.    And being a nice guy and being

23  courteous when you interact with citizens,

24  apparently in your career has led to only

25  one citizen complaint.  Right?

1

2            MR. CAMPOLIETO:  Objection.

3       A.    Correct.

4       Q.    Now some officers, I can

5  represent to you based on the records, have

6  many more than one citizen complaint.  Does

7  that sound like, you know, an accurate

8  statement to you?

9       A.    I don't know.

10      Q.    Some people would have one like

11  you, some people would have more than one.

12  Right?

13      A.    Yeah, I guess.

14      Q.    Do you know of any officers in

15  the department who have a reputation for

16  using excessive force?

17      A.    No.  Not really.

18      Q.    How about Michael Feldman or

19  Michael Stephens?

20      A.    I know of him.  I worked with

21  him for a little while but I've never had

22  any direct problems with him.

23      Q.    And Michael Feldman or Michael

24  Stephens, he is no longer with the

25  department.  Right?

1

2      A.    I think he's on afternoons

3  somewhere.

4           MR. SHIELDS:  Okay.  Before I

5       get ahead of myself, I'm going to put

6       up Exhibit 3 which is a subject

7       resistance report from -- I'll just

8       put it up and then ask you questions

9       about it.

10           (Subject resistance report CR#

11       11-393543 was marked as Plaintiff's

12       Exhibit 3 for identification as of

13       this date.)

14      Q.    So this is Exhibit 2 still.

15  Exhibit 3, do you see what looks like a

16  subject resistance report with the subject

17  name Andrea Rugg in the top left corner?

18      A.    Can you just scroll down a

19  little more so I can see the side?  Yes.

20      Q.    Okay. And it's dated 12/16/2011?

21      A.    Okay.

22      Q.    So I'm just going to go to the

23  narrative section which is kind of long.

24  I'll ask you to read that and then --

25  first, do you see all of the officers

74

1

2   listed here?

3        A.    Yes.

4        Q.    Okay.  So Michael Feldman is

5   the first one, and then two down

6   Christopher Barber.  That's you?

7        A.    Correct.

8        Q.    And just if you can just read

9   it, let me know when you're done reading it

10  and then I just have a couple of questions

11  about this.  Are you on a computer that's

12  large enough for you to read this?  Do you

13  need me to zoom in at all?

14       A.    I think it should be all right.

15             (Pause in the proceedings.)

16       A.    Okay.

17       Q.    So my first question is this

18  number in red on the left, do you know what

19  that number is?

20       A.    I do not.

21       Q.    Okay.  Up here at the top it

22  says PSS.  Do you know why that says PSS?

23       A.    I'm guessing it's their copy of

24  the SRR.

25       Q.    Could the red number be the PSS

1

2  number?

3       A.    It could be something

4  internally I guess, but I don't know.

5       Q.    It's not a number that like

6  looks familiar based on what the numbers

7  look like to you?

8       A.    No.  I would guess the CR

9  number, but the CR number is in the top

10  right corner and they're different.

11       Q.    Okay.  So it's not the CRR

12  number, it's something else?

13       A.    Correct.

14       Q.    That was my first question.  My

15  second question is do you know if PSS

16  investigates every incident where there's a

17  subject resistance report?

18       A.    They get a copy of every

19  subject resistance report.

20       Q.    They get a copy.  Do you know

21  what they do after they get a copy?

22       A.    I've never worked there.  No.

23       Q.    Okay.  You've never worked

24  there, but just based on your fifteen years

25  with the department, you don't have any

76

1

2    knowledge either?

3         A.    Correct.

4         Q.    Okay.  Now the incident

5    described in this subject resistance

6    report, there was a mental health law

7    arrest.  Right?  That's what happened here?

8         A.    Yes.

9         Q.    Is that a common occurrence in

10   the City of Rochester?

11        A.    Yes.

12        Q.    Okay.  So this is, I guess, a

13   typical interaction that officers would

14   have with people in the City of

15   Rochester, --

16             MR. CAMPOLIETO:  Objection.

17        Q.    -- somebody with mental health

18   issues?

19             MR. CAMPOLIETO:  Repeat the

20         question.

21        A.    Yes.  It's not uncommon but

22   it's not all the time.

23        Q.    Okay.  So not uncommon.  It's

24   something that's somewhat frequent at

25   least?

77

1

2              MR. CAMPOLIETO:  Objection.

3       A.    I don't think I could put a

4   number on it.

5       Q.    Okay.

6       A.    They do occur.

7       Q.    I think I said -- at first I

8   said common, you said yeah, then I said

9   typical.  Those are two obviously different

10  words.  It's something that happens and the

11  officers deal with.  Correct?

12      A.    Correct.

13      Q.    In your fifteen years with the

14  department, you've had a few -- at least

15  this one incident where somebody has been

16  mental health law arrested?

17      A.    Yes.

18      Q.    You've had other incidents

19  after this one?

20      A.    I don't recall but I would

21  assume so, yes.

22      Q.    Okay.  Can you tell me all the

23  training that you've received from the RPD

24  about dealing with people who have mental

25  health issues?

1

2          A.    We've had in the academy.   I
3    know we've had an in-service about it.   I
4    don't know that I can give you details
5    about them.
6          Q.    Okay.  So first you said at the
7    academy. Right?
8          A.    Correct.
9          Q.    Okay.  Tell me everything you
10   remember about the academy training for
11   dealing with people with mental health
12   issues?
13         A.    It was a long time ago.  Pretty
14   much I just took away from it just kind of
15   what I do, be polite and try to listen and
16   understand them, see if you can help them.
17         Q.    Okay.  You don't remember any
18   of the like specific, I don't know, courses
19   from the academy about dealing with people
20   with mental health issues?
21         A.    No details about it, no.
22         Q.    Okay.  You said that there were
23   a couple in-services also?
24         A.    I think so.  I know we
25   definitely had one.  I think there was

79

1

2    another one.

3         Q.    Okay.  So one and maybe two in-

4    services?

5         A.    Correct.

6         Q.    Okay.  What do you remember

7    about the first in-service?

8         A.    I think it was just kind of a

9    refresher.  Nothing that I can really

10   remember differently.

11        Q.    My understanding of a refresher

12   is that sometimes they're like a roll call

13   training in the mornings?

14        A.    I think we went to the academy

15   for that one, though.  It wasn't a roll

16   call one.  I think we might have spent

17   maybe a day or half a day at the academy to

18   do it.

19        Q.    Okay.  In the academy, that's

20   the one I forget the location.

21        A.    I'm sorry.  The training

22   facility.  Not the public safety training

23   facility.  We went there for the day.

24        Q.    And that's on Scottsville?

25        A.    Correct.

80

1

2      Q.    What do you remember about that

3  training?

4      A.    It's been years. I couldn't

5  give you any details.

6      Q.    Okay.  Do you remember if it

7  was before or after the incident with David

8  Vann in September 2015?

9      A.    I think it was years before

10  then.

11      Q.    Okay. There might have been a

12  second one, you said, but you don't

13  remember?

14      A.    Yeah.  I don't recall

15  specifically.

16      Q.    Okay. So if you don't recall

17  specifically, would it be fair to say you

18  don't recall if it was before or after

19  2015?

20      A.    Correct.

21      Q.    Okay.  Since the Daniel Prude

22  incident has the department held any

23  trainings, to your knowledge, about dealing

24  with people with mental health issues?

25      A.    I know we had some trainings

1

2  but I don't know if they were specific to

3  the incident.  Not that I can recall.

4       Q.   Okay.  What trainings have been

5  held since the Daniel Prude incident?

6       A.   There's -- I don't think it was

7  anything specific.  I know we had maybe a

8  domestic violence one recently, but that's

9  -- now we get a lot of videos.  The one

10  that I had on Friday for the active shooter

11  thing.  Those are really the only two that

12  I can remember that come to mind.

13       Q.   Okay.  So just to be clear,

14  since the Daniel Prude incident you don't

15  think the department has held any specific

16  trainings because of that incident.  Is

17  that correct?

18            MR. CAMPOLIETO:  Objection.

19       A.   I know we've had trainings, but

20  nothing I can remember that was because of

21  this, we're having this.

22       Q.   Okay. And you remember a

23  domestic violence training that you've done

24  since the Daniel Prude incident?

25       A.   Correct.  I think that was --

1

2    that one might have been an online course

3    that we had to do.

4        Q.    Okay.  When you say that we had

5    to do, does that mean -- let me pull down

6    this document for now.  Does that mean that

7    it was a required training that all

8    officers had to take?

9        A.    Yes.  I think every year we

10   have to do an internet security, a sexual

11   harassment thing, and there might have been

12   one more.  I don't remember what it is

13   specifically.

14       Q.    In addition to firearms training?

15       A.    Correct.

16       Q.    So you said sexual harassment

17   and internet security?

18       A.    Yeah.  I think there's maybe

19   three things, and those are usually online.

20       Q.    Those three things that you do

21   every year, are those topics the same

22   required topics every year?

23       A.    I don't know. I know that

24   subject.  I don't really recall from year

25   to year what the topics are.

1

2          Q.    What I mean is, for example,

3    every year you have to do three credits of

4    training, for example, or is it every year

5    you have to do a sexual harassment, an

6    internet security and maybe something else?

7          A.    Correct.  Yes to the last one.

8    Like there's a sexual harassment one we

9    have to watch, there's an internet safety

10   one that just like talks about phishing and

11   spam and stuff like that.

12         Q.    So for example, there's no

13   required annual training about dealing with

14   people who have mental health issues?

15         A.    No.

16         Q.    I just had a couple other

17   questions on that subject resistance

18   report.  I'm going to put it back up, --

19         A.    Okay.

20         Q.    -- Exhibit 3.  You said, I

21   think, that dealing with people with mental

22   health issues was either a common thing or

23   a not uncommon thing.  Right?

24               Do you see down here where it

25   says this person had recently been arrested

84

1

2   for an MHA on 12/7/11?

3          A.    Yes.

4          Q.    So this specific person, at

5   least, had ongoing issues, apparently, and

6   had been repeatedly arrested for MHAs.

7   Right?

8                MR. CAMPOLIETO:  Objection.

9          A.    She at least had a recent one.

10         Q.    Okay.

11         A.    I don't know her -- I don't

12  know of her history at all.

13         Q.    Okay.  So this was 12/16/11.

14  Right?

15         A.    Yeah.

16         Q.    And then this said 12/7/11.  So

17  two in a week or so?

18         A.    Yup.

19         Q.    This middle section describes

20  the force used.  Right?  So here it was --

21  or the use of force continuum would be more

22  fair, I guess, because it's verbal and

23  that's not physical force?

24         A.    I think those are like

25  technique check boxes.

1

2          Q.    Okay.

3          A.    Because they're trained, we

4    don't have to explain them.

5          Q.    Got you.  So first it's verbal,

6    and then that says 1.  So that's the first

7    thing that was attempted.  Right?

8          A.    Correct.

9          Q.    And then ground stabilization

10   was second and third?

11         A.    Yes.

12         Q.    Okay.  3-point landing, joint

13   manipulation?

14         A.    Those are examples of ground

15   stabilization.

16         Q.    Okay.  So there were two

17   techniques, apparently, used with ground

18   stabilization here.  Right?

19         A.    Correct.

20         Q.    Because on the narrative, what

21   was -- let's see.  It looks like your role

22   was -- did you do anything here other than

23   get out the hobble and give it to Feldman?

24         A.    No.  I used to wear mine around

25   my waist.  Because I've been kicked a few

1
2   times, so I like to have it with me.  Some
3   people go to their cars to get it, and
4   that's not helpful.
5       Q.   What is the hobble?
6       A.   It was a tool that we were
7   provided in the academy.  It's to -- you
8   cross their legs and it keeps them from
9   being able to kick you.  They cross their
10   legs and then you draw it tight around
11   their -- around their ankles.
12       Q.   Okay.  Is it like a rope?
13       A.   Yeah.  I mean that's probably
14   the simplest way to describe it.
15       Q.   Okay.  So it's something to put
16   around a subject's legs, is basically what
17   a hobble is?
18       A.   The ankles.
19       Q.   Ankles.  Okay. I didn't know
20   what it was, so thank you.  It looks like
21   he used the hobble, right, and it was
22   effective?
23       A.   Yes.
24       Q.   Okay. I think that's all my
25   questions on that for now.

87

1

2              Back to Officer Stephens, or

3    Officer Feldman.  First, do you know why he

4    changed his name?

5         A.    No.  That was for personal

6    reasons.  I don't know why.

7         Q.    Okay.  It just makes the

8    reports a little confusing.  Do you know of

9    any other instances where he was found to

10   have used unnecessary force?

11        A.    Nothing that specifically comes

12   to mind.

13        Q.    Okay.

14             MR. CAMPOLIETO:  Objection.  We

15         haven't established that he used

16         unnecessary force.  That's just a

17         subject resistance report.

18             MR. SHIELDS:  Sure.

19        Q.    Are you aware that in the

20   incident with Dudley Scott, he was alleged

21   to have repeatedly punched Dudley Scott in

22   the face and blinded him in one eye and was

23   -- that complaint was substantiated by PSS?

24        A.    I don't know Dudley Scott or

25   that incident.

1

2      Q.    Okay.  So you've never heard of

3   that incident?

4      A.    Nope.

5      Q.    Okay.  And you've never heard

6   of any person by the name of Dudley Scott

7   suffering blindness in one eye as a result

8   of a force incident with RPD?

9      A.    I'm not familiar with that, no.

10           MR. CAMPOLIETO:  Objection.

11      Q.    Okay.  In general, it sounds

12   like if there's an incident like that then,

13   that it's not something that, for example,

14   would be brought up at a roll call to say

15   hey, this happened, don't do that?

16      A.    Not usually, no.

17      Q.    Okay.

18           MR. CAMPOLIETO:  Objection.

19      Q.    I'll represent to you that the

20   City of Rochester settled that case with

21   Dudley Scott who brought a lawsuit for

22   $750,000. Were you aware of that?

23      A.    No.

24      Q.    Okay.  So it would be fair to

25   say then that that's also not something

1

2    that would be discussed at a training or a

3    roll call saying hey, don't do what Officer

4    Stephens or Officer Feldman did during this

5    incident because, one, you could be

6    disciplined by PSS; and two, it could cost

7    the City $750,000 or more?

8              MR. CAMPOLIETO:  Objection.

9        A.    Nothing that specific.  I mean

10   there might be a training after but we

11   don't get any details why or the reason for

12   it.

13       Q.    And that's really what I'm

14   trying to get at.  If there are incidents

15   that happen within the RPD, if they're

16   discussed internally at roll calls or other

17   trainings, does that ever happen?

18             MR. CAMPOLIETO:  Objection.

19         Could you repeat the question,

20         please?

21             MR. SHIELDS:  Sure.

22       Q.    The question is if there's

23   something specific like this Dudley Scott

24   incident or the Daniel Prude incident, are

25   those ever used as examples at roll call or

1

2    other trainings to say this bad thing

3    happened, this is what went wrong, do

4    something different instead?

5              MR. CAMPOLIETO:  Objection.  Go

6        ahead.

7        A.    So we could get a training as a

8    result of it but we don't get specific

9    examples of why we're getting the training.

10   Does that make sense?

11       Q.    Sure.  What's the last training

12   that you remember getting as a result of a

13   specific incident that happened at the RPD?

14             MR. CAMPOLIETO:  Objection.

15       A.    I can't say any because we're

16   not told we're doing this because this

17   happened. That's usually not how they're

18   associated.

19       Q.    Okay.  Do you have a hunch that

20   you had a training as a result of an

21   incident in the past?

22       A.    I don't know.

23       Q.    But you believe that to be the

24   case?

25             MR. CAMPOLIETO:  Objection.

91

1

2          A.     I don't know.

3          Q.     Okay.  Look, I'm just confused

4     from your answer, so that's all I'm trying

5     to understand, because I think what you

6     said was that there can be trainings as a

7     result of an incident but they don't tell

8     you specifically that the training is

9     happening because of an incident?

10         A.     Because of a specific incident.

11    So like you brought up the Feldman thing.

12    There could be a training as something as a

13    result of that but we won't be told this is

14    what happened, this is why we're doing

15    this.

16         Q.     Okay.  So for example, I'll

17    represent to you that the allegations in

18    the Dudley Scott incident were that he was

19    handcuffed at the time force was used

20    against him by Officer Feldman.  Have you

21    ever gotten training that it's

22    inappropriate to use force against a

23    handcuffed subject?

24              MR. CAMPOLIETO:  Objection.

25         You can answer.

1

2      A.    I don't think we've ever been

3   told that specifically, no.

4      Q.    Okay.  In what instances is it

5   appropriate to use force against a

6   handcuffed subject?

7      A.    I have had a handcuffed person

8   kick me before and I've applied a hobble,

9   but I mean that's kind of the only specific

10   thing I can give you.

11      Q.    Okay.

12      A.    That's for me.

13      Q.    So if I represent to you that

14   Dudley Scott was handcuffed and had been

15   punched in the face several times by

16   Officer Feldman, just knowing those facts,

17   would that sound like an inappropriate use

18   of force to you?

19            MR. CAMPOLIETO:  Objection.

20      A.    I don't know any details about

21   it or any -- any specifics about it, so

22   I --

23      Q.    Sure.  As an officer with

24   fifteen years of experience, under what

25   circumstances would it be appropriate to

93

1

2   punch a handcuffed subject in the face?

3          MR. CAMPOLIETO:  Objection to

4       the question.

5   A.    I don't know.

6   Q.    You don't know as in it would

7   be inappropriate under most circumstances?

8          MR. CAMPOLIETO:  Objection.

9   A.    I don't know any of the

10  circumstances with it.  I mean there's --

11  there's things that can always go wrong.  I

12  don't know.

13  Q.    So are you saying that under

14  some circumstances it might be appropriate

15  to punch a handcuffed subject in the face?

16         MR. CAMPOLIETO:  Objection.

17  A.    I mean if you miss maybe a

18  knife or something on the search and now

19  the guy has something.  I couldn't give

20  details with such a broad example.

21  Q.    So that's what I'm asking, if

22  you can fill in some kind of detail.  Right

23  there you said maybe if you missed a knife

24  in the search.  Right?

25  A.    Yeah.  But again, I don't think

94

1

2    that's -- you asked for an example.  That's

3    kind of all I -- I don't know.

4        Q.   On the force continuum, where

5    would a punch in the face fall on 1 to 4?

6        A.   I think a distractionary jab is

7    a level 2 maybe, I think.

8        Q.   So the guidance is basically

9    that the use of force has to be reasonable

10   under the circumstances.  Is that right?

11            MR. CAMPOLIETO:  Objection.

12       A.   Yeah.  I mean we had training

13   on the continuum and stuff like that.

14       Q.   Okay.  And so when is it

15   appropriate to use level 2 force?

16       A.   I'm sorry.  What level?

17       Q.   Level 2 force.

18       A.   2.  So there's officer/subject

19   factors.  I mean proximity to weapons,

20   stuff like that.  I mean it's early in the

21   continuum.

22       Q.   When you say officer/subject

23   factors, what does that mean?

24       A.   Sure.  So if you have a 5'

25   tall, 80 pound female and a 300 pound, 6'5"

95

1

2  foot guy, she's obviously at a disadvantage

3  where she could maybe use pepper spray

4  earlier than somebody else.

5      Q.    So in that instance, what

6  you're saying is because the officer is so

7  much larger than the subject, you have to

8  take that into consideration?

9      A.    Yeah.  It's considered in the

10 officer/subject factors.

11     Q.    Okay.  What other factors are

12 there?

13         MR. CAMPOLIETO:  Objection.

14     A.    That's kind of the biggest one

15 that comes to mind.

16     Q.    Okay. I've got a few other SRRs

17 I want to show you and ask you questions

18 about.

19         MR. CAMPOLIETO:  Mr. Shields,

20      this Investigator has a child pick-up

21      requirement at 2:30.  Just so you're

22      aware.  I understand that you have

23      seven hours to depose him.

24         THE WITNESS:  At 2:00 I have to

25      leave.  2:30 I kind of have to be

1

2          home, if it's possible.  If not, I'd

3          have to take a break to make a

4          handful of phone calls.

5               MR. SHIELDS:  Okay.  John,

6          look, these are the types of things

7          we've got to talk about before the

8          deposition starts.

9               MR. CAMPOLIETO:  Elliot, so you

10         know, I didn't know that.  Because I

11         didn't know we were going to try to

12         use this investigator as a use of

13         force expert.

14              MR. SHIELDS:  We've got to talk

15         beforehand.  I do plan to ask my

16         questions and --

17              MR. CAMPOLIETO:  If it goes

18         past 2:00 we'll allow you to bring

19         him back.

20              THE WITNESS:  I apologize.  I

21         just told him this afternoon when I

22         got here.

23              MR. CAMPOLIETO:  You don't have

24         to say.

25              Like I said, I didn't know

1

2          until this morning.

3               MR. SHIELDS:  We can go --

4          let's do this.  I've got a few other

5          questions and then there should

6          either be a natural break or we'll

7          just break at 2:00 and then figure

8          out a convenient time to bring him

9          back.

10               MR. CAMPOLIETO:  If you want to

11          ask him questions about the actual

12          incident we're here for, we can do

13          that.  We'll set up so you have 11:00

14          until whenever you're done.  That

15          will be the time that's expired and

16          then we'll give you the rest of the

17          seven hours.

18               MR. SHIELDS:  All this talk and

19          stuff is going to get cut out, too.

20          I don't think the total is going to

21          get anywhere near seven hours.  11 to

22          2 is only three hours.  It's half of

23          my seven hours.

24               MR. CAMPOLIETO:  You'll get

25          your seven hours.  You can have at it

1
2          with Officer Barber whenever you
3          want.
4                MR. SHIELDS:  He's such a nice
5          guy, I just like chatting.
6                I didn't mean that facetiously,
7          Investigator.  Anyway, I'll just
8          continue to roll through and we'll
9          either take a break at a natural spot
10         or we can break at 2.
11               (Subject resistance report, CR#
12         15-047046 was marked as Plaintiff's
13         Exhibit 4 for identification as of
14         this date.)
15      Q.    This is going to be Exhibit 4.
16   I'm going to ask you to read this one, and
17   then I'm going to ask you to read two
18   others, and then I'm going to ask you
19   questions about this.
20               Okay.  So this one is an
21   incident from February 28, 2015.  Right?
22      A.    Yes.
23      Q.    Okay.  And then the same
24   question as before.  Do you know what this
25   number at the top is, the red number that

99

1

2    says 2015-0244?

3         A.    I would assume, again like the

4    last one, it's probably a PSS thing because

5    it doesn't match the CR number.  It's got

6    PSS in the top corner.

7         Q.    The subject's name is Chad

8    Welch?

9         A.    Yes.

10         Q.    So this is one of your SROs,

11    correct?

12         A.    Yes.

13         Q.    You're the primary officer.  So

14    it's got, I'll just tell you right now,

15    this first page and then another page of

16    narrative.  I'm going to ask you to read

17    this first page and then let me know when

18    you're done and I'll go down to the third

19    page.

20         A.    Okay.

21              (Pause in the proceedings.)

22         A.    Can you scroll down to the

23    second part?

24              (Pause in the proceedings.)

25         A.    Okay.

1

2              (Subjection resistance report,

3         CR# 16-221860 was marked as

4         Plaintiff's Exhibit 5 for

5         identification, as of this date.)

6        Q.    I'm going to put up Exhibit 5

7    and ask you to read that one.  Again, so

8    this one is an SRR dated August 26, 2016.

9    Again, it's got a red number at the top.

10   It says 2016-0958.  Again, that's different

11   than the CR number.  Right, Investigator?

12       A.    Correct.

13       Q.    The CR number is 16-221860.

14   The subject's name is Demont Lightle.  So

15   this is a two-page document.  The narrative

16   is just right here.  I'm going to ask you

17   -- at the bottom, again you're the primary

18   officer.  Right?

19       A.    Yes.

20       Q.    So just read that and then I'm

21   going to -- let me know when you're done

22   reading it.

23              (Pause in the proceedings.)

24       A.    Okay.

25              (Subject resistance report CR#

1

2          11-371822 was marked as Plaintiff's

3          Exhibit 6 for identification as of

4          this date.)

5     Q.    I'm going to show you one more

6  SRR and then I'm going to ask you some

7  questions.  So the third one is going to be

8  Exhibit 6. It's from 11/25/2011.  The

9  subject's name looks like Cindy Hernandez.

10  The number on the side is 2011-1390.

11  Again, that's different from the CR number.

12  Right, Investigator?

13     A.    Correct.

14     Q.    The CR number is 11-371822.  So

15  again, let's see. It's a two-page document.

16  In this one you're the listed -- you're the

17  assisting officer since you're not listed

18  as the arresting officer.  Is that right?

19     A.    I'm not familiar with this one.

20  Sometimes we're just assisting if our name

21  is on the job card.  I might not have been

22  there.  I'm not familiar with this one.  I

23  haven't read it yet.

24     Q.    That is fair.  I was just going

25  to ask you before we do read it, that -- so

1

2    there's three officers listed.  In these

3    boxes -- box 15 here, generally do you know

4    why people would be listed here other than

5    the primary officer?

6         A.   Your name only has to be on the

7    job card.  You don't even have to be

8    involved in it.  If your name is on the job

9    card, you get tossed on the bottom.

10         Q.   It's sort of like you were

11    assumed to be a witness?

12         A.   You don't even have to be a

13    witness.  If your name is on the job card,

14    you get tossed on the bottom.

15         Q.   Okay.  Does that always happen

16    for everybody that's on the job card?

17         A.   It changed awhile ago to then

18    your name was only on there if you were

19    assisting.  It's changed a couple of times.

20         Q.   Okay.  And this is an older one

21    from 2011.  Okay.  Can you just read the

22    narrative and let me know when you're done?

23              (Pause in the proceedings.)

24         A.   Okay.

25         Q.   So after reading these three

1

2    subject resistance reports, is it fair to

3    say the common thing among those three

4    different incidents is that someone was

5    pepper sprayed in the back of a police car?

6         A.    Yes.

7         Q.    Okay.  The reason that they

8    were pepper sprayed was because they were

9    kicking the window of the car?

10        A.    They were disobeying verbal

11   commands.

12        Q.    Okay.  So they were in the back

13   of a police car and disobeying verbal

14   commands, and so then you -- well, I guess

15   in Exhibit 4 and Exhibit 5, in those

16   incidents you pepper sprayed them.  In

17   Exhibit 6 Officer Carey pepper sprayed the

18   person because they were disobeying verbal

19   commands?

20        A.    Correct.

21        Q.    The verbal commands were to not

22   kick the window?

23        A.    In sum and substance, yeah.

24        Q.    Okay.  Going back to 2011 at

25   least, pepper spraying people who were

104

1

2    kicking the window in the back of a police

3    car, that's like something that's, I guess

4    at least in these three instances, been

5    okay?  That was a bad question.  You're

6    allowed to pepper spray people if they're

7    kicking the window in your car?

8        A.    Again, that goes to the level 2

9    on the continuum, if they're not following

10   the verbal commands.

11       Q.    So why would you give them a

12   verbal command to stop kicking the window?

13       A.    Well, because they're kicking

14   your window and you don't want it broken

15   out.

16       Q.    You get in trouble if you mess

17   up your car.  Right?

18       A.    Well, we're not in trouble.

19       Q.    Could they be charged with a

20   crime if they break the window in your car?

21       A.    Yes.

22       Q.    So you would rather not charge

23   them with a crime?  You would rather not

24   have a broken window, you pepper spray

25   them?

1

2          A.    I'd also rather not have them

3    cut themselves on broken glass. I mean

4    there's multiple reasons.

5          Q.    In general, if someone is irate

6    and kicking the window in the back of your

7    car, you're going to do something to try to

8    get them to stop.  Right?

9               MR. CAMPOLIETO:  Objection.

10         A.    Yes.

11         Q.    And I mean, look, you know, I'm

12   not trying to trick you.  You weren't

13   disciplined in either one of these

14   instances?

15         A.    Right.  Correct.  In these

16   three scenarios they were pepper sprayed.

17   Yes.

18         Q.    And the PSS received copies of

19   these subject resistance reports.  For

20   Exhibits 4 and 5 where you were the one

21   that pepper sprayed them, there was no

22   discipline imposed.  Correct?

23               MR. CAMPOLIETO:  Objection.

24         A.    Correct.  Nothing that I know

25   of or recall.

1

2      Q.    And they were reviewed by your

3   supervisor and your supervisor didn't

4   impose any discipline.  Correct?

5      A.    Two supervisors.  This one

6   looks like Sergeant Potuck and Lieutenant

7   Malley.

8      Q.    And then on Exhibit 5, that

9   would have been -- let's see.  Can you read

10  those ones?

11     A.    I think that's Sergeant

12  Zimmerman.  I think Temporary Lieutenant --

13  I'm not positive.  Can you go up?

14     Q.    To the date?

15     A.    That was central section, so

16  that was probably Temporary Lieutenant

17  LaFave I would assume.

18     Q.    Okay.  In August 2016?

19     A.    Yeah.  At that time I was in

20  central, so it probably would have been

21  him.

22     Q.    Okay.  And after the signature,

23  this is their IBM number or something?

24     A.    Correct.

25     Q.    Okay.  So basically there was,

1

2    in both of those instances, a reviewing

3    supervisor and a platoon commanding officer

4    who reviewed the subject resistance report

5    and said okay, someone is kicking your

6    window, you pepper sprayed them, you know,

7    that's in line with RPD training and

8    policies?

9              MR. CAMPOLIETO:  Objection.

10       A.    I believe so, yes.

11       Q.    Okay.  Because you don't

12   remember ever being talked to about pepper

13   spraying somebody who was kicking your

14   window.  Right?

15       A.    Correct.

16       Q.    Okay.  Have there been other

17   instances where somebody has been in the

18   back of your car and they have been irate

19   and kicking the window and you pepper

20   sprayed them?

21       A.    It's possible.  I mean I

22   couldn't give you a specific example.

23       Q.    Okay.  In general, if someone

24   is in the back of your car kicking the

25   window, you're going to get them to try to

1

2    stop.  Right?

3         A.    Yes.

4         Q.    I'm going to go back to the

5    first one and ask a couple other questions

6    about that one. In general, what happened

7    here was you responded to a call for a man

8    with a gun.  He stopped, you searched him.

9    You didn't find a gun?

10        A.    No.  He took off running before

11   I was able to search him.

12        Q.    Okay.  He took off running,

13   then what happened?

14        A.    We fell to the ground.  I think

15   then I was able to get him handcuffed and

16   then searched him after that.

17        Q.    Okay.  And then what happened?

18        A.    I put him in the car.

19        Q.    Okay.  And why did you put him

20   in the car?

21        A.    To secure him.  I'm not -- is

22   that what you're -- I'm not positive on

23   what the question is.  We usually put --

24   after they're searched, we usually secure

25   people in the back of our car.  I mean at

1

2  that point I hadn't talked to the caller or

3  anything else.  We just had the call from

4  911.

5       Q.    What happened after you put him

6  in the back of the car?

7       A.    He wouldn't put his legs in so

8  I had to move his legs and then close the

9  door.

10      Q.    Okay.  When you searched him

11  you didn't find a gun.  Right?

12      A.    Correct.

13      Q.    Okay.  You put him in the car,

14  you put his legs in the car because he was

15  under arrest?

16      A.    At that time we were still

17  investigating.  I didn't know.

18      Q.    Okay.  Eventually he was placed

19  under arrest?

20      A.    I don't remember.  Is there a

21  report with this or just the SRR?

22      Q.    All that I have is the SRR.

23      A.    Okay.  Can you go back up?  I

24  think there's a charges section.

25      Q.    Okay.  Would that be on the

1

2    first page --

3         A.    Yes.

4         Q.    -- at the top?

5         A.    It looks like harassment OGA.

6         Q.    Okay.  What did he do that

7    constituted probable cause to arrest him

8    for harassment?

9              MR. CAMPOLIETO:  Objection.

10        A.    I don't remember.  I don't have

11   the report.  This was obviously some time

12   ago.

13        Q.    What did he do that provided

14   probable cause to arrest him for OGA?

15             MR. CAMPOLIETO:  Objection.

16        A.    Again, I don't have the report.

17        Q.    Assuming that the report says

18   the same thing in the narrative section as

19   the narrative section of the SRR, do you

20   believe now, reading it again, that you had

21   probable cause to arrest him for harassment

22   and OGA?

23             MR. CAMPOLIETO:  Objection.

24        A.    The report is going to have the

25   details to substantiate the charges, not

111

1

2   the SRR.

3       Q.    Okay.  Assuming that he was

4   charged with harassment and OGA, based on

5   the allegations in the narrative section in

6   the subject resistance report, was he

7   charged -- would he have been charged

8   simply from running away from you?

9           MR. CAMPOLIETO:  Objection.

10      A.    I don't have the details that

11  would have been in the report for it.  I

12  don't remember the specifics.

13      Q.    Is it unlawful for someone to

14  run away from the police?

15          MR. CAMPOLIETO:  Objection.

16      A.    There's -- not to run away, no.

17      Q.    Okay. So he would have had to

18  do something more than run away from you

19  to --

20      A.    There would have been more

21  details involved, yes.  It's probably

22  documented in the report or on the call,

23  which I don't have.

24      Q.    Okay.  Either way, this

25  incident and the incident in number 5,

1

2    neither one of these dates, or assuming

3    that these numbers at the top are PSS

4    numbers, neither of these incidents were

5    listed in your concise officer history

6    which was marked as Exhibit 1. Correct?

7         A.    Correct.

8         Q.    And with respect to the two

9    incidents listed in Exhibit 4 and Exhibit

10   5, no one from PSS ever spoke to you about

11   either one of those incidents.  Right?

12        A.    Not that I recall, no.

13        Q.    Okay.  And I think you

14   testified earlier that you only recall ever

15   speaking with PSS about one incident ever?

16        A.    It might have been twice for

17   the same one.

18        Q.    Maybe twice for the same

19   incident?

20        A.    I think so.

21        Q.    And that was an incident that

22   you were not the officer who used force,

23   you were a witness.  Is that right?

24        A.    How's the best way -- I wasn't

25   listed on the complaint but I was on the

113

1

2    scene.

3         Q.    Okay.  Do you know who the

4    officer was that was complained about?

5         A.    That was years ago.  No, I

6    don't remember.

7         Q.    Do you remember about what year

8    it was?

9         A.    It was when I was in central

10   section still as an officer.  Probably

11   three or four years.

12        Q.    Okay.  And it wasn't the

13   incident involving my client, David Vann.

14   Correct?

15        A.    No.

16        Q.    With regard to the use of

17   pepper spray, what is the minimum distance

18   that you're allowed to use pepper spray

19   from?

20        A.    I don't recall.  I know it's

21   not supposed to be like, you know, two,

22   three inches away, but I don't remember

23   what the recommended distance is.

24        Q.    Okay.  Can you tell me

25   everything that you remember about your

1

2    training regarding the use of pepper spray?

3         A.    That was in the academy like

4    fifteen years ago.  I don't know.  Kind of

5    a short burst.  That was really -- I don't

6    think we were given like, you know, a time

7    or a second.  I think it was just described

8    as a short burst.

9         Q.    Okay.  Short bursts, and a few

10   minutes ago you said not to do it from

11   within two to three inches.  Is that from

12   your training?

13        A.    Yeah.  I mean it was just not

14   right in front of their face.  Again, I'm

15   not sure what the recommended is, but it's

16   not supposed to be right in their face.

17        Q.    Okay.  Since your academy

18   training have you received any other

19   training about the use of pepper spray?

20        A.    Not that I recall, no.

21        Q.    Do you remember anything

22   specific about your academy training other

23   than what you've already testified to?

24             MR. CAMPOLIETO:  Objection.

25        A.    As far as the pepper spray you

115

1

2  mean?

3        Q.    Correct.

4        A.    No.  We did, I think, practice

5   with an inert version just so we would know

6   how it comes out of the can, because I

7   think it comes out as a cone shape.  I

8   think we just used like practice cans.

9        Q.    Okay.  What does -- let me back

10  up.  You said the inert version.  Do you

11  mean that there's more than one version of

12  pepper spray?

13              MR. CAMPOLIETO:  Objection.

14       A.    So instead of being like the

15  live agent, it's just -- it had like a mint

16  smell to it or something like that.  It

17  wasn't live agent in the can.  It was more

18  so we knew how they worked.

19       Q.    Not something that would sting

20  if it got into your eyes or you breathed it

21  in?

22       A.    Correct.

23       Q.    Were you ever exposed to the

24  real version in the academy?

25       A.    Yes.

116

1

2      Q.    Okay.  So that was a different

3  part of the training?

4      A.    Yes.

5      Q.    Okay.  Since graduating from

6  the academy, in your time -- in your

7  fifteen years with the department, have you

8  used different kinds of pepper spray?

9           MR. CAMPOLIETO:  Objection.

10     A.    I think we changed brands

11 somewhere in there.  I don't remember

12 specifically what it was or why.

13     Q.    In general it's -- when you

14 changed brands, was it a similar type of

15 canister and deployment system?

16     A.    Yes.

17     Q.    Okay.  It's not like suddenly

18 it went from, you know, working one way to

19 working completely differently?

20     A.    No.  Correct.

21           (Manual entitled Aerosol

22      Subject Restraint Course - Instructor

23      Guide was marked as Plaintiff's

24      Exhibit 7 for identification as of

25      this date.)

117

1

2      Q.    Okay.  I want to just put up

3  what will be marked as Exhibit 7.  That is

4  a document Bates numbered COR 000139 to

5  COR 000310.  That's the aerosol subject

6  resistance course, instructor guide.  I'm

7  just going to ask you a couple questions

8  about that.

9           Do you see that document on

10  your screen, Investigator?

11      A.    Yes.

12      Q.    Let me find the page and fast

13  forward.  I'm going to fast forward to page

14  141 of the PDF, and I'll give you the Bates

15  number.  I actually wanted to come back to

16  that.  Give me one second.

17           MR. CAMPOLIETO:  Where did this

18       document come from?

19           MR. SHIELDS:  It came from you,

20       I believe, on -- I forget what date

21       the City produced this document, but

22       I think it was the September 2020

23       production.

24           MR. CAMPOLIETO:  What is the

25       number in the right-hand corner?

1

2          MR. SHIELDS:  The number in the

3     right-hand corner?

4          MR. CAMPOLIETO:  Go down.

5          MR. SHIELDS:  This is the Bates

6     number.  It looks like -- I think

7     that, John, you guys took -- this is

8     a problem for us to discuss later,

9     but I believe this is Vann on the

10    bottom left-hand corner, and on the

11    bottom right is a Bates number from a

12    previous case that the City produced

13    this in.  In this case you've used

14    COR or COR VANN. I think what I did

15    was I copied and pasted this into a

16    Word document.  I can get and read

17    it.  Because you put confidential

18    over the Bates number, that made it

19    hard to read.  I figured it out and

20    that's why it says at the top here

21    COR 139 to COR 310.

22         MR. CAMPOLIETO:  That number on

23    the right-hand side was already on

24    the document?

25         MR. SHIELDS:  I did not add

119

1

2          this number.  Correct.  If I had to

3          guess, John, I think it's from Dudley

4          Scott's case -- I mean Septimus

5          Scott's case.  I think it's been

6          produced two or three times in this

7          case.

8               MR. CAMPOLIETO:  In this case,

9          what do you mean?

10               MR. SHIELDS:  You produced this

11          as COR 139 to 310, and then when you

12          reproduced the entire production from

13          Septimus Scott's case, it's got a

14          different Bates number.

15               MR. CAMPOLIETO:  Okay.

16          Q.    So it looks like -- first let

17     me just back up, Investigator.  Just

18     looking at these few pages as I'm scrolling

19     here, does this look like a document that

20     you've seen before or that maybe was shown

21     to you at the academy?

22          A.    No.  I think it said on top it

23     was for instructors.  I'm not an

24     instructor.

25          Q.    Okay.  I think down here

1

2    there's like a test.  Anyway -- either way,

3    let me back up.  Does any of this look like

4    something you might have been shown at a

5    training course, if you remember?

6         A.    I don't remember any of this,

7    no.

8         Q.    Okay.  All right.  Generally

9    this page here, which is page 142 out of

10   172, says, "Canister operation.  Effective

11   ranges depends on type and manufacturer.

12   General rule: Minimum of 2 feet."  Does

13   that refresh your recollection at all,

14   looking at that page, if that was something

15   you were ever taught at the academy or

16   otherwise?

17        A.    I don't remember this, no.

18        Q.    Okay.  I'm going up to page 141

19   out of 172 in this PDF document which says,

20   "Other medical concerns." The first one

21   listed here is hydraulic needle, and it

22   says, "Spraying at close proximity, in the

23   eyes, there is a possibility to injury the

24   eye."  That's what it says.  Often I

25   misread it, but I think it read it and it

121

1

2  was just typed up wrong.  Is that something

3  that you were taught either at the academy

4  or somewhere else, that if you spray too

5  close to the eyes, that somebody could

6  sustain an injury?

7       A.   Again, it was fifteen years

8  ago.  I don't remember specifically what

9  the training said.

10      Q.   Okay.  Do you remember why you

11  said a few minutes ago that you did

12  remember someone saying not to spray from

13  two to three inches, it had to be a

14  slightly longer distance?

15      A.   So ours comes out as a cone.

16  If they're very close, it's not effective.

17      Q.   Okay. So the reason that you

18  said -- I'm just going to take that down

19  for now.  The reason that you said not to

20  spray from too close is because of its

21  effectiveness, not because of the potential

22  harm to the subject?

23      A.   Correct.  From what I

24  understand, yeah, it's a cone.  It's not

25  super pressurized or anything.  It's just

1

2  the shape that it comes out.

3      Q.   Okay. Were you ever taught that

4  if you spray someone from too close, that

5  it could cause injury to that subject's

6  eyes?

7      A.   I don't recall.

8      Q.   Okay.  And you've not received

9  any training about the use of pepper spray

10 since the academy?

11     A.   Like I said, I think we

12 switched over manufacturers awhile ago and

13 I think we had something then.  I don't

14 remember specifically what it was or what

15 it was about.  The style and everything was

16 the same.

17     Q.   Do you remember when that

18 switch was made?

19     A.   I don't.

20     Q.   Do you remember if it was

21 before or after this David Vann incident in

22 September 2015?

23     A.   I think it was before then, but

24 I don't remember when.

25             MR. SHIELDS:  Okay.  I'm going

1

2          to put up the next exhibit which is

3          just going to be information from the

4          Melinda Santos incident.  So that's

5          going to be Exhibit 8.

6              (Information/complaint -

7          disorderly conduct re Melinda Santos

8          was marked as Plaintiff's Exhibit 8

9          for identification as of this date.)

10             MR. CAMPOLIETO:  Let's take a

11         five-minute -- three-minute break.

12         I'll be right back.

13             MR. SHIELDS:  Not a problem.

14             (Whereupon, a recess was taken

15         from 1:22 p.m. until 1:28 p.m.)

16     Q.     Investigator, we just took a

17 quick break.  During that break did you

18 have time to talk with your attorney?

19     A.     I used the bathroom.

20     Q.     Okay.  You didn't talk with

21 John at all?

22     A.     I asked him if I needed to make

23 some phone calls to try and get the kids.

24 He said we're going to try and hopefully

25 make it.

124

1

2        Q.    We'll bring you back next time.

3   That will be fine.

4             After taking a break, are there

5   any answers to any questions that we

6   already asked that you want to change?

7        A.    No.  They're all my answers.

8        Q.    Okay. So I wanted to just mark

9   this as Exhibit 8.  It's the information

10  from the Melinda Santos incident.  Do you

11  see that on your screen?

12       A.    Yes.

13       Q.    There's not much here other

14  than this incident occurred on the 6th of

15  May 2016.  Is that right?

16       A.    Yes.

17       Q.    I can't really read this part,

18  but my understanding of what happened in

19  that incident is there was a fight outside

20  of the German House that you broke up.  Is

21  that fair to say?

22       A.    Yeah.  It was down the road

23  from the German House.  I think they had

24  like a concert or something.  Maybe less

25  than a block away.  In the area.

1

2          Q.     You arrested Melinda Santos and

3     the other person that she was fighting

4     with?

5          A.     Yes.

6          Q.     Okay.  And charged her with

7     disorderly conduct?

8          A.     Correct.

9          Q.     And then she brought a lawsuit

10    arising from that incident.  Correct?

11         A.     Yes.

12         Q.     The City of Rochester settled

13    that lawsuit?

14         A.     That's what I was told.  I

15    wasn't familiar with it.  I did a

16    deposition and that was the last I knew of

17    it.

18         Q.     Okay.  You did a deposition.

19    You testified at the deposition but you did

20    not testify at trial.  Is that right?

21         A.     Correct.

22         Q.     Okay. And you used pepper spray

23    during that incident?

24         A.     Yup.

25         Q.     Okay.  You used pepper spray

1

2  twice?

3       A.    Yeah.  It was kind of a general

4  group spray because there were multiple

5  people.  I was just trying to get everybody

6  to stop fighting and disperse.

7       Q.    Okay.  So you sprayed the group

8  of people to disperse and then you sprayed

9  Melinda and the person she was fighting

10 with?

11      A.    Yes.  I believe so.

12      Q.    And are you allowed, pursuant

13 to RPD training and policies, to spray

14 groups of people?

15      A.    Yeah. I mean there's nobody

16 that was a target.  It's just an irritant

17 to -- it hopefully just makes people not

18 want to be there.

19      Q.    Okay.  And did you fill out a

20 subject resistance report as a result of

21 that incident?

22      A.    For the group?  Is that what

23 you mean?

24            MR. CAMPOLIETO:  Objection.

25      Q.    In general.  One report or two

1

2    reports, or how ever many, just arising

3    from the incident where you ended up

4    arresting Melinda Santos?

5         A.    I don't recall.  I probably

6    would have done one for Melinda if there

7    was the pepper spray.  So there had to have

8    been one for that.

9         Q.    Okay.

10        A.    Again, this was years ago, so I

11   don't recall all the specifics.

12        Q.    Sure.  So you don't remember

13   sitting here today if there was an SRR

14   completed for that incident?

15        A.    There should be one for

16   Melinda, yes, --

17        Q.    Okay.

18        A.    -- for the pepper spray.

19             MR. SHIELDS:  John, I looked

20         for it in the production.  I didn't

21         see it.  That could have just been

22         because there were a lot of them.  To

23         the extent that it wasn't produced,

24         I'm going to ask for it, and I'll

25         follow up in writing.

128

1

2          Q.    Now, at the scene did Melinda
3    complain about any injuries?
4          A.    She said something hurt.  I
5    asked her if she wanted an ambulance and
6    she said no.  I don't remember what it was
7    -- what the complaint was.
8          Q.    When you walked up to Melinda,
9    she had been punched multiple times in the
10   face.  Is that right?
11         A.    She was actively involved in a
12   fight.  She was throwing punches as well.
13         Q.    And she was punched in the face
14   numerous times?
15         A.    Yes.
16         Q.    I think at your other
17   deposition you testified that she was
18   punched in the face a bunch a times, you
19   pepper sprayed them, they stopped for a
20   minute and then she got punched in the face
21   several more times.  Is that right?
22         A.    Yeah.  I think it was about
23   three times.  The other girl had a hold of
24   her hair and hit her on the side of the
25   head.

129

1

2        Q.    Like hard blows that she got to

3    the head?

4        A.    Yeah.  They were punches.  Yeah.

5        Q.    And she claimed in her lawsuit

6    that you had thrown her to the ground on

7    the cement.  Right?  Is that your

8    understanding of what she alleged?

9        A.    I don't recall what the detail

10    was, but it was something to that extent.

11        Q.    Either way, she alleged that

12    she sustained several fractured vertebrae

13    in her neck.  Is that right?

14        A.    I think I remember that, but I

15    don't remember the specific injury.

16        Q.    Okay.  Did she look like she

17    had serious injuries at the scene of the

18    incident?

19        A.    No.  I mean she was disheveled

20    from the fight.  Like her hair was a mess

21    and stuff like that.  Nothing obvious.

22        Q.    Okay.  So you said that she --

23    you asked her if she wanted an ambulance.

24    What was her response?

25        A.    She said no.

130

1

2          Q.    Okay.  What is the policy for

3    the RPD about calling an ambulance for

4    someone in a circumstance like that?

5          A.    So she was free to go because

6    she got an appearance ticket.  It was her

7    option if she wanted to go or not.  I think

8    I related to her friends when they got

9    there and asked them to try and, you know,

10   see if she wanted help.

11         Q.    Okay.  So in that instance she

12   was given an appearance ticket and released

13   from the scene?

14         A.    She was released after we did

15   the eye wash.  So we moved from the scene

16   to the public safety building, I think is

17   where we did the eye flush, and I think her

18   friends picked her up there, I believe.

19         Q.    When someone is pepper sprayed

20   are you required to bring them to PSB to do

21   the eye wash?

22         A.    That's where I use.  I think

23   there was another station at one time but I

24   don't think it's maintained any more.

25         Q.    Okay.  Would it have been an

1

2   option to just release her from the scene

3   or did you have to take her to PSB?

4        A.    No.   We always eye wash or do

5   the flush.

6        Q.    Is there ever an instance where

7   someone is injured and says that they don't

8   want an ambulance but you are required to

9   call the ambulance anyway?

10            MR. CAMPOLIETO:   Objection.

11       A.    Sometimes if -- perhaps if

12  they're in custody, because then they're in

13  our care so they don't have really the

14  option.  She got an appearance ticket so

15  she was free to go.

16       Q.    Okay.  So there's a different

17  standard if someone is in custody versus if

18  they're free to go?

19       A.    Correct.  She wasn't in, I

20  guess, my care at the time.

21       Q.    Okay.  So when someone is in

22  custody, when is -- when are they required

23  to have an ambulance called for them?

24       A.    I guess if there's like obvious

25  injury.  You know, if their hand is cut

1

2   open or something and it looks like they

3   might need a stitch.

4        Q.    Or if they had suffered a head

5   injury?

6        A.    Like an open head wound?  Is

7   that what you mean?

8        Q.    Sure.  Like if you got a big

9   open head wound, are you required to call

10  for an ambulance?

11       A.    We would I guess.  I don't know

12  if we're required, but usually we would

13  because then they're showing signs of

14  injury.

15       Q.    How about if somebody sustained

16  head trauma, are you required -- let me

17  rephrase that.  If someone has sustained

18  head trauma and there's no visible serious

19  injury to the head, like a big laceration,

20  but you know that they suffered trauma to

21  their head, are you required to call an

22  ambulance?

23            MR. CAMPOLIETO:  Objection.

24       A.    I don't know if we're required.

25  A lot of times we'll call like the

1

2    ambulance company and get their opinion.

3    If they say no, they should be treated,

4    then we'll do that.

5         Q.   Okay.  So were you ever taught

6    or trained by the RPD that somebody can

7    sustain a head injury and have, for

8    example, internal bleeding that you can't

9    see and that you should call an ambulance

10   because of that?

11             MR. CAMPOLIETO:  Objection.

12        A.   I know I've done that before,

13   but I don't specifically remember any

14   training.

15        Q.   It wouldn't necessarily be a

16   requirement?

17        A.   It could be, but I don't recall

18   specifically it being a requirement.

19        Q.   Okay.  Would that be the type

20   of thing that you would receive training on

21   at the academy?

22        A.   It's possible.  Again, that was

23   fifteen years ago, so I don't remember all

24   of it.

25        Q.   Like for example, there is the

134

1

2    incident that happened at Depaul last week,

3    right, where the staff member was

4    assaulted, drove away and ended up dying

5    from a head injury?

6        A.    Yeah.

7        Q.    Were you ever trained that

8    something like that can happen?  You know,

9    they can appear to be physically okay but

10   suffer internal damage from blows to the

11   head?

12       A.    I know it can happen, but I

13   don't remember specific training on it.

14           MR. SHIELDS:  Okay.  I've got a

15        few more questions and I think it's a

16        good time to break for the day.

17       Q.    In terms of bringing you back,

18   your schedule is the same.  Right?  You

19   work nights and then you've got to pick up

20   kids at 2 p.m.?

21       A.    Yeah.  I know I've got some

22   court and other stuff coming, too.  I have

23   to grab a calendar.

24       Q.    We can figure it out.  Sometime

25   around 10 or 11 a.m. to 2 p.m. would be a

1

2   good time to redo this?

3       A.   I can still get a few hours of

4   sleep so I'm not exhausted.  Then it's

5   possible I can get held for investigations

6   and stuff.  Unfortunately I'm kind of all

7   over the place schedule wise.

8               (Rochester Police Department

9           General Order 335 - Subject

10          Resistance Report was marked as

11          Plaintiff's Exhibit 9 for

12          identification as of this date.)

13      Q.   All right.  I just want to put

14  up what I've marked as Exhibit 9.  That's

15  going to be General Order 335 about subject

16  resistance reports.  I'm just going to ask

17  you a few questions on that.

18              This is the version that went

19  into effect on April 20, 2015.  Do you see

20  that in the left-hand corner there?

21      A.   Yup.

22      Q.   It looks like Ciminelli was the

23  chief then.  Right?

24      A.   Yup.

25      Q.   So appropriate force.  It says,

1
2    "The reasonable force, based upon the
3    totality of the circumstances known by the
4    member, to affect an arrest, overcome
5    resistance, control an individual or
6    situation, defend self or others, or to
7    prevent a subject's escape."  We generally
8    had agreed to that definition earlier.
9    Right?
10        A.    I don't remember it being a
11   definition, but it seems appropriate I
12   guess.
13        Q.    Okay.  So in general is that
14   consistent with your understanding of
15   appropriate use of force?
16        A.    Sure.  Yes.
17        Q.    Basically reasonable under the
18   circumstances.  Let me just see here.  I
19   guess this is under procedures.  Okay.  I
20   want to ask about some procedures in
21   section III.  I want to go down to II which
22   says -- III A 2, "After force is used,
23   immediately evaluate the need for medical
24   attention or treatment for that person upon
25   whom the techniques were used and arrange

1

2    for such treatment when:  That subject has

3    a visible injury requiring medical

4    attention, including injuries prior to the

5    use of force; B, subject complains of

6    injury or requests for medical attention;

7    C, OC, PLS or the taser was used."  So is

8    that section consistent with what we talked

9    about in the Melinda Santos incident?

10        A.    For the pepper spray?  Is that

11   what --

12        Q.    Correct.

13        A.    Taking them to the eye wash

14   station, is that what you mean, or for the

15   visible injury requiring medical attention?

16        Q.    I guess, you know, is that --

17   both of those things.  OC was used so

18   you've got to evaluate the need for medical

19   attention or treatment.  Right?

20        A.    The OC we do the eye wash for.

21   You know, whatever she complained of, her

22   head hurting or anything, she -- there was

23   nothing visible, and she got an appearance

24   ticket so she was able to leave.  She

25   wasn't, I guess, under arrest or in custody

138

1

2    at that time.

3         Q.    Okay.  What about a situation

4    where the person is unable to request

5    medical attention because, for example,

6    they're unconscious.  What are you supposed

7    to do in that instance?

8              MR. CAMPOLIETO:  Objection.

9         A.    So if they're unconscious but

10   need medical attention?

11        Q.    Correct.  If you're trying to

12   evaluate if they need medical attention and

13   they're in custody?

14        A.    They're in custody already?

15        Q.    Correct.

16        A.    I mean you'd have to -- and

17   they have visible injuries?  I just want to

18   make sure I understand the question

19   correctly.  They're in custody but

20   unconscious but have visible injury?

21        Q.    Correct.

22        A.    I guess they go to get treated.

23   I mean if they're in custody and

24   unconscious and have an open wound, we'd

25   probably, yeah, get them treatment.

139

1

2      Q.   So let's say the head injury is

3  causing them to be unconscious and they had

4  scrapes and cuts on their head or face,

5  that would be an instance where you would

6  get them medical treatment?

7      A.   There's nothing they can really

8  do for like abrasions.  Depending on the

9  size of the cut.  I mean if there's need

10 for stitches, then yes, we would.  That

11 might be maybe a case where we would ask

12 the ambulance crew to look at them.

13     Q.   Sure.  And if they're

14 unconscious as a result of sustaining blows

15 to the head, is that an instance where you

16 think they should be transported to the

17 hospital?

18          MR. CAMPOLIETO:  Objection.

19     A.   If they're unconscious you want

20 to take them to the hospital, yes.

21     Q.   Because you never know how

22 serious an internal injury to the head

23 could be?

24          MR. CAMPOLIETO:  Objection.

25     A.   I mean if they're unconscious

1

2    you don't know anything.

3        Q.    Other than that they're unable

4    to respond and request medical treatment on

5    their own.  Correct?

6        A.    Sure.

7        Q.    If you were at a situation

8    where someone was unconscious and unable to

9    request medical attention on their own, and

10   you were involved in that incident, would

11   you insist on that person being transported

12   to the hospital?

13       A.    Are you saying like we just

14   found somebody on the side of the street?

15   That's kind of the example I guess?

16       Q.    Sure.  You show up to an

17   incident, you see the subject in the back

18   of a police car, his eyes are closed, he's

19   not talking, and all that you know is that

20   there had been an altercation with other

21   officers.  Do you think that person should

22   be transported to the hospital?

23       A.    I don't know.  I mean I don't

24   know the circumstances.  I mean sometimes

25   we just have people that lay down.  So

1

2   without, I guess, details, it's hard to, I

3   guess, make a judgment.

4            MR. SHIELDS:  Okay.  If we have

5         to bring you back, I think this is

6         probably a good place for us to stop.

7         I understand you've got kids.  I

8         would rather keep asking my questions

9         but, you know, I'd rather let you go

10        and figure out a convenient time for

11        us to finish the deposition.

12            So we're going to hold the

13        deposition open pursuant to an

14        agreement with me and John, between

15        Counsel.

16            Do we think we can bring him

17        back maybe Wednesday when Mintz was

18        going to go?  I want to finish his

19        deposition before Mintz.

20            THE WITNESS:  I am out of town

21        on Wednesday for the rest of the

22        week.  I'm leaving the state.  I've

23        got a flight.

24            MR. CAMPOLIETO:  We can do

25        Mintz Wednesday.  Elliot, we'll

142

1

2        figure this out after I get my

3        calendar.

4            MR. SHIELDS:  Okay.  I'll be in

5        Rochester next week.  I'm doing a

6        bunch of stuff.  I don't know if next

7        week is going to work for me, but

8        maybe the week after that.

9            Thank you.

10

11           (Time noted:  1:51 p.m.)

12

13

14        _____

15        CHRISTOPHER J. BARBER

16

17

18

19   Subscribed and sworn to

20   before me this ____ day

21   of _____, 20____

22   _____

23       Notary Public

24

25

143

```
 1
 2                    I N D E X
 3
 4    TESTIMONY
 5    WITNESS                EXAMINATION BY    PAGE
 6    Christopher Barber    Mr. Shields         6
 7
 8
      EXHIBITS
 9
      PLAINTIFF
10    EXHIBIT NO.    DESCRIPTION              PAGE
11        1          Concise officer history  53
12        2          Investigator Barber's     65
                     PDS file
13
          3          Subject resistance        73
14                   report CR# 11-393543
15        4          Subject resistance        98
                     report CR# 15-047046
16
          5          Subjection resistance    100
17                   report CR# 16-221860
18        6          Subject resistance       100
                     report CR# 11-371822
19
          7          Manual entitled Aerosol 116
20                   Subject Restraint Course
                     - Instructor Guide
21
          8          Information/complaint    123
22                   disorderly conduct re
                     Melinda Santos
23
          9          Rochester Police         135
24                   Department General
                     Order 335 - Subject
25                   Resistance Report
```

144

1

2    INSERTS

3    DESCRIPTION                              PAGE
     (None)

4

5

6    REQUESTS

7    DESCRIPTION                              PAGE

8    Provide details for the incident      64
     listed in the officer concise history

9

     Production of the SRR for the Melinda  127

10   Santos incident

11

12

13   MARKED FOR RULING

14   DESCRIPTION                              PAGE
     (None)

15

16

17

18

19

20

21

22

23

24

25

145

1

2                    CERTIFICATION

3

4    STATE OF NEW YORK   )
                         )  ss
5    COUNTY OF ORANGE    )

6

7         I, Michelle Conero, a stenotype

8    reporter and Notary Public within and for

9    the State of New York, do hereby certify;

10              That the witness whose

11   Examination Before Trial is hereinbefore

12   set forth was duly sworn by me;

13              That such Examination Before

14   Trial is a true and accurate record of the

15   testimony given by said witness.

16              I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that I am

19   in no way interested in the outcome of this

20   matter.

21        IN WITNESS WHEREOF, I have hereunto

22   set my hand this 8th day of December 2022.

23

24   _____

25              Michelle Conero