UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SILVON S. SIMMONS,

                              Plaintiff,

                                                          Case # 17-CV-6176-FPG

v.
                                                          DECISION AND ORDER

JOSEPH M. FERRIGNO, II et al.,

                              Defendants.

## INTRODUCTION

On March 27, 2017, Plaintiff Silvon S. Simmons brought this action against the City of Rochester and its employees Joseph M. Ferrigno, II, Samuel Giancursio, Michael L. Ciminelli, Mark Wiater, Christopher Muscato, and Robert Wetzel (collectively, the "City Defendants"), and against Shotspotter, Inc., SST, Inc., and Paul C. Greene (collectively, the "ShotSpotter Defendants"),[1] asserting claims under 42 U.S.C. § 1983 and various provisions of state law.  ECF No. 10.

The City Defendants moved for partial summary judgment on December 22, 2022.  ECF No. 132.  The Shotspotter Defendants moved for summary judgment the same day.  ECF No. 136. Plaintiff filed his responses in opposition to both motions on February 8, 2023.  ECF Nos. 142, 143.  The Shotspotter Defendants and the City Defendants replied separately on March 15, 2023.

---

[1] Plaintiff has also named several John Does as defendants.  As an initial matter, the Court dismisses the claims against the unnamed John Doe defendants (John Does 1-20 and John Does 21-30).  Though discovery is complete in this case, Plaintiff has failed to identify any of the John Doe defendants.  Moreover, Plaintiff's opposition filings to the Defendants' summary judgment motions do not specify the role of any unnamed defendants in the infringing conduct, nor does Plaintiff indicate that he will be able to identify these unnamed defendants in the future.  *See Blake v. Race*, 487 F. Supp. 2d 187, 187 n.1 (E.D.N.Y. 2007).  Because Plaintiff had "an opportunity to pursue discovery to identify the unknown defendants" but failed to do so, this Court "adheres to the 'general rule' that disfavors the use of 'John Doe' to identify defendants."  *Id.* (citing *Feliciano v. Cnty. of Suffolk*, 419 F. Supp. 2d 302, 313 (E.D.N.Y. 2005)). John Does 1-20 and John Does 21-30 are therefore dismissed without prejudice.  *See id.*

ECF No. 148, 149. For the reasons explained below, the City Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part. The ShotSpotter Defendants' motion for summary judgment is GRANTED in its entirety.

## FACTUAL BACKGROUND

### I. The Immel Street Shooting

Shortly before 9:00 pm on the night of April 1, 2016, Plaintiff left his home on Immel Street in the City of Rochester to accompany his neighbor to a nearby store. ECF No. 142-29 ¶¶ 15-16; ECF No. 143-17 ¶¶ 15-16. Plaintiff got into the front passenger seat of his neighbor's gray Chevrolet Impala and the two men departed. *Id.* ¶¶ 16-17. As Plaintiff and his neighbor returned to Immel Street, their car caught the attention of Defendant Ferrigno, who had learned that an individual involved in an ongoing feud in the area drove a gray or tan Chevrolet Impala. ECF No. 136-5 at 2. When Plaintiff and his neighbor returned from the store, Ferrigno pulled up to the neighbor's driveway and shined a spotlight on the Impala. *See* ECF No. 132-2 ¶ 9; ECF No. 142-28 ¶¶ 8-10.

Ferrigno then chased Plaintiff as he started running down the driveway towards his backyard. ECF No. 132-2 ¶ 10; ECF No. 133-4 at 3; ECF No. 142-28 ¶¶ 11-12. As Plaintiff recounts, Ferrigno fired four shots at him as he was running away, hitting him three times. ECF No. 142-28 at 3 ¶ 13; ECF No. 142-29 ¶ 35; *see also* ECF No. 132-2 ¶13. Ferrigno, on the other hand, maintains that he saw Plaintiff reach back, followed by a muzzle flash and a gunshot, before he fired at Plaintiff. ECF No. 136-5 at 3. According to Ferrigno, Plaintiff shot first. *Id.*

After being hit by the third bullet, Plaintiff dove over the fence that led to his backyard and tried to crawl to his back door. ECF No. 132-2 ¶ 14; ECF No. 142-28 at 4 ¶ 14. Physically unable

to crawl, he laid face down on the ground and played dead. ECF No. 132-2 ¶ 14; ECF No. 142-28 at 4 ¶ 15.

After Defendant Giancursio arrived on the scene, he searched and handcuffed Plaintiff. ECF No. 142-29 ¶¶ 50, 54. Eventually, RPD found a Ruger handgun a "few feet" from where Plaintiff had fallen after being shot. ECF No. 142-28 at 27 ¶ 178. Although DNA was recovered from the weapon, it did not match Plaintiff's, and he was excluded as a possible contributor. *Id.* at 43 ¶ 285, 51 ¶¶ 328-29; ECF No. 142-18 at 11. Witnesses differ as to whether a shell casing was "stove-piped," that is, stuck in the ejection port, or not. ECF No. 142-28 at 23 ¶ 151, 38 ¶ 248, 41 ¶ 268.

After being taken into custody, Plaintiff was admitted to Strong Memorial Hospital. ECF No. 142-29 ¶ 75; ECF No. 143-17 ¶ 78. Plaintiff had sustained several injuries in the shooting, including a left hemopneumothorax, a fracture of the left acetabulum, a pseudoaneurysm of the right superficial femoral artery, and fractures of the sixth, seventh, and tenth ribs. ECF No. 142-29 ¶ 77; ECF No. 143-17 ¶ 77. He was intubated and remained on a ventilator until the morning of April 4. ECF No. 142-29 ¶ 78; ECF No. 143-17 ¶ 78.

## II.    The ShotSpotter Evidence

Shortly after the shooting, Defendant Mark Wiater contacted ShotSpotter about the incident. ECF No. 136-2 at 4. ShotSpotter provides a network of acoustic sensors, each of which continuously records audio, that can detect, locate, and alert police departments to gunshot incidents. ECF No. 136-2 at 4; ECF No. 136-10 at 2. The ShotSpotter system is made up of a network of audio sensors, each of which continuously records audio. When the system detects acoustic impulses typical of gunfire, it automatically generates a "ShotSpotter Incident," which includes audio clips and system-generated analysis of the incident. *Id.* When Wiater contacted

Shotspotter, he asked the ShotSpotter representative if someone could "pull the audio [of the incident] and listen to a longer portion for additional shots." ECF No. 136-13 at 2; *see also* ECF No. 132-2 ¶ 17. Wiater did not tell ShotSpotter how many shots he thought had been fired. ECF No. 135-2 at 2; ECF No. 143-5 at 13-14. ShotSpotter later informed Wiater that the system had detected an earlier gunshot, which occurred two seconds before the subsequent four shots. ECF No. 132-6 ¶¶ 23-24; ECF No. 136-13 at 4. Wiater denies ever asking ShotSpotter or any ShotSpotter employee to "modify the audio content of a file or to fabricate evidence of a gunshot." ECF No. 132-6 ¶ 28.

At the time of Wiater's request, Ralph Clark, President and CEO of ShotSpotter Inc., reviewed and approved the release of "extended audio clips" to customers. ECF No. 136-2 ¶ 33. The purpose of Clark's review was to ensure that extended audio clips did not contain incidental sounds other than gunshot sounds. ECF No. 136-10 ¶ 17. ShotSpotter employee Robert Bresler emailed Clark on April 1, 2016 and included as an attachment an audio file containing all five shots. ECF No. 136-10 ¶ 14. Clark approved the audio file, and had no further communication regarding the shooting with Bresler or members of the RPD. *Id.* ¶ 16.

About one week after the shooting, on April 8, 2016, then-Lead Customer Support Engineer Defendant Paul C. Greene produced a "Detailed Forensic Report" on the incident, which stated that the system "auto-acknowledged" the incident but did not alert RPD because "squelch mode" was enabled. ECF No. 136-2 ¶ 43; ECF No. 136-17 at 5. The report also indicated that the ShotSpotter system initially classified the incident as "Helicopter." *Id.* Shortly before 1:00 am on April 2, however, Bresler reclassified the incident to "Multiple Gunshots" "per customer" and updated the number of rounds from three to four. *Id.* According to the report, there were five shots. *Id.* at 7, 11. The first shot, which was not initially included in the incident, occurred

4

approximately two seconds before the second shot. *Id.* at 7. The report also depicts audio waveforms of the incident, showing one impulse occurring relatively early, followed by four impulses in rapid succession. *See* ECF No. 136-2 ¶ 45; ECF No. 136-16 ¶ 8.

Bresler, Clark, and Greene deny that they altered any of the audio data or files associated with the shooting. *See* ECF No. 136-2 ¶¶ 24-26, 34-36, 49-51. They also deny that they know how—or had any motivation—to do so. *Id.* ¶¶ 27-28, 39, 41, 53-54.

### III.    The Criminal Proceedings

Plaintiff was arraigned on April 5, 2016 while in custody at Strong Memorial Hospital, and charged with attempted aggravated murder, attempted aggravated assault of a police officer, and two counts of criminal possession of a weapon in the second degree. ECF No. 142-28 ¶ 81; ECF No. 143-17 ¶ 81. On April 11, he was transferred from Strong Memorial Hospital to Monroe County Jail, where he remained throughout the criminal proceedings. ECF No. 142-29 ¶ 87; ECF No. 143-17 ¶ 87.

During Plaintiff's October 2017 criminal trial, Defendant Greene testified that RPD asked him to search for additional shots and that ShotSpotter found audio of a fifth shot "a few seconds prior" to the other four shots. ECF No. 143-4 at 5. He also testified that ShotSpotter initially detected three gunshots, that a technician updated the number from three to four after initial review, and that the number of shots was "changed to five only after [his] analysis." *Id.* at 8. Greene maintains that he did not rely upon or reference any fabricated or falsified evidence. ECF No. 136-2 ¶ 47. Plaintiff's criminal trial concluded on October 26, 2017 with a jury verdict acquitting Plaintiff of all but one count: criminal possession of a weapon in the second degree.[2] *Id.* ¶ 5 (citing ECF No. 10 ¶¶ 250-53).

---

[2] Plaintiff was charged with two counts of criminal possession of a weapon in the second degree. The jury found Plaintiff guilty of possessing "any loaded firearm" under N.Y. Penal Law § 265.03(3). ECF No. 136-8 at 2. The jury

On February 13, 2018, the trial court set aside the verdict and vacated Plaintiff's conviction. *Id.* ¶ 8. The court concluded that it should have precluded the recording of five acoustic impulses that the ShotSpotter system captured as well as Defendant Greene's testimony that the impulses were gunshots recorded at the time and place of the Immel Street shooting. ECF No. 136-8 at 8-12. The court also explained that, in its view, the jury verdict "reflected a nearly complete rejection of Ferrigno's (and Giancursio's) version of events." In other words, it "reflected a determination that [Plaintiff] did not point his gun at Ferrigno and fire it." *Id.* at 8. The trial court therefore ordered a new trial but limited Ferrigno to testifying that he "heard a shot, and fired." *Id.* at 12; *see also* ECF No. 143-17 ¶ 97. Because the prosecution indicated that, without the ShotSpotter evidence, it could not establish that Plaintiff possessed a loaded firearm on the night of the shooting, defense counsel moved to dismiss the indictment. ECF No. 143-17 ¶ 99-100. The trial court granted the motion and dismissed the indictment. *Id.* ¶ 100.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment" if the moving party "shows that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). In deciding whether there is a genuine dispute as to a material fact, the court is not to evaluate credibility, and must draw all reasonable

---

found Plaintiff not guilty of possessing a loaded firearm with the intent to use it unlawfully against another under N.Y. Penal Law § 265.03(1)(b). *See id.*

6

inferences and resolve all ambiguities in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 454 (2d Cir. 2010).

Once the moving party has met its burden, the nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The nonmoving party may not, therefore, "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Nor is a "mere scintilla of evidence" in support of the nonmoving party enough. *Anderson*, 477 U.S. at 252. The nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading. . . ."). But, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the court must deny summary judgment. *Anderson*, 477 U.S. at 248.

## DISCUSSION

### I.     The City Defendants' Motion

The City Defendants seek partial summary judgment. Specifically, they seek summary judgment on Plaintiff's § 1983 conspiracy claim (Count III); failure to intervene claim against Defendant Muscato (Count VII); failure to implement policies, customs, and practices claim against Defendant City of Rochester; (Count VIII); and a supervisory liability claim against

Defendant Ciminelli (Count IX). ECF No. 132-1.[3] They also assert that Defendants Ferrigno and Giancursio are entitled to qualified immunity from Plaintiff's false arrest claim (Count I). ECF No. 132-1. The Court begins with the City Defendants' assertion of qualified immunity before turning to their arguments in favor of summary judgment.

### a. False Arrest (Count I)

The City Defendants assert that Ferrigno and Giancursio are entitled to qualified immunity with respect to Plaintiff's false arrest claim because it is undisputed that the officers believed the car in which Plaintiff and his neighbor were traveling was the same make and model, and close in color, to that of a "wanted suspect." ECF No. 132-3 at 20. Moreover, when Ferrigno exited his vehicle, shined a light on Plaintiff, and told him to stop, Plaintiff did not stop. *Id.* at 21. And, because "their immediate Sergeant, the Professional Standards Section, the Chief of Police, and the CRB" all concluded that the officers acted appropriately, no reasonable jury could conclude that the officers' actions were objectively unreasonable. *Id.*

Plaintiff contends that, because there are questions of fact for the jury to decide, consideration of qualified immunity is premature. ECF No. 142-33 at 25. Specifically, Plaintiff asserts that if the jury determines that Plaintiff did not display or fire a gun and that Ferrigno was never in danger, it would not have been reasonable for him to believe that it was proper to shoot at Plaintiff. *Id.* at 26. Plaintiff also argues that no reasonable police officer could believe it was permissible to "move shell casings or plant a gun, let alone conspire with ShotSpotter to obtain fabricated and falsified ShotSpotter audio and reports." *Id.* The Court agrees with Plaintiff that

---

[3] The City Defendants do not seek summary judgment on Plaintiff's excessive force claim (Count II), malicious prosecution claims (Counts IV and XII), fair trial claim (Count V), battery claim (Count X), and assault claim (Count XI). While the City Defendants seek qualified immunity from Plaintiff's false arrest claim (Count I), they do not otherwise seek summary judgment on this claim. The Court previously dismissed Plaintiff's malicious abuse of process claim against the City Defendants (Count VI) and his failure to intervene claim (Count VII) against Defendants Ferrigno, Giancursio, Wiater, and Ciminelli. *See Simmons v. Ferrigno*, No. 17-CV-6176, 2019 WL 12361880, at *6-7 (W.D.N.Y. Aug. 5, 2019).

questions of fact preclude granting qualified immunity to Ferrigno and Giancursio at the summary judgment stage.

"In order to sustain a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that the defendant intentionally confined him without his consent and without justification." *Dufort v. City of New York*, 874 F.3d 338, 347 (2d Cir. 2017) (internal quotation marks omitted). "Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." *Id.* (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004). Generally, "probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 348 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Probable cause is a mixed question of law and fact. *Id.* "Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury." *Id.* However, "where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).

"Qualified immunity establishes a defense for a government actor acting in his official capacity." *Dufort*, 874 F.3d at 354. It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). "A police officer is entitled to qualified immunity if (1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did

not violate a clearly established constitutional right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008). A defendant is entitled to summary judgment on qualified immunity grounds if:

> he adduces sufficient facts such that no reasonable jury, looking at the evidence in light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline*, 546 F.3d at 102. "Although a conclusion that a defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual questions must be resolved by the factfinder." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (internal citations omitted); *see also Dufort*, 874 F.3d at 354 (denying summary judgment where plaintiff established dispute of material fact as to whether defendants intentionally withheld or manipulated key evidence during his arrest and prosecution).

In the context of a false arrest claim, an officer is entitled to qualified immunity if he had either probable cause or "arguable" probable cause. *Id.* Arguable probable cause exists "if officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez v. City of Schenectady*, 782 F.3d 149, 157 (2d Cir. 2013) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)). However, "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins*, 478 F.3d at 87. "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.*

Here, because Plaintiff has established a dispute of material fact as to the circumstances his arrest, the Court concludes that it would be inappropriate to grant qualified immunity to

Ferrigno and Giancursio at the summary judgment stage.[4]  *See Dufort*, 874 F.3d at 354.  "At the time of the events in the present case, the legal principles governing [Ferrigno's and Giancursio's] conduct . . . were well established."  *Weyant*, 101 F.3d at 858.  Whether it was reasonable for Ferrigno and Giancursio to believe that their conduct "met the standards set by those principles," however, "depends on whether one believes their version of the facts."  *Id.*  But "that version is sharply disputed," *id.*, and Plaintiff has introduced sufficient evidence to require a jury's consideration as to "what the facts were that the officer faced or perceived."  *Kerman*, 374 F.3d at 109 (internal quotation marks omitted).  For example, two non-law enforcement witnesses have testified that they only heard four shots that evening.  ECF No. 142-28 ¶¶ 30-32, 63.  One stated that she saw Plaintiff running away from an officer and that his back was facing the officer when the officer shot him, did not see Plaintiff fire a gun, and did not see "any type of flash," like a muzzle flash, coming from Plaintiff's direction.  ECF No. 142-28 ¶¶ 30-32, 39.  On this record, the only clearly established material facts known to Ferrigno and Giancursio at the time of the incident are that Plaintiff was a passenger in a gray Chevrolet Impala that backed into a driveway on Immel Street, that a wanted suspect was associated with a light-colored car of the same make and model, and that Plaintiff fled after being ordered to stay put.  Whether Plaintiff ever possessed or fired a gun is in sharp dispute.  Accordingly, "the matter of qualified immunity . . . cannot be resolved as a matter of law."  *Weyant*, 101 F.3d at 858

With respect to Ferrigno's initial approach, the City Defendants assert that it is "undisputed" that Ferrigno and Giancursio believed that the car in which Plaintiff was a passenger was "the same make and model and a close color to the wanted suspect they were looking for."

---

[4] It is worth noting that the City Defendants seek dismissal of the false arrest claim solely on qualified immunity grounds.  *See* ECF No. 132 at 1; ECF No. 132-1 ¶ 17.  They therefore appear to acknowledge the genuine dispute of material fact as to the substance of the false arrest claim.  "[T]hose same questions of material fact preclude a grant of qualified immunity at the summary judgment stage."  *Dufort*, 874 F.3d at 343.

ECF No. 132-3 at 20.  Plaintiff does dispute the assertion that the vehicle "matched the description" of the wanted suspect's vehicle, however.  ECF No. 142-28 ¶ 6; *see* ECF No. 132-2 ¶ 6 ("The vehicle matched the description of a vehicle which a suspect wanted for Menacing in the Second Degree had been known to drive.").  According to Plaintiff, Ferrigno had reason to believe that the suspect drove a gold-colored Impala, not a gray one.  ECF No. 142-28 ¶ 6; *see* ECF No. 142-2 at 12 (describing suspect's vehicle as potentially "gold, champagne, [or] cream").  Other than being somewhat similar in color, the Defendants have not presented any reason for the officers to believe that the vehicle in which Plaintiff was a passenger was the menacing suspect's vehicle.  *Cf. LaLonde v. Bates*, 166 F. Supp. 2d 713, 718 (N.D.N.Y. 2001) (investigator's observation of dark colored car matching the make and general description of suspect vehicle insufficient to hold, as a matter of law, that investigator had probable cause to stop vehicle).

The City Defendants also point to the fact that when Ferrigno exited his car, shined a light on the Impala and "said stop, Plaintiff did not stop."  ECF No. 132-3 at 21.  Although the City Defendants assert that it is "undisputed that Officer Ferrigno . . .. said stop," whether Ferrigno ordered Plaintiff to stop appears to be in dispute.  *See* ECF No. 132-2 ¶¶ 5-12 (identifying undisputed facts regarding the initial approach and stop); ECF No. 142-29 ¶¶ 24-33, 42 (Plaintiff's account of Ferrigno's approach and chase).  The City Defendants do not identify Ferrigno's order to stop as an undisputed fact.  *See* ECF No. 132-2 ¶¶ 5-12.  And, according to Plaintiff, he ran because he could not see or identify the vehicle or the person who exited the vehicle that was pointing a gun at him while running toward him.  ECF No. 142-29 ¶ 28-29.  Moreover, he states that Ferrigno did not identify himself as a police officer in any way.  *Id.*  ¶ 42.

At this stage then, Plaintiff's flight does not support the City Defendants' assertion of qualified immunity.  While "a suspect's flight may, under certain circumstances, provide

reasonable suspicion to warrant a *Terry* stop, it does not, without more, provide probable cause to arrest." *Jenkins v. City of New York*, 478 F.3d 76, 89 n.12 (2d Cir. 2007); *Nixon v. City of New York*, No. 19-CV-5032, 2023 WL 2799920, at *4 (E.D.N.Y. Apr. 6, 2023). "Flight at the approach of strangers," too, is a "strong [indicium] of mens rea, and when *coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime*, they are proper factors to be considered in the decision to make an arrest." *Nixon*, 2023 WL 2799920, at *4 (quoting *Sibron v. New York*, 392 U.S. 40, 66-67 (1968)) (emphasis added). Other than the disputed issues of the Impala's color and Plaintiff's refusal to obey Ferrigno's order to stop, the City Defendants point to no other indicia of criminality, that would support a finding of either probable cause or arguable probable cause at this stage of the proceedings. *See id.* Instead, there are two sharply differing versions of events. The City Defendants assert that Plaintiff, who was a passenger in a car matching the description of a potentially dangerous suspect, fled after Ferrigno ordered him to stop and, shortly thereafter, shot at Ferrigno. Plaintiff, on the other hand, asserts that he fled, fearing for his life, from a then-unidentifiable individual who was pointing a gun at him while chasing him down a driveway toward his backyard. In light of this dispute, Ferrigno and Giancursio are not entitled to qualified immunity at this stage of the proceedings. *See id.*

The City Defendants have failed to establish that Ferrigno and Giancursio are entitled to qualified immunity as to Plaintiff's false arrest claim as a matter of law. The Court therefore denies their request to dismiss that claim on qualified immunity grounds.

**b. § 1983 Conspiracy (Count III)**

Plaintiff alleges that "all Defendants" conspired to falsely create additional gunshots in the ShotSpotter audio files or reports, to fabricate and falsify evidence that they forwarded to the prosecution, and participated in the prosecution "to cause Plaintiff to be wrongfully charged,

imprisoned[,] and prosecuted" and to "secure the exoneration of Defendant Ferrigno for using excessive and deadly force against Plaintiff."  ECF No. 10 ¶ 307.  The City Defendants assert that they are entitled to summary judgment because there is no admissible evidence of conspiracy between the City and ShotSpotter and because allegations of a conspiracy among RPD officers are barred by the "intracorporate conspiracy" doctrine.  ECF No. 132-3 at 8.  As explained below, the Court agrees that the City Defendants are entitled to summary judgment on Plaintiff's § 1983 conspiracy claim.

To prove a § 1983 conspiracy, a plaintiff "must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  The plaintiff must therefore show that the "defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 507-08 (S.D.N.Y. 2008) (internal quotation marks and citations omitted); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  While conclusory, vague, or general allegations of conspiracy are insufficient, because conspiracies are "by their very nature secretive operations, [they] may have to be proven by circumstantial, rather than direct evidence."  *Jean-Laurent*, 540 F. Supp. 2d at 508 (citing *Pangburn*, 200 F.3d at 72).

At the summary judgment stage, the nonmoving party's evidence of a § 1983 conspiracy "must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish an unlawful plan."  *Ivery v. Baldauf*, 284 F. Supp. 3d 426, 439 (W.D.N.Y. 2018) (quoting *Gustafson v. Village of Fairport*, 106 F. Supp. 3d 340, 352

14

(W.D.N.Y. 2015)).  Because Plaintiff has failed to come forward with evidence that reasonably leads to such an inference, his § 1983 conspiracy claim cannot survive summary judgment. Moreover, to the extent that Plaintiff alleges a conspiracy among RPD officers, the intracorporate conspiracy doctrine bars his claim.

### i.      The ShotSpotter Conspiracy

The City Defendants contend that the communications between Wiater and ShotSpotter and later Wetzel and ShotSpotter do not amount to an agreement to act in concert to inflict an unconstitutional injury and therefore Plaintiff's § 1983 conspiracy claim fails.[5]  ECF No. 132-3 at 7-9.  Plaintiff argues in response that because there is evidence supporting the conclusion that RPD contacted ShotSpotter "for the sole purpose of looking for a fifth shot to justify Ferrigno's version of events . . . [a] reasonable inference can be raised that defendants tacitly came to a mutual understanding to create audio containing an additional shot."  ECF No. 142-33 at 17.  The Court disagrees.

Plaintiff's conspiracy claim rests on the communications between RPD employees Wiater and Wetzel on one hand and various ShotSpotter employees on the other.  He points to the fact that, following his communication with Wiater, ShotSpotter employee Robert Bresler reclassified the incident as gunfire and updated the number of rounds from three to four.  ECF No. 142-33 at 11.  When Wiater asked if someone could listen to a longer portion of the audio fire for additional shots, Bresler agreed to do so and to expedite the request.  *Id.*  Then, after conducting the audio search, Bresler found an additional sound, which he identified as a gunshot.  *See id.*  Plaintiff also points to Defendant Wetzel's claim that he did not reach out to ShotSpotter until April 2, 2016

---

[5] The City Defendants also assert that Plaintiff's conspiracy claim fails because he has failed to allege or offer evidence of class-based animus.  *See* ECF No. 132-3 at 7.  As the Court has already noted, because "Plaintiff alleges a civil conspiracy under Section 1983, he is not required to allege a class-based animus."  *Simmons v. Ferrigno*, No. 17-CV-6176, 2019 WL 12361880, at *5 (W.D.N.Y. Aug. 5, 2019).

despite acknowledging that he emailed ShotSpotter support on April 1, alerting them to potential further requests related to an "officer-involved shooting." *Id.* at 17. Finally, Plaintiff points to inconsistencies between Bresler's testimony in this case and Defendant Greene's testimony at Plaintiff's criminal trial as to when ShotSpotter found the additional gunshot. *Id.* at 18.

Here, even drawing all reasonable inferences in Plaintiff's favor, the evidence does "no more than demonstrate that [ShotSpotter] cooperated with [RPD's] investigation into" the Immel Street shooting. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). "[T]here is nothing in the series of communications" between the City Defendants and ShotSpotter, "other than [Plaintiff's] unsubstantiated speculation, to suggest that anything untoward took place." *Id.* at 115; *cf. Dory v. Ryan*, 999 F.2d 679, 683 (2d Cir. 1993) (dismissal improper in § 1983 conspiracy action where plaintiff presented affidavit by prosecution witness indicating existence of conspiracy between prosecutor and witness), *modified*, 25 F.3d 81 (2d Cir. 1994).

The only fact conceivably suggestive of a potential agreement is that a ShotSpotter employee asked Wiater "[h]ow many shots at this location?" ECF No. 135-2 at 2. Assuming "this location" does in fact refer to Immel Street, and not the other locations that Wiater had asked about, the fact that Wiater did not answer, would tend to show that each member of the alleged conspiracy did not, in fact, share the conspiratorial objective of fabricating evidence of a first gunshot. *Cf. Buari v. City of New York*, 530 F. Supp. 3d 356, 394 (S.D.N.Y. 2021) ("While a plaintiff 'need not produce direct evidence of a meeting of the minds, he must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective.'" (quoting *Gordon v. Emmanuel*, No. 15-CV-2439, 2018 WL 4688935, at *9 (E.D.N.Y. Sept. 28, 2018)). Because Plaintiff's evidence cannot, therefore, "reasonably lead to the inference that [the City Defendants and ShotSpotter] positively or tacitly came to a mutual understanding to

try to accomplish an unlawful plan," the City Defendants are entitled summary judgment on his § 1983 conspiracy claim. *Ivery*, 284 F. Supp. 3d at 439.

### ii. Intracorporate Conspiracy

The Court now turns to the allegations that the City Defendants conspired among themselves to deprive Plaintiff of his constitutional rights. *See* ECF No. 10 ¶¶ 301-06. Although Plaintiff asserts that the intracorporate conspiracy doctrine does not apply because "the Amended Complaint alleges a conspiracy between the City Defendants and ShotSpotter," ECF No. 142-33 at 17, the Court nevertheless considers it because he alleges in several places that members of the RPD, including Defendants Ferrigno and Giancursio, conspired among themselves to violate Plaintiff's civil rights, *see e.g.*, ECF No. 10 ¶ 301, 302 (alleging that Defendants Ferrigno and Giancursio agreed to deprive Plaintiff of his rights by, among other things, falsely accusing him of shooting at Ferrigno and by falsely arresting him).[6]

Under the intracorporate conspiracy doctrine, "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Ivery*, 284 F. Supp. 3d at 440. A narrow exception to this doctrine exists where individual defendants, "despite being a part of the same entity, 'are pursuing personal interests wholly separate and apart from the entity.'" *Id.* (quoting *McRae v. City of Hudson*, No. 14-CV-236, 2015 WL 275867, at *8 (N.D.N.Y. Jan. 21, 2015)). Plaintiff asserts only that the intracorporate conspiracy doctrine is inapplicable; he does not raise this exception. *See* ECF No. 142-33 at 16.

---

[6] The Court acknowledges that a previous decision declined to dismiss Plaintiff's conspiracy claim under the intracorporate conspiracy doctrine because Plaintiff alleged his conspiracy cause of action against "All Defendants," and "the amended complaint contains allegations that the City Defendants conspired with the ShotSpotter Defendants to violate Plaintiff's civil rights. *Simmons*, 2019 WL 12361880, at *5. Because the Court has concluded that the City Defendants are entitled to summary judgment on Plaintiff's conspiracy claims to the extent that he alleges a conspiracy between the City Defendants and ShotSpotter, the Court will address Plaintiff's allegations of conspiracy amongst the City Defendants as well.

In any event, the exception does not apply. Plaintiff's "only interaction with the individual defendant officers is through their professional duties, which they carried out under the color of law." *McRae*, 2015 WL 275867, at *8. Moreover, there is no evidence that the defendant officers "had a personal connection to him or were motivated by personal reasons wholly separate and apart from" their employment with the RPD. *Id.* Accordingly, to the extent Plaintiff alleges that the City Defendants conspired amongst themselves, his claim is barred by the intracorporate conspiracy doctrine. The City Defendants are therefore also entitled to summary judgment on Plaintiff's § 1983 conspiracy claim to the extent it alleges a conspiracy among RPD officers.

### c. Failure to Intervene (Count VII)

The City Defendants assert that they are entitled to summary judgment on this claim because Muscato did not have a realistic opportunity to intervene for two reasons. First, Muscato was not the investigator or technician assigned to Plaintiff's criminal case; his only role was to treat him at the scene before the ambulance arrived. ECF No. 132-3 at 5-6. Second, neither RPD nor the Monroe County District Attorney used gunpowder residue tests. *Id.* at 6. Plaintiff contends that because there is evidence that Plaintiff asked Muscato to test him for gunpowder residue and that Muscato could have requested such a test, he had sufficient time and a realistic opportunity to prevent the violation of Plaintiff's rights. ECF No. 142-33 at 14-15. The Court agrees with Plaintiff and concludes that a genuine dispute of material fact as to whether Muscato had a realistic opportunity to intervene precludes summary judgment.

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Sloley v. VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "An officer may be held liable for preventable harm caused by

the actions of other officers if (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jackson v. City of New York*, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020) (quoting *Jackson v. City of New York*, 939 F. Supp. 2d 219, 232 (E.D.N.Y. 2013)) (internal quotation marks omitted). "Whether the officer had a 'realistic opportunity to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Sloley*, 945 F.3d at 47 (2d Cir. 2019) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014)).

Although the City Defendants argue that Muscato had no realistic opportunity to intervene because the RPD and Monroe County District Attorney did not use gunpowder residue tests, Plaintiff has pointed to evidence undermining this assertion. Defendant Ciminelli testified that, although he believed that the RPD did not normally conduct gunpowder residue tests, he could have "work[ed] through the investigating component of the [RPD] to determine whether such a test was possible" and "which crime lab would have the ability to do it." ECF No. 142-26 at 34-35. Moreover, Monroe County Crime Lab firearm and toolmark section supervisor Eric Freemesser testified that, along with examining firearms, the lab would also, among other things perform "gunshot residue examinations" of clothing. ECF No. 142-17 at 3, 20. Finally, Muscato acknowledged that he could have passed on Plaintiff's request to his superiors, although he was "not sure what the result would have been." ECF No. 142-9 at 18. In light of this evidence, the City Defendants have failed to demonstrate that "a reasonable jury could not possibly conclude" that Muscato had a realistic opportunity to intervene by responding to Plaintiff's alleged request for a gun powder residue test. *Terebesi*, 764 F.3d at 244.

The City Defendants' motion for summary judgment on Plaintiff's failure to intervene claim is therefore denied.

### d. *Monell* Liability and Supervisory Liability against the City of Rochester (Counts VIII and IX)

The City Defendants assert that they are entitled to summary judgment on Plaintiff's *Monell* and supervisory liability claims against Defendant City of Rochester because Plaintiff's collection of "unsubstantiated civilian complaint records of both named and unnamed police officers" is insufficient to establish deliberate indifference and therefore cannot support a "failure to train" cause of action. *See* ECF No. 132-3 at 11-12, 16-18. Plaintiff contends that the evidence shows a pattern in which the Civilian Review Board ("CRB") sustained findings of unnecessary force, but the Chief of Police overturned those findings. ECF No. 142-33 at 21. In Plaintiff's view, this pattern, along with additional instances in which the City allegedly failed to respond to misconduct demonstrates the "requisite deliberate indifference to establish a municipal policy or custom." ECF No. 142-33 at 21-22. The Court disagrees and concludes that the City Defendants are entitled to summary judgment on Plaintiff's *Monell* and supervisory liability claims against the City of Rochester.[7]

A plaintiff seeking to impose liability on local governments under § 1983 cannot rely on a theory of vicarious liability and must instead prove that "action pursuant to official municipal policy" caused his injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."

---

[7] Plaintiff asserts two claims against Defendant City of Rochester for failure to implement policies, customs, and practices. *See* ECF No. 10-1 at 58, 61 (Counts VIII and IX of the amended complaint). These claims are duplicative, and because the City Defendants are entitled to summary judgment on one, they are also entitled to summary judgment on the other. *See Colon v. City of Rochester*, 419 F. Supp. 3d 586, 609 (W.D.N.Y. 2019).

*Connick v. Thompson*, 563 U.S. 51, 61 (2011). *Monell*'s policy or custom requirement may also be satisfied "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 534 (S.D.N.Y. 2012) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). "For example, municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (internal quotation marks omitted).

However, "such a failure to act, train or supervise can constitute municipal policy 'only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Triano*, 895 F. Supp. 2d at 534 (quoting *Reynolds*, 506 F.3d at 192). "Deliberate indifference" is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). Such "[d]eliberate indifference may be inferred from the failure to train or supervise based on proof of repeated complaints of civil rights violations that are followed by no meaningful attempt on the part of the municipality to investigate or forestall." *Lawrence v. City of Rochester*, No. 09-CV-6078, 2015 WL 510048, at *7 (W.D.N.Y. Feb. 6, 2015) (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)); *see also Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 499-502 (N.D.N.Y. 2017); *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at *15-16 (N.D.N.Y. Nov. 17, 2017).

Plaintiff contends that he has done just that. In his view, there is a clear pattern: citizens complain about the unnecessary use of force and the City fails to meaningfully respond to such complaints. ECF No. 142-33 at 21. The City Defendants argue, on the other hand, that Plaintiff has failed to demonstrate that the City was "on notice of deficiencies in [its] training, investigative or disciplinary programs" and that "the failure to address that flaw is what caused Plaintiff's purported injury." ECF No. 132-3 at 11.

In support of their motion, the City Defendants point to—and Plaintiff admits—only one relevant undisputed fact: that the Immel Street shooting "was investigated by the Rochester Police Department's Major Crimes Unit and the Professional Standards Section." ECF No. 132-2 ¶ 18; ECF No. 142-28 at 4 ¶ 18. The agreement ends there. Plaintiff goes on to analyze a raft of citizen complaints dating from 2009 through 2017. He first notes that, from 2011 to 2013, "no unnecessary force allegations were sustained" out of at least 124 complaints during that period. ECF No. 142-33 at 21. He then identifies several instances in which the Civilian Review Board ("CRB") sustained force allegations, but the Chief of Police reversed the CRB's finding. *See e.g.*, ECF No. 142-28 at 99-100 ¶¶ 629, 633, 634.

Contrary to Plaintiff's assertion, this evidence does not demonstrate that the City made no meaningful attempt to investigate complaints of civil rights violations. *See Lawrence*, 2015 WL 510048, at *7. As Plaintiff acknowledges, at the time of the incident "[w]hen citizens [filed] complaints against an RPD officer, those complaints are investigated by the Professional Standards Section," ("PSS"), an internal body comprising RPD officers who investigate the conduct of other officers. ECF No. 142-28 at 94 ¶ 600. The PSS would then draft a "PSS Investigative Summary" describing the investigation and recommending findings. *Id.* ¶ 601. The PSS would then turn over to the CRB the PSS Investigative Summary along with "everything the PSS [has] gathered." *Id.* ¶

22

602. A PSS representative would then brief the CRB. *Id.* After the CRB completed its review, the Chief of Police would review the investigations and ultimately determined how to classify the complaint. *Id.* ¶ 604. Complaints could be classified as "sustained," meaning that the "conduct occurred and constituted a violation of rules, policy [and] procedures"; "unprovable," meaning that "there was insufficient evidence to prove the allegation one way or the other"; "unfounded," meaning that the complained of act did not occur; or "exonerated," meaning that the conduct did occur but was "consistent with departmental policies and procedures." *Id.* ¶ 605.

Annual PSS reports from 2011 to 2016 reveal that the number of unnecessary force complaints that the PSS and CRB reviewed or had pending ranged from 16 to 123, a small number of which were sustained. *See* ECF No. 142-28 ¶¶ 621-632. In one 2013 case, the CRB sustained a force allegation, but the Chief of Police determined it to be "unprovable." *Id.* ¶ 626. Likewise, in a 2015 case, the CRB sustained three force allegations, which the Chief determined were "unprovable." *Id.* ¶ 629. However, at least one 2015 force allegation resulted in suspensions. *See* ECF No. 142-27 at 18. In one 2016 case, the Chief of Police overturned a CRB finding of "sustained," reclassifying the allegation as "exonerated." *Id.* ¶ 633. In another 2016 case, however, the Chief sustained an allegation that the CRB found unprovable. ECF No. 142-27 at 23. According to the PSS reports, only one force allegation was sustained during the 2011 to 2016 period. *See id.* ¶¶ 622, 624, 625, 628, 630, 632.

As Plaintiff also points out, Defendant Ciminelli acknowledged that Defendant Ferrigno "had some PSS history," *id.* ¶ 607, that is, that he had been the subject of complaints in the past. According to Ferrigno's deposition testimony, he was subject to several complaints alleging the unnecessary or excessive force prior to the Immel Street shooting. *See* ECF No. 152 ¶¶ 2-4, 6-8. Ferrigno was never terminated or suspended. ECF No. 152-1 at 9-10. The only reprimand

Defendant Ferrigno recalled was a memorandum of record, although he could not recall its contents. *See id.* at 10. PSS also investigated Ferrigno's involvement in the Immel Street shooting, and Defendant Ciminelli classified the finding as "exonerated, which reflects that he acted in accordance with departmental policy, procedures and guidelines." ECF No. 142-26 at 61-62. Plaintiff also points to use of force complaints and lawsuits against several other RPD officers not named in this action. *See e.g.*, ECF No. 152 ¶¶ 17-21, 29-31.

While Plaintiff recognizes that the RPD and the CRB investigated citizen complaints, he asserts that the small number of sustained findings demonstrates "the City's continual failure to respond to such complaints meaningfully." *See* ECF No. 142-33 at 21. But, even when viewed in the light most favorable to Plaintiff, the evidence cannot show that the City "consistently failed to do anything" in response to citizen complaints of unnecessary or excessive force. *Crawley*, 496 F. Supp. 3d at 730. To the contrary, RPD had a program in place to review citizen complaints—the internal PSS investigation and the independent external CRB review. While the Chief of Police had the ultimate authority to make findings, and, as Plaintiff points out, overturned three findings sustained by the CRB, without more, these discrepancies cannot establish a *Monell* claim, *see Crawley*, 496 F. Supp. 3d at 731, especially where the evidence also reveals that the Chief of Police sustained allegations that the CRB had deemed unprovable. Nor can the mere fact that many complaints were deemed unfounded, unprovable, or exonerated, because "deliberate indifference on a failure to supervise or a failure to discipline claim requires a *consistent* failure to meaningfully investigate complaints or a *consistent* failure to discipline those involved in *actual* constitutional violations." *Id.* The evidence Plaintiff has marshaled in opposition to the City Defendants' motion establishes neither.

Accordingly, the City Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.  Further, to the extent that Plaintiff asserts a supervisory liability claim against the City of Rochester, it is duplicative of his *Monell* claim as it is based on an alleged failure to implement policies, customs, and practices and failure to train, supervise, and discipline RPD officers.  *See* ECF No. 10 ¶¶ 363-371, 372-411.  The City Defendants are therefore also entitled to summary judgment on Plaintiff's supervisory liability claim against the City of Rochester.  *See Colon*, 419 F. Supp. 3d at 609.

### e. Supervisory Liability Claim against Defendant Ciminelli (Count IX)

The City Defendants contend that Plaintiff has failed to set forth any facts establishing that Defendant Ciminelli was directly involved in violating Plaintiff's rights, was made aware of the alleged violation, created a policy that resulted in the alleged violation, directly supervised any of the officers or exhibited "gross negligence" in supervising them, or was deliberately indifferent to the possibility that Plaintiff would be harmed.  ECF No. 123-3 at 15.  Plaintiff counters, arguing that the evidence reveals questions of fact "as to Ciminelli's actual direct participation and his failure to act on information indicating that unconstitutional acts were occurring."  ECF No. 142-33 at 23.

"[T]here is no special rule for supervisory liability" in § 1983 actions.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  "'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary."  *Id.* (quoting *Iqbal*, 556 U.S. at 676) (alteration

in original).[8]  But in all cases, "the violation must be established against the supervisory official directly."  *Id.*  Accordingly, to survive summary judgment, Plaintiff must show that a genuine dispute of material fact exists as to Defendant Ciminelli's direct participation in each constitutional violation that Plaintiff alleges.  The Court considers each of Plaintiff's remaining claims in turn.[9]

### i.     False Arrest and Excessive Force

In bringing a supervisory liability claim against Defendant Ciminelli, Plaintiff alleges that Ciminelli has been aware of "widespread abuses of power, including but not limited to . . . false arrest [and] use of excessive and/or deadly force."  *Id.* ¶ 375.  He alleges that Ciminelli was "deliberately indifferent" to those constitutional violations, has "condoned, encouraged, fostered, and/or ratified] the unlawful conduct" of RPD officers, and has "acquiesced in or tacitly authorized [his] subordinates' unlawful actions."  *Id.* ¶ 377.

Plaintiff brings his Fourth Amendment false arrest and excessive force claims against Defendants Ferrigno and Giancursio, not Defendant Ciminelli.  *See* ECF No. 10 at 40-42, 43-44.  Plaintiff does not allege that Ciminelli participated in his arrest at the scene of the Immel Street Shooting or that he used force against Plaintiff at any time.  *See* ECF No. 10 ¶¶ 275, 291-295.  As Plaintiff notes, Ciminelli did not respond to Immel Street until after he learned, between 9:30 pm

---

[8] Both parties frame their arguments in terms of the framework for supervisory liability set forth in the Second Circuit's decision in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995).  *See* ECF No. 132-3 at 15; ECF No. 142-33 at 22-23.  Under *Colon*, a government official could be "personally involved" in a violation of a person's constitutional rights not only by directly participating in that violation, but also through, for example, "failure to remedy the wrong after being informed of the violation by report or appeal" or "gross negligence in supervising the subordinates who committed the wrongful acts."  58 F.3d at 873.  In *Tangreti*, however, the Second Circuit repudiated the *Colon* approach to supervisory liability in light of the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  A plaintiff now must establish "the violation . . . against the supervisory official directly."  *Tangreti*, 983 F.3d at 618.  The Court therefore declines to consider the additional grounds for supervisory liability that Plaintiff asserts.

[9] To the extent that Plaintiff asserts a "supervisory liability" claim against the City of Rochester, it is duplicative of his *Monell* claim and is therefore dismissed.  *Colon*, 419 F. Supp. 3d at 609.  To the extent Plaintiff argues that his supervisory liability claim should survive summary judgment on the basis of Defendant Ciminelli's failure to intervene, *see* ECF No. 142-33 at 24, the Court previously dismissed Plaintiff's failure to intervene claim against Ciminelli for failure to state a claim, *see Simmons*, 2019 WL 12361880, at *8.

and 10:00 pm that night, that Ferrigno was involved in a shooting there. ECF No. 142-26 at 5; ECF No. 142-28 ¶ 546. While there, he examined the scene before proceeding to the Public Safety Building, where the investigation continued. ECF No. 142-26 at 6.

Plaintiff has therefore failed to come forward with any evidence demonstrating that Ciminelli was personally involved in his allegedly false arrest and is therefore subject to liability under § 1983. There is no evidence that he was either present during the arrest, in communication with the arresting officers during the arrest, or otherwise directly involved in the arrest. *Compare Savarese v. City of New York*, 547 F. Supp. 3d 305, 354 (S.D.N.Y. 2021) (granting summary judgment where supervising officer wanted plaintiff arrested but did not effectuate or otherwise cause the arrest), *with Snead v. City of New York*, 463 F. Supp. 3d 386, 401 (S.D.N.Y. 2020) (denying summary judgment where there was testimony that supervising officer was present and involved in the arrest), *and Taylor v. City of New York*, No. 19-CIV-6754, 2022 WL 744037, at *11 (S.D.N.Y. March 11, 2022) (denying summary judgment where evidence supported claim that supervising officer approved arrest at the scene). With respect to Plaintiff's excessive force claim, Plaintiff points to no evidence that Ciminelli ever used force against him. *Rizk v. City of New York*, 462 F. Supp. 3d 203, 222 (E.D.N.Y. 2020) (dismissing claims at summary judgment where there was no evidence that police officer used force against either plaintiff).

Because the evidence cannot show that Ciminelli violated Plaintiff's Fourth Amendment rights by his own conduct, and "not by reason of [his] supervision of others who committed the violation," *Tangreti*, 983 F.3d at 618, the City Defendants are entitled to summary judgment on Plaintiff's supervisory liability claim against Defendant Ciminelli arising out of the alleged false arrest and excessive force.

### ii. Malicious Prosecution and Denial of Right to a Fair Trial

Unlike his false arrest and excessive force claims, Plaintiff brings his malicious prosecution and fair trial claims against "All Defendants," including Ciminelli. *See* ECF No. 10 at 47, 53. These claims are grounded in the alleged fabrication of ShotSpotter data and falsification of accounts of the Immel Street Shooting in police reports. *See* ECF No. 10 ¶¶ 316, 340. As explained below, Plaintiff has failed to point to evidence demonstrating a genuine dispute of material fact as to whether Ciminelli fabricated or falsified evidence against him.

Plaintiff argues that the evidence shows questions of fact as to Ciminelli's "actual direct participation and his failure to act on information indicating that unconstitutional acts were occurring," in that he "responded to the scene, went to the Public Safety Building where the investigation was ongoing, and spoke with officers regarding information they obtained from ShotSpotter." ECF No. 142-33. But this limited involvement cannot reasonably give rise to the inference that Ciminelli "played an active role in Plaintiff's prosecution or had a hand in passing along fabricated information to the District Attorney." *Taylor*, 2022 WL 744037, at *16.

Plaintiff points to some evidence indicating at most that Ciminelli may have "failed to remedy a wrong" of which he was aware, but this falls short of raising a genuine dispute of material fact as to whether Ciminelli, through his own conduct, violated Plaintiff's rights. *See Tangreti*, 983 F.3d at 618. Further, even if, as Plaintiff argues, the evidence demonstrates that Ciminelli knew that his subordinates were engaged in unconstitutional behavior, that would not be enough to establish Ciminelli's liability as a supervisory official. *Taylor*, 2022 WL 744037, at * 11 (citing *Tangreti*, 983 F.3d at 616-17) ("A supervisor's 'mere knowledge' of a subordinate's unconstitutional behavior is insufficient 'because that knowledge does not amount to the supervisor's violating the Constitution.'").

The City Defendants are therefore also entitled to summary judgment on Plaintiff's supervisory liability claim against Ciminelli arising out of the City Defendants' alleged malicious prosecution and denial of Plaintiff's right to a fair trial.

### f. Conclusion

For the foregoing reasons explained above, the City Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The Court declines to grant Defendants Ferrigno and Giancursio qualified immunity as to Plaintiff's false arrest claim (Count I) at this stage of the proceedings and denies summary judgment on Plaintiff's failure to intervene claim against Defendant Muscato (Count VII).

The Court grants summary judgment in favor of the City Defendants on Plaintiff's § 1983 conspiracy claim (Count III), supervisory liability claim against Defendants Ciminelli and City of Rochester (Count IX), and *Monell* claim against Defendant City of Rochester (Counts VIII, IX). Accordingly, Plaintiff's false arrest (Count I), excessive force (Count II), malicious prosecution (Count IV and XII), fair trial (Count V), failure to intervene (Count VII), battery (Count X), and assault (Count XI) claims against the City Defendants may proceed.

## II.     The ShotSpotter Defendants' Motion

The ShotSpotter Defendants seek summary judgment on Plaintiff's § 1983 conspiracy claim (Count III), state and federal malicious prosecution claims (Counts IV and VII), and fair trial claim (Count V).  They seek dismissal of Plaintiff's malicious abuse of process claim (Count VI).  For the reasons set forth below, the ShotSpotter Defendants' motion is granted in its entirety.

### a.   Malicious Abuse of Process (Count VI)

The ShotSpotter Defendants assert that this claim must be dismissed because Plaintiff has not alleged or produced evidence of a "collateral objective."  ECF No. 136-1 at 24.  According to the Shotspotter Defendants, even if they did fabricate evidence, without allegation or evidence of its use to achieve something besides Plaintiff's conviction, Plaintiff has not established an element of malicious abuse of process.   For his part, Plaintiff does not oppose dismissal of the malicious abuse of process claim against the ShotSpotter Defendants.  ECF No. 143 ¶ 3; ECF No. 143-21 at 16.

In New York, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."  *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).  A "collateral objective is not the same as a malicious motive and must exist beyond or in addition to [the] criminal prosecution, but it is usually characterized by personal animus.  Such an objective may include infliction of economic harm, extortion, blackmail [or] retribution."  *Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) (internal citations omitted) (alterations in original).

As explained in a previous decision dismissing this claim against the City Defendants, Plaintiff "has not plausibly alleged the 'collateral purpose' element of such a claim." *Simmons*, 2019 WL 12361880, at *6. This applies equally to Plaintiff's claim against the ShotSpotter Defendants. Plaintiff has alleged that all Defendants "caused him to be arrested and prosecuted in order to obtain a collateral objective outside the legitimate ends of the legal process; namely, to cover up and avoid discipline for their abuse of authority and acts of brutality, and to retaliate against him for the injuries they caused to themselves." *Id.*; *see also* ECF No. 10-1 ¶ 348. Such allegations, however, support at most an "improper motive—not an improper purpose." *Simmons*, 2019 WL 12361880, at *6. Because Plaintiff has failed to state a plausible claim for malicious abuse of process as to the ShotSpotter Defendants, and because he does not oppose dismissal of this claim, the Court dismisses Plaintiff's malicious abuse of process claim as to the ShotSpotter Defendants.

**b. § 1983 Conspiracy (Count III)**

The ShotSpotter Defendants contend that summary judgment is warranted because Plaintiff can establish neither the fabrication of evidence nor an agreement between the ShotSpotter Defendants and the City Defendants. ECF No. 136-1 at 33. Plaintiff, along with asserting that there is evidence of fabrication, also argues that the communications between Bresler and Wiater provide evidence of an agreement sufficient to survive summary judgment. ECF No. 143-21 at 16. The Court agrees with the ShotSpotter Defendants and concludes that the ShotSpotter Defendants are entitled to summary judgment on Plaintiff's § 1983 conspiracy claim.

To demonstrate a § 1983 conspiracy, a plaintiff "must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn*, 200 F.3d at 72. The plaintiff must therefore show that the "defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts." *Jean-Laurent*, 540 F. Supp. 2d at 507-08 (internal quotation marks and citations omitted). To survive summary judgment, the nonmoving party's evidence of a § 1983 conspiracy "must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish an unlawful plan." *Ivery*, 284 F. Supp. 3d at 439 (quoting *Gustafson*, 106 F. Supp. 3d at 352).

Even drawing all reasonable inferences in Plaintiff's favor, his evidence is not enough to demonstrate a genuine dispute of material fact, as it does "no more than demonstrate that [ShotSpotter] cooperated with [RPD's] investigation into" the Immel Street shooting. *Scotto*, 143 F.3d at 114. Although Plaintiff asserts the conversation between ShotSpotter and RPD is "not as innocent as it sounds," ECF No. 143-21 at 16, nothing in the communications between the City Defendants and the ShotSpotter Defendants, "other than [Plaintiff's] unsubstantiated speculation, . . . suggest[s] that anything untoward took place," *id.* at 115; *cf. Dory*, 999 F.2d at 683. Contrary to Plaintiff's insinuations, nothing in these communications could "reasonably lead to the inference that [the City Defendants and ShotSpotter] positively or tacitly came to a mutual understanding to try to accomplish an unlawful plan." *Ivery*, 284 F. Supp. 3d at 439. Accordingly, the ShotSpotter Defendants are entitled summary judgment on Plaintiff's § 1983 conspiracy claim.

### c. Malicious Prosecution (Counts IV and XII)

The ShotSpotter Defendants assert that there is no evidence that they "knowingly and intentionally provided false or fabricated information for the purpose of inducing [the District Attorney] to prosecute Plaintiff." ECF No. 136-1 at 27-28. Plaintiff, on the other hand, asserts

that the genuine dispute as to the number of shots fired during the Immel Street shooting precludes summary judgment. *See* ECF No. 143-21 at 6, 10. The Court agrees with the ShotSpotter Defendants and grants summary judgment on Plaintiff's federal and state malicious prosecution claims.

To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against [him]; (2) termination of the proceeding in [his] favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.*

To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello*, 612 F.3d at 163. In addition to, for example, signing a felony complaint, a defendant may initiate a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014)); *see also Manganiello*, 612 F.3d at 163 ("A jury may permissibly infer that a defendant initiated a prosecution where he "fil[ed] the charges" or "prepar[ed an] alleged false confession and forwarded it to prosecutors."); *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) ("Where a party is responsible for providing false information or manufactured

33

evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution.").

Here, the summary judgment record is devoid of evidence that would permit a reasonable jury to return a verdict for Plaintiff on the issue of fabrication. *See Greene v. City of New York*, No. 08-CV-243, 2017 WL 1030707, at *25 (E.D.N.Y. March 15, 2017) (claim of fabrication grounded in speculation cannot survive summary judgment), *aff'd* 742 F. App'x 532, 534 (2d Cir. 2018) (summary order). Instead, it shows that, following the Immel Street shooting, Wiater contacted ShotSpotter and asked Bresler to "pull the audio and listen to a longer portion for additional shots." ECF No. 143-2 at 4; *see also* ECF No. 143-16 at 7 ¶ 19. Bresler agreed to do so, and Wiater then asked Bresler if he could report back within the next hour, to which Bresler responded that he would "do [his] best" to see what he could find that night. ECF No. 143-2 at 4; ECF No. 143-5 at 12. Bresler also listened to the audio, reclassified the incident from helicopter to gunshots, and updated the number of shots detected from three to four. ECF No. 143-1 at 2-3; *see also* ECF No. 143-16 at 7 ¶ 17. During their conversation, Wiater and Bresler were discussing multiple incidents. Bresler stated he would look into one of the other incidents and asked "How many shots at this location?" before stating that he would look for an incident at 9 Immel Street at approximately 9:09 pm. ECF No. 136-13 at 2. Wiater did not tell Bresler, "and [he] did not otherwise know, how many additional or total shots were involved in the incident." ECF No. 136-13 ¶ 6; *see also* ECF No. 143-16 at 7 ¶ 20 ("Wiater did not say how many shots he thought had been fired and did not answer when ShotSpotter asked him this."). Nor did he know anything about who allegedly fired or in what order any of the alleged shooters had done so. *Id.*

Bresler later informed Wiater by email that the audio search revealed an additional gunshot, which was fired about two seconds before the subsequent four gunshots. ECF No. 136-13 ¶ 10.

He indicated that he was waiting on Clark's approval to send the full audio recording in accordance with ShotSpotter policies. *Id.* ¶¶ 10-11. Clark later approved the request at 6:52 AM on April 2, 2016 and Bresler sent the full audio clip to Wiater about twenty minutes later. *Id.* ¶¶ 11-12. Bresler had no further communication with Wiater, Clark, or anyone else regarding the audio recording associated with the incident. *Id.* ¶ 13.

Plaintiff suggests that Wiater's request for a further audio search is "not as innocent as it sounds" and "could well be interpreted" as a request to "make such shots show up in the record." ECF No. 143-21 at 16. But such conjecture—unsupported by specific facts in the record—is not enough to create a genuine dispute of material fact as to fabrication. *See Greene*, 2017 WL 1030707, at *25 (no material issue of fact for trial where plaintiff relied on "sheer speculation" to support claim); *see also Reyes v. Paul*, No. 21-CV-569, 2023 WL 2306134, at *7 (N.D.N.Y. March 1, 2023) (no question of fact where plaintiff merely relied on conjecture and speculation).

As for the evidence that Plaintiff asserts creates a genuine issue of fact, it largely supports the ShotSpotter Defendants' story. Plaintiff asserts that Wiater told Bresler that a police officer was involved in the shooting and asked him to search for additional gunshots. ECF No. 143-16 at 7 ¶18. Wiater requested a response as soon as possible. *Id.* ¶ 19. And, although Bresler appears to have asked how many shots were fired for at least one of the incidents the two discussed, Wiater never provided that information. *Id.* ¶ 20. Ultimately, Bresler found an additional gunshot in the audio and requested approval from Clark to send the audio to Wiater. *Id.* ¶¶ 21-23. No jury could reasonably conclude from this evidence that Bresler or any other ShotSpotter employee fabricated the evidence of the first gunshot.

Moreover, rather than controverting the facts as Bresler, Wiater, and Clark tell them, Plaintiff agrees, agrees with caveats, or attempts to downplay the statements as "self-serving" or

"conclusory." *See* ECF No. 143-16 ¶¶ 15-29, 32-41, 44-54, 58-59. "There is no law, however, preventing a court from relying on 'self-serving' affidavits—indeed, parties in a litigation routinely submit affidavits on their own behalf whose only purpose is to substantiate the claims alleged." *Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*, 239 F. Supp. 3d 710, 737 (S.D.N.Y. 2017). Bresler, Clark, and Greene have consistently denied altering the audio or otherwise fabricating the evidence of the fifth shot. *See e.g.*, ECF No. 136-10 ¶ 21; ECF No. 136-13 ¶ 14; ECF No. 136-16 ¶ 12. Their statements to that effect cannot be disregarded "merely because they are self-serving," *Dye v. Kopiec*, No. 16-CIV-2952, 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016), especially where, as here, they are unrefuted by any evidence that Plaintiff has submitted, *see Shami v. Nat'l Enter. Sys.*, 914 F. Supp. 2d 353, 358 (E.D.N.Y. 2012).

Plaintiff also raises certain discrepancies in the testimony in this case and his criminal trial, including that Greene testified at the criminal trial that the fifth shot was found two days after the incident and that the shot count was not raised to five until after his analysis. ECF No. 143-16 at 8 ¶ 26. He also points to two non-law-enforcement witnesses who heard only four shots at the time of the Immel Street shooting. *Id.* at 5 ¶ 1. He also notes that there is divergent testimony about the condition of the weapon recovered from the scene of the shooting and whether a casing was in the chamber, stuck in the ejection port, or missing altogether. *Id.* ¶ 5.

None of these discrepancies raises a genuine dispute of material fact as to whether ShotSpotter falsified information or fabricated evidence. To start, Greene's testimony at the criminal trial that the shot count was not raised to five until after his analysis is not inconsistent with Bresler's declaration and deposition testimony. Contrary to Plaintiff's assertion, Greene did not testify that the fifth shot was "found by a search two days after the incident." ECF No. 143-16 at 8 ¶ 26. Instead, he testified that the description of the incident was updated to five shots only

after his analysis.  ECF No. 143-4 at 8 ("It was changed to five only after my analysis").  This is consistent with Bresler's statements that he updated the incident classification to reflect four gunshots, but heard the first gunshot in the longer audio clip and updated the incident notes accordingly.  ECF No. 136-13 ¶¶ 7-8.  Bresler sought Clark's approval to release that audio to RPD.  *Id.* ¶ 11.  Greene, however, prepared the Detailed Forensic Report describing the incident as capturing five gunshot sounds.  ECF No. 136-17 at 2.

The inconsistencies that do exist are not enough to allow Plaintiff's claim to survive summary judgment.  *See Greene*, 2017 WL 1030707 at *25.  Greene testified during Plaintiff's criminal trial that ShotSpotter found the fifth shot after RPD asked him to search for additional shots.  ECF No. 143-4 at 5.  Bresler, on the other hand, has stated that he heard the first gunshot when he listened to the extended audio clip.  ECF No. 136-13 ¶¶ 7-8.  This discrepancy as to who found the first gunshot is not enough to create a genuine dispute as to whether the ShotSpotter Defendants fabricated the evidence of that gunshot.  *See e.g.*, *Bennett v. Vidal*, 267 F. Supp. 3d 487, 498 (S.D.N.Y. 2017) ("But a mere difference in testimony between the defendant, the plaintiff, and the plaintiff's mother of what occurred on the day of the arrest is not sufficient evidence to create a genuine dispute of material fact as to whether [the officer] intentionally falsified information or fabricated evidence."); *Waddlington v. City of N.Y.*, 971 F. Supp. 2d 286, 297 (E.D.N.Y. 2013) ("Plaintiff's mere recitation of inconsistencies in certain officers' testimonies, without more, does not establish liability under section 1983 for providing false information to prosecutors.")

Plaintiff also makes much of the fact that the ShotSpotter Defendants' expert was not able to examine the spool file, arguing that his testimony is therefore insufficient to support summary judgment.  *See* ECF No. 143-21 at 5-7.  However, he has not pointed to any facts supported by

admissible evidence from which a reasonable juror could infer that ShotSpotter altered that spool file in a way that the expert could not identify. While he criticizes ShotSpotter for insisting that its procedures guard against fabrication, he offers no factual support for his assertion that someone could have altered the audio data and avoided detection. Plaintiff notes that the "MD5" tags, which are used to detect corruption, are generated only when an audio file is downloaded, so the original files on the spool do not have such tags. ECF No. 143-16 at 8 ¶¶ 27-28. This may show that alteration is possible, but it does little more. Without evidence from which a reasonable jury could infer that ShotSpotter did in fact alter the audio at this stage, Plaintiff's claim cannot survive summary judgment. *See Reyes*, 2023 WL 2306134, at *6-7.

Finally, Plaintiff's assertion that the dispute as to whether there were four or five gunshots on the night of the Immel Street shooting precludes summary judgment is unpersuasive. Plaintiff presents the testimony of two non-law enforcement witnesses who are adamant that they heard only four shots. *See* ECF No. 143-7 at 3-4; 143-8 at 2; 143-16 at 5 ¶ 1. Plaintiff then asserts that because this testimony "must be taken as accurate," it precludes summary judgment on the issue of fabrication. ECF No. 143-21 at 6. Contrary to Plaintiff's assertion, the dispute as to whether four or five shots were fired is not enough to create a genuine dispute of material fact as to whether the ShotSpotter Defendants fabricated evidence of the first shot. *See Bennett*, 267 F. Supp. 3d at 498. While this may raise an issue as to whether ShotSpotter correctly identified the sound as a gunshot, Plaintiff points to no evidence that this discrepancy reflects a "deliberate falsification of evidence" on the part of the ShotSpotter Defendants. *Greene*, 2017 WL 1030707, at *25; *see also Duna v. City of New York*, No. 17-CIV-5371, 2019 WL 4735354, at *6 (S.D.N.Y. Sept. 27, 2019) (denying summary judgment where plaintiff did not adduce any evidence of intentional fabrication, rather than reasonable error).

38

Because Plaintiff has failed to point to evidence from which a reasonable jury could conclude that the ShotSpotter Defendants forwarded false or fabricated evidence to the prosecution, his malicious prosecution claim against the ShotSpotter Defendants must fail. The ShotSpotter Defendants are therefore entitled to summary judgment on this claim.

### d. Denial of Right to a Fair Trial (Count V)

As with Plaintiff's malicious prosecution claims, the ShotSpotter Defendants argue that the undisputed facts fail to establish falsification. Accordingly, they argue that Plaintiff's fair trial claim likewise cannot survive summary judgment. Plaintiff argues that the dispute as to whether there were four or five shots fired on April 1, 2016 precludes summary judgment. However, the dispute over the number of shots fired is insufficient to raise a genuine issue of fact as to whether the ShotSpotter Defendants fabricated the evidence of the first gunshot. The Court therefore concludes that the ShotSpotter Defendants are entitled to summary judgment on Plaintiff's fair trial claim.

A defendant's right to due process under the Fourteenth Amendment encompasses "the right to have one's case tried based on an accurate evidentiary record that has not been manipulated by the prosecution." *Dufort*, 874 F.3d at 354; *see also Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010) ("The right to a fair trial[] [is] guaranteed to state criminal defendants by the Due Process Clause of the Fourteenth Amendment." (quoting *Cone v. Bell*, 556 U.S. 449, 451 (2009) (alterations in original)). Section 1983 therefore permits suits for violations of the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity." *Willis v. Rochester Police Dep't*, No. 15-CV-6284, 2018 WL 4637378, at *8 (W.D.N.Y. Sept. 27, 2018) (citing *Dufort*, 874 F.3d at 354). "A person is deprived of [his] constitutional right to a fair trial when 'an (1) investigating official (2) fabricates evidence (3) that

is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Folk*, 243 F. Supp. 3d at 374 (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order)). For fair trial claims, liability under § 1983 attaches "for knowingly falsifying evidence even where there simultaneously exists a lawful basis for a deprivation of liberty." *Victory v. Pataki*, 814 F.3d 47, 64 (2d Cir. 2016). Therefore, unlike a malicious prosecution claim, probable cause is not a defense to a fair trial claim. *Jovanovic*, 486 F. App'x at 152.

As explained above, Plaintiff has failed to identify any evidence from which a reasonable jury could conclude that the ShotSpotter Defendants fabricated evidence in his criminal case. He has not pointed to any evidence suggesting that ShotSpotter deliberately altered the audio clip to include the first gunshot or deliberately misidentified that sound as a gunshot, and thereby fabricated evidence that Plaintiff fired at Ferrigno first. *Cf.*, *e.g.*, *Robinson v. City of New York*, No. 15-CV-5850, 2017 WL 241481, at *2 (S.D.N.Y. June 2, 2017) (denying summary judgment where witness signed two declarations recanting statement that he had bought drugs from the plaintiff and testified at his deposition that a police officer promised to release him from custody if he stated that he had purchased drugs from plaintiff); *Harris v. City of New York*, 222 F. Supp. 3d 341, 351-52 (S.D.N.Y. 2016) (denying summary judgment where police officer told a prosecutor that the plaintiff "possessed" a weapon, even though the plaintiff did not have it on his person, and was not wearing and denied owning the jacket in which the weapon was found). And, while he has pointed to inconsistencies in witness testimony that suggest the first sound was not in fact a gunshot, evidence of inconsistency is not, without more, evidence of fabrication. *See Bennett*, 267 F. Supp. 3d at 498.

40

In this case, all that Plaintiff has adduced, construing the evidence in his favor, is that ShotSpotter was mistaken in in identifying the first sound as a gunshot. *See id.* There is no evidence that ShotSpotter deliberately misclassified that sound, and thereby fabricated false evidence of gunfire for the prosecution. *Id.* Accordingly, the ShotSpotter Defendants are entitled to summary judgment on Plaintiff's fair trial claim.

## CONCLUSION

For the foregoing reasons, the City Defendants' Motion for Partial Summary Judgment, ECF No. 132, is GRANTED IN PART and DENIED IN PART. Plaintiff's false arrest claim (Count I), excessive force claim (Count II), malicious prosecution claims (Counts IV and XII), fair trial claim (Count V), failure to intervene claim (Count VII), battery claim (Count X), and assault claim (Count XI) may proceed.

The ShotSpotter Defendants' Motion for Summary Judgment, ECF No. 136, is GRANTED in its entirety. The Clerk of Court is directed to terminate ShotSpotter, Inc., SST, Inc., and Paul C. Greene as defendants.

The Clerk of Court is further directed to terminate John Does 1-20 and John Does 21-30 as defendants.

IT IS SO ORDERED.

Dated: September 13, 2023
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York