```
(1)                    MITCHELL
(2)   other officers?
(3)        A.      With him not being controlled
(4)   and primarily having one cuff on, there is
(5)   a danger that is discussed all the time
(6)   that with one -- a person with one cuff on,
(7)   that could be a weapon.  He's, he's, he's
(8)   actively moving away from us.  So I
(9)   don't -- there's, there's a -- there is a
(10)  level of danger.  He's not under control.
(11)  He's not searched and he's actively pulling
(12)  away while we're trying to handcuff him.
(13)  So that is the threat.
(14)       Q.      Okay.
(15)            The question is what level of
(16)  threat did that present?
(17)            MR. CAMPOLIETO:  Objection.
(18)       A.      Are you -- what level -- I
(19)  don't -- the level on the matrix or what do
(20)  you -- I don't know what level you mean,
(21)  sir.
(22)       Q.      Sure.
(23)            At that point did you consider
(24)  David to be posing a serious threat to you
(25)  and the other officers?
```

(1)                    MITCHELL

(2)          MR. CAMPOLIETO:   Objection.

(3)      A.     A person that is trying -- that

(4)   we are attempting to handcuff that is not

(5)   handcuffed and is not searched is a threat,

(6)   yes.

(7)      Q.     Okay.

(8)             A threat of potential physical

(9)   injury to you and the other officers?  Is

(10)  that what you mean?

(11)     A.     Yes.  It, it's a dangerous job

(12)  and he has not been searched and we don't

(13)  have the ability to see -- if he's not

(14)  searched, handcuffed and in control, we

(15)  don't know what he could have on him.  So,

(16)  yes, it is a threat.  When he's being

(17)  handcuffed and he's actively taking his

(18)  hand away from us, that is a threat.

(19)          MR. SHIELDS:  All right.  Let

(20)     me just -- John, do you need to take

(21)     a break or anything?

(22)          MR. CAMPOLIETO:  No.  I'm good.

(23)          MR. SHIELDS:  Okay.  All right.

(24)     Is there anybody else in the room

(25)     with you guys?

MITCHELL

(1)
(2)      MR. CAMPOLIETO:  With us?
(3)      MR. SHIELDS:  Yeah.
(4)      MR. CAMPOLIETO:  No.
(5)      MR. SHIELDS:  All right.  Just
(6)   checking.  All right.
(7) BY MR. SHIELDS
(8)      Q.    So after this point in the
(9) video -- well, let's just go ahead and --
(10) well, let me just ask you.  After this
(11) point in the video is when Officer Kester
(12) fell on his back onto the ground, correct?
(13)      **A.    Yes.**
(14)      Q.    Okay.
(15)           And Mr. Vann was taken to the
(16) ground and fell on top of Officer Kester,
(17) correct?
(18)      **A.    Yeah.  Myself, him, we all**
(19) **three of us went to the ground.**
(20)      Q.    So you and Vann and Kester all
(21) went to the ground and Vann and you landed
(22) on top of Officer Kester, correct?
(23)      **A.    I don't -- I don't recall if I**
(24) **landed right on top of Officer Kester.  I**
(25) **don't know.**

```
(1)                    MITCHELL
(2)        Q.    Okay.
(3)              You landed on top of Mr. Vann?
(4)        A.    I was on Mr. Vann, yes.
(5)        Q.    Did Drake also go to the
(6)    ground, or no?
(7)        A.    I don't recall.
(8)        Q.    Okay.
(9)              And the reason that you fell on
(10)   top of Mr. Vann is because you were holding
(11)   onto his arms and his handcuffs?
(12)       A.    I was attempting to gain
(13)   control, yes.  So I was holding onto his
(14)   arm, yes.
(15)       Q.    Okay.  All right.
(16)             So we're paused here at
(17)   11:40:33.  I want to hit "Play" and I'm
(18)   going to play for the next few seconds
(19)   until about 11:40:45.  So I'm going to go
(20)   ahead and hit "Play."
(21)             (Whereupon, the video was
(22)        played.)
(23)       Q.    Okay.  So this is where we had
(24)   seen everyone tumble to the ground.  And
(25)   can you tell me in this picture, you see
```

(1)                    MITCHELL

(2)   one officer that appears to be standing.

(3)   Is that Officer Drake?

(4)        A.     Yes, it is.

(5)        Q.     Okay.

(6)               And then you'd be behind

(7)   Officer Drake, sort of?

(8)        A.     Yes.

(9)        Q.     Okay.

(10)              And then on the left side, you

(11)  see Officer Kester; is that right?

(12)       A.     I honestly can't tell who that

(13)  is.

(14)       Q.     Okay.

(15)              And then you see some black

(16)  things over here to the right side of

(17)  Officer Drake.  Is that --

(18)       A.     Yes.

(19)       Q.     Those are David's feet or are

(20)  those your feet; can you tell?

(21)       A.     I can't tell.

(22)       Q.     Okay.

(23)              And So y'all fall to the ground

(24)  and it's at this point that Officer Kester

(25)  tells you that his leg is hurt?

```
(1)                    MITCHELL
(2)        A.      He just starts screaming, so,
(3)   in pain.
(4)        Q.      Okay.  All right.
(5)              I'm going to fast- -- well, I'm
(6)   not going to fast-forward.  I'm going to
(7)   hit "Play" and I'm going to pause it at
(8)   about 11:41:09.
(9)              (Whereupon, the video was
(10)        played.)
(11)        Q.      Okay.  Well, I'm going to pause
(12)   it here first at 11:40:52.
(13)              And it looks like Drake moved
(14)   to the side a little bit.  Can you see
(15)   yourself holding Mr. Vann down?  Is that
(16)   what you can see in the video there?
(17)        A.      I see myself to the side of
(18)   him, yes.
(19)        Q.      Okay.
(20)              And you've got, like, one arm
(21)   holding down on his back area.  Is that
(22)   what that is?
(23)        A.      I, I can't see from this.
(24)        Q.      Okay.
(25)              Can you tell if Mr. Vann is
```

(1)                    MITCHELL

(2)    laying face down on the ground there?

(3)         **A.      He appears to be.**

(4)         Q.      Okay.

(5)              So he's face down and you're

(6)    kind of to the side and it looks like maybe

(7)    holding his body down to the ground at that

(8)    point?

(9)         **A.      It's hard to tell paused.   I**

(10)   **really can't --**

(11)        Q.      Okay.

(12)        **A.      I can see that he's laying**

(13)   **down, but I just can't see beyond that.**

(14)        Q.      Okay.  All right.

(15)             I'm going to hit "Play" again

(16)   and then I'm going to go forward and pause

(17)   again at about 11 -- what did I say --

(18)   40:45.  Is that what I said?  I meant

(19)   11:41:09.  Right now we're paused at

(20)   11:40:52.  Okay.

(21)             (Whereupon, the video was

(22)        played.)

(23)        Q.      All right.  I'm just going to

(24)   pause at 11:41:05 first.

(25)             Did you see yourself kind of

(1)                    MITCHELL

(2)    like putting your arms or your hands around

(3)    his, like, waist and leg area?  Were you

(4)    able to see that?

(5)         A.    No.

(6)         Q.    No?  Okay.

(7)               And you're testimony before was

(8)    that you were unable to conduct any kind of

(9)    search of the back waistband area at this

(10)   point?

(11)        A.    We had just went to the ground.

(12)   I had Kester screaming as well as you can

(13)   see there's three people behind me.  So I

(14)   don't -- I'm trying to gather surroundings,

(15)   everything like that.  So I had not

(16)   searched him at this point.

(17)        Q.    Okay.

(18)              And you were unable to tell

(19)   whether his back waist area, which was, if

(20)   he's laying on his stomach would have been

(21)   exposed to you at that point, right?

(22)        A.    It would not have been exposed.

(23)   He had a jacket on.

(24)        Q.    Okay.

(25)              So you were unable to even just

(1)                    MITCHELL

(2)    run your hand across his waistband to see

(3)    if there was anything there?

(4)                    MR. CAMPOLIETO:  Objection.

(5)        A.      I did not, no.  I did not run

(6)    my hand across his waistband.  At this

(7)    point he was not searched.

(8)        Q.      Okay.  All right.

(9)                    Even if you don't conduct a

(10)    full-blown search, if somebody has got a

(11)    gun in their waistband, is that something

(12)    that you'd be able to generally detect the

(13)    bulge of the gun in their waistband?

(14)        A.      No.  Not if there's a jacket or

(15)    clothing covering it, no.

(16)        Q.      Okay.  All right.

(17)                    So I'm going to hit "Play" and

(18)    then I'm going to pause.  Actually, I'm

(19)    going to slow it down to about 50 percent

(20)    again and then I'm going to hit "Play" and

(21)    I'm going to hit "Pause" at about 11:41:09.

(22)    Okay?  So we're paused --

(23)        A.      Okay.

(24)        Q.      -- at 11:41:05 and I'm going to

(25)    hit "Play" now.

(1)                    MITCHELL

(2)              (Whereupon, the video was

(3)         played.)

(4)         Q.    Okay.  So I'm going to hit

(5)    "Pause" here at 11:41:08.

(6)              So were you able to see

(7)    yourself employ the strike that we spoke

(8)    about earlier?

(9)         **A.    What I did see during that was**

(10)   **Mr. Vann reach for his waistband while on**

(11)   **the ground and not searched yet.  And then,**

(12)   **yes, there was a distractionary jab**

(13)   **applied, correct.**

(14)        Q.    Okay.

(15)             So you were able to see

(16)   Mr. Vann reach for his waistband, correct?

(17)        **A.    Yes, I was.**

(18)        Q.    And then in response you

(19)   applied a distractionary jab which we

(20)   agreed earlier was just a punch to the back

(21)   of his shoulder area?

(22)        **A.    We agree that it was a jab,**

(23)   **distractionary jab to his shoulder area.**

(24)        Q.    Okay.  All right.

(25)             And was that a proportional

(1)                   MITCHELL

(2)    response to somebody that was handcuffed?

(3)         A.    I had not searched him yet.  He

(4)    reached for an area where people -- I

(5)    believed at this point in time he had a

(6)    weapon on him.  I did not search him yet.

(7)    According to my training and time on the

(8)    road.  That is where people do keep weapons

(9)    and I did deploy a distractionary jab and

(10)   tell him to stop reaching for his waistband

(11)   at that time.

(12)        Q.    Okay.

(13)             So the only reason that you

(14)   punched him is because he allegedly reached

(15)   for his waistband, correct?

(16)            MR. CAMPOLIETO:  Objection.

(17)        A.    The reason I applied a

(18)   distractionary jab was because he did reach

(19)   for his waistband.

(20)        Q.    So if he hadn't reached for his

(21)   waistband, then you wouldn't have applied a

(22)   punch or a distractionary jab at this

(23)   point?

(24)        A.    That is correct.  I would not

(25)   have.

(1)                    MITCHELL

(2)        Q.    And that was the very first

(3)   time throughout your entire interaction

(4)   that Mr. Vann had allegedly reached for his

(5)   waistband, correct?

(6)        A.    **That was the first time he did,**

(7)   **yes.**

(8)        Q.    Okay.  Okay.  One second.  All

(9)   right.

(10)        So I'm going to hit "Play," go

(11)   back to regular speed and pause at about

(12)   11:41:30.  Okay.  So we're paused at

(13)   11:41:08 and I'm going to hit "Play."

(14)        **MR. CAMPOLIETO:  Elliot, did**

(15)        **somebody else join the -- I just**

(16)        **noticed there's somebody else in**

(17)        **here.**

(18)        **MR. SHIELDS:  I don't know, but**

(19)        **so -- it says, "Christopher's**

(20)        **iPhone," so I'm assuming that is my**

(21)        **expert, Chris Magnus who informed me**

(22)        **that he might be joining at some**

(23)        **point.  So we can add for the record**

(24)        **that the plaintiff's force expert and**

(25)        **minel (phonetic) expert Chris Magnus**

[Page 289]
August 24, 2023

(1)                    **MITCHELL**

(2)         **logged into the Zoom video as well.**

(3)         Q.    Okay.  I was just about to hit

(4)    "Play."  We're paused at 11:41:12 and --

(5)              **MR. CAMPOLIETO:  He's on**

(6)         **watching.  Not that it makes a**

(7)         **difference.**

(8)         Q.    All right.

(9)              So we were paused at 11:41:12

(10)   and I was about to hit "Play" and play the

(11)   video to 11:41:30.  Okay?  And I'm hitting

(12)   "Play" now.

(13)              (Whereupon, the video was

(14)         played.)

(15)         Q.    All right.  It looked like --

(16)   so I paused right now at 11:41:17.  It

(17)   looked like you kind of like leaned in and

(18)   said something to Mr. Vann.  Do you

(19)   remember what you said to him?

(20)         A.    **"Stop reaching for your**

(21)   **waistband" or "Don't reach for your**

(22)   **waistband."  Something along those lines.**

(23)         Q.    Okay.

(24)              Is that the only thing that you

(25)   said to him right there?

(1)                    MITCHELL

(2)        **A.      That's what I said to him, yes.**

(3)        Q.      Okay.  All right.

(4)                I'm going to go ahead and hit

(5)    plan again from 11:41:17.

(6)                (Whereupon, the video was

(7)          played.)

(8)        Q.      Okay.  So I said I was going to

(9)    pause at 11:41:30 but I paused at 11:41:33.

(10)                So at this point you had

(11)   grabbed Mr. Vann's arms or handcuffed area

(12)   and brought him up to a standing position?

(13)       **A.      I brought him -- yes.**

(14)       Q.      Okay.

(15)                And at that point he was fully

(16)   handcuffed behind his back, correct?

(17)       **A.      He had -- the cuffs had not**

(18)   **been double-locked but the -- that -- the**

(19)   **cuff that I described earlier as not being**

(20)   **on properly had been adjusted to be put on**

(21)   **properly but was not double-locked yet.**

(22)       Q.      So at this point right now when

(23)   you're standing him up he was fully

(24)   properly handcuffed just not double-locked.

(25)   Is that what you're saying?

(1)                    MITCHELL

(2)        **A.**        **Correct.**

(3)        Q.        Okay.  All right.

(4)                    So now you're about to walk him

(5)        over to the back quarter panel of the car,

(6)        correct?

(7)        **A.**        **Yes.**

(8)        Q.        All right.

(9)                    So I am going to go ahead and

(10)       hit "Play" and then I'm going to pause it

(11)       when you get over to the car.  And it's

(12)       going to switch videos back to Camera 4.

(13)       All right.  I'm going to go ahead and hit

(14)       "Play" here at 11:41:33.

(15)                   (Whereupon, the video was

(16)            played.)

(17)                   **MR. SHIELDS:  It will switch in**

(18)            **a second.  This was the compilation**

(19)            **made by the D.A., not me.  So I**

(20)            **wouldn't have left this all here,**

(21)            **but...**

(22)                   **MR. CAMPOLIETO:  Showing an**

(23)            **officer on the ground injured.**

(24)            **THE WITNESS:  Yeah.**

(25)            **MR. SHIELDS:  There we go.  All**

(1)             MITCHELL

(2)        right.  So just for the record after

(3)        it was focused on the Camera 3 angle

(4)        for a while, then it switched back to

(5)        the Camera 4 angle and it went back

(6)        to the timestamp at about 11:41 and

(7)        36 seconds.

(8)        Q.     And so that's -- at this angle,

(9)   Officer Mitchell, that shows you escorting

(10)  Mr. Vann over towards your police vehicle;

(11)  is that right?

(12)       A.     That's correct.

(13)       Q.     And the vehicle that we see in

(14)  the foreground of the screen right behind

(15)  the trash can, that's your vehicle,

(16)  correct?

(17)       A.     Yes, it is.

(18)       Q.     All right.

(19)            So I'm going to go ahead and

(20)  hit "Play" now in this camera angle at

(21)  Camera 4 at 11:41:36.

(22)            (Whereupon, the video was

(23)       played.)

(24)       Q.     Okay.  So now I paused at

(25)  11:41:41.

(1)                    MITCHELL

(2)          And so can you describe to us

(3)  what happened between 11:41:36 and

(4)  11:41:41.

(5)      A.     We were walking to the car.  He

(6)  had been handcuffed.  I would have liked to

(7)  have double-locked and conducted a search.

(8)  When we got to the car, you can see that

(9)  his body weight pushes off of the car and

(10) then when we move to this part where it's

(11) paused, he's walk -- he's now moving

(12) backwards away from me.

(13)     Q.     Okay.

(14)          So your testimony is that what

(15) the video showed was Mr. Vann bumping off

(16) the car -- that's what you described as

(17) bumping off the car earlier?

(18)     A.     Yeah, when he bumps the car and

(19) moves to the left.  He doesn't stay where I

(20) can conduct that search.

(21)     Q.     Okay.

(22)          So what you're saying is that

(23) you were forced to grab him here around the

(24) neck because of Mr. Vann's actions.  That's

(25) what you're saying?

(1)                    MITCHELL

(2)        **A.     I'm not grabbing him around the**

(3)   **neck, but because of Mr. Vann's actions, I**

(4)   **am, at this point, attempting to perform a**

(5)   **hooking technique.**

(6)        Q.    Okay.

(7)             So I want to just rewind that

(8)   part again and maybe play it in slo-mo so

(9)   that we can get a better understanding of

(10)  what happened together.  So I'm going to

(11)  hit rewind.  I'm going to pause it right

(12)  here at 11:41 and 38 seconds.

(13)             So at this point you hadn't --

(14)  Mr. Vann's body hadn't made came into

(15)  contact with the car yet, right?

(16)       **A.     At this point, no.**

(17)       Q.    So I slowed it down to half

(18)  speed and let's take a look at what happens

(19)  right here when his body goes up against

(20)  the car.  Okay?  All right.  So I am

(21)  hitting "Play" at 11:41:38 at half speed.

(22)             (Whereupon, the video was

(23)       played.)

(24)       Q.    Okay.  So right there at

(25)  11:41:40, what do we see?  We see

(1)                    MITCHELL

(2)     Mr. Vann -- you put Mr. Vann against the

(3)     car and then it looks like you both take a

(4)     step back right there?

(5)             MR. CAMPOLIETO:   Objection.

(6)         A.     No.  I put Mr. Vann against the

(7)     car and he moves off the car and to the

(8)     left which forces me to then have to follow

(9)     him, because at that point he is in custody

(10)    and not searched.

(11)        Q.     Okay.

(12)            So is that the moment right

(13)    there when you describe Mr. Vann bumping

(14)    off the car?

(15)        A.     He uses his body weight to move

(16)    off the car and to the left.  So bumping or

(17)    moving body weight, yes.

(18)        Q.     Okay.  Yeah.  I was just trying

(19)    to be on the same page.

(20)        A.     Yeah.  No.  That's the -- yeah,

(21)    that's the spot in the video, yes.

(22)        Q.     Okay.  All right.  I'm sorry.

(23)    Okay.  I meant to hit -- I meant to say I

(24)    was hitting "Play" before I hit "Play"

(25)    right there, but we're at 11:41:40.  I'm

(1)                    MITCHELL

(2)    going to go ahead and hit "Play" again.

(3)    We're still at half speed.

(4)                    (Whereupon, the video was

(5)        played.)

(6)        Q.    Okay.  All right.  So I hit

(7)    "Pause" here at 11:41:41.

(8)                    And my question is, it looks

(9)    like your body went over to the left and

(10)   then you're grabbing his sweatshirt; is

(11)   that right?

(12)       **A.    My body went to the left where**

(13)   **Mr. Vann went originally and as you can see**

(14)   **here stopped Mr. Vann's body weight**

(15)   **including his leg placement is moving away**

(16)   **from me.  So I am attempting to regain**

(17)   **control him of him.**

(18)       Q.    Okay.

(19)                   Were you saying anything to

(20)   Mr. Vann throughout this interaction?

(21)       **A.    At this point, I don't recall**

(22)   **what I said.**

(23)       Q.    Okay.

(24)                   You didn't say, like, "Stop

(25)   pushing away," for example?

(1)                    MITCHELL

(2)            MR. CAMPOLIETO:  Objection.  Go

(3)      ahead.

(4)      A.    I'm not at the hooking -- I'm

(5)  attempting to do a hooking technique.  He's

(6)  not -- he's moving away from me at this

(7)  point.  So I have not said anything yet.

(8)      Q.    Okay.

(9)            And at this point you felt like

(10)  a hooking technique was a proportional

(11)  application of force?

(12)            MR. CAMPOLIETO:  Objection.

(13)      A.    At this point I made the

(14)  determination to use a hooking technique.

(15)  He actively pulled away from me.  I still

(16)  did not have control of him and I still had

(17)  not searched him yet.

(18)      Q.    Okay.

(19)            So the answer to my question is

(20)  yes, you had determined at this point that

(21)  an application of a hooking technique was a

(22)  proportional response?

(23)            MR. CAMPOLIETO:  Objection.

(24)      A.    I made the determination that a

(25)  hooking technique was the safest for myself

[Page 298]
August 24, 2023

(1)                    **MITCHELL**

(2)    **at this time.**

(3)        Q.    Okay.

(4)            Now, my question -- I just want

(5)    you to answer my question, please -- is,

(6)    you had made the determination that

(7)    application of a hooking technique was a

(8)    proportional response; yes or no?

(9)                **MR. CAMPOLIETO:   Objection.**

(10)       **A.    Yes.**

(11)       Q.    And you had made the

(12)   determination, yes or no, that application

(13)   of a hooking technique was an appropriate

(14)   response?

(15)       **A.    Yes.**

(16)       Q.    And application of a hooking

(17)   technique in this circumstance was proper

(18)   pursuant to your RPD policy and training;

(19)   yes or no?

(20)       **A.    Yes.**

(21)       Q.    Okay.  All right.

(22)            So we're paused at 11:41:41 and

(23)   I'm going to hit "Play" and pause again in

(24)   a few seconds here.  Okay?  And we're still

(25)   at half speed.

[Page 299]
August 24, 2023

(1)                    MITCHELL

(2)              (Whereupon, the video was

(3)          played.)

(4)     Q.     Okay.  So I paused at 11:41:45.

(5)              And my first question is, at

(6)   the beginning of the clip that we just

(7)   played between 11:41:41 and 11:41:45 is the

(8)   beginning of the clip there where it shows

(9)   where you tried to do the hooking technique

(10)  to take him to the ground but you were

(11)  unsuccessful?

(12)    **A.     Correct.**

(13)    Q.     Okay.

(14)             And then you turn Mr. Vann

(15)  around and you applied what you described

(16)  earlier as a distractionary jab?

(17)    **A.     Mr. Vann turned around and was**

(18)  **still moving away from me and then apployed**

(19)  **(sic) or deployed a distractionary jab,**

(20)  **yes.**

(21)    Q.     Okay.

(22)             And is that the distractionary

(23)  jab that you demonstrated for us on the

(24)  video earlier?

(25)    **A.     Yes.**

[Page 300]
August 24, 2023

(1)                    MITCHELL

(2)        Q.    Okay.

(3)             And so your testimony is that

(4)    the distractionary jab that you

(5)    demonstrated for us earlier was the same

(6)    technique that you can see being deployed

(7)    in the video here right before we paused at

(8)    11:41:45?

(9)        **A.    The jab here is me standing**

(10)   **with nobody here.  That is moving.  So I --**

(11)   **it's hard to replicate that.  Is it the**

(12)   **same movement and technique?  Yes.  It**

(13)   **doesn't look the same but, yes, it is the**

(14)   **same technique.**

(15)       Q.    Okay.

(16)            And, you know, talking about --

(17)   what I'm, what I'm trying to say is there's

(18)   different types of punches that you're

(19)   taught in defensive tactics, right?

(20)       **A.    Yes.**

(21)       Q.    One of them is a distractionary

(22)   jab, correct?

(23)       **A.    Yes.**

(24)       Q.    And that would be basically a

(25)   straight punch?

(1)                    MITCHELL
(2)          And is that the distractionary
(3)     jab that you described earlier that was
(4)     just depicted on the video there?
(5)          **A.    I, I don't recall.**
(6)          Q.    Okay.
(7)          Did you see yourself strike
(8)     Mr. Vann in between when we were paused at
(9)     11:42:07 and where we are paused now at
(10)    11:42 --
(11)         **A.    I put, I put my hand in his**
(12)    **back to control him and tell him to stop**
(13)    **moving.**
(14)         Q.    So there was some application
(15)    of force by your hand in his back?
(16)         **A.    Yes.**
(17)         Q.    And was that what you described
(18)    earlier as a response to Mr. Vann reaching
(19)    for his waistband?
(20)         **A.    I don't recall if it's the -- I**
(21)    **don't recall what part of the video.**
(22)         Q.    Okay.
(23)         So what we saw between 11:47 --
(24)    11:42:07 and 11:42:08 was you flipped him
(25)    onto his stomach and then you either struck

(1)                    MITCHELL

(2)   him or put your hand on his back.  Is that

(3)   what we saw?

(4)        **A.    Yes.  I didn't -- that was not**

(5)   **a strike.  I put my hand on his back to**

(6)   **control him.  I came down on his back and I**

(7)   **had my hand across his, like, shoulder back**

(8)   **area right now.  And I'm telling him again**

(9)   **not to move.**

(10)        Q.    Okay.

(11)              So you flipped him over onto

(12)   his stomach and then you told him not to

(13)   move?

(14)        **A.    Yes.**

(15)        Q.    Okay.

(16)              At that point, had he been

(17)   struggling with you on the ground?

(18)        **A.    He had just struggled with me**

(19)   **for 20 seconds.  We haven't searched him**

(20)   **yet.  At this point, too, I'm -- at this --**

(21)   **I don't know how long exactly this has been**

(22)   **going on, but I'm, I'm getting tired and**

(23)   **exhausted.  It's been going on for quite**

(24)   **some time.  So I am telling him to stop**

(25)   **moving.  He still has not been searched at**

```
                    MITCHELL
(2)  this point.
(3)       Q.    Okay.
(4)             And at this point in your
(5)  career back in 2015, did you exercise
(6)  regularly?
(7)       A.    Here and there, yeah.
(8)       Q.    Were there ongoing physical
(9)  fitness requirements for the Police
(10) Department?
(11)      A.    No.
(12)      Q.    Okay.
(13)            What kind of workouts would you
(14) do back in 2015?
(15)      A.    I ran and lifted weights but I
(16) mean, I was never serious about it, so.
(17)      Q.    Okay.
(18)            Would you workout at a, at a
(19) gym or something else?
(20)      A.    I, I -- I don't recall.  I
(21) mean, in 2015, I don't know what I was
(22) doing.  I worked out from time to time
(23) throughout my whole career.
(24)      Q.    Okay.
(25)            And what was --
```

[Page 313]
August 24, 2023

(1)                        MITCHELL

(2)        **A.      I mean, and I'm exhausted here,**

(3) **so.**

(4)        Q.      Okay.

(5)                What's the fastest you ever ran

(6) a mile?

(7)        **A.      The fastest I ever ran a mile?**

(8)                MR. CAMPOLIETO:   If you know.

(9)        **A.      When I was in seventh grade.**

(10) **It was 5:20.**

(11)        Q.      Pretty impressive.

(12)        **A.   Thank you.**

(13)        Q.      How about after you became a

(14) police officer, what's the fastest that you

(15) ever ran a mile?

(16)        **A.      I don't think I ever ran a mile**

(17) **again.**

(18)        Q.      Okay.

(19)                At the academy when you ran

(20) your mile and a half for your physical

(21) fitness test, do you remember what time you

(22) completed that mile and a half run in?

(23)        **A.      It was something nine, but I**

(24) **don't remember.**

(25)        Q.      Okay.

(1)                    MITCHELL

(2)          And what's the maximum amount

(3)    that you ever bench pressed?

(4)          **A.    I don't know.**

(5)          Q.    Could you ever do two plates,

(6)    put up 225?

(7)          **A.    Yeah.**

(8)          Q.    Okay.

(9)          250?

(10)         **A.    No.**

(11)         Q.    Okay.

(12)         So somewhere between 225 and

(13)    250?

(14)         **A.    Correct.**

(15)         Q.    Could you rep out 225 or was

(16)    that, like, your max?

(17)         **A.    I could rep it out.  This was**

(18)    **before I was a police officer in college.**

(19)         Q.    Okay.

(20)         I mean, you don't recall that

(21)    strength, right?  Like, you, you maintain

(22)    some of that strength through your time as

(23)    a police officer?

(24)         **A.    Yeah.  In my entire officer and**

(25)    **in my time working out, I never had a two**

(1)                    MITCHELL

(2)    to three-minute physical allocation that

(3)    went on for this long.  So that's -- I

(4)    didn't train for two to three-minute

(5)    allocations like this.  So this was

(6)    exhausting.

(7)         Q.    Okay.

(8)              Did you ever in, like,

(9)    defensive tactics or on your own have any

(10)   kind of martial arts training?

(11)        A.    No.

(12)        Q.    In defensive tactics, you don't

(13)   do any kind of sparring for several minutes

(14)   at a time?

(15)        A.    No.

(16)        Q.    Interesting.

(17)              Do you think that's something

(18)   that should be added to the defensive

(19)   tactics curriculum?

(20)              MR. CAMPOLIETO:  Objection.

(21)        A.    I, I -- no, I don't.  I'm not

(22)   really involved in that anymore, so no.

(23)   There are role plays and different things

(24)   like that but they don't -- this is a very

(25)   long exhausting altercation.

[Page 316]
August 24, 2023

(1)                          **MITCHELL**

(2)        Q.    Okay.  All right.  Okay.

(3)              So I'm going to go ahead and

(4)    hit "Play" here at 11:42:08 and then I'll

(5)    pause it again in a few seconds at about

(6)    11:42:16.

(7)              (Whereupon, the video was

(8)         played.)

(9)        Q.    Okay.  So I paused it at

(10)   11:42:18.

(11)             Is what we saw depicted between

(12)   11:42:08 and 11:42:18, that's where you

(13)   pepper sprayed Mr. Vann?

(14)       **A.    Where I attempted to, yes.**

(15)       Q.    Okay.

(16)             And your testimony earlier is

(17)   that that attempted to pepper spray was

(18)   ineffective?

(19)       **A.    It was not effective to the**

(20)   **degree it should have been.  It was hissing**

(21)   **and it didn't come out, it came out**

(22)   **maybe -- it just didn't come out the way it**

(23)   **was supposed to.**

(24)       Q.    Okay.

(25)             So it came out a little bit?

(1)                    MITCHELL

(2)        **A.    Yeah.   There was some that came**

(3)   **out.   He was also moving around, so it was**

(4)   **hard to apply it, so -- but it did not come**

(5)   **out fully.**

(6)        Q.    Okay.

(7)             And can you tell us the

(8)   distance that you attempted to deploy the

(9)   pepper spray from Mr. Vann's face?

(10)       **A.    I don't know.   It was -- I**

(11)  **don't know the exact distance.**

(12)       Q.    Okay.

(13)            Was it within 6 inches?

(14)       **A.    No.   It was a foot to two feet.**

(15)       Q.    Okay.

(16)            Was it -- I mean a foot to

(17)  two feet is a big gap.   Can you tell me

(18)  anything closer than that?   Was it closer

(19)  to one foot or closer to two feet?

(20)       **A.    I don't know.   He's still on**

(21)  **the ground; he's still moving around.   I,**

(22)  **I -- it could have varied the whole entire**

(23)  **time.**

(24)       Q.    Okay.

(25)            So somewhere between one foot

[Page 318]
August 24, 2023

(1)                    MITCHELL

(2)    and two feet?

(3)         **A.        Correct.**

(4)         Q.        Okay.  All right.

(5)              I'm going to go ahead and --

(6)    well, my question is, why did you decide to

(7)    pepper spray Mr. Vann at this point?

(8)         **A.        At this point there -- the, I**

(9)    **still had to search him.  We were still**

(10)   **not -- he was still not searched.  We used**

(11)   **other tactics that had not worked and this**

(12)   **was something that I went to.**

(13)        Q.        Okay.

(14)             To get him to stop moving

(15)   around basically?

(16)        **A.        To stop --**

(17)             **MR. CAMPOLIETO:  Objection.**

(18)        **A.        To stop moving around and to do**

(19)   **the search.**

(20)        Q.        Okay.

(21)             So if you hadn't deployed the

(22)   pepper spray, you don't think you would

(23)   have been able to effectively search him?

(24)        **A.        Up until this point I had not**

(25)   **been able to search him.  So, no.**

(1)                    **MITCHELL**

(2)        Q.    Okay.

(3)              And you're taught on how to use

(4)    tactics like, what are they called, like a

(5)    knee across the back in order to search

(6)    him?  I forget what that's called.

(7)        **A.    Three-point landing.**

(8)        Q.    Okay.

(9)              So you didn't attempt to do a

(10)   three-point landing and search him before

(11)   you deploying the pepper spray, correct?

(12)       **A.    I hadn't got to a three-point**

(13)   **landing at that point in time.**

(14)       Q.    Okay.

(15)             So the answer is no, you did

(16)   not attempt to do a three-point landing

(17)   prior to pepper spraying Mr. Vann, correct?

(18)       **A.    Correct.**

(19)       Q.    Did you attempt do any other

(20)   ground holding techniques to search

(21)   Mr. Vann before you deployed the pepper

(22)   sprayed?

(23)             **MR. CAMPOLIETO:  Objection.**

(24)       **A.    At this point, no.**

(25)       Q.    Okay.  All right.  I'm going to

```
(1)                      MITCHELL
(2)    go ahead and hit "Play" and I'm going to
(3)    play it for a little bit until the next
(4)    officers show up which I believe is about
(5)    11:42:45.  So we're paused at 11:42:18.
(6)    I'm going to go ahead and hit "Play."
(7)                 (Whereupon, the video was
(8)         played.)
(9)         Q.    Okay.  So I'm going to pause
(10)   11:42:22.
(11)                Is what we saw between 11:42:18
(12)   and 11:42:22, is that a three-point
(13)   landing?
(14)        A.    That is a three-point landing,
(15)   yes.
(16)        Q.    All right.
(17)                So I'm going to go ahead and
(18)   hit "Play" again now at 11:42:22.
(19)                (Whereupon, the video was
(20)         played.)
(21)        Q.    Now, as we're looking at this
(22)   right now, 11:42:25, -26, at this point how
(23)   come you're not searching Mr. Vann?
(24)        A.    At this point I have two
(25)   officers that are down injured.  I am
```

(1)                    **MITCHELL**
(2)    **trying to keep his hand away from his**
(3)    **waistband and I know that I have other**
(4)    **officers coming that will help me with the**
(5)    **search and I am -- it's been a two minute**
(6)    **physical altercation.  So, at this point, I**
(7)    **know back up is coming and I'm waiting and**
(8)    **keeping his hands, the best I can, away**
(9)    **from his waistband and monitoring the other**
(10)   **two officers that are injured.**
(11)        Q.    Okay.  So I'm just going to
(12)   pause here at 11:42:43.
(13)            So other officers aren't here
(14)   yet.  It looks like you got off of your
(15)   three-point landing and it looks like
(16)   you're starting to push Mr. Vann's body
(17)   over; is that right?
(18)        **A.    Yes.**
(19)        Q.    And why did do you that?
(20)        **A.    He reached for his waistband**
(21)   **and grabbed my -- and -- it felt like he**
(22)   **grabbed my leg.  He touched my leg but he**
(23)   **definitely reached for his waistband again.**
(24)        Q.    Okay.
(25)            So you got off of him because

```
(1)                    MITCHELL
(2)   he allegedly reached for his waistband
(3)   again?
(4)        A.      Yes.
(5)        Q.      Okay.  All right.
(6)                So 11:42:43.  So I'm going to
(7)   hit "Play" again.
(8)                (Whereupon, the video was
(9)          played.)
(10)       Q.      Okay.  And I'm going to pause
(11)  here at 11:42:45.
(12)               And so did you see yourself
(13)  just strike Mr. Vann in, it looks like, the
(14)  side of his body?
(15)       A.      No.
(16)               MR. CAMPOLIETO:  Objection.
(17)       A.      I did not see myself, no.
(18)       Q.      Okay.
(19)               So let's rewind that back and
(20)  look at it again.  So I want you to pay
(21)  attention to your right hand and after you
(22)  get off of the three-point landing at about
(23)  11:42:43 to -44.  So it's paused 11:42:40
(24)  and I'm going to go ahead and hit "Play."
(25)               (Whereupon, the video was
```

[Page 323]
August 24, 2023

                    MITCHELL

(1)

(2)          played.)

(3)      Q.    Okay.

(4)            How about that time, did you

(5)  see yourself strike Mr. Vann in the chest?

(6)      **A.    I didn't strike him there, no.**

(7)      Q.    So your testimony watching this

(8)  video together is that as you're rolling

(9)  him over, you don't strike him with your

(10) right hand right there?

(11)     **A.    I did not.**

(12)     Q.    Okay.  All right.

(13)           But your testimony was that

(14) immediately before that, he had allegedly

(15) reached for his waistband, right?

(16)     **A.    He did reach for his waistband,**

(17) **yes.**

(18)     Q.    Okay.  All right.

(19)           So I'm going to go ahead and

(20) hit "Play" again.  It's 11:42:45 and I'm

(21) going to hit "Play."

(22)           (Whereupon, the video was

(23)        played.)

(24)     Q.    Okay.  And so just quickly I'm

(25) going to pause here at 11:42:50.

[Page 324]
August 24, 2023

(1)                    MITCHELL

(2)              We've got one officer that's

(3)     arrived at the scene.  I think you said

(4)     earlier that that's Officer Kephart?

(5)          **A.      Correct.**

(6)          Q.      Okay.  All right.

(7)              Do you remember saying anything

(8)     to Officer Kephart immediately when he

(9)     arrived at the scene?

(10)         **A.      I said, he's been reaching for**

(11)    **his waistband.**

(12)         Q.      Okay.  So that's what you told

(13)    Kephart.

(14)              Anything else?

(15)         **A.      That was it.**

(16)         Q.      All right.

(17)              I'm going to go ahead and hit

(18)    "Play" again.

(19)              (Whereupon, the video was

(20)         played.)

(21)         Q.      Did you tell Officer Kephart

(22)    about the other officers who had been

(23)    injured or go tell him to check on them?

(24)         **A.      I don't recall what I said to**

(25)    **him as to that.  I know I yelled out that**

[Page 325]
August 24, 2023

(1)                    **MITCHELL**

(2)    **the waistband -- he had been reaching for**

(3)    **his waistband.**

(4)         Q.    Okay.

(5)              (Whereupon, the video was

(6)      played.)

(7)         Q.    And then is that Kephart

(8)    walking back again --

(9)         **A.    Yes, it is.**

(10)        Q.    -- or is that someone else?

(11)        **A.    That's Kephart.**

(12)        Q.    All right.

(13)             And then if we pause it right

(14)   here, we got 11:43:03.  It looks like an

(15)   additional car pulls up and that was a

(16)   two-man car; is that right?

(17)        **A.    I, I, I can't tell.**

(18)        Q.    Okay.

(19)             So I'm just going to rewind.  I

(20)   just want to make sure we get all the

(21)   people right.

(22)             (Whereupon, the video was

(23)      played.)

(24)        Q.    Okay.

(25)             So you see the car pulling up

```
(1)                    MITCHELL
(2)    right here at 11:42:59?
(3)         A.    Yes.
(4)         Q.    I'm going to hit "Play," and
(5)    will you just tell me if you can recognize
(6)    whether it's a two-man car and if you
(7)    recognize who the two people that get out
(8)    of the car.
(9)         A.    Yes.
(10)        Q.    Okay.  So I'm going to go ahead
(11)   and hit "Play" at 11:42:59.
(12)             (Whereupon, the video was
(13)          played.)
(14)        Q.    All right.  So real quick I'm
(15)   going to pause at 11:43:04.
(16)             Do you see that somebody had
(17)   exited from the passenger side of the car?
(18)        A.    Yes.
(19)        Q.    And do you know who that was?
(20)        A.    Officer Dempsey.
(21)        Q.    Okay.
(22)             So was Officer Dempsey -- he
(23)   was the officer and it was Brodsky that was
(24)   the recruit; is that right?
(25)        A.    Yes.
```

(1)                    **MITCHELL**

(2)        Q.      So Brodsky would have been the

(3)   driver?

(4)        **A.      Correct.**

(5)        Q.      All right.

(6)               So I'm paused 11:43:04.   I'm

(7)   going to go ahead and hit "Play" again.

(8)               (Whereupon, the video was

(9)          played.)

(10)       Q.      All right.

(11)              When Dempsey and Brodsky come

(12)  over, do you remember saying anything to

(13)  them?

(14)       **A.      I remember saying, "We got to**

(15)  **check his waistband."**

(16)       Q.      Okay.

(17)       **A.      He hadn't been searched at all.**

(18)       Q.      Okay.

(19)              So I'm paused at 11:43:10 here

(20)  and I had been talking as the video was

(21)  playing.   Were you able to pay attention to

(22)  the video as it was playing and I was

(23)  talking?

(24)       **A.      Yes.**

(25)       Q.      So can you describe for us what

```
(1)                    MITCHELL
(2)   just happened on the video there?
(3)        A.    David Vann was moved to his
(4)   stomach.
(5)        Q.    Okay.
(6)             So -- and can you tell me which
(7)   officer it was that helped to pick him up
(8)   and turn him over onto his stomach there.
(9)        A.    Officer Kephart assisted me.
(10)       Q.    Okay.
(11)            Did Dempsey assist you at all,
(12)  too, or was it just you and Kephart?
(13)       A.    I can't tell from that video.
(14)       Q.    Okay.
(15)            So I'm just going to hit rewind
(16)  again and let's watch that part together
(17)  again.  Okay?  So I'm paused at 11:43:10.
(18)  I'm going to hit "Play" and then I'll
(19)  rewind.  Okay.  So I rewound it to 11:43:05
(20)  and I'm going to play that same part again,
(21)  but I'm not going to talk.  Okay?
(22)            (Whereupon, the video was
(23)      played.)
(24)       Q.    Okay.
(25)            So does it look like it was you
```

(1)                    MITCHELL

(2)   and Kephart and Dempsey?

(3)        **A.     Yes.**

(4)        Q.     Okay.

(5)               And then Brodsky had walked up

(6)   behind immediately afterwards?

(7)        **A.     Yes.**

(8)        Q.     Okay.

(9)               And then I'm going to go ahead

(10)  and hit "Play" again at 11:43:10.

(11)              (Whereupon, the video was

(12)       played.)

(13)       Q.     All right.

(14)              So the video is playing right

(15)  now.  Can you kind of describe for us

(16)  what's going on at this point.

(17)       **A.     At this point, we're going to**

(18)  **attempt -- we're going to start a search of**

(19)  **Mr. Vann.**

(20)       Q.     Okay.  And I paused the video

(21)  at 11:43:17.

(22)              Can you tell us who the officer

(23)  that just walked into the screen is.

(24)       **A.     Sergeant LaFave.**

(25)       Q.     So that's LaFave at 11:43:17.

(1)                    MITCHELL

(2)            And do you remember saying

(3)    anything to Sergeant LaFave when he

(4)    arrived?

(5)        **A.    I don't recall.**

(6)        Q.    Okay.  All right.

(7)            I'm going to go ahead and hit

(8)    "Play" at 11:43:17.

(9)            (Whereupon, the video was

(10)       played.)

(11)       Q.    Okay.  And I paused it at

(12)   11:43:22.

(13)           Does it look like someone just

(14)   threw something at, like, Sergeant LaFave's

(15)   feet area?  Did you see that?

(16)       **A.    Yes.**

(17)       Q.    And so that's part of the

(18)   search that had started to be conducted;

(19)   you guys were removing stuff from David

(20)   Vann's pocket and whatnot?

(21)       **A.    I wasn't conducting the search,**

(22)   **but something was removed and --**

(23)       Q.    Okay.

(24)       **A.    -- tossed.  Yeah.**

(25)       Q.    You're still in the video right

(1)                    MITCHELL
(2)    now, though, right?  You're --
(3)         **A.    Yes.**
(4)         Q.    -- the one on the right side
(5)    kind of on the ground?
(6)         **A.    Correct.**
(7)         Q.    All right.
(8)               And the other officers are
(9)    searching him; that's what you're saying?
(10)        **A.    Yes.**
(11)        Q.    Are you still making physical
(12)   contact with David at this point?
(13)        **A.    I'm helping to control him,**
(14)   **yes.**
(15)        Q.    Okay.  All right.
(16)              I'm going to go ahead and hit
(17)   "Play" at 11:43:20.
(18)              (Whereupon, the video was
(19)        played.)
(20)        Q.    Do you remember anything that
(21)   you're saying at about this point?
(22)        **A.    I don't recall.**
(23)        Q.    Okay.
(24)              And as a result of this search,
(25)   you guys didn't find any contrabands or

[Page 332]
August 24, 2023

(1)                    MITCHELL

(2)   weapon on Mr. Vann's person, correct?

(3)        **A.    Correct.**

(4)        Q.    Okay.

(5)             Did you ever ask Mr. Vann why

(6)   he kept allegedly reaching for his

(7)   waistband?

(8)        **A.    I did not.**

(9)        Q.    Did you ever ask him, for

(10)  example, if he ordinarily stores things in

(11)  that area?

(12)       **A.    I did not at this point.  This**

(13)  **would have been the first opportunity I had**

(14)  **to and I was -- like I said, it had just**

(15)  **been three minutes of -- I was exhausted**

(16)  **and tired at this point.**

(17)       Q.    Okay.

(18)             So I paused the video at

(19)  11:43:53, but I just wanted to rewind it a

(20)  little bit and ask you some question before

(21)  we get to this point.  So I'm going to hit

(22)  "Play" and then rewind it.  Okay.  So let

(23)  me rewind it a little more.  All right.  So

(24)  I rewound it to 11:43:44.

(25)             So Mr. Vann is still on the

```
                          MITCHELL
(1)
(2)    ground at this point, right, and then you
(3)    guys are about to pick him up and bring him
(4)    over to your car?
(5)         A.     Correct.
(6)         Q.     So do you participate in
(7)    lifting Mr. Vann up off of the ground and
(8)    bringing him over to your car?
(9)         A.     I have to watch it one more
(10)   time.
(11)        Q.     Okay.
(12)               So I'm going to play it and
(13)   then I'll pause it when it looks like we
(14)   can tell who's escorting him.  Okay?  So
(15)   it's 11:43:44 and I'm Hitting "Play."
(16)               (Whereupon, the video was
(17)         played.)
(18)        Q.     Okay.  As we watch that part,
(19)   we're paused at 11:43:49.
(20)               Between 11:43:44 and 11:43:49,
(21)   is that you kind of dragging him or holding
(22)   him from the shoulder area?
(23)        A.     That's me holding him and
(24)   assisting him up to his feet, yes.
(25)        Q.     Okay.  All right.
```

(1)                      MITCHELL

(2)              So I'm going to go ahead and

(3)      hit "Play" again.

(4)                  (Whereupon, the video was

(5)          played.)

(6)      Q.    Okay.  So I'm hitting "Pause"

(7)      here at 11:43:52.

(8)              Do you know who that other

(9)      officer was that helped you pick Mr. Vann

(10)     up to his feet?

(11)     **A.     I can't pronounce his last**

(12)     **name.**

(13)     Q.    Brodsky?

(14)     **A.     Brodsky, yeah.**

(15)     Q.    Okay.

(16)             And before you guys picked him

(17)     up to put him on his feet, did you ask him

(18)     or instruct him to get up to his feet on

(19)     his own?

(20)     **A.     I don't recall.  We would --**

(21)     **with him being handcuffed, we would have**

(22)     **assisted him up.**

(23)     Q.    Okay.

(24)             At that point, do you think

(25)     that he had the physical ability to stand

```
                        MITCHELL
(1)
(2)   on his own?
(3)              MR. CAMPOLIETO:  Objection.
(4)       A.    I don't know.  I was pretty
(5)   exhausted.  I assume he was as well.
(6)       Q.    Okay.
(7)              If you were so exhausted why
(8)   didn't you ask one of the other officers
(9)   that wasn't as exhausted to physically lift
(10)  Mr. Vann off of the ground?
(11)             MR. CAMPOLIETO:  Objection.
(12)      A.    I was able to, and safely walk
(13)  him over to my car.
(14)      Q.    Okay.
(15)             So that wasn't my question.  My
(16)  question was just, why didn't you ask one
(17)  of the officers who wasn't as tired as you
(18)  to help lift him off the ground if you were
(19)  so tired?
(20)             MR. CAMPOLIETO:  Objection.
(21)      A.    I was able to, if that's -- so
(22)  I didn't ask.
(23)      Q.    Okay.  All right.
(24)             So I'm going to hit "Play" here
(25)  at 11:43:52 and I'm going to pause it when
```

MITCHELL

(1)

(2) you get over to the car and -- well, before

(3) I play it, do you remember was Mr. Vann

(4) able to walk on his own at this point?

(5)      **A.     No.  He's handcuffed, so we're**

(6) **going to walk him over.  I don't -- we**

(7) **wouldn't let him walk by himself, so I**

(8) **don't know.**

(9)      Q.     Sure.

(10)      Was he able to put one foot in

(11) front of the other as you walked with him

(12) over to the car?

(13)      **A.     From what I could tell, yes.**

(14)      Q.     So, I guess, was he able to

(15) walk or did you basically have to carry him

(16) and drag him over to the car?

(17)      **MR. CAMPOLIETO:  Objection.**

(18)      **A.     I didn't carry him and drag**

(19) **him.  I walked with him over to the car.**

(20)      Q.     Okay.  All right.

(21)      So I'm going to go ahead and

(22) hit "Play" at 11:43:52 and I'm going to

(23) pause it once you guys get over to the car.

(24) Okay?  All right.  So I'm hitting, "Play."

(25)      (Whereupon, the video was

```
                           MITCHELL
(1)
(2)        played.)
(3)        Q.    Okay.  So at 11:43:57 it looks
(4)   like you guys reach the back quarter panel
(5)   area of your vehicle; is that right?
(6)        A.    Yes.
(7)        Q.    Okay.
(8)              And it looks like you had begun
(9)   to open the backdoor to, to the car; is
(10)  that right?
(11)       A.    Correct.
(12)       Q.    And why did you start to open
(13)  the backdoor to the car?
(14)       A.    My original thought was to
(15)  place him in the back, but as we've been
(16)  trained to do a secondary search, I made
(17)  the decision to do a secondary search at
(18)  the car.
(19)       Q.    And why did you make the
(20)  decision to do a secondary search at the
(21)  car?
(22)       A.    Because that's how we are
(23)  trained in the academy.  Is to -- things
(24)  can be missed; things can be not found, and
(25)  at that point it had been a couple of
```

(1)                    MITCHELL

(2)    minutes and I wanted to make sure that, far

(3)    the safety of myself and for him, that

(4)    everything was searched appropriately.

(5)        Q.    Okay.

(6)             So you didn't feel like an

(7)    appropriate search had been conducted by

(8)    the five or six officers on the ground?

(9)             MR. CAMPOLIETO:  Objection.

(10)       A.    I felt an appropriate search

(11)   had been done, but as trained in -- at the

(12)   Police Department a secondary search is, is

(13)   appropriate.

(14)       Q.    Is it necessary?

(15)       A.    Yes.

(16)            MR. CAMPOLIETO:  Objection.

(17)       A.    And appropriate.

(18)       Q.    Is it required pursuant to

(19)   policy?

(20)       A.    It's how we are trained.

(21)       Q.    So it's required pursuant to

(22)   your training?

(23)       A.    I have been trained in DT and

(24)   at the academy that that is -- that you do

(25)   a secondary search.  That's how I've been

[Page 339]
August 24, 2023

(1)                      **MITCHELL**

(2)    **trained, yes.**

(3)         Q.    Okay.

(4)              A secondary search by raising

(5)    the subject's hands above their head?

(6)         **A.    By bringing the subject's hands**

(7)    **away from their waistband, yes.**

(8)         Q.    Okay.

(9)              So what I'm going to do is I'm

(10)   going to go ahead and hit "Play" and I want

(11)   you to tell me, after I pause it, how far

(12)   above Mr. Vann's head his hands are.  Okay?

(13)   Can you do that for me?

(14)              **MR. CAMPOLIETO:   Objection.**

(15)        **A.    Okay.**

(16)        Q.    Okay.  So I'm going to hit play

(17)   here at 11:43:57.

(18)              (Whereupon, the video was

(19)        played.)

(20)        Q.    Okay.  All right.

(21)              So my question is, here paused

(22)   at 11:44:07, does it look like Mr. Vann's

(23)   hands are extended up above your head?

(24)              **MR. CAMPOLIETO:   I'm sorry.**

(25)        **Above whose head?**

```
(1)                    MITCHELL
(2)              MR. SHIELDS:  So above -- so
(3)         let me just take it step-by-step.
(4)         Q.    So you are the officer who
(5)    looks like you have the shaved head who is
(6)    standing with Mr. Vann, correct?
(7)         A.    Correct.
(8)         Q.    And do you see right in front
(9)    of you, Mr. Vann's hands that you're
(10)   holding up?
(11)        A.    I see his hands, yes.
(12)        Q.    Okay.
(13)              And does it look like his hands
(14)   are above the level of the back of the top
(15)   of the police car?
(16)        A.    It's hard to tell at that --
(17)        Q.    Okay.
(18)              Does it look like you're
(19)   holding --
(20)        A.    They're at -- they're out --
(21)   they're up away from him, yes.
(22)        Q.    Okay.
(23)              And they're up at least
(24)   parallel with your face?
(25)        A.    Yes.
```

(1)                     **MITCHELL**

(2)        Q.     And maybe even above your head?

(3)               **MR. CAMPOLIETO:   Objection.**

(4)        **A.     I can't tell.  They are**

(5)   **parallel with my face.  I know that they**

(6)   **are in front of me.**

(7)        Q.     Okay.

(8)               Have you ever done yoga?

(9)        **A.     No.**

(10)       Q.     Okay.

(11)              Do you ever do any stretching?

(12)       **A.     No.**

(13)       Q.     Have you ever tried to hold

(14)  your arms behind your back in an extended

(15)  position up above your head in a similar

(16)  way to what Mr. Vann's hands are being held

(17)  behind his back above his hand in this

(18)  position?

(19)              **MR. CAMPOLIETO:   Objection.**

(20)       **A.     His hands aren't above his**

(21)  **head.  He's bent over the car so he's not**

(22)  **standing straight up.**

(23)       Q.     Okay.

(24)              So when someone's arms are

(25)  extended behind their back like this, when

[Page 342]
August 24, 2023

(1)                    MITCHELL

(2)   their body is placed over the back of a

(3)   car, is that painful?

(4)            MR. CAMPOLIETO:   Objection.

(5)        **A.     At the time of this, we**

(6)   **monitored -- he never made a complaint of**

(7)   **pain or being uncomfortable.**

(8)        Q.     Okay.

(9)            When you are a defensive

(10)  tactics trainer, is this a technique that

(11)  you practice with your trainees?

(12)       **A.     Having the hands pulled away**

(13)  **from the waistband if the person's bent**

(14)  **over?**

(15)       Q.     Correct.

(16)       **A.     Not, not over his head.**

(17)       Q.     Okay.

(18)            So this is not a technique that

(19)  you ever taught your trainees in defensive

(20)  tactics?

(21)            MR. CAMPOLIETO:   Objection.

(22)       **A.     We did -- in the DT lab, we**

(23)  **didn't have a car like this, so no.**

(24)       Q.     Okay.

(25)            So you never personally

(1)                    MITCHELL

(2)  experienced what it might feel like to have

(3)  your hands extended behind your back and up

(4)  in the air like this?

(5)       A.    **No.  Not that I recall.**

(6)       Q.    Do you imagine that it could be

(7)  painful?

(8)            **MR. CAMPOLIETO:  Objection.**

(9)       A.    **If you're bent over at the**

(10) **waist and your hands are away from you, I**

(11) **don't know.**

(12)      Q.    Okay.

(13)            Can you do me a favor and get

(14) up and try to do it for us on camera.

(15)            **MR. CAMPOLIETO:  No.  We're,**

(16)      **we're, we're not going to do that.**

(17)            **MR. SHIELDS:  Okay.**

(18)      Q.    Is that something that you've

(19) ever tried to do yourself, extend your

(20) hands -- enclose your hands behind your

(21) back and extend them up above your head?

(22)      A.    **No.**

(23)      Q.    All right.

(24)            Now, is it the policy of the

(25) Rochester Police Department to search

[Page 344]
August 24, 2023

(1)                          MITCHELL
(2)    individuals for weapons as soon as possible
(3)    after they're placed under arrest?
(4)         **A.     If it can be done safely and in**
(5)    **a controlled manner, yes.**
(6)         Q.    Okay.
(7)              So I'm just going to play this
(8)    through the end of the video.  We're paused
(9)    at 11:44:07 and I'm just going to play this
(10)   through to the end.
(11)             (Whereupon, the video was
(12)       played.)
(13)        Q.    All right.  I'm going to pause
(14)   it, because we're still at half speed.  So
(15)   I'm just going to speed it up to regular
(16)   speed and then I'm going to play it through
(17)   to the end.  Okay.  And we're paused at
(18)   11:44:12 and I'm going to hit "Play."
(19)             (Whereupon, the video was
(20)       played.)
(21)        Q.    And that's Sergeant LaFave that
(22)   we were just seeing; is that right?
(23)        **A.     Yes.**
(24)        Q.    Okay.
(25)             And did you see yourself with

[Page 345]
August 24, 2023

(1)                    MITCHELL

(2)  Mr. Vann over at the car right before I

(3)  paused at 11:44:43?

(4)       **A.    I did.**

(5)       Q.    And do you remember the reason

(6)  why you pushed him back up against the car

(7)  right there?

(8)       **A.    I moved Mr. Vann back up to the**

(9)  **car because he started to move away after**

(10) **he was told to stay still.  I did say that**

(11) **several times.**

(12)      Q.    Okay.

(13)            So let me just rewind that so

(14) we can look at that again together.  I'm

(15) just going to hit "Play" and then rewind.

(16) We're at 11:44:39 and I'm going to go ahead

(17) and hit "Play" again.

(18)            (Whereupon, the video was

(19)       played.)

(20)      Q.    Okay.  So we're paused at

(21) 11:44:42.

(22)            So your testimony is that that

(23) technique that you just used when you

(24) pushing him up against the car was because

(25) he tried to get away again?

```
(1)                    MITCHELL
(2)         MR. CAMPOLIETO:  Objection.
(3)         A.      He moved away from the car and
(4)    we did not have control of him at that
(5)    point in time, so he was placed up against
(6)    the car one more time, yes.
(7)         Q.     Okay.
(8)                It was as a result of his
(9)    action and moving that you push him up
(10)   against the car?
(11)        A.      I moved him back to the car.
(12)        Q.     Okay.
(13)               I'm going to go ahead and hit
(14)   "Play" again at 11:44:42.
(15)               (Whereupon, the video was
(16)       played.)
(17)        Q.     And you extended his hands back
(18)   up above his head there; is that right?
(19)        A.      I extended my -- his hands back
(20)   away from his waistband but not above his
(21)   head, because he's bent over the trunk
(22)   area.
(23)        Q.     Okay.
(24)               They're at the same level as
(25)   they were before, correct, that we --
```

[Page 347]
August 24, 2023

```
(1)                    MITCHELL
(2)      A.      About --
(3)      Q.      -- spoke about before?
(4)      A.      About the same spot, yes.
(5)      Q.      Which would be about parallel
(6)  with your, with your face?
(7)      A.      Give or --
(8)              MR. CAMPOLIETO:  Objection.
(9)      A.      Give or take, yes.
(10)     Q.      How tall are you Officer
(11) Mitchell?
(12)     A.      5'7, 5'8.
(13)     Q.      Okay.
(14)             5'8 on a good day?
(15)     A.      Yeah.
(16)     Q.      Okay.  All right.
(17)             Now, did you see another
(18) officer arrive at the scene right before we
(19) paused right here, a female officer?
(20)     A.      No.  I saw the, I think it was
(21) the ambulance technicians.
(22)     Q.      Okay.
(23)             So I'm going to hit "Play"
(24) because I just want to make sure I
(25) understand everyone who is at the scene.
```

# EXHIBIT F

**SUBJECT**                                                                                     Page 1 of 2

| 1. LAST NAME Vann | | | FIRST David | | M.I. C | 2. DATE 9/4/15 | 3. TIME 2328 | 4. CR # 15-235240 |
|---|---|---|---|---|---|---|---|---|
| 5. DOB 12/18/91 | 6. SEX Male | 7. RACE Black | 8. HEIGHT 5'9" | 9. WEIGHT 160 | 10. INCIDENT LOCATION 439 South Ave | | | BEAT 229 |

**11. ARREST?** ☐ NO -- release approved by:
☒ YES -- charges: Assault 2nd, Assault 3rd, Resisting Arrest, Trespass

| 12. SUBJECTS ACTIONS | 13. TACTIC EFFECTIVENESS |
|---|---|
| Subject resisted by (check all that apply and explain in narrative) | Check the appropriate box indicating whether the tactic was used, if the tactic was used write the number (1,2,3...) indicating what order the tactics were used in column one (1). In column two (2) write E, for *Effective*, ME, for *Moderately Effective* and NE, for *Not Effective*. |

|  |  | Order | Effectiveness |  |  | Order | Effectiveness |
|---|---|---|---|---|---|---|---|
| ☒ Verbal Resistance (Failing to adhere to verbal commands) | ☒ Verbal | 1 | E | ☐ Forward Spin | | | |
| | ☐ Mandibular Angle | | | ☐ Shin Sheer | | | |
| | ☐ Hypoglossal Nerve | | | ☐ Arm Lock | | | |
| | ☐ Jugular Notch | | | ☐ Front Jab w/Baton | | | |
| | ☐ Clavical Notch | | | ☐ Rear Jab w/ Baton | | | |
| | ☐ Brachial Stun | | | ☐ Flat Chop | | | |
| ☐ Passive Resistance (dead weight) | ☐ Suprascapular Stun | | | ☐ Upper Chop | | | |
| | ☒ Jab | 3 | ME | ☐ Forward Spin | | | |
| | ☐ Front Kick | | | ☐ Reverse Spin | | | |
| ☒ Active Resistance (pulling away, striking or attempt assault) | ☐ Straight Punch | | | ☐ Inside Spin | | | |
| | ☐ Angle Kick | | | ☐ Power Spin | | | |
| | ☐ Forearm Strike | | | | | | |
| | ☐ Knee Strike | | NE | ☒ OC | 5 | E | |
| | ☐ Defensive Wedge | | | ☐ Taser | | | |
| ☐ Armed Resistance (uses or attempts to use a weapon or dangerous instrument) | ☒ Hooking Technique | 2 | NE | ☐ Bean Bag | | | |
| | ☒ Ground Stabilization (ie. 3-Point Landing, joint manipulation) | 4 | ME | ☐ Hand Gun | | | |
| | | | | ☐ Long Gun | | | |
| | | | | ☐ Other: | | | |
| | | | | ☐ Other: | | | |

**14. Narrative** *(If officer is in plainclothes, describe own clothing. If tactic(s) used on subject were ineffective, explain reason(s) why.)*

See Addendum

| Officer: ☐ Primary Officer   ☒ Assisting Officer   Name: Steven Mitchell | | ID# 2134 |
|---|---|---|

Rochester Police Department          Subject Resistance Report          RPD 1377          Rev. 06/2015

| 1. A CONTINUATION OF A (N)   SRR | | 2. CR#   15   - 235240 | |
|---|---|---|---|
| 3. VICTIM'S NAME (LAST, FIRST, MIDDLE) OR FIRM NAME IF BUSINESS   Algazali, Dawan | 4. OFFENSE/INCIDENT ADDRESS   439 South Ave | 5. PBA   229 | 6. DOW   Fri.   DATE OF INCIDENT   09 / 04 / 15 |

**PAGE 2 OF 2**

**BLOCK NO. 14**

**7. INDICATE BLOCK LETTER OR NUMBER IN LEFT MARGIN**

At the above date and time, I responded to 439 South Ave. (A and Z Market) for the report of a male refusing to leave. Upon arrival, (S) (Vann) was uncooperative and refused to leave the location. (S) walked to the side walk and began to ball his fist as he turned towards officers and began to argue once more. I then moved in to handcuff (S)

I was able to get the left hand cuff on (S)'s left hand and then (S) began to pull his right hand towards the front of his body to avoid being handcuffed completely. Ofc. Kester had control of (S)'s right arm when I was applying handcuffs and when (S) pulled his hand away, Ofc. Kester brought (S) to the ground (See Ofc. Kester's SRR). The force of (S) and Ofc. Kester going to the ground brought me to the ground. (S) fell onto Ofc. Kester and Ofc. Kester immediately yelled out that his leg was hurt. I could see that Ofc. Kester was in extreme pain and that he could not stand up. At this time, (S) did have handcuffs applied to both of his hands, but (S) was still not listening to commands to stop moving around on the ground in order to be searched. (S) did reach several times towards his right rear pants waist band area and was told several times to stop reaching. Ofc. Kester asked for space from (S), as he was in pain and (S) was laying right next to Ofc. Kester. I stood (S) to his feet and walked (S) over to the side of my patrol vehicle to complete my search of (S).

As I brought (S) to my patrol vehicle, (S) immediately pulled away from me. I attempted a hooking technique to bring (S) to the ground, however the technique was not effective, as (S) was moving away from me. (S) then turned towards me and I told (S) several times to "get on the ground". (S) refused the commands. I then used a jab with my right closed fist to the chin area of (S), which was moderately effective as (S) was moving when the technique used. It should be noted that (S) still had not been searched, especially in the area of the waist band where (S) hand been reaching. I then used an arm bar take down on (S)'s left arm and brought (S) to the ground. (S) was laying on his back and I told (S) several times to roll onto his stomach. (S) refused to listen to the commands given. I then was able to roll (S) onto his stomach and administered four ½ second bursts of O.C. Spray to the face of (S), as (S) moved his head as the O.C. Spray was being administered. After being sprayed with O.C, (S) once again reached for his waistband on the right rear side of his pants. I attempted to grab (S)'s hands, still fearing that (S) had a weapon in his waistband. While trying to stop (S) from grabbing his waistband area, (S) rolled onto his back once again. I then used ground stabilization, placing my right arm across (S)'s chest and held him to the ground so that he could not reach for his waistband anymore. I waited in that position until additional officers arrived and I yelled to officers coming to assist me that. I told Officers that (S) was reaching for his waistband. (S) was searched on the ground and then again while he was standing up at the rear of my patrol vehicle. While (S) was being searched standing up, (S) would not stand still and was moving around. (S)'s actions forced me to have to keep (S)'s hands above his waistband in order to keep control of (S) and allow for a proper search. (S) was placed into the rear of a patrol vehicle after the secondary search was concluded. The search of (S) was negative for weapons and it is unknown why (S) continually reached for his waistband while resisting arrest.

Photos of (S) and injured officers were taken by Tech 270 (Farbizio) at the scene. Rural Metro responded to the scene to evaluate (S). Rural Metro staff flushed (S)'s eyes due to O.C. exposure. Rural Metro staff cleared (S) and I transported (S) to booking without further incident.

**10. XC TO:**

| 8. REPORTING OFFICER   S. Mitchell | ID#   2134 | 9. SUPERVISOR | ID # |
|---|---|---|---|

**ADDENDUM REPORT**

**ROCHESTER POLICE DEPARTMENT**