(1)                    KESTER

(2)        A.      Correct.

(3)        Q.      And when he exited the store,

(4)   he didn't bump into you, correct?

(5)        A.      No, he did not.

(6)        Q.      When he walked out of the

(7)   store, he walked right by you and Officer

(8)   Drake, correct?

(9)                MR. CAMPOLIETO:   Objection.

(10)       A.      That's correct.

(11)       Q.      And he walked out towards the

(12)  street which is South Avenue, correct?

(13)               MR. CAMPOLIETO:   Objection.

(14)       A.      Correct.

(15)       Q.      And he walked out onto the

(16)  public sidewalk, correct?

(17)       A.      Correct.

(18)       Q.      All right.

(19)               And at that point there's two

(20)  officers outside on the sidewalk and then

(21)  Officer Mitchell right inside the door to

(22)  the store, correct?

(23)               MR. CAMPOLIETO:   Objection.

(24)       A.      Correct.

(25)       Q.      All right.

(1)                     KESTER

(2)              And all three of the officers

(3)   were physically larger than Mr. Vann,

(4)   correct?

(5)              MR. CAMPOLIETO:  Objection.

(6)        A.     I, I, I believe Officer

(7)   Mitchell would be smaller than Mr. Vann.

(8)        Q.     Okay.

(9)              Well, we can review the subject

(10)  resistance report later.  That would have

(11)  everybody's heights and weights on it for

(12)  the officers, correct?

(13)             MR. CAMPOLIETO:  Objection.

(14)       A.     Yes.  I was just giving you --

(15)  I -- it would be an opinion at this point.

(16)       Q.     Okay.

(17)             So your opinion is that Officer

(18)  Mitchell was smaller than Mr. Vann?

(19)       A.     Yes.

(20)       Q.     But were you about 70 pounds

(21)  heavier than Mr. Vann, correct?

(22)             MR. CAMPOLIETO:  Objection.

(23)       A.     Approximately.

(24)       Q.     Okay.

(25)             And Mitchell is a -- even if he

```
(1)                  KESTER
(2)  might have been smaller or about the same
(3)  size, he's a professional police officer
(4)  who was in pretty good shape, correct?
(5)           MR. CAMPOLIETO:  Objection.
(6)      A.    I would say he was in good
(7)  shape, yes.
(8)      Q.    Okay.
(9)            Same with Officer Drake?
(10)          MR. CAMPOLIETO:  Objection.
(11)     A.    Yes.
(12)     Q.    Okay.  So I'm going to hit
(13) "Play" now and I'm going to pause again at
(14) about 11 minutes -- I'm sorry -- 11 hours
(15) 40 minutes and 12 seconds.
(16)          MR. CAMPOLIETO:  By the way,
(17)      I'm going to make an objection.  It's
(18)      a standing objection.  I'm not going
(19)      to object every time.  I just want to
(20)      preserve it for the record.  I object
(21)      to the use of the freeze frame of the
(22)      video in the course of questioning
(23)      the witness, but please go ahead and
(24)      do whatever you need to do.
(25)          MR. SHIELDS:  Okay.  John,
```

(1)                     **KESTER**

(2)        there's no such thing as a freeze

(3)        frame.  I'm not doing a freeze frame.

(4)        I'm pausing the video and then I'm

(5)        asking the witness --

(6)             MR. CAMPOLIETO:  And I'm

(7)        objecting --

(8)             MR. SHIELDS:  -- what he saw --

(9)             (Simultaneous crosstalk.)

(10)             MR. CAMPOLIETO:  I'm objecting

(11)        to the pausing of the video.  It's

(12)        that simple.

(13)   BY MR. SHIELDS:

(14)        Q.    Okay.  So I'm going to hit

(15)   "Play" and I'm going to pause the video and

(16)   I'm going to ask you questions about what

(17)   you observed during the video being played.

(18)   So I'm going to pause at about 12 seconds

(19)   after 11:40.

(20)             (Whereupon, the video was

(21)        played.)

(22)        Q.    All right.

(23)             So you're continuing to speak

(24)   with Mr. Vann as he walks down the

(25)   sidewalk, correct?

```
(1)                     KESTER
(2)        A.     Yes.
(3)        Q.     And he's walking down the
(4)   sidewalk towards Comfort Street, correct?
(5)        A.     I believe so.  It's, it's to
(6)   the south.  He's walking to the south.
(7)        Q.     So he's walking on the public
(8)   sidewalk in a southern direction at this
(9)   point, correct?
(10)       A.     Correct.
(11)       Q.     Okay.
(12)              And you're speaking with your
(13)  hands in an animated way as he's walking
(14)  past you, correct?
(15)              MR. CAMPOLIETO:  Objection.
(16)       A.     Yes.  I'm speaking while moving
(17)  my hands.
(18)       Q.     Okay.
(19)              And Mr. Vann's hands are by his
(20)  side the whole time, correct?
(21)              MR. CAMPOLIETO:  Objection.
(22)       A.     In this, in this frame they are
(23)  in front of him around his midsection.  So,
(24)  no, they are not to his side.
(25)       Q.     Okay.
```

(1)                    KESTER

(2)            Up until this point in the

(3)    frame when he walked past you, his hands

(4)    were by the sides of his body, correct?

(5)            **MR. CAMPOLIETO:   Objection.**

(6)        **A.      I actually wasn't paying**

(7)    **attention to when he moved them in front.**

(8)        Q.     Okay.

(9)            Let's just -- I'll just rewind

(10)   that real quick.  So I'm going to hit --

(11)   the way that I'll rewind it is I'll hit

(12)   "Play" and then I'll just jump back about

(13)   five seconds.  Okay?

(14)       **A.     Okay.**

(15)       Q.     Okay.  So I jumped back to

(16)   11:40:09 in the video and I'm going to hit

(17)   "Play" and I'm going to pause it again at

(18)   about 11:40 and 12 seconds.

(19)            (Whereupon, the video was

(20)        played.)

(21)       Q.     Okay.

(22)            In the portion that we just

(23)   watched between 11:40:09 and 11:40:12, his

(24)   hands were at the side of his body,

(25)   correct?

(1)                         KESTER
(2)              MR. CAMPOLIETO:  Objection.
(3)        A.     Yes.
(4)        Q.     All right.
(5)              And now I'm going to hit "Play"
(6)    and I'm going to pause again in about four
(7)    seconds at 11:40:16.
(8)              (Whereupon, the video was
(9)         played.)
(10)       Q.     Okay.
(11)             So at this point, Mr. Vann
(12)   turns around to face you and the other
(13)   officers, correct?
(14)       A.     Correct.
(15)       Q.     And Mr. Vann didn't ever make a
(16)   motion towards his pocket, correct?
(17)             MR. CAMPOLIETO:  Objection.
(18)       A.     Not, not that I can see from
(19)   this angle, no.
(20)       Q.     And Mr. Vann never made any
(21)   motion towards his waistband, correct?
(22)             MR. CAMPOLIETO:  Objection.
(23)       A.     Not that I can tell from this
(24)   angle, no.
(25)       Q.     Okay.

(1)                    KESTER

(2)            Not that you could see in the

(3)    video that we just watched, correct?

(4)        **A.    Correct.  His back is to me in**

(5)    **this angle.**

(6)        Q.    Okay.

(7)            And he didn't make any motions

(8)    towards the man in the white, correct?

(9)        **A.    Correct.**

(10)       Q.    And he didn't make any motions

(11)   towards you or Mitchell or Drake, correct?

(12)           **MR. CAMPOLIETO:   Objection.**

(13)       **A.    Correct.**

(14)       Q.    And he didn't make any

(15)   threatening moves towards you or Mitchell

(16)   or Drake, correct?

(17)           **MR. CAMPOLIETO:   Objection.**

(18)       **A.    I can't speak for, if the other**

(19)   **officers would view him as threatening.   He**

(20)   **didn't make any animated movements towards**

(21)   **us.**

(22)       Q.    He didn't move towards you and

(23)   threaten you with physical violence,

(24)   correct?

(25)       **A.    He did not threaten me with**

```
(1)                    KESTER
(2)  physical violence.
(3)       Q.     Okay.
(4)              And he hasn't raised his voice
(5)  at this point either, correct?
(6)              MR. CAMPOLIETO:  Objection.
(7)       A.     I don't believe so, no.
(8)       Q.     Okay.
(9)              He never threw anything at you
(10) or the other officers, correct?
(11)      A.     No, he never threw anything at
(12) us.
(13)      Q.     Okay.
(14)             And his hands were visible at
(15) all times --
(16)             MR. CAMPOLIETO:  Objection.
(17)      Q.     -- correct?
(18)      A.     Up until now, yes, his hands
(19) were visible.
(20)      Q.     Not in the video but in
(21) realtime his hands were visible at all
(22) times?
(23)      A.     I don't recall the entirety of
(24) the interaction we had with him, but as far
(25) as up until this point, yeah, his hands are
```

(1)                    **KESTER**

(2)  **visible.**

(3)           Q.    Okay.

(4)                 And where we're paused right

(5)  here in the video, from the angle in the

(6)  video, you see his back but you're standing

(7)  in front of him so you can see his hands in

(8)  front of his body at the time of the

(9)  incident, correct?

(10)                **MR. CAMPOLIETO:   Objection.**

(11)                **You can answer.**

(12)          **A.    Correct.**

(13)          Q.    Okay.

(14)                So then at that point officers

(15)  made the determination that you were going

(16)  to arrest Mr. Vann, correct?

(17)          **A.    Yes.**

(18)          Q.    And you're standing outside the

(19)  store with Drake and Mitchell for about two

(20)  minutes before you made the determination

(21)  that you were going to arrest Mr. Vann,

(22)  correct?

(23)          **A.    Correct.**

(24)          Q.    Okay.

(25)                And you guys made the

(1)                         K E S T E R

(2)    determination that he was going to be under

(3)    arrest for trespass at that point, correct?

(4)         A.    Correct.

(5)         Q.    Okay.

(6)               Even though he had left the

(7)    store under his own accord and started to

(8)    walk in a southern direction down the

(9)    sidewalk, correct?

(10)              MR. CAMPOLIETO:   Objection.

(11)        A.    I just think it's a mis-,

(12)   mischaracterization that he's continuing to

(13)   walk.  He walked for a moment, then turned

(14)   back towards the store and faced us.

(15)        Q.    Okay.

(16)        A.    It's not like he continued to

(17)   disperse.  He walked, took a step away,

(18)   turned around and then faced back towards

(19)   us at the entrance of the store.

(20)        Q.    When Mr. Vann exited the store

(21)   and began to walk down the sidewalk, was he

(22)   free to leave?

(23)        A.    In, in, in, in my opinion, yes.

(24)        Q.    Okay.

(25)              Why did Mr. Vann turn around

(1)                     KESTER

(2)   and face the officers?

(3)              MR. CAMPOLIETO:  Objection.

(4)        A.     I can't speak for what he was

(5)   thinking, but the impression that I got was

(6)   that it was his decision that he wasn't

(7)   going to disperse from the area.

(8)        Q.     Did Mr. Vann stop and turn

(9)   around because you or one of the other

(10)  officers said something to him?

(11)       A.     Not that I recall.

(12)       Q.     Okay.

(13)             Let's just rewind the video and

(14)  take a look and see if it looks like one of

(15)  you said something to him.

(16)             (Whereupon, the video was

(17)        played.)

(18)       Q.     So I rewound to 11:40

(19)  and 09 seconds.  So I'm just going to hit

(20)  "Play" and I'll pause at about the same

(21)  point where we were paused before 11:40 and

(22)  16 seconds.  So just, I'd ask that you look

(23)  at you and Officer Mitchell and Officer

(24)  Drake and try to determine if it looks like

(25)  one of you said something to him.

(1)                          KESTER

(2)                (Whereupon, the video was

(3)         played.)

(4)         Q.    So I paused at 11:40:15 and at

(5)    this point Mr. Vann had turned around to

(6)    face the officers again, correct?

(7)         A.    Correct.

(8)         Q.    And throughout this entire time

(9)    period you can see yourself speaking to

(10)   Mr. Vann, correct?

(11)              MR. CAMPOLIETO:   Objection.

(12)         A.    No.

(13)         Q.    Okay.  So let's rewind that and

(14)   take a peek at that again.  Okay?  All

(15)   right.  So I rewound and paused at

(16)   11:40:08.  So I'm just going to ask that

(17)   you watch yourself until I pause at about

(18)   11:40:15.  I'm going to hit "Play" again.

(19)              (Whereupon, the video was

(20)        played.)

(21)         Q.    Okay.

(22)              Now, did you see yourself

(23)   speaking and gesturing with your hands

(24)   throughout that time?

(25)         A.    Not for the entirety of it.  As

(1)                    KESTER

(2)    he begins to move past me is when I turn

(3)    around and after I turn around, I, I don't

(4)    see myself speaking at all, sir.

(5)        Q.    Okay.

(6)              Between where we paused at

(7)    11:40:08 and where we're paused right now

(8)    at 11:40:15, what did you say to Mr. Vann?

(9)        A.    I believe when my hands went

(10)   up, I said, "We're all at an impasse.

(11)       Q.    Okay.

(12)             And do you remember ever

(13)   testifying previously that that's what you

(14)   said?

(15)       A.    I don't recall exactly, no.

(16)       Q.    Okay.

(17)             Do you remember ever testifying

(18)   previously about what you had told Mr. Vann

(19)   after he exited the store?

(20)       A.    No.

(21)       Q.    Okay.

(22)             And do you remember anything

(23)   that Mr. Vann said back to you?

(24)       A.    At this point, no.

(25)       Q.    Okay.

(1)                     KESTER

(2)          But as you testified earlier,

(3)   you were already frustrated with Mr. Vann

(4)   at this point, correct?

(5)          A.      Yes.

(6)          Q.      Okay.  All right.  So I'm going

(7)   to go ahead and I'm going to hit "Play" and

(8)   I'm going to pause at about 11:40 and

(9)   20 seconds.

(10)               (Whereupon, the video was

(11)         played.)

(12)         Q.      Okay.  So I paused at 11:40 and

(13)   21 seconds.  Okay.

(14)               So at this point you and

(15)   Mitchell moved in to arrest Mr. Vann,

(16)   correct?

(17)         A.      Correct.

(18)         Q.      Mr. Mitchell goes to Mr. Vann's

(19)   left side, correct?

(20)         A.      Correct.

(21)         Q.      And you go behind Mr. Vann on

(22)   his right side, correct?

(23)         A.      Correct.

(24)         Q.      And Drake is standing directly

(25)   in front of Mr. Vann on the sidewalk,

(1)                    KESTER

(2)  correct?

(3)       A.     Correct.

(4)       Q.     And when you go in to arrest

(5)  Mr. Vann, he doesn't run away, correct?

(6)       A.     Correct.

(7)       Q.     He's not trying to escape,

(8)  correct?

(9)       A.     **At this point, no, he's not**

(10) **trying to escape.**

(11)      Q.     Okay.

(12)             And he's not fighting with you,

(13) correct?

(14)      A.     **Not at this point, no.**

(15)      Q.     Okay.

(16)             **MR. SHIELDS:  And I'm just**

(17)        **going to move to strike the**

(18)        **nonresponsive portion of the**

(19)        **question.**

(20)      Q.     Now, he doesn't reach for his

(21) pocket, correct?

(22)      A.     **No.**

(23)      Q.     And immediately when you and

(24) Mitchell grab him, Mr. Vann allows you to

(25) bring his arms behind his back, correct?

(1)                    K E S T E R

(2)           MR. CAMPOLIETO:  Objection.

(3)        A.    It required some moving to get

(4)    his arms behind his back.

(5)        Q.    Okay.

(6)              Is that what your testimony is

(7)    after just viewing the video here today?

(8)        A.    As I see it, yes.  It looks

(9)    like I'm grabbing him.  I had my hands on

(10)   his arm at this point.

(11)       Q.    Okay.

(12)             And he wasn't fighting with you

(13)   and trying to pull his arm out of your

(14)   hand, correct?

(15)           MR. CAMPOLIETO:  Objection.

(16)       A.    No.

(17)       Q.    And at this point paused in the

(18)   video at 11:40 and 21 seconds, you can see

(19)   that both of Mr. Vann's arms are behind his

(20)   back and it looks like his hands are

(21)   basically touching in the middle of his

(22)   back; is that correct?

(23)       A.    Yes.

(24)       Q.    Okay.

(25)             And he didn't pull away at this

(1)                    KESTER

(2)  point, correct?

(3)       A.    Correct.

(4)       Q.    And he didn't do anything

(5)  violent, like, twist and turn or refused

(6)  you -- refuse to allow you to hold his

(7)  hands behind his back, correct?

(8)            MR. CAMPOLIETO:  Objection.

(9)       A.    No.

(10)      Q.    The answer was correct?

(11)      A.    I, yeah.  I said he had not

(12) done that.

(13)      Q.    Okay.

(14)            And you and Mitchell have him

(15) physically controlled as Drake is standing

(16) directly in front of him at this point,

(17) correct?

(18)            MR. CAMPOLIETO:  Objection.

(19)      A.    He's, he's not handcuffed at

(20) this portion, so I would say we don't have

(21) him controlled yet.

(22)      Q.    Okay.

(23)            You've got three professional

(24) police officers standing, two directly

(25) behind him and one directly in front of him

(1)                    KESTER

(2)    at this point, correct?

(3)              And Mr. Vann did not hold his

(4)    arms straight down at the side of his body

(5)    at this point, correct?

(6)         A.    Correct.

(7)         Q.    All right.

(8)              He wasn't holding his arms

(9)    against the side of his body and refusing

(10)   to be handcuffed, correct?

(11)        A.    Correct.

(12)             MR. CAMPOLIETO:  Objection.

(13)        Q.    So I'm going to play the video

(14)   and pause it in a few seconds at about

(15)   11:40 and 24 seconds.

(16)        A.    Okay.

(17)             (Whereupon, the video was

(18)        played.)

(19)        Q.    Okay.

(20)             Now, you and Mr. Mitchell are

(21)   physically controlling Mr. Vann's body at

(22)   this point, correct?

(23)             MR. CAMPOLIETO:  Objection.

(24)        A.    Do you mean we have, we have

(25)   hold of him?  I don't understand.

(1)                     **KESTER**

(2)         Q.     You have hold of Mr. Vann and

(3)   you're moving his body, correct?

(4)             **MR. CAMPOLIETO:  Objection.**

(5)         **A.     It, it appears that Officer**

(6)   **Mitchell is pulling him closer to him.**

(7)         Q.     Okay.

(8)                In the video that we just

(9)   watched between 11:40 and 21 seconds and

(10)  11:40 and 24 seconds, you and Officer

(11)  Mitchell moved Mr. Vann's body physically

(12)  to the left towards the store, correct?

(13)            **MR. CAMPOLIETO:  Objection.**

(14)        **A.     I believe it was from mostly**

(15)  **collective.  It was at this point where I,**

(16)  **I feel Mr. Vann start to straighten his**

(17)  **arm.**

(18)        Q.     Okay.

(19)            **MR. SHIELDS:  So I'm going to**

(20)        **move to strike the nonresponsive**

(21)        **portion of the question or move to**

(22)        **strike the answer as nonresponsive to**

(23)        **my question.**

(24)        Q.     So just listen to my question.

(25)               So at this point you and

(1)                    KESTER

(2)   Officer Mitchell had physically moved

(3)   Mr. Vann's body to the left closer to the

(4)   front of the store, correct?

(5)                 MR. CAMPOLIETO:  Objection.

(6)          A.     Well, I guess what I'm trying

(7)   to say is, it's unknown to me if it's, it's

(8)   pulling on the point -- on the part of

(9)   Officer Mitchell, if it's pulling on the

(10)  part of Mr. Vann.  I feel force directing

(11)  towards, like, the west.  I'm unknown --

(12)  it's unknown to me what the source of that

(13)  is.

(14)         Q.     Okay.

(15)                And the video shows that the

(16)  three of you moved closer to the store,

(17)  correct?

(18)         A.     Correct.

(19)         Q.     And then Mitchell placed a

(20)  handcuff on Mr. Vann's left wrist, correct?

(21)                MR. CAMPOLIETO:  Objection.

(22)         A.     I can't see that in the video

(23)  at this point.

(24)         Q.     Okay.  So I'm just going to

(25)  rewind it and we'll watch that part again.

```
(1)                    KESTER
(2)              (Whereupon, the video was
(3)         played.)
(4)          Q.    Okay.  So I just paused it at
(5)     11:40:24.
(6)              Did you see Officer Mitchell
(7)     put the handcuff on Mr. Vann's left wrist?
(8)          A.    Yes.
(9)          Q.    I'm sorry.  Did you say, "Yes"?
(10)         A.    Yes.
(11)         Q.    All right.
(12)              So I'm going to hit "Play" and
(13)     stop at 11:40:31.
(14)              (Whereupon, the video was
(15)         played.)
(16)         Q.    Between where we hit pause at
(17)     11:40:24 and where we're paused now at
(18)     11:40:31, Mr. Vann's hands never went in
(19)     front of his body, correct?
(20)         A.    His, his hands are moving
(21)     towards the front of his body, yes.
(22)         Q.    His hands never went in front
(23)     of his body, correct?
(24)              MR. CAMPOLIETO:  Objection.
(25)         A.    At, at this point, I cannot see
```

(1)                    **KESTER**

(2)    **where his right hand is.**

(3)        Q.     Okay.  So let's just rewind

(4)    that and take a look again.

(5)               (Whereupon, the video was

(6)          played.)

(7)        Q.     All right.  So I paused at

(8)    11:40:30.

(9)               At this point, Officer -- it

(10)   looks like you've got a hold of his right

(11)   arm and Officer Mitchell has a hold of his

(12)   right wrist, correct?

(13)       **A.     Correct.**

(14)       Q.     And Officer Drake is standing

(15)   in front and he doesn't look like he's

(16)   concerned about anything, right?  He

(17)   looks --

(18)               **MR. CAMPOLIETO:  Objection.**

(19)       Q.     -- relaxed?

(20)       **A.     Can you say that one more time,**

(21)   **sir.  I'm sorry.**

(22)               **MR. CAMPOLIETO:  My fault.  My**

(23)          **fault.  I'm sorry.**

(24)       Q.     Officer Drake is standing in

(25)   front of the three of you and he looks

(1)                    KESTER

(2)   relaxed, correct?

(3)            **MR. CAMPOLIETO:  Objection.**

(4)        **A.     I, I disagree with that.**

(5)        Q.     He doesn't look like he's about

(6)   to get hands on with Mr. Vann and the two

(7)   of you?

(8)            **MR. CAMPOLIETO:  Objection.**

(9)        **A.      He has both of his hands in**

(10)  **front of his body which, it's not quite an**

(11)  **interview position, but defensive tactics**

(12)  **it would be a position he would be in right**

(13)  **before he took -- he touches somebody.  I,**

(14)  **I, I have no idea what his impression is of**

(15)  **what's going on at this point.**

(16)       Q.     Okay.

(17)       **A.     I'm unable to make out his**

(18)  **facial features and I don't know what, what**

(19)  **look he has on his face, if he's concerned.**

(20)       Q.     I'm just going to rewind it and

(21)  play the portion between 11:40 and

(22)  24 seconds and 11:40 and 31 seconds again.

(23)  Okay?  So I rewound to 11:40:24 and I'm

(24)  going to hit "Play."

(25)                 (Whereupon, the video was

(1)                    KESTER

(2)        played.)

(3)        Q.    So at this point Officer

(4)  Mitchell handcuffs the left wrist and then

(5)  you two are about to attempt to handcuff

(6)  the right wrist, correct?

(7)        A.    Correct.

(8)        Q.    Okay.  So why don't you take a

(9)  look at that and then I'll ask you some

(10) questions.

(11)             (Whereupon, the video was

(12)        played.)

(13)             MR. SHIELDS:  You know what I'm

(14)        going to do is, do you see the little

(15)        timer at the bottom?  Is that in your

(16)        way?  It's in the way for my screen,

(17)        so I'm going to move it.

(18)             Was that in your way?

(19)             THE WITNESS:  A little bit,

(20)        yeah.  I appreciate it.

(21)             MR. SHIELDS:  Okay.

(22)        Q.    So let me just rewind that

(23) again then and play it over.  So I rewound

(24) to 11:40:26 and I'm going to hit "Play"

(25) from there.

(1)                    KESTER

(2)              (Whereupon, the video was

(3)        played.)

(4)        Q.    So I paused at 11:40:31 and

(5)    prior to that you see the handcuff get

(6)    applied to Mr. Vann's right wrist, correct?

(7)              **MR. CAMPOLIETO:   Objection.**

(8)        **A.    His right wrist?**

(9)        Q.    Correct.

(10)       **A.    No, sir.**

(11)       Q.    Okay.

(12)             You didn't see Officer Mitchell

(13)    just apply the handcuff to his right wrist?

(14)       **A.    No.  I did not.**

(15)       Q.    So let's rewind and take a look

(16)    at that again.

(17)             (Whereupon, the video was

(18)        played.)

(19)       Q.    Okay.  Right there, paused at

(20)    11:40 and 30 seconds.

(21)             You didn't see Officer Mitchell

(22)    apply the cuff to Mr. Vann's right wrist

(23)    right there?

(24)       **A.    Correct.  I, I, I don't see**

(25)    **that.**

(1)                    **KESTER**

(2)        Q.     Okay.  All right.

(3)               You don't see the handcuff on

(4)    Mr. Vann's right wrist as we're paused at

(5)    11:40 and 31 seconds right there?

(6)        **A.     I don't, sir.**

(7)        Q.     All right.

(8)               Now, if we go forward -- all

(9)    right.  Well, let me just ask you some

(10)   questions before we play it again.  Okay.

(11)              Mr. Vann hadn't tried to escape

(12)   at this point, correct?

(13)              **MR. CAMPOLIETO:   Objection.**

(14)       **A.     At the current point you have**

(15)   **it paused is, is when he begins to try and**

(16)   **move his arm down to his side.  So we are**

(17)   **unable to handcuff him.  I, I -- "Escape,"**

(18)   **I'm not sure what you mean, sir.  Is he**

(19)   **trying to run away from us?**

(20)       Q.     His feet had not moved,

(21)   correct?

(22)       **A.     Correct.  His feet had not**

(23)   **moved.**

(24)       Q.     He's not trying to throw you on

(25)   the ground, correct?

(1)                    KESTER

(2)        **A.     Correct.**

(3)        Q.     He's not trying to escape from

(4)   police custody, correct?

(5)              **MR. CAMPOLIETO:   Objection.**

(6)        **A.     He, he -- I don't know what his**

(7)   **intention is.   I just know that he's**

(8)   **tensing up his arm and putting it down.   I**

(9)   **can't comment if he's trying to escape or**

(10)  **not.**

(11)       Q.     Okay.

(12)              He's not flailing his arms,

(13)  correct?

(14)       **A.     His arms are not flailing,**

(15)  **that's correct.**

(16)       Q.     Okay.

(17)              And Officer Mitchell has his

(18)  right hand on David's right elbow, correct?

(19)       **A.     Yes.**

(20)       Q.     Okay.

(21)              And you have your right hand on

(22)  David's right wrist, correct?

(23)              **MR. CAMPOLIETO:   Objection.**

(24)       **A.     I can't make out exactly where**

(25)  **it is.**

(1)                    KESTER

(2)        Q.     You have your right hand on

(3)   some portion of David's body, correct?

(4)              MR. CAMPOLIETO:  Objection.

(5)        A.     Yes.

(6)        Q.     Okay.

(7)              And does that appear to be his

(8)   right wrist or his right arm?

(9)        A.     In this -- at this freeze

(10)  frame, I, I, I see just a mass of -- it's,

(11)  it's difficult for me to tell.  I can't --

(12)  I'm not trying to be difficult, I just

(13)  can't tell you what I see.

(14)       Q.     Okay.

(15)              So at this point, you and

(16)  Mitchell both have your arms or hands

(17)  touching Mr. Vann's body, correct?

(18)              MR. CAMPOLIETO:  Objection.

(19)       A.     Yes.

(20)       Q.     And Officer Drake is standing

(21)  directly in front, directly in front of

(22)  you, correct?

(23)       A.     Correct.

(24)       Q.     Okay.  All right.  I'm going to

(25)  hit "Play" and I'm going to pause it in

```
 (1)                  KESTER
 (2)    about one second at 11:40:32.  So I just
 (3)    want you to watch what happens here.  Okay?
 (4)    And then I'm going to ask you some
 (5)    questions.
 (6)                  (Whereupon, the video was
 (7)        played.)
 (8)         Q.      Okay.
 (9)                  So in between where we were
(10)    paused previously and where we're paused
(11)    now, first you push Mr. Vann's right arm up
(12)    forcing his body to bend forwards, correct?
(13)              MR. CAMPOLIETO:  Objection.
(14)         A.      Correct.
(15)         Q.      Okay.
(16)                  And Mitchell still has a hold
(17)    of Mr. Vann's right elbow at the point that
(18)    you push his arm up, correct?
(19)         A.      Can you say that one more time.
(20)    I'm sorry.
(21)         Q.      When you pushed Mr. Vann's
(22)    right arm up, Mitchell was still holding
(23)    onto his right elbow at that point,
(24)    correct?
(25)              MR. CAMPOLIETO:  Objection.
```

(1)                   **KESTER**

(2)        **A.      I don't, I don't see Officer**

(3)  **Mitchell's hands at all at this point.**

(4)        Q.      Okay.

(5)              So not where we're paused, but

(6)  before we paused when you pushed his arm up

(7)  towards his head, Mitchell was still

(8)  holding onto his right elbow, correct?

(9)              **MR. CAMPOLIETO:  Objection.**

(10)       **A.      Could you go back to that.**

(11)       Q.      Sure.

(12)             I'm just going to pause right

(13)  here.  So I'm paused where we before --

(14)       **A.      At 11 --**

(15)       Q.      -- at 11:40:31 and then I'm

(16)  going to hit "Play" and then I'm going to

(17)  try to pause it real quick so we can see

(18)  that.  Okay.

(19)             So at this point paused at

(20)  11:40:31, you see Officer Mitchell's hand

(21)  on David's elbow, right, his right elbow?

(22)       **A.      Yes.**

(23)       Q.      Okay.

(24)             And your hand appears to be

(25)  somewhere below that on his -- on David

(1)                    KESTER

(2)  Vann's right wrist or right arm?

(3)          MR. CAMPOLIETO:  Objection.

(4)      A.    Again, I don't know where it is

(5)  at this point.

(6)      Q.    Okay.  All right.  So I'm going

(7)  to hit "Play" and I'll pause it.  Okay?

(8)          (Whereupon, the video was

(9)      played.)

(10)      Q.    Okay.  So I paused a little

(11)  further forwards at 11:40:31.

(12)          At this point you're pushing

(13)  Mr. Vann's arm up and Officer Mitchell, it

(14)  looks like his arm is below your chin and

(15)  still holding onto David's elbow or arm; is

(16)  that right?

(17)      A.    Yes.  I think -- I can't tell

(18)  where my arm is though.

(19)      Q.    Okay.

(20)          Does it look like -- but you

(21)  testified earlier that you're pushing David

(22)  Vann's right arm upwards and his body is

(23)  caused to bend forwards, correct?

(24)      A.    His elbow at this point, I

(25)  think.  Again, I can't see where it is.  If

(1)                    **KESTER**

(2)   **you go forward a frame, I think I'll see**

(3)   **it.**

(4)        Q.    Okay.

(5)              Before we do that, both of

(6)   Mr. Vann's arms are still behind his back

(7)   at this point, correct?

(8)        **A.    Yes.**

(9)        Q.    Okay.

(10)             And would that be an indication

(11)   that the handcuffs are on both of his

(12)   wrists at this point?

(13)       **A.    No.**

(14)       Q.    If you had pushed his arms up

(15)   behind his back like this and his

(16)   handcuff -- the handcuffs were not secured

(17)   on both wrists, wouldn't that -- wouldn't

(18)   hit wrists separate and move forwards?

(19)       **A.    If I'm, if I'm pushing inward**

(20)   **and upward, no.  If I'm pushing, like,**

(21)   **outward, it could.**

(22)       Q.    So you asked me to hit "Play"

(23)   and pause in a frame forward.  So let's do

(24)   that.  Okay.

(25)             Now, in this freeze frame, you

(1)                   KESTER

(2)    can see the handcuff on Mr. Vann's right

(3)    wrist, correct?

(4)              **MR. CAMPOLIETO:   Objection.**

(5)       **A.    I cannot tell if it's on -- if**

(6)    **it's applied or not.**

(7)       Q.    Can you see my cursor on your

(8)    screen --

(9)       **A.    Yes.**

(10)      Q.    -- doing a little circle

(11)   (indicating)?   Yes?

(12)      **A.    Yes.**

(13)      Q.    Okay.

(14)            And you see -- can you see what

(15)   looks like a handcuff directly to the left

(16)   in the video -- and we're paused at 11:40

(17)   and 32 seconds -- directly next to what you

(18)   see in the video it looks like it's Officer

(19)   Mitchell's head (indicating)?

(20)      **A.    I see what you're pointing at.**

(21)   **I can't tell if that's a handcuff.**

(22)      Q.    Okay.

(23)            So your testimony is that as a

(24)   professional police officer you're unable

(25)   to determine whether or not that's a

(1)                    KESTER

(2)    handcuff?

(3)              MR. CAMPOLIETO:  Objection.

(4)              Go ahead.

(5)         A.    Watching a video, yes.  And

(6)    with the quality of it and the motion, I

(7)    can cannot definitively tell at this point

(8)    if that's a handcuff or not.

(9)         Q.    Okay.

(10)              And at this point, you have

(11)   your right hand above Mr. Vann's head,

(12)   correct?

(13)        A.    Correct.

(14)        Q.    All right.

(15)              And does it appear that Drake

(16)   is still standing calmly directly in the

(17)   front of the three of you, Officer

(18)   Mitchell, yourself and Mr. Vann?

(19)        A.    He's standing in front of us.

(20)   I don't want to comment on whether he's

(21)   calm or not.

(22)        Q.    Okay.

(23)        A.    I don't think I can make that

(24)   determination.

(25)        Q.    At this point, Officer Drake

KESTER

(1)

(2) had not put any of his hands on Mr. Vann or

(3) you or Mitchell, correct?

(4)      **A.      Correct.  He hasn't touched any**

(5) **of us.**

(6)      Q.      Okay.  All right.  So I'm going

(7) to hit "Play" and I'm going to pause again

(8) in another about half a second here.

(9)           So just listen to my question.

(10)      Q.      Okay.

(11)           So at this point, you grab

(12) Mr. Vann by the head around the back of his

(13) neck, correct?

(14)      **A.      I think I have the rear of his**

(15) **hoodie.**

(16)      Q.      Okay.

(17)           In the neck area, correct?

(18)      **A.      I'm sorry?**

(19)      Q.      In the area of the back of his

(20) neck, correct?

(21)      **A.      Yes.**

(22)      Q.      Okay.

(23)           And where we're at paused in

(24) the video right now, Officer Mitchell still

(25) has physical control of Mr. Vann's arms and

(1)                    KESTER

(2)  wrists behind his back, correct?

(3)           MR. CAMPOLIETO:  Objection.

(4)      A.    I, I can't tell in -- from the

(5)  video what, what he's holding and what he's

(6)  not holding.  I, I see his head and it

(7)  looks like his arm above him.

(8)      Q.    Okay.

(9)           He's still making physical

(10) contact with Mr. Vann, correct?

(11)     A.    Yes.

(12)     Q.    Okay.

(13)          And at this point Drake has not

(14) yet made physical contact with Mr. Vann or

(15) either other officer, correct?

(16)     A.    Correct.

(17)     Q.    Now, this technique that you

(18) did grabbing Mr. Vann around the back of

(19) the neck, is that a trained technique?

(20)     A.    At this point I believe I have

(21) one hand in the middle of his back, one

(22) hand at the top of his back.  That would be

(23) the precursor right before a, a three-point

(24) landing or a two-point landing.

(25)     Q.    Okay.

(1)                    KESTER

(2)            When you grabbed Mr. Vann

(3)    around the back of the neck, was that a

(4)    trained technique?

(5)        **A.      So, again, at this point, I**

(6)    **don't see my hand around his neck.  If you,**

(7)    **if you want to move forward, I, I --**

(8)        Q.      First of all, that wasn't my

(9)    question.

(10)           **MR. SHIELDS:   So I'm going to**

(11)       **move to strike as nonresponsive.**

(12)       Q.      But my question was if we

(13)    rewind -- and I'll pause it -- okay.  So I

(14)    paused at 11:40:31.  I'm going to hit

(15)    "Play" forward to 11:40:32 at the point

(16)    where we were paused before and then I'm

(17)    going to ask you some questions.  Okay?

(18)       **A.      Okay.**

(19)           **(Whereupon, the video was**

(20)       **played.)**

(21)       Q.      Okay.

(22)           Right there at 11:40:32 where

(23)    we're paused right now, you see your arm

(24)    around the back of Mr. Vann's neck,

(25)    correct?

(1)                    KESTER

(2)          MR. CAMPOLIETO:  Objection.

(3)     A.      I see me grab his opposite

(4)  shoulder.

(5)     Q.      Okay.

(6)          And that would be below his

(7)  head and behind the back of his neck.  Your

(8)  right arm is behind the back of his neck,

(9)  correct?

(10)         MR. CAMPOLIETO:  I'm sorry.  I

(11)     couldn't here you, Elliot.  What did

(12)     you say?

(13)    Q.      I said, the back of your right

(14)  arm is behind the back of Mr. Vann's neck,

(15)  correct?

(16)         MR. CAMPOLIETO:  Objection.

(17)    A.      I see my hand across his back

(18)  and -- my arm across his back and my hand

(19)  around his left shoulder or hand over his

(20)  left shoulder.

(21)    Q.      Okay.

(22)         And your left hand appears to

(23)  be down by Mr. Vann's hands and wrists,

(24)  correct?

(25)    A.      Yes.

(1)                    **KESTER**

(2)        Q.     Okay.

(3)               Where we're paused right here

(4)     at 11 hours 40 minutes and 32 seconds into

(5)     the video, is this a trained technique?

(6)        **A.     Yes.**

(7)        Q.     What is this technique called?

(8)        **A.     I would say it's, like, a**

(9)     **hooking technique.**

(10)       Q.     Okay.

(11)              So this a trained hooking

(12)    technique that you're using right now?

(13)       **A.     Half of one, yes.**

(14)       Q.     Okay.

(15)              And is this a proper

(16)    application of the hooking technique?

(17)       **A.     In a prop- -- no, in a proper**

(18)    **application, my other arm would be at his**

(19)    **shoulder.**

(20)       Q.     Okay.

(21)              So this is not the proper

(22)    application of a hooking technique,

(23)    correct?

(24)              **MR. CAMPOLIETO:   Objection.**

(25)       **A.     I'm using the wrong arm.**

[Page 83]
August 23, 2023

(1)                    KESTER

(2)        Q.    So the answer to my question

(3)  was correct, this is not the proper

(4)  application of a hooking technique?

(5)              MR. CAMPOLIETO:   Objection.

(6)        A.    Correct.

(7)        Q.    Okay.

(8)              And where we're paused right

(9)  here in the video, can you see that

(10) Mr. Vann's right wrist is indeed handcuffed

(11) and it appears to be touching your chest?

(12)             MR. CAMPOLIETO:   Objection.

(13)       A.    Again, sir, I can't see

(14) handcuffed hands in this.

(15)       Q.    Does Mr. Vann appear to be

(16) uncuffed where we're paused right at

(17) 11 hours 40 minutes and 32 seconds?

(18)       A.    Yes.  He appears to be

(19) unhandcuffed.  At this point his hand or

(20) his arm looks like it's parallel with his

(21) body not brought up into the center of his

(22) lower back.

(23)       Q.    So you can see his right arm in

(24) this video.  Can you also --

(25)       A.    Yes.

(1)                      KESTER

(2)        Q.      -- see his left arm?

(3)        A.      I cannot.

(4)        Q.      Okay.

(5)              Do you know where his -- so you

(6)   can see his left, a portion of his left arm

(7)   right in front of Officer Mitchell's head,

(8)   correct?

(9)              THE WITNESS:  Is there, is

(10)        there a way you can zoom in a little,

(11)        sir?

(12)            MR. SHIELDS:  I don't think

(13)        that we have the ability to zoom in

(14)        on the video but maybe if we play

(15)        it --

(16)            THE WITNESS:  Can I zoom in?

(17)        Can I make it larger?

(18)            MR. CAMPOLIETO:  Hold on.

(19)            MR. SHIELDS:  Maybe you can see

(20)        it a little better if I just rewind

(21)        it and play it back for you okay.

(22)            MR. CAMPOLIETO:  Hold on a

(23)        second.

(24)            MR. SHIELDS:  So I'm going to

(25)        rewind it and play it again.  Okay?

(1)                    KESTER

(2)              THE WITNESS:   Okay.

(3)    BY MR. SHIELDS:

(4)        Q.    All right.   So we're paused at

(5)    11:40:29 and then I'm going to go ahead and

(6)    play it forward and pause again at

(7)    11:40:34.

(8)              (Whereupon, the video was

(9)        played.)

(10)       Q.    Okay.

(11)       A.    I'm sorry.  Can you go back one

(12)   more time, sir.

(13)       Q.    Sure.   All right.   So we

(14)   rewound to 11:40:29 and now I'm going to go

(15)   ahead and hit "Play" again.

(16)             (Whereupon, the video was

(17)       played.)

(18)       Q.    Okay.   So I paused at 11:40:33.

(19)   Okay.

(20)             So now at this point, do you

(21)   see both of Mr. Vann's hands extended

(22)   behind his back?

(23)       A.    Yes.

(24)       Q.    And do you see Officer Mitchell

(25)   holding onto the area near his hands?

(1)                    KESTER

(2)              MR. CAMPOLIETO:  Objection.

(3)         A.    I see -- I see his right arm

(4)    near Mr. Vann's right arm.  I don't -- I

(5)    can't tell where his other arm is.

(6)         Q.   Okay.  Let me just rewind one

(7)    more time.  I have a couple more questions.

(8)    Okay.  So I paused again at 11:40:32 where

(9)    we were before.

(10)              Now, this hooking technique

(11)    that you said that you employed here, are

(12)    you permitted to use that technique against

(13)    somebody who is handcuffed and not

(14)    resisting?

(15)        A.    I believe it would be level

(16)    two.  So I, I guess it wouldn't really, it

(17)    wouldn't matter if the person is handcuffed

(18)    or not.

(19)        Q.    Okay.

(20)              So the answer is it wouldn't

(21)    matter if they're handcuffed or not?

(22)        A.    Yeah.  It would be, it would be

(23)    situationally dependent.

(24)        Q.    Okay.

(25)              Now, right before you grab

(1)                    KESTER
(2)    Mr. Vann around the shoulder or neck area,
(3)    he wasn't posing any threat of physical
(4)    harm to you, correct?
(5)         A.    No.  Well, he, he was pulling
(6)    away.  So he was, what I would say is -- I
(7)    think that would also be like a level two.
(8)         Q.    Okay.
(9)               So at that moment, what
(10)   level --
(11)        A.    He wasn't assaultive.  He
(12)   was -- you want to -- I'm sorry.  I didn't
(13)   mean to interrupt you, sir.
(14)        Q.    So at that moment, what level
(15)   of threat did David Vann pose to you?
(16)        A.    Just in my opinion, level two
(17)   at this point.
(18)        Q.    Okay.
(19)              If you had decided to not grab
(20)   him around the neck or shoulder area, what
(21)   do you think would have happened?
(22)        A.    He would have avoided --
(23)              MR. CAMPOLIETO:  Objection.
(24)        A.    He would have avoided custody.
(25)   My -- that's -- I can just tell you why I

(1)                    KESTER
(2)     grabbed him, to prevent him from avoiding
(3)     custody.
(4)          Q.     So you think you weighed
(5)     70 pounds more than him and there were two
(6)     other officers standing right there and if
(7)     you had not decided to grab him around the
(8)     back of the neck to try to throw him to the
(9)     ground, he would have been able to escape
(10)    custody.  That's your testimony?
(11)             MR. CAMPOLIETO:  Objection.
(12)         A.     So, again, sir, I, I told you I
(13)    didn't grab him behind the back of his
(14)    neck.  I have my arm across his back.  I
(15)    have my hand on his shoulder.  I'm not
(16)    saying that I believe he would have been
(17)    successful in escaping, but when you're
(18)    handcuffing someone and you feel them pull
(19)    away from you, in my training and
(20)    experience that's someone avoiding custody.
(21)    So at that point, before completing the
(22)    handcuffing, you have to regain control of
(23)    the individual.
(24)         Q.     Okay.
(25)             And we're paused again at 11:40

```
(1)                    KESTER
(2)    and 32 seconds and your testimony is still
(3)    that at this point you can't see that the
(4)    handcuff is applied to Mr. Vann's right
(5)    hand?
(6)         A.    I cannot.
(7)         Q.    Okay.  All right.  If that's
(8)    your testimony, okay.  So I'm going to go
(9)    ahead and play the video again and I'm
(10)   going to pause at 11:40 and 34 seconds.
(11)              (Whereupon, the video was
(12)       played.)
(13)        Q.    Okay.
(14)              So at that point the video
(15)   shows you drag Mr. Vann backwards and slam
(16)   his head into the metal bench, correct?
(17)              MR. CAMPOLIETO:  Objection.
(18)        A.    No.
(19)        Q.    At that point you see Mr. Vann
(20)   being guided by you towards the metal bench
(21)   and you see his head make contact with the
(22)   bike and/or the metal bench, correct?
(23)              MR. CAMPOLIETO:  Objection.
(24)        A.    So at this point my energy is
(25)   not the one directing us.  I'm being
```

(1)                    **KESTER**

(2)    **pulled.**

(3)         Q.    You're testimony is that you

(4)    are being pulled at this point?

(5)         A.    **There's force exerted towards**

(6)    **the street.  I'm hanging onto Mr. Vann and**

(7)    **that's why we're moving that way.**

(8)         Q.    Okay.

(9)               And that force being exerted

(10)   was Officer Mitchell pushing Mr. Vann from

(11)   behind, correct?

(12)              **MR. CAMPOLIETO:  Objection.**

(13)        A.    **So both when I was present**

(14)   **there and both when I'm watching it, I'm**

(15)   **not -- I don't know the source of the**

(16)   **inertia that's pushing us.  I just know**

(17)   **that's the direction we're going.**

(18)        Q.    Okay.

(19)              And you --

(20)        A.    **It's difficult for me to make**

(21)   **that determination.**

(22)        Q.    You began the movement of Mr.

(23)   Vann by putting your arm around the back of

(24)   his neck or shoulder area, correct?

(25)              **MR. CAMPOLIETO:  Objection.**

(1)                    KESTER

(2)         A.      My, my I ceased the movement

(3)   towards the west and it was after I ceased

(4)   his movement that the movement began the

(5)   other direction.

(6)         Q.      You initiated pulling Mr. Vann

(7)   towards the bench when you put your arm

(8)   around the back of his neck and shoulder

(9)   area, correct?

(10)              MR. CAMPOLIETO:  Objection.

(11)        A.      Not correct.

(12)        Q.      Okay.

(13)              So Mr. Vann used his magical

(14)  strength to push three police officers

(15)  towards the bench; is that your testimony?

(16)              MR. CAMPOLIETO:  Objection.  Do

(17)       you want him to answer that?

(18)              MR. SHIELDS:  I do.

(19)              MR. CAMPOLIETO:  Magical

(20)       strength.

(21)        A.      I can't speak to Mr. Vann's,

(22)  Mr. Vann's magical strength, sir.

(23)        Q.      Okay.

(24)        A.      I can tell you that in an ideal

(25)  situation it would have moved downwards for

(1)                    KESTER

(2)    handcuffing and ground cuffing and I recall

(3)    from, again, my own personal recollection

(4)    being pushed or pulled in that direction.

(5)         Q.    Okay.

(6)                And is it your testimony

(7)    that --

(8)                THE VIDEOGRAPHER:  Excuse me

(9)          one second, counsel.  I have a hard

(10)         time to hear the objection, the

(11)         objection from the other counsel.  He

(12)         need to be closer to the mic.

(13)                MR. CAMPOLIETO:  You can't hear

(14)         me?

(15)                THE VIDEOGRAPHER:  Now I can

(16)         hear you.

(17)                MR. CAMPOLIETO:  Okay.

(18)                THE VIDEOGRAPHER:  Thank you.

(19)                MR. CAMPOLIETO:  But my other

(20)         objections you heard but you want to

(21)         hear them more loudly?

(22)                THE VIDEOGRAPHER:  Exactly.

(23)                MR. CAMPOLIETO:  Okay.

(24)                THE VIDEOGRAPHER:  Especially

(25)         when you said few words the last

KESTER

(1)

(2)     time, it was very hard to hear you.

(3)            MR. CAMPOLIETO:  Okay.  Thank

(4)     you.

(5)            THE VIDEOGRAPHER:  No problem.

(6)            MR. SHIELDS:  All right.

(7)  BY MR. SHIELDS:

(8)         Q.     So I'm just going to rewind and

(9)  play that part again.  Give me one second.

(10) So we rewound and paused at 11 hours

(11) 40 minutes and 31 seconds.  So I'm going to

(12) hit "Play" and ask you a few more

(13) questions.

(14)            (Whereupon, the video was

(15)      played.)

(16)        Q.    So I paused at 11:40:33.

(17)        A.    Yes.

(18)        Q.    At this point, does it look

(19) like you are -- you've lost your balance at

(20) this point?

(21)        A.    Yes, it does.

(22)        Q.    Is that because you did not

(23) apply the hooking technique properly?

(24)        A.    No.  That's not, that's not

(25) what I would say is the reason for losing

(1)                    **KESTER**

(2)  **my balance.**

(3)        Q.    That could have been part of

(4)  the reason you lost your balance?

(5)              MR. SHIELDS:  Well, let me

(6)         withdraw that.

(7)              THE WITNESS:  That's not what I

(8)         said, sir.

(9)              MR. SHIELDS:  I'm going to

(10)        withdraw that question.

(11)       Q.    So at this point, do you see

(12)  Mr. Vann's right hand handcuffed?

(13)       A.    **Again, again, sir, I don't.  I**

(14)  **cannot make out what that grainy thing is.**

(15)       Q.    Okay.  Sure.  If that's your

(16)  testimony.

(17)             Now --

(18)       A.    **It is my testimony, sir.**

(19)       Q.    -- at this point you see

(20)  Officer Drake had placed his hand on

(21)  Mr. Vann's back, correct?

(22)       A.    **Correct.**

(23)       Q.    And you see Officer Mitchell

(24)  has, it looks like, a hold of Mr. Vann's

(25)  arms from behind his back, correct?

(1)                    KESTER

(2)          MR. CAMPOLIETO:   Objection.

(3)      A.     I, I cannot see what he is

(4)  grabbing or holding onto at this point --

(5)      Q.     But --

(6)      A.     -- at this freeze frame.

(7)      Q.     But Mitchell is behind him

(8)  exerting some force, it looks like?

(9)          MR. CAMPOLIETO:   Objection.

(10)     A.     From the video, sir, I, I can't

(11) tell you if he's exerting force or not.

(12)     Q.     Okay.  So we'll go ahead and

(13) hit "Play" and then I'll ask that question

(14) again.  So we're paused 11:40:33.  I'm

(15) going to hit "Play" and then I'll pause it

(16) again.

(17)          (Whereupon, the video was

(18)      played.)

(19)     Q.     So we paused at 11:40:36.

(20)          Now, my question is, was the

(21) level of force that you used as depicted on

(22) the video necessary?

(23)          MR. CAMPOLIETO:   Objection.

(24)     What force?  At what point, Elliot?

(25)          MR. SHIELDS:   Stop asking

(1)                    KESTER

(2)      questions.  He can ask for

(3)      clarification if he wants to.

(4)           MR. CAMPOLIETO:  No.  I'm

(5)      asking for clarification.  I don't

(6)      know what you're referring to.

(7)           MR. SHIELDS:  Clarification

(8)      pursuant to Judge Peterson's order.

(9)      So I'm going to ask you to stop

(10)     talking, John, and you're wasting my

(11)     time.

(12)          MR. CAMPOLIETO:  What, what,

(13)     what orders are you talking about?

(14)          MR. SHIELDS:  The February

(15)     order from Judge Peterson, and I'm

(16)     asking two minutes onto my time

(17)     because of you talking right now.

(18)          MR. CAMPOLIETO:  No, you're

(19)     not.

(20)          MR. SHIELDS:  Yes, I am, John.

(21)          MR. CAMPOLIETO:  Well, we're

(22)     not, we're not staying past 11:36 or

(23)     12:06.

(24)          MR. SHIELDS:  So go ahead and

(25)     keep talking, John.

                        KESTER

(1)

(2)      Q.     All right.

(3)            So the question, Officer

(4)  Kester, was the level of force that you

(5)  used against Mr. Vann necessary?

(6)            MR. CAMPOLIETO:  Objection.

(7)      A.     In what way do you mean, sir?

(8)  At what point?

(9)      Q.     Okay.

(10)            When you put your arm around

(11) the back of his neck and/or shoulder area

(12) and decided to employ improper hooking

(13) technique.  Was that necessary?

(14)            MR. CAMPOLIETO:  Objection.

(15)            If you -- you can go ahead and

(16)          answer if you can.

(17)      A.     So I, I used like a level two

(18) technique at that point, again, for

(19) somebody who wasn't -- for someone who is,

(20) in my opinion, at the level where they are

(21) avoiding custody.  So, yes, it would be --

(22) so was it, was it, was it necessary?

(23)      Q.     The question was that level of

(24) force that you used necessary?

(25)      A.     Yeah.  So, again, the, the

(1)                    KESTER

(2)    placing -- you continue to say I was

(3)    placing his -- my arm on his neck.  I just

(4)    want to make sure I clarify.  I didn't put

(5)    my hand on his neck or my arm cross his

(6)    neck at any point that I see there.

(7)              Again, I put my arm across his

(8)    back and I used my -- I believe my left

(9)    hand to go on the opposite side of his

(10)   shoulder.  And, yes, that was level two

(11)   and, in my opinion, necessary.

(12)       Q.    Okay.

(13)             Was it necessary to slam David

(14)   Vann's head into the metal bench and the

(15)   bike?

(16)       MR. CAMPOLIETO:   Objection.

(17)       A.    So I did not slam Mr. Vann's

(18)   head into the bench or the bike.

(19)       Q.    Okay.

(20)             Was the hooking technique that

(21)   you used necessary to mitigate any threat

(22)   posed by Mr. Vann?

(23)       A.    Yes.

(24)       Q.    Okay.

(25)             Was it necessary to achieve any

(1)                        KESTER

(2)    lawful objective?

(3)        A.     Well, you -- yes.  It was

(4)    necessary for effecting the arrest.

(5)        Q.     Okay.

(6)              Was it safe?

(7)        A.     As far as for myself or, or

(8)    Mr. Vann or in general?

(9)        Q.     Was it safe?  That's the

(10)   question.

(11)             MR. CAMPOLIETO:  Objection.

(12)       A.     I believe it was, you know, to

(13)   mitigate risk.  I don't understand what you

(14)   mean by "Safe."

(15)       Q.     Looking back on what ended up

(16)   transpiring because of your decision to

(17)   employ this hooking technique, is it your

(18)   opinion that employing the hooking

(19)   technique under these circumstances was a

(20)   safe choice?

(21)             MR. CAMPOLIETO:  Objection.

(22)       A.     The hooking technique, yes.

(23)       Q.     Okay.

(24)             Was there another safer option

(25)   available to you that would have allowed

(1)                    KESTER

(2)    you to achieve the same objective as

(3)    effectively?

(4)         A.    Not that I can think of.

(5)         Q.    Okay.

(6)              Is there another option that

(7)    posed less of a safety risk to you?

(8)         MR. CAMPOLIETO:  Objection.

(9)         A.    Not that I'm aware of.

(10)        Q.    Okay.

(11)             So the only option that you had

(12)   was to bring Mr. Vann to the ground; is

(13)   that your testimony?

(14)        A.    Yes.  It was, it was my opinion

(15)   that in the interest of safety ground

(16)   cuffing would be safer as opposed to trying

(17)   to handcuff someone who is standing and

(18)   avoiding custody.

(19)        Q.    Okay.

(20)             And that's because of the

(21)   training that you've been provided by the

(22)   Rochester Police Department?

(23)        MR. CAMPOLIETO:  Objection.

(24)        A.    Yes, sir.

(25)        Q.    Okay.

(1)                    KESTER

(2)              Given the minor nature of the

(3)    underlying incident, a trespass, did you

(4)    consider that a more appropriate and

(5)    proportional response would have been to

(6)    keep speaking with Mr. Vann and trying to

(7)    de-escalate the situation?

(8)         **A.    I think throughout our**

(9)    **interaction we were trying to de-escalate.**

(10)   **If, if we weren't, we would have taken him**

(11)   **immediately into custody.**

(12)        Q.    Okay.

(13)              Can you point to any specific

(14)   de-escalation techniques that you employed

(15)   with Mr. Vann?

(16)        **A.    Speaking with him in general**

(17)   **asking him to leave, giving him an**

(18)   **opportunity to disperse and go home.**

(19)        Q.    Okay.

(20)              Do you think that you failed to

(21)   consider any specific de-escalation options

(22)   because you were frustrated when you were

(23)   speaking with Mr. Vann?

(24)        **A.    No.  And I, I think even some**

(25)   **of our -- even through our force,**

(1)                    KESTER

(2)    de-escalation can occur even when force is,

(3)    is being applied.

(4)         Q.    Okay.

(5)               And did you ever consider that

(6)    you could have simply written him a ticket

(7)    and just let him go home?

(8)               MR. CAMPOLIETO:  Objection.

(9)         A.    In this case I don't think we

(10)   would have been able to, to write him a

(11)   ticket.

(12)        Q.    Why don't you think you would

(13)   have been able to write him a ticket in

(14)   this case?

(15)        A.    Typically, we can, we can only

(16)   write tickets in instances where we think

(17)   the conduct is not going to continue.  That

(18)   was our guidance at the time, and I can't

(19)   speak for how any of the other officers

(20)   felt, but I would say based on his

(21)   behavior, it would have been reasonable for

(22)   us to think that, that there may have been

(23)   ongoing issues at the location.

(24)        Q.    Okay.

(25)               Did you ever ask Mr. Vann about

(1)                    KESTER

(2)    whether there were any ongoing issues with

(3)    him and the store clerks at the location?

(4)         A.    No.  I didn't get the

(5)    opportunity.

(6)         Q.    Okay.

(7)               Did Mr. Vann ever tell you that

(8)    he had, in fact, left the store and started

(9)    to walk home and that the store clerk

(10)   called him to come back into the store

(11)   before the store clerk had called 911?

(12)        A.    No.  I'm not aware of any of

(13)   that.

(14)        Q.    And after Mr. Vann's head made

(15)   contact with the bench, you fell backwards

(16)   onto the ground, correct?

(17)        A.    Yes.

(18)        Q.    And you dragged Mr. Vann down

(19)   on top of you, correct?

(20)        A.    I believe my weight pulled him

(21)   down in my direction and also the direction

(22)   he was, was moving.  I, I, I wouldn't, I

(23)   wouldn't use the, the verb dragged.

(24)        Q.    Okay.

(25)               You had -- you were still

(1)                    KESTER

(2)  physically holding onto Mr. Vann's body

(3)  when you fell backwards causing him to fall

(4)  on top of you when you fell to the ground,

(5)  correct?

(6)       **A.     Yes.  I was still grabbing him.**

(7)       Q.    Okay.

(8)       **A.     I still, I still had a hold of**

(9)  **him.**

(10)      Q.    Okay.

(11)            And Mitchell also fell on top

(12) of you, correct?

(13)      **A.     Correct.**

(14)      Q.    Because Mr. -- because Mitchell

(15) was holding onto Mr. Vann's wrists and

(16) handcuffs, correct?

(17)      **A.     Correct.**

(18)            **MR. CAMPOLIETO:  Objection.**

(19)      Q.    And after you all fell onto the

(20) ground, you informed Officer Mitchell and

(21) Drake that your leg was hurt, correct?

(22)      **A.     Correct.**

(23)      Q.    And after you all fell, while

(24) you were on the ground near the corner of

(25) South Ave and Comfort Street, did you

(1)                    KESTER

(2)     observe Officer Mitchell punch Mr. Vann in

(3)     the back of the head?

(4)          A.    No.

(5)                MR. CAMPOLIETO:   Objection.

(6)          Q.    Okay.

(7)                Did you observe Officer

(8)     Mitchell pick Mr. Vann up off of the ground

(9)     and bring him towards the police car that

(10)    was parked in front of the store?

(11)         A.    No.

(12)         Q.    Okay.

(13)               Do you remember testifying at

(14)    your criminal trial that you did observe

(15)    that?

(16)         A.    (Inaudible.)

(17)         Q.    I'm sorry.  We couldn't hear

(18)    your answer.

(19)         A.    I, I don't remember what I

(20)    testified to after, after the, after I was

(21)    injured.

(22)         Q.    Okay.

(23)               So you don't remember Mr. Vann

(24)    being brought to his feet and walked away

(25)    from you towards the front of the store?

                            KESTER

(1)

(2)        **A.     I, I remember him being walked**

(3)  **away, yes.**

(4)        Q.     Okay.

(5)               So that's the question.

(6)        **A.     Sorry.**

(7)        Q.     So you --

(8)        **A.     I'm sorry.**

(9)        Q.     So you remember after you were

(10) injured Mr. Vann being brought to his feet

(11) by Officer Mitchell and brought over to the

(12) front of the store?

(13)       **A.     I, I, I don't remember what**

(14) **officer it was, but I know he was, he was**

(15) **escorted away, yes.**

(16)       Q.     Okay.

(17)              So your testimony is that it

(18) could have been either Officer Drake or

(19) Officer Mitchell?

(20)              MR. CAMPOLIETO:  Objection.

(21)       **A.     It, it, it -- or, or any other**

(22) **officers.  I'm not sure if any other**

(23) **additional ones had arrived at this point.**

(24)       Q.     Okay.

(25)       **A.     So it could have been any of**

(1)                     **KESTER**

(2)  **them.**

(3)        Q.    Okay.

(4)              And at that point, Mr. Vann was

(5)  handcuffed behind his back?

(6)              **MR. CAMPOLIETO:   Objection.**

(7)        **A.    Yes.  At that point he was.**

(8)        Q.    When he was brought over back

(9)  in front of the store?

(10)       **A.    Yes.**

(11)       Q.    Okay.  All right.

(12)             And when you testified at the

(13) criminal trial against Mr. Vann, the

(14) prosecutor didn't play the video for you

(15) and ask you questions about the video,

(16) correct.

(17)       **A.    Honestly, sir, I, I don't**

(18) **remember.**

(19)       Q.    Okay.

(20)             And you also testified at the

(21) grand jury proceedings against Mr. Vann,

(22) correct?

(23)       **A.    Yes.**

(24)       Q.    And the video was never played

(25) at the grand jury proceedings against

(1)                        KESTER

(2)    Mr. Vann, correct?

(3)                    MR. CAMPOLIETO:  Objection.

(4)        A.    I, I, I don't remember it being

(5)    played during my portion.

(6)        Q.    Okay.

(7)        A.    It could have been played,

(8)    played during the grand jury presentation,

(9)    but I'm not -- I'm unsure.

(10)       Q.    Okay.

(11)             And just going back to when you

(12)   arrived at the scene, did you make an

(13)   assessment of whether you needed to take

(14)   immediate action when you arrived at the

(15)   scene?

(16)       A.    When I, when I arrived on

(17)   scene, it was clear to me that Officer

(18)   Mitchell and Officer Drake were the context

(19)   and cover officers and my, my part was

(20)   there just out of, I felt -- I'm trying to

(21)   think of the right word.  I, I felt like

(22)   it's responsible to come there because they

(23)   were both four platoon cars.

(24)       Q.    Okay.  So I'm going to ask you

(25)   just to listen to my question.

[Page 109]
August 23, 2023

(1)                         KESTER

(2)            **MR. SHIELDS:   I'm going to move**

(3)       **to strike that answer as**

(4)       **nonresponsive.**

(5)        Q.    So my question was just, did

(6)   you make an assessment of whether you

(7)   needed to take immediate action; yes or no?

(8)        **A.    I felt that I did not -- I**

(9)   **personally did not need to take immediate**

(10)  **action, no.**

(11)       Q.    Okay.

(12)            Did you ask if there were

(13)  additional resources that could maybe help

(14)  resolve this situation?

(15)            **MR. CAMPOLIETO:   Objection.**

(16)       **A.    No.**

(17)       Q.    Okay.

(18)            Did you consider contacting,

(19)  for example, any supervisors who maybe

(20)  could come and help resolve the situation?

(21)            **MR. CAMPOLIETO:   Objection.**

(22)       **A.    No.   Not, not personally.**

(23)       Q.    Okay.

(24)            Did you consider contacting any

(25)  Crisis Intervention personnel who could

(1)                    KESTER

(2)    come and help resolve the situation?

(3)              MR. CAMPOLIETO:  Objection.

(4)         A.     I don't, I don't believe they

(5)    were working at that time.  So I don't

(6)    think it would have been an option for us

(7)    to contact them --

(8)         Q.     Okay.

(9)         A.     -- just because of the hour.

(10)        Q.     Now, if it was before, like, an

(11)   official CIT team had been implemented by

(12)   the City, prior to an official, like,

(13)   Crisis Intervention Team being implemented

(14)   by the City, were there any other, for

(15)   example, mental health resources that you

(16)   could have contacted at that time in

(17)   September 2015?

(18)             MR. CAMPOLIETO:  Objection.

(19)        A.     So I think FACIT was still in

(20)   existence, which I think is the Family in

(21)   Crisis Intervention Team, but, again,

(22)   they're, they're -- that's the agency I was

(23)   referring to.  But I think during that time

(24)   they wouldn't have been available to, to

(25)   respond just because of the hour.

(1)                    **KESTER**

(2)        Q.    Okay.

(3)              Because it was after 11:00 p.m.

(4)    they wouldn't have been working and on

(5)    duty?

(6)        **A.    I, I don't think they, I don't**

(7)    **think they work -- I think they work like**

(8)    **kind of bankers hours, I believe.  It, it's**

(9)    **been so long since I've used them.**

(10)       Q.    Okay.

(11)             So at the time, did you even

(12)   consider reaching out to FACIT or some

(13)   similar agency?

(14)             **MR. CAMPOLIETO:  Objection.**

(15)       **A.    I don't, I don't believe I**

(16)   **considered it.**

(17)       Q.    Okay.

(18)             And after the incident you

(19)   filled out a felony complaint and a Subject

(20)   Resistance Report, correct?

(21)             **MR. CAMPOLIETO:  Objection.**

(22)       **A.    Yes.  I filled out an SRR, the**

(23)   **Subject Resistance Report.  The felony**

(24)   **complaint someone typed up for me.**

(25)       Q.    Okay.

(1)                         KESTER

(2)               And you signed it?

(3)        A.     I did.

(4)        Q.     Okay.

(5)               And they got that information

(6)    in the felony complaint from speaking with

(7)    you?

(8)        A.     Speaking with me and, and all

(9)    the involved officers, yes.  I believe.

(10)       Q.     Okay.

(11)              MR. SHIELDS:  So let's put up

(12)          the felony complaint which will be

(13)          Exhibit 11 for this deposition.

(14)              (Whereupon, the aforementioned

(15)          felony complaint was marked by the

(16)          Reporter after the deposition

(17)          concluded as Plaintiff's Exhibit 11

(18)          for identification as of this date.)

(19)       Q.     So officer -- Investigator

(20)   Kester, I'm sorry, do you recognize the

(21)   document I've put on the screen as the

(22)   felony complaint from this incident?

(23)       A.     Yes.

(24)       Q.     So, if we go down to the

(25)   highlighted portion, it says that David

(1)                      KESTER

(2)    fell on top of you as a result of him

(3)    resisting arrest and quote, "Intentionally

(4)    refusing to put his hands behind his back,"

(5)    correct?

(6)          A.      Correct.

(7)          Q.      Okay.

(8)                  And in the video that we

(9)    watched, we didn't see him intentionally

(10)   refusing to put his hands behind his back,

(11)   correct?

(12)          MR. CAMPOLIETO:  Objection.

(13)          A.      No.  I would say he more

(14)   refused to have them remain behind his

(15)   back.

(16)          Q.      Okay.

(17)                  We agreed earlier when we

(18)   watched the video that when you and Officer

(19)   Mitchell approached him, he voluntarily

(20)   brought his hands behind his back, correct?

(21)          MR. CAMPOLIETO:  Objection.

(22)          A.      Yes.  Initially.

(23)          Q.      Okay.

(24)                  Then it says that he, "Twisted,

(25)   turned, pulled and trashed around in a

(1)                      KESTER

(2)   violent manner," correct?

(3)        **A.     That's correct.**

(4)        Q.     Okay.

(5)              And we didn't see him twist or

(6)   turn or pull around in a violent and

(7)   thrashing manner when we watched the video,

(8)   correct?

(9)        **A.     As, as he's moving, as he's**

(10)  **moving, that's the twisting.  That's what,**

(11)  **that's what caused our position to change.**

(12)       Q.     Okay.

(13)             And, and what we watched in the

(14)  video, that's what you would describe as

(15)  twisting, turning, pulling and thrashing in

(16)  a violent manner?

(17)       **A.     Well, that -- there was the,**

(18)  **the, the force that he exerted was, like,**

(19)  **side-to-side.  Like a shimmy, yes.**

(20)       Q.     Okay.

(21)             It was violent?

(22)       **A.     It resulted in my injury, yes.**

(23)  **So --**

(24)       Q.     Okay.

(25)             Your opinion is that it -- that

(1)                    KESTER

(2)   is what caused your injury?

(3)              **MR. CAMPOLIETO:  Note my**

(4)        **objection.**

(5)         **A.    My opinion is it, yes, directly**

(6)   **contributed to that, yes.**

(7)         Q.    Okay.  All right.

(8)              And so it goes on to say that

(9)   obviously what you just said that's the

(10)  reason that the officers, three police

(11)  officers fell on to the sidewalk, correct,

(12)  his actions?

(13)        **A.    Correct.**

(14)        Q.    Okay.

(15)              And it says that David fell on

(16)  top of you?

(17)        **A.    Yes, he did.**

(18)        Q.    Okay.

(19)              It doesn't say anything about

(20)  Mitchell also falling on top of you?

(21)        **A.    No, it doesn't.**

(22)        Q.    Okay.  All right.

(23)              And then it goes on to say what

(24)  you observed after you were hurt, correct?

(25)        **A.    I'm sorry.  Can you say that**

(1)                    **KESTER**

(2)  **one more time.**

(3)       Q.    Then the complaint goes on in

(4)  this lower highlighted section to describe

(5)  what you observed after your injury?

(6)       **A.    No.  Those aren't my**

(7)  **observations.**

(8)       Q.    Those aren't your observations?

(9)  It says, "Your complainant's pain level was

(10) an eight out of ten."

(11)      **A.    Oh.  I'm sorry.  The**

(12) **highlighted part?**

(13)      Q.    The highlighted.

(14)            "The defendant continued to

(15) resist officers lawful arrest by continuing

(16) to twist and pull away.  The defendant's

(17) actions forced the officers to bring him to

(18) the sidewalk to get him under control."

(19)      **A.    Yes.  That, that, that -- yes,**

(20) **that is.  I'm sorry.**

(21)      Q.    Those were your observations.

(22) Then it says, "While going to the ground,

(23) Officer Matthew Drake dislocated his right

(24) shoulder, his pain level was also an eight

(25) out of ten.  All officers were on duty and