# EXHIBIT H

COUNTY00457

EXHIBIT

PLF 13   3/21/24   JB

1    MONROE COUNTY GRAND JURY

2    - - - - - - - - - - - - - - - - - -X

3      THE PEOPLE OF THE STATE OF NEW YORK

4              - vs -

5            DAVID VANN

6    - - - - - - - - - - - - - - - - - -X

7

8    CHARGES:        ASSAULT IN THE SECOND DEGREE

9

10

11   PRESENTED:      APRIL 4th, 8th & 19th, 2016
                     BY: MICHAEL HARRIGAN
12                   ASSISTANT DISTRICT ATTORNEY

13

14

15   REPORTED BY:    CHAD L. SMITH
                     MARY JO MOONAN
16                   DIANA M. SMITH

17

18

19

20

21

22

23

COUNTY00458

2

1                          I N D E X

2                                               Page

3       Introduction and Law                    3 - 5

4       Officer Steven Mitchell                  6 - 16

5       Instructions                              17

6       Introduction                            18 - 19

7       Officer Matthew Drake                    20 - 31

8       Officer Jeffrey Kester                   32 - 39

9       Instruction                               40

10      Evidence & Instructions                 41 - 44

11

12

13

14

15

16

17

18

19

20

21

22

23

COUNTY00459

3

RE: D. VANN                                    INTRODUCTION & LAW

1        Proceedings held before the Monroe County Grand Jury

2        on the 4th day of April, 2016

3        by Michael Harrigan, Assistant District Attorney.

4        Reported by:  Chad L. Smith

5                        *          *          *

6            MR. HARRIGAN:      Hello, everybody.

7                              My name Michael Harrigan, last

8                 name is spelled H-a-r-r-i-g-a-n.  And today

9                 I'm presenting the case of the People of the

10                State of New York versus David, D-a-v-i-d,

11                middle name Christopher,

12                C-h-r-i-s-t-o-p-h-e-r, and last name is Vann,

13                V-a-n-n.

14                              May I have the clerk's book

15                number please?

16           THE CLERK:         Twenty-nine.

17           MR. HARRIGAN:      Thank you.

18                              Number of jurors present?

19           THE CLERK:         Twenty-two.

20           MR. HARRIGAN:      Thank you.

21                              Okay.  At least initially today

22                you're going to hear from one officer.  You

23                may hear from other officers.  I'll list all

COUNTY00460

4

RE: D. VANN                                    INTRODUCTION & LAW

1        three officers at this time, they're all from

2        the Rochester Police Department, they're names

3        are Officer Matthew Drake, Officer Jeffrey

4        Kester and Officer Steven Mitchell.

5                Just by me saying the names of

6        those witnesses and the defendant, does anyone

7        think that they know or have any familiarity

8        with any of these individuals?

9                Seeing no hands raised.

10               I'm going to be asking you to

11       consider two counts of assault in the second

12       degree, they're both under the same

13       subdivision.  One is going to be referring to

14       Officer Drake and one is going to be referring

15       to Officer Kester.  The Penal Law Section for

16       both is 120.05(3), I will read that to you at

17       this time:

18               A person is guilty of assault in

19       the second degree when with intent to prevent

20       a police officer from performing a lawful

21       duty, he or she causes physical injury to such

22       police officer.

23               Now there are some definitions

COUNTY00461

5

RE: D. VANN                                        INTRODUCTION & LAW

1        that I will give to you.

2                Intentionally:  A person acts

3        intentionally with respect to result or to

4        conduct described by a statute defining an

5        offense when his conscious objective is to

6        cause such result or engage in such conduct.

7                Knowingly:  A person acts

8        knowingly with respect to conduct to a

9        circumstance described by a statute defining

10       an offense when he is aware that his conduct

11       is of such nature or such circumstance exits.

12                As your legal adviser I'll advise

13       you that this section of assault in the second

14       degree does not require intent to cause the

15       injury.  It's the intent is to prevent a

16       police officer from performing a lawful duty.

17                Physical injury, that means

18       impairment of physical condition or

19       substantial pain.

20                Okay.  Does anyone have any

21       initial questions with regards to the law?

22         Okay.  Seeing no questions I'll go ahead and

23       call in the first witness.

COUNTY00462

6

Re: D. VANN                                          S. MITCHELL

1                    S T E V E N   M I T C H E L L,

2         called herein as a witness, first being duly sworn,

3                      testified as follows:

4    EXAMINATION BY MR. HARRIGAN:

5    Q      Sir, can you please state your name and spell your

6           name for the record?

7    A      Steven Mitchell, S-t-e-v-e-n, M-i-t-c-h-e-l-l.

8    Q      And where do you work?

9    A      For the Rochester Police Department.

10   Q      And in what capacity?

11   A      As a police officer.

12   Q      Generally what are some of your duties as a police

13          officer with the Rochester Police Department?

14   A      We respond to 911 phone calls, as well as proactive

15          police work such as traffic stops, street stops and

16          I also like do certain details for high-violent

17          areas.

18   Q      Let me ask you this, approximately how long have

19          you worked in law enforcement?

20   A      Over nine years.

21   Q      Now I'm going direct your attention to

22          September 4th of 2015, at approximately 11:28

23          p.m.

COUNTY00463

7

Re: D. VANN                                          S. MITCHELL

1              Did you respond to an address at 439 South
2         Avenue in the City of Rochester, County of Monroe,
3         state of New York?
4    A    Yes, I did.
5    Q    And why did you respond to that location?
6    A    It was for customer trouble for a male refusing to
7         leave the inside of that location.
8    Q    And what was that location?
9    A    It's a corner store, a mini-mart.
10   Q    Okay.  And did you respond with any other officers?
11   A    Yes, I did.
12   Q    And was anybody else in your car or did they
13        respond separately?
14   A    They responded separately.
15   Q    And who were those other officers?
16   A    Officer Drake and Officer Kester.
17   Q    Were you all in marked patrol vehicles?
18   A    Yes, we were.
19   Q    And were you all in department issued uniforms?
20   A    Yes, we were.
21   Q    When you arrived at that location what are some of
22        your initial observations?
23   A    The male, the defendant, was still inside of the

COUNTY00464

8

Re: D. VANN                                    S. MITCHELL

1        location.  We spoke with -- the owner of the store

2        stated that the male had been removed at one point

3        and was told not to come back and did come back.

4        The male was inside the store and we spoke with him

5        about leaving that location, said he was not

6        welcome anymore.

7    Q   Did the owner of the store ask you to remove that

8        individual?

9    A   Yes, he did.

10       MR. HARRIGAN:     Now the witness has testified

11           about some of the things that other people may

12           have said to him.  They're not offered for the

13           truth of the matter asserted.  They're merely

14           offered to show why the officers or the

15           witnesses acted in the manner that they did.

16   BY MR. HARRIGAN:

17   Q   So let me ask you, did you eventually get a name

18       for the individual that you were dealing with that

19       you were asking to leave the store?

20   A   Yes, sometime later.

21   Q   Do you recall what his name was?

22   A   It was David Vann.

23   Q   And what are some of the things that you said to

COUNTY00465

9

Re: D. VANN                                    S. MITCHELL

1        this individual to try and have him leave the

2        store?

3    A   I explained to him that it was a private business

4        and he was no longer welcome in the store.  I even

5        put it to the point of if you have a private party

6        at your house and someone asks you to leave it's

7        the same thing, the owner of the house can ask you

8        to leave.  I told him it was a private

9        establishment, the owner had the right to ask him

10       to leave and he was to leave.

11   Q   And what, if anything, did he say in response?

12   A   Initially he was very argumentative, said that it

13       was a free country, he did not have to leave the

14       store.  He was very upset about not being able to

15       buy beer.  And after several minutes of going back

16       and forth with the individual he finally started to

17       walk out the door.

18   Q   And you said he started.

19           Did he walk all the way out of the door?

20   A   He did and then turned back around.

21   Q   And when he turned back around what did he do, if

22       anything?

23   A   He was beginning to walk back towards the store,

COUNTY00466

10

Re: D. VANN                                    S. MITCHELL

1              and balled – he actually balled his fists up as he
2              turned towards the officers.  And he yelled out
3              something, I can't remember exactly what it is was.
4    Q         And what, if anything, did you or other officers do
5              at that point?
6    A         At that point we were putting him into handcuffs
7              and placing him under arrest, which we started to
8              do at that point.
9    Q         Did you get him all the way in handcuffs?
10   A         No, we did not.
11   Q         What did you do?
12   A         We told him he was under arrest.  We put one cuff
13             onto his left hand.  And his right hand he pulls
14             from behind him and pulls forward to the front of
15             his body, which was a sign of not wanting to be
16             handcuffed, resisting.
17   Q         So you said there were three officers?
18   A         Yes.
19   Q         Were you three still the only ones there?
20   A         Yes, sir.
21   Q         And were you all engaging with the defendant, Mr.
22             Vann?
23   A         Two of us were.

COUNTY00467

11

Re: D. VANN                                          S. MITCHELL

1    Q       Who were the two?

2    A       Myself and Officer Kester.

3    Q       So once the individual -- you said he brought his

4            hands forward.

5                What if anything happened at that point?

6    A       I still was holding on to his left arm and the

7            individual at that point was being brought to the

8            ground.  At that point he fell to the ground and

9            landed on Officer Kester.

10   Q       When he landed on Officer Kester what, if anything,

11           did you hear or see?

12   A       Officer Kester immediately yelled and screamed out

13           that he was in pain and kept screaming, My leg my

14           leg, which the defendant had landed on.

15   Q       And what, if anything, did you do at that point

16           then?

17   A       I tried to the pull the defendant away from Officer

18           Kester to try to give him some room, he was in

19           extreme pain.  The cuffs were finished being

20           applied to the defendant.  I was going to start a

21           search, but Officer Kester was asking to be removed

22           from the area because Officer Kester at that point

23           had really been immobilized and was laying on his

COUNTY00468

12

Re: D. VANN                                              S. MITCHELL

1           back on the sidewalk.

2       Q   Now you said that Officer Kester was in pain.

3           MR. HARRIGAN:     I'm going to ask the grand jury

4               to disregard that statement.

5   BY MR. HARRIGAN:

6       Q   But just tell me what did you hear or see with

7           regards to Officer Kester at that point?

8       A   He was laying flat on his back and he kept

9           screaming out- he was yelling out, My leg, my leg,

10          multiple times.

11      Q   Now were you able to -- you still only had the

12          individual in one handcuff?

13      A   He was cuffed at that point in time, but was not

14          searched.

15      Q   So you cuffed him with both hands?

16      A   Did I put him in both hands?

17      Q   Yes.

18      A   Yes, I did.

19      Q   And what did you do at that point then?

20      A   I was going to start a search.  I wasn't able to.

21          So we stood him up and brought him over to the

22          patrol car because he had been reaching for part of

23          his waistband.

COUNTY00469

13

Re: D. VANN                                    S. MITCHELL

1   Q     And were you able to do that, complete that search?

2   A     I was not.

3   Q     What happened.

4   A     When I brought him to the patrol vehicle he bumped

5         his chest off the patrol vehicle, I lost control of

6         his body even though he was handcuffed.  And he

7         stood right in front of me and kind of came at me.

8   Q     And were you dealing with him alone at this point

9         or with any other officers?

10  A     I was by myself.  Officer Drake saw the struggle

11        and saw the defendant pull away from me, and

12        Officer Drake came in to assist.

13  Q     And then what happened?

14  A     S -- or I apologize, excuse me for poor language.

15        The defendant was told to get on the ground,

16        refused, and we brought S to the ground.

17  Q     You said S --

18  A     I said S the entire --

19  Q     Is that Mr. Vann?

20  A     The defendant, yes.  I apologize.

21  Q     And as you were bringing Mr. Vann to the ground did

22        you make any other observations with regards to

23        Officer Drake?

COUNTY00470

14

Re: D. VANN                                    S. MITCHELL

1   A      Yes.  When we went to the ground, Officer Drake

2          yelled out, I'm out, and pulled away from the

3          defendant.

4   Q      Okay.  And then what are some of the things that

5          happened?

6   A      Officer Drake was moving away and he wasn't moving

7          one of his arms, so I knew he was injured or had

8          some sort of an injury.  I had the defendant on the

9          ground, still had not searched him, and the

10         defendant at least once, if not twice, reached for

11         the same spot that I'd seen him reach for before

12         which was his back-rear waistband area.

13  Q      Were his hands handcuffed behind his back?

14  A      His hands were handcuffed, yes.

15  Q      So then when you see him reaching for his

16         waistband, what, if anything, do you do at that

17         point?

18  A      I continue to hold him on the ground.  At one point

19         I pepper spray him, he refused to stop reaching for

20         that part of his waistband.  I hold him on the

21         ground until additional resources, additional

22         officers, get to the scene.

23  Q      So once additional officers get to the scene are

COUNTY00471

15

Re: D. VANN                                    S. MITCHELL

1          you able to take control of Mr. Vann?

2     A    We were, yes.

3     Q    And did you place him in a patrol car at this time?

4     A    Yes, we did.

5     Q    And did that end, for all intents and purposes, the

6          incident there?

7     A    Yes.

8          MR. HARRIGAN:    All right.  I don't have any

9              further questions for this witness.

10                         Any questions from the grand

11             jury?

12                         Yes, ma'am?

13         A GRAN JUROR:    When you were saying that you

14             guys were trying to put the handcuffs on the

15             defendant, you guys fell on Officer Kester's

16             leg?

17         THE WITNESS:    The defendant fell on Officer

18             Kester's leg.

19         A GRAN JUROR:    As you guys were putting

20             handcuffs on him --

21         THE WITNESS:    Yes.

22         A GRAN JUROR:    -- the defendant fell on Officer

23             Kester's leg?

COUNTY00472

16

Re: D. VANN                                    S. MITCHELL

1          THE WITNESS:       Yes, he did.

2      MR. HARRIGAN:       Any other questions?

3                          Okay.   Seeing no other questions,

4              you are free to go.

5                          Thank you, sir.

6                  (WITNESS EXCUSED.)

7                  *        *        *        *        *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

COUNTY00473

17

Re: D. VANN                                    S. MITCHELL

1          MR. HARRIGAN:      Okay.  At this point I don't have

2               any further evidence or any witnesses to

3               present to you.  I'm going to be back on a

4               different date or time.  I'm going to ask you

5               not to talk about the case or discuss the case

6               with each other.  I'm not leaving anything

7               with you.  And I will be back.

8                    Thank you, everybody.

9

10                    (CASE ADJOURNED.)

11               *       *       *       *       *

12

13

14

15

16

17

18

19

20

21

22

23

COUNTY00474

18

RE:  D. VANN                                    INTRODUCTION

1         Testimony presented before the Monroe County Grand

2         Jury on the 8th day of April, 2016, by Michael

3         Harrigan, Assistant District Attorney.

4         Reported by:  Mary Jo Moonan

5                        *      *      *

6         MR. HARRIGAN:     Hello, everybody.  My name is

7                Michael Harrigan, and I'm continuing the case

8                of clerk's book number 29, People of the State

9                of New York versus David Vann.

10                      May I ask how many jurors are

11                present?

12         THE CLERK:        Twenty-two.

13         MR. HARRIGAN:     These are the same twenty-two

14                jurors that were present during the prior

15                presentation of the case?

16         THE FOREPERSON:   Yes.

17         MR. HARRIGAN:     I think I've already mentioned

18                their names.  I'm going to do it again.

19                      Officer Matthew Drake.  Officer

20                Jeffrey Kester of the Rochester Police

21                Department.

22                      I'll ask again if anybody knows

23                those individuals?

COUNTY00475

19

RE:  D. VANN                                    INTRODUCTION

1                              I don't see any hands raised.

2                              Any other questions at this

3               point?

4                              I don't see any questions.  I'm

5               going to go ahead and continue with the case

6               at this point.

7                              Thank you.

8

9                              *      *      *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

COUNTY00476

20

RE:  D. VANN                                              M. DRAKE

1                       M A T T H E W   D R A K E,

2              called herein as a witness, first being duly sworn,

3              testified as follows:

4              EXAMINATION BY MR. HARRIGAN:

5      Q.      Sir, can you please state your name and spell your

6              name for the record?

7      A.      Officer Matthew Drake, D-r-a-k-e.

8      Q.      And you said you're an officer.  With what agency?

9      A.      I work for the City of Rochester Police Department.

10             I'm assigned to Center Division, fourth platoon.

11     Q.      Approximately how long have you worked in law

12             enforcement?

13     A.      Almost ten years.

14     Q.      And now I'm going to direct your attention to

15             September 4th, 2015 at approximately eleven twenty

16             p.m.

17                     Were you working at that time?

18     A.      I was.

19     Q.      And were you in uniform?

20     A.      Yes, I was.

21     Q.      And in a marked patrol vehicle?

22     A.      Correct.

23     Q.      Around that date and time did you arrive at a

COUNTY00477

21

RE:   D. VANN

M. DRAKE

1        location at 439 South Avenue in the city of

2        Rochester, county of Monroe, state of New York?

3    A.    I did.

4    Q.    Why did you go to that location?

5    A.    I received a call from the store owner for a male

6        trespassing the location.

7    Q.    And was there any other officers on scene when you

8        arrived?

9    A.    There were not.

10   Q.    Were there any other officers in your vehicle with

11       you?

12   A.    No, there were not.

13   Q.    When you got to the scene what are some of the

14       things you observed or some of the things you did.

15   A.    When I got to the location, I had a brief

16       conversation with the store owner.  I observed one

17       other male inside the location.  While speaking to

18       the store owner, he stated the other male in the

19       location had been in and out of the store all day

20       and he hadn't purchased anything.  He was acting

21       kind of suspicious, out of the ordinary, and the

22       store owner had asked me to make the male leave the

23       location.

COUNTY00478

22

RE:  D. VANN                                    M. DRAKE

```
 1          MR. HARRIGAN:    Now, an officer testified about
 2               some things another person told him.  You're
 3               not to consider that for the truth of the
 4               matter asserted.  You're only to consider that
 5               for why the witness did what he did based on
 6               that conversation.
 7          BY MR. HARRIGAN:
 8     Q.   So after you had this conversation with this store
 9          owner, what if anything did you do?
10     A.   At that point I had a brief conversation with the
11          male inside the store.  I asked him what his
12          business was inside the location.  I didn't really
13          get a response from him.
14               I attempted to interact with that subject for
15          approximately a minute or two.  I got no actual
16          responses from the individual to which point I
17          asked him to leave the location.
18     Q.   And that individual, did you come to end up knowing
19          that individual's name?
20     A.   I did.
21     Q.   What was his name?
22     A.   David Vann.
23     Q.   Did the individual leave the location?
```

COUNTY00479

23

RE:  D. VANN                                           M. DRAKE

1    A.    He did.  Eventually he stepped outside the store,

2          yes.

3    Q.    And what happened once he stepped out -- well, let

4          me ask you this:  Once he stepped out of the store,

5          by that time had other officers arrived?

6    A.    That's correct.

7    Q.    What other police officers?

8    A.    Officer Mitchell and Officer Kester.

9    Q.    What if anything happened when Mr. Vann exited the

10         front of that store there?

11   A.    So as Mr. Vann exited the store, he came into

12         contact with Officer Mitchell who took over the

13         primary on this investigation.  I moved to a cover

14         position.

15   Q.    When you say, a cover position, what does that

16         mean?

17   A.    When we interact with someone, we will have somebody

18         with primary interaction.  With the cover, I take a

19         couple steps back.  I kind of observe the entire

20         situation.

21   Q.    Once Officer Mitchell began his contact with

22         Mr. Vann, what were so some of your observations

23         you made from that point?

COUNTY00480

24

RE:  D. VANN                                              M. DRAKE

1    A.    From this point, everything happened pretty quickly.

2          As soon as Mr. Vann exited the store, he had a very

3          brief conversation with Officer Mitchell at which

4          point he actually turned his back to me.  He mumbled

5          something to which point Officer Mitchell moved into

6          to effect an arrest.

7    Q.    Was he able to make the arrest at that point?

8    A.    I believe he got one handcuff on.

9    Q.    Then what happened?

10   A.    At which point Mr. Vann kind of pulled away from the

11         officer.

12              Officer Kester also went in to assist with

13         the arrest, and I moved in from the cover position.

14   Q.    Were you able to take Mr. Vann into custody at that

15         point?

16   A.    Mr. Vann struggled for a brief period of time at

17         which point he was -- as we were struggling with

18         him, he kind of fell to the ground.

19   Q.    And what if anything did you do at that point then?

20   A.    At which point we all fell to the ground.

21         Immediately upon, Officer Kester stated he had broke

22         his leg.

23   Q.    Based on that, what if anything did you do once

COUNTY00481

25

RE:   D. VANN                                          M. DRAKE

1              Officer Kester said he broke his leg?  Did you do

2              anything in response to that?

3    A.        Yeah.  So at this point Mr. Vann was in both

4              handcuffs.  He had been arrested at that point by

5              Officer Mitchell.  I stayed with Officer Kester, and

6              Officer Mitchell escorted the subject back to the

7              police vehicle.

8              MR. HARRIGAN:     Again, the witness testified as

9                   to what somebody else did.  It's not offered

10                  for the truth of the matter asserted, merely

11                  to only say what he did following that.

12             BY MR. HARRIGAN:

13   Q.        At some point did you leave -- why were you staying

14             with Officer Kester?

15   A.        So at this point, Officer Kester is laying on the

16             ground.  He stated he's broken his leg.  We started

17             to attract crowds from across the street, so I

18             stayed to provide security with him until the

19             ambulance showed up.

20   Q.        And at some point did you leave where Officer

21             Kester was?

22   A.        I did.

23   Q.        Why did you do that?

COUNTY00482

26

RE:  D. VANN                                    M. DRAKE

1    A.    So as I was standing with Officer Kester, the
2          crowd's attention was kind of distracted off to what
3          would be my left.  As I looked over there, I
4          observed Officer Mitchell was again fighting with
5          the subject.
6    Q.    Was that individual, was that Mr. Vann we're
7          talking about?
8    A.    Yes.
9    Q.    What did you do then?
10   A.    At which point I left Officer Kester.  I went over
11         to assist Officer Mitchell to get the subject back
12         in control.
13   Q.    What are some of the things that happened when you
14         got in contact with Mr. Vann and Officer Mitchell?
15   A.    At this point, Mr. Vann's actively resisting arrest.
16         The two of us attempted to take him to the ground to
17         get him back into custody.  As soon as we get to the
18         ground, I felt a searing pain in my right shoulder.
19         I go to push off the ground because Officer Mitchell
20         and the subject rolled away from me, I go to push
21         off the ground to get back into the situation at
22         which point I realize my right arm is completely
23         useless.

COUNTY00483

27

RE:   D. VANN

M. DRAKE

1    Q.    Were you in any pain at that point?

2    A.    I was, yes.

3    Q.    Can you describe the pain for the grand jury?

4    A.    Kind of a lot, searing pain.

5    Q.    What if anything did you do at that point then?

6    A.    So at which point I got on the radio.  I called out

7          that we needed additional cars, we had two officers

8          injured and the third officer was still in a

9          physical confrontation with the subject.

10   Q.    Eventually did other cars, other officers arrive?

11   A.    That's correct.

12   Q.    Now, did you go to any hospital or get any care

13         regarding your shoulder?

14   A.    Yeah, I was transported to Rochester General

15         Hospital via ambulance.

16   Q.    And what's some of the care that you received at

17         Rochester General Hospital?

18   A.    So upon arriving at Rochester General, they gave me

19         some kind of a pain medication which was able to

20         kind of get the shoulder pain under control.  I

21         received x-rays there at which point they did

22         confirm I dislocated my shoulder.  I was in and out

23         of care at the hospital for about two hours.  At one

COUNTY00484

28

RE:  D. VANN                                    M. DRAKE

1              point they came in and they knocked me completely

2              out at which time they had to reset my shoulder.  I

3              was put in a sling for approximately two weeks.

4     Q.       Did you receive any -- other than having a sling,

5              did you go to any other further doctor appointments

6              or physical therapy?

7     A.       I did, yes.  I had a couple different appointments.

8              I had MRIs.  I had to speak to a shoulder surgeon

9              and about a month of follow-up doctor appointments

10             and six weeks of physical therapy.

11    Q.       Were you out of work for any period of time?

12    A.       Yes, I missed a little over a month of work.

13    Q.       At the worst, zero being the least and ten being

14             the most, what was the most pain, I guess, you

15             received or you felt -- excuse me?

16    A.       From the scene up to the time I received the

17             medication at the hospital, pain varied, anywhere

18             from eight to a ten.

19             MR. HARRIGAN:     I don't have any further

20                  questions for this witness.

21                            Any questions from the grand

22                  jurors?

23             A GRAND JUROR:    What was the defendant placed

COUNTY00485

29

RE:   D. VANN                                              M. DRAKE

1          under arrest for?

2          THE WITNESS:     The original charge would have

3              been trespassing.

4          A GRAND JUROR:   Okay.

5          MR. HARRIGAN:    Any other questions?

6          A GRAND JUROR:   You said you're the first one on

7              the scene.  Okay.  If you're the first one on

8              the scene, you're talking to the store owner,

9              then you're speaking to the defendant to see

10             what's going on with Mr. Vann.

11                 Then you said there's another

12             officer who arrived after the fact, and you

13             stepped back.  If you get there first, is it

14             proper protocol for you to step back and

15             another officer take over that because you

16             were the first one to arrive on the scene?

17         THE WITNESS:     Yeah, pretty routinely we'll

18             rotate throughout of contact and cover roles.

19         A GRAND JUROR:   Okay.  You also said that during

20             the struggle, when you guys fell to the

21             ground, you had eventually managed to get the

22             handcuffs on.  That somebody got the handcuffs

23             on.  Then you're saying you got the handcuffs

COUNTY00486

30

RE:  D. VANN                                          M. DRAKE

1              on, somewhere along the line your arm got

2              dislocated or whatever.  That was before or

3              after?

4        THE WITNESS:        Two separate incidents.

5        A GRAND JUROR:    When the handcuffs was on him or

6              before when your arm got injured in this

7              tussle?

8        THE WITNESS:        I don't understand the question.

9        A GRAND JUROR:    At what time did you hurt your

10             arm, during the first struggle before you got

11             those handcuffs on him or while he was on the

12             floor and you were trying to raise him up off

13             the floor to remove him from the area?

14       THE WITNESS:        There's two separate fights.

15             During the first fight, he was originally put

16             in handcuffs and my shoulder was not injured

17             in that, and Officer Mitchell escorted the

18             subject to the police vehicle.  I stayed with

19             Officer Kester because he had broken his leg.

20                   As Officer Mitchell is taking the

21             suspect to the vehicle, somehow there's

22             another altercation and the subject is not

23             wearing two handcuffs, so I go back there to

COUNTY00487

31

RE:  D. VANN                                          M. DRAKE

1              effect that arrest.  Again, we have to

2              re-handcuff the defendant.  During that second

3              arrest is when I dislocated my shoulder.

4         A GRAND JUROR:    Okay.

5         MR. HARRIGAN:    Any other questions?

6         A GRAND JUROR:    Was Mr. Vann handcuffed in the

7              store or outside the store?

8         THE WITNESS:    Outside on the sidewalk.

9         MR. HARRIGAN:    Any other questions?

10              Okay.  Seeing no other questions,

11         you're free to go.  Thank you, sir.

12

13                   (WITNESS EXCUSED)

14

15                   *   *   *

16

17

18

19

20

21

22

23

COUNTY00488

32

RE:  D. VANN                                                    J. KESTER

1                    J E F F R E Y    K E S T E R,

2           called herein as a witness, first being duly sworn,

3           testified as follows:

4           EXAMINATION BY MR. HARRIGAN:

5    Q.     Sir, can you please state your name and spell your

6           name for the record?

7    A.     Jeffrey Kester, K-e-s-t-e-r.

8    Q.     Where do you work, sir?

9    A.     The Rochester Police Department.

10   Q.     And in what capacity?

11   A.     Police officer.

12   Q.     And generally what are some of your duties as

13          police officer?

14   A.     I respond to calls for service, 911 calls to

15          dispatch.

16   Q.     And approximately how long have you worked in law

17          enforcement?

18   A.     Six years.

19   Q.     I'm going to direct your attention to September

20          4th, 2015 at approximately eleven twenty p.m. or a

21          little bit thereafter or around that time.

22              Did you respond to 439 South Avenue in the

23          city of Rochester, county of Monroe, state of New

COUNTY00489

33

RE:   D. VANN                                          J. KESTER

1              York?

2      A.      Yes, I did.

3      Q.      Why did you respond to that location?

4      A.      I heard over the radio that two other officers had

5              been dispatched for a customer trouble, and I drove

6              by because I was in the area.

7      Q.      And did you stop at that location then?

8      A.      Yes, I did.

9      Q.      And were you in uniform?

10     A.      Yes, I was.

11     Q.      And were you operating a marked patrol car?

12     A.      Yes, I was.

13     Q.      And were the other two officers that you mentioned,

14             were they there on the scene when you arrived?

15     A.      That's correct, they were on scene.

16     Q.      Who were those officers?

17     A.      It was Officer Mitchell and Officer Drake.

18     Q.      So once you got on scene, what are some of the

19             things you observed or some of the things you did

20             initially?

21     A.      I observed both those officers speaking to a male

22             that was standing in the doorway of the address that

23             I had been dispatched to.

COUNTY00490

34

RE:   D. VANN                                          J. KESTER

1     Q.     At some point did -- was that individual -- did

2            either of those officers try to approach that

3            individual to effectuate an arrest?

4     A.     Yes.  I observed Officer Mitchell approach the

5            person standing in the doorway and attempt to put

6            him under arrest.

7     Q.     And what did Officer -- what was Officer Mitchell

8            doing and what did you do to assist if anything?

9     A.     From where I was standing, I observed him approach

10           the suspect, take out his handcuffs and handcuff the

11           individual's left hand, and then I observed him go

12           to handcuff the individual's right hand.

13                As I observed him do this, I saw this

14           individual pull away.  At that point, I stepped in

15           to assist.

16    Q.     And to assist, what did you do?  What are some of

17           the things you did?

18    A.     My intention was to hold the individual's right arm

19           and make it easier for Officer Mitchell to complete

20           the arrest by handcuffing him.

21    Q.     Did that happen?

22    A.     Eventually, yes.

23    Q.     You were able to hold his arm to have Officer

COUNTY00491

35

RE:   D. VANN                                         J. KESTER

1              Mitchell cuff the right arm?

2     A.      I was able to grab the individual's arm, and as I

3             did so, a struggle ensued as he tried to pull away

4             from the arm that I grabbed.

5     Q.      Okay.  And so this individual -- did you come to

6             find out what this individual's name was?

7     A.      Yes, after the arrest.

8     Q.      What was his name?

9     A.      David Vann.

10    Q.      So you said this individual tried to take his arm

11            away, and there was a struggle with you?

12    A.      Correct.

13    Q.      And what if anything happened as a result of that?

14    A.      During the struggle, we ended up on the ground.  As

15            we went to the ground, the result was me breaking my

16            right leg.

17    Q.      When you went to the ground, did you feel any pain

18            in your leg?

19    A.      Yes, immediately.

20    Q.      Describe the pain for us.

21    A.      It was intense pain in my right leg around the ankle

22            area.

23    Q.      And were you able to get back up?

COUNTY00492

36

RE:  D. VANN                                    J. KESTER

1   A.   No.  I didn't know at the time, but the ligament
2        that connects the two bones was completely torn
3        during that incident.
4   Q.   So tell us some of the things you did at that point
5        once you fell to the ground and you felt this pain.
6   A.   As we did hit the ground, I did audibly hear the
7        sound of the second handcuff going on, so I knew the
8        individual was handcuffed.
9             Once Officer Mitchell stood up and asked for
10       my assistance in raising the suspect up, I informed
11       him that I couldn't get up because I had believed I
12       had just broken my leg.
13  Q.   Then what happened if anything?  What did you do?
14  A.   I basically pulled myself over to the corner of the
15       brick that was on the side of the convenience store
16       and made a radio transmission -- or attempted to
17       make radio transmission.
18  Q.   Eventually were you taken to the hospital?
19  A.   Yes.  I was transported to Highland Hospital.
20  Q.   And what's some of the treatment that you received
21       at Highland Hospital?
22  A.   I received morphine in the ambulance for the pain so
23       they could take my boots off.

COUNTY00493

37

RE:   D. VANN                                    J. KESTER

1          Upon arriving at the hospital, I received

2     x-rays and I believe I received intervenous fluids,

3     and eventually I was discharged with a referral to

4     an orthopedic surgeon and with a prescription for

5     additional pain medication.

6     Q.    And did you have any follow-up procedures or

7     appointments?

8     A.    I received surgery at the end of that month of

9     September.

10    Q.    Okay.  And do you know -- what are some of the

11    things that you have as a result of that surgery?

12    A.    As far as I recall, I'm not sure of the exact

13    number, I believe I have four screws.  I have one

14    rod and one plate, all titanium.

15    They're -- basically they anchor the bone to my

16    ankle so I can stand and I can walk without --

17    hopefully without a limp eventually, and that's like

18    permanent hardware.

19    Q.    Have you been out of work at all as a result of

20    this?

21    A.    I have yet to return as of now.  I'm expected to

22    return to a light duty status by the end of this

23    month.

COUNTY00494

38

RE:  D. VANN                                          J. KESTER

1   Q.      Now, can you describe the level of pain at its

2           worst, zero being the least and ten being the most?

3   A.      I would say it was a ten out of ten, and -- during

4           the incident, and then just post surgery, just

5           because of the nature of the injury, that was also,

6           I would say, a ten out of ten at its worst.

7   Q.      Thank you, sir.

8           MR. HARRIGAN:      I have no further questions for

9               this witness.

10                              Any questions from the grand

11              jury?

12          A GRAND JUROR:    With respect to your injury, did

13              you have any other injury with that leg

14              before -- prior to or had it been weak, would

15              it have given out?

16          THE WITNESS:      I've never broken a bone, and

17              I've never sustained an injury on duty in my

18              six years.

19          A GRAND JUROR:    What's the police -- I don't know

20              if you can answer this.  What's the protocol?

21              Does the person get like a verbal warning that

22              he's being arrested that he's supposed to --

23              or just to put the cuffs on, like he might

COUNTY00495

39

RE:   D. VANN                                           J. KESTER

1              jerk, what are you doing?  Somebody grabs me

2              and they don't tell me what they're doing --

3         MR. HARRIGAN:    I ask that -- just I guess -- if

4              there's any policies or regulations you can

5              testify to based on your training and

6              experience.  I'd ask that if you don't, then

7              just speak with us on what was done during

8              this incident.

9         THE WITNESS:    I can tell you that that's

10             specific verbiage that is used.  In this

11             incident the directive was given to place his

12             hands behind his back.  This is typically

13             what -- in my experience, I've heard used, and

14             I can say specifically just speaking of this

15             incident, that was the verbiage that was used.

16        A GRAND JUROR:    Okay.

17        MR. HARRIGAN:    Any other questions?

18                Okay.  Seeing no questions,

19             you're free to go.  Thank you, sir.

20

21                (WITNESS EXCUSED)

22

23                *   *   *

COUNTY00496

40

RE:   D. VANN                                    INSTRUCTION

1              MR. HARRIGAN: ,   Okay.  At this point, I don't

2          have any further testimony for you.  I don't

3          have any further evidence.

4                  I'm going to ask you not to

5          discuss the case amongst yourselves, and I'm

6          not going to leave anything with you, and I

7          will be back on a separate date and time.

8                  Thank you, everybody.

9

10                  (CASE ADJOURNED)

11

12                      *    *    *

13

14

15

16

17

18

19

20

21

22

23

COUNTY00497

41

RE:  D. VANN                              EVIDENCE & INSTRUCTIONS

1    Proceedings held before the Monroe County Grand Jury

2    on the 19th day of April, 2016, by Michael Harrigan,

3    Assistant District Attorney.

4    Stenographer:  Diana M. Smith

5                        *          *          *

6          MR. HARRIGAN:  Hello, everybody.  I am continuing

7              Clerk's Book Number 29.  Again, my name is

8              Michael Harrigan, and this is the case of

9              the People of the State of New York versus

10             David Christopher Vann.

11                  May I ask how many jurors are

12             present?

13         THE FOREPERSON:  Twenty-two.

14         MR. HARRIGAN:  Thank you.  And these are the same

15             twenty-two jurors present during the prior

16             presentations of the case?

17         THE FOREPERSON:  Yes.

18         MR. HARRIGAN:  Thank you.

19                  Okay.  At this time I'm going to

20             ask you to vote two counts of assault in the

21             second degree, one for Officer Drake, one

22             for Officer Kester.  They're both under

23             Penal Law section 120.05 subdivision (3).

COUNTY00498

42

RE:   D. VANN                           EVIDENCE & INSTRUCTIONS

1           I'm going to leave two exhibits

2      for your review.  They're both medical

3      records.  The first are medical records for

4      September 5th, 2015, for Matthew Drake, and

5      this is from Rochester General Hospital.  It

6      does have a certification attached to it

7      that indicates that these records are kept

8      and prepared in the regular course of

9      business, and that it was the regular course

10     of business to make them at the time of the

11     act, transaction, occurrence or event or

12     within a reasonable time thereafter.  It is

13     signed by the Manager Operations Kathleen,

14     K-a-t-h-l-e-e-n, Barry, B-a-r-r-y.

15           It is your review of this

16     document that is controlling.  I'll just

17     mention a couple of things.  It talks about

18     a reduction -- a shoulder reduction that

19     needed to be performed.  It talks about

20     level of pain is five out of ten when

21     sitting and nine out of ten when standing.

22     Described the pain as stabbing.

23           I'll also leave with you Grand

COUNTY00499

43

RE:   D. VANN                              EVIDENCE & INSTRUCTIONS

1          Jury Exhibit Number 2.  These are medical

2          records for Jeffrey Kester.  These are from

3          Highland Hospital.  Again, it's your review

4          of these documents that are controlling.

5          I'll just mention a couple of things for

6          your convenience.

7                  First off, there is a

8          certification attached to these documents

9          from Kristen, K-r-i-s-t-e-n, Dilg, D-i-l-g,

10         who is a manager in the Health Information

11         Management Department for Highland Hospital.

12         And this indicates that she is an authorized

13         custodian of these records, that they are

14         accurate versions of the documents in

15         possession, custody and control of Highland

16         Hospital, and they were made in the regular

17         course of business of the hospital, and it

18         was in the regular course of business to

19         make the entries at the time of the acts,

20         transactions, conditions, occurrences or

21         events, or within a reasonable time

22         thereafter.

23                  There are a number of things

COUNTY00500

44

RE:  D. VANN                              EVIDENCE & INSTRUCTIONS

1            that these records show, but I'll just bring

2            to your attention that they show a distal

3            fibula fracture and talks about ankle pain

4            of ten out of ten and severe nausea from the

5            patient.

6                     I'll leave these two exhibits

7            for your review and ask for your vote.

8                     Before I leave and ask for your

9            vote, are there any questions?

10      THE GRAND JURORS:  (No response.)

11      MR. HARRIGAN:  Seeing no questions, I ask for

12            your vote at this time.

13

14

15            (CASE VOTED)

16                *    *   .*

17

18

19

20

21

22

23